IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE OSTERTAG,<br><br>Defendant. | DOCKET NO. 24-CR-00084-ABJ<br>VOLUME I<br><br>(Pages 1 through 273)<br><br>Cheyenne, Wyoming<br>Thursday, January 23, 2025<br>8:36 a.m. |

# TRANSCRIPT OF MOTION HEARING PROCEEDINGS

**BEFORE THE HONORABLE ALAN B. JOHNSON**
**UNITED STATES DISTRICT JUDGE**

***MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC***
***Federal Official Court Reporter***
***2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001***
***307.433.2169 * MelanieSonntagCRR@gmail.com***

*Proceedings reported with realtime stenography;*
*transcript produced with computer-aided transcription.*

APPEARANCES:

For the Plaintiff:

PAIGE HAMMER
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
2120 Capitol Avenue, Fourth Floor
Cheyenne, WY 82001

CHRISTYNE M. MARTENS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
100 East B Street, Suite 2211
Casper, WY 82601

For the Defendant:

JORDAN DECKENBACH
FEDERAL PUBLIC DEFENDER'S OFFICE
DISTRICT OF WYOMING
104 South Wolcott Street, Suite 601
Casper, WY 82601

AMY SENIA
FEDERAL PUBLIC DEFENDER'S OFFICE
633 Seventeenth Street, Suite 1000
Denver, CO 80202

# I N D E X


| | PAGE |
|---|---|
| OPENING STATEMENT BY MR. DECKENBACH | 13 |
| **GOVERNMENT WITNESSES:** | |
| **ROBERT HAVICE** | |
| Direct Examination by Ms. Martens | 15 |
| Cross-Examination by Mr. Deckenbach | 53 |
| **MARC PHILIP RUSSELL** | |
| Direct Examination by Ms. Martens | 86 |
| Cross-Examination by Mr. Deckenbach | 125 |
| Redirect Examination by Ms. Martens | 166 |
| Recross-Examination by Mr. Deckenbach | 176 |
| Examination by the Court | 180 |
| **JOSHUA HARDEE** | |
| Direct Examination by Ms. Martens | 183 |
| Cross-Examination by Mr. Deckenbach | 197 |
| Redirect Examination by Ms. Martens | 222 |
| Recross-Examination by Mr. Deckenbach | 232 |
| Examination by the Court | 235 |
| Further Redirect Examination by Ms. Martens | 244 |
| Further Recross-Examination by Mr. Deckenbach | 249 |
| **ANDRES MARTINEZ** | |
| Direct Examination by Ms. Hammer | 254 |


## E X H I B I T S


| GOVERNMENT'S EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 1 | IPCA Training Standards | 29 | 30 |
| 2 | SWGDOG SC2 General Guidelines | 30 | 31 |
| 3 | Certification Form for California Narcotic Canine Association | 188 | 189 |

(Proceedings commenced 8:36 a.m., January 23, 2025, within the presence of the defendant on bond. Ms. Senia was not present.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

This morning we are considering a motion to suppress evidence arising from the stop of -- traffic stop -- of the defendant, George Ostertag, who is present in court today, and the subsequent discovery of a pistol in his vehicle, resulting in the charges of -- that are pending of felon in possession of a firearm.

The -- this matter has kind of grown to a challenge of the dog in this matter, and -- with a 38 percent fail rate -- as well as the methods of training of that dog and maintenance of the dog as well as the handler's conduct in this matter.

The . . . just considering the volume -- we were still receiving things last night -- or last evening -- connected with this matter, so I think counsel are going to be very, very careful to make sure in your presentations that we clearly identify what you are presenting and -- and what the Court needs to see because I'm not sure at all that we've seen everything or -- that came in yesterday at this point -- they were downloading it when I left last evening -- in that it took a substantial period of time.

Pursuant to a previous meeting we've had, I note that -- that the parties have provided an advisement that can be given to the witnesses -- are all the witnesses present that will be testifying in this matter?

MS. HAMMER: Good morning, Your Honor.

We have Rob Havice on Zoom, and then our other four witnesses will be here in person. But they are all law enforcement.

THE COURT: All right.

MR. DECKENBACH: And, Your Honor, the defense lay witnesses are either already in Cheyenne or en route this morning. We don't anticipate their testimony would start until maybe end of today. Most likely, the bulk of them will be tomorrow.

THE COURT: Well -- well, that probably answers my question, then, as to whether or not I can just give advice once in this matter.

I would note that Attorney Joanne Zook is on standby today. Her telephone number is area code (307) 640-0144.

MR. DECKENBACH: Your Honor, could you repeat her name one more time for me?

THE COURT: Area code (307) 640-0144.

And you might take it upon yourself as -- as -- if there is a concern with regard to particular witnesses -- to give that number so that they can call even before any

advisement that I might give in this matter.

And you might acquaint her, Ms. Zook, with the issues in this matter. I think she was just informed either today or late yesterday, in that John Conder was in Gillette watching his daughter perform in basketball and not available but is certainly available now.

I assume the Government is prepared to assume its burden of proof in this matter.

MS. HAMMER: Actually, Your Honor, I think that is one of the housekeeping matters that we were hoping to address with the Court prior to beginning, if that's okay. I'll start with a couple more minor concerns.

First, Mr. Honor -- or Your Honor -- is that Mr. Havice, who's currently on Zoom, he has a flight -- he's on the West Coast, on Pacific time.

He has a flight leaving to California later this morning. He's indicated that he needs to leave his house by 11:00 a.m. Mountain Time. And so it's our hope that we can get through his testimony well before then.

(Discussion held at counsel table.)

MS. HAMMER: So our hope is that we can get through his testimony in time; however, with the Court's permission, if we cannot, he has indicated that he is available in the afternoon today or tomorrow to complete his testimony.

THE COURT: Once -- once he can get off the airplane.

MS. HAMMER: As well, Your Honor, we have a witness, Marc Russell with highway patrol, who currently has both laryngitis and bronchitis, who's here today.

We have tested the mic. We believe that he will be able to make an appropriate record, but he is asking permission of the Court to bring in a Thermos with a lid that contains a hot beverage to, hopefully, help his throat and vocal cords to assist in his testimony.

THE COURT: Permission is granted.

MS. HAMMER: Thank you, Your Honor.

Regarding the burden, I think that is something I want to discuss, which is, per *Clarkson*, which is a case that we've noted in our pleadings, the burden is actually on the defense to prove that there are reliability issues with the dog in place before the Government has to present evidence to combat that once they've met that threshold.

However, for logistical reasons and so that all parties could be prepared with their witnesses at appropriate times, the Government agreed to go first. However, I would note that our position is it is the defense's burden first.

Finally, Your Honor, the Court noted there were videos that came in late last night. We didn't get those until 10:00 last night, when Mr. Deckenbach forwarded those to us.

Our request is that those videos be excluded from the

hearing, given that, when we were provided them, it was the bulk videos without any time stamps or any kind of -- anything to help us be prepared for today. Mr. Deckenbach provided us a hard drive this morning with the clips for -- more narrowed down.

Our concern is twofold. One is just a fairness argument that, previous to today -- the motion to suppress was filed in November. We filed our response a couple weeks ago.

After our response was filed, Mr. Deckenbach reached out with four more videos, early last week, to address some of our concerns, which were specifically that, in our response to the motion to suppress, we noted that, while in the defense's picked sample size where they're claiming that K-9 Becky is 38 percent unreliable, we flipped that and said, "Well, if you flip that percentage, she's 62 percent reliable," which, as a matter of law under *Ludwig* and other cases in the Tenth Circuit, makes her reliable as a matter of law. And so we argued that argument isn't persuasive.

In response, Mr. Deckenbach provided us with four videos from other stops with K-9 Becky and Trooper Martinez, indicating a new argument that there's cuing. We don't object to those four videos, as we had sufficient time to both review them and he gave us a more limited scope of what in that video was actually important to him for this hearing.

Given that we don't have that in this case with these

now new videos that came in so late last night, we haven't had the opportunity to adequately prepare.

Our recommendation to the Court is twofold. One, we would ask that those videos be excluded, given that, when we look at *Harris*, field performance is one factor that's the least weighted in the Court's consideration.

And, two, if the Court -- we're here for two days. I think the Court's going to hear plenty of evidence. If, at the end of the two days, the Court feels that those additional videos would be helpful, our request would be to then set another setting after to give us time to prepare and address whatever concerns Mr. Deckenbach has that he believes are shown in those videos.

THE COURT: Yeah. As I understand it, one of the problems has been securing those from your witnesses, essentially from the highway department.

MS. HAMMER: I think Mr. Deckenbach has more information on -- I guess -- the timing and how that happened, but I don't think that there was any ill will or bad intent by highway patrol.

MR. DECKENBACH: Good morning, Your Honor.

Clearly, no objection to Mr. Havice's testimony being broken up if need be and agree with your ruling on the Thermos.

In regard to the videos, the Government did file

their response in this case, identifying that they were going to propose that the rest of the deployments where narcotics was found were reliably executed and meet the standard for probable cause -- or for reliability leading to probable cause.

We immediately, the next business day after that filing, provided them four videos that we independently were able to get through defense investigation. We also informed them that we had provided them then, at that point, to our expert, who had relied on them in observations that she's going to share with this Court about what was happening in those videos.

We also -- unable to get the rest of the deployments that are reflected in the log, we petitioned this Court for a subpoena, ex parte -- actually, it wasn't even just ex parte, just a subpoena since the filings were out. The Government said they didn't actually have the videos at that time.

The Court granted our subpoena.

The subpoena was immediately served on the Wyoming Highway Patrol. I believe the woman that normally handles records for the Wyoming Highway Patrol is no longer there, so the subpoena kind of sat on a shelf.

Yesterday, through the defense's constant prompting of their department, they finally pushed the request to Officer Martinez, who -- or Trooper Martinez, excuse me --

90 minutes between -- before close of the business, compiled them quickly for us and published them. And so Mr. -- the clerk, Mr. Fisher here, and I worked to download them independently. I sent the links to the downloads to the Government.

This morning I provided them what I will also provide this Court, is an exhaustive list of all the video exhibits that we've had for various amounts of time. Some were provided in discovery by the Government with their response, some were provided to them through defense investigation, and then the actual videos disclosed last night by the Government's witness in this case.

The -- the videos that are relevant have been knocked down. I can also share them -- with them the relevant time stamps. Each video -- or each stop -- there was five of them that was disclosed last night -- or actually six -- and they involve 90-second deployments, very brief.

And we're actually making a -- a collective exhibit. We'll submit all of the videos in entirety, but we'll also present to the Court short, succinct, time/date-stamped as well as exhibit-stamped clips which both the -- will aid the expert, will aid the Court, will even aid Trooper Martinez in discussing what was happening, his observations, his methods, his means.

And I would tell the Court that the videos that were

disclosed last night are the most relevant and probative to the issue that's before this Court. There are -- both to our reliability claim as well as to the claims about trespass and what is learned behavior and what is instinctual behavior and what is reinforced behavior.

And so I ask that the Court deny the Government's request for a -- keeping these videos out. I will send them the relevant time stamps. I've been informed Trooper Martinez is not testifying until the end of today. The lunch hour is plenty of time to look at these 90-second clips from six different stops.

And, again, Trooper Martinez not only is the one that provided them -- these videos -- to us; he's familiar with them because he was there. So I'm not sure what prejudice the Government has in reviewing something that he's already personally experienced, personally had access to the videos -- in fact, was the one who produced them to us. And I believe that giving them the lunch hour to kind of go through what's been provided and the time stamps I give them should better inform what -- them that there is no prejudice and that the videos do not need to be kept from you, Your Honor. Because, like I said, these are the most consequential and relevant and probative videos that are going to be put into the record.

THE COURT: I suppose we could set aside this hearing time and let you look at them, but you've got two attorneys.

I think there's plenty of time for one attorney to look. I'll overrule your request.

MS. HAMMER: Your Honor, at this point, then, is the Court ready for us to begin with witnesses?

THE COURT: Please.

MS. HAMMER: Okay.

THE COURT: I'd be happy to hear any opening statements the parties wish to present.

MS. HAMMER: I think, Your Honor, we would waive opening statements and would rely on kind of a closing argument at the end.

THE COURT: Very well.

MR. DECKENBACH: Just briefly, Your Honor, I realize -- and I'll give a very short opening statement.

The Government brings up that it's the defense's burden and then that would shift the burden back to them.

We have agreed to the logistics of them going first, but I believe, also, in the filings that we presented to this Court, we've proffered enough evidence to meet our burden to raise a legitimate question, both about the certification, the training, the maintenance that this Wyoming Highway Patrol trooper was involved in and the insufficiencies to exclude the cognitive bias that might come through it and that that -- the proof would be in the pudding at the end of the day, Your Honor, in how this dog has been deployed and used by this

trooper and the -- the expert testimony the defense will offer at the end of the day, demonstrating that this dog is not, in fact, alerting to any odor but has been, unfortunately, responding to errors in how it's being handled.

THE COURT: Very well.

MR. DECKENBACH: Oh, and one more matter. I'm so sorry. I know the Government's about to start.

Because Trooper Martinez's testimony is kind of central -- I know we're not at trial, we don't have a jury, he's not part of the prosecution team -- I would ask that he be sequestered up until he has already offered his testimony.

Seeing that we will be cross-examining and questioning people who both certified him, trained him, sup- -- and are responsible for him, I would prefer to ask the Court that he be sequestered during their testimony so each individual's testimony will not be affected by the other's.

MS. HAMMER: Your Honor, our request is that he be allowed to stay, as often in trial we're allowed to have one law enforcement individual with us at the table throughout trial, and we would ask that that -- the same apply to Trooper Martinez.

THE COURT: He's a percipient witness in this matter. I'll grant the motion to sequester him. There are other officers, I suppose, who could be called in.

Could you -- somebody tell him where to go?

MS. HAMMER: Your Honor, given that -- the Court's ruling on the videos that came in last night, I will be leaving -- if that's okay with the Court -- to view these while Ms. Martens has the first three witnesses.

And I'll make sure that Mr. -- or Trooper Martinez has a place to be.

THE COURT: Perfect.

(Ms. Hammer left the proceedings.)

MS. MARTENS: All right. So with the Court's permission, I would like to call Mr. Rob Havice.

THE COURT: Very well.

Would the courtroom deputy please administer the oath to the witness.

THE COURTROOM DEPUTY: Mr. Havice, please raise your right hand.

(Witness sworn.)

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: My name is Robert Havice, H-a-v, like "Victor," -i-c-e.

**ROBERT HAVICE, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. Mr. Havice, where are you today?
A. I am in Medford, Oregon, at my residence.

Q. Appearing with us by Zoom?
A. That is correct.
Q. And I want to talk to you a little bit about what it is that you do and your background, training, and experience.
So what sorts of things keep you busy these days?
A. I am a -- retired law enforcement and currently own my own K-9 training business called Rogue K-9, R-o-g-u-e.
Q. Are you engaged in any other professional organizations?
A. I'm -- well, I'm involved in the International Police Canine Association, the Oregon Police Canine Association.
Q. And as far as the International Police Canine Association, do you hold any special role?
A. I'm the current board president for the executive board and trainers board.
Q. So let's talk some about how it is you got where you are professionally.
When did you start in law enforcement?
A. I started in 1991 as a reserve police officer for the City of Talent Police Department.
I then was hired in 1992 by the Medford, Oregon, Police Department, where I spent until 2023, when I retired July 1st of 2023. During that time I -- I spent most of my time as a K-9 handler. I spent 25 years as a K-9 handler for the City of Medford Police Department.
Q. And, as a K-9 handler, what sorts of things did you do?

A. Most of the time I was assigned as a -- a K-9 handler I worked in a -- a HIDTA drug task force. The "HIDTA" is an acronym for high-intensity drug trafficking areas. And I worked on an interagency team investigating narcotic cases and deploying my K-9.

A lot of the stuff that I did with my K-9 -- I -- I worked the last about six years handling two different K-9s at the same time because we are a -- a state that has legalized marijuana. So one of my K-9s would detect marijuana; the other one would not.

So I spent a lot of time with the one that did detect marijuana working parcel interdiction and import/export of marijuana and other drugs.

Q. Did you regularly train with your K-9s?

A. I did.

Q. Did you help other K-9 handler pairs train?

A. I did.

Q. How so?

A. We would have regional training in my area here in southern Oregon with other K-9 handlers on a regular basis where we would train together, as well as for the IPCA -- we have regional training days -- and the Oregon Police Canine Association.

They have two conferences a year for the OPCA and three days for each conference. And, generally, one day is

classroom training and the other two days are field training.

During that time I would host a training location where teams would rotate through the station that I had set up.

Q. When did you become involved with OPCA?

A. I became involved in -- when I got my first K-9, which was 1998, and that was a patrol dog. "Patrol dogs" meaning they -- they hunt for people and/or articles.

Q. And with OPCA have you held any role other than a member?

A. I was the detection chairman for approximately 13 years.

Q. Do you administer any tests or have anything to do with the standards for OPCA?

A. Yes. Part of being a -- a trainer with OPCA is I was -- had the ability to administer the detection standards for OPCA.

Q. What about the IPCA, the International Police Canine Association? When did you become involved with them?

A. I became a member in approximately 2000.

Q. In what capacity?

A. At that time I was -- I was a member.

And over the years, after attending their conferences, going to trainings and such, I became a board member. And then was asked to be -- be the president for the board.

Q. What kinds of things do you do as a board member?

A. As a board member you're dealing with the standards, the training days, organizing those training days, executing them.
We have a conference once a year, so I'm involved with the -- helping to set up the people who are going to speak at that conference, making sure the bills are paid, making sure that there's money in the bank account. We're a 501(c)(3), so we're a nonprofit organization, so we don't run with a lot of money in the account. It's not a -- it's not a for-profit business.
Q. When, about, did you become a board member?
A. I became a board member in approximately -- let me think here.
Probably about 10 years ago, I'm guessing.
Q. As a board member you mentioned that you deal with standards. What did you mean by that?
A. The standards are the minimum standards that an association will set up that the dog team -- meaning the dog and the handler -- need to meet to be certified by that organization.
Q. So setting the standards themselves?
A. Yes. It's a -- it's a culmination -- the majority of the stuff was set prior to my coming in as a board member or the president. Some things get refined over time, which are dictated by case law decisions or changes in drugs that are added or eliminated from the actual list that you're going to

be certified on.

Q. And when did you become the president?

A. I've been the president since 2021.

Q. We've been talking about the IPCA.

And can you tell me what other names that organization has gone by?

A. It was initially started as the California Narcotic Canine Association or CNCA.

Q. Why the name change?

A. The name change was -- when I came in, it didn't really reflect what we represented.

So when the -- when the -- when CNCA was first founded, it only dealt with narcotics. Over the years it's evolved into explosive dogs, electronic dogs, patrol dogs, gun dogs, so it offers certifications from -- on multiple different disciplines.

It also doesn't reflect our membership. Our membership -- we have members literally all over the world now. So that was the main reason for changing it.

What we would run into is -- is an officer -- trooper, deputy, whatever -- would try to come to our conferences, say an explosive dog or patrol dog handler, and their command staff would say, "Well, why are you going to a drug conference? That isn't what you are."

And so it -- it -- it needed to reflect, basically,

what we had evolved into.
Q. And when did that name change occur?
A. It took effect January of 2024, just a year ago.
Q. Now, you mentioned also that you are running your own K-9 handler business.
When did you start that business?
A. I -- I started it in August of 2022, the year before I retired, basically just getting my business licenses together, my DEA license, which I knew was going to take some time, so that I could be in possession of narcotics that I use for training the K-9s.
So the actual training part of the business and stuff really didn't take off until I retired the next year, in 2023.
Q. And what kinds of services does that business provide, Rogue K-9?
A. Rogue K-9 -- I do civilian training with the basic -- I have a few clients that we do just like basic obedience and behavioral issues that they have around the house and helping them with that.
Primarily what I do is I -- I will supply brand-new, green-trained police dogs to agencies, whether it be corrections or law enforcement.
Q. Did you mention that you had any standing contracts with state agencies?
A. I do have a current contract with the State of Oregon.

About a year ago they reached out to me and wanted to start up -- they had had a K-9 group within their prisons, but it had been cut, basically because of funding, about 13 years ago. And the governor in Oregon was wanting to start that back up due to overdoses within their institutions.

So I helped them with new policies and did -- did consulting as well as built a pilot program with two dogs in two different institutions at this time within the state. And the goal for them is to build into having a K-9 within each one of their institutions across the state.

Q. So even though you're a retired law enforcement officer and K-9 handler, do all of these activities keep you current in K-9 detection?

A. They do. I -- I still attend K-9 conferences, and I'm in and around K-9 handlers at least on a weekly basis.

Q. And as far as detection dogs go, do you deal only in narcotic-detection dogs or any other kinds of detection dogs?

A. The majority of things I do are narcotic-detection dogs. I have worked with, you know, some electronics, some explosive dogs, some firearm dogs.

But as far as what I supply, what I train on a regular basis is primarily drug-detection dogs.

Q. And are there differences between those detection subspecialties?

A. The primary -- primarily the biggest difference is just

what they detect, what they're -- they're trained and imprinted to detect.

Q. And then going back to Rogue K-9, have you ever provided service to Mark Rispoli or Makor K-9?

A. On one occasion last year I was contacted by Mr. Rispoli and requested to do a 10-day training for a dog that he had to replace.

I wasn't involved in the actual imprinting or training of that dog. The -- the K-9 team was in my area in southern Oregon. He was busy and needed to get the dog replaced so that the agency could get back up and running, and so he contracted with me to do that 10-day course for him.

And then it was done as a -- a 1099, where it was just temporary work.

Q. Let's talk a little bit about Mr. Ripsoli [sic] and Makor K-9.

How did you come to know him?

A. I first got to know Mr. Rispoli when I joined the California Narcotic Canine Association, met him at the conferences that they would host in Burbank, California, at the time.

And then he was the person that trained my very first dog. It was -- the first -- first K-9 I had in detection was in 2000. It was purchased from Far Fetched K9s, which she -- the person that -- Mary Ann Sampson, the person that was my

trainer at that time, she had procured that dog through Mr. Rispoli.
Q. So you've known him professionally, then, since that time?
A. Yes.
Q. And what about the -- what do you know about Makor K-9?
A. Makor K-9 is a -- a company that my agency, the City of Medford Police Department, has purchased several dogs from, both for myself and for other detection handlers. And they have a -- a long-standing relationship with that company. So I've been around his business practices, basically, since 2000, observing several different deals.
There are also several other agencies within the state of Oregon that have purchased K-9s from Mr. Rispoli, so I've been around those handlers, obviously, that have taken standards. I've seen them at both the OPCA and IPCA.
So I've spent a lot of time around his product, if you will, the dogs that he has trained.
Q. And just to be clear, Mr. Ripsoli's the owner of Makor K-9?
A. He is. He is the founder and owner.
Q. Have you testified before as a K-9 handler?
A. I have.
Q. What about as an expert witness or something outside of being a -- a law enforcement officer on the case you're working on?

A. I have -- I have not.
Q. So going back to Makor K-9 and Rogue K-9, I want to talk to you a little bit about how a private business works alongside of IPCA -- IPCA.
So what is Mr. Ripsoli's role with IPCA, if any?
A. Mr. Rispoli is a founding member of the California Narcotic Canine Association, which evolved into IPCA, meaning that he was one of a group of individuals that came up with the idea, formed the -- the original bylaws and such. He didn't do it independently. There -- there were a group of folks that were involved with that.
Since that time he has maintained membership with the association that entire time and is a board member -- a current board member with the IPCA.
Q. How many board members are there in total?
A. 13.
Q. And you said he founded it with a group of other people.
Do you know how many people were the founding members?
A. As I recall -- I have the original list here, if you give me just a second to recall the original amount.
There were nine original founding members.
Q. Do you know what year the IPCA was founded?
A. As I recall, it was 1991.
Q. What was the purpose of the organization? And I guess

maybe not at its founding, but what is the current purpose of the organization?
A. The purpose is to provide training to K-9 teams and to provide the opportunity to take basic standard certifications.
Q. Do you provide --
A. Part of the --
Q. -- resources?
A. Well, the resources we provide would be we hold training events, training days, and have large groups of folks that -- that show up from the numerous disciplines.
And usually during a training day we'll also allow them the opportunity to take certifications.
Q. What does it take to become a member?
A. A member is a law enforcement officer. They -- they pay a fee, a yearly fee, to be -- to be a member.
And then there are some civilians that are allowed to be a member or an associate member. It takes a little bit more of a process to go through to be vetted for that. So that would be like a -- an organization or a -- a company that is in a -- a civilian, like a security business that has contracts of searching like ports of entry and -- and such.
Q. As a board member are you or any board member paid for your activities?
A. No, we are not.
Q. What about folks who offer certification tests? Are they

paid?
A. No. It's strictly a volunteer organization. Some of them, maybe their agency may be paying them for their time. But as far as from the IPCA, there are no paid individuals.
I have one person that gets a stipend, and that is our secretary that does all of our taxes and such -- such like that. But that individual does not -- does not -- isn't allowed and is not trained to do certifications.
Q. So I want to talk some more about the standards for IPCA.
What do you know about those standards, just as a general matter?
A. The -- it's a single-blind test involving narcotics that the K-9 team is trained to detect.
Q. All right.
A. That's based off of --
Q. You got ahead a little bit, so I'm going to slow you down.
But how did the association adopt its standards? Start there.
A. Those were based off of guidelines that was put together by a group that -- the acronym is SWGDOG. It stands for Scientific Working Group on Dog and Orthogonal Detector Guidelines.
Q. How did ICPA [sic] come to adopt those guidelines?
A. They -- those guidelines come from a -- a group of scientists that put together the best practices that they

believed would be for K-9 detector dogs.

One of the persons that headed up that group is a scientist by the name of Dr. Ken Furton. Dr. Ken Furton isn't a founding member but has been involved with CNCA and now IPCA since shortly after its inception.

Q. Does he continue to be involved in the organization?

A. He does. He -- he still instructs for us and will be instructing next week at our -- our yearly conference.

Q. Will you be recognizing him at the conference?

A. We will, all of the founding members. And then there's another group, on and above the founding members, of approximately another 8 to 10 people that were like Dr. Furton that were very key members, very key -- they -- they had very key roles in the success of CNCA over the years, and they will also be recognized at the conference.

Q. So in establishing your standards, is it fair to say you consulted and worked with Dr. Furton?

A. That's accurate.

Q. And that's based on the SWGDOG standards?

A. It is.

Q. All right. So now let's talk about what those standards actually require.

Are you familiar with the standards put out by the organization, their individual requirements?

A. I am.

Q. All right. So I would like to show you those standards.

And I think it's at this time that I need to ask the clerk of court to share my screen with you or make it so I can share my screen.

All right. I am showing you what I have labeled as Government's Exhibit 1.

And can you see the tab at the top that says "Government's Exhibit 1, IPCA STDs"?

A. I do.

Q. Perfect.

Do you recognize that document?

A. I do.

Q. How so?

A. Those are the International Police Canine Association narcotics certification standards.

Q. There seems to be a little lag with my scrolling. I'm sorry. It's making it a little difficult, but I've got it now.

All right. So where do you publish your standards?

A. The -- the standards are -- we have them on our website. I'm not sure if those are in the training area or if they're also available to the public, but they are on our -- on our website.

Q. And I'm just going to scroll through this document.

Can you tell me if that looks like the most recent

version of those standards to you?
A. It does.
MS. MARTENS: At this time, Your Honor, I would ask that Government's Exhibit No. 1 be received.
MR. DECKENBACH: No objection, Your Honor.
THE COURT: Excuse me for a second.
They are received.
(Government's Exhibit 1 received into evidence.)
MS. MARTENS: Thank you, Your Honor.
BY MS. MARTENS:
Q. All right. I'm going to show you what I've marked as Government's Exhibit No. 2.
Do you recognize that document?
A. I do.
Q. How so?
A. They are the SWGDOG SC2 General Guidelines, part of which are mostly what we base our certification standards off of.
Q. And I'm going to scroll through that document just a little bit. It's got six pages.
Does that look like the version of those standards you've been working off of?
A. It does.
MS. MARTENS: At this time, Your Honor, I would move to admit Government's Exhibit No. 2.
MR. DECKENBACH: No objection, Your Honor.

THE COURT: Received.

(Government's Exhibit 2 received into evidence.)

BY MS. MARTENS:

Q. All right. So I'd like to talk a little bit about the SWGDOG standards and the IPCA standards and how they relate to each other.

So, starting with the IPCA standards, can you just sort of talk us through what those standards require?

A. What they require is -- is the person being tested will fill out the -- if you will -- a checklist form that we -- we supply them with. And it basically will have their name, agency, K-9 name, passive or aggressive alert that will explain their alert to us, and then they tell us what their dog is trained to detect.

We know ahead of time what we are testing for on that date, the drugs they are, like -- we have optional odors. Some of those are, say, fentanyl and marijuana. Marijuana's become legalized in a lot of the states, so it's not a standard odor. Those are the -- will be the odors that will be into the test area.

The areas that they're tested on are rooms and vehicles. There's going to be four rooms. In those rooms -- they have to be rooms that are -- like, if you will -- real life. There's going to be items in there.

Generally, we'll use, say, a business that is not

open at the time where there's items in there, where there's human odor. It looks like an area they're going to be searching. It could -- could even be a residence. But it's not going to be an empty room. It's going to be full of furniture and items.

They -- there is going to be zero to two aids in the rooms --

Q. What do you --

A. -- with at least one --

Q. What do you mean by an "aid"?

A. An aid would be one of the drug items, drug odors.

So an aid with our test is going to be at least 20 grams of substance while -- we'll use methamphetamine as an example. So an aid would be 20 grams or more of methamphetamine.

That aid, if that is one of the odors being tested for by this K-9 team, would be -- could possibly be in that room. When I say "possibly," each room has zero to two aids in the room.

So -- and one of those four rooms will be blank, meaning there will be no odor put in that room by the certifying official that's setting the test.

Q. Why has --

A. These are . . . we have to be able to show that a K-9 team can go in and search an area and the -- the -- an unknown

area. They don't know if it's blank or not. They are not told ahead of time.

And they have to be able to show that they can go in and search that area and not have a false positive, meaning giving -- giving an alert where there's no odor that we have placed.

Q. All right. I sort of talked over you with the Zoom hearing.

MS. MARTENS: I apologize specifically to our court reporter.

BY MS. MARTENS:

Q. So the question that you just answered there was why have a blank room; right?

A. That is correct.

Q. All right. What else does the test require?

A. The test will require them to search three vehicles. Again, the three vehicles is considered one area. So there will be zero to two aids on the three vehicles combined with -- at least one of those vehicles will be blank.

So they -- like I stated before, they do not know the -- where the blanks are at; they just know that one vehicle and one room, at least, will be blank, but there could be more. We make sure that, within the rooms and the cars, that all of the odors that the handler has told us their K-9 is trained to detect will be represented within those

search areas.
Q. All right.
And turning to Government's Exhibit 1, the testing area that you just described, is that laid out in subsection III there?
A. It is.
Q. You started talking about "single-blind." What does that mean?
A. Single-blind -- there's -- there's two types, in the industry, of testing. There's a search called single-blind and double-blind. A single-blind is what we subscribe to.
And a single-blind is the person being tested does not know where the odors are placed and where the blank rooms are at; however, the evaluator or the certifying official, as we refer to them at IPCA, is aware of those locations.
Q. You said that there was zero to two aids.
Is that part of the single-blind testing?
A. It is.
Q. How so?
A. Well, it's an unknown amount.
If -- if you tell a team being certified that there's only going to be one aid or there's going to be two aids in there, as soon as they find those, whether -- say if it's one aid; they could go in and, in the first 30 seconds, find an aid -- they're going to be done in that room.

For us to -- for it to be an authentic representation of real life, we want them searching the whole room. The whole room's got to be searched before they tell us they are done with it.

Q. Now I want to turn your attention to Government's Exhibit No. 2, the SWGDOG standards.

Does that single-blind testing procedure comply with those standards?

A. It does.

Q. Why?

A. Well, in -- within those general guidelines, they give the option of either a single- or a double-blind as long as part of that is -- is odor recognition.

Q. And I --

A. And so we -- so we do a single-blind with odor recognition within our -- our testing so we -- we are in compliance with what they are recommending.

Q. And I've scrolled down through this document. I'm going to direct you to Section 3.2.

Can you tell us where in that standard what you just said is represented?

A. It's on . . . 3 point -- I have it here in my -- my thing, but I can't see the whole document there.

It's 3.2.3. "The certification shall be comprised of a comprehensive assessment together with either an odor-

recognition assessment or a double-blind."

Q. Now, are those odor recognition, comprehensive assessment, and double-blind assessments also described in this document?

A. I believe they are, yes.

Q. And I'm looking here at Section 2.

Do you see that?

A. I do.

Q. All right. So let's talk a little bit about what's required for an odor recognition assessment in subsection 2.3.1.

A. Okay. There -- the handler has to be advised of the parameters of the search; like I explained, zero to two aids; at least one -- one will be blank, as an example.

It -- it -- in -- in their testing they say the handler can know the number of target objects, which would be the odor aids, but not the placement. For us, we don't let them know so it makes it even a little bit more challenging for them.

"The evaluating official shall know the desired outcome of the search."

Q. And then when we look at the comprehensive assessment, can you describe what the comprehensive assessment in 2.3.2 requires?

A. The handler is advised of the parameters of the search and does not know the desired outcome. "The handler shall not

know the number or placement of the target objects. The evaluating official shall know the desired outcome of the search. The assessments shall include a blank search."
Q. And how does that compare to what you described as IPCA's test?
A. That would be in alignment with how we administer our test.
Q. So does your test combine the odor and comprehensive assessment?
A. It does.
Q. Do you do double-blind testing?
A. We do not.
Q. Why not?
A. The double-blind assessment -- it's -- just to clarify on the double-blind, there's a couple of different ways it's been described to me as how they are administered by different organizations.
The double-blind assessment will send in a person that evaluates the -- the team and where they advise the alert was at, but they do not know where the aids are placed.
The other way I've been told that it -- that it -- people have had a double-blind assessment administered is they were just sent into the room alone, they would document where their alerts were at, and then they would find out later if they were right.

Either way, those two -- one logistically would not work because we do roughly 50 dogs at a time in a large training day in Southern California. We'll usually use like -- like recently we used Angel Stadium in Anaheim, and we had probably 60 or 70 dogs there.

That would mean that, for every dog we sent in, we would have to have an evaluator that has not been in that room. Logistically that's impossible. We're -- we're a fairly small organization with limited resources, assets, to be able to execute something like that.

The biggest problem that you run into with the double-blind is -- is you get a -- a K-9 team in a room with a -- an assessor that doesn't know where the aids are at, they could start -- if you get a -- a -- say -- a brand-new team, a team that doesn't have a lot of experience. They get in there and they are -- start going through and they're having all kinds of issues with the dog.

If that assessor does not know where the aids are at, they -- they are not able to read what's going on with this dog team and so that those actions can be corrected when this person -- say, if they fail the test. That's one of the -- the biggest parts of our organization, is keeping these K-9s trained properly and -- and not having these dog teams regress in their training and adding additional issues.

If you allow a dog team to go through and keep

searching and -- and the -- the evaluator doesn't know that the dog is struggling or the K-9 team is struggling because they're nowhere near the odor, if -- on a single-blind that assessor can cut that test off immediately and send that person off to remedial training for them to test on another day without causing a bunch of additional training issues in that dog team that could be brought on by allowing that dog team to continue working.

Q. So just to explain, how is it that a -- not getting that immediate feedback could cause a problem for the dog's training?

A. It -- you could get a handler frustrated very quickly, and the -- the dog could be showing an -- an interest in an area that is . . . it's . . . it shouldn't be interested in.

And instead of failing that person, you're encouraging this handler to get in there to work with this dog and to try to get it to find it, and you're causing a lot of frustration in the dog and frustration in the dog team that is going to cause the -- the training to regress.

It's going to cause issues that could be fixed in a short period of time as opposed to maybe a day or two of additional training if it's allowed to continue.

Q. Would it be fair to say that, at its most basic level, a lot of dog training works off of rewards and corrections?

A. It does.

Q. So muddling the signals on those rewards and corrections just creates more issues?

A. It can.

Q. Now, what about the integrity of your test if there's no person in the room observing the test on a double-blind?

A. If you didn't have -- if you had a double-blind where you didn't have an evaluator in the room, you know, the person in taking the test, I guess, could start opening drawers and trying to find the aid to make sure that they -- they're writing down the -- the correct location of the aid, making sure they're all the way to it. So there needs to be some sort of a -- a -- a person in there administering the test.

I guess it would be like in college, taking a math test and the professor leaving the room and saying "Don't use your calculators," and there's generally probably going to be one or two that are going to use their calculators as soon as the professor leaves the room. So it's kind of along those lines.

And it's a safety issue. A person needs to be in there to make sure that -- these dogs really want to get to the source. And some are a little more assertive than others, and you want to make sure they're not going to get into a cupboard or something and get their mouth on one of these aids. It's generally set in a manner that that doesn't happen, but it's just an extra layer of security for the --

the K-9 team.
Q. So then if you have to have a person in the room, I think it -- your testimony was you have to change the proctor for every K-9 team to maintain that double-blind.
A. For the double-blind it's -- it's -- the person has to not know where the aids are at. So yes. Each dog team that goes through would have to have a new proctor.
Q. Can't you just move the aids?
A. The -- each time you move the aids in there, if you're using the same room, which you would need to -- we have limited facilities for these -- there's still going to be existing odor where that aid was sitting even though the aid is not there.
Q. What do you mean by "existing odor"?
A. Well, whenever you place an odor -- if you place 20 grams in a drawer and then you're going to move it, there's still going to be the odor there.
These -- these dogs don't quantify odor. They're trained on a -- on a specific odor. So they can't tell you if there's 20 grams in there or if there's a -- a quarter gram. It's -- they'll tell you if there's odor there.
So a dog can alert to an area where there's no drugs but there was drugs there. And the -- what had happened is the odor had absorbed into the material -- whether it be wood, whether it be plastic, whether it be cloth, like clothing --

and there is no longer drugs there.

I -- like I testified earlier to, I spent a lot of time working parcel interdiction, and a lot of the inbound parcels that I alerted to, there was no drugs when we opened the parcel, the heat-sealed plastic inside the parcel. But -- you could smell the drug odor, but there was no actual drug present.

So that's -- that's a sign of residual odor. And it had been contained in heat-sealed plastic, so it really helped preserve it for long periods of time. So that's along the lines of what I'm -- what I'm describing.

Now, you take it to another level, these dogs have a much more sensitive nose, and they're going to be able to smell that residual odor that's left behind for -- at a much lower level of odor than a human could.

Q. So we've got all these logistical problems with double-blind testing.

What are some potential pitfalls with single-blind testing?

A. Well, the single-blind testing, the only pitfalls that have been brought up is the people thinking that maybe the proctor is cuing the dogs, meaning giving some sort of indication to the dog or to the handler that they're close or getting close.

The proctors in these tests -- like when I administer

a test, I step inside the room and stand just inside the door. You -- 99 percent of the time you can see the whole room from where you're at.

And almost the entire evaluation, the dog and the -- the handler have their back to you. I'm not walking side by side with the handler and the dog.

And in a lot of cases -- like when we do rooms, the dog is off lead. It's -- it's the handler's choice on how they want to search. But, initially, a lot of times they will just cut the dog loose off lead and the dog will be moving about the room searching.

These dogs have an extremely high hunt drive. That's why we purchase them. It's one of the instinctive traits that we -- we do certain breeds for, the hunting breeds. And in most cases they -- they just -- they don't even care who's in the room. They just want to hunt and go in and do what they're trained to do.

Q. Are there certain steps that ICPA has taken to help avoid any cuing by an evaluator or a proctor during a test?

A. It's like -- like when we're doing, you know, our initial training with them and when you're doing it with a handler, it's -- you just let the dog work. You remain quiet. A lot of the things that we do when we're -- when we're teaching handlers or -- or such is you want to be quiet because one of the things you're doing to try to read the dog is you're not

only watching what the dog does but you're listening. You're listening to their breathing and the changes in their breathing, their olfactory system when they're processing odor.

So it's -- when you're doing a test, it's extremely quiet in the room other than the noise that the dog is making as it goes through, knocking things over and, you know, its movement.

Q. You mentioned what you do as a certifier.

So how is it that the IPCA recruits and trains certifiers?

A. So a lot of the people that we recruit is based off of how we see they handle their dog and -- and their training when -- when we are -- over the years when we're administering certifications. So in a lot of cases we are going to them and asking them if they're interested.

They have to have a minimum of five years' training detection dogs and -- and two years in the narcotic field. So they could be an explosive dog handler, but we want to see, also, two years of narcotic dog training on top of that as a minimum. And that -- that could be from their time in military as a dog handler, civilian. It -- it doesn't matter.

But those -- those are some of the -- the basics that we're looking for. And then what we do is we -- we move to -- they fill out an application.

There's a couple of folks on my board currently that deal with the certifying officials, and they will basically do a bit of an in-depth background on the person. They're going to contact the agency that they work for, find out, you know, are they a good worker, do you have any issues with them.

We're going to look at how much time they have to -- to devote. We're going to look at the agency they work for, if that agency is in support of that. We're going to talk to people they train with, dogs they have trained, talk to those handlers and such.

So that's -- that's what we do on the front side of that before they are ever even voted on by the board and -- and approved.

Once they are approved, then they have to spend time with -- we prefer a board member but, if not, a certifying official. They have to set a test in their presence and administer that test. And they spend, you know, the better part of a day with them on the proper setting of a test.

These are people that have taken the test, generally, multiple times over the years. You know, they're obviously prior members, so they've -- they've taken our tests. They're pretty familiar with it. And you're -- you're teaching them some of the things we just talked about, the problems, the pitfalls that they can run into during a certification, safety of -- of the K-9 team and things along that line.

Q. And you said "the better part of a day."
By that do you mean approximately eight hours? Approximately four hours? Is there generally an amount of time that goes with that?
A. Where we like to do it is -- is we like to bring those folks in to set a test preferably when we're doing one of our large training days, like I explained, that we'll do throughout California, or we do -- we do them in Las Vegas with large numbers of dogs. That way, they get to go through -- we get to see them working with a lot of different dogs, a lot of different handlers.
And it's -- it's at least a day. It's at least eight hours. Sometimes we'll do two days. It depends on the amount of people that we have sign up.
Q. So just to recap, there's a minimum experience level, five years plus two years of experience as a trainer, and then there's a vetted application process and a board member vote before you get to even the -- the training part of becoming a certifier?
A. That's correct.
We do -- we do an ongoing training with them. It's like at our conference that we hold every year, we have a -- a certification -- a certifying official meeting with updated information. We're always pushing out emails to them on new information.

Like we recently added fentanyl in the last couple of years, and so there were a lot of questions through that time.

So we have Zoom meetings with all the certifying officials. So it -- it isn't -- it isn't just something like as soon as you're in, that's -- that's it. You get continued training. We'll talk about changes in the industry, case -- case law decisions, et cetera.

Q. So what if a dog handler who was closely connected to Rogue K-9, your business, or another business held by a board member was applying to become a certifier? What would the board do?

A. One of the first questions we -- we ask them is why they want to be a certifying official. And we make it clear to them -- you know, because we want to make sure their agency is -- is aware that they are not going to be certifying dogs within their agency. Okay?

If -- if -- when I worked for the City of Medford Police Department, I couldn't certify dogs at the Medford Police Department. And I could not train -- I couldn't certify -- if I had someone working with me at Rogue K-9, they would not be able to certify K-9s trained by Rogue K-9.

When I finish a class and I need a certification, that's just one of my added expenses. I either have to pay them mileage or fly -- have flown in certifying officials

wherever I'm at, so that's just an added cost. I have to bring someone in that is independent that doesn't have a vested interest in that dog, they're not involved in the day-to-day training of that dog, they don't certify that dog, et cetera.

Q. Does that avoid conflicts of interest?

A. It does.

Q. Is it consistent with the SWGDOG standards?

A. It is.

Q. So when somebody is certifying, they cannot have a vested interest or be involved in the day-to-day training to certify that dog?

A. Correct.

Q. What about becoming a certifier in the first place? Are there ways that you avoid conflicts of interest in that board vote?

A. Well, that's like what I was discussing, is we ask -- like we'll -- say if we get someone that calls up, and say they're from Oklahoma and they want to be a certifying official for us. One of the things we're going to ask them is "What are your expectations? What are you wanting to do?"

"Well, my agency wants us to be able to have someone in-house that can certify our dogs."

Well, we're going to say, "No, that's not going to happen, that you can't -- you can't do that." And then we

explain why.

So -- you know, they're involved in their day-to-day training; they -- or they're a supervisor of them -- over them. That's a conflict.

So those are the things we look for on the front side.

THE COURT: Ms. Martens, is there a good time to take a break?

MS. MARTENS: Yeah. I believe this is a good spot to take a break. We've got just a little bit of ground left with this witness but probably not a lot so --

THE COURT: All right. We'll stand in recess for 15 minutes.

THE COURTROOM DEPUTY: All rise.

(A recess was taken from 9:49 a.m. to 10:08 a.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

You may continue with your examination of Mr. Havice.

MS. MARTENS: Thank you, Judge.

BY MS. MARTENS:

Q. All right. Before the break we were talking about conflicts of interest. And so we were talking about how the certifying official cannot be involved with the daily activities with the dog.

Now I want to ask you a slightly different question.

If someone is applying to become a certifying official and they have a close relationship with a board member -- say, for instance, someone was applying to be a certifying official and they also worked for Rogue K-9 -- would you, as a board member, take any special actions?

A. Well, it -- it's obviously on a case-by-case basis. Those things would be -- would be looked at -- again, what their intentions are, why do they want to do it and such -- to make sure that they -- say if it's a Rogue K-9 employee. They're going to be questioned by the board. "What are you wanting to do? Are you going to be wanting to certify Rogue K-9 dogs?" If that's the case, then no. That's -- we don't allow that. So -- and if that's their intention, sometimes then they're not interested.

But we're up front with them and let them know that they're not going to be certifying their own dogs; they're -- they're -- they can't have a conflict of interest with being part of the training and then wanting to certify that dog.

Q. So even if they don't want to certify their own dogs but want to do other appropriate certifications, would that change anything about the vote or their application process?

A. No. If they're -- if they -- if they own their own business and they want to come in and certify and they just want to certify other dogs, then that's great.

Because generally those are people that have a lot of

experience and can -- can lend a lot to the association.
Q. Would you abstain from that vote?
A. If they -- yes. If they -- if they were somebody that worked for me, yeah. That wouldn't be something I'd be involved with.
Q. Is that the general expectation for other board members, as well?
A. Yes. If it's somebody like a spouse, a coworker, things like that, then they -- they abstain from the vote.
Q. So even sort of a close relationship, even if there's no money involved?
A. Yeah. It will -- what they'll do is generally they will give their information that they have on the individual, good or bad. But as far as the voting goes, then they -- they will abstain.
Q. So once someone becomes a certifier, is there ever a time where they may no longer be a certifier with IPCA?
A. Yes. If they're no longer a member or not in good standing, then they're -- we just went through, within the last year, some people that were still on our website listed but had not been doing certifications.
So one of the board members reached out to every one of those folks, and a lot of them were removed from it just because they're not interested in doing it anymore; time doesn't allow it; they don't have the availability or

resources to do it any longer; sometimes it's health reasons. There's -- there's numerous different reasons for them withdrawing or not being a certifier any longer.
Q. And I'm looking over my list. And earlier, when we were talking about the test requirements itself, I missed something I wanted to ask you, so I'm going to rewind a little bit.
So during a certification test for IPCA, may a dog miss?
A. No. It's a hundred percent test. They have to find all the aids accurately and identify those training aids that are in the search areas without giving a false positive, meaning alerting to an area where there is no drug odor.
Q. So they cannot miss a training aid, nor may they provide a false alert?
A. Right.
Q. Is that consistent with SWGDOG?
A. SWGDOG is a little more lenient on the percentages. As I recall, I think they were at 90 percentile, somewhere in that area.
And at one point we were along those lines. But we over the years discussed, and we wanted a hundred percent test in these. We didn't think that was unreasonable.
Q. And you said at one point it was that 90 percent threshold. Do you remember when, about, that changed?
A. It's been quite a while. I do not remember, but it's been

a lot of years since we went away and went to a hundred percent test.

Q. Is that -- never mind. I already asked that.

MS. MARTENS: I think that's all the questions I have for this witness.

THE COURT: Very well.

MS. MARTENS: Do you need me to do anything with the laptop, Jordan? Maybe just close the lid?

(Discussion held at the podium.)

MR. DECKENBACH: Your Honor.

THE COURT: You may proceed.

MR. DECKENBACH: Good morning, Mr. Havice.

THE WITNESS: Good morning, sir.

**CROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. I just want to touch on a few points regarding your background. Is that okay?

A. Yes, sir.

Q. Sounds like you worked in law enforcement for a very long time.

A. Yes, I did.

Q. And when did you officially retire?

A. It was effective July the 1st of 2023.

Q. Okay. And you've worked with the -- I guess I'll refer to them as the IPCA since that's the -- the name now of the

certifying group.

You've worked with the IPCA, formally the CNCA, since 2000? Is that approximately correct?

A. Yes. That was when I became a member.

Q. And you've worked closely with Mark Rispoli since you joined the CNCA in regards to that organization?

A. That would be accurate, yes.

Q. And you mentioned that he is a -- in fact, the founding member of that organization?

A. He is one of them, yes, sir.

Q. And that other individuals have also helped found and maintain that organization?

A. That's correct.

Q. And those other individuals that are part of the CNCA, many of them own their own K-9 vending companies; isn't that correct?

A. Several of them do.

Q. I want to talk about -- and then you, yourself, were appointed a certifying official back around the time you joined them in 2000?

A. No. It was later that I became a certifying official.

In 2000 I was a -- just a member.

Q. All right. And when did you become a certifying official?

A. Probably . . . boy, I don't remember.

But I would say roughly 10, 12 years ago, maybe.

I don't remember the exact date that I -- I became a certifying official.

Q. All right. And you, again, were selected to be a certifying official based on your experience with K-9s?

A. Yes. That was one of the reasons.

Q. And you were, as a member -- or that -- kind of selected by Mark Rispoli as well as other board members to -- to take on that additional duty; is that correct?

A. Yeah. I was initially approached by the president at that time, which was Steve Sloan, who was a founding member.

Q. And this is after you had received training from Mark Rispoli on your own K-9; is that correct?

A. I had received the training from Mary Ann Sampson on my -- my first drug-detection K-9.

He was the one that -- that imported the dog from Europe and supplied the dog to Mary Ann Sampson, who owned Far Fetched Retrievers at the time. And then she was the one who imprinted and trained the dog.

Q. Okay. And she was also a member of CNCA at that time?

A. She is also a founding member of CNCA.

Q. All right. And so with that initial K-9 Mark Rispoli was the vendor who purchased the dog, I'm guessing, from Europe. Is that correct?

A. That's -- that's my understanding, yes, sir.

Q. And then the other founding member provided you

training -- or was the vendor for the training of that dog; is that correct?

A. Yes.

Q. And then it was that organization that provided a certifier to give you a CNCA -- as it was called at the time -- certification after you worked with that dog?

A. Yeah. They were one of two organizations that certified that dog at that time.

Q. And you've observed Mr. Rispoli's work with Makor K-9 throughout the years; is that correct?

A. I have.

Q. He's sold -- he's sourced and sold K-9s to multiple law enforcement agencies?

A. He has.

Q. And many of those dogs that he has sourced to those agencies he's also provided training through Makor K-9?

A. That would be accurate.

Q. And those dogs have all then subsequently been certified by CNCA or IPCA, as it's called now?

A. I don't know if all of them but probably the majority.

Q. All right. And when you were -- I want to go back to 10 or 12 years ago, when you were selected as a certifier or an evaluator.

Were you required to attend a specific course in regards to becoming an evaluator?

A. It was like what I described. It was a -- a certifying day where I had to set the test, go through the whole procedure. And then I was shadowed by then-President Steve Sloan on -- on that procedure. And then that -- at that time what they did was they go through and kind of give you the -- a working training throughout that day of what you're looking for, the dos and the don'ts, and how to effectively administer a test.
Q. And that day of training was provided by CNCA at that time?
A. Yeah. It was with CNCA certifying officials present, yes.
Q. And you weren't required to attend any formal evaluator's course outside of the organization of CNCA; is that correct?
A. Outside of CNCA?
Q. Yes.
A. Not required, no.
Q. And I want to talk a little bit about your formal education.
You've attended the Rogue Community College back in the late 1980s; is that correct?
A. Yes.
Q. Okay. Did you ever get a bachelor degree after that?
A. I did not. I went to a four-year trade school and -- before I got into law enforcement.
Q. Okay.

A. And that was -- they are the sponsors of that.
Q. And have you ever pursued or received an advanced degree in any type of applied science?
A. No.
Q. Do you, in your professional capacity, have any experience in writing peer-reviewed academic experiments with the detection K-9s?
A. No. I -- I am not a scientist, nor have I ever claimed to be a scientist.
Q. All right. So your -- your experience is rooted firmly in your law enforcement experience; is that correct?
A. Law enforcement and all my training and -- and working around -- around K-9s.
And -- and I spent a lot of time around highly skilled scientists and trained individuals in the sciences.
Q. And you would agree it's appropriate to rely on those scientists in helping shape the standards when it comes to training and certifying K-9s?
A. It can be. It's -- it's part of -- part of your learning. They -- they don't have the actual experience, leash time and stuff. Theirs is mostly -- mostly lab work, if you will.
And it is a science, so I always equate the sciences of working with dogs a lot like being a parent. There's numerous ways to get to your end objective.
Q. And so collaboration between scientists and practitioners

are important; is that correct?
A. As far as their communication between one another?
Q. And -- and in establishing working standards for -- for certification and training purposes.
A. Yeah. That's why there's multiple -- like with SWGDOG, there was multiple scientists involved, so a lot of different input.
Q. And I'd like to talk about that group, the working -- the Scientific Working Group.
That was put together by the FBI, Department of Justice, and other law enforcement agencies; is that correct?
A. That's my understanding. And Florida International University was a -- a big part of that.
Q. And their purpose was to improve the performance and reliability of detection K-9s; is that correct?
A. Yeah. They wanted to get a standardized group out there, try to standardize the stuff that's going on in the K-9 world.
Q. Okay. And the goal was to kind of build a consensus around best practices; is that right?
A. That was -- that was one of their goals, yes.
Q. And would you agree that it's important to constantly be refining and improving professional standards?
A. Yes. And I -- that -- like I testified to earlier, that's why we've -- we've had some changes in the certification standards over the years.

Q. And I think you've testified, you know, those improvements are partly based on experience in the field as well as in testing environments.
A. Yeah. And case law will affect that, too.
Q. You also would agree it's important to improve standards as we better understand the science around drug detection and odor and K-9s?
A. To do what with that again, sir?
Q. Another thing that should shape the evolving standards -- would you agree? -- is the evolving science that we've come to understand about K-9s and detection?
A. Yes.
Q. And I think the exhibit that was entered by the Court -- or by the -- actually . . .
MR. DECKENBACH: Did you enter Exhibit 2 in?
MS. MARTENS: Uh-huh. Do you want me to pull it up?
MR. DECKENBACH: No. That's okay. I just wanted to make sure it was entered.
BY MR. DECKENBACH:
Q. So Exhibit 2, the Scientific Working Group standards, that exhibit was published in 2010; is that correct?
A. I think the thing I have -- "Approved by the membership September 15th of '09" is what is on mine. They are no longer a working group and stuff. There's other groups, like NIST, the National Institute of Standards and Technology. They have

kind of picked up doing that type of thing now, is my understanding.
Q. Okay. And I'm glad you brought it up.
So they kind of are the torchbearer now for trying to establish that continuing consensus regarding the national standards; is that right?
A. They are one of them, yeah. There's a couple of them out there, and they are one of them.
Q. And, just for the record, the one you referenced is the American National Standards Institute; is that correct?
A. No. It's the National Institute of Standards and Technology. It's called NIST.
Q. All right. Are you familiar also with the American Academy of Forensic Sciences?
A. I'm not.
Q. Are you familiar with the American National Standards Institute?
A. No. The two I am is NIST and an organization called OSAC.
Q. Okay. And you --
A. Like I said -- like I said, there's several of them out there.
Q. And, just for the record, OSAC is the Organization of Scientific Area Committee; is that right?
A. Yes, I believe that's accurate.
Q. And they have specifically had the dogs and sensors

subcommittee of that organization; is that right?
A. That I'm not sure of, sir.
Q. And are you familiar with the general guidelines for training, certification, and documentation of canine detection disciplines that was based on the -- the Scientific Working Group and published in 2020?
A. In reference to what?
Q. In reference to best practices and updated guidelines for detection disciplines.
A. I'm not sure what you're referring to.
Q. Okay.

And so your last point of reference for guidelines were the ones that were put out by the Scientific Working Group; is that correct?
A. Well, not necessarily because Dr. Furton, like I said, has been a part of our organization and provides ongoing updates and information and guidance and direction on our standards, too, on -- on a -- several times a year if needed.
Q. Okay. But you've never discussed with him any other guidelines that have been more recently published besides the ones that were put out by the Scientific Working Group?
A. Personally, not myself, but I do have board members that do that are in contact with him quite a bit. But, like I said, we have a -- a -- 13 members on our board, so I'm -- I'm not the only one that brings information to the board.

And I'm not the one that makes the final decision.
Q. All right.
And I just want to verify with you. The reasons guidelines are -- by any of these organizations -- are established is because, prior to the Scientific Working Group, there was no industrywide standards in existence; is that right?
A. There were not. There -- there's even still states in the nation that don't even do any standards. They -- they have dogs that are certified at the end of the school and that's the end of it.
Q. Uh-huh.
A. So we wanted something to give a measure of -- as the dog goes through its career.
Q. Okay. So I -- I guess I -- when you became president -- you became president of the -- the IPCA in 2021?
A. Yes.
Q. And you already had your certification standards -- that I believe were entered as Exhibit 1 -- at that time; is that correct?
A. The -- the standards that are reflected have been changed since that time that I became president because we added fentanyl into there. So there's -- there have been slight changes to the standards since I became president.
Q. And I think in the text of Exhibit 1 we saw a fentanyl

section that was in a slightly different font. Would that be the addition that was inserted into the standards?
A. That would be accurate.
Q. And then the rest of those standards were previously part of the -- preexisted your tenure as president, let's say. Is that right?
A. That's accurate.
Q. They were actually published in 2018; is that right?
A. Yes, I believe that's right.
Q. Okay. And you agree that since -- I think you were talking about the -- the -- testified to what should influence updates and changes.
You testified that changes in case law might cause you to update the standards; right?
A. It -- it -- they could cause us to either update or just to review them.
Q. Okay. And I think fentanyl's a perfect example.
New drugs might cause you to add a section; correct?
A. Yes. Yes, if it's a drug we're seeing on a regular basis on the streets.
Q. And would peer-reviewed scientific studies be cause to change or update standards?
A. It would definitely be something that would be taken into consideration and reviewed.
Q. And have you routinely reviewed the updated studies,

peer-reviewed scientific studies, in your duties as president?
A. The ones that are brought to us on the board. You know, there's -- there's a lot of studies that go on, a lot of peer-reviewed studies.
Q. And since you've been president, have they influenced you to change any of the standards?
A. Like I say, the only thing that's been changed since I've been president would be the addition of fentanyl.
Q. And would the -- the fact that there are new national consensus -- if there were new national consensus regarding updated forensic standards, would that influence you to potentially update CNCA's or IPCA's certification standards?
A. Well, now, that's kind of a broad swath there. I guess it would depend on the details of the study.
Just as a generalized statement, I couldn't say yes or no.
Q. Okay. And your awareness of national guidelines or standards are based on what Dr. Furton has brought to your attention as a board member; is that correct?
A. He is -- he is someone that is heavily relied upon just because of his standings in the field.
Q. And the -- but you're not aware of his involvement in the -- the addition or the updating of standards published in 2020?
A. His involvement in adding fentanyl?

Q. No, his involvement in updating general guidelines on a national level.
A. I -- I'm not aware of who exactly is on that board and who was involved in it.
Q. Okay. And the standards as far as they were published in 2018 and updated in 2000- -- I'm not sure when the fentanyl was added -- those are -- those are standards you helped update and work through with Mark Rispoli; is that correct?
A. Well, the entire board worked with it. He was part of it, yes.
Q. All right. And the document that was entered as far as those standards, that is -- that document -- that I believe is Exhibit 1 -- that is the totality of any published materials regarding standards and methodology for testing and certifying K-9s that the IPCA has; correct?
A. Yeah, that we have as best practice. That's -- yes.
Q. And there are no other written materials that you have in regards to that process?
A. For our certification standards?
Q. Yes.
A. Well, like I explained, we didn't bring up like the -- as far as the rules and such, there is a -- a sheet like the checklist that I -- I explained that they -- that the person fills out and brings it to each evaluator at a test. But --
Q. The scoring sheet?

A. -- as far as -- yes.
Q. Okay. Thank you for that clarification.
And I think you talked about that there's a selection process for people who are interested in becoming certifying officials for the IPCA. Is that right?
A. Yes.
Q. And you have requirements about their requisite experience that you described as at least two years working with narcotics dogs; is that correct?
A. Yes.
Q. However, at the board's discretion, that requirement can be waived; is that right?
A. Of just being with narcotics dogs?
Q. Yes.
A. It could. They could be -- all their experience could be in bomb dog handling because it's very -- when -- it's very close to the same type and detection. That -- that is our ultimate goal, is five years' experience/training and two years with detection.
Q. Okay. And in regard -- we talked a lot about the role of the IPCA in certifying K-9s, but it's not just a certifying organization. It also provides training and instruction; is that right?
A. That's correct.
Q. And I think your website boasts that the IPCA provides the

best instructors.
A. We believe so.
Q. And, according to the website, your organization also provides expert witnesses to assist in successful prosecution of cases; is that right?
A. We -- we can refer to expert testimony, sure.
Q. And, in fact, that is what you're providing today?
A. I'm providing testimony.
The term "expert" is subjective, obviously. That's the Court's decision to make.
It's more so referring to people like Dr. Furton himself, things like that. It's going to depend upon the topic, too, and people's availability during those times.
Q. All right. And Mark Rispoli is one of the trainers recommended by the IPCA; is that correct?
A. One of the trainers recommended by -- how so?
Q. Well, your website talks about that you provide the best instructors; is that right?
A. It does.
Q. And Mark Rispoli is one of those instructors that might be recommended by the IPCA?
A. It would be. If someone came to us and asked for, we would give them a whole list of instructors, he being one of them because he is a very good instructor.
Q. Uh-huh. And when those instructors go, then, through the

IPCA, they are offering their services as an independent vendor, an independent contractor, so to speak; is that right?
A. Their business is independent of that of IPCA.
Q. All right. So you give them a list of potential vendors, most of whom are members and involved in the IPCA themselves; correct?
A. Yeah. We don't -- as an organization, we don't go out and endorse specific vendors. We will give you a list of people generally for your area that's going to be closest for you.
It's up to that agency, then, at that point to go do their background to find out who's going to give them the -- the best product, best service, talk to references, and so on and so forth.
Q. And I think you testified previously that Mark Rispoli offers training services as well as sourcing dogs through Makor K-9.
A. He does.
Q. And you've worked with him, yourself, in developing training programs for law enforcement agencies; is that correct?
A. Yeah. He -- for my own. The City of Medford contracted with him, and I had two or three dogs during my career that came for -- from Makor K-9.
Q. And so this has been a collaboration at those times between Rogue K-9 and Makor K-9?

A. No. Rogue K-9 really didn't exist during the times I was a handler, only maybe the last 10, 11 months of my career.

But I wasn't operating -- like I said, I was building my business while I was still a K-9 handler with the paperwork part of it, not doing any work, per se, as far as in the training area so that there wouldn't be a conflict between my agency and my business.

Q. Okay. And so, when you were developing training with Mark Rispoli, you were doing it with him in his capacity as a vendor under Makor K-9?

A. I'm not sure what you mean, "developing training." Are you referring to when he asked me to do the training for him?

Q. That might be one example, yes.

A. Yeah. He -- well, yeah. He came to me because he's familiar with my skills and abilities and knew that I would be able to fulfill his needs for his company. So he -- he came to me and asked me to do that training.

The other thing was -- is it was in southern Oregon where I'm at, so it made it a lot easier.

Q. All right. And you've also worked with Mr. Rispoli in the state of Wyoming to develop training; is that correct?

A. I went to Wyoming two separate times. One of the times is when the -- the vendor Precision Explosives was in Wyoming. And I was wanting to see their product in regards to fentanyl, and so I -- I went to Cheyenne. On one occasion it was for

that.
Q. And those aids were being developed for the Wyoming Highway Patrol as one of the first agencies to attempt to train dogs to detect fentanyl; is that correct?
A. That's correct.
Q. And were you then on that trip in your capacity as part of Rogue K-9?
A. I was up there in the capacity of CNCA at the time.
Q. Okay. And Mark Rispoli was serving as a vendor for the Wyoming Highway Patrol at that time through Makor K-9; is that correct?
A. I believe that's accurate, yes.
Q. And so you, in your capacity of the president of CNCA, worked with both the Wyoming Highway Patrol as well as Makor K-9 to come forward with one of the first fentanyl-detecting trainings in the country; is that correct?
A. It was . . . they had -- they were already working on that, the Wyoming Highway Patrol and Makor together. I went up at that point because we wanted to look at maybe adding a certification, and I wanted to see if it was viable, if it was something that was going to be safe.
And so my main reason for being there was to look at the product --
Q. Okay. So your --
A. -- that was being put up.

Q. I apologize.

So it was a collaboration, and your piece was bringing that final certification piece of the puzzle to what they were developing and training?

A. Well, we hadn't -- we hadn't brought that certification. It hadn't been implemented yet.

In order for us to bring a certification, we had to have a viable product that was safe for the K-9s. And so that's why I was there, is to see if they -- if Precision Explosives -- which the two owners of it were there in Wyoming, and it was a good opportunity for me to go up there and see that. Because we didn't want to use like fentanyl -- we don't use pseudo, and we didn't want -- we wanted to use a pure odor.

Q. And just to touch on that point, you don't want to use pseudo or fake odors that mimic real ones; is that correct?

A. That's correct.

Q. And that's because you don't want the K-9 to be trained to alert to things that are not, in fact, illegal?

A. Well, we don't know what are in those pseudo products because they have proprietary protection. So they -- they can't even tell us what's in them. So we don't even -- we don't even know what's in -- to -- in those items to make up that odor.

Q. And so it's not clear what molecules a dog is actually

responding to an odor if there are molecules present in a pseudo aid versus a real one? That distinction --

A. Yeah. Pseudo -- yeah. Pseudo is imitation or fake, so it's -- we, as law enforcement officers, have access to actual real odors, so that's why we recommend those.

Q. All right. And I think those type of -- is it true that that type of -- needing to make those distinctions is the same reason why you don't use marijuana-alerting K-9s in Oregon? Because you don't know if they're alerting to a legal narcotic or a legal -- or legal marijuana; is that correct?

A. No. We use them still in Oregon.

The reason being is, if it's a -- a legal substance in Oregon, it -- you -- you're unable to develop probable cause -- like, say, on the exterior search of a box -- unless it's been imported or exported. That's why we use them at shipping companies, because it's been imported from out of state, which is a crime in Oregon. But we still -- we still use marijuana-detection dogs in Oregon.

Q. All right. And I guess I should have been more specific.

You don't use them maybe like, let's say, at a traffic stop where it would be legal for marijuana to be present in a vehicle if a dog is trained to alert to marijuana?

A. You could. It would depend upon the circumstances.

If it was a consent or at the scene of a search

warrant, then, yeah, we would use them.
Q. Okay. But if -- it could not independently provide probable cause; is that right?
A. Not unless we had a border nexus.
Q. Okay.
A. I live on the border of another state, so there is a difference there.
Q. Understood. So if there's any type of inference of importation, then marijuana would be illegal; is that right?
A. That's correct.
Q. And, similarly, a K-9 -- you, I think, testified earlier they're trained to respond to odor at -- not necessarily tied to amount of odor. Is that correct?
A. Yeah. They're trained to detect a target odor; not a target substance, an odor. So there's times when a K-9 can alert to an object where there's still odor there but there's no actual physical product.
Q. And so there's no way to distinguish if a K-9 is alerting to an illegal amount of hemp or THC versus a legal amount of hemp or THC?
That dog is not able to make that type of distinction when it alerts to that odor; is that correct?
A. It can't quantify odor. He can't tell you, just to be clear, how -- how much is there. A dog can either tell you if the odor is there or the odor is not.

Q. And your understanding is that, under Federal law, even certain amounts of THC is permitted to be present in hemp now; is that correct?
A. As far as hemp, there's -- you could have a Department of Agriculture permit.
There pretty much isn't any Federal prosecution on marijuana in my district currently. Or very little.
Q. Okay. I just want to touch a little more on the training provided to the Wyoming Highway Patrol.
Do you require -- or do you -- did you, yourself, seek certification from the Wyoming POST prior to ever engaging in training in the state of Wyoming?
A. I did not.
Q. And are you aware of whether Mr. Rispoli ever sought such certification prior to providing training to the Wyoming Highway Patrol?
A. I do -- I'm unaware of any. I do not.
Q. And the vendors that you send out to -- or that you recommend, do you -- to different law enforcement agencies -- do you vet them that -- to see if they are certified by the POST in the states where they're going to potentially offer training?
A. We -- we don't go through that. We would leave that up to -- state by state to deal with those vendors on what their minimum qualifications are to operate in their state.

Q. Okay. And these vendors that are being recommended come with training packages. They also sometimes help select the dogs from overseas that they are going to train; is that correct?
A. The vendor? The vendor does the selections of their dogs.
Q. And I think you already confirmed most of these dogs are brought in from Europe. Is that correct?
A. Yeah, a fair amount. The majority, I would say, is accurate.
Q. And you can help hone me in to correct numbers here.
But an untrained dog brought in from Europe of the correct breed can cost somewhere around $8,000?
A. That -- that would probably be accurate. It varies on the level of training that the dog has at that point or how many disciplines.
Q. And a trained dog -- so if you bring in a dog and it does have training or you provide it subsequent training, that dog can go upwards -- be sold for upwards of $15,000; is that correct?
A. It's generally regional. I don't sell dogs in Wyoming, so I don't know what the going rate is.
Where I'm at in Oregon, a trained dog and the class, the 80-hour class that goes with it, is around $13,000.
Q. All right.
And you -- now, your kind of second career after

retirement is your own vending company through Rogue K-9?
A. Correct.
Q. And I think you testified that you have contracts with the State of Oregon -- Oregon -- to provide training to K-9s. Is that right?
A. Yes, a single contract. Singular, not plural.
Q. And is that just -- how many agencies are serviced by that singular contract?
A. The Oregon Department of Corrections.
Q. You've also worked with the Beaverton Police Department previously; is that correct?
A. I have.
Q. Okay. You've also worked with --
A. Not -- not with my business, but I've -- I've worked with them through OPCA.
Q. And you've provided training to their dogs?
A. At conferences, yes. Not for consideration but provided training to them.
Q. All right. And you've also provided training to the Josephine County Sheriff's Office; is that right?
A. I have through my business.
Q. And that was -- so that was as a vendor?
A. It was. Through Rogue K-9 I provided a detection dog to them.
Q. And you're heavily involved in the Oregon K-9 community;

is that -- is that fair to say?
A. I'm involved with it, yeah.
Q. And you've also -- you've recruited other law enforcement officers there to become certifying officials with the IPCA; is that right?
A. One in the law enforcement area that I can think of in Oregon.
Q. And is that Tony Bastinelli?
A. Yes, sir.
Q. And you recommended him to the board as someone you thought would be a good candidate for becoming a certifying official in the state of Oregon based on his experience?
A. I did.
Q. And they took your advice, and he was selected; is that correct?
A. Well, not based off just my -- my recommendation. He -- he went through the process. But --
Q. He --
A. -- I'm sure what I had to -- what I had to say probably was part of the determining factor.
Q. Okay. And Josephine County, for an example, that would be an organization where you then had Tony come in -- or Anthony -- come in to become the certifying officials after you provided training to their K-9; is that right?
A. He could, yes. And did.

Q. And he's actually certified numerous dogs after -- after appointed by the CNCA, that you've trained; is that correct?
A. He has trained -- he has certified several, yes, sir.
He's -- he's one of the few certifying officials I have up in the Pacific Northwest.
Q. All right. In the time that you've -- I want to shift back to Makor K-9.
In the time that you've worked with Mark Rispoli, you've never seen Makor K-9 produce any written curriculum for narcotics K-9 training, have you?
A. I have not.
Q. You've never seen a written Makor K-9 training syllabus, have you?
A. I have not.
Q. Do you produce such written materials for Rogue K-9?
A. I don't have a prescribed written syllabus for my business at this time.
Q. And, as president of the IPCA, shifting back to that organization, they are incorporated in the state of California; is that correct?
A. We are a 501(c)(3), a nonprofit in the state of California.
Q. You've also -- and you've filed with the secretary of state documentations updating its status as a limited liability corporation, as well?

A. All -- all of those documents I'd have to review as to what's been filed. Those are filed by a member on our board that I explained to you -- she is the only one that gets a stipend from us, and she files all those documents.
Q. And at times she has you sign those documents when they're updated in your capacity as the principal or the president?
A. Yes. Some of those I do sign, correct.
Q. And you are familiar -- I guess your website boasts that you guys are recognized by the California POST. Is that correct?
A. We are.
Q. And you understand, though, that the California POST itself doesn't certify organizations; is that true?
A. That is accurate. They -- they have recommendations.
Q. And you've made yourself familiar with the California POST standards; is that correct?
A. I'm fairly familiar with them.
Q. And they have their own established standards for certifying officials?
A. Yes.
Q. And your -- you understand that they require certifying officials to first attend a California POST certified evaluator's course before they can be certified by California POST; is that correct?
A. That is correct.

Q. And though your organization is out of California, you don't require such, that your certifying officials attend that course; is that correct?
A. We don't. I have several folks that have been through that course, and they advised me that the training that we provide for our folks far exceeds what they got out of that class.
Q. And those people that advised you of that are from within your own organization?
A. They are.
Q. Okay. And you've not invited anyone from the California POST or any other state POST organization to come and evaluate or certify your program; is that correct?
A. We have certifying officials that are on their board right now.
Q. But they're -- they have -- there's not been an independent certification of your course by any state board; is that right?
A. That's correct.
Q. And, again, you've never taken an evaluator course outside of the one offered by the CNCA; correct?
A. Correct.
Q. So you, personally, can't evaluate how it compares to what might be required by other state POSTs; correct?
A. That's accurate.

Q. And you've touched upon the need to avoid the appearance of conflicts. Do you understand that is also a California POST requirement?
A. The -- yeah. They have -- most organizations do have that in their bylaws and stuff on conflicts of interest.
Q. And do you agree, then, that specifically an evaluator should not have any type of monetary interest in the breeding, selling, or training of the dog being evaluated?
A. Yes. That's kind of like what we discussed already.
Q. With that said, the dogs that you've had trained and certified in Oregon, those certifications have your signature on it as president of IPCA; is that correct?
A. The certificate on them would have my signature on all certificates going through there.
Q. And that includes dogs that have been sold and trained by Mark Rispoli; is that correct?
A. They could have, yes.
Q. And that would include dogs that you, yourself, have trained and sold; is that correct?
A. Yeah. There would be two signatures on there. The president's signature, which is mine, is on all certificates, and then there's a blank space for whoever the certifying official is, and then he or she then would sign that if they pass.
Q. Okay. And in Wyoming, in the state of Wyoming, your

website currently shows that there are two evaluators in this state that might sign that part of the -- of the certificate; is that right?
A. I'm not sure the amount that's on there right now. That's probably accurate.
Q. You're familiar with Marc Russell; is that correct?
A. I am.
Q. He is with the Wyoming Highway Patrol; is that correct?
A. He is.
Q. And he is a -- someone who's been appointed to be a certifying official for your organization?
A. Correct.
Q. He's also -- understands that -- that's someone you've worked with in developing the fentanyl training devices; is that correct?
A. He was present, I believe, when -- when all that took place in Wyoming while I was up there.
Q. Okay. And . . . I think I'm getting a signal you might have to go very soon here so . . .
A. That is accurate.
MS. MARTENS: Do you have much left?
MR. DECKENBACH: I do have a little bit left, yes.
MS. MARTENS: So can we stop at this point so we don't make Mr. Havice late for his flight?
MR. DECKENBACH: Yes. Can I ask five more questions?

And then that will be a natural breaking point to resume.

Your Honor, are you okay with proceeding in that way?

THE COURT: If our witness is.

MR. DECKENBACH: Mr. Havice, would you prefer that I break shortly here and then we let you get to your flight and we'll resume this conversation this afternoon?

THE WITNESS: Yes, if we can get through it in the next few minutes.

MR. DECKENBACH: We'll get to a natural breaking point, and then we'll let you do what you have to do here. Thank you your patience.

BY MR. DECKENBACH:

Q. The other certifier for the Wyoming -- or for the state of Wyoming is Josh Hardee; is that correct?

A. That's accurate.

Q. And you're familiar with him as someone who formerly ran the K-9 program for the Wyoming Highway Patrol; is that correct?

A. Correct.

MR. DECKENBACH: Okay. I think we'll just break there and let you be on your way, Mr. Havice.

THE WITNESS: Okay.

MR. DECKENBACH: And I look forward to resuming our conversation later this afternoon.

THE WITNESS: Okay.

Your Honor, I will message counsel when I arrive at a place where I have internet access to let them know my availability at that time.

THE COURT: Thank you, Mr. Havice.

Safe travels.

THE WITNESS: Thank you, sir.

MS. MARTENS: Thank you, Judge. We certainly appreciate the accommodation of the witness.

THE COURT: All right.

MS. MARTENS: On the tech side, I think I can disconnect from the Zoom hearing now.

And then, since Ms. Hammer is upstairs, I intend to continue to run exhibits from the podium. Will that work?

Perfect.

All right. So, with that in mind, I would like to call the Government's next witness, and that will be Trooper Marc Russell.

And I don't have any hands, so may I excuse myself to go get him?

THE COURT: Yes, you may.

MS. MARTENS: Thank you, Judge.

(Witness sworn.)

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please take a seat.

Please state and spell your name for the record.

THE WITNESS: Marc Philip Russell, M-a-r-c P-h-i-l-i-p R-u-s-s-e-l-l.

**MARC PHILIP RUSSELL, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. Mr. Russell, where do you work?
A. I work for the Wyoming Highway Patrol.
Q. What is your role there?
A. I'm a district captain as well as the K-9 team commander.
Q. And, as we get started here, you're having some trouble with your voice?
A. Yes, ma'am.
Q. So if you need a break at any point, just please let us know.
A. I sure will.
Q. So --

THE COURT: I've got something here that will help you out.

THE WITNESS: Thank you, sir.

BY MS. MARTENS:

Q. How long have you been with the highway patrol?
A. I hired on in July of 2011.
Q. In what role?
A. As a State trooper.
Q. Was that your first experience in law enforcement?
A. No, ma'am.

Q. Where were you before?
A. I began my Wyoming law enforcement career first as a detention deputy at the very end of 2006 with the Platte County Sheriff's Office out of Wheatland. And then about nine months later I went to the road as a patrol deputy and worked there for the Platte County Sheriff's Office until I hired on with the Wyoming Highway Patrol.

And I also worked part-time for the Guernsey Police Department during that period of time as well as Wyoming State Parks law enforcement at Glendo State Park.
Q. In any of that prior experience did you have any subspecialty or any particular area of expertise or just general law enforcement?
A. Mostly general law enforcement. I was a certified drug-recognition expert from 2009 up until last year, actually.
Q. Did you ever become a K-9 handler for highway patrol?
A. I did.
Q. When was that?
A. I was selected in 2015 and began my training in November of 2015.
Q. And what was the next change for you with highway patrol?
A. In 2021 I promoted to a division lieutenant; basically, a supervisor of a local troop in Rock Springs.
Q. And did you remain a K-9 handler at that time?
A. No. I had to give up my dog at that time for the

supervisory role.

And then there was a brief kind of hiatus from the K-9 team before I became a cosupervisor of the team. I believe in 2022-ish is when I took on that role.

Q. So when you say there "was a brief hiatus," about how long were you away from K-9s for your supervisory duties?

A. Say probably about eight or nine months, maybe.

Q. So when you came back to the K-9 team, did you get your own dog back?

A. No, ma'am.

Q. So in what capacity have you served the K-9 team?

A. At that time I was one of two K-9 team supervisors. And then I had a further promotion in 2023, and I became the K-9 team commander for the state.

Q. Do the K-9 team supervisors generally keep their patrol dogs?

A. No, ma'am.

Q. So it wasn't abnormal for you not to have a dog while supervising the team?

A. Correct. So as a -- a supervisor of the K-9 team, my primary role was still a troop supervisor, so of everyday road troopers. And the K-9 team supervisor was kind of a full-time additional duty on top of that.

Q. What kinds of things do you do as a supervisor of the K-9 team?

A. Coordinate training. Coordinate our interdiction operational deployments.

We order a lot of the -- all the supplies, dog food and things for the -- things like that. We work with the -- our vendor for purchase and acquisition of our K-9s. We maintain and review training and deployment records. We train with the dogs. We're involved in the handler selection process.

Really, you know, kind of from A to Z of the program. There's -- you know, kind of involved in a lot of that logistical back-end stuff.

Q. And, as the captain over the program, does that continue to be your duty?

A. Yes. You know -- so I took on some additional responsibility of managing some of our grants and things like that. And then when I -- when I promoted to captain in November of 2023, shortly after that, I couldn't -- you know, I needed somebody else to help me with a lot of that stuff so -- we have a sergeant in the team. He took on some of the -- basically, the K-9 team coordinator is what he's considered with some of those responsibilities.

Q. So that load is shared between you and that sergeant?

A. Yes.

Q. In addition to all of that experience, do you have any formal education?

A. Yes.
Q. What is that?
A. I have a bachelor's degree in biblical studies from Frontier School of the Bible.
Q. Any other formal education?
A. Attended the Wyoming Law Enforcement Academy in 2008 -- I believe 2008. And then the Wyoming Highway Patrol Trooper Basic Academy in 2011.
Q. And you continue to be a sworn peace officer?
A. Yes, ma'am.
Q. Do you belong to any professional organizations?
A. Yes.
Q. What are they?
A. The IACP, I'm a -- a member there, IACP; Wyoming Highway Patrol Association; Fraternal Order of Police; Troopers Lodge, Wyoming Troopers Lodge. That's all that I can think of right now.
Q. So specifically the International Police Canine Association, what is your role with that organization?
A. I'm currently a certifying official for IPCA.
Q. What kinds of things do you do as a certifying official?
A. I coordinate and set up and evaluate dog teams for certification in odor detection, explosives and narcotics odor detection only.
Q. Do you certify teams that are with the highway -- sorry;

I got tripped up on my words -- with the Wyoming Highway Patrol?
A. No, ma'am.
Q. So who do you certify?
A. I've certified a dog team out of Mesa County, Colorado; Teton County Sheriff's Office teams; Rock Springs Police Department; Carbon County. Lots of different agencies around the region will either come to me or I'll meet them.
I've certified the explosives detection dog for the Federal Reserve out of Salt Lake City, to name a few. I'm sure there are some more.
Q. Why don't you certify for Wyoming Highway Patrol?
A. That would be -- that would be a bias, I mean, if we certified our own dogs. We want to -- we want to not subject ourselves to that. We want an independent set of eyes evaluating and certifying our teams.
Q. Let's talk about the Wyoming Highway Patrol K-9 program.
I'd like you to give us just a broad overview of what is required for a trooper to become a K-9 handler.
A. Sure.
So when we have a vacancy, we -- we open that up and advertise it for qualified troopers in our agency. They would submit an application, and then we would give them, basically, a writing assignment with some things that we'd like to hear about their -- maybe experience or understanding of what a dog

handler would be, things like that. There's an oral interview with that, with a panel, with 16 or so questions pertaining to dog handling, how they would utilize their dogs in certain scenarios.

We do peer evaluations because we want to hear from those they work with day-to-day to make sure that they have the character and the marks of a -- the type of person we want to assign a dog to.

And then we kind of evaluate those -- performance of each candidate -- and make a selection.

Q. Once someone is selected as a K-9 handler, what happens next?

A. After that we coordinate with our vendor for selection of a dog and dates for their initial training, set up where that's going to be and the dates, logistics of that.

And then they would go through that initial training, which generally culminates with a certification before the vendor leaves.

Q. Who's the vendor?

A. Makor K-9.

Q. How long has Makor been the vendor?

A. I believe since the inception of our program. 2020 is, I believe, when they -- we first -- made our first purchase of dogs from Makor.

Q. Did you say "2020," like five years ago?

A. I'm sorry. 2000. Our program's been going for about 24 years. My apologies.

Q. So what's the nature of the arrangement with Makor K-9?

A. So, working for the State, our procurement roles are -- we have to work under contract, just as far as those State of Wyoming purchasing rules.

And we -- we do a sole-source contract. What we don't want to do is put something like that out to bid because generally we end up with the lowest bidder. And, as y'all can imagine, that's probably not something that you necessarily always want to end up with as far as when you're working with working dogs.

So we work on a sole-source contract with Makor.

Q. So in terms of somebody who provides a sole-source contract, do you have to be satisfied with those services for them to continue as a vendor?

A. Yes. And that's all reviewed through the AG's office and all the kind of levels between.

Q. So tell us a little bit about the kinds of services that Makor provides to highway patrol.

A. Sure.

So Makor, I really believe that they -- it's just honest business practice there, that Mark Rispoli is just an honest businessman. So through our -- our years -- and I can use a specific example.

When I got my first dog, Baxter, he was a springer spaniel. And I kind of -- kind of qualified him as reliably unreliable after a little while. In the training environment he kind of, as a young dog, experienced some things that he didn't like. So he kind of shut down in certain circumstances, but in others he was -- he was full bore, full steam ahead, no problems.

And as -- as he and I were out in the field after our training and certification, months later, there was a few roadside circumstances where -- traffic going by I think affected him negatively because he didn't like it, and he'd go to the other end of the leash.

But we had our -- our in-service training, and Makor was there, along with our team commander at the time, and they -- and they watched some of those behaviors. And they said, "Well, go put him up."

And I was thinking, "Oh, man, what did I do here?"

And -- and Mark said, "Hey, we're going to get you a new dog. There's -- there's a problem here. We don't know what it is. Doesn't seem to be something that we can rectify, so we're going to get you a dog. Don't worry."

And that's just -- that's a lot of the honest business practice. A lot of -- a lot of vendors out there will give you a 12-month warranty and then after that it's done.

So I got my second dog, Bailey, another springer spaniel. And years after we got him, he had some medical problems with his patellas and had to have surgeries. And Mark had heard about that and called me up and said, "Say the word and I'll get you another dog. You know, we weren't aware. That was not something we could have known about. But you say the word."

I didn't want a different dog. I loved my dog. He was a great dog. So we just -- we worked through the surgeries and whatnot.

But that's just an example of honest business practice, and it's been that way through the years. If we've had uncorrectable problems with a dog that, for whatever reason -- dogs are dogs; sometimes we don't know why -- he's always stood by that and -- and rectified the situation with -- with finding another suitable dog.

Q. So you mentioned that Baxter was your very first dog. So -- and, also, that troopers have to go through an initial training process. So let's talk a little bit about that initial training process for you.

About how much training did you get there?

A. I ended up -- we had -- there was four of us selected. So it was . . . two weeks, I believe -- two or three weeks. I think they extended it a little bit, since there was four of us, to allow us all sufficient training time since we all

weren't able to train at the same time. So I think we were there two or three weeks for our initial training.
Q. Is that the 80 hours or so that I think you mentioned for new troopers?
A. Yes.
Q. So what kinds of things happened for you in that initial training?
A. So Day One/Week One, especially if you've never worked with a working dog, it's -- it's like learning how to dance, I guess. People would think that holding a leash is a simple task, but it's not when you're -- when you're using a working dog.
So learning how to interact with the dog and how much space to give the dog and how to hold the leash and what you should be watching with your dog.
So the first several days were very -- pretty rudimentary stuff, just, you know, at lockers and just learning the dance. You know, the dogs come to us with a real -- you know, an understanding of -- of search patterns and odor identification. Now it's teaching the handler how to -- how to dance with the dog, if you will, and how to work the dog.
Q. Now, at that time Mark Ripsoli and Makor K-9 was the vendor that supplied Baxter; right?
A. That's correct.

Q. Did he participate in that training?
A. Yes.
Q. How so?
A. He -- he set up the training. He's the one that sat down with us and, you know, "Here's how you hold the leash, here's how you move with the dog, here's what you should be looking at with the dog, here's -- here's how to take a search area and break it down and systematically work that with your dog," all those real fundamental, basic tasks for that first period of training.
Q. So you and Baxter got through your 80-ish hours of training and achieved certification?
A. Correct.
Q. And then got out on the road and there were problems?
A. I'm sorry?
Q. Once you got out on the road, there were problems?
A. Yes, ma'am.
Q. And you said he was reliably unreliable.
So was that more of -- was it behavior or a target odor problem?
A. No. He was -- he was great when he was -- when he was willing to search. But there was certain things -- like on I-25 with that traffic, I think he -- it was just something that frightened him, that he wasn't even going to search in certain circumstances if it was heavy traffic.

When he was searching, he was great. No problem with odor identification; no problem with search. It was something that just -- he was a young dog, 13 months old. I think just something in his brain clicked that "This is not something I'm comfortable with."

And -- and a dog will -- that will happen. Dogs have certain environmental things. We try and screen for those. But certain -- certain things are just going to click in a dog's mind that "This is not safe to me," and their instinct's going to kick in before them wanting to do what we want them to do.

Q. So his unreliability wasn't whether or not he was giving false alerts to the presence of narcotics?

A. No.

Q. It was whether he would work at all?

A. I mean, reliably get out and work for me and search. Sometimes he'd just go to the back of the kennel in my car and not want to come out. It was more a behavioral thing.

Q. Poor guy.

A. Yeah.

Q. So has that process changed much since you went through it in 2015?

A. As far as the initial training, the 80 hours?

Q. Yeah.

A. No.

Q. So Mark Ripsoli still comes out, trains with the K-9 and handler teams?
A. Yes, ma'am.
Q. And it still culminates in certification?
A. Yes, ma'am.
Q. Can you give us a little more about what kind of training is provided by the vendor Makor K-9 before the dog shows up?
A. Yeah.

Obviously, I'm not there for part of that -- or for any of that. But they would -- they imprint the dogs on the odor, so odor recognition. And so when they show up, they're already -- they're already, you know, not what we consider a green dog where it's a novel odor to them. They've already recognized that odor so they'll go to it. The new handler will see that behavior, that alert, and be able to pay it.

They've had a little bit of obedience. Really, the focus that Mark puts in is really just a good recall. Because, you know, as far as a single-purpose odor detection, we're -- we're less concerned about, you know, how they march around and things like that. We want them to come back when we call them, but we want them to search when we give them a search command. So there's a little bit of -- a little bit of basic obedience there.

So, yeah, they'll -- they'll imprint them. They'll reinforce that. I imagine they do some distraction proofing

odors amongst that, but, again, I'm not there for that. I just know that, when they show up, you know, what we see is a dog that recognizes odor that we can start paying on.
Q. Yeah. So even though you're not there for the initial training, when you receive the dog as a product, you expect to get a product with certain characteristics?
A. That's correct.
Q. Are they trained with their final indication at that point?
A. Yes.
Q. And then I think you said "recall."
And what do you mean by "recall"?
A. Basically, if the dog -- let's say we're in an open-area search and the dog's out a ways away from you where you feel uncomfortable or the dog takes off after a rabbit or something. We want to be able to call the dog back. That's what I mean by "recall."
Q. And then you also mentioned paying the dog. What does that mean?
A. I'm sorry. Rewarding the dog.
Q. Tell us a little bit about how rewarding the dog works.
A. Sure.
So we work on a premise of target odor equals reward. And that's all we want that dog to understand. The only time that -- when I say "pay," it's kind of their paycheck. Right?

The only time you get your paycheck is when you are actively sniffing target odor and you, the dog, believe you're closest to the source of the odor as you can get.

So as the dog searches and we see some -- what we consider, you know, like a bird dog, like -- like Bailey and Baxter, these springers, they get what we kind of consider birdy -- if you're familiar with bird dogs -- and they bracket and they get real excited.

And then when they get in with their nose actively sniffing on what they believe to the target source -- or the source of the target odor -- then we reward them or pay them and -- by throwing or tossing or dropping in their toy right -- as close as we can to the tip of their nose to the source of the odor.

Q. And that final trained indication as close to the source of the odor, is that -- that's the desired outcome every time?

A. Yes. A focused stare is what we would consider that.

Q. Now, that final trained indication, aren't there multiple ways that a dog can do that?

A. Yes.

Q. Can you list them?

A. Yeah.

Certain dogs are -- are -- it's kind of broken down into passive alert or -- or an aggressive alert.

So some dogs will paw at it. We don't want that. So

we -- we've chosen a passive alert. Some dogs will sit. Some dogs will lay. We -- we do the focused stare with the nose on the -- closest to the source of the odor.

Q. Why don't you want a dog to paw?

A. I would have more complaints than I want to deal with as far as -- we primarily deal with cars, and we want to respect people's property, and we don't -- I wouldn't want a dog pawing on my car.

Q. So do you train them not to paw on a car?

A. We -- we don't -- we train -- we don't train them to do that.

Sometimes if a -- if a dog is on maybe a novel odor or something like that or even a target odor, they -- they just start throwing some different excited behaviors. Some dogs will start licking it, and I think that's kind of to enhance it.

Sometimes, if we don't get there quick enough with the pay, they'll paw on it a little bit. That's -- that's not a desired result, but some dogs do that at times.

Baxter did that every once in a while when -- when -- when I was waiting him out a little bit just to make sure that he wasn't going to depart from odor. He'd say "Come on, Dad; you haven't paid me yet," and he'd just -- he'd lick it and then maybe he'd whimper a little bit and -- he was just kind of an excited dog and would start throwing some additional

behaviors.
Q. Do you correct a dog if he's pawing at the source of odor?
A. If he's pawing, I might give a verbal correction. I'm real cautious to correct a dog negatively when they're on target odor. It's a fine line. We don't want to send a negative message to the dog because the dog might interpret that as, you know, "I'm -- I shouldn't" -- you know, "This target odor, me sniffing this target odor, just got me a negative result." We don't want to -- we don't want to communicate that to the dog.
So I might give a little verbal correction and then try and -- it's all about timing -- try and pay that in -- you know -- pay that between some of those additional things.
It's like -- it's like the saying "There's only a few things you can take back." Right? Well, we add the ball into that. That's one thing -- once you throw it -- if you throw it and then the dog scratches as you -- as the ball's in the air, you may have just marked -- unintentionally marked behavior.
So a little verbal correction often fixes that, and then you can go back and reinforce what you want to see.
Q. And then who's currently certifying the dogs for the Wyoming Highway Patrol?
A. Hm-m . . .
Q. As terms of an organization.

A. Oh. International Police Canine Association, IPCA.
Q. Has it always been the -- either the IPCA or the California Narcotic Canine Association?
A. As far as who we've used?
Q. Yes.
A. We've always used them. There was a period of time we -- we -- we additionally used NPCA, but we haven't -- we haven't used that for years.
Q. Is there a particular reason that you're using IPCA?
A. I believe that they're a good -- good standard, well-recognized standard.
So -- I mean, other than that, it's -- I mean, it's kind of difficult at times due to the lack of certifying officials in our region. But, again, working with Makor, he arranges for other certifiers to come in and help.
Q. "Other certifiers." What do you mean by that?
A. Certifying officials. So when we have him come in, he'll coordinate for -- for another person in IPCA, a certifying official, to come in for a certification day and do the actual certification.
Q. So is that certifying official like employed by Makor or something else?
A. Not necessarily, no.
Q. So moving, then, to -- I guess finishing up with the initial training, does the Wyoming POST have anything to do

with a K-9 handler's initial training?
A. No. Their -- their only involvement is -- basically, we submit the -- the training hours and whatnot so the handler can get POST-certified training hours on their POST record, but it's nothing specific to the K-9 program or K-9 in general.
Q. You mentioned those certified training hours. Why are those important?
A. Because every peace officer, to remain certified, has to have a certain amount of hours every couple -- several years to remain certified as a peace officer in Wyoming.
Q. So they get the credit with POST?
A. That's correct.
Q. Does POST have anything to do with ongoing training of K-9 officers?
A. No. They have nothing to do with that.
Q. Would they maybe just continue to keep track of credit?
A. Yeah. That's kind of their function, is they -- they maintain those -- they -- they approve the hours and then maintain the training record.
Q. Do you know what their role is in terms of setting standards for any law enforcement officer for training?
A. For K-9 or just in general?
Q. Just in general.
A. Yes. I believe they're the -- they're the -- kind of the

certifying entity that sets those standards for -- for peace officers maintaining their certification.

Q. Do they work hand in hand with the academy?

A. They do.

Q. So once a K-9 officer has achieved that initial certification, what kind of ongoing training does Wyoming Highway Patrol require?

A. We require every handler maintain the minimum of 16 hours of training with their dog per month. Often that's a minimum.

We -- since I've been in my role, we've kind of expanded what we used to consider the Southwest Narcotics Interdiction Force. I kind of renamed it to the Statewide Narcotics Interdiction Force, SNIF. So it's our SNIF training.

And I coordinate that twice a month, one offering on the east side and one offering on the west side of the state, so handlers around the state, since we're spread over a large geographic area, can make group training every month, have -- have one or two opportunities to do that.

Additionally, we -- we mobilize throughout the year as -- as a K-9 team and work as -- as a team in certain areas for about a week. Usually, the first day or two we set up as group training since we're all there. And we'll -- we'll secure some venues.

And I'll coordinate, either myself or the sergeant,

or if neither one of us are there -- we're usually there -- then we'll designate a senior handler or something to coordinate that training for the group.

Q. What kinds of things do you do in group training?

A. All sorts of stuff.

We -- we incorporate a lot of blank finds, blank -- so it's just as important for the dog not to find what's not there as it is for the dog to find target odor that is there.

So we incorporate regular blank finds, either single-blind or double-blind search scenarios, so that -- so that the handler doesn't know where the finds are or how many there are.

But there's also -- it's also appropriate for times, if you're trying to work on a specific issue with a dog, to tell the handler "Okay. There's a find here. When you see your dog first get into that odor, I want you to tell me that. And then let's mark that when" -- you know -- "when you feel that your dog's as close to the odor as it can be."

So there's also an appropriate time for the -- for the handler to know where the finds are, but that certainly can't be an exclusive training method. There has to be anonymity in the search area so that the -- the handler has no idea how many finds there are or where they are or if it's got live finds or if it's blanks.

We train in buildings, a variety of different types

of venues and buildings and open areas. We work with like suitcases and parcels. We train on vehicle exteriors and interior.

We try and vary up our weather conditions. Obviously, if we train inside where we're all cozy, every time that we get the dog out in February on the side of the road, neither one of us are going to want to be out there working, so we try and expose them to that.

We'll put finds up on excavators. We want them to try and navigate difficult-to-get-to places so that they're, you know, kind of unafraid of -- of narrow things or tight spaces, things like that. So trying to expose them to a lot of different things.

We incorporate a lot of proofing and distracting odors, distracting sounds. We want those search areas to be really as realistic as possible.

And I kind of . . . it's kind of broken down into two types of training, maybe more calibratory training -- that's where maybe we're going to say, "Handler, here's where your find is. I want you to start here in the search area, let your dog work," and then we -- maybe we're going to work on a specific problem.

And then there's more operational-type training where we're saying "We're going to take a car out and you're going to stop the car as if it's realistic and you're going to run

it and you're going to call it as if it's on the side of the road."

So we try to keep a good incorporation of both of those, but, really, the operational training is, in my opinion, a lot -- probably more effective. Because if we only did the calibratory-type training, our team -- our dogs are probably going to suffer for that on the side of the road.

Sorry, my voice is starting to cut out a little bit here.

We also add some drills with -- like overpresentation drills and some changing of posture. We want the dog to develop an obedience to odor. We want the dog, again, to recognize and understand "The only thing is -- that's going to get you paid is target odor equals reward. So by me changing my posture, that should have no effect on you. You should keep working. By me tapping here, that should have no effect. If there's not a target odor, you're not going to get the reward."

So we incorporate some drills like that. That's more of that calibratory-type training, if you will.

Q. Do you also train like different actions with the leash or have the handler -- I don't know -- change the tone of their voice, just try and vary it up and see if you can get the dog off the target odor that way?

A. Yep. Yep. That's part of that -- you know, we'll have

them like squat down. We'll have them put their hand up like they're going to drop a toy in. If the dog sticks on something, we go neutral. We wait them out. We teach them "None of this that's coming from me is going to get you anything. It is target odor -- actively sniffing target odor is what's going to get you the toy."
Q. What about -- you mentioned "distractors."
Are there certain kinds of distractors that you train with?
A. Yes. Handlers generally have distractor kits.
So when I was handling, I'd have a tote, and I would have little jars with vinegar, coffee, dog food, cigarette butts, anything and everything that I could think of. If it's a novel -- novel odor, if it's an -- cut-up air fresheners, a cut-up tennis ball, cut-up KONG. And we'd switch those out and kind of vary those out to make sure that we're getting a lot of the things -- axle grease. Those are just kind of a swath of examples.
And we put those out in the search area for the dog, and we want to make sure that the dog gets their nose on those and makes a decision "Not target odor, moving on," and then we move on. They'll hit the target odor, and then we'll pay them.
Q. What about human food?
A. Yeah. Yeah.

We've actually gone down to McDonald's and grabbed a cheeseburger and thrown it in a locker in the bank of lockers.

Q. You mentioned also in that calibratory -- calibration training -- that you want handlers to recognize when their dog is first getting into target odor.

Can you talk a little bit more about that?

A. Sure.

So initially when you -- when the dog gets a search command -- maybe it's "find it"; maybe it's "search" -- they'll start searching. And then a lot of times you can see when they initially get into some sort of target odor, if it -- if there's a plume coming out from wherever that source may be.

And a lot of times you'll see a head snap. Like they'll -- they'll hit, and then they'll maybe go a little too far and they'll come back. And it's this bracketing where they -- where they're in it and they hit the end of it, and then they leave it and they come back and they leave it, and they're kind of narrowing it down in this cone pattern.

A lot of the -- you know, it's very dog dependent on exactly what behaviors they see, but a lot of times that mouth will close and it will be very active, sniffing through the nose, that bracketing behavior.

Sometimes their ears will kind of stand up, depending on if they're pointy-eared dogs or floppy-eared dogs. Their

tail will kind of act a little differently. Their posture will change, a little more excited posture and demeanor as they work it in.

And then they're -- sometimes it's a -- it's a problem-solving task for them to figure out where they want to decide and where they have the confidence to decide where that source of the target odor is. And then eventually they'll -- when they've made that decision, they'll give that final -- trained final response.

Q. Why is it important for the handler to recognize all of that?

A. Well, for a couple reasons.

One, sometimes, if it's such -- if there's such depth of odor and it's -- and it's coming out -- let's use a -- for instance, I'll use an example if that's okay.

If there's a source of odor behind a -- 20 feet behind a fence and the wind's blowing it through the fence but the dog can't get to it, there's -- it's kind of a plume of odor coming.

So what you'll see is you'll see the dog get to a point where they have -- they're working a plume of odor, but there's no real concentrated source. So sometimes you'll see them exhibiting behavior, behavior, behavior, but they can never get to a point where they can actually get a concentrated point of it and set up with a final response.

So I believe the -- the alert behavior is just as important, if not more, than the final indication because that is the indication that the dog is on target odor.

There are certain circumstances -- you know, if it's a high find and my dog can't get up to it, he's going to keep trying. And he may not set up on it, but this alert behavior is very important.

The ability for me not to be able to call him off of it because he's being obedient to odor is important. So that's the first point.

The other -- the other piece is, you know, if -- if a dog is going to false, they're not going to show all this alert behavior leading up to a final indication. You're going to have a dog just searching, searching, searching. And maybe they get to a novel odor, and maybe they're an inexperienced dog, and they just stick their nose to it or sit, if that's their thing.

So a final -- a trained final response absent the alert behavior leading up to it I would say is -- if that was me, I'd be moving my dog on because I didn't have the alert behavior that led up to that.

Q. And you're practicing all of this in those trainings. Are there other exercises that you do in those trainings?

A. I don't -- I don't remember if I talked about the overpresentation drills and things like that, but we'll do

some of that to create obedience to that odor.

Sometimes when the dog's on odor and presenting a trained final response with the focused stare, we'll do a little bit of pull-offs. We'll kind of pull them back, and they'll lean into it, just reinforcing that. And then we'll pay them just to reinforce that, "Hey, if I'm pulling you away, you need to be fighting me to get back to that odor again," obedience to odor.

So those are a couple of things that we do additionally.

Q. And then you mentioned that these are group trainings.

Are troopers giving each other feedback as peers, or is that coming only from folks in a supervisory role?

A. No. It's kind of -- it's kind of 360-degree feedback.

Again, I think it's -- it's important at times for the handler to be in a search area alone to help with their confidence and -- and watching their dog.

And I think there's appropriate times for the group to be there to watch the drill and, after they come back, when they put their dog up, to give them some feedback of what they've done well, what they're -- what they could do a little differently.

Again, each dog's a little dependent -- or each dog's different than -- than the next. But sometimes when I . . . I deal with this problem, maybe you've dealt with this problem

and you can give me some feedback on -- on how to work with this, too.

Q. So, in addition to these group trainings, do handlers do other kinds of training?

A. We do. So there's the monthly training. There's these group trainings.

We also do in-service training once a year -- we're about to do that here in a couple weeks -- where we bring in an outside vendor, not always Makor. This year it's Golden Gate K9.

And -- and they'll come in and set up training. They'll evaluate the dogs, see how they can work with each individual team to -- to make them more successful or bring them to the next level. You know, each team's varying different levels of experience, so you've got some veteran teams and some newer teams, so they're kind of at different levels and need a little different instruction or feedback.

So it's really valuable to bring another third-party set of eyes in to set up a week of training, evaluate teams, set up some new drills. You know, you don't know what you don't know. So having somebody new come in with a fresh set of training, you know, options or different drills that we've never seen, that's -- that's really good.

Maybe I'm having a specific thing with my dog that they can say, "Hey, start doing this on a regular basis and,

you know, maybe that will work."

So it's just really good to get another set of experienced opinion in at those in-service trainings.

Q. Are there other opportunities to get those outside perspectives beyond in-service?

A. Yeah. We train with other agencies.

So when we do our SNIF trainings, we invite agencies in those regions to come join us, so we train with all -- agencies all over the state and even outside the state. So we're able to, you know, give some of that back-and-forth dialogue and feedback with each other and set -- set training up for them and have them set training up for us.

Q. Does the highway patrol do internal assessments in addition to certification with IPCA?

A. We do.

Q. Can you tell us about that?

A. We try and keep it about six months from our certifications.

But we do . . . it's based off the IPCA standards. So we basically set it up as a certification, but it's an internal agency -- it's an opportunity for us to evaluate those dogs in performance.

As of 2023, after I took over, I decided I wanted those to be a double-blind -- administered as double-blind. So we'll set up just by the same standards as IPCA

certification, and we'll give the -- you know, at the beginning of the evaluation, we'll tell the handler all the same things we would except "We're going to be out here; you're going to go in there. Run the area and you -- when you're done, you come out and tell us what you found," kind of thing.

So that's how we've been running those the last two years.

Q. In addition to that double-blind internal assessment, I think you mentioned that you're doing double-blind exercises in training.

A. Correct.

Q. About how often do you do that?

A. We probably do some sort of double-blind element, if not every group training, maybe every other. I mean, there's some times where we -- we focus on one thing.

But it's -- it's very often, but maybe there's a month -- you know -- a month where we go without one in that group training. But it's, I'd say, no less than every other month.

Q. Are double-blind exercises new to highway patrol's K-9 trainings?

A. No.

Q. In your experience, when did they start?

A. From -- from my inception on the team. So in 2015 when

I started, we were doing double-blinds.
Q. Do you know whether Trooper Martinez and K-9 Becky have passed double-blind internal assessments?
A. They did this past September, October in our internal tests, 2024.
Q. And that would have been the first opportunity since they became a -- a K-9 team pair?
A. Correct.
Q. I want to talk to you a little bit about -- a little more about jumping on cars.
Does the highway patrol train their dogs to jump on cars?
A. No.
Q. Why not?
A. Couple reasons.
One, I don't want the complaints, being the recipient of those, and they're not enjoyable to deal with.
But, really, we want the dog to be able to move along without interfering on -- and scratching people's stuff. It's a lot of energy wasted when they're -- if they're up, you know, pawing -- you know, getting handsy on a car.
Q. So it's kind of hand in hand with that pawing behavior we discussed earlier?
A. Uh-huh.
Q. I need you to --

A. Yes. I'm sorry.
Q. Would the reward and correction for jumping be similar or the same to the pawing behavior we already discussed?
A. Yes. If a dog is searching, actively searching, and -- and goes up on a car -- again, I'm watching to see is the dog in odor, following odor, high -- high odor.
And I think it's a fine line. And I'm always very hesitant to correct a dog, especially if they're in odor. We never want to call a dog off of odor. That's counterproductive to that obedience-to-odor philosophy.
But, yeah, you could try a -- you know -- a -- a slight verbal correction. But we don't train a dog to get up on things or to put paws up on things.
Q. What happens if you have a reliability issue with a K-9 team?
A. Like struggling in a certification or training as far as -- as far as finding target odor and whatnot?
Q. Yeah. So I guess -- let's maybe back that up a step.
What would you consider to be a reliability issue?
A. If -- if the dog is -- one of two things -- missing finds that we know are there and that there's accessible odor.
So, for instance, maybe we already ran a dog through that search area and there was no problem and that dog is not -- is failing to recognize that odor and indicate. Or that the dog is alerting where there is no target odor, no

find, so a false alert. Those would be two things.

And I think the first part of your question was what would we do in those instances.

Q. Yes.

A. First, I would be talking to the handler, saying, "Hey, what's -- what's the rub here?" Like "It seems that there's a high -- high occurrence here of your dog missing this. Does it have" -- you know, "Is it the same odor? Is it -- what's going on? Do we need to go back to Day One/Week One stuff and -- and reinforce that? Is it" -- just try and kind of ferret out what that issue might be.

If it's consistent, we will take the dog out of service and -- and probably work one-on-one or -- or set up some training regimen for that dog team to remediate the issue.

And, beyond that, we would probably remove -- and we have -- we would remove the handler, the dog from that handler, and then reassign him back to a -- as a nonhandler to reassign the -- evaluate the dog if it could be reassigned.

Obviously, if we're taking the dog from the handler, it's a handler issue. If it's a dog problem, we would get with Makor and say, "Hey, what's -- what's going on here? Is this a problem we can solve, or is this something we need to look for a new dog?"

But if it's a handler problem, we're going to

reassign the handler and reissue the dog.
Q. But, at any rate, they'd get pulled from patrol duties?
A. Yes.
Q. How many opportunities do you have to identify issues?
A. Every time we train together. In addition to -- and when Sergeant Deckert's reviewing records and stuff, there's opportunity there, but, really it really stands out, if there were to be an issue, that we train so much.
Q. So you've got eyes on those K-9 teams all the time?
A. Yeah. Very regularly.
Q. Through those trainings?
A. I don't make it to all of them, but I make it to almost all of them.
Q. So does Sergeant Deckert go in your stead if you're not there?
A. Most of the time. There are some times when neither of us -- we'll have scheduling conflicts, so we'll -- we'll kind of designate a handler to coordinate that training day.
Q. You mentioned "records."
What kind of records are handlers required to keep?
A. There's two forms that each handler's required to complete on a monthly basis. One is the monthly deployment record, which is a documentation of each time they operationally used their dog in the field, whether it's from a call for service or self-initiated traffic stop or request from a school.

And the other form is the monthly training record, which is their -- each and every time they get their dog out for a specific training purpose.

Q. What kind of information should troopers be recording? On those records.

A. On the deployment log it's the -- the date, the location. If it was a -- an agency assist or a traffic stop or other, we'd have them note that, like, for instance, a school. Maybe the school requested we come.

Whether the dog alerted or not. And then any amounts of contraband, weapons, or currency seized. And then make -- and then there's a spot on the bottom for any other notes, if there's anything that should be -- you know, maybe out of the norm that might want to be noted.

And then on the training records we have them document the amount of hours as the -- the team's information on there, the amount of hours they trained that session on that date, what -- how many finds for a particular substance. So it breaks it down into five categories of substances that we certify on.

So let's say they had maybe two methamphetamine finds out that day and one heroin find and one fentanyl find. They'd put those amounts in those fields, and then, for each of those finds, whether they were high, medium, low, or buried.

The amount of substance, whether it was residual -- I think we break it down like 0 to 5, 5 to 10 -- or 5 to -- different -- different brackets of quantities, 20-plus. Whether it was a building, a vehicle interior, exterior, open area, parcel search.

Whether there -- it was a . . . a blind find. So if I -- if I put the find out for you and you ran your dog on a blind find, they'd mark how many blinds there were and then how many blank search areas there were.

And then there's also a spot for notes on the bottom for proofing distracts and any other comments.

Q. Why is that information helpful for the program?

A. I mean, it's our -- our way of documenting what that team is doing for their training.

I look at those records less than Sergeant -- Sergeant Deckert. But at the internal assessments I print out each of those for the handler. I have a -- a -- kind of a total tally that I keep. And I can say, "Hey, here's where you're spending your time and here's where you're not; here's where you could spend more time" to try and keep some -- make sure that we're balancing our training.

Because you kind of get a narrow scope on a month, but when you look at the last six, eight months, a year, you can kind of maybe see trends that you might be able to get ahead of and shore up with that handler.

And it shows, you know -- keeps track of making sure that we're doing enough blind finds, enough blank finds, things like that.

MS. MARTENS: Your Honor, that's all of the questions I have for this witness.

THE COURT: Thank you.

Well, it's a good time, I think, to break for lunch. If we could all be back here around 1:00, it would be good.

MS. MARTENS: Thank you, Judge. Yes.

THE COURT: All right. Thank you.

THE COURTROOM DEPUTY: All rise.

(A recess was taken from 11:52 a.m. to 1:06 p.m. Ms. Senia joined the proceedings.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

Officer Russell, please be seated.

MR. DECKENBACH: You're done; right?

MS. MARTENS: Yeah.

MR. DECKENBACH: Your Honor.

THE COURT: Mr. Deckenbach, please proceed.

MR. DECKENBACH: Thank you, Your Honor.

Good afternoon, Captain Russell.

THE WITNESS: Good afternoon.

///

///

**CROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. So I want to just briefly address some of your responsibilities as a supervisor of the K-9 unit. Okay?
A. Sure.
Q. Part of your responsibility is to oversee the initial training of K-9 handlers who are chosen and selected to serve in that capacity; is that right?
A. Yes, sir.
Q. And you do that by working closely with the vendor, Mark Rispoli; is that correct?
A. Yes, sir.
Q. And I believe you stated that he was the sole vendor -- or he is kind of the only contract currently with the Wyoming Highway Patrol. Is that correct?
A. That's correct.
Q. And how many years has he had that contract?
A. Since the inception of our program, 24 years.
Q. Okay. And you are also, in your capacity, responsible for the maintenance training that I think you've talked about earlier today. Is that correct?
A. Yes.
Q. Okay. And you help establish and uphold standards for that training; is that correct?
A. Correct.

Q. And, in order to conduct that training, you're required to be apprised of what the most current national guidelines are; is that fair to say?
A. Yes.
Q. And so you've taken it upon yourself to educate yourself to what the best practices are that are out there?
A. Yes.
Q. And, in doing that, are you familiar with the American National Standards Institute's general guidelines that was published in 2020?
A. Say the name of the organization again.
Q. The American National Standards Institute.
A. I'm not familiar with that.
Q. Are you familiar with the scientific working dog group?
A. Yes, SWGDOG.
Q. SWGDOG. Okay.
And you -- but you're not familiar with the next generation of their work with the American Standards Institute?
A. I don't recall anything, no.
Q. You also are responsible for overseeing and making sure that the new handlers that you select meet the certification requirements at the end of their training?
A. Yes. Can I ask a clarifying question?
Q. Sure.

A. Are you saying like making sure that they're -- they're proficient to go into a certification?
Q. Yes.
A. Yes, sir.
Q. And you work with the vendor in setting up the test; is that correct?
A. The -- the vendor coordinates the certification.
Q. And then the certifying official is someone that needs to coordinate with your agency the location and the aids that will be used in the testing?
A. Yeah. I'll set up the location, but the vendor is responsible for setting up the certification and coordinating who's going to do that.
Q. Okay. And then, just in regards to the logistics of the certification process, your department is responsible for supplying the training aids that the dog might need to find; right?
A. Yes, sir.
Q. And these aids are the ones that you train the dog on; is that correct?
A. We have two large kits, one kept in Cheyenne and one kept in Rock Springs, that are issued to the handlers. They each have their own training aid kits. We use certifications to the -- the -- with the big kits that we have stored on either side of the state.

Q. Okay. So each handler has their own training kit that they use on their own time?
A. That's correct, sir.
Q. And is that the training kit that they use during their initial training, as well?
A. Yeah. They use some of that, and we'll kind of filter different kits through the training. And the vendor will also bring some of his own training aids, too.
Q. And I think you talked about, when you returned to the K-9 team, you were one of two K-9 team supervisors. Is that correct?
A. Yes, sir.
Q. Who was the other one?
A. At the time Lieutenant Josh Hardee.
Q. Okay. And he had similar duties that you have as you described; is that correct?
A. Similar.
We kind of split some of the responsibilities so we weren't really -- I mean, there was a little bit of overlap, but we were kind of responsible for two kind of different lists of stuff.
Q. Okay. And please correct me if I'm wrong. Your list sounded like you were in charge of a lot of the logistics, the -- kind of setting things up, the supplies, things like that. Is that correct?

A. That's correct.

When we were cosupervisors, he did a lot of taking care of the supplies, setting up venues, a lot of that stuff. I primarily did uploading of training and deployment logs, helping set up regional trainings, things like that.

Q. And, in that time, were you both, in your positions, kind of mentors to the younger handler pairs?

A. Uh-huh. Yes.

Q. And both had access to and exposure to these handlers and their K-9s; correct?

A. Yes, sir.

Q. You also, I think, talked about coordinating with interdictions or coordinating K-9 work with other law enforcement agencies. Is that correct?

A. Specifically K-9 training.

Q. Okay. And so -- I'm sorry. Go ahead.

A. I think maybe what you're referencing is interdiction deployments. That's -- that's something that just our agency does, but we do train additionally with other agencies separately.

Q. And what role do you -- if any -- do you play in the interdiction deployments and coordinating those ahead of time?

A. I -- I set up the dates, the locations, get the hotel rooms.

The schedule -- I do operational kind of briefing

with the team before each one. I set up the training for it.

Sometimes, every once in a while, additionally to the K-9 training, we'll maybe do a half-day classroom training with a -- you know, if there's something -- a topic we want to bring in. So I coordinate a lot of that.

And then, after we go through the training, the team goes off and works for the remainder of the week.

Q. And that working is actually being in the field?

A. Yep. Enforcement activities.

Q. Okay. And, just to clarify, some of the interdiction agencies you work with, one would be DCI, for example; is that correct?

A. Yes. We notify them under certain circumstances.

Q. And DCI -- one of those circumstances is when DCI would want to conduct what's known as wall stops; is that correct?

A. Yes, sir.

Q. And a wall stop is when DCI has independent information that someone may be traveling with narcotics; is that right?

A. Yes, sir.

Q. And they work with you to initiate a separate traffic stop, an observed violation, in order to have that suspected vehicle stopped; is that correct?

A. Yes, sir.

Q. And the coordination with the dogs come in that, during that traffic stop, a K-9 unit is nearby and ready to deploy on

the vehicle while the traffic stop is being dealt with?
A. Oftentimes, yes.
Q. And this allows the -- DCI's investigation to still remain hidden from the occupants of that vehicle because they just understand it to be a simple traffic stop; is that correct?
A. That's correct.
Q. But, going into those deployments, there's already an anticipation that there may be drugs based on what is known from DCI to your agency?
A. There's a possibility of that, yes.
Q. And that possibility is why that vehicle was specifically targeted for a traffic infraction enforcement?
A. Based upon their information, yes.
Q. And in this case when you have K-9 Becky -- are you familiar with K-9 Becky?
A. Yes, sir.
Q. And how long has K-9 Becky been with the department?
A. Oh, I believe 2017 is maybe when she came on. Yeah. To the best of my recollection, it's in that time frame.
Q. And so K-9 Becky is -- previous to Trooper Martinez, had a separate K-9 handler; is that correct?
A. Yes, Becky had a previous handler.
Q. And that handler was with Becky from 2017 until 2023? Is that about correct?
A. Correct.

Q. And in that time frame, you, as a supervisor, had a lot of access and exposure to K-9 Becky as a working dog; is that right?
A. Only the last -- very last part of that I was a supervisor. Prior to that, I was a handler. So I was still around Becky as a handler but not in a supervisor capacity.
Q. She would be familiar with you just from working around you?
A. Yeah. I think that's safe to say.
Q. And prior -- when you were a handler, it was Josh Hardee that was the acting sergeant supervisor; is that correct?
A. For part of that time. Prior to that, there was a different K-9 coordinator, back to 2017. Hardee was a handler, himself, at that point and not in a supervisor capacity.
Q. He was a -- I'm sorry. What was that?
A. I'm sorry. I'll try and speak up.
When -- when Trooper Hardee promoted to lieutenant and became the supervisor, that was the same time I promoted out of the K-9 team. So prior to 20- -- May of 2021, there was -- or maybe . . . in the beginning of 2021, thereabouts, there was a different coordinator prior to that.
Q. Okay. And, in your capacity that you have now, as a supervisor, you're kind of the interface between the vendors offering the training and the dogs and the agency; is that

correct?
A. Yes.
Q. Okay. And how many dogs would you estimate, at least in your time at the agency -- or at the Wyoming Highway Patrol -- that Makor K-9 has sold?
A. Oh . . . like that we've procured since I've been on the team?
Q. Yes.
A. New dogs that we've purchased since 2015, maybe 8 or 10.
Q. And what is the sole-contract price point for a dog and the full training package that comes with it?
A. So for narcotics, a narcotics -- single-purpose narcotics detection team, I think it's around -- it's, I think, 11,500 for the dog, more or less. And then I think it's 5 -- $5500 for the training. There's a shipping fee. Like at the -- most of the dogs come from -- a lot of the dogs come from out of the country, getting them to Wyoming. So there's $1700 to get them here. And then the lodging, meals, cost of the trainer to be there.
So, generally, around 16-, 18,000 -- trying to do the math in my head -- somewhere in that ballpark.
An explosives-detection dog requires a little extra time with the trainer, so that one's a couple thousand dollars more.
Q. And Makor K-9 is the -- both the source -- helps you

source a dog from Europe or wherever as well as provides the training; is that correct?
A. Yes.
Q. And Mr. Rispoli is the only vendor you've ever worked with during your career; is that correct?
A. Yeah. Makor K-9 is who our contract is with, and we haven't had any other -- any other business interactions as far as procuring dogs from any other K-9 vendor.
Q. And as far as Makor K-9 is concerned, Mark Rispoli is the sole proprietor and owner and employee of Makor K-9?
A. Yeah. I think he's got -- I think there's Makor West Virginia and Makor Texas, but I think they're independently owned.
So sometimes they'll -- he'll get dogs from one of those guys or they'll be there to help with the training, depending on how many people we have.
Q. And as far as people that he has in West Virginia, are you familiar with a gentleman named Mel English?
A. He's in Texas.
Q. Or he's in Texas. Okay.
A. Yes, sir.
Q. And is he in one of those associated vendoring groups that Mr. Rispoli --
A. To the best of my knowledge.
Q. And Mr. English is also a member of the IPCA, as you

understand it?
A. Yes, sir.
Q. And you don't personally have knowledge about the depth of Mr. English's business relationship with Mr. Rispoli, do you?
A. I don't know any of the workings of his associated business workings or anything like that, no.
Q. And I think you testified earlier that you trust that individuals -- or -- well, you trust Mr. Rispoli, as you see him -- he comes across to you as an honest business partner. Is that correct?
A. Yes, sir.
Q. And you have nothing to compare -- you said you have nothing to like compare him against in regards to other vendors because he's the sole one you work with; is that right?
A. I mean, I've done business in other realms and recognize what a good businessman is in general, and I think he has the marks and character qualities of that.
Q. And I think part of that was his willingness to replace Baxter or other dogs that were not performing well. Is that correct?
A. That's just one piece of it.
Q. And part of Mr. Rispoli's ability to do that was because you've brought those deficiencies to the attention of Mr. Rispoli as well as your supervisors at that time; is that

correct?
A. Correct.
Q. And because of your forthrightness, a correction was able to be made?
A. Correct.
Q. As far as a vendor, Mr. Rispoli and his company, they've never provided or produced to you any type of written curriculum, have they?
A. I haven't seen a -- any -- like a written curriculum.
Q. And that's including never a written syllabus?
A. Correct.
Q. And, in regards to supervising training of your troopers, you understand how the Wyoming POST certification process for training goes; is that correct? Just through your experience.
A. The Wyoming POST?
Q. Yes.
A. Yes, sir.
Q. And that, if you want a training to receive credit, you have to make an application for certification; is that right?
A. That's correct.
Q. And, when you do so, it may involve an inspection of your program by the Wyoming POST commission; right?
A. Correct.
Q. And doing so requires submission of a course outline?
A. Correct.

Q. Also requires submission of written curriculum if it -- if there is any?
A. It -- it asks objectives. It asks like a schedule of what's going through there. It asks safety considerations. It asks a myriad of different things on the application.
Q. And the Wyoming POST rules also require that anyone providing training would seek certification to provide that training from them; is that correct?
A. I'm sorry. Can you ask that again?
Q. Sure.
Trainers of -- are required to seek certification by the Wyoming POST for -- in order for the training to be certified?
A. Okay. So the -- an instructor, more or less?
Q. Yes.
A. Yes.
Q. Okay. And you have no knowledge of whether Mr. Rispoli has ever applied for such certification with the Wyoming POST; correct?
A. I'm not certain.
Q. And, again, you've never seen any written curriculum submitted by Mr. Rispoli?
A. I have not.
Q. And, in fact, this training through Makor, your agency has never sought to get training accreditation or credit hours

from this training; is that correct?
A. More recently we have.
I . . . I can tell you that, when I took over, I didn't -- wasn't aware that was something that was my responsibility. Since I have applied for, you know, our upcoming in-service here in a couple weeks, I've learned that process and know what to do now.
Prior to me -- I can't answer to prior to my -- in there -- time in this position.
Q. Okay. So that first application you know of is the one for -- that you submitted personally -- for something that's coming up in the next few weeks?
A. Yes, sir.
Q. And who's providing that training?
A. That's Golden Gate K9.
Q. And so that -- okay. And so that's with a different -- I think you testified -- a different vendor that you'll be using for this upcoming event.
A. That's correct.
Q. Okay. And we talked about the selection, how selection is made for individuals interested in becoming handlers.
And you were, yourself, certified back in 2015; is that right? The first time.
A. Yes, November of 2015.
Q. Okay. And what was the organization that certified you as

a handler?
A. At the time, CNCA and NPCA.
Q. And, in regards to, then, that initial training you receive, your -- the length of that training is determined by the vendor; is that correct?
A. Yes, sir.
Q. Now, there is a series of important topics that are covered during a training, and I'd ask you to enlighten the Court whether or not these topics are included in the training that you've received or your troopers have received.
Is there training time spent on how to read the K-9?
A. Yes.
Q. And that's important because you need to know the difference between a behavior triggered by a narcotics odor versus a behavior triggered by other odors or distractors?
A. Absolutely.
Q. And there's also education about the various environmental conditions that might impact an open-air sniff; correct?
A. Yes, sir.
Q. Different environmental factors -- I mean, it might take a detection K-9 different amounts of time to alert to the presence of narcotics based on the wind and the temperature and the humidity, factors like that; correct?
A. Correct.
Q. And I think you've covered it a little bit, but I'd like

to ask you some more questions.

There's training as to how to appropriately reward a K-9; correct?

A. Correct.

Q. I think you called it its payday. Or what --

A. Pay. It's actually -- we either pay or we can praise off.

Q. Okay. And you -- the -- the handlers are trained to reward correct responses; is that correct?

A. Correct responses from the dog?

Q. Yes. To the presence of odor.

A. Yes. Target odor, yes, correct.

Q. And handlers are not supposed to reward an incorrect response? Let's say behavior when there is no odor present, like a blank.

A. Correct.

Q. Because if you -- if a handler were to correct -- or incorrectly reward a dog on a blank where there is no odor, that might risk reinforcing those incorrect behaviors; correct?

A. Correct.

Q. Does the training that you participate in offer any specific training addressing cognitive bias?

A. Yes.

Q. Okay. And what does "cognitive bias" mean, as far as you understand, in -- in the context of K-9s and handlers?

A. Sure. As far as cuing and -- and under -- like if you -- if you stop a car and you believe something's in there, the -- the possibility of -- we say it goes downleash. You know, if you're nervous, your dog might be nervous, you know. So showing behavior that might cue the dog into alerting.
Q. And that's -- dogs are incredibly perceptive creatures; correct?
A. Certainly.
Q. And so a set of influences by the -- the -- the handler may affect the reliability and the validity of a dog's observations and exclusions based on the handler's behavior; is that fair to -- that's a possibility?
A. It -- if . . . if not properly trained.
Q. And then, finally, part of the training is focused on making sure a handler can conduct a controlled search; is that right?
A. Yes.
Q. And what is a controlled search, as far as you understand it?
A. Well, when we teach it, we want the -- the handler to be a good -- what we call -- search manager. Again, knowing your dog well enough that, if your dog is in odor and pulling you, not restricting the dog or calling the dog off odor strictly just to search a particular area if your dog's pulling you to odor.

But, if not, allowing the dog to work and work at their pace and remembering maybe the dog blew past this area so we need to come back and check that because the dog didn't spend enough time.

And a lot of that's dog dependent.

Q. And often these working dogs are very eager to work; is that fair to say?

A. Very high drive.

Q. And so there's a natural amount of excitement that they exhibit when being put to work?

A. Yep.

Q. And so handlers are taught to kind of calm the dog by an obedience order prior to deploying it?

A. Sometimes.

Q. It could be to sit? It could be to relax, some type of command?

A. If -- not all the time. If the dog -- dogs have different dispositions. If it's a . . . if it's a lower-energy -- high-drive but lower-energy dog, sometimes you don't need to do that. If -- like I referenced my dog Bailey. He was -- we called it the -- we called it the springer spasm walk because he just -- he was everywhere. So he needed a moment to just recenter before we go. Some dogs don't need that.

Q. And, if you have one of the more -- what -- you called it a springer spasm dog?

A. Spasm walk.
Q. Spasm walk. Okay.
If you have a spasm walk-type dog, what happens if you don't center the dog before you begin the deployment?
A. They'll -- they'll still search fine, but they -- it's just a lot of sometimes wasted energy at first. You know, we try and preserve their energy and not waste a sniff. So if they're just running back and forth exerting energy, you might have to take them back from the search area and sit them down, give them a second, and try to refocus because their brains are everywhere.
Q. And is it possible that the -- an uncentered or excited dog -- it might be hard to distinguish between their excitement to work versus their excitement over a target odor?
A. I would disagree with that.
Q. You don't think that's possible?
A. From my experience, I think there is a distinct difference between when a dog gets in odor -- and you know your dog, and you see the particularized behaviors and what happens with -- with the dog as a whole as to just my dog running around because he's out of the car.
Q. And so if the dog's excitement prior to being deployed and movements mimic and mirror the same excitement during the deployment, that is -- that excitement cannot be indicative of target odor because it's consistent both when in presence of

odor and when not?
A. Can you -- I don't know that I understood the . . .
Q. Sure.
If a dog's excitement and behavior is exactly the same or similar whether the odor is present or not, is that indicative of that excitement being tied to it working versus tied to its presence of odor?
A. I'm still not sure I understand the question.
Are you asking me if -- if the dog's general excitement and the -- the -- and an excitement related to target odor . . .is that --
Q. There's no distinction?
A. There is a difference between that, yeah.
Q. There should be a difference; correct?
A. Yes. Yeah.
Q. All right. And, if there's no difference, then it's not helpful in determining when that dog is on a -- on target odor?
A. Yeah, I would say that's accurate.
Q. In your -- in the initial training as well as the maintenance training, you, as a supervisor trainer, may witness K-9 handler errors; correct?
A. Correct.
Q. And it's your obligation, as a supervisor, to take corrective steps; is that right?

A. Correct.
Q. And does the Wyoming Highway Patrol have a corrective action plan system, or how do those corrective steps get taken?
A. As observed, we step back. We talk about the scenario. We -- we redo the scenario. We -- it's kind of . . . on-the-job, as we're doing it, feedback and work, if that makes sense.
Q. Yes. Kind of on-the-spot correction?
A. Yeah.
Q. And if a handler error is persistent, I think you testified it could result in that handler possibly losing their position as a handler.
A. Yes.
Q. And, in fact, maybe just being reassigned to another part of the Wyoming Highway Patrol?
A. Yes, sir.
Q. And not only do you -- as far as your supervisory roles -- involve directly working with the K-9 handlers and then their K-9, you also audit their training logs?
A. I don't -- so that's primarily the role of Sergeant Deckert on the monthly basis.
I look at them on kind of a broader, quarterly basis as far as the overall team and then biannually at our assessments. Like I said, I'll print those off, and I'll go

over where they're at kind of midway through that certification year with each handler.
Q. And those training logs, that quarterly review you do -- or maybe the more persistent review of your -- the other supervisor -- is an opportunity to catch deficiencies?
A. Yes. We hope so.
Q. And, again, if there are observed deficiencies in the training logs, then you would respond with the appropriate corrective action for that handler?
A. Yes, sir.
Q. And as far as the -- someone going through that initial assessment for certification, they have to demonstrate that they have control of the K-9 during the search; is that correct?
A. Yes.
Q. All right. An out-of-control K-9 would not pass certification?
A. Yeah.
Q. They also need to demonstrate an ability to interpret a final response?
A. Correct.
Q. And I think you kind of went through the different types of assessments that your organization runs. Is that correct?
I think you said you do single-blind assessments at times.

A. Correct.
Q. As well as operational assessments?
A. Correct.
Q. And that you also do double-blind assessments?
A. Correct.
Q. And the double-blind assessments, those are trying to account for not only potential cuing or inadvertent cuing, possibly, by the handler but also from maybe a known assessor; is that correct?
A. Absolutely.
Q. Because, again, dogs are extremely perceptive even to a -- an assessor they're familiar with?
A. That's possible.
Q. And it probably takes a little more work to set up a double-blind test. Is that fair to say?
A. No. Same -- same amount of time. It's the same certification. We're just out of the room.
Q. Okay. So it's not overly burdensome to your organization to apply that in that context?
A. Correct.
Q. And I think you talked about the cuing and answered my question already.
But when a dog is behaving and responding to the behavior of the handler, it's not always the handler doing it consciously or purposely; is that correct?

A. Correct.
Q. More often than not, they're doing something subconsciously?
A. They could be.
Q. And are you -- in your role are you always present when a K-9 handler and his K-9 are going through the IPCA certification process?
A. No.
Q. And you talked about the need to have somebody with -- or you would agree that someone with fresh eyes should be commit- -- conducting the certification of that dog; correct?
A. Sorry. Somebody -- yeah. I mean, somebody outside our agency. Somebody outside from that.

But sometimes we have to reuse certifying officials that we've used before due to availability and things like that from outside our agency.
Q. And one example of somebody from outside your agency who's come in is the gentleman we discussed before, Mel English; correct?
A. Correct.
Q. An associate of Mr. Rispoli who's traveled and certified dogs for your department on numerous occasions?
A. Correct.
Q. You are aware that there are other certifying organizations besides the CNCA or IPCA in the state of

Wyoming?
A. Yes, sir.
Q. Have you ever attempted to have them come in and certify your dogs?
A. We used to use NPCA when I started for a few years, as well.
Q. Okay. And when did that practice come out of favor?
A. 20- -- 2016. Just became cost prohibitive to get up to Jackson and bring our team up there every year.
Q. And are you aware of certification organizations out of Cheyenne that are associated with the Cheyenne Police Department?
A. I'm generally familiar that there's one out of here, yes.
Q. But no effort's been made to get those organizations -- that organization to come in and provide --
A. Correct.
Q. Instead, you work with Mr. Rispoli to provide certifiers through the organization of IPCA?
A. Correct.
Q. You and Ms. Martens discussed briefly kind of the difference between an active alert and a passive alert; is that correct?
A. Yes, sir.
Q. Is a sit a passive alert or an active alert?
A. A sit?

Q. Yes.
A. Yeah, that would be passive.
Q. Okay. And are most of your K-9s that you deploy in the field right now passive-alerting K-9s?
A. All of them are trained passive alert.
Q. And you talked about the pawing and jumping on vehicles. You don't want to deal with it because you're going to get complaints potentially; right?
A. Correct.
Q. Scratches or property damage might -- your agency might be liable for?
A. Correct.
Q. And so that is a -- a habit of some K-9s at times; is that correct?
A. Yes.
Q. And it's the obligation of the handler to work that habit out of that dog?
A. Right.
Q. And there are methods of breaking dogs of habit by maybe withholding their pay until they cease with that and, instead, revert to their trained passive alert; correct?
A. Correct.
Q. And if you withhold reward enough, that dog will realize "Okay. I'm going to get my reward by doing it the right way"?
A. Actually, there's kind of a cycle. They add behavior upon

behavior, thinking that they're going to get something different.

That's where we talked about if you pay it with the intention to pay the sniff and, while the thing's flying through the air, the dog paws at it, looks at it, whines at it, you just inadvertently unintentionally marked something that you don't want. So then a go-back would probably be an appropriate thing to try and shore that up.

Q. What's a go-back?

A. So if a dog is on a find and we -- and we reward the dog or pay the dog, withholding the toy and going neutral and allowing the dog to -- again, it's a re- -- reinstills skills and obedience to odor. Again, they want this.

They know, without a directive, they need to go back to find this -- the target odor. So they'll go back on their own, and we'll -- we'll reward them again.

And sometimes we do that a third time depending on what we're reinforcing, what we're working on.

Q. Thank you for explaining that.

And is there risk in continually rewarding a dog after it's manifested poor behavior, such as scratching?

A. Only continually rewarding it on the behavior we don't want.

So if you're rewarding the dog on the scratch, rather than the sniff, that could reinforce the bad behavior.

Q. Okay. And then, at that point, it's almost a trained, ingrained incorrect behavior; is that correct?
A. No. They're -- they're -- we say you can -- probably can't break -- you can bend them, but you can't break them.
They -- it's just a matter of -- it's just a matter of doing more repetition and reinforcing what you want so the dog establishes that -- that "This is not going to get what I want."
Q. And the dogs that you've worked with in your department are fairly smart dogs, I imagine.
A. Very smart, yeah.
Q. And are capable of being broken of those habits with the appropriate training?
A. Yes.
Q. You also talked about how dogs can get birdy, get excited over odor or scent. Is that correct?
A. Correct.
Q. And a number of things can make a dog birdy, including birds?
A. If a dog has been rewarded on birds, then I suppose a dog could get birdy on birds.
Q. And, again, you would need to -- in order to make sure a dog's not getting birdy over an actual bird, you'd need to break them of that in order to not confuse that behavior for something?

A. If they were trained to detect the odor of birds or locate birds and have been rewarded on that, that's where they would probably exhibit that birdy behavior.

I would say that that behavior -- although I use the term "birdy," it's associated to the odor -- the substance that gets them their reward.

Q. And dogs can also get excited about many different types of odors just naturally; correct?

A. True.

Q. The odor of another dog?

A. Sure.

Q. The odor of food?

A. Sure.

Q. And so, if these types of distracting odors are not proofed out, that excited behavior could be just in response to that?

A. Yes. Slightly different -- I would say it's different excited behavior.

So it's real easy -- if you -- if you filled a locker with a novel odor, real heavy novel odor, and you ran your dog around the bank of lockers, the dog's going to stop and show interest and explore it because it's something new, it's something big.

What we want them to do is to make the decision "This is not what's going to get me rewarded, this is not target

odor," and move on.
Q. So a dog might momentarily whip its head like "What is that?" if it's something new or novel?
A. A head check and move on, yeah.
Q. It might turn briefly to address its attention; correct?
A. Uh-huh.
Q. But a good dog ultimately will move on from that? If it's seeking odor first, a trained -- target odor?
A. Oftentimes there is a -- a moment of check, you know -- I think the -- it's the dog processing, like "Is this what I'm looking for or not?" You know, dogs work on generalization. And usually -- oftentimes they make that decision fairly quickly and move on, and that's what we want.
Q. A poorly trained dog might not move on, knowing . . .
A. I wouldn't say "a poorly trained dog."
Q. Is it possible a poorly trained dog wouldn't move on from a novel odor?
A. Yes.
Q. And, ultimately, that's why trained indications are ideal or helpful in understanding when a dog is actually on target odor?
A. Yes.
Q. If the dog is trained to sit, it's not going to sit -- for target odor -- it's not going to sit for novel odor? Is that fair to say?

A. Unless it's a poorly trained dog.
Q. Unless it's a poorly trained dog.
But that trained sitting is something that's very unique to the targeted odor; is that correct? Or is -- if it's trained correctly.
A. Yeah. The goal is the dog should be in search behavior, identify -- correctly identify a target odor, and then give, you know, that -- and, at that time, the handler's observing behaviors associated with that.
And then, when the dog would reach the source of the target odor, present a trained final response, whether it was a sit, whether it was a focused stare.
Q. And I just -- and I apologize. I have one question that's come . . . you know, talking about the well-trained dog and the certification to affirm that.
You defer to the IPCA's standards in regards to what is required for certification; correct?
A. Yes, sir.
Q. You've never requested that they incorporate some type of double-blind assessment into their certification?
A. Not into their certification, no.
Q. Because that -- that's their business? You're actually the client, and they're providing that service for you?
A. Well, as a -- as a . . . certifying official, I understand the importance of the single-blind in the certification realm.

One of the certification standards is the find should not be placed more than 6 feet high unless the dog can reach it.

We want to make sure that when the -- the handler is required to actually call their alert and -- and tell the evaluator "alert," we want to -- we need to be able to see that. And we're also evaluating are there -- are there any unsafe practices.

So there's a -- there's a need to be in the room for a certification to evaluate the handler and the team and the dog as a whole to ensure on a certification level that they were -- when they called their alert -- they were actually on -- on or close to -- within standards -- of the target odor.

Q. And, as far as that being possible, are you aware of agencies -- or maybe your own and your own assessments -- accomplishing that by having the assessor not in view of the team but being able to watch and correct as well as confirm if and when a find has been appropriately made?

A. I'm not aware of if that's happening other places, and we have it -- we just do the double-blind where we leave the search area.

And, again, that's not a certification; that's just an internal assessment. We want to see if they were accurate and their confidence, and -- and that has proven to be very successful.

Q. And it sounds like you -- that kind of came about when you took over. Is that correct?

A. Yes, sir. We had been doing double-blinds, again, since the inception of my time in the program. It just came into a formal practice for our internal assessments when I started.

Q. And, as far as you know, Trooper Martinez and K-9 Becky have only recently participated in such an assessment?

A. The formal assessment.

Q. And that was within the last . . . nine months or so? Or do you have a time frame?

A. October -- September, October. End of September, beginning of October.

Q. About three or four months ago? Okay.

And then, finally, I'd like to just touch on training records that -- you talked about them.

They allow you, as a supervisor, to ensure a K-9 and handler are performing adequately? Is that -- or that's one measure?

A. That's one piece.

Q. Yeah. And I think you testified that the individual handler's responsible for maintaining their records. Is that correct?

A. Yes.

Q. Okay. And in that record are they required to reflect the -- what -- the assessment's results? Or if they

participate in an assessment, is that reflected in their training records?
A. Like a formal assessment? Or . . .
Q. Or just one -- a periodic assessment.
A. So like . . . like when they'd be training, sometimes they have to train by themselves, just by the nature of it. Oftentimes they train as a group.
So what they're expected to do is document the specifics of the training day, how many finds, what was out, location. We try and vary up depths and things like that and different things like that.
And that -- that's what we expect they'd document on their training log.
Q. Are they required to document environmental factors on that document?
A. Not necessarily.
Q. And --
A. If there was something like extreme or out of the norm, maybe.
Q. And are they required to document the individuals who are either assisting or conducting the training with them?
A. No. They each have individual trainer records. So if they were -- five of them were training together -- like we were yesterday -- they would each fill out their own form.
Q. Is there any space for them to indicate whether it was --

they were using a double-blind or a single-blind or --
A. Yeah. They could note it in the -- in the narrative portion underneath. There's a section for blind finds to them. So whether it was a single or a double, it's going to be a blind find for them on that column.
Q. And is there a spot for them to mark how much time was taken to complete the assessment?
A. Yes. On the bottom they would put how many -- to the half hour, rounded to the half hour -- how many hours they trained that day.
Q. And is there a place for them to also indicate the type and size of this area they were searching?
A. They could note it. In general, we just have them put interior or exterior of the vehicle, building, open air, parcels, or buried.
Q. Okay. And the majority of the training, those 16 hours a month they're required to do, is it fair to say they're mostly on their own to make sure that gets done on their own time?
A. No, I wouldn't say "mostly."
We -- like I said, we try and provide 8 to 10 hours a month. Sometimes handlers can make it to both sessions; sometimes they can't.
So, at a minimum, most months they should be getting eight hours of group training. But, outside of that, often they're training either with other handlers from other

agencies or other troopers from the areas that will convene on an area and do a little bit of training.
Q. And then the other type of record you talked about are the deployment records.
And records of a deployment are kind of made in multiple ways; is that fair to say?
A. Yes, sir.
Q. They can be -- you know, let's say in the incident of a traffic stop with a deployment. An incident report would be generated, very bare bones, but it would capture some information?
A. Yeah. Our policy dictates in certain circumstances they would have to create a report.
Q. Okay. And specifically during a traffic stop where a K-9's going to be deployed, a handler will radio to dispatch to -- when they're deploying the K-9; is that correct?
A. Not all the time.
Q. When -- when are they required or when are they supposed -- supposed to do that?
A. There's no requirement for that. Oftentimes they're just maybe trying to provide a situational awareness to their shift partners or other agencies if they're in the area. There's no requirement to advise dispatch that they're running their dog.
Q. Okay. And so it's more of a courtesy to kind of let everyone else know what they're doing?

A. Yes, sir.
Q. And then, optional, they can also inform dispatch whether there was an alert or no alert?
A. Yes.
Q. So there's also a record of these deployments that are created from body camera footage at times; is that correct?
A. Yes.
Q. And your department's policy is that K-9 handlers should have their body cameras in operation when conducting a deployment in an operational setting?
A. Yes.
Q. And your troopers, be it K-9 handlers or not, have some basic training in regards to body camera operation?
A. Correct.
Q. And there's also training that touches upon how to appropriately use the body camera to create narratives and capture evidence?
A. I don't know what you mean by "create narratives" but --
Q. To -- to just -- if a -- a traffic stop's being initiated, a trooper might state the purpose for the traffic stop -- observed a car speeding, cross over the white line -- knowing that it's being recorded so, if prosecutors have to make decisions in the future or if there's a hearing like this, evidence might be preserved in that body camera.
A. I understand what you're saying.

That's not a requirement. I think a lot of people just choose to do that out of good practice, but it's -- it's -- some don't. Probably a lot of them don't.
Q. But I think the -- maybe that's more appropriate.
There's not a hard line -- "You must do this" -- but it's known as a good practice to preserve -- or create a record in and of itself?
A. I think it's good practice. Whether all the troopers, you know, do that or not for that reason I don't -- I don't know.
Q. And then, finally, there's the deployment log that the -- your K-9 handlers are required to maintain; is that correct?
A. Correct, sir.
Q. And you review those logs as part of your ongoing assessment of these K-9 handlers?
A. I review them periodically. The sergeant reviews them on a more regular basis.
Q. And, hypothetically, if you were to look at a log that had numerous alerts with no evidence of narcotics or explanations for why, would you grow concerned about that K-9 handler?
A. If there was not good reason for that.
Q. And that's why there's opportunity on the logs to put in comments to help illuminate or explain potential alerts that didn't result in a seizure of evidence?
A. True.
Q. And, if there wasn't a good explanation for these alerts

without evidence, that individual might require some corrective training?
A. Yeah. Or -- yes. Either corrective training or if -- I know there's been times where you bring it up to them and they've been logging it incorrectly or whatever the case, such as -- when we find noncollectible or a nonseizeable amount of substance, it will be -- we prefer they put "trace" or "residual" or something.
But sometimes I've learned with newer handlers they didn't remember from the instructions or whatever; sometimes they'll just -- "We didn't seize anything, so we didn't put anything in the blank."
Q. Okay. And is completing a log required for every deployment of a K-9?
A. Every enforcement employment -- deployment, yes.
Q. What was the word you said? "Enforcement"?
A. "Enforcement," yeah. Anytime we're requested, anytime we're -- you know, when we're actually deploying the dog expecting there's a possibility we'll find contraband.
Q. And are they required to make a record even when deployments aren't successful or don't go according to plan?
A. I'm trying to think of an example. I'm not sure what that might be.
Q. Maybe I can offer you one. Let's harken back to K-9 Baxter.

You mentioned that Baxter would get scared of traffic, maybe would refuse to work or be too shy to work. If you deployed Baxter in an operational setting and Baxter stopped working because of truck traffic on I-80, would you be required to log that in your deployment log regarding Baxter's performance?
A. I think it depends on did the dog actually do any searching for the opportunity to alert or not alert. If for -- for that example, when I got him out and he just went to the end of the leash, I doubt I would put that on a deployment log because there was no -- there was no search conducted.
Q. If Baxter began to sniff along the -- the car, the back, the front, the door, but then ultimately hid behind you because of the truck traffic --
A. Yeah, if --
Q. -- would that be considered the initiation of deployment?
A. If I feel that there was enough of a search that I felt that he made an effort there, I would probably log it. And I wouldn't have a "yes" or -- I'd probably put "no" but make a note that we had to terminate it early.
I think that's kind of a -- a little bit of a gray area, dependent on the situation.
Q. And such a record would kind of alert others, like you kind of raised your own alert on Baxter, that, "Hey, maybe we

need to work with this dog and . . . try to proof out distractions" or -- I don't know how you overcome that, if you do overcome that. Is that correct?

It would just raise the issue that this might need to be addressed?

A. Sure. And should bring some attention to something.

Q. Yeah.

And in regards to . . . this specific K-9 and handler, have you spent time going over any of their -- their deployments?

A. We -- we went over their deployment log for the calendar year from January until August -- or sorry -- September or October when we printed them off. Kind of looked at the big, 30,000-foot view.

Q. Okay. And, again, you -- your ability to advise and mentor is based on the accuracy of that information in that log review; is that correct?

A. Uh-huh.

Yes. Sorry.

MR. DECKENBACH: All right.

I have no further questions, Your Honor.

Thank you.

THE COURT: Ms. Martens.

MS. MARTENS: Thank you, Judge.

///

**REDIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. All right. So you spent quite a bit of time talking with Mr. Deckenbach about training, and I wanted to follow up on that by asking that -- in training do you look to spot or correct anything that you believe might be cuing done by the handler?

A. Absolutely.

Q. How do you do that?

A. So we're -- I mean . . . in a nondouble-blind, either a single-blind or a known calibratory-type training we're telling the handler, "Hey, man, you're too close to this dog. You know, the tail's hitting you. Back up." We're constantly giving them some feedback.

But, again, we also try and incorporate some of those drills, posturing drills, to say, "Okay. If your dog likes that, your dog's set up on an area where you know there's not a find, go and try to wait him out, and then we're going to try and set that up again."

We want to -- we train to our weakness. So we look for the things that either we, as the handler, or the dog might be a weakness, and we -- we set that up and we train that. That's how we succeed, is training to our weakness.

So if we saw a cuing-type result, we would say, "Okay. Go neutral. Teach the dog that your movement isn't

going to get them anything. Let them finish the search, and let's go set up an overpresentation drill."

Maybe it was the first presentation the dog set up, for instance. We're going to go do an overpresentation drill to train that, reinforce that "My behavior does not get you this toy. Target odor gets you this toy."

Q. So you said "an overpresentation drill." Can you tell us exactly what that is?

A. Sure.

If you just imagine a bank of lockers, and maybe we have a target odor towards the end. We're going to start at the beginning, where the dog is far enough away that they're not going to detect the odor coming from the locker.

And I'm going to say, "Handler, I want you to take Locker No. 2, and I want you to present to -- to this locker and this locker only." We'll start out with a minute.

I'll say "As long as your dog is searching those seams or that locker, we're going to let him search independently. That's what we want them to do. If they go off, I want you to present them and bring them right back to this locker."

If they sit up after a minute because they're getting frustrated, we're going to go neutral, and we're going to wait them out. And we're going to let the dog search, and we're going to do a presentation. We're going to -- and then

eventually we're going to go down the line, and we're going to pay him on the target odor. And we're going to go back and we're going to start the scenario again. And we're going to do it as an overpresentation. We're going to slowly, over time, increase the duration of our presentations from a minute to two minutes.

It feels like an eternity with a dog. But we want them to understand like "As much as I'm telling you to search here, if there's nothing there, there's no reward out of this."

And then we can move down and eventually pay them on the target odor. That's what an over- -- that's what I mean by "an overpresentation drill."

Q. Have you had an opportunity to train and observe with Trooper Martinez and K-9 Becky?

A. Yes.

Q. Can you describe sort of the scope of your experience observing them?

A. It's -- so I was there on and off during their initial training.

I -- like I said, being the K-9 coordinator is kind of my second full-time job. I still have to run a whole district of regular troopers. So I oftentimes have to split my time between the two responsibilities.

So I try and make it to -- to this. But oftentimes

that is my primary responsibility. So I try and make it to, again, the group trainings. I try and make it to all the events that I can with them and everybody.

So it's -- over the last year and almost a half that they've been together -- I mean, it's been frequent but not all the time that I've been around them.

And oftentimes when we have a training set up, I might have some search areas set up over here and the sergeant might have some training scenarios set up here so we can be running two dogs at a -- two teams at a time so, you know, you might see some people more than others through the training day but . . .

Q. You talked with Mr. Deckenbach a little bit about Becky being with highway patrol, I believe, since 2017 with a prior handler until 2023, when she went to Trooper Martinez. Is that right?

A. Correct.

Q. Were you familiar with Becky and her prior handler?

A. Yes, very.

Q. How so?

A. Before I promoted, we were on the team as peers, K-9 team handler -- or K-9 handlers together on the K-9 team. So we just worked a lot side by side, trained a lot. And then . . . once I promoted, he was still Becky's handler for a brief period of time before he promoted.

Q. And that trooper's name, again, was what?
A. It's now Lieutenant Michael Petruso.
Q. Petruso.
So in that time did you observe Becky paw or -- or scratch at vehicles or jump on vehicles?
A. Yeah.
Q. Can you explain that?
A. So a lot of it -- again, if you take like a -- a Labrador, as opposed to a springer spaniel, a Labrador is still very high drive but far less energetic and methodical in their search pattern.
Springers search and they -- and they are very independent and they -- they search. Oftentimes, you know, if they're in their -- in their -- you know, we try a search pattern to get them to make sure they cover corners and things like that. But oftentimes they'll nose up and -- in an exploratory way, and they'll -- they'll go up to see if there's any odor up high.
And oftentimes I believe that's their stature. And especially Becky. Becky is . . . a cute, little tiny thing. She's the smallest springer I think that we've ever had. And that's a little bit of her deficiency, is her size. So I think she tends to put her nose up to areas that she can't reach just naturally.
And then I . . . and then the other thing is, when we

see dogs get into fringe odor or if they see -- or if they -- I talked about novel odors earlier. If they smell something that is either a target odor or a novel odor, they're going to -- they're going to explore it and check it. We expect that. That's just part of their search -- search behavior. If they go up and find that it's not it, they're going to move on. If it is it, they might stay up and they might bracket. And they might go up and they might jump.

And then my dog -- so . . . my dog's thing was he would -- he would lick it and almost like start trying to like nibble at it. And -- and then he'd lick it and kind of whine. You know, I'd -- I always tried to figure out how they can train that out of him, but I think that's just who he was. And each dog is individual and has a little bit of a quirk here, a quirk there, and so it -- something that comes with it.

But I think that's kind of my best explanation of watching Becky with Mike.

I know when -- when we worked with Mike, you know, it -- she worked great. And she just has that -- that height kind of limitation. I think that causes her to search high in a different way than other dogs.

Q. So when you talk about not wanting her to jump or paw, how do you balance, as a trainer and a supervisor, not wanting the jump-and-paw behavior with the things that you've observed

with Becky?

A. So, first, I would never -- I would never want to correct a dog in an enforcement environment.

If we're -- if we're operationally deploying the dog on the side of the road where its unknown to me whether there's something or not, I don't want to pull her -- pull him or her off odor to make a correction.

That would definitely be more of a calibratory thing that we can work on in -- in -- with a known find. Like, "Okay. I know the find's over here. I know that maybe I can pay her a little earlier to mark that."

Especially her and all the other springers, they're quick little buggers, and they start -- they start doing things really fast before you can -- you know, you're trying to time it at the right time to get -- to mark the right behavior.

And, overall, our handlers do a great job doing that. But sometimes, you know, some guys are like "Why does my dog keep looking back at me or turning their head?" Well, that's something we can generally clean up, but sometimes -- you know, whether it's little tap dance that some of the dogs do or -- they just have a little bit of a quirk, and some things -- if it's a quirk of the dog, you might not be able to train that out of them.

Q. So is it fair, then, to say that -- this behavior that

Becky exhibits, you don't think it needs to be trained out of her, as a supervisor?
A. If -- if we're marking -- if she's not being paid improperly, being paid on target odor, as we do -- again, maybe a -- maybe a little correction. But I think . . . I wish -- I wish I could read the mind of a dog and ask her why she's pawing.
But -- you know, when we see our handlers paying the sniff, paying the active sniff, and we get a little paw -- you know, maybe we'll give a little verbal correction. But I'm more concerned that, hey, she's -- she's on odor and that we're paying the sniff.
And, again, mind you, this is following other odor behavior that we've seen at this point. I'm less concerned about correcting her when she's in odor, on target odor, than -- than getting the pay correct.
Q. And in a training environment where you have observed Andy and Becky, do you think that Trooper Martinez is paying the sniff?
A. Yes.
Q. Do you know whether or not Becky passed a double-blind assessment with her prior handler?
A. Yes. Trooper Petruso and Becky passed -- no. I'm sorry. Let me -- let me get my times right here.
No. So the time frame when Trooper Petruso promoted

to sergeant and gave his dog up was before we started the double-blind assessments.

I apologize. I'm getting my time frames correct.

So we hadn't done them at that point. We had done double-blinds in training but not in the formal internal assessment, agency assessment.

Q. And then the way that you choose to do the double-blind assessment is with no examiner or proctor watching how the test is carried out?

A. Yes. We're not in the search area.

Q. Have you ever worked with a dog where their general excitement behavior was the same as their excitement over target odor?

A. No, not exclusively.

Q. Do they overlap sometimes?

A. I mean -- yeah. Certainly, there's certain things. But like -- Bailey, like his whole -- he'd have this like body wiggle thing that only was done when he was on target odor. And he'd have the -- you know, he'd look back at me like, "Dad, where are you?" you know.

Every dog I've seen -- a lot of the pointy-eared dogs, you know, you can tell. Their ears just sit back, and they're just -- they literally stature themselves up for it. The Labs have this little tap dance thing they do a lot of the times, like they're -- it's very distinct.

Yes, there's some general excitement that maybe you see over -- over other things, but there's nothing like alert behavior on target odor. Once you -- once you see it, you've seen it.

Q. Mr. Deckenbach asked you about some sort of certification organization based out of Cheyenne.

What do you know about them?

A. I know -- I don't know if it's the same organization that's out of Casper.

I know there's an organization based out of Wyoming, but I don't know anything about them.

Q. As far as you understand, is it sort of like a small local thing, or has it got national reach?

A. I -- I would doubt that it had national reach. I believe Casper is part of some sort of Wyoming -- I'm guessing it's got to be the same one -- Wyoming K-9 type of association and maybe Gillette. I think it started up in that region. I don't know much about it other than that.

If I'm talking about the same one.

Q. And then you're a certifier for IPCA yourself; right?

A. Yes.

Q. And we talked on direct exam about the fact that you can't certify dogs that you work with or have a financial interest in.

So when somebody comes from IPCA to certify dogs for

highway patrol, do you trust that that organization has appropriately ensured that those things are true in the certifications you receive as an organization?
A. Yes.
MS. MARTENS: May I have just a moment, Your Honor.
THE COURT: You may.
(Discussion held at counsel table.)
MS. MARTENS: We have no further questions for this witness, Your Honor.
MR. DECKENBACH: May I have just a few follow-up on Ms. Martens' questions.
THE COURT: Sure.

**RECROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. I just want to hone in the time frame of your work with Trooper Martinez and K-9 Becky that Ms. Martens was asking you about.
Were you working directly with them after their certification in September of 2023 and then January of 2024, conducting these assessments in that very initial time frame?
A. I don't recall which -- which trainings I made it to after that.
I know I was in and out during the September initial training. I couldn't tell you through this past year which ones -- specifically which months or times I've made it to.

Q. And did Trooper Martinez ever approach you asking for help with behavioral issues with Becky?
A. No.
Q. Did he ever ask you to help him break her of her scratching and attempting to seek odor through windows?
A. No.
Q. And if Mark Rispoli identified that as a habit that needed to be broken, would you disagree with him?
A. If he said it was a habit that needed to be broken?
If -- if she's in odor, I don't think that's a habit that needs to be broken.
Q. You'd agree there's a distinction between being in odor and a dog curious about odor just generally coming out of a car window and trying to, you know -- like you said -- squirrelly seeking it, seeking --
A. Yeah. If that's search behavior, I would not correct search behavior.
If the dog is naturally, instinctually, without direction of the handler, searching, that's what we want them to do. We want them to explore that, you know, as -- to get into odor, to -- because it's . . . if you think of it this way, it's all about accessible odor. There could be a hundred pounds of drugs in the back. But if that vehicle is so well sealed and it's coming out of a pinpoint section of a door seam, it -- you know, we -- we think of it differently

and think there's just this plume of stuff coming out but there's not.

So that -- it might be up above her. You know, that's -- or any dog, for that matter. We want -- we want the dog searching and, if they get into odor, following that odor to source.

Q. And so the -- the pawing and the attempting to get its head in the window could be a searching behavior?

Potentially?

A. Attempting to get the dog's head in the window?

Q. If the dog is attempting -- like you said, she's just a little thing. Clawing up, trying to get a better vantage point of the window -- you described one scenario that could be a searching behavior; is that correct?

A. If the dog's sticking the head in the window, I'd imagine they're probably in odor.

Q. But if it's clawing just to get closer to the window, then potentially that's just searching behavior?

A. Possibly. I guess I'm trying to picture that.

I know -- so we don't -- we don't train our dogs to go in windows. We don't train our dogs to -- to jump on cars. So I believe it's got to be one of two things, the dog is searching --

Q. Uh-huh.

A. -- and believes they're in odor or is in odor or is

following odor to the source.
Q. That's the one thing. And the other is --
A. Searching or in odor.
Q. Okay. So either --
A. Sorry.
Q. Either it's on odor or it's searching for the odor?
A. Yes.
Q. Could be either of them?
A. Or exploring a novel odor and deciding it's time to move on, that's not it.
Q. Okay. What is that -- okay. Not it?
A. Yeah.
Q. Okay. And then, finally -- the name.
The Wyoming Police Service Dog Association, is that the -- I think Ms. Martens and I have been asking -- that's another certifying organization out of Gillette, Casper, and Cheyenne?
A. I'm not sure if that's the same one or not. I know there is a Wyoming association.
Q. Do you have any knowledge of whether they're affiliated with a national vendor selling -- sale of dog training programs?
A. I know nothing about them.
MR. DECKENBACH: Okay. I have no further questions, Your Honor.

THE COURT: I'm not going to take a lot of time.

**EXAMINATION BY THE COURT**

Q. Why European dogs? What's --

A. It's in their blood, sir.

They're great -- great bloodlines, great pedigrees. And they're -- they're just, I think, instinctually naturally good at what they do over time.

Q. So the American breeders just don't cut it?

A. Well, quality has diminished over the years we've noticed.

Q. Did you used to get . . .

A. We've had a few dogs from within -- within the States, but the majority of them are from France, Czech, Ireland, Europe in general.

Q. A springer's a very hyper dog.

A. Yes, sir.

Q. I wanted to understand the double-blind.

You're saying there is no -- no -- no proctor or observer in the room --

A. That's correct.

Q. -- in your double-blind.

A. That's correct.

I would set up the search area and give them the parameters. Let's say, if it was this courtroom, I would say "Zero to two finds. You've got seven minutes. I'll be out -- down the hall. When you're done, you come out and tell me

what you found."

Q. The only thing that's lost there is the observation of how the search is conducted?

A. Correct.

Q. And how the dog operates, any bad habits?

A. Correct.

Q. All right. So the sole goal there is to find -- find the drugs --

A. Yes, sir.

Q. -- within the time -- the time limit?

A. Yes, sir.

And in those double-blinds, one of those search areas is always blank. So there -- one of them, they should be coming out and saying "I've got nothing." So we'll say "You're right. Let's move on."

Q. Are you aware of the studies out there that -- where the proctor knows where the odor is and actually has put a piece of paper on the target at the -- and there's nothing there -- that the dogs more frequently make false . . .

A. I was unaware of that one.

Q. When there's an overpresentation situation, is it logged?

A. We -- we encourage the handlers to log that if they're doing it. I don't know that they always do.

We . . . we probably don't always log that as we -- as we could.

Q. Well, I was just looking at the interior of some of these cars that you have out there. These guys are busy --
A. Yes, sir.
Q. -- filling out paper and operating equipment and . . . and, of course, all of this takes place in a very limited time frame.
A. Yes, sir.

THE COURT: All right. That's all I have.

Anything from my questions that you wanted to ask?

MS. MARTENS: No, Your Honor. Thank you.

MR. DECKENBACH: No, Your Honor. Thank you.

THE COURT: All right.

THE WITNESS: Thank you, sir.

THE COURT: Captain Russell, you're excused.

THE WITNESS: Thank you.

THE COURT: We'll stand in recess for 15 minutes.

THE COURTROOM DEPUTY: All rise.

(A recess was taken from 2:23 p.m. to 2:43 p.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

Next witness.

MS. MARTENS: Thank you, Your Honor. The Government will call Josh Hardee.

THE COURT: Mr. Hardee.

(Witness sworn.)

THE COURTROOM DEPUTY: Please be seated.

Please state and spell your name for the record.

THE WITNESS: Joshua Hardee, J-o-s-h-u-a H-a-r-d-e-e.

**JOSHUA HARDEE, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

**BY MS. MARTENS**:

Q. Mr. Hardee, where do you currently work?

A. I currently work at Hilltop Bank.

Q. What do you do there?

A. I'm a vice president and commercial lender.

Q. Before working for the bank, what did you do?

A. I was a lieutenant for the Wyoming Highway Patrol.

Q. How long were you with highway patrol?

A. I was with the highway patrol approximately 17 years.

Q. What did you start -- when you started with the highway patrol, what were you doing?

A. When I first started with highway patrol, I was a trooper based out of Casper.

Q. Did you become a K-9 handler?

A. I did. I became a K-9 handler in 2009.

Q. And what kind of dog did you have?

A. My first dog was a Labrador retriever.

Q. And what was he trained to detect?

A. Narcotics.

Q. And you said you had -- your first dog. So you had other dogs. How many dogs have you had?

A. I've had two and then kind of three. I had a third one for a little while that was with me as -- when someone else left. We had a period where someone else left and I had to take that dog over. So, in essence, mostly two but a little bit three.
Q. Did you work as a trooper on the road that whole time?
A. That I was a dog handler?
Q. Yes.
A. A majority of it. So my first six years was on the road.
And then I moved to Cheyenne, here, in 2015, and I was assigned to the Capitol division, so I was mostly assigned to the Capitol, and that's when I had an explosives K-9.
Q. How long did you work at the Capitol?
A. Approximately six years.
Q. Did you ever take on any other roles with the highway patrol's K-9 program?
A. I did. I was the -- I believe in 2018 I was the -- became the K-9 coordinator for the highway patrol.
Q. Can you tell us just a little bit about the things you did as the coordinator?
A. Kind of everything, honestly.
I was responsible for coordinating deployments across the state, coordinating things for supplies for the dogs, veterinarian care, tracking stats. Those are the necessary

and the major groups of things that I did for the program.
Q. Is that the role you stayed in until you retired?
A. That's correct. In 2021 I essentially became the K-9 team supervisor. So for approximately two years I was a supervisor of the team.
Q. And did your duties substantially change between being the program coordinator and the supervisor?
A. A bit, yes. You know, more decision-making. I was more responsible for the outcome of the team, the direction we were headed, you know, decisions being made on the direction we wanted to go and the hiring of handlers, things like that.
I still kept, you know, some of the other stuff that I was doing prior. I just kind of added a little bit more responsibility.
Q. When did you retire?
A. In 2023.
Q. Do you remember what date?
A. I believe it was about May 18th, 2023.
Q. And is that when you went to work for the bank?
A. Yes.
Q. Have you had any continuing involvement with police K-9s since your retirement?
A. I have.
Q. How so?
A. So I was a certifying official for what was at that time

California Narcotic Canine Association, so I continued to do either -- you know, training combined with certifications of K-9 handler teams.

So I continued that up until -- I would say sometime last year I did a certification for an agency.

Q. You said "was a certifying official."

Have you let that go, or are you still currently --

A. No. No, I haven't let it go. I'm still good.

Q. I'd like to talk to you specifically about services you offered to the Wyoming Highway Patrol.

Did you ever certify dogs for the Wyoming Highway Patrol?

A. No. So what I did was our internal assessments.

So I would --

Q. Let me be clear. Like when you were with the highway patrol versus retirement.

So when you were with them, did you ever certify with highway patrol?

A. I usually certified other agency dogs, yes.

Q. But not dogs in the highway patrol?

A. That's correct.

Q. Okay. After retiring have you certified any dogs for Wyoming Highway Patrol?

A. Yes, I have.

Q. Let's talk specifically about that.

How many times have you done that?
A. The number of dogs or the number of times?
Q. Does it matter?
A. No. No, I don't think so.
I would say that I probably -- in the last couple years, probably two or three times I've done it. Probably somewhere in the area of five to seven dogs, something like that.
Q. Now, since you are retired from highway patrol, does that present any conflict of interest for you?
A. No, not at all.
Q. Why?
A. I don't get anything from it. You know, I'm just -- I do it for free. I do it because it's the right thing to do.
And it's what I did for years, and I -- I believe in -- in what they're doing and the K-9 program. And it's what's right for the members of the community and the state of Wyoming.
Q. So now that you're separated from Wyoming Highway Patrol, do you have anything to do with the K-9 program at highway patrol?
A. No, not other than if I do a certification.
Q. So you don't oversee any day-to-day training or handling of any of those dogs anymore?
A. No.

Q. How about before you retired?

How involved would you have been with K-9 Becky?

A. Very involved. You know, from training any, you know, issues that the handler may have had.

When I was with highway patrol, there was a couple different handlers with Becky. So anytime we had deployments or if there was some medical issues or something, I would have involvement.

And I also kept the stats for all of the K-9s.

Q. So once Trooper Martinez became Becky's handler, were you involved with Becky's day-to-day training?

A. No.

Q. I would like to show you what has been marked Government's Exhibit No. 3 --

MS. MARTENS: If we could switch to the HDMI.

BY MS. MARTENS:

Q. -- on the screen in front of you.

Are you seeing that document?

A. Yeah. It's sideways.

Q. It is. But I'm going to scroll through it just a little bit so you can get a chance to look at all three pages.

Do you recognize that document?

A. I do.

Q. How so?

A. It's my handwriting and my signature. Some of it's my

handwriting.
Q. So what is it?
A. It is a certification form for California Narcotic Canine Association.

MS. MARTENS: At this time, Your Honor, I would ask that Government's Exhibit 3 be received.

MR. DECKENBACH: No objection, Your Honor.

THE COURT: It is received.

(Government's Exhibit 3 received into evidence.)

BY MS. MARTENS:
Q. All right.
Do you recall administering the assessment that went with this certification?
A. A little bit. I recall that it was done in Rawlins.
Q. And is that documented here in the certification with its attached paperwork?
A. It should say the location.
I think it was -- yeah, go to the next one.
Yeah, so it was --
Q. So on page 3?
A. Yeah. At the Rawlins, Wyoming, Department of Transportation.
Q. And so, since you signed that form, you were the certifying official that administered that test?
A. That's correct.

Q. I want to talk to you a little bit about how it is that you set up a testing location and then administer the test.

So in broad terms can you explain what you usually do when you set up a location for a test?

A. So one of the first things is I want to make sure it's not a location that some previous K-9 training has done -- been done before, anytime recently, at least within six months prior.

If -- if that's the case, then I want it to be a -- a location that is large enough that has enough rooms to use for the certification and then that we have open access to at least three vehicles to do the certification.

Q. Why six months?

A. I just don't want to have any lingering, residual odor of narcotics or anything like that.

Q. And then in terms of setting up your testing course, are there things that you're looking for specifically?

A. Can you rephrase that? Or -- or restate that? Sorry.

Q. Yeah. So you're talking about finding a location.

What about a location might make it particularly suitable?

A. It needs to be big enough, you know, at least for the building area, that you have enough for four different rooms. That was part of the certification standards.

So, you know, not every place is perfect. So I'm not

looking for this perfect place. You're never going to find a perfect place. As -- as long as there isn't like, you know, a lot of people coming in and out. Not that it's an issue or a distraction or anything; it's just -- you know, we do have real drugs out, so I kind of want it to be a more secure area. So I just don't want people coming and going and something happen to those.

And, also, you know, we are in the middle of -- of testing, so I would rather people not come up and try to pet the dog or do something like that. So we generally try to make it to where there isn't like a lot of human traffic.

Q. And is there any particular procedure you follow when you set up where the aids or the finds are at?

A. Not really a procedure. When -- each place is different. It depends on the room. So I will go in and I will look first to see what each room or the cars look like and then kind of assess that room and that area and kind of have an idea of where I want the finds. It's, you know, not the same for each room. So it will vary. Each room will -- will vary where the finds are.

So I want to go and get a lay of the land, essentially, before I go and put those odors out. So that's the first thing that I do.

So once -- once I kind of get a lay of the land, then I'll get the odors, and then I'll go for placement. I usually

have an idea of where I want to put them in each separate area, and then I'll place them out. And then, once I place them, then there's a time that they sit.

Q. And you said you're looking for -- to vary those hides.

What do you mean by that?

A. So when I vary, that means like, you know, depth, height, portion of the room.

You know, if I had, you know, four rooms, I'm not going to go in two of those rooms and, as soon as you walk in the room, that there's going to be a find right on the left-hand side. So I vary that up.

So it may be one of the -- where they have to search the entire room, you know. They may start on the left side and the find may be in the middle of the room or it may be on the far right side or it could be as soon as they come in on the left-hand side.

But every single one is not the same. Every single one is different.

Q. And you're not using like a random number generator or some sort of external aid to do that?

A. No. It's not a randomization process.

Q. Do the handlers ever know how many aids or finds are in a given space?

A. Never. It's . . . every time that they go to a space, they are told "zero to two finds."

Q. Do you do any proofing?
A. Yes.
Q. What is proofing?
A. Proofing is bringing in another certified K-9 handler team that is not in the testing process or the certification process. Essentially, you're bringing that team in. You want them to run through those areas where you have those finds to make sure that -- a couple of things: A, that odor is emitting from that narcotic source; and, B, that there's no other odors that -- there's always a possibility that there could be narcotics in a room somewhere that you didn't know about.

So kind of those two things to make sure that there also isn't an area where a dog -- it might be a trouble area or something like that for whatever unknown reason. You know, when we bring that proofing dog in there and they may have interest in that area, that may become an issue.

So we just try to identify that in the beginning before we get started.
Q. Once you're satisfied with the setup, what do you do next?
A. So the odors need to sit there at least 30 minutes. You know, that gives it an opportunity to let the odor come out. You know, I've been doing this a long time, so there are certain -- certain situations that I've seen in my career that, no matter what you do -- you've put an odor in somewhere

and there's no odor coming out for -- for whatever reason. You can't explain it, you know. You can't see odor.

So in order to do a certification, there has to be odor there to know whether that dog can detect that odor. So that's -- that's the reasoning to let that sit there, you know, afterwards.

And that's -- so we'll let it sit actually prior to that proofing process. So it needs to sit. So backing it up a little bit there, we need that odor to actually sit before we run that proofing process.

Q. When you're running the test itself, what are the kinds of things you're looking for?

A. Really, there's two basic things that I'm looking for.

So if they're running, you know, cars or buildings -- it doesn't matter what they're running. I'm looking for two things: A, does the dog alert to the odor of narcotics that are present? And, B, does the handler recognize that the dog is into odor?

Q. Do you look to see if a handler is maybe cuing a dog?

A. Oh, sure. I watch for everything, yes.

Q. Would you have signed this certification if Trooper Martinez and K-9 Becky had not achieved those goals?

A. Absolutely not.

Q. Now, in terms of pass and fail, what kinds of things does a dog do to pass? Well, a dog-handler team. Excuse me.

A. Essentially what I said, is -- so in each of those areas that dog has, you know, found the odor and the handler recognized that the dog was in odor and called the alert. So that they found each one of those finds in all the areas.
Q. Have you ever failed a dog?
A. I sure have.
Q. Can you tell us a little bit about that?
A. Yeah.
So several years ago I was asked to certify a -- an agency explosive K-9.
And I had known of them. I had worked with them in the past, trained with them, helped them to kind of become a better K-9-handler team.
And so they came in to certify one day, and I set up the whole certification, the area. And the handler -- the dog was doing its job. The -- the handler was not. And it was absolutely painful. She could not recognize when her dog was in odor. I could. And she would take her dog off the odor. She would take the dog somewhere else.
And we went through the first two to three rooms, and she didn't find any of the finds. And I called it. And I pulled her aside, and I told her that I wasn't going to certify her because I didn't believe that she was up to the level that she needed to be and nor should she be running a K-9.

So, essentially, what happened from that is it shut down that agency's K-9 department.

Q. Is that the only time you failed a dog?

A. No. That one really stands out for me because -- mostly because it -- you know, it shut their department's K-9 program down.

But there's been times in, you know, certifications where a -- a team, you know, didn't find the odors. Or maybe there -- there was just -- the handler wasn't able to recognize that the dog was in odor so they missed something.

And so, if they missed it, I couldn't certify it. If -- if they missed methamphetamine in a room or something like that, I couldn't certify them.

So, yes, that's happened in both certifications and even in internal assessments, as well.

Q. That you failed dogs for highway patrol?

A. Yes.

Q. How many dogs have you certified?

A. I would say somewhere . . . I can give you a range of somewhere between 50 and 60 probably.

Q. And about how many agencies do you think that represents?

A. Maybe a dozen.

Q. Specifically for Becky's certification -- or I guess any certification on -- after an initial training -- is the -- the vendor involved with the certification process in any way?

A. No. So what will happen is the vendor will reach out to me and say "We have these -- a team" -- or several teams of dog-handler teams and that they've been training them for a period of time. And they'll ask me, "Hey, can you do a certification for us?"

That's generally what happens, is they reach out to me. And, if I can do it, I'll do it.

Q. But beyond that logistical setup, is there any involvement?

A. No. You know, they may like watch from a distance or something like that, but they have no involvement in it.

MS. MARTENS: That's all the questions I have for this witness, Your Honor.

MR. DECKENBACH: Your Honor, may I proceed.

THE COURT: You may proceed.

MR. DECKENBACH: Thank you.

Good afternoon.

THE WITNESS: Afternoon.

**CROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. I think you said in your prior dog-handling experience that you had worked with three different dogs over your years of experience. Is that correct?

A. Yeah. I would essentially say two. It's just that that third one I kind of worked on and off over the course of a

couple years. It wasn't really my dog, but I worked that dog to keep it in -- in good working shape for the next handler.

Q. Okay. And would you agree that every dog works a little differently?

A. Absolutely.

Q. And some sort -- type of initial training is required when a new handler takes over a dog they haven't worked with before?

A. Yes.

Q. And that training is basically for this unique pairing to get to know each other and how each other works?

A. Yes.

Q. And the training -- the initial training requirements of those K-9s, that is something that, when you were a supervisor, you would hire vendors or a vendor to provide?

A. Yes.

Q. And the -- you, as the supervisor, didn't control the structure of that training? That was left to the discretion of the vendor or the trainer?

A. That's correct.

Q. However, you were in charge of maintenance training once that dog handler and K-9 were certified?

A. Of maintenance training?

Q. Any ongoing training of the K-9-handler pair.

A. Yes.

Q. And at least supervising and making sure it was being conducted regularly?
A. Yes.
Q. Often handlers would have to train on their own time in addition to training established by your department?
A. Yes.
Q. And, in setting up that training for your certified handlers and K-9s, would you seek guidance from national resources, or how would you establish guidelines for how that training was to be conducted?
A. Like just regular maintenance training?
Q. Yeah.
A. You know, I based it upon all my years of experience and the training I had done in the past, what I had learned.

You know, it was something I -- that I always tried to vary. We -- we would change the focus of things that we did.

So it's not necessarily that I would consult with national agencies. You know, I had a -- a certification from a national agency so -- if there was any issue that came up during a training that I didn't know or understand, I may consult with, likely, the vendor we got the K-9 from.

But, you know, I learned a lot over the years from some of those other people that either, A, were our vendors or just I trained with another agency.

So we just always varied up the training.

Q. So your -- the training methods and techniques you employed were based on your own personal experience in -- in the profession?

A. Yes and no. I mean, it's not my own, made-up training. It was training that I learned from, you know, actual K-9 vendors, strictly -- mostly Makor. That's who we got our -- almost all of our dogs from from 1999 to current.

So there's been several different trainers through there that I've worked with and trained with that taught me how to work with dogs. So it's been pretty consistent training over the years.

There's been some tweaks here and there, but, you know, my experience -- I had a wide range of experience so -- and so did the -- the handlers that we were training with. Some were very experienced, maybe not as experienced as me, and some were green.

So it's training that changed up all the time.

Q. And you mentioned Makor as being one of the -- was that the sole vendor that you worked with during your time as a supervisor?

A. That's really the only vendor that the highway patrol worked with from the beginning, honestly. There might have been one more mixed in there, but it didn't -- that one didn't pan out and work with, you know, what we were doing at the

time. They did things a little bit differently. But that was several years back.

So I would say almost the entire time from when the K-9 program started for the highway patrol we've been with the same vendor.

Q. Okay.

And you mentioned that sometimes Makor would bring in other individuals to kind of complement or assist in the training; is that correct?

A. Uh-huh. Yes.

Q. And Mark Rispoli was the main trainer and sole proprietor of Makor? I think he was -- as far as you know?

A. As far as I know. I think he's had some partners and stuff in the past, but he's always been the main proprietor, yeah.

Q. One of those partners was a gentleman named Mel English; is that correct?

A. Yes.

Q. And he'd also help provide training to the department, alongside Mr. Rispoli?

A. Yes.

Q. And Mel English was also someone who was a certifying official for ICPA; correct?

A. Yes.

Q. And he also was involved in the certification of K-9s who

had completed training through -- by Mark Rispoli?
A. Yes.
Q. And how many trainings would you say you were involved with Mark Rispoli over your time at the Wyoming Highway Patrol?
A. That's tough. A lot. 30-plus.
Q. Okay. And you developed a professional relationship with him in that capacity?
A. Yes.
Q. And during all of the -- your time working and receiving training and training with Makor K-9, at any point did they ever provide you any written curriculum?
A. So we followed, at that time, CNCA standards, which is now IPCA. So those would be the curriculum that we would follow.
So as far as like a certification-type process -- are you saying a -- like a training curriculum?
Q. Yeah. I should have been more specific.
I think already in evidence is that -- the document from the IPCA of the certification -- we'll get to that -- the outline for how that's done.
A. Oh, okay.
Q. I'm talking about Makor K-9 and their training that they provided as a vendor.
Was there any other -- ever -- written curriculum regarding methods, techniques that you could reference back

to?
A. I don't recall, you know, a written curriculum. It was always just a hands-on-type training.
You know, generally, when you first got your dog -- you know, when I recall back all those years -- the trainer would generally sit you down and kind of talk to you about the basics of K-9 training and how a dog works and how a dog's nose works and things like that.
I probably received some literature over the years from those types of trainings, you know, and even when I got a new dog. I mean, that was 2009. So I -- I really can't recall a curriculum.
Q. When you were in the position -- or I guess -- well, one question I have for you is at what point did you, yourself, be asked -- or maybe you inquired; you can tell us -- about becoming an evaluator yourself.
A. So -- yeah. That was kind of a mutual thing. You know, I was one of the senior K-9 handlers. And then becoming the K-9 coordinator and the supervisor, you know, I needed the ability to have a certifying official status to do our internal assessments.
I think that just gave a little bit more credibility to the highway patrol's program, if you were a certifying official and you conducted an internal assessment and you could say, "Hey, I've been through this, I'm a certifying

official, and I can say, you know, at this point, you know, these dogs are capable of passing a certification," even though it was an assessment.

Q. And once that kind of mutual arrangement or agreement to -- to have you become a certifying official for the IPCA -- were you required to attend any formal courses to -- to gain that certification?

A. So I had already been to a lot of courses that CNCA -- let me just -- maybe this has been stated; maybe it hasn't. But I'll likely refer to "CNCA" because, when I was in it, it was CNCA, which is also IPCA now.

So I had been to several different trainings through CNCA but, also, the training and experience that I had over all those years prior from having a narcotic K-9 and having an explosives K-9. So I kind of had a broad experience in different things there.

Q. And at any point prior to or during or after you became a -- a CNA -- CNCA evaluator, did you ever seek Wyoming POST certification of your training?

A. I cannot recall.

Q. Do you ever recall assisting or requesting, on Mark Rispoli's behalf, having the training provided by Makor K-9 to be certified and examined by the commission at the Wyoming POST?

A. I can't recall. That would have been in like 2018, so

like seven years ago.

I mean, I'm trying -- I'm kind of thinking that maybe that there was something to do with POST, like some of the training -- like I know for sure the training that we went to when I went to their -- when they would hold training sessions, conferences out of state, those would become -- they were qualified for POST.

But as far as being a certifying official, I don't think we ever went through a process to get that through Wyoming POST.

Q. And as far as the 80-hour program that new handlers would go through with Makor, that was never submitted to POST for consideration, either; is that correct?

A. No, I believe it was. I believe that is -- that was on my POST transcript when I first got my dog and probably even when I did the training with my second dog.

You know, I haven't seen my POST transcripts in -- in a few years, but I -- I'm fairly certain they're on the POST transcript.

Q. And what year was that course again?

A. Oh, the -- my initial course was 2009.

Q. Okay. Thank you.

And in your role as supervisor, you worked with handlers and K-9s pretty consistently; is that correct?

A. Correct.

Q. Your job was to provide them constant mentorship and training as they progressed in their career?
A. Correct.
Q. And I think you already testified that you worked extensively and closely with K-9 Becky amongst other dogs.
A. Yes.
Q. And not only did you get to know the dogs, but the dogs got to know you; is that correct?
A. I would . . . say . . . yeah, maybe they -- they knew of who I was. They could care less who I was. Okay? Even, you know, a dog that I used to have, I -- I saw him just a few months ago or so, and he could care less who I am. He -- I think he knew who I was, but he was like "Where's the ball? Let's go to work."
And so, truly, to be honest with you, some of those dogs could care less who you are, even the handler.
Q. Sometimes I wonder if my own dog only considers me the source of food.
A. Yes. Exactly.
Q. So -- and how many years did you overlap with K-9 Becky?
If you can remember.
A. I would say from 2018 to 2023.
Q. And I think you -- you -- as you told the -- or responded to the Government -- you really believe in the work of the Wyoming Highway Patrol K-9 department.

A. I do, yes.
Q. And that it really does play an important role in our community?
A. It does.
Q. And you definitely want to see their continued success, even though you don't work there anymore?
A. I want to see all agencies' continued success that I've been a part of in certifying their K-9s.
Q. And you've certainly given years of your professional life to the Wyoming Highway Patrol to see it be successful.
A. It was successful when I left. I don't know what's changed since I've been there, but I -- I wish them success.
I mean -- but if -- if they had a dog that wasn't performing or able to certify, you know, I certainly wouldn't certify it. So I -- I think that -- maybe is that . . . what you're trying to say is whether I would certify that dog just because I was with the highway patrol?
Q. No. I'm just -- that you're -- you hold no ill will and, in fact, you've invested a lot of your time in the success of dogs like K-9 Becky. Is that correct?
A. Many dogs.
Q. Yes.
And how many -- when you were there, how many of the narcotics K-9s failed under your supervision when certified or evaluated by IPCA?

A. That's -- that's tough. I mean, I know that we -- likely there was records kept of it. But if -- if I had to guess, maybe -- are you talking just the Wyoming Highway Patrol?
Q. Yes. And I'm talking about when you were there as a supervisor.
A. Oh, as a --
Q. Yeah.
A. -- a coordinator to a supervisor?
Q. Yes, when you were -- yes.
A. You know, I -- I would say maybe less than half a dozen.
Q. Okay. And out of how many dogs that were actually coming through the program?
A. Well, at one point we were up to 12 dogs, both narcotic and explosive. But, you know, in that time there we -- I was probably a part of bringing along another maybe six to eight teams or something like that.
So as far as internals, I would say . . . yeah, it's probably about six or less.
Q. And so upwards of -- I mean, I don't know if I'm counting right here, but like 25 percent of these dogs failed certification?
A. Well, you're talking several different certifications and internals.
So we ran internals once a year. So being there for five or six years, there was an internal every year. And then

you had -- so that's 12, 12 dogs that go through an internal certification over five, six different times. That's -- what? -- 60 to 72 different times?

And then how many dogs I certified through there, so you could be saying 70 to 80.

So we're saying . . . 4 to 5 or so out of 70 or 80 times --

Q. And I guess I should --

A. -- a low number.

Q. You bring up a great distinction. I think I was talking -- or asking generally about just the actual official certification, not the internal assessments.

A. Sure. Yeah.

You know, as far as I can recall, a certification where I had to -- so if they failed that certification, well, I'd have to set up a new certification.

So they can't go and run the same certification because they already know where the finds are. Right?

Q. Uh-huh.

A. So . . . to think back, it's still a fairly low number.

I'm going to say still right at -- right about in that area -- fourish, five, something like that -- that I may have had to set up again. You know, for whatever reason --

Q. Right.

A. -- they either didn't find the odor or they -- it was just

missed.
Q. And it sounds like they would be given a second certification opportunity if they failed and -- is that correct?
A. Yeah. That was something that we had the ability through CNCA to do. We could set up another certification for them, and then they could run through the certification again.
Q. And did you ever have to decommission a dog because it just couldn't pass the IPCA certification tests?
A. For Wyoming Highway Patrol?
Q. Correct.
A. No.
Q. And I think you talked about the fact that -- I just want to touch briefly on training of -- during your term as supervisor.
Did you employ double-blind assessments internally, those internal assessments, not the annual certification?
A. You know, I recall doing them maybe once or twice in a training-type atmosphere but not in internal certifications or certifications.
Q. And I -- I just want to make sure we got the verbiage right.
The internal certifications are those kind of more formal internal assessments?
A. Yes.

Q. Okay. Thank you.
And, again, your best practices that you got were through the vendor of -- through Mark Rispoli and other associates of his who came to offer you guys training?
A. Sure.
But even, you know, over the years, along from other handlers that I worked with over the years, you even may pick up good things from them.
Conferences that I went to. I went to a number of those.
So it really is a -- a massive compilation of many people and many different events that makes up my experience in K-9 training.
Q. Okay. I'm -- just one last question here.
I think you stated that when -- the vendors may be present at the certification. Like Mark Rispoli, for instance, when you certified K-9 Becky, was present at -- in Rawlins with you all; is that correct?
A. Yeah, I -- you know, I honestly can't recall who was there at that time, whether it was Mark or one of his associates. I can't recall.
Q. All right.
A. It -- I think it was Mark.
So typically what they would do is they would stay out of the way. And that's the way I -- I ran a

certification. I generally didn't like too many people in there. I -- because I like to have room in there to step back and watch the team work and be out of their way.

So, generally, the vendor is not going to be right in there or right next to me or anything like that.

Q. And that's because, really, the handler is the only one that can really perform during the test; is that correct?

A. The handler?

Q. Is the one that's being -- you know, you're assessing the handler's ability to control the search? Is that part of your assessment?

A. The -- the team, the K-9 team. The K-9-handler team, yeah, both the dog and the handler.

Q. And -- I was almost -- you reminded me of a question that I failed to ask you.

What type of alerts does a -- do Wyoming -- Wyoming Highway Patrol K-9s generally perform, in your experience?

A. Focused stare.

Q. Okay. And are there other passive alerts that they do?

A. Well, there's changes in behavior. That's what I call them.

Q. And, in regards to alerts and the standards for certification, as stated in the rules, it shall be the responsibility of each handler to advise the certifying official as to the type of alert or indication his K-9 will

give.

What are -- what are the type of indications or alerts that would be reported to you? Just could you give us some examples?

A. Yeah, sure.

There's a final indication, which would be the focused stare, if they got to the source or the dog thought it was at source. That's how we trained them, was to get to source of the odor. So, generally, in most cases, they would do their focused stare, which they essentially kind of stop what they're doing and stand and stare at it.

But you could see some others in there. Your -- your verbiage is "alerts." I'd call them changes in behavior.

But some of those could be, you know, their breathing changes. Their body movements change. Their tail will -- wags faster or slower. You can see some more excitement in them. Maybe, you know, instead of hearing them huffing and puffing, they close their mouth and you can really hear them breathing through their nose. They may take big, strong, deep breaths, and you really hear them smelling, you know, and snorting.

And -- they have a lot of changes. There's -- there's a lot. You can't just quantify it into -- you know, for every single dog -- that they have, you know, one or two or three or four things. A good handler is going to see many

different things.

Q. And so under the IPCA guidelines, would -- a handler who's responsible for telling you, the certifying official, the type of alert or indications a K-9 will give, would they list off the different change of behaviors to you?

A. They could. But, you know, a lot of times -- the product that we got from Makor was really good. So, generally, the -- the dog, in a lot of cases, got to source or very close to source, and so you would see that stop and that final focused stare.

But I had been doing it so long that -- you know, I could see many dogs -- maybe even a dog I hadn't seen before -- and I could see the changes in behavior. So I had seen those. So maybe I didn't necessarily ask them or tell me what it was, but I saw what was going on.

And so they didn't have to necessarily tell me. They just had to tell me -- you know, "Alert" is what they were told to tell me as a certifying official, is -- we wanted them to tell us an alert. So they could kind of somewhat explain after, you know, "Yeah, my dog came to a final focused stare." But being in it that long, you know, you're watching them and you're watching the dog. So not always did I require them to say that because I saw it. I know they saw it. The dog in most cases came to that final focused stare.

Q. All right. So you didn't preemptively require them to

disclose necessarily the exact alert or indication of the dog?
A. Just tell me that alert.
Q. You could --
A. That's what I asked for.
Q. Okay. And at times you could pick up on what you thought was the change in behavior even if you were unfamiliar with the dog?
A. I could, yes.
Q. Other times when it's undiscernible to you because you don't really know the dog enough?
A. I was so -- had been working with that vendor for so long and those dogs that I could honestly . . . I could truly -- with a lot of the dogs I could be standing outside that door out there and I would know when that dog is in odor.
So as I'm watching -- so I know when the dog's in odor. I'm also watching that handler to see if -- are they recognizing that dog.
So I had many different jobs while I was in there being the certifying official. So that's why I said, you know, I stay out of the way, because I want to see them both work.
And so just because I knew it, I wanted to watch that handler, as well. What are his reactions? Is he seeing what's going on? And did he call the alert?
Q. And do you recall what Becky's indication or alert was

when you certified -- I know --

A. Yeah, I --

Q. -- it's been a while so --

A. -- I know.

So Becky is -- is -- is interesting. She's very, very high drive, always has been.

I remember when she first started. She -- she spins a lot, and she's -- she's just very -- very high drive.

But she is still a focused stare. You'll get a focused stare out of her, but she'll -- she'll do a lot of tail-wagging and circling, but then she will come in and do a focused stare, as well.

MR. DECKENBACH: Thank you.

THE WITNESS: Yes.

(Discussion held at counsel table.)

MR. DECKENBACH: Why don't you go.

MS. MARTENS: Do you have another question?

MR. DECKENBACH: I think I have one last -- would the Court entertain one more question?

BY MR. DECKENBACH:

Q. So you talked about K-9s sometimes react to novel odors; is that correct?

A. Define "novel."

Q. Something that is not a target odor but is different to them, something they didn't expect or are not sure what

they are.
A. So ask your question again. Will --
Q. K-9s can respond to . . . to the presence -- maybe a head turn, maybe a curiosity -- and do something that they're not familiar with?
A. I mean, they could. It's -- yeah, it's certainly possible.
Q. And so sometimes -- is it difficult to make the distinction between when a dog is curious about a novel odor versus when they are on -- starting to hone in on a target odor?
A. Not if you've been, you know, trained well and you've been paying attention to your dog. Even by the end of your -- your training as being a new handler, you should be able to identify the difference.
You know whether -- if it's a male dog and that dog is off in the weeds or something and trying to smell other wild animal urine or something, if you know your dog, you know when that dog is on odor of what they've been trained to alert to versus something else.
Q. And being able to make that distinction, you should be able to also articulate that distinction, either to an evaluator or to another person who asks?
A. You know, you should, yeah. You should.
I mean, if a dog is pulling off leash and going off

into the weeds or something like that but -- again, it still could be odor from a narcotic that is in that particular area because we don't know what odor does because you can't see odor. So is the dog -- actually might be in odor and it caught something and then it went away.

This is something that we saw quite often with -- as we learned through the fentanyl process. Fentanyl did a little bit different things than what we were used to. So, as we watched those dogs, we could see them get into the odor immediately, and then they would be out of the odor, so they're bracketing back and forth. So they may bracket out of it, out of that odor, but then they're coming back into it. So they're always doing that work.

So it doesn't necessarily mean that -- they may have smelled a novel odor and it may have caught their attention for a split second, but then they went back to work because they knew that "I'm trained on these particular odors and that's what I'm here to find." So while something may be a -- a distraction, that dog likely went back to work.

And most of the K-9s that I saw for the highway patrol were very good about that. If there was some kind of other whatever -- if it was a novel odor or whatever it was -- most of the K-9s have been very good about, you know, putting that aside and focusing in on what they were looking for.

Q. And so a trained handler should be able to articulate the

difference between a distracted K-9 and a K-9 that's on target odor?
A. I think they should, yes.
Q. And they should also be able to make a distinction and describe the difference in behavior between a dog who is searching and a dog who is honing in on target odor?
A. A difference between searching and honing in on target odor? I think that -- those kind of inter- -- interlap there a little bit.
Honing in on odor and searching is kind of two of the same things.
Q. So if there -- maybe -- maybe let me clarify. I don't mean to muddy it.
If a dog is honing in on odor, that means it's acquired odor and is looking for its source; right?
A. Honing in on it?
Q. Yeah. I think maybe I'm misphrasing something you said earlier.
A. Was I talking about bracketing?
Q. Sure. Let's -- let's -- can bracketing occur when they are not on -- when they're not picking up on the odor of a target?
A. You know, based on past experience, I didn't see a lot of bracketing from K-9s -- narcotic K-9s, explosives K-9s -- when they are not on a target odor. Let's put it that way.

So let's just say that novel odor is beef jerky. I generally didn't see a dog bracketing into a piece of beef jerky in a car.

Q. And so if a K-9 was bracketing every time it's deployed, regardless of whether there's target odor present or not, is that problematic?

A. Is it problematic if they're bracketing?

Q. Bracketing -- even if there's a blank and there's no odor in the assessment and it starts bracketing on something where there's no -- it's a blank, is that problematic?

A. Is it a known blank?

Q. Yes. In this hypothetical -- you set it up. It's a known blank.

A. It's a known blank?

Q. And it's bracketing.

A. And if I see a bracketing?

Q. Uh-huh.

A. Is it a problem?

Q. Yes.

A. No, I don't think it's a problem. I mean, you know, maybe there's -- there's something there and, yeah, they're, you know, searching their way through.

But if it's a known blank, I mean . . . I just can't recall a time where I saw a dog in a blank area and went into this bracketing session and . . . and there was nothing there.

Generally, the dog would go in -- if it's a -- if there's nothing in there, I'd see most dogs go in there and they'd smell, you know. The handler might have to redirect and, "Hey, check this particular area" or something.

But, generally, in a -- in a known blank area, I don't recall a lot of bracketing going on. That -- that comes from -- that bracketing comes from when they are in odor of that target source they've been trained on. So immediately something goes off in them -- they're like, "Oh, I -- I know what that is; I know that odor" -- and they're tracking it down because that odor is going everywhere.

So that bracketing becomes -- because there's this wide plume of odor. So they're trying to narrow it down and get down to source, and that's where that bracketing's coming from. So if there isn't a source in there, they're likely not going to bracket.

So I'm likely not going to see bracketing happen in a nonodor room, in a blank room.

Q. And, again, a handler should be able to decipher and to explain what is bracketing and what is their dog just searching; correct?

A. I think they should be able to, yes.

MR. DECKENBACH: No further questions, Your Honor.

MS. MARTENS: I have some follow-up for you.

///

**REDIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. So you were talking with Mr. Deckenbach about the ways that dogs behave with distraction odors versus target odors. And I think maybe we got a little muddled on the -- the test with that, so I just want to make sure I -- I'm clear about what your testimony is.

So when a handler goes in to take a test, do they tell you what the final trained response of that dog is?

Like the -- the stare or the sit.

A. Yeah. There -- there will be a lot of times that I'll ask for that, especially -- so . . . the highway patrol, you know, I knew that it was a focused stare --

Q. Yeah, so --

A. -- so I didn't have to ask --

Q. I'm going to cut you off right there.

So I'm just asking about, as a certifying official for IPCA or CNCA, when you're administering a test, the handler -- do they tell you what the final trained response is?

A. Yes. So typically that would be something that I would ask, and I'll tell you why, because some dogs will do a focused stare and some dogs may be a sit. There's, unfortunately, some that may be an aggressive bite or scratch.

So, yeah, it -- it is something that I did need to

know. I mean -- so, yeah, maybe -- I probably wasn't clear with him. So, yeah, that clears it up. So, yes, I would want to know from them what it is.

So, in most cases, most certifications or assessments that I did with highway patrol, I would know that. But, then, a lot of the other agencies I didn't know, so I would have to ask them "What is your dog's alert?"

Q. Yeah. So you knew -- for the purpose of that internal assessment, when you weren't certifying on behalf of IPCA or CNCA but just for the highway patrol, you already knew that?

A. Yes.

Q. Okay.

A. So -- yes. My apologies to him about that.

So, generally, with -- with Makor I knew what the final alert was. If it was a different agency, I likely didn't know, so I would ask those agencies to tell me what their dog's alert is.

Q. So when you were a certifying official for CNCA and you're talking to somebody outside of your agency and they tell you what the final trained response is, did you have conversations about what that change in behavior when an individual dog got into target odor was?

A. Would we have to have discussions about it? Yeah. Sometimes afterwards.

You know, if it took that handler a moment before

they called the alert -- so as I'm watching the team, if the dog was like doing some kind of dance or dancing around or something like that and maybe was half-sitting and half-staring but he called an alert, and then I'd -- I'd have him explain, you know, what -- "Is this his -- his alert? What -- what happened here?" So there may need to be some explanation.

But in a lot of situations, most situations -- if they told me what it is, almost -- most situations, that's what happened, was that -- that final alert.

Q. So you mentioned that you might see some other behaviors while you're testing. Does that depend on the dog?

A. Yeah. Every dog's different.

Q. Are there certain things that you see certain breeds doing consistently, large dogs versus small dogs?

A. Yeah. I think some of the smaller dogs, especially the springer spaniels, they seem to have an insane amount of drive. And they do a lot of jumping, bouncing, spinning around.

The bigger dogs, you typically don't see that as much. You know, Labs and shepherds I've worked with, you don't see them spin around in circles a lot. You know, they may dance their feet a little bit or, you know, wiggle their butt or their tail. But, the smaller breeds, you'll see a bit more of that excitement level in that spinning and doing some

jumping and things like that.

Q. You mentioned that, when you're administering an assessment, that you stay out of the way and let the team work.

Are there things that you do to help make sure that you, as the administrator of the test, are not cuing the K-9?

A. Yes. So what I like to do is -- myself -- is keep moving and staying out of the way, just so that doesn't become an issue. Because, you know, I've seen other agencies -- you know, outside of, you know, the highway patrol's program and Makor's program -- do some different things and -- and maybe stand really close to the find.

So I can see how, you know, as a certifying official, that you could essentially cue a handler -- maybe not the dog -- maybe the dog, as well. So what I would do is typically -- I kept moving and I would stay away from where the target odor was.

I may walk right by it, as well. So I -- I may not avoid it. So -- it depends on where that dog and the handler is. So my position always changed, and it was so that I could see what they were doing, how the dog was working and what the handler was doing, was it paying attention to its dog.

So I -- I truly could. I could walk right past the find, not while they were there but they could be in a different area and I'm walking right past the find. So

I intentionally did things to make sure that I wasn't showing them where it was.

And just to add to that -- I'm sorry -- a good certifying official should do that.

Q. Avoid cuing?

A. Yes.

Q. You talked some with Mr. Deckenbach about failures of Wyoming Highway Patrol dogs on their CNCA certifications and that those dogs would get a second chance to try again to certify.

Would you immediately set up a test? Or would there be remedial training or other measures taken?

A. You know, it depends. Sometimes you might have to do some remedial stuff. It just depends on how it went. If it was, you know, not good -- maybe they didn't find several odors -- but that rarely ever happened. I mean, we really got an elite product from Makor, so, when those dogs were done and they were certified when we got them, they really were a good product.

And in the highway patrol we always held our handlers to a very high standard. And I've seen a lot of agencies and a lot of bad dogs and -- like it's embarrassing, some of the other agencies and the dogs they have. But the Wyoming Highway Patrol -- and there's also many other agencies that have been very impressive over the years. I've seen good and

bad.

But the Wyoming Highway Patrol did a good job from the moment the program was started, up until even right now -- I don't know what they're doing right now. But, at the time that I left, a very elite program, always -- training standards were high. And that's why we did our internal assessments, to make sure, at a halfway point, those dogs were still working at a high level. We could catch it at the time.

That's what the point of the internal assessment was, is were those handlers doing their job. Were they getting their training hours in? And we can tell if they weren't doing that. So that was the point of it.

So they always had an elite program, and they always did a good job.

Q. With your time with highway patrol -- well, I guess -- let me ask another thing first.

So, as a certifying official, you talked with Mr. Deckenbach about your wish for the dog and the K-9 program for any agency where you go and certify -- for their success.

If you certify a dog that does not deserve to be certified, does that contribute to the success of an agency?

A. I -- you know -- yes. If that dog is not doing its job and it wasn't doing the right thing and you could tell that that team, that combo -- they shouldn't be out there. No matter what their discipline is -- explosives, whatever,

narcotics -- it doesn't matter. If they don't have the ability to do the job, what they're supposed to do and pass a certification, yeah.

Unfortunately, I considered it a success to fail them because they should not be doing that job, plain and simple.

Q. And it's -- so, just to be clear, you're saying it's better for the agency in the long run to fail a team?

A. Yes.

Q. You mentioned -- or talked a little bit about distractions versus target odor.

Did you know Becky well enough as a K-9, a detection K-9, to tell when she was interested in some distraction odor versus a narcotic odor or her target odor?

A. Yeah. I would say at the time, you know, I trained enough with them to know.

But Becky . . . was a machine. So rarely did she ever mess around. She was always -- as soon as she got out of the car, she was ready to work. That dog was a lot similar to the explosives K-9 I had. There's just some dogs that are born to do this job.

I'm not saying that all the other ones aren't good. They're good. It's just some -- they really stand out and above, beyond the rest of them. And Becky was one of those dogs.

And I don't say that lightly. She just was an elite

dog when it came to knowing what her job was. Like she lives, breathes, eats, and she will probably work until her dying day finding drugs. And rarely, if ever, can I recall her being a dog that would get distracted by novel odors or odors that aren't the target source.

Q. You mentioned that you could be standing outside of the courtroom and tell that a dog was in its target odor. How?

A. Using your ears. Just listening. On a lot of cases you'll hear a lot of sniffing going on and a lot of movement -- maybe you can hear their tail wagging and banging up against stuff.

But, generally, when they -- they're getting really close to source, that stuff tightens up. And they'll -- they'll stop and they may take in a deep breath. And then things get really quiet because they're sitting there and staring. They're like "It's right here."

So a lot of dogs -- I'm not saying I could do it with every one of those. But, you know, I had been doing it long enough that I -- I could hear a lot of the dogs -- if I worked with them enough, I could hear them, without seeing them, and know that they were in odor.

Q. And was that part of that behavior change leading up to the final trained response?

A. Yes.

Q. We talked a little bit about proofing rooms -- and some --

some on cross, too -- about blanks versus odors and the possibility of unknown scenarios.

Can you tell us a little bit about your experience with residual odors?

A. Yeah. You know, residual odor, it can be around a while. And -- and I experience that from my training and experience, you know.

I had a dog where I had set something out a week ago, and we came back and -- a week later -- he hit on that particular area. And so, obviously, that residual odor can stay around for some time.

Do we all know? No, we don't. No -- nobody knows. I mean, I -- there's no scientific backing that says, "Hey, this particular drug or this particular odor, this residual odor of that stays around for this length of time."

But, through experience, you can see that it -- it can stay around for a bit, you know, on seats of cars or on floorboards of cars, things like that. Residual odor can -- can stay for a while.

And, you know, over the years of, you know, times that I ran my dog, you know, my dog would hit on something and, you know, we may not actually find something in there. And -- and the people are like, "Yeah, I" -- you know, "I had, you know, marijuana in my car and it was in a bag on the floor" or "It was in a bag on the seat." I mean, that

happened several times before. So that residual odor really stays around for -- for a while.

Q. And that's part of why proofing a room before a test is important?

A. Yes.

Q. We talked some about some -- Mark Ripsoli and a fellow named Mel English.

Do you have personal knowledge of the precise business arrangement between Mr. Ripsoli or Mel English?

A. No.

Q. Just know them professionally through doing K-9 handler work?

A. Yeah. You know, whatever business arrangements they had wasn't my business. I didn't ask; they didn't talk about it. It was always on a very professional level.

They were there to do a job, but they never discussed -- I knew that they partnered up together and -- and, you know, Mel may do a certain . . . specific thing for Mark for dogs or a certain set of dogs. He may do just, you know, narcotic work for him or explosives. I -- I believe he did both.

But it wasn't anything that we ever had discussions about.

MS. MARTENS: May I have just a moment, Your Honor.

THE COURT: Yes.

(Discussion held at counsel table.)

MS. MARTENS: I have no further questions.

MR. DECKENBACH: Briefly, Your Honor?

THE COURT: Sure.

**RECROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. The -- I think you described Becky's breed and her specifically as being a -- kind of a jumping, bouncing dog.

A. Uh-huh.

Q. That's just kind of innate into how she -- just her drive and excitement?

A. Yes.

Q. And that's even before she's on odor or if she's -- that's just kind of her -- she's -- she's excited?

A. Yeah. But when -- when she's going to work, it changes. I mean, when you let her out, that dog knows -- like as soon as you let her out of the car, like -- it could be as simple as the handler putting a leash on her. She knows it's time to go to work, so she's getting excited.

I -- you know, I had a K-9 like that. They knew they were going to work. The minute you open that door, they think they're going to work.

Now, there may be times when you like get home at the end of your shift, and maybe they might know -- okay? -- like "We're going home for the day," may not be as excited. But

you could certainly see in dogs. They know when it's time to go to work, and that's when that excitement level really ramps up.

Q. And then one other thing. You talked about residual odors with Ms. Martens.

You haven't been involved in any scientific experiments or peer-reviewed experiments in regards to the longevity of narcotics odor, have you?

A. No.

Q. And have you read any peer-reviewed literature regarding seven days being enough time to clear the smell out for experimental controls?

A. No.

Q. You just -- you don't normally peruse such types of literature, I imagine.

A. Oh, I'm sure if I came across it, something about -- that had to do with how long an odor would stay out, I would read about it. You know, if it was in the K-9 world, I would make sure that I'm versed up on it.

But I just don't ever recall, you know, reading anything or seeing anything or -- that says an odor of anything or -- especially a narcotic substance -- disappears after this amount of time or stays for this amount of time.

Q. Okay. And I think your example is based on personal experience where your dog alerted to narcotics one week -- was

that right?
A. Yeah.
And that was just an example. I'm not saying that -- I mean, there could have been times that, you know, I went there a couple of days later. I just recall that there happened to be a time that it was -- it was a week later and my dog went to it, and he -- you know --
Q. And that was where --
A. -- he was in that area.
Q. And he had made a find a week prior in that area? Is that what you're telling us?
A. Yeah.
Q. And was rewarded at that find in that week earlier?
A. The -- likely, yeah.
Q. And then returned to that area a week later? Or two more --
A. Yeah, it could have been. I'm not recalling specifically that.
I mean, it could have been a -- a scenario where we, you know, came in from a different area or a different door or something like that. It's just the dog happened to go to that particular location and alert, and I recalled, "Oh, you know, I had a find there."
So it wasn't like a scenario where I went in and tested and said to the -- you know, "See if the dog still

smells it there." It just happened to be like, "Oh, my goodness; I -- I had something there last week, a week ago," so . . .

MR. DECKENBACH: Okay. Thank you.

THE WITNESS: Yeah.

THE COURT: I just have a couple questions.

**EXAMINATION BY THE COURT**

Q. Do you agree with me that every stop and deployment of that dog has the potential of ending up in a court proceedings like the one we're in today?

A. Every single stop?

I think it -- yeah. It could have the potential, yes.

Q. And that every handler should know, you know, if they punch out a person, they may be in court for a -- a breach of the constitutional laws concerning excessive force, for example?

A. If they punch out a person?

Q. Yeah.

A. Sure, yeah.

Q. And you wear cameras, body cameras. You're there, all the time, recording what you're doing. Although we can't see the cuing or what the handler is actually doing, other than dispatching the animal -- maybe seeing a hand move out or a hand directing the dog towards a wheel well or something of

that nature.

I agree with the Wyoming Highway Department's policy that dogs are trained to do a focused stare.

Do you feel that the handler has a responsibility, knowing that that case could -- any case -- could come to court --

A. Yes. Absolutely.

Q. -- to make sure that the dog that they're training does a focused stare? And records it on his body camera.

A. Do you think -- so you're asking me do I think that every single one of those should be a focused stare and that it's recorded on camera?

Q. Well, what- -- whatever that dog is supposed to do . . . and it's --

A. So, you know --

Q. -- been -- it's been trained. And you personally believe -- I -- let me ask you this: You believe that dogs are infallible; is that right? Trained dogs.

A. Infallible? No, I don't. I -- I think that there's --

Q. They have good days and bad days like we do?

A. Sure. They sure do.

Q. They could be sick and have a runny nose?

A. Yeah. You know, I've -- I've had a dog like that in the past, you know. He might have a bad day. He got older, things like that, but --

Q. My dog, for example -- my wife could say "Should we do a walk today?" and that dog was at the front door. I could walk by where his leash was hanging and reach out and touch it, and he was jumping all over the kitchen.

I mean, they -- they read you like a book.

A. Right.

You know, if I -- I respectfully disagree on the fact that it should be the same focused stare every time because sometimes conditions are different. And you've got to think of weather and wind and things like that.

So, you know, that dog may not always be able to get to source and do that final focused stare. So that's why you have to have everything in there, you know, all those changes in behavior.

So, if you didn't get, you know, anything -- you know, any changes in behavior or a focused stare or something like that -- and then, obviously, yes, you -- you shouldn't call an alert on something like that. A handler needs to be ready to say "I got nothing here."

But a handler also has to be ready to say "I got all these changes in behavior. Things were different, the conditions were different, there was a lot of wind, we don't know what the odor was doing, but I have all this, and I can tell you this is what the dog did. I may not have got that focused stare, but I got all these changes in behavior," which

is consistent with how they've been trained and the experience and what they saw from their dog to say that "My dog was in odor" and in odor of a target odor they were trained on.

Q. And so I would be expected -- that the handler would record and be able to tell me what the mileage -- you know, was it a 70-mile-an-hour wind that was blowing --

A. Right.

Q. -- that day? A Wyoming wind. Was it 2 feet of snow that we were wading through out there?

A. Right.

Q. But a normal situation, no particular pressure but on a highway where there's traffic -- and usually I-80 or I-25 -- you would expect a focused stare?

A. Not every single time, sir.

Q. So why is that not true?

A. There could be many factors. I mean --

Q. Bad dog?

A. No. No. Not necessarily, no. Just because they don't get to a final focused stare doesn't mean that it's a -- a bad dog. It's that handler team and is that handler able to tell those changes in behavior.

So maybe there was something that was in the way or, you know, they were -- the dog was stepping on a rock, couldn't get to a focused stare. Every situation is different.

So I can't guarantee you every single time --
Q. That would be significant, though, something -- something that was there that interfered with what was the normal routine of that dog; right?
A. Yeah, and that's always possible. On every single stop there could always be something that --
Q. What if the handler just grabs the dog and jerks him away when they're sniffing?
A. Well, what's your question there?
Q. Where is -- where's the stare?
A. Where's the stare if he jerks it away?
Maybe the dog was working on the stare and -- and he jerks it away. Yeah, that's possible.
Q. But it raises a question, doesn't it? In court.
A. You know, every situation is different. And -- and you can't -- I don't believe that you can call every single one of them the same due to many factors.
Q. Okay. I'll give you the next question.
A. Okay.
Q. The officer says, "Oh, I know the explanation of why we didn't find anything. There was shake present on the floor."
Wouldn't that officer have a responsibility to pick up some of that shake?
A. You know, in my past experience . . .
Q. It's evidence.

A. It is evidence, yes. It is evidence.
Q. He's just walking away from it.
A. Certainly. I mean . . . every officer is different. I can't speak for them. I can speak for what I would do.
But I -- I also can't recall a time where I had just shake and didn't find something else, a pipe or something else that went with it.
If I didn't, I would -- I've -- I've picked up shake before, sir. I certainly have.
Q. I'll bet you did.
A. It was -- I felt it was evidence so -- so I -- I picked it up off the floor and I put it -- put it in a bag.
Q. Or, in a case where there were just a couple specks on a -- on a car seat, took a picture?
A. Yeah, a picture, something. You know, with body cams now at least you put it on body cam. But yes.
Q. I recognize that out there on the highway circumstances can be different from time to time but -- oh, one more question.
I had a -- a -- a search a while back. There were other problems; timing was the main problem in that case.
But the officers were very particular, before the dog deployed, to insist that the car windows were rolled up. Now, it was a deputy sheriff up in Campbell County as opposed to the Wyoming Highway Patrol.

In this case there's an allegation the -- the dog tried to -- stuck its head inside the car, through the car window. But we'll see. I don't know. I'm not judging it at this point.

But is -- is there a protocol that it's better to roll up the car windows or not? Or is it better to leave them down?

A. Your Honor, I . . . that's something that came up in the past in my career, certainly.

I usually just left it how the driver left it or the passenger or whatever. I -- I didn't dictate of how things were to be -- maybe close the door, you know. Just for whatever reason, I would make sure that the door is closed.

But I never dictated to a -- a driver or a passenger to either roll up or close it down. I would have just left it be.

It doesn't matter whether a window is up or down. You know, I took my K-9 team out one time -- and we hadn't done it before. And I put a -- a smoke bomb in a car, in a closed-up car, a junked car.

And -- it was colored -- and let the air come out, the smoke. And you could see the smoke. It was coming out from everywhere. It was coming out from by the windshield and the door seams, down low, the back of the trunk.

So the thought of, you know, a handler trying to

control the scenario, it's not necessary, you know, in that particular case for the deputy to have them roll up the windows. You should just leave it be. That's -- that's how the driver or the passenger both left it. Leave it alone. It doesn't matter.

So if, in this particular situation or this case, the window was up -- if -- if a window's up, are we going to see a bit more odor coming out of there? Quite possibly, yeah. It's an easier escape route.

Of course, you know, air is probably going to take the path of least resistance, and that's an open window. So if it's coming out of that window, you know, a dog's likely going to jump up, you know, and smell that coming out of that open window.

Q. There's an issue here of freshly purchased -- or given, I guess -- fried food. I assume those odors are just like all the rest of them. Would that be a distraction to a dog?

It would be to mine but --

A. Not a good trained dog. That's why you train with that type of stuff.

You know, when I was a supervisor, I made sure they trained with those type of things. Those are distractors. And, in fact, when I had my K-9, I spent more time training with distractors than I did drugs.

I knew my dog could find drugs. But I spent more

time on distractors. And I told my team as we went through training -- I said "Always, always work on distractors as much as you possibly can and document it."

And for this particular reason here. If there's fried chicken in there, you could say "My dog could care less about that fried chicken." And I can tell you I know Becky well enough she could care less about fried chicken. You know, if she was outside of work and -- and her handler decided to feed it to her, she'd probably eat it.

But she has such a high drive and a drive for the hunt of finding that odor that that food doesn't bother her. Those -- those odors, those distracting odors, don't bother her. She is -- she is a true machine. And I'm not just saying that because we're in court. If it wasn't a dog that I didn't think was a machine, I wouldn't say it.

But this particular dog, Becky, reminds me a lot of the K-9 that I had, and they were just born and built for it. And she doesn't get distracted by, you know, a dog peeing on the roadside or an antelope going by. If you saw a video of her and you saw her work and you saw her in a training scenario, you would be like "That dog was born to do this." And she is and that fried chicken wouldn't bother her.

THE COURT: Questions?

MS. MARTENS: Yes, Your Honor.

///

**FURTHER REDIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. So the Judge brought up with you a scenario where a Campbell County Sheriff's deputy made a stop and asked the driver to roll up the window.

And I know you're -- are you -- first of all, are you familiar with any particular stop in Campbell County?

A. No. Is it recent?

Q. Oh, it --

A. In the last two years?

Q. -- it's been a couple of years now.

But I think that would be -- would have been the Rondell Baker case if I'm tracking with where the Court is at.

A. I'm not familiar at all.

Q. Are you familiar with the dogs employed by Campbell County?

A. No. I didn't work with Campbell County a whole lot.

Q. So does the Wyoming Highway Patrol use dogs that are trained in more than one police discipline?

A. Just . . .

Q. A single dog with multiple disciplines.

A. No.

Q. Why not?

A. You know, the highway patrol has always just been focused in on one of two things. That's narcotic detection and

explosive detection. We just haven't, during that time, wanted to take on that other aspect -- or was it necessary to have the -- the dual discipline. Just . . . I don't think the agency's ever seen the need for it.
Q. So I'll represent to you that the dog involved in the Rondell Baker case was a narcotics-detection dog that was also trained as an apprehension dog.
What do you know about apprehension dogs?
A. They're going to jump up and they're going to go after people.
Q. What do you mean by "go after people"?
A. You know, they're -- they're trained to bite. Trained to bite people.
Q. So --
A. They're trained to track them down and -- and bite, if necessary, yes.
THE COURT: Poor Rondell Baker; they invited him out of the car and he was standing there.
MS. MARTENS: On the other side of the car.
BY MS. MARTENS:
Q. But if -- in your experience running a dog, you weren't concerned about a dog biting somebody?
A. No.
Q. Because your dogs weren't trained to bite people?
A. Right.

Q. So, if you were concerned about a dog biting somebody, might you think about asking someone to roll up a window?
A. Yeah. Yeah. Because that will happen with a bite dog. You know, if they had a sudden movement or something, that dog may lash out and -- and grab them.
So that is a -- a safety precaution there, to roll up those windows.
Q. And, as you said, even with the windows rolled up, if there's odor, the dog should be able to find it?
A. It's still going to come out everywhere.
Q. So it wouldn't interfere with the narcotics function of the dog?
A. No.
Q. Are you familiar with any current direction from highway patrol on collecting trace amounts of controlled substances?
A. No. You know, when -- when I was there -- so I did have a particular case kind of similar in this scenario where, you know, going through your -- your training and -- you know, from the very beginning to, you know, the WLEA training to the highway patrol training -- if I may just real quick explain about that case.
It was a case where I -- I found -- I ran my dog and I found a marijuana pipe. And I was -- I took the pipe, the -- there was barely any residual in it. You could tell it was a marijuana pipe. It went to a case and a hearing like

this.

And the -- the issue is, with things like shake and a marijuana pipe -- I was asked in that particular court case "Why didn't you just scrape the pipe and test it?"

And I said, "Well, I was never trained to do that."

And they said, "Well, why didn't you use your pocket knife?"

And I said, "Well, that pocket knife is mine and I was never trained to do that."

And the same goes for shake. I was never trained through the WLEA academy or the highway patrol to -- nor given tweezers or any sort of instruments -- to pick up shake off the floor of a car. Similar to that pipe. I wasn't trained to do that. I wasn't given the tools to do that. So that's why it hasn't been done in the past.

I told you I had done it. It was probably because there was quite a liberal amount of it. But never in my time in the 17 years was I trained to go get some tweezers and pull shake off the floorboard of a car.

THE COURT: You can pick it up.

THE WITNESS: Yeah. You could get, you know -- I mean, depending on how much it is -- I mean, are -- are you picking it up with rubber gloves? And is it windy? Is the wind blowing through there?

I mean -- what are the mitigating factors there?

THE COURT: Or there.

BY MS. MARTENS:

Q. Are you aware of how much substance it takes to even test?

A. You know, I can't recall exactly how much.

I think it has to be -- it's -- it's not a lot, but it needs to be a reasonable amount to fill the tube. But I can't recall. It's been many years since I've used a NIK kit for marijuana.

But, generally, when I did, it was -- you wanted to have like at least a portion of -- of a bud, something like that, a little piece of it to be able to throw in there, and you should be able to get a positive result from it.

Q. In terms of just how hard you tried to collect any given piece of evidence, as -- in your experience, would your effort be calculated with what else was going on at that stop?

A. Yes. Yeah. There might be a lot going on with a stop.

You know, depending on how many people are there; what's -- what's going on outside; you know, what's . . . it -- if there's many factors going on, you're like -- it may be a situation where you notated it for your body cam. You're like -- you look down, you're like "There's shake on the floor here." That was -- that was good enough for me.

In the courts I was in, you know, the -- I think a situation like that -- and even the pipe story that I -- I talked about, you know -- the -- the particular Judge, I had

been in his court before. And . . . he knew that, if I was able to do it, I -- I would do it. So -- and even just notating it was enough, that it was there.

Q. Or what about other, more serious violations?

A. Yeah. You know, if there's something serious in there, I mean -- and you've got to collect some other stuff -- you're going to take care of that versus, you know, picking shake off the floor.

MS. MARTENS: That's all I have, Your Honor.

**FURTHER RECROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. I just want -- I just want to ask you briefly about your experience with smoke bombs.

So this wasn't a controlled scientific experiment? This was just something you were testing out? Fair to say? The story you recounted.

A. Yeah.

Q. And you don't know if the smoke bomb particles are similar to how air particles and odor might move? They're different substances, different intensities; correct?

A. Yeah. I'm not a scientist. It was just something we wanted to do and test and see.

Q. And I think you said that was an old junker. Is that right?

A. Oh, it -- you know, it wasn't a crashed-up, banged-up car.

You know, we picked a car that, you know, was put together. It didn't have busted-out windows and stuff. It was a whole car, but it was in a -- in a scrapyard. It hadn't been used for a while.

But it was wholly together. I didn't want to just take one that had -- you know, half the door was off and broken-out windows. What's the point of that? The point was -- was to have a near-functional car and put that in there just to see what odor does.

I'm not saying that it was similar to marijuana or methamphetamine or cocaine, heroin, but, yet, it was still describing and showing how odor can come out of a car.

Q. And your reason and experience might tell you that the seals -- the door seals on a car abandoned in a scrapyard might be different than the door seals on a newly minted car driven off the dealership lot; correct?

A. It could be, yes. I don't know. I'm not an expert in that area, and I don't know how long that car was there. It could have been there for two weeks; it could have been there for a year. I don't know. I didn't ask.

It's just -- I picked a car that was well put together just to show the team and even myself -- it was just an interesting experiment to see what happened. And I think it was eye-opening to all of us to see where it was coming out.

Q. And, as you said, you're not a scientist and you didn't -- you did this with one car; is that correct?
A. That's correct.
Q. So you can't account for how odor might move out of vehicles, different models, different makes, different years? You didn't run that experiment, did you?
A. I -- you know, we didn't run multiple cars. I think the one was good enough to show.
Yes, every situation, every car, everything's going to be different. But it was just one particular situation that -- it was good to show what can happen with a car and where odor comes out.
MR. DECKENBACH: All right. Thank you.
THE WITNESS: You're welcome.
THE COURT: I can't ask any more questions. I'll let you stand -- step down.
THE WITNESS: All right. Thank you, sir.
(An off-the-record discussion was held between the Court and court reporter. Ms. Hammer returned to the proceedings.)
MS. HAMMER: Good afternoon, Your Honor.
THE COURT: Good afternoon. It's nice to have you back.
Let's call Joanne Zook up here. Let me introduce you.
In case you don't know, this is a defense attorney.

She's been on standby today.

Thank you.

MS. ZOOK: Of course.

THE COURT: I gave your number to everybody here, and I don't know if anybody's called you or told you about this case at all.

MS. ZOOK: I've spoken to two witnesses --

THE COURT: Oh --

MS. ZOOK: -- so --

THE COURT: -- okay.

MS. ZOOK: -- I've been able to do what the Court's asked and advise regarding Fifth Amendment rights.

THE COURT: Okay. Thank you so much.

I don't know of any reason we've got to take Joanne away from her office unless there is an issue that develops. But I assume that we can give her number to whoever's interested and recess or take somebody else and let them contact you.

If you want to stay, of course, you're very welcome to. It's kind of an interesting case.

MS. ZOOK: I do want to stay, Your Honor.

THE COURT: I'd love -- love to have you, but I don't want to ignore you, either.

MS. ZOOK: Sure.

The only concern I have is tomorrow morning I have a

quick, 15-minute hearing in the District Court in Laramie County at 9:00 a.m., so I'm just a little worried about being available. But I'll rush over and come back. I think it will be all right.

THE COURT: Thank you so much.

MS. ZOOK: Yeah. Thank you, Your Honor.

MS. HAMMER: We would call . . . may we call our next witness.

THE COURT: Yes.

MS. HAMMER: We would call Andy Martinez.

THE COURT: Thank you.

(Witness sworn.)

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Please take a seat.

Please state and spell your name for the record.

THE WITNESS: Andres Martinez, A-n-d-r-e-s M-a-r-t-i-n-e-z.

MS. HAMMER: Your Honor, just briefly before we get going, I see we're at 4:30.

How late is the Court wanting to go? Just so I can maybe find a natural stopping point if we're stopping at 5:00.

THE COURT: 5:00 would be good.

MS. HAMMER: Okay. And may I proceed.

THE COURT: Proceed, please.

MS. HAMMER: Thank you, Your Honor.

Good afternoon.

THE WITNESS: Hello.

**ANDRES MARTINEZ, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

**BY MS. HAMMER:**

Q. Trooper Martinez, who do you work for?

A. The Wyoming Highway Patrol.

Q. And how long have you worked for them?

A. Almost seven years now.

Q. And do you have any prior law enforcement experience?

A. Prior to the highway patrol, I worked for the Rawlins Police Department for six years between 2012 and 2018.

And then, prior to the police department, I worked for the Wyoming Department of Corrections there at the State Penitentiary in Rawlins. And I worked there from 2007 until 2012.

Q. And, as part of your being a law enforcement officer, have you attended the Wyoming POST Academy?

A. Yes, I did.

Q. And are you a certified peace officer in the state of Wyoming?

A. Yes, I am.

Q. Now, I want to turn first to you being a K-9 handler.

When did you become K-9 Becky's handler?

A. I became her handler -- she was assigned to me in August of . . . is that 2023?

Q. And were you her first handler?
A. No, I was not.
Q. And how long had Becky been working as a drug-detection dog for the Wyoming Highway Patrol when you became her handler in August 2023?
A. I believe the previous handler had her for five years.
Q. Okay. And what kind of dog is Becky?
A. She's a springer spaniel.
Q. And what odors is she trained to detect?
A. Marijuana, methamphetamine, cocaine, heroin, and fentanyl.
Q. Now, in August of 2023, was that the first time that you had had exposure to police drug-detection dogs and their respective handlers?
A. No.
Q. What was your first exposure?
A. Honestly, it was my grandfather. He was a -- a police K-9 handler. So I was -- I had spent a little bit of time around -- around his dog and -- and him.

I remember him taking me for rides in his patrol car with the lights and sirens going -- I don't think we responded to any calls or anything but . . . and watched him participate in these huge police dog competitions. So that was my first exposure.

And then I went on to the Rawlins Police Department, and one of my FTOs was a -- he was a K-9 handler.

Q. What is an FTO?
A. My field training officer.
Q. And what kind of involvement did you have with him and his assigned K-9?
A. So that time I would -- I would be driving, so I would have to be cognizant and responsible for -- for his dog, so I -- I learned that aspect of being responsible for the dog as well as ourselves.

And then I would help him set up trainings, play -- putting out his -- his finds for his dog. I would -- he'd even let me handle his dog. He'd let me hold the -- the end of the leash and run his dog. So then during that time I would learn the dog's behaviors and how they would alert to the handlers and -- and how to manage search areas.

So then I -- then I moved on to the Wyoming Highway Patrol and essentially did the same thing.
Q. So going back to when you were with the Rawlins Police Department, how often were you working with your TFO [sic] with his K-9 training?
A. I would say like three to four times a year on -- on the low end. And it would be for hours at a time that we would be doing trainings.
Q. And during those trainings did you learn about, you know, the importance of the variety and the training that you're doing with those dogs?

A. Oh, yeah. We'd . . . would do trainings in buildings and on vehicles.

We learned about how the air and temperatures -- "air" meaning wind, I guess -- could affect the . . . the odors, the transfer of odors. Yeah.

Q. What about proofing off certain things, certain odors?

A. Yeah. So proofing is -- is everything. So we would have a -- a target odor being -- well, back then fentanyl wasn't one of the odors but it is now. But proofing is -- is everything. It's -- the -- that's not associated with -- with the -- with the target odor.

So it can be the -- this microphone. So you've got the -- the foam and then the dye that has colored this -- the foam black, the metal that's on here, the -- the cord, the plastic coating. So all of that is nontarget odors.

And so we would ensure that the dog wasn't alerting to nontarget odors.

Q. Now, when you went from the Rawlins Police Department to the Wyoming Highway Patrol, what kind of interactions did you have with Wyoming Highway Patrol K-9 handlers and their dogs?

A. Similar -- similar to the police department. They would -- except in this case they would put out their own finds as opposed to me. I wouldn't -- I wouldn't handle their -- their -- their training aids.

And I would do ride-alongs with them and watch them

deploy their dogs. I would be present to watch them while they're running their dogs and watching their dogs' behaviors and watching how they would manage their dog.

Q. And was all that information that you learned when you were with the Rawlins Police Department and with the highway patrol before you were a handler helpful when you transitioned into being a K-9 handler yourself?

A. Yeah. Absolutely.

Q. So it's fair to say that, when you became Becky's handler, you were not necessarily learning some of this information for the first time?

A. Correct.

Q. Now I want to move into kind of when you became Becky's handler.

After you were picked, did you have any concentrated training with her with you being her new handler?

A. Yes. We did a -- a 10-day, 80-hour training. And that's -- that's all we did all -- for those 10 days.

Q. And can you kind of describe the early days of that training and what that looks like, for you being a new handler but with Becky being a more seasoned dog?

A. Yeah.

So we would start out with easy finds. So it would be big odors with an easy find, say, like in a -- a locker amongst many lockers. But the -- the odor was large, so it

was -- when -- when I would hold the end of the leash running Becky, noticing her -- her behaviors to that -- that easy odor and easy find -- or big odor and easy find -- it just kind of would make me recognize that.

And then it would progress to smaller odor -- odors and -- and harder finds.

Q. And why is it important to have that transition from big odors that are easy finds to much smaller odors and more difficult finds as part of your training as a new K-9 handler?

A. Learning -- learning her behaviors and how she alerts.

Q. Is her behavior different between easy finds and -- and harder finds?

A. No. They're the same.

Q. It was more -- easier for you to detect and getting -- making it harder for you as you went along?

A. Yes. And -- and for the dog, too. Like it would have -- so we could have an odor that's -- that's buried in -- in a pile of dog food, so that's -- it would be harder for her to -- to catch this odor because it's buried under 50-pound bags of dog food.

So I would have to pay attention a little bit harder to where she's -- she's managing her search area and then narrowing that -- that area down to a specific location and then -- and then finally -- finally the odor to nose.

Q. And you hit on this so I want to ask.

You mentioned how -- dog food. Is that -- was used. Is that because it was a distraction?
A. Oh, yeah.
Q. And what was the training in those first 80 hours like related to Becky having to find these odors in -- amidst other distractions?
A. Can you ask that question again, please?
Q. Yeah. That was a bad question.
A. Sorry.
Q. Were there other distractions used during the initial 80-hour training?
A. Tons.
Q. Could you describe those?
A. We had other people, not part of the training, that -- that would be in the training area. Multiple, multiple different food items, people and -- and animal foods. There was like machinery.
Q. Were there other dogs there, too?
A. Other dogs, yes.
Q. And during that first 80 hours of training with all these distractions, did Becky ever get distracted by them?
A. No.
Q. And how can you tell?
A. Because she stayed focused on -- on doing her job. She -- she remained on task, searching for the finds that were put

out.
Q. So the other dogs didn't distract her?
A. No.
Q. Human food didn't distract her?
A. No.
Q. And what did you learn about how Becky works?
A. She's a very fast-working dog. She's -- and so, for me, that kind of made it . . . a little bit -- a little bit easier to -- to notice her change of behaviors, because she goes -- she's -- she's running out of the gate. And once that -- her behaviors slowed down, then that was -- that's huge. That's a huge change of behavior. For her.
And so that -- that made it easier for me to notice that change of behavior.
Q. She's a highly motivated dog?
A. Very highly.
Q. And do you -- can you tell a difference when you clip her leash on her in the car and you're about ready to take her to, you know, wherever that's going to be searched? What's her behavior like there compared to when she's given her order to find it?
A. When -- when she's clipped up to the leash, she's -- usually, she's coming up just out of the . . . up off the -- the kennel floor. She'll kind of shake a little bit, and then she's -- she's ready to go. She's -- she's pulling hard to

where -- where we're getting ready to -- to deploy her.

And -- what was the second part of that question?

Q. The -- her conduct from when you take her out of the car to before you deploy her. You're indicating that she's very motivated and excited?

A. Yes.

Q. And how does that excitement -- can you tell a difference between that excitement and her -- and how she acts when she's in odor on that vehicle?

A. Yes.

Q. Can you describe that, please?

A. So when . . . when she's in odor, it's more of a . . . a closed-mouth breathing, meaning she's -- she's taking in more -- more odors through the nose. She's more focused on -- on a certain area that -- that she's sniffing.

And -- and her . . . her . . . I guess she's not -- she's not a hundred miles an hour. She's kind of -- she's slowed down her pace.

Q. So is it fair to say that when -- before you deploy her she's moving really fast because she's very excited, but then, once you actually deploy her on the vehicle, she starts slowing down to do her job?

A. When she's in odor. She's -- she's going to be high drive anyhow. That's -- that's how she is. So when -- when she's getting deployed, she's -- she's also at that -- that high

drive. She wants to -- to -- she wants to and she's ready to -- to sniff the vehicle or whatever it is that we're -- we're deploying her on.

And then, when she's in odor, that's when she -- her change of behavior starts to happen and -- and those -- the breathings and her movements slow down.

Q. Is bracketing one of those movements?

A. Yes.

Q. And what does that look like for Becky?

A. So Becky will -- for bracketing, Becky will come to . . . an end of her search area.

And when she catches odor, she'll come back, either to the left or to the right, whichever -- depending on whichever way she started. If she runs up to the left, she'll do a hard stop when she catches odor, and then she'll return to the right and then just -- her search area just kind of narrows down. So bracketing, left to right. And then . . . narrowing her search area to a -- a very small area.

Q. And when she gets to that very small area, how does she typically respond at that point?

A. It's -- so she's stopped and has a -- a focused stare.

Q. Does she ever jump?

A. Yes.

Q. Can you just talk about why she jumps?

A. She -- so Becky stands about 18 inches tall. So she's a

short dog. If she catches odor that's -- that's above her -- her normal standing position, then she would -- she would jump up to -- to catch that high odor.

Q. And, now, is that something she is trained to do by you?

A. No.

Q. Then why does she do it?

A. That's her natural instinct, is -- she's -- she's been trained to go to the strongest source of the odor. So if the odor's coming from above and not from below, naturally she will want to go to the strongest source of the odor, which would be up high.

Q. Would we expect that with a window of a car rolled down?

A. Yes.

Q. What about scratching on the vehicle?

A. She has done that.

Q. Is that something she's trained to do?

A. No.

Q. Now, why do you let her jump on the vehicle and even scratch it instead of pulling her off?

A. If -- so when she's -- when she's in odor, scratching and jumping, she's -- she's caught the odor. And if I were to pull her off, that's kind of . . . letting her know that that's not okay, to go towards that source.

If she's in odor and that's what she needs to do to get up in the odor, then, essentially, you're kind of

punishing her for -- for finding the odor, which is the complete opposite of what our -- our goal is.

We -- so I don't -- we don't want to break the dog, essentially, is -- is what we say.

Q. Now, is it . . . has there been a time when you've deployed Becky in the field where you did pull her off the car when she was jumping and scratching?
A. Yes.
Q. Why?
A. In -- for her -- me fearing that she's damaging this -- this vehicle too much. Yeah. I don't -- I don't want to -- I don't want to have her -- us -- be responsible for damaging somebody else's vehicle, so I have pulled her off of it.
Q. And was that, in fact, one of your first deployments after the 80 hours of training?
A. Yes.
Q. Do you pull her off now?
A. No.
Q. And what changed from that first deployment after the 80 hours to now?
A. Just having more . . . more confidence and -- and trust, just knowing that she's doing what she's supposed to do.

And I don't want to break her. She's a great dog. So just let her -- let her do her thing so she can continue to work and do it right -- the right way.

Q. And, ultimately, if the State of Wyoming has to pay money to someone to help fix the paint job on their car, that's -- that's what's just going to happen?
A. Yeah. I'll just let my supervisors know that that did happen and like -- "Okay. We'll be responsible for -- for paying for any- -- anything that needed to be done to -- for the vehicle."
Q. Now, on that stop where you pulled her off, on the first deployment after those 80 hours, did you determine -- what was your determination on whether or not she alerted to that vehicle?
A. I noticed that she -- that she was alerting when she was jumping up into that window and spent a -- a little bit of extra time there. She was even looking back at me like "This is me alerting. We're -- we're here now."
So that's -- it was her change of behavior. She stopped right there at that location, had that focused stare up into that window.
Q. But did you ultimately -- how -- what did you ultimately tell the other law enforcement on scene about whether it was a positive alert, meaning you could search the car, or a negative alert, meaning you could not?
A. I . . . I said that it was a negative alert.
Q. And why did you say that?
A. So I wanted -- for one, I . . . I'm brand-new. I didn't --

I didn't have the trust in myself that she -- I wanted the perfect -- the perfect alert. I wanted the -- the sit-down, the -- the perfect posture, where she's just got her nose on the seam of the door, and -- and that didn't happen.

She had -- it -- her -- her behavior was -- was more excited, wanting to get closer to that -- that source of the odor. And I didn't allow that.

So that . . . that was completely on me, you know.

Q. So if you were -- if that same exact traffic -- traffic stop with that same exact behavior by Becky happened today, what would -- would you say that it was a positive alert, meaning you could search the car, or would you stay with your opinion from back then that it was a negative alert and you could not search the car?

A. Now I would say that's a -- that's a positive alert.

Q. And is that purely to do with you gaining more experience with Becky and trusting yourself?

A. Yeah. And -- and I've -- I've been, I guess, coached or mentored that she's a -- she's an extremely high-drive dog. So her ultimate goal is to -- to want to continue to get as close as she can.

This -- this dog has no fear for her life. She will -- she would jump off a cliff if that's where the odor was going to.

But . . . yes. I -- I have learned to just trust --

to trust her. That's -- that's what she does when she is -- is alerting to the odor.

Q. How does her height affect whether or not she will ever get to that final indication behavior of this sit and stare versus continuously to just jump and try to get as close as she can to the odor?

A. It's . . . can you ask that one more time? I'm sorry.

Q. Sure.

You said earlier that Becky's about 18 inches tall --

A. Yeah.

Q. -- and that she's a rather small dog.

A. Yeah.

Q. And you -- and then you said that she jumps because she's so small and she's trying to get to that -- the strongest source of that odor; correct?

A. Yes.

Q. Now, how does that -- the fact that she's so small and is constantly having to jump to get to the closest source of the odor, does that affect whether she will constantly do that or how often she'll actually get to that final indication of the sit and stare?

A. Yeah. So that . . . at -- it's . . . she doesn't -- she won't do it immediately. She has kind of finally -- she'll jump up a few times and then -- then she can get herself relaxed and then get into that focused stare.

But, essentially, she still -- even when she's jumping, she still has that focused stare to where she wants to go. But it's -- it's difficult for her -- her to get there.
Q. Do you always wait for her to give her final indication?
A. No.
Q. Why?
A. It -- that's . . . she -- when she's doing that, that's alert behavior. She's -- she has detected the odor. She's just trying to get -- trying to get to it, but she can't because she only stands 16 inches tall.
Q. Is it required that she always gives her final indication of the sit and stare in order for you, as the handler, to say, "Yes, that's an alert" or, "Yes, she's indicating to the odor of controlled substance in the vehicle"?
A. No. It's the change of behavior. It's . . . that -- that we were looking for. It's that -- and it's dramatic. She goes from very -- very quickly to a sudden stop. It could be a head -- a head snap back to the left or right and a closed-mouth breathing.

Her body will tighten up and -- and just be more focused on an area.
Q. Okay. Now, since we've only got about five minutes left, I think I want to just turn quickly back to your original 80 hours and kind of complete out that information, if we

will.

Is it fair to say that, by the end of the 80 hours, you recognized when Becky was in odor?

A. Yes.

Q. And, during the 80 hours of training, did Becky have any false positives?

A. No.

Q. And, during that training, were instructors present to help you give -- give you feedback?

A. Yes, they were.

Q. And what kind of feedback were you given or that you sought?

A. So specifically to her jumping, we were -- I was told to -- to try to help maintain that. And then -- and the feedback, it was, you know, just watching my dog's behavior, learning -- learn -- continuing to learn her behavior.

Q. What do you mean when you said "to help maintain" her jumping behavior?

A. To try to . . . to try to correct it.

Not that it's a bad thing, but we don't want to -- to have her continue to jump on -- on vehicles so that we can prevent property damage.

And it -- if it's -- if it's possible to -- to help settle that down a little bit, to -- to prevent the State from having to pay out for these damages, then let's do that.

Q. And what actions have you taken since that training in September 2023 to work on that with Becky?

A. Honestly, not much because that's -- that's her change of behavior. She's . . . she's a veteran dog. And what -- really, if you -- if we start correcting that behavior, then she might lose her -- her drive to do what -- what she's been trained to do, alert to the odor of narcotics.

Q. Now, in the training when you're discussing trying to maintain that jumping, is it that you're trying to eradicate that behavior completely? Or limit it? Or I guess -- how is it that we're trying to maintain it but also encouraging her to continue with her natural hunting drive?

A. Yeah, not -- not completely getting rid of it because then I think at that point that she might be broken.

But we can -- we can try to help mitigate that a little bit, and we can do that by -- by rewarding her sooner.

Q. And why would you do that?

A. Why reward her sooner?

Q. Uh-huh. Yes.

A. Oh, to -- to -- to instill her that -- to be at this . . . at this spot and -- and -- and to prevent property damage so that we can stop the scratching, stop the jumping.

Q. Now, at the end of that training, did you go through a certification process?

A. Yes.

Q. And, during that certification process, how many -- do you remember how many rooms and how many cars you had to search?
A. So there were four rooms and there were three vehicles.
Q. And how did you and Becky do on that certification?
A. We passed.
Q. Were there any blank rooms or blank vehicles?
A. I believe there was one blank room. And -- and I think there were two blank cars. I -- I think. So I can't say 100 percent sure.
Q. Were -- did Becky have any false positives during that certification?
A. No, she didn't.

MS. HAMMER: And at this point, Your Honor, we'd be going into the next subject, so I know we're -- it's about two minutes before, but this may be a natural breaking point.

THE COURT: Good place?

MS. HAMMER: Yes, sir.

THE COURT: Same time tomorrow morning?

Very well. 8:30, we'll see you.

MR. DECKENBACH: Your Honor -- Your Honor, I don't know if we want to address this now or not, but I think I . . . we thought two days would be sufficient. At the pace of this -- I thought they'd have a whole day for their witnesses, I'd have a whole day for mine.

I'm a little curious if we're going to get it all in

tomorrow at this point. I'm actually not very hopeful that we will, seeing that I'm sure Ms. -- or Trooper Martinez will take some time tomorrow morning, his partner; Mr. Havice is going to reappear, I imagine. So I might not even get to my first witness until after lunch, and I've got seven lay witnesses and an expert so -- as well as my investigator.

So I don't know if -- how -- I don't come with you -- to you with a solution; I'm just flagging an issue and wonder if you might have some guidance for us. Maybe just everyone stand by with the option to have a third day scheduled if we don't get them all in tomorrow.

THE COURT: Well, I'll look and see what we can do.

MR. DECKENBACH: Okay.

THE COURT: Maybe, you know, if we're tied up next week, we can just recess and start up again.

MR. DECKENBACH: Okay. Thank you, Your Honor.

THE COURTROOM DEPUTY: All rise.

THE COURT: Thank you, Phil.

(Proceedings adjourned at 5:00 p.m., January 23, 2025.)

# C E R T I F I C A T E

I, MELANIE HUMPHREY-SONNTAG, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, do hereby certify that I reported by realtime stenography the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 7th day of February, 2025.

/s/ Melanie Humphrey-Sonntag

MELANIE HUMPHREY-SONNTAG
RDR, CRR, CRC
Federal Official Court Reporter