IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES OF AMERICA, | DOCKET NO. 24-CR-00084-ABJ<br>Volume II |
| Plaintiff, | (Pages 274 through 553) |
| vs. | |
| GEORGE OSTERTAG, | Cheyenne, Wyoming<br>Friday, January 24, 2025 |
| Defendant. | 8:32 a.m. |

# TRANSCRIPT OF MOTION HEARING PROCEEDINGS

**BEFORE THE HONORABLE ALAN B. JOHNSON**
**UNITED STATES DISTRICT JUDGE**

***MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC***
***Federal Official Court Reporter***
***2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001***
***307.433.2169 * MelanieSonntagCRR@gmail.com***

*Proceedings reported with realtime stenography;*
*transcript produced with computer-aided transcription.*

APPEARANCES:

For the Plaintiff: PAIGE HAMMER
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
2120 Capitol Avenue, Fourth Floor
Cheyenne, WY 82001

CHRISTYNE M. MARTENS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
100 East B Street, Suite 2211
Casper, WY 82601

For the Defendant: JORDAN DECKENBACH
FEDERAL PUBLIC DEFENDER'S OFFICE
DISTRICT OF WYOMING
104 South Wolcott Street, Suite 601
Casper, WY 82601

AMY SENIA
FEDERAL PUBLIC DEFENDER'S OFFICE
633 Seventeenth Street, Suite 1000
Denver, CO 80202

# I N D E X

## GOVERNMENT WITNESSES:


| | PAGE |
|---|---|
| **ANDRES MARTINEZ** | |
| Direct Examination (Continued) by Ms. Hammer | 280 |
| Cross-Examination by Mr. Deckenbach | 364 |
| Redirect Examination by Ms. Hammer | 463 |
| Examination by the Court | 471, 481 |
| Recross-Examination by Mr. Deckenbach | 477 |
| Further Redirect Examination by Ms. Hammer | 479 |


## DEFENSE WITNESSES:


| | PAGE |
|---|---|
| **RICHARD MENDOZA** | |
| Direct Examination by Mr. Deckenbach | 484 |
| Cross-Examination by Ms. Martens | 497 |
| **SEANNA KELLY** | |
| Direct Examination by Mr. Deckenbach | 500 |
| Cross-Examination by Ms. Martens | 511 |
| **COREY CRUZ** | |
| Direct Examination by Mr. Deckenbach | 514 |
| Cross-Examination by Ms. Hammer | 522 |
| Redirect Examination by Mr. Deckenbach | 523 |
| **HAILEY KELLER** | |
| Direct Examination by Mr. Deckenbach | 526 |
| **KAITLYN WHITE** | |
| Direct Examination by Mr. Deckenbach | 535 |
| **ELIAS ACEVEDO** | |
| Direct Examination by Mr. Deckenbach | 543 |
| Cross-Examination by Ms. Martens | 549 |

# E X H I B I T S

GOVERNMENT'S EXHIBITS

| | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 4 | Training Log for K-9 Becky | 284 | 285 |
| 5 | Martinez Body Camera Footage | 314 | 340 |
| 6 | Screenshot From Bracken Body Camera Footage | 319 | 320 |
| 7 | Martinez Report | 334 | 335 |
| 8 | Deployment Log, 9/23 to 1/24 | 340 | 341 |
| 9 | Martinez Body Camera Footage, 10/9/23 | 349 | 349 |
| 10 | Howell Body Camera Footage | 354 | 355 |
| 11 | Martinez Body Camera Footage, 12/10/23 | 358 | 358 |

DEFENSE EXHIBITS

| | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| A | Body Camera Footage Clip | 362 | 364 |
| B | Body Camera Footage Clip | 362 | 364 |
| C | Body Camera Footage Clip | 362 | 364 |
| D | Body Camera Footage Clip | 362 | 364 |
| E | Body Camera Footage Clip | 362 | 364 |
| F | Body Camera Footage Clip | 362 | 364 |
| G | Body Camera Footage Clip | 362 | 364 |
| H | Body Camera Footage Clip | 362 | 364 |
| I | Body Camera Footage Clip | 362 | 364 |
| J | Body Camera Footage Clip | 362 | 364 |
| K | Body Camera Footage Clip | 362 | 364 |
| L | Body Camera Footage Clip | 362 | 364 |
| M | Body Camera Footage Clip | 362 | 364 |
| U | Body Camera Footage Clip | 363 | 364 |
| A1 | Copy of Government Exhibit 5 | 364 | 364 |
| B1 | Copy of Government Exhibit 9 | 364 | 364 |
| D1 | Copy of Government Exhibit 11 | 364 | 364 |
| E1 | Body Camera Footage Clip | 402 | 364 |

(Proceedings commenced 8:32 a.m., January 24, 2025, within the presence of the defendant on bond.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated, everyone.

When we recessed last evening, you were -- Mr. Deckenbach had raised an issue concerning time. And we could continue the proceedings, if necessary, 10:00 on Wednesday, next Wednesday.

MS. MARTENS: Unfortunately, Your Honor, that does not work for the Government. I will be out of the country next week.

THE COURT: Well, Sunday.

MS. MARTENS: This Sunday?

THE COURT: Yeah. Maybe that would be an answer.

MS. MARTENS: I could --

MR. DECKENBACH: Your Honor, I just ask that we would -- if we do it on Sunday -- we'd be released before the Bills game.

MS. MARTENS: My flight leaves Sunday so . . . as much as I would love to show up.

THE COURT: How many weeks are you going to be gone?

MS. MARTENS: Just next week. Taking a trip to Cancun with my husband that's already been rescheduled once with great expense.

THE COURT: Okay.

Well, we'll have to check. It may be several weeks because I think I go to trial the following week.

MS. MARTENS: I appreciate that, Your Honor. Thank you very much.

MS. HAMMER: Your Honor, I am on one of those trials that's set for -- not the following -- not this following week but the week after.

My understanding is defense counsel in Mr. Moriyama's case may be filing a motion to continue trial and asking for competency proceedings or something related to some medical conditions.

I don't have the details, but that was the word I got late yesterday, so I anticipate the Court will be getting that motion soon.

THE COURT: Well, we may have time, then. The parties had filed a notice that they were ready to proceed.

MS. HAMMER: The Government's ready to proceed. But I guess the -- Mr. Bustos may need to address some other issues.

THE COURT: We'll see.

I have a civil case the following week.

All right. Mr. Martinez, would you please come forward and resume your position here.

THE WITNESS: Yes, sir.

MS. HAMMER: May I proceed, Your Honor.

THE COURT: Yes.
MS. HAMMER: Thank you.
Good morning, Trooper Martinez.
THE WITNESS: Good morning.

**ANDRES MARTINEZ, GOVERNMENT'S WITNESS**

**DIRECT EXAMINATION (Continued) BY MS. HAMMER:**

Q. Now, before we jump into new information, I want to go back and clean up some of what we discussed yesterday, as I feel I may have asked you some inarticulate questions.
A. Okay.
Q. Now, yesterday you discussed how you worked with other Wyoming Highway Patrol K-9 handlers before you became a K-9 handler; correct?
A. That's correct.
Q. Now, during those experiences did you ever have occasion to watch Trooper Petruso, K-9 Becky's previous handler, working with her?
A. Yes, I did.
Q. And based off of those experiences, has there been any changes in how she works since you became her handler?
A. No. It's the same -- same behaviors.
Q. And same jumping, same high drive?
A. High drive, very excited.
Q. And her final indication behavior, all the same?
A. Focused stare.

Q. Now, I do want to talk about that.
And you've -- and you just answered my question but I'll ask it again.
What is her final indication behavior?
A. It's a focused stare.
Q. Now, with that focused stare can she sit while she does that?
A. Yeah.
Q. Can she be on all four paws while she exhibits the focused stare?
A. Yes.
Q. Can she be on her hind paws with her front paws on a car while she exhibits a focused stare?
A. Yes.
Q. In fact, she can be jumping while she gives that focused stare?
A. That's correct.
Q. And all of those would qualify as giving her final indication behavior?
A. Yes.
Q. Now, when she's jumping up on a car, how can you tell when she's jumping as part of her alert behavior versus jumping but giving her focused stare as her final indication behavior?
A. So when -- excuse me.
So when she's in -- when she's showing alert behavior

and -- and jumping, she can have a head turn, just trying to catch that odor, to a more centralized location.

And when she has the -- the focused stare and jumping, that's exactly what it is. She's -- she's focusing on whatever area it is that she's detected that strongest source of the odor, and she -- she can be looking and jumping at the same time.

Q. And so her head is not bracketing back and forth while she's jumping? It's staying on one central location where she's finding the strongest source of that odor?

A. That's correct.

Q. Now, we talked about -- yesterday -- about Becky jumping up on cars and scratching them.

And to remind us, jumping is an innate behavior for her?

A. Yes, it is.

Q. It's not something you've trained her to do?

THE COURT: You're leading the witness.

BY MS. HAMMER:

Q. Is -- is jumping -- has she been trained to jump?

A. No, she has not.

Q. And, as I understand your testimony yesterday, is jumping -- that jumping behavior -- something that you and others at the highway patrol are trying to correct?

A. Just more . . . to correct in more of a preventive measure

from damaging property to other people's vehicles.
Q. Are you saying that scratching is the issue?
A. Yes.
Q. And so if she's jumping up on a car and you pull her off, am I correct that that's a correction?
A. That's correct.
Q. And how can that affect her hunt drive?
A. That can discourage her to -- to -- to have that drive. If -- if we're pulling on her -- on her leash and -- she -- she's not going to want that. She's not going to want to be -- continue to be yanked on for -- for doing her job, which is going -- which is detecting the odor.

So . . . again, that -- that can essentially break the dog from -- from wanting to do her job.
Q. So how are you addressing the fact that you don't want her to stop jumping because that's her alert behavior but you want to get her to stop scratching at cars?
A. So what I would -- what I would do is reward her sooner than later. The later that's prolonged, the more she's going to scratch at this vehicle or whatever it is.

And so that's what we're trying to prevent, is that damage from that vehicle. So we would reward her earlier. And more at a . . . more sooner than later.
Q. So long as she's giving the focused --
A. -- the focused stare, yes.

Q. Okay. Now, moving into kind of new information from yesterday, we discussed the 80 hours of training that you had done as part of that initial training?
A. Yes.
Q. Did your training with Becky end there?
A. No.
Q. How many hours of training are you required to do each month with her?
A. We're required to have a minimum of 16 hours.
Q. And are there any requirements related to that training?
A. Just that it be varied. Being -- meaning using multiple odors, multiple like levels of height compared to my dog.
We can . . . different areas of searches, whether it be vehicles, open areas, parcels. And -- and there's some others in there, also, but it's varied.
Q. Do you log those hours in a training log?
A. Yes.
Q. All right. If I may, I'd like to show you what's been marked as Government's Exhibit 4.
THE COURTROOM DEPUTY: How are you hooked up?
MS. HAMMER: USB-C.
BY MS. HAMMER:
Q. Do you recognize what's in front of you that is marked as Government's Exhibit 4?
A. Yes.

Q. I'm going to scroll through it briefly just so you can see all pages.

Do you recognize that document?

A. Yes, I do.

Q. What is it?

A. That's my -- my training log for -- for K-9 Becky.

Q. And looking at page 1, when does it start?

A. September of 2023.

Q. And it goes through which months?

A. From September through January of -- so -- ending in January of 2024.

Q. And September of which year?

A. '23.

Q. Is it a fair and accurate representation of your training log from September of 2023 through January of 2024?

A. Yes, it is.

MS. HAMMER: The Government would move to admit Government's Exhibit 4.

MR. DECKENBACH: No objection, Your Honor.

THE COURT: It is received.

(Government's Exhibit 4 received into evidence.)

BY MS. HAMMER:

Q. So after training in September 2023 but before your traffic stop with Mr. Ostertag, do you recall approximately how many hours you trained with her?

A. I believe it was 60 -- 69 hours in 23 days.
Q. Okay. Over 23 individual days of training?
A. Yes.
Q. And can you kind of describe -- are these trainings that you're doing by yourself?
A. Not all the time, no.
Q. And who would you be doing other trainings with?
A. The entire K-9 team. Other . . . other officers, other K-9 handlers in the area.
Q. What does training look like when it's just you?
A. When it's just me, it's me placing out the -- the finds. And that -- that would be on a vehicle or in an area.
Q. And how . . .

MS. HAMMER: I'm sorry, Melanie.

BY MS. HAMMER:
Q. How often are you training with other people who are hiding the finds so you don't know where they are?
A. It varies.

I know in the month of November we -- we had a -- a team training, so those particular days somebody else would put out the finds. And . . .
Q. Now, when you're doing trainings with other K-9 handlers, what kind of feedback is typical for those kind of trainings?
A. So they . . . somebody else would -- would put out the finds, and then it would just be more of . . . actually,

honestly, those -- those guys are very impressed with -- with my -- with my dog and -- and tell me that she does a great job and that she's a very fast worker.

Q. Have you received any feedback about you as the handler of Becky?

A. Yes.

Q. What kind of feedback?

A. So sometimes I would need to -- to manage my search area a little bit better because she is such a -- a high-drive and a very fast-paced working dog, just to -- to manage her area a little bit better, not to let her pull me so far away down -- down the way to where we miss something.

So it's just managing that -- that search area better.

Q. Now, during these group training sessions, are there blank rooms or blank vehicles used?

A. Yes.

Q. And why is that important as part of the maintenance training of Becky?

A. So that she's not giving a false alert in an area where there are no target odors.

Q. And have you ever had any issues with her during either the training sessions with you or training sessions with other officers where she's given a false alert?

A. No.

Q. Now I want to turn to page 2 of Exhibit 4.

And I see here at the bottom there are some comments. Is that correct?

A. Yes.

Q. Now, what's the purpose of this "Comments" section on your training log?

A. Just to kind of make note of -- of what it did -- or what we did on a particular day.

Q. All right. And so let's go to the bottom here.

And I see that there are comments from a training on October 9th, 2023. And so looking at your training log that day, can you kind of walk us through what that training day looked like? And then we'll move to the comments after.

A. Okay.

So on October 9th we placed one interior hide, we did three exteriors, one blank. Placed out two heroin odors and two cocaine odors, one residual odor, and three -- three finds that were weighing between 6 and 20 grams. One of the finds was high, two of the finds were -- were medium height, and one of those were low.

Q. As part of being a K-9 handler, what training aids are given to you to help facilitate these trainings with Becky?

A. So we have -- we're -- we're given marijuana, methamphetamine, cocaine, heroin, and fentanyl odors.

Q. Are they of varying strength or amount?

A. They -- they're two packages. And they -- depending on which -- which odor it is. But they weigh between -- I believe it's around 10 grams and 11-ish grams.

Q. Okay. And looking at your training log for the 9th, approximately how many hours did you work with Becky that day?

A. Two.

Q. Now, in the "Comments" section below, can you read your comment from that training session?

A. "10/9/23, did 3-minute tap-off drill using cocaine filter paper."

Q. And what is a tap-off drill?

A. A tap-off drill is when we -- so I use the cocaine filter and would place it in an area. And she is given the command to find it.

So she's presented the odor, she locates the odor, does her -- her final alert, which is the focused stare.

And the objective is to tap off on a different location, away from her -- it could be off to the left, to the right, behind her -- and to -- with an attempt to pull her off of the odor.

Q. And how do you tap off?

A. Exactly that. We're just tapping on a different location, tapping on the locker, tapping on the wall, a desk drawer.

Q. And what's the purpose of a tap-off drill?

A. To get her to check over here, check here, check here,

check here, presenting her a different location where there's no target odor.

And then the goal is to -- to keep her focused stare on -- on the target odor.

Q. And how did she do in those tap-off drills?

A. She did good.

Q. And what does it mean by -- to do good?

A. She remained focused on -- on the target odor.

Q. And is that the behavior you're trying to reinforce with that training?

A. That's correct.

Q. Now, I also see here there's another note where it says "10/17/23, proofed off tennis ball."

Can you describe what that training exercise is?

A. So that's when we -- we introduce a nontarget odor. It's her tennis balls, her rewards that she gets. And those tennis balls are placed in the -- in the search area, along with a target odor, and then she's given the command to -- to find it.

And she would go towards the -- leave the tennis balls alone and go towards the target odor.

Q. Now, what's the goal with these proof-off drills?

A. So that we're -- so that she's not alerting to the -- the items that we're putting out there, that she's not alerting to nontarget odors.

Q. Is it fair to say that you are introducing distractions into her training, her maintenance training regimen?

A. Yes.

Q. And why is a tennis ball particularly important to proof off of?

A. Because that's what she -- she's rewarded from. That's -- so she associates the -- the tennis ball with -- with doing her job. So if she -- if she's alerting to -- to tennis balls, that's not what we -- we want her to be doing. We want her to be alerting to target odors.

So then she knows that, if she's alerting to tennis balls, she's not getting her reward. If she's alerting to the target odors, that's when she's getting her reward.

Q. And how does Becky do when you proof off tennis balls?

A. She does good.

Q. And what do you mean by "good"?

A. So she'll get curious about it, but then she'll just run past it. She might do a little sniff as she's walking past it, but she goes directly towards the -- the target odor.

Q. And then we also see here at the bottom "Proofing off cleaning -- general cleaning chemicals, 10/30/23."

Is that a similar drill?

A. So those are -- yeah, just more odors. Anything. We can be proofing off of anything, the -- the wood on the -- on the -- on the countertops here, the coffee, coffee grounds.

My wallet, my hat is -- any- -- anything that is a nontarget odor that's introduced into the training areas, essentially we're -- we're proofing off of that.
Q. And how do these proofing drills help in the field with Becky's credibility in terms of knowing that she's actually alerting to one of her target odors and not one of these distractions?
A. So if she's not alerting to -- to a -- the -- give me a second.
Can you ask that question one more time?
Q. Sure.
What is the value in proofing drills in a controlled training environment when you actually deploy her in the field?
A. As -- so that just gives us reassurance that she's not indicating, alerting on a nontarget odor, regardless of where it -- if it's in the field or in -- in the training environment.
Q. Is it fair to say that the items you're proofing off of are items that are -- that can be generally found in cars, buildings, and other places where you're going to deploy her?
A. Yes.
Q. I want to move ahead to page 3 for the month of November. I want to look at November 6th and 7th.
It appears that these were pretty big days of

training. Is that accurate?
A. Yes.
Q. Do you remember what was going on on November 6th and 7th?
A. Yeah. So that -- that week -- so that ran through the -- it was Monday, the 6th, and then Tuesday, Wednesday, Thursday, Friday, ending on -- on the 10th.
We had a K-9 team deployment. That's when the entire K-9 team -- all the K-9 units around the state -- gathered in Laramie. And we essentially deploy all of our dogs and try to -- try to make high-volume traffic stops and interdicting criminals.
Q. And are these K-9 units just the Wyoming Highway Patrol or other agencies, as well?
A. They -- so -- when we do trainings, other agencies do. They're -- they're welcome to come to our trainings so that they can -- so that they can get training hours if they need to.
Q. And who from highway patrol administration comes to these intensive training days?
A. So our commander and cocommanders. That would be -- Captain Marc Russell and Sergeant Brandon Deckert would be there.
Q. And what is their role during these -- these two days, these training activities?
A. They would be putting out the finds for -- for our dogs to

hide.

And then they would be essentially assessing us on how our dogs are doing, how we are doing, and then us operating as a team.

Q. Is it fair to say that this is just another quality control check by your supervisors to make sure you're doing what you need to be doing and your dog's doing what she needs to do?

A. Yes.

Q. Now, do you remember these two days of training?

A. Bits and pieces of it, yes.

Q. Do you recall whether you received any feedback or any information from your supervisors about how you were doing with Becky at this point?

A. We were -- we were doing great. I . . . and now that you bring this up, I -- I think we were even highlighted in -- in a news article. I don't recall which one. But Becky and I were -- were highlighted in a news article for how good we were doing.

Q. Do you recall any negative feedback or any suggestions on how you could change how you were being K-9 Becky's handler?

A. No.

Q. Do you recall whether she had any false positives on those two days of training?

A. No.

Q. Now, going to the bottom here, can you read that first comment for 11/6/23, please.
A. "11/6/23, parcel work, deep finds, blanks, object fixation. Proofing on gas, fire hose, tape, wood, painted metals, plastic, antifreeze, trash bags, US currency."
We had distractions of the media, handlers, other handlers, other dogs.
Q. Okay. Now, can you describe what "deep finds" are?
A. Deep finds are where the -- the target odor is -- there's distance between where she would be able to get to and to where the -- the odor is located at.
Q. Are they harder to find?
A. Yes.
Q. And why is that training important?
A. Just so that she's still able to detect the odors. It's -- it's more difficult for her, for her to be able to maneuver through something to -- to get to where it is.
Q. Is that also affected by her size?
A. Absolutely.
Q. How did she -- do you recall how she did on those deep finds?
A. It -- like you said, it -- it's going to be hard for her, and it was difficult. But we would work through it and -- and she would find it.
Q. What is "object fixation"?

A. So that's when there would be odor placed next to an object. Let's say placing -- placing an odor on -- on the wall and her getting fixated that -- on -- on the door handle of -- of a door. That's not where the -- that's not where the source of the odor is coming from, the door handle, but -- but the -- the odor would be placed on the wall.
Q. And what's the value of that drill?
A. So that she's still alerting to the odor and not -- not associating objects, substances, with -- with -- with odor.
Q. Now, it looks here you -- you noted again that you had distractions that were media, handlers, and dogs.
Why is it important to do training with other handlers and other dogs present?
A. It's -- we're -- we're adding in a distraction. So the dog could be distracted by -- by people and other animals, not wanting to do their job, you know.
Q. By training with other dogs, what are you trying to reinforce with Becky?
A. When -- that . . . can you ask that again?
Q. Sure.
What do you want Becky focused on when she's deployed?
A. Focused on doing her job, just detecting the odors.
Q. And so, with that in mind, why is it important to train with dogs, other dogs, as distractions?

A. So she stays on task. So that she's continuing to do her job locating the odors and not having dogs or people having . . . having the -- a distraction for her.
Q. Is it fair to say you're trying to reinforce the focus on the job and for her to ignore everything else?
A. Yes.
Q. Are there dogs that are sometimes involved in her real-world deployments?
A. Yes. Yep.
Q. Now, finally, in -- I want to move to page 5, which is the month of January.
And we see here at the bottom -- actually, let me go back up.
It looks like on the 3rd of January you had another big day. Do you remember what was happening that day?
A. I believe that's when we had a . . . a team training in Rock Springs.
Q. And do you remember the location of where that training happened?
A. That was at the -- the -- Murdoch's.
Q. And what is Murdoch's?
A. Murdoch's is a -- like a tractor and -- supply, animal food store.
Q. And do you recall why Murdoch's was picked to be the location for the training?

A. They have tons of -- of distractions and tons of things to -- to proof off of.

Q. And so looking at the bottom, where your comments are, can you read out loud what -- the things you were proofing off of during that training?

Actually, let me back up.

Are the comments at the bottom related to that training or a different training?

A. That training.

Q. And how do you know?

A. So like in the distraction area, it says "moving machinery." That's where we would have -- there was a -- I recall -- a person driving around a forklift in the training area. There were the other K-9s. Yeah.

Q. So go ahead, then, and read out what items you were proofing off of that day.

A. "Animal food, dog chews, cardboard, other dog odor, hand sanitizer, energy drinks, rubber gloves, bug spray, air freshener, food."

Q. That last word, "food," what kind of food was that?

A. I don't recall specifically but I'm -- Murdoch's has tons of like food items, candies, jerkys. So we -- I don't -- it's not listed specifically but those types of food items.

Q. Who would be eating those food items, dogs or humans?

A. Well, they're for people but dogs can . . .

Q. And why is it important to proof off animal and human food?
A. Because that's not -- that's not a target odor. She is still -- she was trained to -- to alert to the -- the target odors.
Q. As far as you're aware, has Becky ever alerted or given a final indication to the odor of human food?
A. No, she has not.
Q. Is she trained to alert to a human food?
A. No.
Q. Where does Becky go at the end of her day, when you're done with your shift?
A. When I'm done with my shift, we -- we go home --
Q. Does she --
A. -- comes home with me.
Q. -- live with you full-time?
A. Yes, she does.
Q. And is it fair to say that you've had quite a bit of time to learn her behavior, both on the job and off the job?
A. Yes.
Q. Now, do you cook in your home?
A. Yes.
Q. Is Becky home when that happens?
A. Yes.
Q. And does she exhibit -- what kind of behavior is she

exhibiting when she's at home and she smells you guys cooking dinner versus when she's at work and is detecting her target odors?

A. She's just being a normal dog. She's . . . I can't really say that she's relaxed because she's always excited. But she doesn't -- she's not alerting to anything inside my house when -- so if there is any sort of cooking or anything going on, she's -- you just don't see her having a focused stare on any sort of object or anything like that. She can . . . she has a stuffed animal. She'll play with her stuffed animal. So -- yeah.

Q. Does she jump up on -- jump up on the counter when you're cooking food?

A. No, she doesn't.

Q. Is she bracketing back and forth when you're cooking food?

A. No.

Q. Does she exhibit any of her alert behaviors that you would anticipate during a deployment in the field when she's at home smelling human food?

A. No.

Q. And, finally, have you done overpresentation drills with Becky?

A. Yes.

Q. What is an overpresentation drill?

A. So that would be when she's been presented a target odor

and she alerts to that target odor and we're just like over- -- overencouraging that -- that focused behavior, that check here, check here, check here.

And she's -- remains focused.

Q. What is -- are you delaying the reward?
A. Yes.
Q. And why is that important with an overpresentation drill?
A. So that -- so that she remains focused and doesn't come off the odor, thinking, "Well, if I'm not on the odor, then I'm not going to get -- I'm not going to be getting paid."
Q. And how does Becky do with overpresentation drills?
A. She remains focused.
Q. Now, during the training sessions noted in Exhibit 4, has Becky ever had a false positive or given her final indication behavior when there was no target odor present?
A. No.
Q. Is it fair to say that between your 80 hours of initial training and these 69 hours over the five months after that that she's never given a false alert in a training setting?
A. That's correct.
Q. Since 2023 has Becky had her annual official certification exercise?
A. Can you ask that question again?
Q. I recall you testified that in September 2023 --
A. Yes.

Q. -- when you did your first initial 80 hours --
A. Yes.
Q. -- you went through the certification process with her. Is that correct?
A. Yes.
Q. Now, have you gone through that again with her in 2024?
A. Yes.
Q. And how did she do?
A. She passed.
Q. Any false positives?
A. No.
Q. Did she miss any of the finds?
A. No, she did not.
Q. Are -- do you also go through in-house certifications?
A. Yes, we do.
Q. And how often are those?
A. Once a year.
Q. How far away from the official certification?
A. I -- I think it's six to eight months.
Q. And who's present for those?
A. The supervisors are, for the K-9 team.
Q. Is that Captain Russell and Sergeant Deckert?
A. Yes.
Q. And how have you and Becky done on any in-house certifications?

A. We've passed them.
Q. Have there been any issues noted by your supervisors?
A. No.
Q. And do you -- the certification in 2024, was that single-blind or double-blind?
A. Honestly, I don't -- I don't recall.
Q. Okay. I'd like to move on to the process when Becky's going to go sniff a vehicle on the side of the road.
At what point do you turn on your body cam?
A. Prior to me arriving to the scene.
Q. And why is that?
A. It just kind of documents me -- our -- our first look into what it is that we're coming into.
Q. Now, when you're about ready to deploy Becky, do you announce on the radio that you're about to deploy her?
A. Yes.
Q. Are you required to do that?
A. No.
Q. So why do you do it?
A. It's just letting everybody know that I'm going to be deploying a K-9, other officers, other agencies.
Q. How does it help with documenting the deployment?
A. It also gives -- it's a record that -- that we're deploying that dog.
Q. And do you call out on the radio the result of that

deployment?
A. Yes.
Q. Every time or sometimes?
A. When the dog's deployed, I would say every time.
Q. And why do you do that?
A. That just lets the others know that -- whether the -- the dog has alerted to the odor of narcotics or not.
Q. Now, what is your first step when you're about to deploy Becky?
A. Well, I try to remember grabbing her reward. I grab her leash. I pop the kennel and leash her up.
Q. And, based off of your response, am I correct that you don't always grab her reward?
A. That's correct.
Q. So what do you do instead?
A. So if I forget her reward, it's a -- and she alerts -- it's a big praise.
Q. Alert or presents her final indication?
A. Yes.
Q. So once you put her on the leash, how big -- how long is the leash?
A. It's a 6-foot leash.
Q. Okay. And why is it a 6-foot leash versus something longer?
A. So we generally use long leashes for wide, open areas.

It -- like a -- the next size I think is a -- is a 30-foot leash. That's a really hard leash to manage if we only need the length of a -- of a vehicle.

It's not necessary to have that long of a leash. And that 6-foot leash just allows her that independence.

Q. And as her handler, are you responsible for her safety?

A. Yes.

Q. And how does having her on a leash help you be a responsible K-9 handler?

A. Yeah, that helps me keep control of -- of her running out into -- into traffic, running . . . yeah, that -- I think that's the most important thing, is that leash gives us control of -- of her safety.

Q. If you -- if you -- is it fair to say that you would only use your leash to pull her if you thought there was something unsafe happening?

A. Yes.

Q. Otherwise, when she's on the leash, how do you -- do you expect her to be independent?

A. Yes. She's given, essentially, 12 foot -- 6 foot either -- in either direction. Her -- and it's slacked. Like I don't keep taut of it unless I need to to keep her from running out into the -- into -- into traffic.

Q. And where do you typically start Becky for a sniff of a vehicle?

A. At the front end of the cars.
Q. And why do you do that?
A. Just -- it's a . . . just a common starting point, you know.
Q. When you're thinking about where to start her, are you also considering wind and other environmental factors?
A. Yes. So I said "front" but it could also be the rear, depending on -- on where we are.
So a lot of times we're -- a lot of times I'm running traffic that's coming eastbound. So the front end of that car is -- is going to be where we place her because that's generally where the -- the wind is blowing into. So westbound traffic would be opposite of that. We can . . . so we would be able to catch the odors from the back end of that vehicle.
So I guess their starting positions can -- they can vary.
Q. Typically, in your experience in Rawlins, is it windy?
A. It's very windy.
Q. And which way does the wind blow typically in Rawlins?
A. From the west to the east.
Q. And you discussed earlier that, if you have stopped going eastbound, you would start at the front because the wind blows west to east, so back of the car to the front of the car?
A. That's correct.
Q. And why is that something you're thinking about when

setting up Becky to deploy on a vehicle?
A. So, when that wind is blowing, it creates a scent cone for -- if there's odors, target odors in the vehicle, it -- essentially, it's a -- a wider area to begin her search. And then, as we're moving through that, that scent cone becomes more narrower to the -- to the target source.
Q. How does the wind affect the odor as it's coming west to east?
A. It . . . so towards the end of that scent cone, the odor's going to be more . . . not as, I guess, potent, I guess. And, as you get closer to that scent cone, the target odor's going to be stronger.
Q. How does that help Becky as she's about ready to search?
A. The -- so as a -- the odor gets stronger, then it's easier for her to pick up and -- and essentially locate that, the target odor.
Q. Is it fair to say that you're trying to help Becky by having the odor blow to her versus away from her?
A. Yes.
Q. Okay. Now, once you get her to the front of a vehicle or the back or wherever you're going to begin your search, what do you do with Becky?
A. I'll kind of -- I'll present the car to her and give the command to find it.
Q. What position do you try to start her in before you say

"Find it"?
A. Facing the -- the target vehicle. I guess that's the way it is, to say it. The -- whatever it is that we're trying to search, whatever it is I want her to search, I want her to -- to realize that this is what we're going to be searching, not a vehicle that's next to it or anything like that. This is what we're -- we're searching.
So I would place her so that she is essentially looking at -- at the object, the thing that we're wanting to search.
Q. Do you have her sit?
A. Not all the times.
Q. Why do you sometimes?
A. To settle her down. Because she's such a high-drive dog, it -- it kind of . . . relaxes her. I think it's relaxing her, getting her settled down a little bit.
And then once I give her the command to find it, then that's her -- her high drive kicks into gear.
Q. And once you say "Find it," what does she do?
A. She's -- she's sniffing for -- for the target odors.
Q. And who decides which way she goes around the car?
A. She does.
Q. Why?
A. She's got the nose. She -- she would have the -- the -- the better direction on where the -- the odor's coming from,

the stronger side. If it's going to be stronger on the left or the right, she would know if it's stronger going that way.
Q. Does this also tie into the fact that she needs to be working as an independent dog?
A. Yes.
Q. And what's your role during this sniff?
A. My role is to observe her and manage that search area.
Q. And during the search how are you holding her leash?
A. It's slacked. I -- I hang onto -- I kind of -- I loop the . . . loop the loop around my -- my thumb. And I will hang onto -- just kind of drape some of that slack over -- over my hand and -- and let her -- let her be free, essentially.
Q. Now, earlier you mentioned that Becky works really fast.
A. Yes.
Q. How often does she hit the end of that leash?
A. She can get there pretty quickly.
Q. And when that happens, what -- when she hits the end of that leash, what happens typically?
A. So I . . . will try to adjust myself so that she has that -- that slack that she needs. If . . . so she -- if she is rounding a corner of a vehicle, she has that space and ability to do so independently.
Q. Now, by letting her hit the end of the leash, are you cuing her to turn around and go back the way she came?

A. No.
Q. What happens when she does that? Does she continue on with her search, or does she . . .
A. When she hits the end of the leash?
Q. Yes.
A. Yeah, she'll just keep on -- on searching. She'll . . . she might check back, look briefly, but then she'll -- if she wants to continue rounding that corner and -- and searching the -- the back end of a trunk or the side of a -- of the car, that's what she does.
Q. During her search are you watching her breathing patterns?
A. Yes.
Q. What are you looking for?
A. What I'm looking for is a closed-mouth breathing, meaning she's intaking the odors through her nose, so getting a better scent.
Q. When -- how does a dog's breathing change when they're in odor? And what are you looking for?
A. So -- so Becky, she -- she starts out with a -- a closed-mouth breathing. And then when she is detecting the odor, she's got a closed-mouth breathing and breathing more heavily through the nose.
Q. Why do dogs do that?
A. Because that's where they're -- they're picking up the odor from, from their nose.

Q. Is it dissimilar from humans when we breathe through our mouth when we don't want to smell something and then we close our mouth to breathe through our nose?
A. Yeah.
Q. And so as Becky -- let's say she starts at the front of a vehicle and then is going down the side towards the back. What happens if she doesn't smell anything on that side?
A. She just rounds the corner and searches the next side.
Q. And if she makes it back to the starting point without exhibiting any alert behavior or giving her final indication, what do you do?
A. So if she doesn't give a final alert, I put her back in the kennel in the patrol car and notify dispatch that there is a negative alert.
Q. When you say "final alert," are you talking about her final indication behavior of the focused stare?
A. Yes.
Q. Now, why would you not run her around the car again?
A. I -- I trust Becky. To me, I -- I feel like, if she hasn't found it the first time around, like we shouldn't -- I'm not going to -- if she didn't find it the first time, I'm not going to -- not going to run the dog a second time.
Q. During deployments with Becky, do you always wait for her final indication of a pointed stare at the vehicle?
A. Can you say that again?

Q. When you're going to reward Becky because you think that she's found that target odor, are you always rewarding her on that final indication behavior of a point -- a focused stare?
A. The focused stare.
Q. Okay.
And remind us. What is her reward?
A. She has a couple of them. One is a regular tennis ball, and then there's another one with a -- like a heavy, weighted tennis ball that has like a rope on the end.
Q. And where do you keep her rewards during a deployment?
A. In my pocket.
Q. Why?
A. It . . . for one, it's so that I can manage her -- her leash because if she's -- you know, I can constantly be switching hands between the leash as -- to give her that -- that independent work space.
And to . . . yeah, just to -- to keep it out of the way.
Q. Now, when you deploy Becky, are some of those traffic stops traffic stops you make?
A. Yes.
Q. And do you also respond when officers seek to have you deploy Becky on a vehicle that they've stopped?
A. Yes.
Q. And when you're called out to deploy Becky, do you go in

assuming that she's going to display positive alert behavior or her final indication?
A. No.
Q. Why not?
A. It's . . . I . . . I just remain in a neutral position. I'm not placing any sort of like anticipation that we're -- that she's going to be alerting to a vehicle.
I would say that's not fair.
Q. Why not?
A. Because we -- that's not our -- our job, our intention. That's not my job, is to like automatically have this . . . these pre- -- predetermined thoughts that this car's going to be loaded. We just don't do that.
Q. So it's fair to say you don't allow the other officers' belief that there may be drugs in the car -- that's why they call you -- to cloud how you --
MR. DECKENBACH: Objection; leading.
THE COURT: Sustained.
BY MS. HAMMER:
Q. So I'd like to turn to the traffic stop that we are here for today with Mr. Ostertag from January 24th, 2024.
Were you wearing a body camera that evening?
A. Yes, I was.
MR. DECKENBACH: Your Honor, may I just briefly make a record for the Court on this exhibit?

THE COURT: Yes.

MR. DECKENBACH: We've prediscussed this morning -- prior to this morning, as well -- there are numerous body cameras in this case. Both sides stipulate to their foundation as admissible and will present them to the Court based on a joint stipulation of their foundation.

And both sides will work together to make sure that -- at the end of this hearing and at the end of the third, I'm going to file something that outlines for the Court -- kind of cross-references all the exhibits. I have numerous videos I'm putting in. I believe they're putting in a handful. Some were submitted with motions.

So I will commit to the Court that I will file a cross-reference exhibit list identifying which videos are which.

But for the purposes of testimony, we will just state the time and date that -- and what their associated exhibit number is for each side.

THE COURT: Thank you. Thank you.

MS. HAMMER: With that, I would move to admit Exhibit 5.

THE COURT: This is Exhibit -- Government's Exhibit --

MS. HAMMER: -- 5, Your Honor.

THE COURT: All right.

MS. HAMMER: For the traffic stop on January 24th, 2024.

BY MS. HAMMER:

Q. Trooper Martinez, is this your body camera footage from that traffic stop?

A. Yes, it is.

Q. Okay. Did you make that traffic stop or did someone else?

A. Somebody else did.

Q. Who?

A. Sergeant Bracken.

Q. And why did you respond?

A. Because I was requested to do a -- a free air sniff of the vehicle.

Q. Now, I'm going to start at 1 minute 5 seconds in on Exhibit 5.

Well, it's 1 minute 4 seconds because I can't quite get it there to 5.

And, at this point in the traffic stop, have you pulled Becky out of your car yet?

A. I don't believe so. It looks like I'm walking back to my patrol car.

Q. Okay.

(Excerpt of Government's Exhibit 5 played.)

BY MS. HAMMER:

Q. Now, we see Becky start running; is that correct?

A. Yes.
Q. Why is that?
A. She's a very high-drive dog. She's excited.
Q. Okay.
(Excerpt of Government's Exhibit 5 played.)
BY MS. HAMMER:
Q. Now, what happened there?
A. Right there she -- she brought her -- her nose up to that open window.
(Discussion held at the podium.)
MS. HAMMER: And, just for the record, Your Honor, this is stopped at 1 minute 31 seconds.
BY MS. HAMMER:
Q. And do you know why she did that?
A. To me, she had detected the odor of something.
Q. Of --
A. Of a target odor.
Q. Okay.
(Excerpt of Government's Exhibit 5 played.)
BY MS. HAMMER:
Q. Now, here at 1 minute 35, what did you do?
A. So I placed her in a -- in a position facing -- facing the vehicle.
Q. And what command did you give her?
A. I gave her the command to find it.

THE COURT: Say it again.

THE WITNESS: "Find it." I gave her the command to find it.

THE COURT: And you're -- it looks like you're holding pretty closely to the leash at that point.

THE WITNESS: Yes, sir.

MS. HAMMER: And we'll continue on.

(Excerpt of Government's Exhibit 5 played.)

MS. HAMMER: Now, I'm going to stop it again at 1 minute 37 seconds to address the Court's concern.

BY MS. HAMMER:

Q. When she begins to deploy, how are you holding the leash and what kind of slack is there on that leash?

A. So at -- at that starting point I'm -- I'm holding the leash so that -- the white fog line, the line is right there. So I don't want her to run out into traffic at this point in time.

When I give her the command to find it, that slack is -- I let go of that leash, and then she is given the entire 6 foot of -- of that leash to -- to go to work.

MS. HAMMER: Okay.

(Excerpt of Government's Exhibit 5 played.)

BY MS. HAMMER:

Q. Now, stopping at 1 minute 40 seconds, what did we just see her do there?

A. So she -- she jumped up.
Q. And what did she do before that?
A. Oh, she -- so . . . she's checking -- she checked the -- the bottom door seam on the front -- front passenger-side door.
We come up to the -- the back side of that door, she stops suddenly and then makes a -- a quick head snap back to -- to the right.
Q. What do you call that behavior?
A. That's alert behavior. She's -- to me, that -- she has detected the odor of narcotics.
Q. Does that meet the definition of bracketing?
A. Yes.
Q. And is bracketing one of her alert behaviors?
A. Yep. So she's narrowing down her search area. She -- so she started at the -- at the front end of the vehicle, worked her way along down the side. When she hit that -- that back door, she stops. So then she's starting to -- to narrow that -- that search pattern down.
THE COURT: Tell me, is that window open on the passenger side? Or do you remember?
THE WITNESS: So you can see it -- I would say it's probably about 3 inches -- I'm sorry.
The rear passenger window?
THE COURT: No, the -- where she's jumping.

THE WITNESS: So right where her nose is at right now, the -- the window, I believe, is up 2 to 3 inches from -- just from what I can tell from the video.

MS. HAMMER: And, Your Honor, we're going to address that right now.

BY MS. HAMMER:

Q. Do you recall whether Sergeant Bracken was wearing a body camera that evening?

A. Yes, he was.

Q. So I'm going to show you what's been marked as Government's Exhibit 6.

Do you recognize this screenshot in front of you?

A. Yes.

Q. What is it?

A. That's -- it looks to be the -- Sergeant Bracken's patrol -- or body camera video showing Mr. Ostertag's front passenger-side door and -- and window, which is -- which is rolled up.

Q. And the positioning of that window, is that a fair and accurate representation of how it remained the rest of the traffic stop?

A. Yes.

MS. HAMMER: The Government moves to admit Government's Exhibit 6.

MR. DECKENBACH: No objection, Your Honor.

THE COURT: It is received.

(Government's Exhibit 6 received into evidence.)

BY MS. HAMMER:

Q. And in this video is it fair to say it's quite dark?

A. Yes.

Q. And approximately how many inches is the window up on the far left side, the best you can tell?

A. I'd say about 2 to 3 inches.

MS. HAMMER: Okay. Your Honor, is there anything else you would like to see with this photo before I move back to the body camera footage?

THE COURT: No. I don't need to see anything else.

MS. HAMMER: Thank you.

THE COURT: And what is -- at this shot what is the time?

MS. HAMMER: Your Honor, we are here at Exhibit 5 at 1 minute 40 seconds.

THE COURT: Thank you.

BY MS. HAMMER:

Q. Now, from what you recall from this evening, did Becky ever get her nose across the plane into the vehicle?

A. No.

Q. And why do you believe that?

A. With as short as she is and the window rolled up, at that very left edge, I -- I think that she would have hit that --

that window before -- before she actually passed beyond that.

Q. Does the window in Mr. Ostertag's vehicle roll flat up where all points of the window are at the same height? Or is there an angle to it?

A. It -- yeah, it angles down from -- from left to right.

Q. What's the highest point?

A. The highest point would be on the left-hand side there, at approximately 2 to 3 inches.

Q. Okay. Now, I'd like to keep playing this.

MS. HAMMER: And, in fact, Your Honor, I may back up just slightly, given that we've started and stopped just a little bit. I'll be starting the video again at 1 minute 32 seconds.

(Excerpt of Government's Exhibit 5 played.)

MS. HAMMER: So I'm stopping it at 1 minute 49 seconds.

BY MS. HAMMER:

Q. What do we see her doing after she bracketed from the rear passenger-side door back to the front passenger door?

A. Yeah. So she -- she jumped up a few times. She's trying to -- that -- the odor, to me, is apparently higher than -- than what she can reach from her standing position. So she's jumping up at -- on the car, and then she settles down and gives a focused stare still up towards that -- that open window.

Q. And with that jumping, do you consider that alert behavior?
A. Yes.
Q. And once she gives that final indication behavior of the pointed stare, is her -- where is her focus?
A. Her focus is up towards that -- that open window. She's got her head and neck stretched out and trying to put her nose up -- up there directly towards that window.
Q. And then what do you do once you see that final indication behavior?
A. That's when I rewarded her.
Q. Okay. And then what happens at that point with Becky?
A. Becky gets her reward and then I -- I load her back up into the kennel.
Q. Okay.
MS. HAMMER: Your Honor, before I move on from this exhibit, do you wish it replayed at all?
THE COURT: (Moved head side to side.)
BY MS. HAMMER:
Q. Okay. Now, after Becky gives her final indication and you put her away, what happens next with Mr. Ostertag?
A. Sergeant Bracken starts to -- has him exit the vehicle and was placed in the front of his patrol car.
Q. And what happens at the front of the patrol car?
A. So, there, Mr. Ostertag is placed into -- into handcuffs

and then his pockets were searched.
Q. And why are you doing this at this point?
A. So we've -- we've got a probable cause alert for searching the vehicle, so we're going to detain Mr. Ostertag and -- and he's searched for any weapons.
Q. On his person or in the vehicle?
A. On his person.
Q. Okay. And what was Mr. Ostertag's behavior like at this point?
A. It was very hostile and very aggressive towards us.
Q. Okay. And did you have any other observations during this pat-down search?
A. I noticed that he was wearing a biker jacket. It had a lightning bolt --
Q. I'm going to stop you right there. Let me be more specific about my question.
Did you notice any physiological signs?
A. Yes. He was -- he was sweating.
Q. And why did that catch your attention?
A. It was very cold outside. It's not normal for -- for somebody to have been sweating outside in -- in the freezing cold weather.
Q. And did you have any concerns with -- when you noted that?
A. Yes.
Q. What concerns?

A. That some sort of criminal activity was -- that Mr. Ostertag was involved in some sort of criminal activity.
Q. Did you have any concerns other than that?
A. That he . . . just that he may have either used narcotics, which would tend to sometimes make people do that, be sweating at unusual times when -- freezing cold weather.
Q. And do you know which controlled substance may cause someone to have that reaction?
A. Methamphetamine.
Q. And how do you know that?
A. From my training and experience.
Q. And what kind of training have you had regarding the effects of methamphetamine on someone?
A. Just --
(Technical interruption.)
THE COURT: Excuse me.
Proceed.
MS. HAMMER: Thank you, Your Honor.
BY MS. HAMMER:
Q. What kind of training and experience have you had on the effects of methamphetamine on one's body?
A. From . . . we've had -- we've taken drug-related classes, so classes that would inform us of those types of -- of indicators.
Q. Have you had ARIDE training?

A. Yes.
Q. And what is ARIDE -- spelled A-R-I-D-E. What kind of training is that?
A. That's to evaluate somebody who was under the influence of -- of a controlled substance.
Q. Is it a more -- is it fair to say it's a more enhanced training than just the standard field sobriety tests that you would typically associate with alcohol?
A. Yes. So just a DUI -- a standardized field sobriety test is alcohol related. ARIDE is drug related.
Q. And then, after that pat-down search, where did Mr. Ostertag go?
A. After that search he was placed into Sergeant Bracken's cage portion of his patrol vehicle.
Q. And what was the next step in the traffic stop?
A. The -- after that is when we started to -- to search the vehicle.
Q. And during your search did you discover any of the five controlled substances that Becky is trained to detect?
A. Yes.
Q. What did you find?
A. Marijuana shake.
Q. And what is marijuana shake?
A. It's -- it's residue. It -- they're the small particles from a larger marijuana bud.

Q. And what kind of experience do you have with identifying marijuana shake?

A. Again, we've taken drug classes. And just from -- from seizing marijuana itself.

Q. How common is it to find marijuana shake in your career?

A. It's starting to become more and more infrequent that -- that we can -- that we've come across marijuana shake.

Q. Is it more frequent earlier in your career?

A. I think . . . with -- with marijuana being legalized more around the country, that stuff is being transported, so I think that it's -- it's become more -- more so now than -- than -- than when I first started.

Q. And how many times have you come across marijuana shake in your career, approximately?

A. I'd say over a hundred times.

Q. Would you describe it as distinct?

A. Yes.

Q. Why so?

A. So it -- it has a -- a very -- well, it can have different-colored greens, shades of greens, but it's the odor itself. It's a -- a skunky-smelling-type odor. I've seen it in -- in bright green form, a little bit darker green, even with purple and crystals.

Q. Do you smell it every single time you come across it?

A. No.

Q. Why not?
A. Well, I could be sick. I could have a cold and just congested and not be able to smell it.
But then just the odors can dissipate over a period of time, also. So just the odors won't be there for -- for me to -- to smell it.
Q. Speaking of, what was your health like on the night of January 24th, 2024?
A. I was sick.
Q. How so?
A. I -- I believe it was the cold and . . . yeah, I was -- I was in rough shape that day.
Q. And were you experiencing congestion?
A. Yes, I was.
Q. Okay. Now, is shake, marijuana shake, something that you will collect during a traffic stop?
A. Do we do that?
Q. Yes.
A. Is that -- no.
Q. Why not?
A. There's no -- for one, we're not trained on how to collect marijuana shake. They're essentially collecting crumbs from an area. There's no -- collecting that, the shake, is -- we would have to enter that into evidence and then send that off to the DCI crime lab to be -- to be tested. And when you

collect that, there's no . . . you can't collect a substantial amount to be able to send that off for an accurate testing. So there's no . . . evidentiary value for like weight, weightwise, and . . .
Q. Are you provided with the tools to collect shake?
A. I wouldn't know what those tools are, no. We don't collect it. We don't have any tools to collect shake.
Q. In your experience, has a prosecutor in your jurisdiction ever charged a possession of marijuana case based off of shake?
A. No. That kind of goes towards our -- our credibility, like . . . why -- why don't we charge somebody with -- with the -- this very little amount of substance when there is -- when we should be doing it for more -- more substance? Like that's -- to them, I -- I believe it's -- it would be petty of us to do that.
Q. Now, was there other evidence collected that night from the vehicle?
A. Yes.
Q. And what was that?
A. It was a handgun.
Q. Now, when you're thinking about evidence collection from that night, what was your focus?
A. Our focus was geared towards that -- that handgun.
Q. Once you found it?

A. Yes.
Q. Why?
A. Well, the -- the serial number was -- was scratched off of it, appeared to have been scratched off. And that -- that alone is -- is a pretty -- pretty serious offense.
Q. Given what you know now, that you would be in court having to testify about this, would you have done anything different?
A. Yes, I would have.
Q. What would you have done?
A. I would have taken some close-up still pictures at least of this -- of the -- the marijuana shake that -- that I observed.
Q. Do you regret not doing that?
A. Regret it? I see it as a learning experience.
Q. I want to go back to Government's Exhibit 5, and I want to go to approximately 20 minutes 20 seconds.
All right. So we're going to be starting at 20 minutes 19 seconds. And we're going to be watching -- at this point what's happening?
A. At this point I believe we're -- we're searching Mr. Ostertag's vehicle.
Q. And which side of the car are you on?
A. I'm on the front passenger side, it looks like.
Q. Okay.
(Excerpt of Government's Exhibit 5 played.)

MS. HAMMER: Becky, do we have sound?

THE COURTROOM DEPUTY: Sorry.

MS. HAMMER: That's okay. Thank you.

(Excerpt of Government's Exhibit 5 played.)

MS. HAMMER: And I'm stopping that at 21 minutes 5 seconds.

BY MS. HAMMER:

Q. When Sergeant Bracken asks if you found anything, what do you tell him?

A. That I just found some shake.

Q. And where did you find the marijuana shake in that vehicle?

A. That would be on the floorboards.

Q. And where on the floorboard did you see it?

A. There were just little bits and pieces up along the -- I guess towards -- by the center console.

Q. So, Trooper Martinez, that screen in front of you is actually a touch screen where you can draw. And if we need to go back to where there's a better vantage point, you can let me know.

Would you prefer that or is this . . .

A. No. Just like . . . you know, right around in this area underneath that -- up along that side there, there's the -- the center console. So -- and that's --

Q. I'm going to stop you real quick.

It would be very helpful if you could actually, using the touch screen on the screen in front of you, draw where you're describing so that we have a good record of where you're talking about. And if we need to go back so that there's a better angle, please let me know.
A. Yeah. I guess we can go back, then.
Q. I'm going to go back, and then you tell me when I need to stop.
A. Okay.
(Excerpt of Government's Exhibit 5 played.)
THE COURT: The center console, he said.
MS. HAMMER: Say again, Your Honor?
THE COURT: I think you've said by the center console.
THE WITNESS: Yes, sir. So the center console -- well, not on the -- on the center console.
THE COURT: Near the center console.
THE WITNESS: Yeah. By the -- on the floorboard, though.
BY MS. HAMMER:
Q. Now, did you watch your body cam -- actually, I'll go back.
At what point during the search did you first see the marijuana shake?
A. When -- probably when I was searching -- searching that

floorboard area.
Q. Okay. And did you watch your body camera footage from this traffic stop before today's hearing?
A. Yes.
Q. How many times did you watch your body cam?
A. I've watched it a lot.
Q. And are you able to see the marijuana shake that you saw that night in your body camera footage?
A. Actually see it here? No.
Q. And why not?
A. So it's . . . the video itself is a little bit distorted but it's dark. And I'm also using my flashlight. And -- and the area where I observed it, it whitewashed that -- that area to make it a little bit harder -- make it very difficult to see that.
Q. And how big were the marijuana shake flecks, if you want to call them that?
A. Literally crumb size. The tip of a pencil. The -- the lead that gets broken off on a piece of pencil. It's small.
Q. Is it fair to say that your body cam -- well, let me back up.
How well does your body cam pick up small details that your eye can see?
A. They're nice cameras but they're not -- they're not that nice, to be able to see that.

Q. Are you aware that the defense in this case is arguing that you never found any marijuana shake that night and that you're making that up to explain why Becky displayed alert behavior and gave her final indication to the vehicle?
A. Yes, I am.
Q. And let me ask you directly. Did you see what you believed to be marijuana shake in the car that night?
A. Yes, I did.
Q. Would you ever claim to see or smell a controlled substance that you did not, in fact, see or smell in order to bolster Becky's reliability?
A. I would not do any of that.
Q. Why not?
A. That . . . that would just destroy my credibility and my dog's credibility. I believe in what we do in law enforcement. I would never jeopardize my career, my integrity over any incident or any person, including Mr. Ostertag.
Q. Was Mr. Ostertag arrested that night?
A. Yes, he was.
Q. And what happened to his vehicle?
A. He . . . we . . . we had contemplated on towing it. We -- essentially, we had turned it over to -- he said it was his brother, but there was no like identifying last name match. And then he said, "Well" -- I believe; I believe, if I remember right -- he said that he was like a brother.

Q. And did you document in your report that night about your discovery of the marijuana shake?
A. Yes, I did.
Q. I'm showing you what's been marked as Government's Exhibit 7. And I'll scroll down so you can see both pages.
Do you recognize this document?
A. Yes.
Q. What is it?
A. That's my report.
Q. From when?
A. From the Ostertag incident, from January 24th.
Q. And does it appear to be a fair and accurate representation of the report you wrote?
A. Yes.
MS. HAMMER: The Government would move to admit Government's Exhibit 7.
MR. DECKENBACH: We would -- I guess -- what's the purpose if -- if the testimony is not sufficient?
We wouldn't -- we wouldn't -- we would object for this being offered for the truth of the matter. It's just a regurgitation of his testimony this morning.
MS. HAMMER: Mr. Deckenbach has put Trooper Martinez's credibility in as a factor in this case, and I think it's important to acknowledge consistencies between what he's writing in his report and what has been shown in the

body camera.

THE COURT: It will be received.

(Government's Exhibit 7 received into evidence.)

BY MS. HAMMER:

Q. I want to go down to the fourth paragraph -- and I'll zoom in, as well.

And so where my mouse is right here -- do you see it?

A. Yes.

Q. Can you read that paragraph, please?

A. "Sergeant Bracken and I started a vehicle" -- or -- I'm sorry.

"Sergeant Bracken and I started a search of the vehicle. While searching the vehicle, Sergeant Bracken located a handgun. The handgun appeared to have the serial number scratched off of it. The item was confiscated and later logged -- and -- confiscated and later entered into evidence by Sergeant Bracken. No other contraband was found. There appeared to be marijuana residue on the front passenger floorboard. George is also known to be associated with illegal narcotics, either by using illegal narcotics or being around people who use illegal narcotics."

Q. Now, you note that no other contraband was found. Why did you write that?

A. So -- nothing else was collected to log into evidence.

Q. And in your body camera footage we hear you say "marijuana

shake"?
A. Yes.
Q. But in your report you state "marijuana residue"?
A. Yes.
Q. What's the difference?
A. The only difference is using the term "shake" is more of a -- a slang type of word compared to "residue" being a more -- a legal term.
Q. There's no difference between the two?
A. No, there's no difference.
Q. Okay. In the last sentence of the paragraph is where you indicate that Mr. Ostertag is known to be associated with illegal narcotics, either by him using illegal narcotics or being around people who use illegal narcotics.
Do you recall me calling you and asking you about how you knew this information last year?
A. Somewhat, yes.
Q. Okay. Do you remember the answer you gave me?
A. I believe it was something to the effect of it was maybe just heard around -- something said amongst cops that -- that we -- that I heard this information from.
Q. Do you remember a specific person who told you this?
A. I don't recall.
Q. Or a specific conversation?
A. I don't recall.

Q. And why are you unable to do that?
A. I have had many conversations with -- with cops. I don't really remember everything that -- that's been said to -- to me and by whom.
Q. What's the law enforcement community like in Rawlins?
A. We're -- we're a smaller, tight-knit group of people. I -- there's no . . . I -- heck, I don't even think we -- we have a hundred cops in that -- in Carbon County. So it's a small community of -- of officers.
Q. What's the value in law enforcement officers speaking to each other, especially officers from different agencies?
A. I think it's huge. It's -- that's how . . . we can just keep a -- a broader spectrum of -- of shared information. You know, the -- something can happen in the city of Rawlins but also have attachments to the town of Saratoga. So it's just -- information sharing I think is huge in law enforcement.
Q. During our conversation did we discuss Kendal Wall?
A. Yes.
Q. Who is Kendal Wall?
A. Kendal Wall, he is known to deal narcotics, use. He's known to be associated with narcotics.
Q. And where does he live?
A. Right now? I . . . I don't know if he's in rehab up in Sheridan or something of that sort. But I know Kendal from --

from being in Rawlins.
Q. And do you recall whether Mr. Ostertag brought up Kendal Wall during the traffic stop?
A. Yes, he did.
Q. And what did he say about Kendal Wall?
A. He essentially said that Kendal Wall must have left that pistol in- -- inside of his vehicle.
Q. Why?
A. Why? I'm not sure why.
Q. How would Mr. Wall have had access to Mr. Ostertag's vehicle, according to Mr. Ostertag?
A. Oh. Yeah.

So he -- so . . . I believe Mr. Ostertag said that he had let Kendal borrow his car a couple days prior to that.
Q. Now, are you aware that the defense is claiming that you put this last sentence of the paragraph that we just discussed in your report in order to bolster Becky's reliability and explain her positive final indication?
A. Yes, I am.
Q. And what's your response?
A. That's not -- that's not accurate at all.
Q. Why did you put it in there then?
A. To make note of it. This is a -- this is a legal document and a way to -- to share information. If -- if another trooper were to -- to come across Mr. Ostertag, then this

information would be -- could -- could be helpful for this other -- other officer or trooper.

Q. Now, as part of being a K-9 handler, are you required to maintain a deployment log?

A. Yes.

Q. What is a deployment log?

A. A deployment log is just logging the date and time that Becky was deployed and who it was for, whether it was my own initiated traffic stop, another trooper's traffic stop, or another agency requesting me to run my dog. It documents whether she alerted or not and if any contraband was found.

THE COURT: Is it a good time to take --

MS. HAMMER: Yes, sir.

THE COURT: We'll stand in recess for 15 minutes.

THE COURTROOM DEPUTY: All rise.

(A recess was taken from 10:06 a.m. to 10:21 a.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

Proceed.

MS. HAMMER: Thank you, Your Honor.

We have just one housekeeping matter.

Exhibit 5, what is Trooper Martinez's body camera from the January 24th stop, I just wanted to be sure that that was admitted as an exhibit.

THE COURT: It is admitted.

(Government's Exhibit 5 received into evidence.)

MS. HAMMER: Thank you, Your Honor.

BY MS. HAMMER:

Q. Trooper Martinez, before the break we were discussing your deployment log and what its purpose is; correct?

A. Yep.

Q. Now, how -- what is -- how does the purpose of your deployment log differ from the purpose of your report?

A. The report is -- is much more detailed. That's documenting what happened that day more thoroughly. And the deployment log is just kind of basic stats and numbers.

Q. Is there -- what's the purpose of the deployment log for Wyoming Highway Patrol?

A. For records keeping.

Q. Now I'd like to show you what's been marked as Government's Exhibit 8.

MS. HAMMER: It may just take a moment to pop up. There we go.

BY MS. HAMMER:

Q. I'm going to go through all six pages just so you can see those.

Do you recognize this document?

A. Yes.

Q. What is it?

A. That is Becky's and -- and I K-9 deployment record.

Q. Starting from what month and year to what month and year?
A. From September of 2023 to January of 2024.
Q. Is this a fair and accurate representation of that deployment log?
A. Yes.
MS. HAMMER: The Government would move to admit Exhibit 8, please.
MR. DECKENBACH: No objection.
THE COURT: It is received.
(Government's Exhibit 8 received into evidence.)
BY MS. HAMMER:
Q. Now, briefly, earlier you testified about the contents of the deployment log.
Looking at the deployment log now, did you miss any information that's logged here?
A. No.
Q. Okay. Now, at the bottom -- what is that gray box at the bottom?
A. That's the "Comments" section.
Q. And what information goes there?
A. There -- bas- -- just, basically, notes. Anything to help us reference an event.
Q. Now, does your deployment log reflect every time you present a vehicle or an item for Becky to sniff?
A. No.

Q. And why not?
A. There could be times where I attempt to deploy Becky and she's too distracted, not focused, wanting -- wanting to go to work for some reason. She could be -- maybe because she was sick or -- or there could be other animals that were interfering with her -- her work ability.
Q. So why would you not note that on your deployment log?
A. Because it -- essentially, there's -- nothing productive was done.
We . . . there -- if she's not productively working, then, essentially, this all serves no purpose to document that.
Q. If she's feeling sick or scared or otherwise doesn't feel like working, does she -- will she do a complete search of whatever's happening?
A. No. It's unsuccessful.
Q. And so, from your point of view, that's not a successful deployment?
A. Correct.
Q. Now, does the Wyoming Highway Patrol have any policies or procedures in place about -- that you have to note every time you deploy her, whether or not it was a successful deployment or not?
A. No.
Q. Is there guidance that you receive from your supervisors

about which deployments need to go into the deployment log?
A. Yeah. Any time where she's deployed and either an alert or no alert is -- is given by Becky.
Q. Am I hearing you correctly that the distinction is that it has to be a successful deployment, meaning not successful that drugs are found but successful in a complete deployment?
A. Correct.
Q. Now, let's talk about on the deployment log where it says "Drug Seizures in Grams."
The weights noted, are those with or without packaging?
A. Those weights are with packaging.
Q. And why do you note it as weight with packaging?
A. So we don't transfer -- if we come across a substance that's already in packaging, we just transfer that -- that item into an evidence bag. We don't want to open up a -- an unknown substance, mainly methamphetamine and -- and fentanyl, which are very dangerous drugs these days.
So we don't -- we don't want to expose ourselves to -- to come into contact with that. And then us essentially could potentially have an overdose and matters being worse.
Q. Now, when you write a report, do you note whether or not the weight is with or without packaging?
A. Yes.
Q. And, for example, if you had a case where -- I'll back up.

What's the threshold under Wyoming law for whether a possession of a certain drug is a misdemeanor or felony?
A. So it's 3 -- 3 ounces for -- for marijuana.
Is that what you're referring to, like the amounts?
Q. Yes.
A. So more than 3 ounces of -- of marijuana is a -- is a felony. And the powder substances are 3 -- 3 grams.
Q. Okay. And, if you had a situation where it -- let's say marijuana -- where it weighs over the 3 ounces but you visually see that -- you can tell it's under 3 ounces, how would you charge that individual?
A. Yeah, so that person would be charged with -- with a misdemeanor charge. If it's clear to us that it's -- it's under 3 ounces, we're not going to charge them with a felony. That's -- that's not really fair because the actual amount of substance was -- is less than, so you'd be charged with a misdemeanor.
Q. Now, you noted that, generally speaking, you don't take any drugs out of the packaging that you find it in; is that correct?
A. Yes.
Q. Have there been exceptions to that in your history as a Wyoming Highway Patrol trooper?
A. Yes.
Q. What's been an exception?

A. There was a time when we had tested a substance we believed to be a THC product. It was very thick. It was like molasses almost. It was -- it was strange. But had a heavy odor of -- of that marijuana smell, that skunky smell.

And so we -- we used that to try to get a -- a field test kit done on.

Q. And what was the result of that field test?

A. It was inclusive. We never could really . . . we couldn't get a read on it.

Q. And what did you do with it after that point?

A. The test or the substance?

Q. The substance.

A. So after that we . . . we placed that substance under -- under an open box so -- like an open box, and we just sat -- sat that box on -- on top of that substance and laid out some other empty boxes and deployed Becky.

Q. What did she do?

A. She indicated in a positive alert.

Q. On which box?

A. The box with -- that had that substance under -- underneath.

Q. And what did you -- did you send that molasses-like substance to the Wyoming Crime Lab for testing?

A. Yes, we did.

Q. And what did they say?

A. If I remember correctly, they couldn't tell what it was, either.
Q. Were they able to test it?
A. I think they tried but I -- I don't know. Sergeant Bracken received those results and talked to them about it.
But I don't think that they were even capable of -- of getting a -- a test done.
Q. Okay. So I want to go to page 6 in your deployment log, which is Government's Exhibit 8.
And which month is page 6?
A. That is January of 2024.
Q. And which of the four listed events is the event related to this traffic stop with Mr. Ostertag?
A. That would be Event No. 2024-00006925.
Q. And at the bottom of page 6 is there a comment related to that traffic stop?
A. Yes.
Q. And what does that comment say?
A. "No drugs found. Driver is a known to be associated with illegal narcotics by using, dealing, or being around people who use. Serial number on handgun found was filed off."
Q. And why did you put "No drugs found"?
A. No collectible amount of drugs. So we observed the marijuana shake, but we didn't collect anything to -- to be able to log into evidence.

Q. And is that an important distinction for the deployment log versus your initial report?

A. Yeah.

Q. What is the expectation of your supervisors about what drugs get logged in this deployment log?

A. Seizable amounts.

Q. And by "seizable amounts," how does that correlate to a future prosecution?

Does it have to be a prosecutable amount?

A. Yeah. Yeah. We don't -- there has to be an amount that we can weigh, and then there needs to be an amount that we can send off to -- to be chemically tested.

Q. And why did you write that Mr. Ostertag is known to be associated with illegal narcotics and drug users?

A. Because he is.

Q. And have there been any changes in what you note in your deployment log since January of 2024?

A. No.

Q. Now, according to your deployment log, were there other deployments of Becky where she exhibited alert behavior or final -- or her final indication of the focused stare where drugs were not seized?

A. Can you ask that question again?

Q. Absolutely.

According to your deployment logs, do they note other

deployments of Becky where she gave her final indication behavior and -- or positive alert behavior -- where you ultimately did not seize any drugs?
A. Yes.
Q. So I want to go to page 2 of Exhibit 8.
What month is being documented in page 2?
A. That is October of 2023.
Q. And I want to discuss the first deployment noted on October 9th, 2023.
Is that the first or second deployment?
A. That is the first deployment.
Q. And is there a note correlated with that deployment below?
A. Yes.
Q. And what does that comment read?
A. That it was involving a Rawlins Police Department traffic stop. "Vehicle searched, nothing found. Residual odor in vehicle."
Q. And do you recall the basic facts of that traffic stop?
A. Yes.
Q. And what is that?
A. So a Rawlins police officer attempted to make a traffic stop on a vehicle. That vehicle was fleeing from him and eventually stopped.
So, at that time, we were at -- while this is happening, we were at -- "we" -- I say "we." I had a -- a

training officer with me. So we responded to -- to that area to assist.
Q. And were you asked to deploy Becky on the car that had fled but was ultimately stopped?
A. Yes.
(Excerpt of Government's Exhibit 9 played.)
BY MS. HAMMER:
Q. I've been showing you what's been marked as Government's Exhibit 9.
Is this your traffic stop -- or is your body camera footage from that traffic stop on October 9th, 2023?
A. Yes, it is.
Q. Does it appear to be a fair and accurate representation of that?
A. Yes.
MS. HAMMER: The Government would move to admit Exhibit 9.
MR. DECKENBACH: No objection, Your Honor.
THE COURT: Exhibit 9 is received.
(Government's Exhibit 9 received into evidence.)
MS. HAMMER: So I want to go to 22 minutes in.
So we'll -- starting at 21 minutes 59 seconds.
BY MS. HAMMER:
Q. At this point have you deployed Becky?
A. Yes.

Q. And what -- did she give her final indication behavior?
A. Yes, she did.
Q. And, at this point, what are you doing in terms of that vehicle?
A. So now we -- I was asked to -- to help with searching that -- that vehicle.
Q. Okay. So let's start playing at 21:59.
MS. HAMMER: Becky, do we have sound?
Thank you.
(Excerpt of Government's Exhibit 9 played.)
MS. HAMMER: And stopping at 22:43.
BY MS. HAMMER:
Q. So can you explain what happened in that clip?
A. Yeah. So I was searching his -- well, his -- that cigarette carton or pack, cigarette pack, and then I had located a -- a hand-rolled cigarette that was on the -- on the floorboard there.
Q. When you first picked it up, did you know right away that it was tobacco?
A. No, I did not.
Q. So what did you do?
A. Examined it a little bit further. Just kind of looked at the -- at the tip of it and seen that it was more of a long -- like a long-grain tobacco that's brown in color rolled up in -- in -- in that paper.

Q. And then you decided it was not marijuana?
A. That's correct.
Q. So I want to move forward.
And we're here at 25:43, and we'll start playing.
(Excerpt of Government's Exhibit 9 played.)
BY MS. HAMMER:
Q. So can you -- in case it wasn't clear, can you just repeat what you said there?
A. I was telling the -- my training officer that he was -- that there is so much odor in -- in that vehicle from them using.
Q. And what kind of odor?
A. It could have been any odor. I had . . . I didn't smell it specifically, but there -- there was odor of -- of some sort of substance in there.
Q. What do you mean by that?
A. So I -- we can't smell everything. But just the -- the burnt odor of any controlled substances that -- that were inside that -- that vehicle.
Q. And was it an odor that you could smell?
A. I could not.
Q. And so why did you say that out loud on the video?
A. More for my training.
So he's brand-new. Not new to law enforcement but new to the agency. And he was -- since he started he had an

attraction towards -- towards my dog and our job.

So that, at that point, Becky had alerted to the odor of narcotics coming from that vehicle, so then I was explaining to him that that is what she would be alerting to.

Q. So if you didn't smell it, why did you believe that?

A. Because Becky alerted to that -- that vehicle.

Q. Do you have a -- do you know the individuals in that vehicle?

A. Yeah. So there were three occupants in there. There was Corey Cruz, Hailey Keller, and then Carlos DeHerrera.

Q. And what do you know of those individuals?

A. Those individuals -- not . . . those individuals are known to be associated with -- with narcotics.

Q. How do you know that?

A. From Rawlins Police Department reports and Sergeant Bracken, as well.

MS. HAMMER: And, for the record, Your Honor, we stopped Exhibit 9 at 26:04.

BY MS. HAMMER:

Q. Turning back to your deployment log, which is Exhibit 8 . . .

(Discussion held at the podium.)

MS. HAMMER: Actually, Your Honor, we're going to go back to Exhibit 9.

///

BY MS. HAMMER:
Q. Now, later during the traffic stop, after your search, did you have a conversation with another K-9 handler with Rawlins Police Department?
A. Yes, I did.
Q. So starting at 27:58.
Did you -- just for context, did you invite this conversation?
A. No, I did not.
(Excerpt of Government's Exhibit 9 played.)
BY MS. HAMMER:
Q. What did he tell you?
A. He told me that his dog hit on that exact same vehicle last week and all they got out of it was a -- a marijuana roach.
Q. What is a roach?
A. The -- the butt end, essentially, of a hand-rolled marijuana cigarette.
Q. Okay. Now let's go back to your deployment log, Exhibit 8.
Do you note residual odor in the vehicle?
A. Yes.
Q. And what did you base that notation on?
A. The -- Sergeant Greninger's statement.
Q. The officer with Rawlins Police Department?

A. Yes.

Q. So it's fair to say that what's shown on your body cam footage is consistent with what you put in your deployment log?

A. Yes.

Q. Now let's turn to page 5 of your deployment log.

What month do we see here?

A. December of 2023.

Q. So let's turn to that second deployment from December 5th, 2023.

What -- do you remember briefly what this one -- this stop is?

A. Yes.

So this stop -- Trooper Howell initiated the traffic stop there in Rawlins and requested me to respond.

Q. Okay. And were you wearing a body camera that day?

A. Yes, I was.

Q. And what does your note here at the bottom related to that traffic stop say?

A. "Positive K-9 alert. Nothing found. Driver stated that he uses controlled substances."

Q. So I'm showing you on the screen what's been marked as Government's Exhibit 10.

You noted that this was a stop initiated by Trooper Howell?

A. Yes.
Q. And was he wearing his body camera that day?
A. Yes, he was.
Q. And does this appear to be that footage from his body cam?
A. Yes.
Q. And is -- for the points in this video where you were also present and on video, are these a fair and accurate representation of what happened that day?
A. Yes.
MS. HAMMER: The Government would move to admit Exhibit 9 -- or excuse me -- Exhibit 10.
MR. DECKENBACH: No objection, Your Honor.
THE COURT: It is received.
(Government's Exhibit 10 received into evidence.)
BY MS. HAMMER:
Q. Starting at 11:18, at this point what's happened with the traffic stop?
A. At that point in time I had already -- I had already deployed Becky on that vehicle.
Q. And did she give her final indication behavior?
A. Yes, she did.
Q. And, just for orientation, where are you in this video?
A. I am standing on the -- on the passenger -- the front passenger-side door, speaking -- and there's the -- the driver of that vehicle is sitting in the passenger seat.

Q. Okay. So let's go ahead and play this.

(Excerpt of Government's Exhibit 10 played.)

BY MS. HAMMER:

Q. Stopping at 13:38.

Now, at the beginning of that clip the driver, Mr. Mendoza, denies any usage of drugs; correct?

A. Yes.

Q. So why did you ask him, then, when he last used?

A. Because people lie. People -- people lie to us all the time. So it's just to -- to further that, that -- that questioning. People will lie to us. And so just trying to get the answer.

Q. And later in that conversation he discusses how there might be a baggie in the car ultimately?

A. Yes.

Q. Okay. Now, what was the result of the search of Mr. Mendoza's vehicle?

A. Nothing was found.

Q. And after that search did you have a conversation with Mr. Mendoza about why you thought Becky displayed alert behavior or gave her final indication on the vehicle even though no drugs were found?

A. I'm sorry. Can you ask that again?

Q. Did you have a conversation with Mr. Mendoza after you searched his vehicle?

A. Yes.
Q. As part of that conversation, did you discuss why you thought Becky gave her final indication on the vehicle even though no drugs were found?
A. Yes.
Q. What was that conversation?
A. So he stated that he -- he uses narcotics, so I explained to him that if -- if he -- if he uses, those odors are going to be consumed on -- on his person, and they can be in -- in the car. So then that would be a reason why Becky would have alerted.
Q. Now, going back to the comments on your deployment log where it says "Positive K-9 alert. Nothing found. Driver stated that he uses controlled substance," is there any discrepancy about what you put in your deployment log versus what was stated during the traffic stop based off of the body camera footage?
A. No, there's not.
Q. Now, also looking at page 5 on Government's Exhibit 8 of your deployment log, was there a deployment on December 10th, 2023?
A. Yes.
Q. And is there a comment below related to that stop?
A. Yes.
Q. What does your comment read?

A. "Positive K-9 alert. Nothing found. Driver stated that marijuana was recently used. Car also smelled of marijuana."
Q. Were you wearing your body camera footage that day?
A. Yes, I was.
Q. Does this look to be your body camera footage from December 10th, 2023?
A. Yes.
Q. And does it appear to be a fair and accurate representation of what occurred during the traffic stop?
A. Yes.

MS. HAMMER: The Government would move to admit Exhibit 11.

MR. DECKENBACH: No objection.

THE COURT: Government's Exhibit 11 is received.

(Government's Exhibit 11 received into evidence.)

(Excerpt of Government's Exhibit 11 played.)

BY MS. HAMMER:
Q. Now, can you provide some context leading up to this point that we see here at 8 minutes 42 seconds?
A. So Sergeant Brackard -- Bracken -- had made a traffic stop. I believe this one is just outside of Sinclair, the beginning of Sinclair.

So he brings the -- the driver back to his patrol vehicle. And I believe I'm arriving right about -- around this same time that they are walking back.

Q. And was there a passenger in the vehicle?
A. Yes, there was.
Q. And what happened with the passenger at this point?
A. At this point the passenger was placed in the front passenger side of -- of my patrol vehicle.
Q. Okay.

(Excerpt of Government's Exhibit 11 played.)

BY MS. HAMMER:
Q. Now, the individual you were just speaking to said that he had smoked last Thursday.

Do you recall what day of the week this traffic stop happened?
A. That traffic stop was -- happened on a Sunday so approximately three days later.
Q. Okay.

And, at this point, I'm going to continue playing the video from 10 minutes 58 seconds where we stopped.

(Excerpt of Government's Exhibit 11 played.)

BY MS. HAMMER:
Q. Stopping at 11 minutes 45 seconds.

Did I hear correct that you said, "Oh, yeah, I can smell it"?
A. That's correct.
Q. What were you referring to?
A. The odor of marijuana.

Q. Starting again at the same point.

(Excerpt of Government's Exhibit 11 played.)

BY MS. HAMMER:

Q. Stopping at 11:53.

What -- who's the other individual on this side of the vehicle?

A. Sergeant Bracken.

Q. And what did he just tell you?

A. He asked me to smell something.

Q. Okay. Do you remember what it was?

A. I believe it was a -- a cartridge.

Q. For?

A. For smoking either tobacco or marijuana.

So there -- nowadays they have tobacco cartridges -- nicotine cartridges -- and then there's also marijuana/THC cartridges that -- that are used for smoking.

Q. With the use of a . . . a vape pen?

A. Yes.

Q. Okay.

(Excerpt of Government's Exhibit 11 played.)

BY MS. HAMMER:

Q. Now, what were you doing -- stopping at 12 minutes even.

What were you doing right there with the cartridge?

A. I believe I did smell that cartridge.

Q. And were you able to detect the odor of marijuana coming

from the cartridge?
A. From that one, no.
Q. And, at the end of the search, did you seize any controlled substances?
A. No, we did not.
Q. Now, did you have a conversation with the female passenger of the vehicle after the search?
A. Yes, I did.
Q. And we'll start playing at 18 minutes 6 seconds.

(Excerpt of Government's Exhibit 11 played.)

BY MS. HAMMER:
Q. Why did you have that conversation with the female passenger about smelling the odor of marijuana in the vehicle?
A. Just to -- again -- to let her know what -- what was going on. People are going to wonder why we're searching their stuff. And I don't -- I don't remember if she was talked to about -- about the dog alerting and that.

But to let them know that we didn't find anything and that that vehicle smells like weed in the car. And . . . suggested that they clean it out. And . . . yeah.
Q. And when you confronted her about that odor of marijuana, did she deny it?
A. No, she didn't. She said that she didn't -- she didn't notice it.

Which, in my experience, that's kind of indicative of

somebody who -- who uses frequently because they get used to that smell of marijuana. Somebody that doesn't use marijuana on a regular basis will -- it has a very distinct smell, so it's more noticeable.

Q. Now, turning back to Exhibit 8, your deployment log, looking at the language you used, are there any discrepancies about what the male driver told you and what you stated in your deployment log?

A. No, there's not.

Q. And is there any discrepancy about what you seemed to indicate in the video of what you smelled and what you put in your deployment log?

A. No.

MS. HAMMER: May I have just a moment, Your Honor.

(Discussion held at counsel table.)

MS. HAMMER: Thank you, Your Honor.

I have no further questions for Trooper Martinez at this time.

(Discussion held at the podium.)

MR. DECKENBACH: Your Honor, prior to questioning Trooper Martinez, with the stipulation to foundation, I'd like to move to enter Exhibits A through M.

Exhibit A is a video from the January 24th stop, the stop in question with Mr. Ostertag.

Exhibit B is an October 9th, 2003, [sic] stop video.

Exhibit C is a December 5th, 2003, stop video.

Exhibit D is a December 10th, 2003, stop.

Exhibit E is a September 27th, 2003, stop.

Exhibit F is a November 8th, 2003, stop.

Exhibit G is a November 8th, 2003, stop.

Exhibit H is a December 3rd, 2003, stop.

Exhibit I is a December 28th, 2003, stop.

Exhibit J is a January 1st, 2004, [sic] stop.

Exhibit K is a January 14th, 2004, stop.

Exhibit L is a January 23rd, 2003 -- '4 -- stop.

And then September 27th -- or I'm sorry -- Exhibit M is a December 27th, 2003, stop.

Each of these exhibits -- some of these exhibits have subexhibits, which are just the -- a different angle or camera view of these stops. And I would note -- well, I'll ask that the Court admit them.

MS. HAMMER: What about U?

THE COURT: Are you reading from a list?

MR. DECKENBACH: I am reading from a list that I will file with the Court later, as well.

THE COURT: Yeah.

MR. DECKENBACH: And also --

THE COURT: The courtroom deputy will appreciate receiving it.

MR. DECKENBACH: And Exhibit U is also a 20 -- a

September 27th, 2003, [sic] stop.

MS. HAMMER: No objection to the admission of the exhibits noted by Mr. Deckenbach.

MR. DECKENBACH: And, for the purpose and clarity of the record -- and, again, I will file an extensive exhibit list as well as cross-reference to the other exhibits.

But just as far as moving through this, what was Exhibit 5 by the Government correlates to Defense Exhibit A1. They are the same video, same time stamps.

Exhibit 9 is -- of the Government's -- is correlated in the same exhibit as Exhibit B1. And, again, those time stamps will be the same for those two exhibits.

And, finally, Exhibit 11 of the Government's correlates to Exhibit D1 of the defense.

And that -- with that, Your Honor, I'm prepared to proceed with questioning if the Court is -- would allow.

THE COURT: Exhibits A through M -- and, apparently, some subparts -- and Exhibit U are received.

(Defense Exhibits A-M and U received into evidence.)

MR. DECKENBACH: Thank you, Your Honor.

Good morning, Trooper Martinez.

THE WITNESS: Good morning.

**CROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. With your initial training as a police officer, you

learned a lot of different skills; is that correct?
A. Yeah.
Q. You learned how to conduct patrols?
A. Yes.
Q. You learned how to use a firearm?
A. Yes.
Q. You also learned how to write reports?
A. Yes.
Q. You also have received during your career how to utilize body cameras?
A. Yes.
Q. And you've learned that body camera footage is evidence?
A. Yes.
Q. And that someday they might be viewed in court?
A. Yes.
Q. You've also learned how to narrate to your camera in order to preserve evidence?
A. Yeah.
Q. And sometimes reviewing your body cameras helps you with your report writing?
A. Yep.
Q. And early in your career I think you testified that you spent time kind of shadowing or watching K-9 handlers at the Rawlins Police Department.
A. That's correct.

Q. You also continued that when you joined the Wyoming Highway Patrol, again shadowing or watching folks who handled K-9s?
A. Yes.
Q. In order to do that, you weren't required to take any precourses in K-9 handling in order to shadow or watch those individuals, were you?
A. No.
Q. And you talked about volunteering with the K-9 handlers at the Wyoming Highway Patrol. That didn't require any coursework or education prior to doing so?
A. That's correct.
Q. And you were finally selected as a K-9 handler by the Wyoming Highway Patrol in 2023?
A. Yes.
Q. And this was pretty exciting news for you as something you always wanted to do since you appreciated your own grandfather was involved in this at one point?
A. Yeah. Of course.
Q. And you received training that we've already talked about from Mark Rispoli; is that correct?
A. Yes.
Q. He provided you a course through Makor K-9?
A. That's correct.
Q. How much of that coursework involved you coming to

understand the science behind K-9 detection dogs?
A. The science? Not too much.
Q. He didn't offer you academic literature to apprise yourself of how it works scientifically?
A. No. It was more of -- of observing our -- our dogs and -- and changes in behaviors.
Q. Did he use any aids or slides or written materials in this course? Did he provide any of that to you?
A. No, he did not.
Q. Did he give you a written syllabus prior to the beginning of your coursework?
A. No.
Q. Did he teach you that K-9s should be trained to perform a predetermined specific final response, an alert, upon locating a trained odor?
A. Can you ask that again?
Q. All right.
Did you learn from him or did he teach you that your K-9 should have a final response specific to identifying a trained odor?
A. So . . . are you asking to -- if the dog was trained to give a final alert, final --
Q. Yeah, was that part of his training. Right.
A. Yes.
Q. And I think you've testified that Becky was trained to

give you a focused stare as her final alert.
A. Yes.
Q. And part of your initial training was to work with her on very specific target odors; is that correct?
A. That's correct.
Q. Marijuana?
A. Yes.
Q. Fentanyl?
A. Yes.
Q. Meth?
A. Yes.
Q. Cocaine?
A. Yes.
Q. And heroin?
A. Yes.
Q. Now, fentanyl is a drug you've come across in your profession; correct?
A. Yes.
Q. You are aware that fentanyl is currently being pressed into pills by traffickers and shipped all over the country, to include Wyoming?
A. Yes, they are.
Q. These pills mimic -- or look like prescription drugs?
A. Yes.
Q. But they are cut with fentanyl from Mexico?

A. Yes.
Q. Pharmaceutical-grade fentanyl from Mexico?
A. Yep.
Q. Very dangerous?
A. Very dangerous.
Q. You're also aware that fentanyl can be lawfully prescribed by doctors in the United States?
A. That's correct.
Q. Fentanyl lollipops relieve pain for someone who'd just recovered from surgery might be an example?
A. I -- I don't know but, yeah, if that's what you're saying, that they could -- they could be given, then yeah. Yeah.
Q. I'll back it up.
At the very least you know there's lawfully prescribed fentanyl in the community from doctors?
A. Yes.
Q. And during your training did you train Becky how to distinguish between the scent of illicit fentanyl versus lawfully possessed fentanyl?
A. No.
Q. She can't make that distinction? She just alerts to the presence of odor from fentanyl?
A. That's correct.
Q. I'll ask you similar questions about marijuana.
At any point did you train Becky, when you were

working with Mark Rispoli, to make a distinction between hemp that has THC concentrates that are unlawful versus hemp that has THC concentrations that are legal? Is she able to distinguish between concentrations of THC in her alerting?
A. Not that I'm aware of. We never trained with hemp, so I would . . .
Q. But, ultimately, when Becky alerts to marijuana, she's alerting to the components and chemicals from THC; correct?
A. I -- I guess technically that's -- I -- I wouldn't know if she is alerting to -- to hemp or not.
Q. But in -- she would be able to alert to any product that has THC presence -- present in it; correct?
A. Sure. Like edibles, they -- those have THC product.
Q. She wouldn't alert to CBD, though; right?
A. No.
Q. Because there's no THC in CBD products?
A. Correct.
Q. So it's the products with THC that she alerts to the odor of?
A. I -- I would say yeah.
Q. Okay. Regardless of the concentration or levels of THC in that product?
A. Correct.
Q. And then meth. Meth is also something that she's looking for odor of when you're training her; correct?

A. That's correct.
Q. And you are aware that there's a lot of illicit meth in the community?
A. Yes.
Q. There's also pharmaceutical -- or there's also prescription drugs that have methamphetamine in it, as well; correct?
A. There is. I don't know specifically but I -- I think there are traces of methamphetamine in some medications, yes.
Q. ADHD medication, for example?
A. Yep. Yep.
Q. And in your training you did not teach Becky how to make a distinction between lawfully prescribed medication with methamphetamine in it and illegal meth?
A. Correct.
Q. That was not part of the training?
A. Correct.
Q. When she alerts, she's alerting to the odor of methamphetamine regardless if it's illicit or if it's lawfully possessed?
A. Alerting to the odor of methamphetamine, yes.
Q. Whether or not it's prescribed by a doctor or bought by a drug dealer, she doesn't make that distinction, does she?
A. Correct.
Q. And part of the training that you received from

Mr. Rispoli was the importance of having her under control during your deployments?
A. Yes.
Q. That means she's responsive to your commands when she's being deployed?
A. Yes.
Q. And it also means that she is not independently engaging in bad habits while you are deploying her?
A. Correct.
Q. And part of your training also involved learning how to properly reward her for her work; is that correct?
A. Yes.
Q. Trained to reward her when she indicates correctly or she alerts correctly?
A. Yes.
Q. And you also learned that you are not supposed to reward her incorrect responses?
A. To reward her -- to not to reward her? Is that what you said?
Q. Yes.
A. Correct.
Q. If you were to reward an incorrect behavior or response, you risk reinforcing that behavior?
A. Correct.
Q. And if Becky -- she has a few rewards. One is a toy ball?

A. Yes.
Q. She also receives rewards through praise?
A. Yes.
Q. And K-9s, working dogs, live for the reward; correct?
A. Yes, they do.
Q. That's the motivator?
A. Yes.
Q. You also call her reward her pay; is that correct?
A. Yes.
Q. And what does a K-9 get when they're deployed and nothing happens?
A. She gets put back in the kennel. She can be given a "Good girl" for not alerting. So -- so she's -- she's still doing -- she's doing her job. So if she didn't alert to the presence of narcotics, then she can still be -- be told, you know, "Good girl, good girl."
Q. And that's when -- when do you give her that reward?
A. Generally, it's . . . I guess it depends. It can be at the -- at the car as we are walking back or -- or when I put her up in the kennel and tell her "Good girl."
Q. You would not give her a toy, though, in that circumstance?
A. No.
Q. And did Mark Rispoli give you tips and training on how to break her of any bad habits?

A. Mark Rispoli? I -- I don't believe so.
Q. But you understood generally, as a principle, you should try to break her if she ever manifested a bad habit? It's something you would want to address?
A. Address it, yeah. Sure. Yep.
Q. And, in Mark Rispoli's training with you, did he have any section or time dedicated to teaching you about cognitive bias?
A. Cognitive bias?
Q. Is that a term that's unfamiliar to you?
A. Yeah. So what -- what are you -- what do you mean by that?
Q. Well, I would imagine, if it's a term that's unfamiliar to you, then it's not something Mark Rispoli covered with you.
A. Okay.
Q. But I'll give you a definition, and you tell me if you've heard of this.

Cognitive bias: A set of influences that may affect the reliability and validity of one's observations and conclusions.
A. So cuing? Is that what you're referring to?
Q. Just any set of influences. Cuing might be one of them; right?
A. So I guess a cognitive bias would . . . if I'm understanding you right -- so cuing -- cuing the dog to -- to

alert.

Q. That's what you understand to be cognitive bias?

A. I guess, from -- if you -- just from your statement of the definition.

Q. Well, and I'll ask. Did you spend any amount of time talking about either cuing or just cognitive bias in general with Mark Rispoli?

A. Yes.

Q. And what did he tell you?

A. To -- to be cognizant of that. To be aware that we could be -- that our movements could -- or not even movements -- not even just movements but other things -- could cue a dog to alert on vehicles.

Q. And did he talk to you about how your beliefs might affect your observations of the K-9?

A. My beliefs?

Q. Your personal beliefs about the dog might impact your observations.

A. Not that I recall.

Q. I want to ask you about the certification process that you went through.

When you were certified by IPCA, you were required to tell them the type of indication or alert that you expect; is that right?

A. Yes.

Q. And what did you tell Josh -- it was Josh Hardee that certified you; correct?
A. That's correct.
Q. What did you tell Josh Hardee was your -- going to be the type of indication or alert for Becky?
A. I don't recall.
Q. And Josh Hardee himself is someone you're familiar with; is that correct?
A. I know who he is, yes.
Q. And you'd volunteered with K-9s in the department for a long time?
A. Yeah.
Q. Had a lot of interactions with Josh Hardee when he was the supervisor of that department?
A. He was . . . he would be around maybe sometimes. Because I think he was in a different position, like where he was required to be at more often.
I . . . I can't -- I can't remember if he was -- I can't remember his -- his position. But he wasn't there all the time.
Q. He was there sometimes, though?
A. I think so, yeah.
Q. And you had a positive working relationship with him when you did interact with him?
A. I . . . I would assume so. But I don't -- like I don't

really recall like any specific conversation or anything like that.

I mean, I think we're having a positive reaction right now so . . . yeah. I guess I would -- it would have been a positive reaction that we had if we . . .

Q. You knew Josh Hardee much better than you know me; right?

A. Yep. Not much better, but I know him a little bit better than you, yes.

Q. Okay. And in -- specifically in a professional capacity?

A. Yeah.

Q. Okay. And I also want to ask you about your training records.

Your training records that I believe was entered into -- as a Government exhibit reflect what the Wyoming Highway Patrol required you to document; is that right?

A. Which training records?

Q. Your K-9 -- your K-9 training records. I'm so sorry.

A. For the dog -- yes.

Q. Thank you. So -- I'm sorry. I'll ask that again.

This is -- that K-9 training record is something the Wyoming Highway Patrol requires you to maintain?

A. Yes.

Q. And much of the training you -- is conducted by you and Becky, sometimes just you two alone; correct?

A. Some- --

Q. Some of it?
A. Sometimes, yeah.
Q. And sometimes you are required to plant the hides and see if she can find them?
A. That's correct.
Q. And in that log that was admitted into evidence, there's nothing indicating clearly when you're training by yourself versus when you're training in a group?
A. That's correct.
Q. There is also nothing in your log to indicate where the training specifically took place?
A. That's correct.
Q. And your log doesn't indicate who specifically might have provided training if you were receiving it from someone else?
A. That's correct.
Q. I think your log did reflect that Mark Rispoli gave you the initial training, so that might be an exception.
A. Yeah.
Q. But, otherwise, the normal training in the department, it doesn't reflect who was involved at any given time?
A. Correct.
Q. And there's nothing in that log that indicates whether or not a single-blind test was being applied at a specific training?
A. Can you ask that question again?

Q. There's nothing, at least in your training log, that indicates whether single-blind testing is being utilized in training?
A. So there is a section on -- on the -- on the -- on the training log; one of the -- the -- the boxes are blind. Is that . . .
Q. Okay.
A. Is that the section that maybe you were referring to?
Q. So there's blanks; correct? On the --
A. Okay.
Q. Is that what you're referring to or --
A. Okay. Yeah. That's -- that's correct. You're right. So the -- right. So there -- there's nothing indicating blind, blind types.
Q. Nothing also indicating whether there was a double-blind test; fair to say?
A. Yes.
Q. Okay. And, ultimately, the training records that were admitted into evidence are records that you maintained; is that correct?
A. That's correct.
Q. Nobody else is recording your training on your behalf?
A. No.
Q. And all your successful training is self-reported?
A. Yes.

Q. And as far as timing, that initial training that you received with Mark Rispoli was back in September of 2023, from September 9th to September 18th; is that correct?
A. I believe so.
Q. And it was only after seven days of completing training that you then took the certification test on September 16th; is that right?
A. I guess maybe I have some dates wrong.
Q. That's okay.
MR. DECKENBACH: Could I ask that the Government exhibit certificate -- I think it's 2, 3 --
MS. HAMMER: Certificate?
MR. DECKENBACH: Yeah.
Exhibit 4.
BY MR. DECKENBACH:
Q. If you were to see the exhibit -- or the -- the exhibit of the certificate with the date signature, might that refresh your memory --
A. Yes.
Q. -- of when you were certified?
A. Yes.
MR. DECKENBACH: Your Honor, may we approach the witness -- or I --
MS. HAMMER: Please. I trust you.
MR. DECKENBACH: May I, Your Honor.

THE COURT: You may approach.
A. (Continuing.) It's September 16th of 2023.
BY MR. DECKENBACH:
Q. Okay. And that's the date that you were certified --
A. Yes.
Q. -- by Josh Hardee?
A. That's correct.
Q. That's Day 8 of your training with Mark Rispoli?
A. I think it should be -- that should have been . . . Day 10. I believe we -- we certified on our -- our very last day of training.
Q. And so if your training logs infer that you began training on September 9th, was that correct?
A. I think if I had like the -- the training log, that would be a -- that would be helpful to --
MR. DECKENBACH: Your Honor --
BY MR. DECKENBACH:
Q. That might refresh your memory?
A. Yes.
MR. DECKENBACH: May I approach the witness again, Your Honor.
THE COURT: You may.
(An off-the-record discussion was held at the witness stand.)
A. (Continuing.) So starting September 9th and then ending

on the 18th.

BY MR. DECKENBACH:

Q. Okay. And so you received your IPCA certification towards the tail end of that training; correct?

A. Yes.

Q. Prior to it being completed, though?

A. Yes.

Q. Okay. And some nine days later you had your first deployment in the field with K-9 Becky; is that right?

A. Yes, I did.

Q. That was on September 27th of 2023?

A. Yes.

Q. And, at that time, your instruction from Mark Rispoli's course was fresh in your mind?

A. Should -- should have been.

Q. Fresher than it might be today?

A. Yeah.

Q. And your first deployment of K-9 Becky was during a traffic stop on I-80 on that day; is that correct?

A. Yes, that's correct.

Q. Approximately -- at least according to the deployment log -- around 5:18 p.m., in the evening?

A. Yes.

Q. I now want to show you what's been previously marked Exhibit M, starting at Marker 22:44, and we'll play it until

23:32.

MR. DECKENBACH: And it's going to be the computer at counsel table there.

(Excerpt of Defense Exhibit M played.)

BY MR. DECKENBACH:

Q. And during this deployment Becky starts to -- jumping towards --

MR. DECKENBACH: I'm sorry. Is that all the way through the final marker?

(Discussion held at counsel table.)

MR. DECKENBACH: All right. Could you advance it slightly farther, then? My apologies.

I'm sorry. If you want to just -- why don't we start from the beginning time mark on the original, and we'll just kind of play it through as far as -- starting at 22:44.

And then we can just let it continue playing until I say "pause." Is that all right?

(Discussion held at counsel table.)

MR. DECKENBACH: All right. Sorry about that, Trooper.

We'll start again at 22:44.

THE WITNESS: Okay.

(Excerpt of Defense Exhibit M played.)

MS. HAMMER: Can we --

THE COURT: What is that command? "Watch out"?

THE WITNESS: I think that's delayed. I think there's a delay in the audio. There -- that's not matching up.

MS. HAMMER: That's what we were just noting, was that, when we watched this video from what was provided to us yesterday, that audio doesn't line up with the video.

MR. DECKENBACH: From -- what was actually disclosed is different than what that disclosed?

MS. HAMMER: That's different.

MR. DECKENBACH: Okay. Let me try playing it off my laptop. I'm not sure what's going on with Trial Director.

(Discussion held at counsel table.)

MR. DECKENBACH: Okay. Third time's the charm.

THE WITNESS: All right.

MR. DECKENBACH: All right. 22:44. Thank you.

(Excerpt of Defense Exhibit M played.)

MR. DECKENBACH: Can you pause it, please?

BY MR. DECKENBACH:

Q. This is 12:34 [sic]. And I think the Judge is curious.

What are you saying to the dog at that point?

A. To -- "Don't jump."

Q. And that's a command you've learned to control her behavior?

A. Well, I don't -- a command that I've learned? I . . . I think we can tell our kids not to -- not to do something.

So a command to not jump -- sure. Yes.

MR. DECKENBACH: Okay.

MS. HAMMER: And, Jordan -- I apologize. I think your time stamp is 23:34, not 12:34. Just for the record.

MR. DECKENBACH: Yes, 23:34. Thank you.

Okay. And then if we could resume, please.

(Excerpt of Defense Exhibit M played.)

BY MR. DECKENBACH:

Q. Paused again at 23:46.

You testified yesterday that during this deployment you pulled her away from the window with the leash.

Is that what we just saw you do?

A. Where?

Q. That -- after you said "No jump," that you then pulled her with your -- the leash away from the window.

A. I believe so.

Q. Okay. And we'll commence the video again at 23:46.

(Excerpt of Defense Exhibit M played.)

BY MR. DECKENBACH:

Q. We're pausing now at 24:38.

Is this you praising her once upon putting her back in her cage?

A. Yes.

Q. And at no point did you give her a reward during this deployment; is that correct?

A. That's correct.
Q. And, in fact, after you told her to stop jumping and pulled on her with the leash, there was no more jumping, as far as at a window; correct?
A. Correct.
Q. She did continue to jump on the car to try to smell other parts; is that correct?
A. Yes.
Q. And she was jumping on these other parts of the car to assist her search for odor; correct?
A. If they -- if the odor would be coming from a higher level, then yes. So yes.
Q. So she can't get -- she can't search for the higher odor unless she is able to leverage herself by pushing up against the car to get her head higher?
A. Yes.
Q. And at no point does she do a focused stare during this deployment, does she?
A. She actually -- she does.
Q. Okay. And what point in the video did you see her performing a focused stare?
A. So it was around the -- the video where she's -- she's at the window.
Q. And so it's your testimony that, while she was trying to access the window, she was performing a focused stare; is that

correct?
A. That's correct.
Q. And that was what you understood to be her trained indication?
A. The focused stare, yes.
Q. Yet, though she was performing her trained indication, you didn't provide her her toy, did you?
A. No, I did not.
Q. Nor did you call that an alert?
A. No, I didn't.
Q. In fact, shortly after this point in the video, you radio to dispatch that there was no alert?
A. That's correct.
Q. And it was your testimony yesterday that you believe it's an alert now; correct?
A. Yes.
Q. But yesterday you also testified that at the point in your career or early with her in the deployment that you didn't want to call it because it wasn't her trained indication. That's what you testified to yesterday.
A. So her -- her trained alert, the focused stare, I -- like this -- this traffic stop, that -- that whole dog deployment, that was -- I think I even said it yesterday, but that was me failing that 100 percent.
Like I wanted -- I wanted her -- I wanted her to have

that -- that controlled focused stare and not so much of the -- the jumping action.

And so I . . . because she didn't do that, yeah, I didn't . . . I didn't have the trust in -- in my dog. So I had -- like I -- I failed her. Because she, in my opinion -- watching this now, compared to back then -- she should have been rewarded.

Q. And so yesterday I think you said that you were scared -- or you just -- I think the same thing. You didn't trust her enough; is that right?

A. Well, I --

Q. Or trust yourself?

A. -- probably the -- yeah, I didn't trust myself.

But like the scared part, even on me, like this is -- like this is a huge moment in -- for my part of being a handler.

Being brand-new and not having anybody to -- to give me critiques as to what to -- what to be look- -- looking for with this change of behavior, like this is all on me.

And if I wasn't 100 percent confident in myself, then I should not be -- be calling a -- a positive alert.

Q. Because during the 80 hours you had trained before, you had people assisting you in -- in figuring out what was going on; correct?

A. Yes.

Q. And now you were without a net? You were walking that tightrope alone?
A. That's right.
Q. And yesterday you specifically said you were afraid to call an alert because she wasn't doing her trained indication. That's what you testified to yesterday.
Has your opinion changed today that now you actually think she was doing her trained indication?
A. Absolutely.
Q. And so your observation at that day, at least what you told dispatch, was no alert; correct?
A. Yes.
Q. Yesterday you testified that there was no trained indication; correct? And that caused you not to call it?
A. Yes.
Q. And now, today, you're saying actually you do see a trained indication?
A. Yes.
Q. So it's an evolving observation by you even to this day?
A. Yes, it is.
Q. And so your report to dispatch wasn't fully truthful, as you had seen her engaged in alert behavior during that deployment? Is that your testimony?
A. Well, that -- can you ask that question again?
Q. I think you testified that, back when the stop actually

happened, you did notice alert behavior, just not her trained indication. Correct?
A. Well, there was -- there was both. Watching the video now, for me, and evaluating this now and having the experience that I have now compared to way back then, she -- she is showing alert behavior. And she's even . . . did her -- her final alert.
And, once again, that -- that was completely on me. I failed. I failed her, my dog, by not calling that.
Q. I'll clarify.
Just -- what your observation was that day, Trooper Martinez, on the 27th of 2023 -- you did testify yesterday that back then you thought you saw alert behavior, just not her final indication; right?
A. Yes.
Q. And though at that time you observed alert behavior, you told dispatch there was no alert?
A. Correct.
Q. And so that wasn't accurate information? In fact, you had observed an alert behavior; correct?
A. Alert behavior, yes.
Q. And alert behavior equals an alert, in your mind; correct?
A. Yes.
Q. And in -- you -- as a K-9 handler, you've already testified you're required to prepare your deployment log to

reflect what happens on deployments?
A. That's correct.
Q. And you're trained to fill these logs out completely?
A. Well, I don't think there -- there's no like sort of elaborate training. We're just told, essentially, just read -- read the top of the line and plug in the numbers.
Q. And when you do that, you're trained to do that accurately; correct?
A. We're supposed to do that accurately, yes.
Q. And you understand it's important to be truthful in law enforcement documents; correct?
A. Yes.
Q. And the report you made -- you're going to reflect what happened regardless of the outcome of any search or what comes at the end of it; correct? You're going to --
A. I'm sorry?
Q. Any deployment you initiate you're going to report, regardless of what the actual or ultimate outcome is of that deployment?
A. If it was a successful dog deployment.
Q. And would this be considered a successful dog deployment?
A. Yes.
Q. And you did, in fact, then fill in an entry reflecting this dog deployment; correct?
A. I did.

Q. You indicated it was a T/S type of contact.
What does "T/S" stand for?
A. "T/S" is a traffic stop.
Q. Thank you.
And you indicated the location?
A. Yes.
Q. And you indicated that there was no alert?
A. Correct.
Q. And your testimony today is that you did, though, at the time, observe alert behavior?
A. Yes.
Q. But you never indicated that on this law enforcement document, did you?
A. So I never -- so alert -- if I didn't call an -- an alert to my dispatcher, then . . . whatever I informed my dispatcher of, that's what I would be logging on there.
Q. Okay. And so because you weren't fully honest with your dispatcher, you needed this to reflect that omission on your behalf? You needed this to be consistent with what you told dispatch?
A. Back then, that day, that time, I wasn't confident enough to -- to call an alert. So that was recorded to -- that was said to my dispatcher --
Q. So then you --
A. -- and that was recorded on that document.

Q. So you didn't have the confidence to make the right call in that moment?
A. Yes.
Q. And this was 11 days after being certified by Josh Hardee; correct?
A. That's correct.
Q. And yesterday you testified that Becky's jumping was her just doing her thing and doing it the right way.
Do you remember saying that?
A. Yeah. Because -- yes.
Q. And you've come to the -- that conclusion through -- I think you said -- people mentoring and helping you, in the department, understand her behaviors better? Is that right?
A. Yes.
Q. And you testified that these mentors have told you to just trust that, when she is jumping and pawing, she is in alert behavior?
A. Not -- so that's not . . . her jumping all the time is not necessarily alert behavior. That . . . she's just trying to -- she's short. She's a short dog, so she's just trying to check up higher.
Q. Okay. So sometimes her jumping is just assisting her search and giving her leverage to access other odor areas?
A. Yes.
Q. And those areas she can't get to without that leverage

because she's a little, short thing?
A. Yes.
Q. And so it's necessary for her to do that in order to do a full and complete search of all the odors around the vehicle?
A. Yes.
Q. And that sometimes results in her paws being placed on the car?
A. That's correct.
Q. And you talked about all the inherent risk of scratching that come with that. That's -- just comes with the territory?
A. Yes.
Q. And you'll let your sergeants figure out the -- the buffing bill for that; right?
A. Yes. Somebody -- somebody will have to be responsible for that, yes.
Q. Okay. And I think you testified that -- just not -- that her jumping is instinctual, that it's something that comes from her innate drive. Is that right? That's what you said yesterday?
A. Yeah. In reference to like if she's trying to catch odor from a -- from a higher elevation, yes. So she has a high drive, and it's instinctual for her to do that.
Q. And that it's not something that she's -- that's learned behavior? It's not something that's habitual; right?
A. It's nothing that we have trained her to do.

Q. And you would agree that habit or habitualness is something that is learned versus instinct that is something that is innate?
A. That she learns to -- to jump up?
Q. Well, I'll back up and break that question up. I apologize.
Would you -- when you say -- I just want to make sure we're using these words correctly.
When something is instinctual, it's something that's innate to one's nature; right?
A. Yes.
Q. Would you agree that, when something is a habit or habitual, it's something that is learned behavior that would then occur automatically?
A. I don't know if I would --
Q. Could I give you an example maybe?
A. Yeah.
Q. When you're born, you don't have an innate desire to smoke cigarettes, do you?
A. No.
Q. But someone might have a learned behavior that becomes automatic if they get exposed to it and start smoking cigarettes; correct?
THE COURT: Might be addicted.
///

BY MR. DECKENBACH:
Q. And then -- would you agree with that characterization?
A. That could happen.
Q. And that addiction then becomes habitual -- you finish your meal; you light a cigarette -- right?
A. Sure, for some.
Q. I'm not saying you, Trooper Martinez.
A. No. I gotcha.
Q. Okay. So that's kind of different, someone who has an instinct versus someone who has a habit? Would you agree with those characterizations? Does it make sense to you?
A. I can -- I can see that.
Q. Okay. Now, Trooper Martinez --
THE COURT: Anthropomorphizing a dog?
MR. DECKENBACH: Oh, I'm just hoping that we had a shared understanding of the terms here.
BY MR. DECKENBACH:
Q. So, Trooper Martinez, isn't it true, though, that on the day -- on that roadside at that first deployment, you knew that that behavior was not, in fact, her instinct?
A. To jump up?
Q. Yes.
A. Yeah, it's . . . for her, that's instinctual, that it . . . yeah, I would -- I would disagree with -- with that.
Q. Isn't it true that on that day you actually knew that

behavior to be a habit?
A. Habit . . . she -- that -- that is something that she would -- would tend to do. So I guess that can be the habit. "Habit," that term can be used.
Q. And I guess I'll be even more specific.
It was a habit -- habitual response to open windows? You understood she had a habitual response to open windows on that day; right?
A. Yes.
Q. And that it was her -- habit of hers to jump up towards open windows?
A. She -- yes.
Q. And isn't it true that Mark Rispoli, during your training, told you that Becky has a habit of, when she sees an open window, she gets real excited?
A. I don't necessarily know if that was Mark Rispoli.
I believe that might have been a conversation that me and -- and Captain Marc Russell had.
Q. Okay. Thank you for that clarification.
A. Yep.
Q. So your supervisor told you that she had --
A. There's two -- two Marks -- two Marks during that training period so --
Q. And your -- Marc Russell was also involved in your -- your training and certification process; correct?

A. Yes.
Q. Now -- so thanks for that clarification.
So it was your supervisor Marc who told you that Becky has -- and -- a bad habit of getting excited when she sees an open window?
A. I don't know necessarily . . . I don't -- I don't remember how that conversation exactly went but something to -- to that effect.
Q. And that what makes it not great is that she tries to get into open windows because she thinks she is going to get paid for doing so?
A. Once again, I think -- like my understanding and what was said is not . . . like the best of words, I guess.
Q. But that was at least how you understood or how you explained it at that time; correct?
A. That's correct, yes.
Q. And that, in fact, Marc Russell told you that it was something you had to try to break her of, to keep her from trying to jump to open windows in excitement for pay?
A. It was more for -- for to prevent that -- from her scratching at -- at things so that she's not jumping and -- and doing property damage.
Q. You also would agree that it would be not great for a K-9 to associate open windows and jumping towards them for pay? That wouldn't be a good habit?

A. Correct.
Q. Okay.
A. And she wouldn't be -- the way -- like back then and the way that I see things now, if I can -- if I can explain to you --
Q. Sure.
A. -- it -- so like if there is a -- a strong odor of -- of any one of her -- her target odors inside of that car, she is -- she's going to want to jump in there. And -- because she wants to put nose to odor, nose to odor, as close -- she wants to be as close as she can to that -- to that source of the odor. If a window is open, then that's giving her an opportunity to jump inside that car.
Q. And she thinks -- associates that with then being rewarded for getting close to potential odor?
A. I think if -- I think, if she would have gotten inside of a car, she would try to locate the strongest source of an odor.
Q. And you -- I think you're testifying now that your understanding of that behavior has kind of evolved since this first deployment. Is that a fair characterization?
A. Yes.
Q. And, at that time, you only had what Marc Russell had told you as kind of a reference point; correct?
A. Yes.

Q. And then you've worked with Becky, and you've kind of developed your own understanding of that behavior? Is that what you are testifying to?
A. Yes.
Q. And, just for prosperity's sake, I will ask that Exhibit M1 be played, starting at 25:40.
Again, this is your body camera from that stop.
(Excerpt of Defense Exhibit M1 played.)
BY MR. DECKENBACH:
Q. Pausing at 27:30 of Exhibit M1.
And so does that conversation accurately reflect what your understanding was on that day of what was appropriate behavior and what was incorrect behavior by K-9 Becky?
A. Can you ask that question again?
Q. Does that conversation reflect your understanding of K-9 Becky's behavior on that day?
A. Yes.
Q. And that understanding was based on what Marc Russell had told you?
A. Yes.
Q. And Marc Russell had been working with the K-9 department much longer than you had; correct?
A. Yes, he has.
Q. And he was quite familiar with K-9 Becky prior to your pairing with her?

A. Yes.
Q. Now, I would like to address one other thing about this deployment.
When the wind is blowing, you talked about the effects it can have. And it certainly does have an effect on the dispersion of odor; is that fair to say?
A. Yes.
Q. And in this stop the wind would be blowing towards the front of the vehicle; is that right?
A. That's correct.
Q. And you would expect K-9 Becky to react to odor beginning at the front of the vehicle?
A. Correct.
Q. And your testimony now is that you think that's what was occurring, that she was responding to odor at the front of the vehicle?
A. At the front of the vehicle? I think earlier I said the -- at the -- at the window.
Q. Okay. Did -- and so you didn't actually observe any type of alerting behavior at the front of the vehicle where the wind was blowing?
A. No.
Q. Her alert behavior was -- that you're testifying as alert behavior today, at least -- was strictly at the window? That's where she was engaging in it?

A. Yes.

Q. I'd like to move on, then, to September 27th, later that day, of 2023.

That same evening you deployed K-9 Becky a second time, second go; is that correct?

A. Yes, that's correct.

MR. DECKENBACH: And I'm going to now show to the Court what is Exhibit E1. And we're going to start it at 1:54.

Oh, and I could also take a break here if the Court thinks now is a good breaking time.

THE COURT: This would be a good time.

MR. DECKENBACH: Okay.

THE COURT: 1:00?

MR. DECKENBACH: Yes, Your Honor.

THE COURTROOM DEPUTY: All rise.

(A recess was taken from 11:58 a.m. to 1:03 p.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Please be seated.

Let's see if I can get organized here. I have to enter a password every time I do anything.

Proceed.

MR. DECKENBACH: Okay.

BY MR. DECKENBACH:

Q. All right. Trooper Martinez, I think where we left off

was back on that first day out in the field with K-9 Becky. Correct?
A. That's correct.
Q. And we just went over your first deployment with her where you radioed there was no alert but today you think she was alerting; correct?
A. Yes.
Q. And now we're going to go over the second stop of that day that involved K-9 Becky being brought out of her -- your unit. Okay?
A. Yep.
Q. And we'll start with Exhibit E1 at Moment 1:54. We'll let it play.
(Excerpt of Defense Exhibit E1 played.)
MR. DECKENBACH: Just pause here.
BY MR. DECKENBACH:
Q. Trooper Martinez, have you reviewed this video prior to testifying right now?
A. Yes.
Q. And just for everyone else who's watching it for the first time, does the video not fully capture Becky, what she's doing on the ground? Kind of . . .
A. That's correct.
Q. However, there is a reflection in the side of the motor vehicle, which you can kind of see what she's doing mirrored

in the side of the -- the panels of the vehicle that's being free air sniffed?

A. Yes.

MR. DECKENBACH: Okay. And that's just for everyone's attention.

We'll continue the video at 2:37.

(Excerpt of Defense Exhibit E1 played.)

MR. DECKENBACH: We'll stop at 4:55.

BY MR. DECKENBACH:

Q. Did you then, shortly after this video stop, leave the scene of that deployment?

A. Yes.

Q. Okay. Now, during this deployment we can hear on the video there were barking -- barking dogs in the background; is that correct?

A. That's correct.

Q. And these dogs scared Becky; is that fair to say?

A. Absolutely.

Q. And --

THE COURT: You don't know if she was scared or wanted to mate with the dogs or . . . you're trying to read her mind.

MR. DECKENBACH: Yeah. Well . . .

BY MR. DECKENBACH:

Q. At the very least, she was aware of their presence and it

impacted her ability to work for you?
A. Yes.
Q. And you assessed it to her being scared at the time at least; right?
A. Yep.
Q. And, basically, these dogs were distracting her, whatever the reason was?
A. Yes.
Q. Okay. And you tell the person over -- the Rawlins PD that was there that you were assisting that she wasn't going to be able to work because of those dogs?
A. That's correct.
Q. Now, we talked about your deployment logs earlier; is that right?
A. Yep.
Q. And you told the prosecutor on direct that you don't always put your deployments in there if you think that they were not a successful deployment? Is that an accurate statement?
A. Yes.
Q. You understand that the purpose of these deployment records are to help your supervisors understand how you and your K-9 are operating in the field; right?
A. Yeah.
Q. And it's an opportunity for them to see your performance

and perhaps catch if there are any errors or areas you might need assistance in; correct?
A. Yes.
Q. And a problem for a K-9 is if it is easily distracted by other odors or people or things; right?
A. Yes.
Q. And so her being distracted by other dogs is a problem that needs to be corrected?
A. In this particular case I would -- I would disagree.
Q. Tell me why you disagree.
A. Because those -- those dogs aren't -- that aren't -- that you can hear barking in the background, that were feet behind that -- that elderly lady that was standing at -- at her house -- so those dogs are in very close proximity of -- of my dog.
Those were two pit bulls barking aggressively. So my dog was terrified there. That's not -- that's not a -- it is a distraction, but that wouldn't be . . . a -- I guess -- a normal distraction.
Q. Okay. And so I think you testified that, when she was going through her initial training and certification, there were distractors present. Is that correct?
A. Yes.
Q. And those would be what you call normal distractors?
A. Yeah. I mean, given that -- given the environment,

I guess, is a better way to -- to explain where "normal" would fit in.

Normally, they're -- we're not around aggressive dogs. And so I'm responsible for the safety of -- of -- of Becky so -- and I can't necessarily make her -- her work when she's -- when she's scared, you can tell that she's scared.

Q. And so you're not able to account for all the abnormal distractors you might run into in the field in your training?

A. Correct.

Q. And so, because you felt that the conditions in the field were not normal, you decided not to report this deployment in your log?

A. I decided not to report that because that was unsuccessful, period. I can't get an accurate evaluation of -- of her -- of her deployment.

Q. And so your standard was you would only put successful deployments in your log?

A. Yes.

THE COURT: And "successful" means that you were able to walk the dog around and she was able to adequately sniff?

THE WITNESS: Yes, sir.

THE COURT: Whether she found anything or not?

THE WITNESS: Correct.

BY MR. DECKENBACH:

Q. And in regards to normal versus abnormal distractors, you

do use dog distractors in your training and assessments; right?
A. Yes.
Q. But the dog distractors you meet in the field might not be the same that you meet in a controlled environment; correct?
A. Not all of the time. Like I said, those -- those dogs were -- were aggressive. And then there have been other times where a dog was present and -- and she's still able to work and this dog that was present wasn't nearly aggressive towards her. In fact, it wasn't aggressive towards her at all.
Q. So sometimes the proofing back at the station is effective in the field and sometimes it's ineffective because the conditions and environment are not the same?
A. I mean, we can't . . . we can come up with all sorts of -- of different environments and -- and distractions, but we can't -- I don't know if we can necessarily implement them all, such as an aggressive dog.
Q. In your line of work I'm sure you come across all sorts of environments and conditions in law enforcement.
A. Yes.
Q. Then I'd like to jump forward, then, to your third deployment on your first day out in the field with Becky.
That was around 7:45 p.m. at night; is that correct?
A. Yes.
Q. And that's about 2 1/2 hours after that first deployment

that we reviewed before lunch?
A. Yeah.
Q. And I'd like to show you Exhibit U, starting at 4:20.
(Excerpt of Defense Exhibit U played.)
BY MR. DECKENBACH:
Q. I'll stop at 5:30.
Okay. Again, during this deployment that we just saw, we saw her -- Becky -- again jumping towards an open window towards the beginning of the search; is that right?
A. Yeah.
Q. And this behavior, again, is what you described earlier that evening as a habit; correct?
A. Yes.
Q. And that -- and I think we talked about it before. This was that habit that Marc Russell had told you that needed to be broken; correct?
A. That's correct.
Q. And so we see, when she's jumping on the window on this third deployment -- or second successful deployment, I would say -- you correct her when she starts to do that; right?
A. Yes.
Q. And you give her that command or you say, at least, "No jumping"?
A. That's correct.
Q. And -- but, however, with this -- with this deployment you

do feel confident enough to cause -- call an alert; is that correct?
A. Yes.
Q. And this specific stop here you annotated in your log as an alert; correct?
A. Yes.
Q. An alert that ultimately produced methamphetamine and fentanyl after a search?
A. That's correct.
Q. And you also identify that this was part of a DCI wall stop?
A. That's correct.
Q. And so, when deploying Becky, you already had information from other law enforcement agencies that there were likely drugs in this vehicle?
A. No, not necessarily.
Q. Well, I just want to clarify what a wall stop is, at least in your understanding.
When you assist DCI with a wall stop, you are working in coordination with a drug agent; correct?
A. Yes.
Q. And that drug agent is doing their own independent investigation that you don't have much knowledge about; is that fair to say?
A. Yeah.

Q. And they ask you -- the way you assist them is that they would have a suspect that they believe is involved in the sale or distribution of narcotics, and they direct you and another law enforcement agency to conduct a traffic stop on that person's vehicle? Is that how that begins?
A. Yeah. So there's a compiled list of -- of people that they are -- are interested in and being suspected of being associated with narcotics, either by selling, using.
And they would -- yeah, they would let us know who -- who their people of interest are.
Q. And so then those people would become the targets for a traffic stop with an associated dog sniff in order to see if they are possessing or carrying drugs?
A. Yes.
Q. Okay. And that's what this was that -- that night?
A. The -- I mean, they were -- the officers were making traffic stops on these people of interest. And we don't know if there's narcotics in these vehicles or not.
Q. Sure.
But you -- they're part of a drug investigation when --
A. Yes.
Q. Okay.
All right. And then we'll move to your next work with her, which was in -- October 9th of the next month.

You've already talked about that stop a little bit with the prosecutor.

You responded to a report of a pursuit by the Rawlins PD; is that correct?

A. That is correct.

Q. And you were -- you were not part of that pursuit yourself; is that right?

A. No, I was not.

Q. You responded after the stop had occurred?

A. Yes.

Q. And you even, at the scene, heard a dispute between Rawlins PD and the driver about whether there was an actual pursuit?

A. Yes, I did.

Q. And this stop happens to be at a residence that is across the street from Trooper Bracken's house; correct?

A. That's correct.

Q. I think there was even -- you had your picture taken kind of at the stop with his house in the background; right?

A. That's possible.

Q. And who's Trooper Bracken? Is this your sergeant?

A. He is my supervisor, yes.

Q. Okay. And once everyone was pulled out of the vehicle, the target vehicle, you then deployed your K-9 at the request of Rawlins Police Department; correct?

A. That's correct.
Q. And I will just play that video for you -- it's Exhibit B1 -- from 9:40 to 11:26.

(Excerpt of Defense Exhibit B1 played.)

MR. DECKENBACH: That's Exhibit B1, ending at 11:26.

BY MR. DECKENBACH:
Q. I think at the beginning of that deployment you tell her to take a break. Is that right?
A. Yes.
Q. And is that your command to kind of have her center herself and sit?
A. No.
Q. What is that command?
A. So she's been in -- in the patrol vehicle for some time now. So to "take a break" would be for her to -- to try to -- to go to the bathroom.
Q. Oh, okay. So you get her to relieve herself before going to work?
A. Yes.
Q. Thank you for that clarification.

And once you then moved towards the truck and begin the deployment, we see Becky kind of sniffing up and down the sides of the truck; correct?
A. When was this?
Q. I'm sorry.

Once you start the deployment, she begins sniffing or searching for odor along the side of the truck?
A. Yes.
Q. And we then -- shortly after that in that video we just saw, we saw Becky beginning to climb up the seam of the front door?
A. Yes.
Q. And, again, she's doing this under an open driver's side window?
A. I believe it was open.
Q. And, again, this is consistent with the warning Mr. Russell -- Marc Russell -- gave you, that she gets excited when she sees the open window and starts to kind of fixate on them; right?
A. Yes.
Q. And this time you didn't try to pull her back and tell her to stop jumping, did you?
A. No, I did not.
Q. In fact, in this video you reward her while her paws are still on the truck?
A. Yeah. I believe she was standing on like the -- there's a little sidestep bar. I believe her paws were on top of that.
Q. And that's when you gave her the toy and the praise?
A. When she gave a focused stare, that's when I -- that's when I rewarded her.

Q. And after you rewarded, you reported it to dispatch as an alert; is that correct?
A. That's correct.
Q. And did you -- you didn't take any kind of corrective action during this deployment in regards to her jumping towards open windows, did you?
A. No.
Q. Now, you then participated in a search of this vehicle after that, what you reported to be alert; correct?
A. That's correct.
Q. And you found no physical evidence of narcotics use in that vehicle, did you?
A. No.
Q. You found no syringes?
A. No.
Q. You found no baggies?
A. No.
Q. You found no burnt foil?
A. No.
Q. No scales?
A. No.
Q. No marijuana shake?
A. No.
Q. No marijuana residue?
A. No.

Q. And no -- any type of identifiable drug paraphernalia?
A. No.
Q. But because K-9 Becky alerted, in your perception, you had a strong belief that there must have been some kind of odor present; correct?
A. That's correct.
Q. And after you -- towards the end of your search, you did pick up a -- I think the Government pointed it out to you -- a rolled cigarette or some kind of piece of -- something that looked like it was for smoking on the ground. Correct?
A. Yeah. It was just a -- a cigarette.
Q. Like a broken cigarette?
A. Yes.
Q. Okay. And upon closer -- someone -- I think it was -- probably Trooper Carbon was standing behind you during that point. Right?
A. That's correct.
Q. And he suggested it was probably a joint?
A. Yes.
Q. But you -- and, if it was a joint, you'd be required to take it as evidence; correct?
A. That's correct.
Q. So you gave it closer inspection, and you told him, no, it looks pretty tobaccoy?
A. Yes.

Q. And then you kind of discarded it back into the truck?
A. Yes.
Q. Two other Rawlins police officers were also searching the vehicle; is that correct?
A. Yes.
Q. And they reported that they also found nothing when they conducted their own search?
A. That's correct.
Q. And so it's -- I'd like to then go to Exhibit B2 at 25:45.
(Excerpt of Defense Exhibit B2 played.)
BY MR. DECKENBACH:
Q. This is you at the end of your search; correct?
A. That's correct.
Q. Where you didn't come up with any type of physical evidence of drug use; correct?
A. Correct.
Q. And you then concluded by telling Trooper Carbon "There's so much odor in there from them using."
A. Yes.
Q. Those are your words we just heard; right?
A. Yes.
Q. However, today, this morning, when testifying on direct, you said there was a type of odor that you, yourself, could not smell?
A. Correct.

Q. You testified that it was a type of odor that only Becky could smell?
A. That's correct.
Q. And that you, yourself, couldn't tell you -- say if it was marijuana? You couldn't tell?
A. Correct.
Q. You couldn't tell if it was methamphetamine?
A. Correct.
Q. You couldn't tell if it was fentanyl?
A. Correct.
Q. You couldn't tell because you couldn't smell it?
A. That's correct.
Q. Yet you didn't clarify that for Trooper Carbon, did you?
A. No, I did not.
Q. In fact, you quantified the amount to Trooper Carbon by saying "There's so much odor," didn't you?
A. Yes, I did.
Q. But you had no way of quantifying it because you, yourself, weren't perceiving it?
A. Correct.
Q. And Becky doesn't speak English?
A. No, she does not.
Q. She doesn't say "It was a little bit of odor versus a lot of bit of odor"? She can't communicate that to you?
A. Correct.

Q. That was something you made up to tell Trooper Carbon as far as the quantity being so much?
A. Yes.
Q. And you believe that there was odor, even though you couldn't smell it, because Becky's never wrong; right?
A. In -- in training and -- yeah. She's -- she's not wrong. My dog is not wrong.
Q. And that shaped your belief that odor must be present?
A. Yes.
Q. I think you also testified that it was burnt odor on direct. Right?
A. I don't --
Q. You don't recall that?
A. I don't recall.
Q. Well, at least in what you told Trooper Carbon, that it was from them using, the odor; correct?
A. Well, using . . . so I guess, in that aspect, using is -- would be having to burn it. Using can -- is also associated with possessing. You . . . that's how you start off with using, is possessing that substance. And that substance will -- will still leave a -- an odor trail.
Q. So if you testified this morning before lunch that it was a burnt odor, that would have been a mistake because you have no idea what the odor was of or what status it was in when Becky supposedly detected it?

A. A mistake saying that it was burnt -- burnt odors?
Q. Yes.
A. It could be.
Q. It could also be -- if she actually did have odor -- which we can't know -- it could have been from something fresh? Unused?
A. That would still be odor.
Q. Right. So when you qualified it as burnt odor, you were just speculating this morning; is that right?
A. If -- if I said "burnt" specifically, that's -- it's still a possibility.
Q. And so you were not talking about actual observations while under oath this morning? You were speculating about possibilities?
A. That's poss- -- yes.
Q. Okay. And we saw a part of an exhibit earlier, on your direct, where a Rawlins police officer describes to you -- and I believe it's Officer Grainger [phonetic] -- that -- approaches you to talk about a deployment he had on that vehicle; is that right?
A. Yes.
Q. And Officer Grainger -- is that -- am I saying his name correct?
A. Greninger.
Q. Thank you. Greninger.

Officer Greninger is someone you worked routinely with in the Rawlins area; right?
A. Yes.
Q. He is also a K-9 handler?
A. That's correct.
Q. And after the fruitless search of this truck on October 9th, he tells you not to worry about it because his dog also had hit on that vehicle a week prior?
A. He did notify me that his dog hit one week prior.
Q. And he says -- and he told you -- and I think in the clip we saw this morning -- that he found an old marijuana roach after a search of that vehicle.
A. Yes.
Q. Now, you weren't there for that previous encounter, were you?
A. No, I was not.
Q. And you don't have any -- you don't have any idea about how many times that officer has encountered Mr. Cruz in the preceding weeks and months, do you?
A. I don't know.
Q. You don't understand the nature or any personal knowledge about their relationship?
A. No.
Q. And you've never reviewed reports about any search conducted the week prior on that vehicle, have you?

A. No.
Q. You don't even know if such reports exist?
A. Correct.
Q. And you have no knowledge whether that supposed roach he found a week earlier was ever field-tested, do you?
A. No, I don't.
Q. You have no idea if it was ever preserved in evidence?
A. No.
Q. You were taking his word for it?
A. Absolutely.
Q. And you wouldn't be even able to distinguish whether that was just another broken piece of cigarette or not because it's never been showed to you?
A. If he told me what -- what he believed to be a marijuana roach, I would take his word 100 percent.
Q. Okay. Based on his word alone?
A. Yes.
Q. Okay. Then after this point you decide to talk to a gentleman by the name of Carlos DeHerrera.
Do you remember that?
A. Yes.
Q. And part of that was because you wanted to search him for drug evidence; correct?
A. No. Actually, I think I was -- I was asked to -- to have him be released from that patrol vehicle and to take him out

of handcuffs.
Q. Prior to doing that, you wanted to search him to see if there was anything in his pockets that might incriminate him?
A. I performed a -- I believe I performed a search, if I remember right.
Q. Okay. And it might refresh your memory. We'll just look at Exhibit B1 --
A. Yes.
Q. -- starting at 29:50.

(Excerpt of Defense Exhibit B1 played.)

BY MR. DECKENBACH:
Q. Does that -- do you recall having that conversation with Mr. DeHerrera?
A. Yes.
Q. Okay. And during your search of his person, you absolutely found nothing in his pocket; right?
A. No, I did not.
Q. All right. No -- no -- at least no baggies, drug paraphernalia, or any items like that?
A. It -- surprisingly, no.
Q. "Surprisingly" because you expected to find that in his pockets, didn't you?
A. No. He -- he questioned about -- because I asked him if he smoked marijuana or something to that effect, and then he questioned "Why? Did you find some in my pocket?"

Q. He just -- in the video we just watched?
A. I -- yeah. We can replay it and I can tell you where.
Q. What he did tell you in that video, just to be clear, is that he does not use marijuana; right?
A. He did say that.
Q. He also joked about maybe you're the one that uses marijuana?
A. He did.
Q. All right. And when you told him that he might smell like marijuana, he told you that there's no way that's possible?
A. He did say that.
Q. And made it very clear and was honest that he is an alcoholic?
A. Yes.
Q. And that he would even take a urine test to prove that he doesn't smoke marijuana?
A. If you could get him in there to do that, yes.
Q. And you did make -- I just have a question for you, then.
Do you know Mr. DeHerrera?
A. I have -- I've had contacts with him as a -- as a City cop working for the Rawlins Police Department.
Q. And what years was that again?
A. Between 2012 and 2018.
Q. And you reference in your direct testimony that you knew people with this traffic stop to be associated with narcotics;

is that right?
A. Yes.
Q. And you said that was based on reports you had read from Rawlins Police Department; is that right?
A. That's correct.
Q. Can you tell me about when those reports were authored?
A. I don't recall dates. But --
Q. Who were they authored by?
A. Sergeant Jared Frakes.
Q. And what were the details in those reports about these specific individuals being associated with narcotics?
A. I believe it was in -- in this report it stated that Mr. DeHerrera, when he showed up to do -- to do a -- I can't recall if it was a -- a PVT or a UA, because he's required to -- to do that -- and when one of the officers looked inside of his mouth, there -- his tongue was green, the back -- the back of his tongue, which is indicative of smoking marijuana.
Q. And was this a report you read when you were a Rawlins police officer?
A. No, it was not.
Q. Is this a report you read in preparation for this hearing today?
A. Part of it, yes.
Q. And you, as a Wyoming Highway Patrol officer, have access to that report?

A. Directly, no.
Q. You requested it from the Rawlins Police Department?
A. It was offered to me, yes.
Q. In preparation for this -- your testimony on behalf of the Government?
A. Yes.
Q. And when was the date of this supposed green tongue?
A. I . . . I don't recall. I . . . it was weeks later. I -- I believe it was when the incident had happened.
Q. And so that incident with the green supposed tongue happened with the Rawlins Police Department sometime after this occurred?
A. Yes.
Q. Okay. And did that UA return positive for marijuana?
A. I don't recall. Or if it even said.
Q. Did you ask for the results of that as part of this independent investigation you went on?
A. No, I didn't.
Q. And would you be able to produce those reports to the Government upon request?
A. I'm sure the Rawlins Police Department would be able to produce those for you if you -- if they're requested.

MR. DECKENBACH: Your Honor, I'd ask that the Court would order the Government to assist the defense in securing those reports as they have been used to prepare a witness of

theirs in this hearing.

MS. MARTENS: Your Honor, this hearing is already far afield from anything to do with this prosecution. If the defense wants to do independent investigation on behalf of people that are not their clients, about other cases, they should have to use the Wyoming Public Records Act or other tools at their disposal. We're not obligated to gather discovery information when it doesn't have to do with this case.

Now, when we think about *Florida versus Harris*, the least persuasive factor is the field performance of the dog. So, in terms of relevance of any of this, I think we have a hard time saying it's not relevant at all, but there's got to be a limit to how far down this rabbit hole we go.

Now, if the defense wants to accuse Trooper Martinez of lying in his deployment log, they've done that. We went to the body cam, referenced precisely to the deployment log, showing where the body cam matches the deployment log.

Now, further investigation about stuff that's not even in the deployment log is so far afield of the reliability of this K-9 and this case that it's just irrelevant at this hearing.

THE COURT: I agree.

Sustained.

MR. DECKENBACH: Your Honor, may I make a brief

record, acknowledging you've already made your ruling?

THE COURT: You may make an offer of proof.

MR. DECKENBACH: Off the record? Or may I make a record?

THE COURT: Just go ahead and make a record.

MR. DECKENBACH: Sure.

THE COURT: It's a non-Judge --

MR. DECKENBACH: Okay.

THE COURT: I mean a nonjury matter.

MR. DECKENBACH: Yeah. Thank you, Your Honor.

Your Honor, this directly goes to the credibility of witnesses in this case, which is a key issue before the Court. We didn't go looking into reports of what these individuals necessarily did after the fact.

He was the one that did that in order to bolster his credibility by trying to sully the witnesses he knows we're going to call to contradict some of his testimony that is offered before this Court.

I agree that we could independently research that issue, and maybe we still will; however, they are the ones that made it relevant by trying to attack the credibility of our witness through one of their key witnesses, whose credibility is something that you'll have to consider as a very important factor in whatever ruling you reach.

THE COURT: Proceed.

BY MR. DECKENBACH:

Q. So on this evening, though, you had no idea or -- of Mr. DeHerrera's history regarding any type of substance use; correct?

A. So can I elaborate a little bit of -- about what I'm going to say?

Q. Sure.

A. Okay.

So in criminal activity, somebody is not going to -- to question whether they have a baggie of -- of marijuana inside their pockets. That person is going to say -- wouldn't -- wouldn't even offer up that information, that they're -- that -- that I might have located a baggie or -- of marijuana in his pocket.

Like that's . . . so that is indicative of somebody who uses marijuana.

Q. Would you acknowledge Mr. DeHerrera was joking with you quite a bit during that whole exchange? Correct?

A. He -- he's a -- he's a joking person, yes.

Q. He joked about you using marijuana; correct?

A. He did.

Q. Do you think he actually suspected you had marijuana -- you were a marijuana user?

A. I -- I can't -- I can't say what he is trying to really get answers for.

Q. He just -- he may have jovially been referencing "Did you find it in my pocket?" That's another reasonable explanation for that --

A. But it's the way he said it, also. It wasn't in a joking manner of question. It was "Why? Did you find it in my pocket?" Like shocked and surprised that I potentially found marijuana in his pocket.

THE COURT: We can move on.

MR. DECKENBACH: Okay.

THE COURT: I saw the -- what was going on.

MR. DECKENBACH: Okay.

BY MR. DECKENBACH:

Q. And you didn't write a case report about this search, did you?

A. No, I didn't.

Q. All you did was make an annotation in your deployment log; is that right?

A. That's correct.

Q. And, again, that's something you're required to do after a deployment?

A. Yes.

Q. And you also are required to account for when there is nothing found after an alert; is that correct?

A. Yes.

Q. And you wrote in your comments in this one -- you

annotated that -- noting there was a residual odor in the vehicle? That's what you wrote; correct?
A. Yes, I did.
Q. You didn't annotate that that was an unperceptible residual odor, did you?
A. I believe I also notified Mr. Herrera -- DeHerrera -- that he kind of smelled like marijuana.
So, at that time, there was a hint of -- it wasn't a strong odor, but it surely wasn't cologne. I know the odor of marijuana. I smelt a brief hint of -- a slight hint -- not brief but a slight hint of marijuana coming from his person.
Q. Okay. So you told Trooper Carbon there's so much odor from use in the vehicle. That's what you told him; right?
A. Yes, I did.
Q. And then you wrote in your report that there was residual odor in the vehicle? That's what you wrote in your -- in your deployment log?
A. Yes, I did.
Q. And now you're telling us it was, in fact, the odor that you perceived off Mr. Carlos who was standing next to a squad car -- that's what you meant. Is that what you meant?
A. Odor -- odor can be transferred everywhere. That -- I smelled that odor, that slight hint of marijuana, on Mr. DeHerrera. If my dog alerted to the -- the odor of narcotics coming from that vehicle, that's what had happened.

Q. Okay. So that odor was on Mr. DeHerrera, not in the vehicle? I'm just clarifying.
A. Both.
Q. Okay. But you only perceived it on Mr. DeHerrera is what you're saying?
A. Me. My -- my perception from Mr. DeHerrera, yes.
Q. But you didn't mention "The passenger smells like marijuana," did you?
A. I didn't smell the passenger. I didn't smell any odors coming from the passenger, no.
Q. Mr. DeHerrera was a passenger?
A. Yes. I'm -- I'm -- I was assuming that you were talking about the others.
Q. Okay. No odor off anybody else is what you're saying?
A. Correct.
Q. Okay.
Okay. We'll move on.
And we're not going to play the video for this one. October 11th is the next deployment in your log.
Again, we have a positive alert with nothing found; is that right?
A. I don't have it in front of me, but if that's what you're saying, then yes.
Q. I'll read the annotation and see if it refreshes your memory.

It says "Searched two LCSO jail pods. One alert in one jail cell. Nothing found. No alerts in the second."

A. That's correct.

Q. And so that -- there was an agency assist call where you helped search Laramie County Jail for potential narcotics; correct?

A. Yes.

Q. And she -- you recorded an alert but didn't secure any evidence of narcotics physically?

A. That's correct.

Q. And then, on November 8th, we've already reviewed that video with the prosecutor. I'd like to ask you some questions about it.

Well, actually, you didn't review that with the prosecutor. I'll briefly just play a portion of it. It's Exhibit G1, 10:50 to 12:16, from a traffic stop on November 8th.

MR. DECKENBACH: Becky, I think we've got a dark screen here -- oh, thank you.

Mine's up. There we go.

(Excerpt of Defense Exhibit G1 played.)

MR. DECKENBACH: Okay. That's ending at 12:16.

BY MR. DECKENBACH:

Q. I want to address a conversation you had with that young man in your squad car.

At that point he had already informed you there was marijuana in the vehicle; is that correct?
A. Yes, he did.
Q. And you sometimes give drivers an opportunity to tell you whether or not you're going to find something after running your dog?
A. Yes.
Q. And once he admitted to you that there was marijuana in the vehicle, you had probable cause to search the vehicle; is that right?
A. That's correct.
Q. And so at this point the only utility in running K-9 Becky would be training?
A. No. It's still to -- well, yeah, training and -- it's still to -- to document a deployment for her due -- so that guy is -- obviously, he's told us that there's marijuana in there, and then we can put that -- use that for her stats, for -- for the records for her.
Q. It increases her numbers?
A. Yes.
Q. Okay. And so -- and we've been -- we kind of saw alert activity, very similar to her jumping and trying to get closer to a window; correct?
A. It was a closed window. Yes, it was.
Q. Nonetheless, she visually saw a window and was trying to

reach it; correct?
A. Yes.
Q. And we'll try to keep this moving. I apologize. But we'll go to December 5th now. We'll jump ahead in time.
And there are other deployments that we're kind of skipping through here on your deployment log. She's had numerous deployments throughout this time frame, resulting in amounts of drugs being discovered; correct?
A. Yes.
Q. And so on December 5th we'll show you what's Exhibit C1, starting at Minute Marker 1:11 through 2:05.
(Excerpt of Defense Exhibit C1 played.)
BY MR. DECKENBACH:
Q. Okay. Once more, we see her engaging in the behavior of jumping up towards an open window and being rewarded shortly thereafter; correct?
A. Yes.
Q. And you then, after identifying that as alert, go to speak with the driver of that vehicle. And we saw that video on the Government's direct.
And you directly asked him if he uses narcotics; correct?
A. That's correct.
Q. He told you he doesn't?
A. He did.

Q. He also tells you, though, he had used weed a couple weeks prior?
A. Yes.
Q. Okay. And you understand not all common people equate marijuana with the word "narcotics"; right?
A. Sure.
Q. "Narcotics" sometimes infers harder drugs?
A. The harder, yeah.
Q. And you questioned him about, "Well, what about use in the car?" Right?
A. Yes.
Q. And he assures you that there won't be any -- any reason anyone would be using in his cars; right?
A. There isn't any reason . . .
Q. He -- he had first told you there's no reason anyone would be using in his car?
A. Yes.
Q. And tells you that his -- as far as his -- what he's doing there is he's driving the female passenger back from a court hearing in Cheyenne?
A. Yes, he was.
Q. And you continue to kind of push him on why your dog might have alerted to his vehicle; correct?
A. I wouldn't say "push." It's just a continued -- continued questioning.

Q. Okay. And he told you he has used meth in the past; correct?
A. Yes. I believe he said that he's used everything except for fentanyl and heroin.
Q. And he says that's something he did in -- he infers that it was done in the past, that he is not currently using?
A. Yeah. I -- I don't know how -- I didn't -- we didn't go as far back into his past. But yes.
Q. And you didn't know Mr. Mendoza prior to this stop, did you?
A. No, I did not.
Q. For the record, that gentlemen's name, according to your report, is Richard Mendoza; correct?
A. Yes.
Q. And then after -- after telling you that he doesn't think there's anything in there, he also tells you that his car had been abandoned for some period of time; correct?
A. I don't know if it was -- it was abandoned, but it was left alone for a period of time.
Q. And he speculates that maybe somebody -- well, maybe someone dropped a baggie in there because his car had previously been burglarized?
A. That's a strange statement to make, yes.
Q. And you asked him what type of baggie they dropped, and he really couldn't tell you because he was just speculating?

A. Another -- another strange statement to be specific about a baggie being left in -- in a vehicle.
Q. Not as strange, though, when it's -- because you're asking him to account for why your K-9 alerted? People come up with all the reasons while trying to scratch their head as to how this could have occurred?
You've experienced that, haven't you?
A. In my experience, if somebody does not use narcotics, to include marijuana, their answer is going to be a flat-out, plain-and-simple no. There's not going to be any more reasoning behind -- behind, "Oh, well, maybe you might find this in here."
Q. So you took the reasoning or attempts to answer your questions as inference of guilt?
A. Yeah. We want to make sure -- I want to make sure that the dog is accurate.
Q. And so even if they deny it, if you feel like they're being evasive, you then assume your dog is being accurate?
A. When people are lying, that's -- being dishonest, yeah, there's more to that. I don't believe that the last time he used was -- was a couple weeks ago even.
Q. As far as marijuana?
A. Correct.
Q. Okay. And so you assessed him to be a liar?
So -- is that correct?

A. That he was a liar?
Q. Yeah. Or he was lying.
A. Well, yeah, because he -- I mean, that -- he showed a -- a history of that.
Q. Okay.
A. Started off with "No. No. Yes, this time."
Q. And then I'll just play you one more short clip from this stop, Exhibit C1, 32:32.

(Excerpt of Defense Exhibit C1 played.)

BY MR. DECKENBACH:
Q. And you told him "The dog doesn't lie; she's a hundred percent"; is that right?
A. That's right, I did.
Q. And is that something you believe?
A. Yes.
Q. She is a hundred percent accurate all the time?
A. Yes.
Q. Okay. And after that part of the video you go on and tell him -- you kind of give him a speech about how he needs to stop using drugs; correct?
A. That's correct.
Q. Even though he never admitted to narcotics use; correct?
A. He has a history of it.
And generally, once again, if -- people who are -- are honest with their narcotics use, they're going to be

pretty adamant about that. There won't be any delay in their response about -- about their past histories.
Q. And the videos are in evidence, but he was pretty adamant when you first interviewed him about it; right?
A. Adamant about --
Q. That he wasn't using and there should be nothing in the car.
A. No. He was lying.
Q. Oh, okay.

So you want them to be adamant, but, if they are, then they're lying? Is that how that works?

I'll move on. You don't have to answer that question.

There was a search, though, conducted by the other trooper in this case; correct?
A. That's correct.
Q. And there was no baggies found in his car; is that right?
A. No.
Q. No drug paraphernalia?
A. No, there wasn't.
Q. No marijuana shake?
A. No.
Q. No marijuana cigarettes?
A. No.
Q. And your partner didn't report even an odor of narcotics,

did he?
A. No.
Q. And, again, you reported this in your deployment log, as required, didn't you?
A. That there was residual odor or something to that effect.
Q. Well, I -- just that there was a deployment is what I meant.
A. Oh. Yes, the deployment was logged.
Q. And I believe you stated "Nothing found. Driver stated that he uses controlled substances."
A. Yes.
Q. And the controlled substance you're referring to there is his couple-week-old use of marijuana that he told you about?
A. That's correct.
Q. You didn't clarify what drug or how -- what the time frame was in your note, though, did you?
A. No. That's -- no, it's not.
Q. And then December 10th, if we can just quickly see Exhibit D1 at 3:25 to 4:06.

(Excerpt of Defense Exhibit D1 played.)

BY MR. DECKENBACH:
Q. Again, we see Becky jumping up under an open window here?
A. Yes.
Q. Again, we see you rewarding her as her paws are on the car as she tries to access that window; correct?

A. She's actually giving a focused stare to the -- the seam of that door.
Q. Oh. And so that -- your testimony is you gave her the reward due to her staring at the seam?
A. The focused stare.
Q. Okay. But that was concurrent with her jumping towards the open window, as well; correct?
A. She was doing that, yes.
Q. And, again, because Becky's -- did what you believed to be a focused stare in that moment, you're convinced there must be target odor in that vehicle?
A. That's correct.
Q. Because, again, Becky is a hundred percent?
A. She is.
Q. And I won't play it again because the Government already did.

You talked with the driver of that vehicle, the male; correct?
A. Yes.
Q. And he tells you that he does smoke marijuana occasionally; correct?
A. That's correct.
Q. But he also tells you that they intentionally did not bring any marijuana on their road trip from Colorado to Utah; correct?

A. Yes.
Q. And you understand that, at this point, they're coming back from Utah; correct?
A. That's correct.
Q. And he told you that he personally didn't use any marijuana over that weekend?
A. That's correct.
Q. And the last time he was in Colorado was Thursday?
A. Yes.
Q. And you don't ask him to clarify whether he smoked on Thursday, did you?
A. I believe he said that the last time he used was on Thursday.
Q. You didn't ask him about his laundry habits, either, did you?
A. No.
Q. And you then conducted a search that they also played the video of.
And when you approached -- well, actually, we'll play it from your body camera on Exhibit D1, 11:00 through 12:28.
(Excerpt of Defense Exhibit D1 played.)
BY MR. DECKENBACH:
Q. Okay. When you first approached the car, Trooper Bracken tells you he can smell it now; correct?
A. That's correct.

Q. And Trooper Bracken then informs you he thinks that he's found some old THC vape cartridges; correct?
A. That he might have found some, yes.
Q. And then you tell him you've also found some cartridges?
A. I told him there was some cartridges over here, yes.
Q. And then that's when you also say you can smell it; correct?
A. Yes.
Q. And then you begin smelling some cartridges in that video; correct?
A. That's correct.
Q. And after -- and if those cartridges were THC, you'd be required to seize them as evidence; correct?
A. That's correct.
Q. But you concluded after sniffing them that it was, in fact, some type of tobacco or nicotine vape; correct?
A. Those were not THC vape cartridges --
Q. And so that's why you --
A. -- so otherwise.
Q. I apologize.
That's why you left them in the vehicle, then?
A. That's correct.
Q. Okay. And you then searched the rest of the vehicle?
A. Yes.
Q. There were no baggies?

A. No.
Q. There were no -- there was no shake of any kind?
A. No.
Q. There were no pipes?
A. No.
Q. And there was no drug paraphernalia that you -- you observed?
A. Correct.
Q. And then . . . you then -- that's when you proceeded to then go let the female out of your vehicle; correct?
A. Yes.
Q. And we already saw that video where she tells you she's surprised that there would be the smell in her car?
A. That's correct.
Q. And you suggest it's maybe because she had some shake in her floorboards?
A. Possibly. I wasn't looking -- it -- when -- when people smoke and you have the odor in that vehicle, it's likely they're going to be rolling hand-rolled marijuana cigarettes inside that car, smoking those inside that car, so some of that debris, that residue, will -- will get in the car. I'm not -- I wasn't specifically looking for -- for shake. But there could potentially be shake. Maybe that's why the odor was in there.
I didn't look deeply underneath or on the sides or,

really, where . . . residue could be.
Q. And the -- your -- your assessment from your observation is -- or your testimony -- is that there was odor consistent with them having smoked marijuana in that vehicle?
A. There was the odor of marijuana in that vehicle. I would suspect it to have been more raw than -- than burnt. But they kind of intermingle with each other anyhow.
Q. Okay. And, again, you annotated in your deployment log notes about this search; correct?
A. Yes.
Q. And you stated that the driver had recently used marijuana?
A. That's correct.
Q. And -- though you never really nailed down exactly that time frame with him, did you?
A. No, I did not.
Q. And then I . . . many of your other reports -- you -- where you find drugs in the other deployments reflected in the log result in finds of marijuana or other narcotics; correct?
A. Yes.
Q. And you write reports about that?
A. Yes.
Q. And in your reports you often reflect -- you kind of describe Becky's search; correct?
A. Yes.

Q. And often those searches are so similar you can kind of cut and paste that section into subsequent reports where she does the same type of alert activity; is that fair to say?
A. Yes.
Q. It's kind of a shortcut in report writing for troopers?
A. Yes.
Q. And one of those lines you've used in multiple reports is that "It was apparent to me that she had detected the odor of narcotics. Becky focused on the open window approximately 4 inches open on the front passenger-side door and gave a positive alert to the odor of illegal narcotics."
That's something you've written in reports?
A. For that particular incident, yes.
Q. And that's something that you've also reported in other reports --
MS. HAMMER: Objection. Your Honor, can we be -- can we clarify which report Trooper Martinez was just speaking about and being a little bit more precise on which reports he's talking about, please?
MR. DECKENBACH: Certainly.
May I clarify, Your Honor.
THE COURT: Please clarify.
BY MR. DECKENBACH:
Q. You wrote that in a report on December 3rd; is that right?
Would it refresh your memory if --

A. Yes.

MR. DECKENBACH: May I approach, Your Honor, with the report from December 3rd.

THE COURT: You may.

THE WITNESS: This was from December 3rd?

(An off-the-record discussion was held at the witness stand.)

THE WITNESS: Okay. Yes.

(Discussion held at counsel table.)

BY MR. DECKENBACH:

Q. Okay. And on December 28th do you recall if you had used that similar -- exact same language in describing her alert behavior?

A. I believe so.

Q. Okay. And that's because she alerts in a very similar way most deployments that you have with her under the open window; correct?

A. Yes.

Q. And, again, as we discussed at the beginning of my cross-examination, that was behavior that Marc Russell told you she needed to be broken of?

A. That's correct.

Q. All right.

Let's get to the stop in this case finally.

On that evening you were assisting Trooper Bracken

with traffic stops; is that correct?
A. On which date?
Q. Oh, let me -- yeah. Thank you.
The stop in question on January 24th, 2024, a year ago today.
A. Yes.
Q. You discussed with him -- or you participated in that traffic stop with Trooper Bracken; is that right?
A. That's correct.
Q. And were you familiar with Mr. Ostertag prior to that stop?
A. Very little. But I knew who he was.
Q. Had you personally encountered him previous to this stop?
A. I have.
Q. On how many occasions?
A. I don't recall.
Q. And what was the context of your previous encounter with Mr. Ostertag?
A. So I was actually present to -- to notify him of the death of his brother.
Q. And that was how many years prior to this?
A. Years.
Q. A solemn occasion.
A. Yes.
Q. Was Mr. Ostertag a -- a target of that stop with you and

Trooper Bracken that evening prior -- prior to his turn signal failure?
A. A target?
Q. Yes. Was he part of a wall stop or anything like that?
A. A wall stop, no.
Q. Was he part of a -- a stop that you were conducting on behalf of another law enforcement agency?
A. No.
Q. And we watched the video of that deployment. And you'd agree that Becky has yet again focused on the open window on the passenger side of the vehicle; correct?
A. She has a focus there to that window, yes.
Q. And, as you -- as you've done in numerous other deployments, you then reward her after -- after she had been jumping towards that window; correct?
A. Correct.
Q. And then you indicate to Trooper Bracken it's a positive alert?
A. Yes.
Q. And, at this point, this is the 14th time -- according to your logs, at least -- you've deployed her; correct?
A. That's correct.
Q. And, if we were to count the deployment that didn't work out so well because she was scared -- or whatever she was, distracted -- that would be the 15th deployment?

A. Yes.

Q. And a majority, if not almost all of those 14 deployments, according to your testimony, resulted in alert behavior; is that right?

A. There was alert behavior.

Q. And you believe that alert behavior in all those other cases, as well as this, gave you probable cause to search the area where she alerted?

A. Yes.

Q. And you came to this conclusion despite Marc Russell telling you that her jumping towards an open window might be a habit where she's seeking payment?

A. Ask that question again.

Q. Again, we've kind of gone over it numerous times.

But, again, you've considered it a probable cause alert when she's engaged in behavior that previously Marc Russell told you was a habit she needs to be broken of?

MS. HAMMER: Your Honor, I'd object at this point to asked and answered. We've gone over this countless times.

THE COURT: Sustained.

BY MR. DECKENBACH:

Q. So as far as this specific search, Mr. Ostertag, prior to -- when you secured him to conduct the search, he told you he had been working at the kitchen at the TA; correct?

A. He did mention that, yes.

Q. And he'd been doing that job for years is what he told you; is that right?
A. Yes.
Q. Okay. And you testified, I believe, that you saw him sweating. Is that right?
A. Yes, he was.
Q. And I think you testified on direct for some time that you assumed that meant he was a methamphetamine user. Correct?
A. No. That was part of it. The other half is he is involved in some sort of criminal activity.
Q. And we'll get to that in just a second.
A. Sure.
Q. So it was the combi- -- it wasn't the sweat alone; correct? It was -- I guess what you're telling us is it was other information that made you believe that.
A. Can you ask that question again?
Q. Your presumption that he was on methamphetamine was not just tied to his sweat? It was tied to additional information you had about Mr. Ostertag?
A. No.
Q. Then I guess I misunderstood you.
You testified on direct that you believed he was on methamphetamine; is that correct?
A. Yes.
Q. One of the factors that made you consider that was his

sweat?
A. Yes.
Q. Was there any other factor that made you consider that?
A. His -- his behavior, that that's not -- his behavior was unusual for -- for that . . . for what had just happened.
There's . . . yeah. His -- that -- his -- his sweat at that time of day with those temperatures is -- is not consistent with -- with the normal person.
Q. And you talk about him being upset in these circumstances.
He was pulled over for failing to signal a turn; correct?
A. I believe so.
Q. And then that led to his -- him being pulled out of the car and handcuffed? That was -- that happened after he was pulled over for a signal to turn; correct?
A. He was placed in the handcuff because he was being detained.
Q. And that detainment was due to his car about to being searched by two troopers; correct?
A. Yes.
Q. And so he was pretty upset about those set of circumstances; correct?
A. Sure.
Q. And you have training in -- you talked about it on direct -- that you know how to do field testing for people who

are under the influence; correct?
A. That's correct.
Q. There's a nystagmus test you can do with the eyes?
A. There's a -- there's tests that we can do, yes.
Q. A whole battery of things you've been trained on; correct?
A. Yes.
Q. You didn't do any of those with Mr. Ostertag that evening, did you?
A. Nope.
Q. Nor did you try to charge him with driving under the influence?
A. No.
Q. You just observed him to be upset and sweating?
A. Yes.
Q. And you'd agree that, once you did begin to search Mr. Ostertag's vehicle, it was filled with junk, both in the front and back of the vehicle?
A. There was a lot of stuff in there, yes.
Q. And the floorboards were covered in items, random miscellaneous trash as well as other items?
A. Yes.
Q. And in your search you did discover a box with takeout fried fast-food; correct?
A. There was.
Q. And that was consistent with him -- his claim that he had

just come from a restaurant where he works?
A. I didn't check the temperature of it, but, yes, that food came from -- from his -- from his place of work.
Q. And then during the search Trooper Bracken finds a gun?
A. Yes.
Q. And after Trooper Bracken finds a gun, you then both return to his -- the squad car to further secure Mr. Ostertag, who was making some noise back there?
A. Yes.
Q. And was complaining about the cuff location, which then you -- Trooper Bracken accommodated and put in front of him so he was more comfortable?
A. That's correct.
Q. We then saw that you resumed your search after that in the video that was played by the Government. And your -- you have a conversation with Trooper Bracken during that resumed search; correct?
A. Yes.
Q. And your conversation almost exclusively begins and resolves around this pistol and the nature of the pistol; correct?
A. Yes.
Q. And you discuss the possible charges that you might be able to book -- you might be able to book him on with this gun being found in his car?

A. Yes.
Q. And it's only after 11 minutes into the search that Trooper Bracken asked you "Have you seen anything in -- else in the vehicle?"
A. Yes, he said that.
Q. And after a long -- a pause, you suggest that there is shake in the floorboards for the first time?
A. Yes.
Q. And you don't point it out to Trooper Bracken, do you?
A. Like physically say, "Hey, there's shake right here"?
Q. Correct.
A. No. I just brought it to his attention. I said that.
Q. And you only said that in response to whether or not you saw -- a question of whether you saw anything else?
A. Correct.
Q. And you then go back to the squad car to call a local DA to see what Mr. Ostertag might be booked on in regards to the firearm?
A. Yes.
Q. And it's during this conversation -- pauses in this conversation -- that Bracken asked you to confirm at least twice that you had seen marijuana shake?
A. He had asked me again, yes.
Q. Okay. And that implied that might not have been something he saw and that's why he was asking you; correct?

A. Correct.
Q. And I think you've already testified you made no effort to preserve evidence of that marijuana shake.
A. That's correct.
Q. Took no pictures?
A. No.
Q. And you said it could have been as small as a tip of a pencil?
A. Yes.
Q. And so that's why it might not show up in any of the body cameras?
A. That's correct.
Q. And, again, you wrote in your deployment log that no drugs were found associated with this search; is that right?
A. That's correct.
Q. Nowhere in that deployment log did you indicate you saw marijuana shake, did you?
A. In the deployment log, no, I did not.
Q. And I think you testified on direct you'd only report in your deployment log a sizeable amount, that's why that wasn't in there. Correct?
A. Yeah. It's not -- I can't -- I can't log in an amount that doesn't -- that doesn't exist.
Q. You could annotate a note about it, though; correct?
A. I could have but that was documented in my report.

Q. Got it.

And I do want to ask you, then. You've stated in your report and you've testified both on direct and cross that you believe the driver's known to be associated with illegal narcotics by using, dealing, or being around people who use; is that right?

A. That's correct.

Q. And you told Ms. Hammer you couldn't remember when you learned that; right?

A. Correct.

Q. You can't -- you don't know even the place where you learned that, the geographic location you were at when you learned that?

A. That's correct.

Q. And you can't tell us who told you that information; correct?

A. Correct.

Q. And you don't even have a basis to understand where that person may have learned such allegations?

A. Correct.

Q. Or what type of vetting might have been done regarding that information?

A. Correct.

Q. And that night you took no independent steps to -- to substantiate that type of allegation, did you?

A. No.
Q. But you still chose to include it in your report?
A. Yes.
Q. And you talked on direct that these Wyoming Highway Patrols are accessible by other law enforcement members on your -- in your department; right?
A. That's correct.
Q. And so that information may follow Mr. Ostertag; correct?
A. Yes.
Q. Regardless of your ability to lay any type of background or vetting or validity of that information --
A. So --
Q. -- that will follow him?
A. Can I --
Q. I'm just asking. Will it follow him? That's the question.
A. Yes, it will.
Q. I'll ask more questions about your report.
I guess something on direct that you kind of made a distinction. You equated that residue and shake are the same thing and terms you use interchangeably; correct?
A. Yes.
Q. Have you ever heard "residue" referred to something as a remnant left behind after marijuana has been used, like a resinous coating, like in a pipe or something?

A. Yes.
Q. And have you ever heard and understand shake to be more like loose particles that come from -- off a larger bud that you could actually gather and still smoke?
A. It would be -- you'd be putting in some work to collect all of that. Potentially one could gather up enough shake residue to . . . to make a -- to make a small marijuana bowl or cigarette joint to smoke.
Q. Fair enough. I guess the distinction -- and I don't know if you'd agree with it -- residue is what's left after marijuana is burnt and used, where shake is what's kind of been discarded off a bud prior to its being smoked?
A. So you could have marijuana residue, shake, from a grinder, a marijuana -- one would use a grinder to -- to grind up marijuana into very fine particles.
Q. Okay. So there's not too much of a distinction for you in those two things? Or is there?
A. To me they're one and the same, residue.
Q. Okay. Thank you.
And then, finally, you talked about Kendal Wall and Trooper Bracken.
Kendal Wall -- when Mr. Ostertag told Trooper Bracken that Kendal Wall had possessed his car, Trooper Bracken did not find that credible, did he?
Or I guess -- did he discuss that with you?

A. So it . . . that he --
Q. If he didn't, that's fine. Or if you don't remember, that's fine.
A. So I remember Mr. Ostertag saying that he had lent his car to -- to Kendal Wall. Is -- is that what you're . . .
Q. Yeah. Well, I was asking did you have any further conversations with Trooper Bracken about that claim.
A. I don't recall.
Q. Okay. We'll move on from there.
And wrapping up here, your testimony is that -- I just want to clarify.
Your testimony is that Becky has never failed any assessment; correct?
A. She has not failed any assessments.
Q. And that Becky has never failed or false-alerted at a -- in training?
A. In training? No.
Q. And it's your testimony that every deployment -- between September 27th, 2023, and January 24th of 2024, she has exhibited alert behavior at every single deployment?
A. Yes.
Q. And your belief is that occurred because she was always alerting to the odor of narcotics?
A. The odor of narcotics, yes. That's what she alerts to.
Q. To include odors that you, yourself, cannot smell?

A. That's correct. That's why we use the dogs.
Q. But -- and that -- your belief that that odor was there was based totally on your perception of her alert?
A. Correct.
Q. And that's because, in your mind, Becky is never wrong?
A. I mean, she makes mistakes, but she's not wrong when she alerts.
Q. All right. Because she's a hundred percent correct when she alerts?
A. She's . . . she's spot on.
Q. And, again, you've testified that you've never received any formal training on cognitive bias; correct?
A. As -- if you're referring to cuing once again --
Q. I'm not referring to cuing.
A. Okay. Then I'm not exactly sure what you're referring to when it -- when you bring up cognizance bias.
Q. Fair enough.

MR. DECKENBACH: No further questions at this time.

THE COURT: We'll stand in recess for 15 minutes.

THE COURTROOM DEPUTY: All rise.

(A recess was taken from 2:30 p.m. to 2:52 p.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Once again, please be seated.

MS. HAMMER: May I proceed.

THE COURT: You may proceed, Ms. Hammer.

MS. HAMMER: Thank you, Your Honor. I'll try to be brief. I know we've got other stuff to get to.

THE COURT: Please.

**REDIRECT EXAMINATION**

**BY MS. HAMMER:**

Q. Now, Trooper Martinez, I know this isn't something we talked about a little earlier, but I think it's important.

Can you talk to me about your formal education?

A. I went to high school, a little bit of college.

As far as that -- that goes, that's about it.

Q. And what was your best class in high school?

A. Gym class. I loved gym class. It was good.

Q. And what do you think was your worst class in high school?

A. English and -- and writing.

Q. And so earlier today, when you were talking with Mr. Deckenbach, you guys were talking about the definitions of "habit" versus "innate behavior."

What's your definition of "habit"?

And when you -- and how do you actually use that word?

A. I would say like a tendency of doing something.

Q. Okay.

Now I want to go to the traffic stop on September 27th, 2023. It's Defense Exhibit M1.

And what I'm going to do is I'm going to play that

video. I'm going to have it on mute because I don't know that the -- we've gone through it, played. We know what you've said.

But I want you to actually narrate what you're seeing and when you're seeing her alert behavior --

A. Okay.

Q. -- and then when you're actually seeing her final indication.

A. Okay.

Q. Okay. So we're going to start Exhibit M1 at 23 minutes 9 seconds when you're about to start Becky's sniff. Okay?

A. Yes.

THE COURT: Is this the first -- first search?

MS. HAMMER: Yes, sir. This is the first deployment after training.

(Excerpt of Defense Exhibit M1 played.)

BY MS. HAMMER:

Q. And I'm just going to ask you to narrate out loud what you're seeing, what you're doing.

A. Okay.

So I just deployed Becky.

She's doing a very good job of searching the front end of that vehicle there.

Then she starts to work along the passenger side here, does a quick head snap back.

And she -- I can tell that she's catching the odor up higher because she keeps jumping up.

And so, right there, she's got her focused stare into that -- into that vehicle.

Q. So we've stopped the video at . . . 23 minutes 32 seconds. Is that an accurate place for where you're saying you're seeing that focused stare?

A. Yep. So -- yeah. During this time right here, where she starts bracketing, so making her -- her search area narrower, that -- so that would be her alert behavior.

And then her focused stare is -- is her final alert.

Q. And during this time when she's jumping up, you give the verbal correction "No jumping"?

A. Correct.

Q. And we're going to continue playing at 23:32, stopping at 23:38.

Do you physically pull her off?

A. I don't -- I don't recall. But I . . . I believe I do. If we can maybe just go back just a little bit.

Q. Starting again at 23:22.

A. Yes, I do.

THE COURT: I was looking at his shadow. I didn't see it clearly.

How do you direct the dog? Do you do it with a hand signal? To work or --

THE WITNESS: Yeah. So I essentially just wave my hand out in front of her, presenting that -- that car to her.

BY MS. HAMMER:

Q. After you pull her off, does she go back to that spot?

A. Gosh, if --

Q. I'll keep playing.

At 22:38.

A. Yeah. So she keeps wanting to bracket closer there.

And, again, going back.

And now we're starting to work the -- the rear end of the car.

Q. Okay. Now, it's not your verbal correction that gets her to stop? It's pulling her actually off the location?

A. Yes.

Q. And I believe yesterday -- or even -- maybe it was this morning -- you testified about your not wanting to actually pull her off like that because that's a negative correction for behavior that you're actually wanting her to do --

A. That's correct.

Q. -- which is the jumping.

A. Yep.

Q. You were earlier speaking with Mr. Deckenbach about the October 9th, 2023, stop involving Corey Cruz and others who had fled from the Rawlins Police Department and you were asked to show up later to do a free air sniff.

A. Yes.
Q. And I believe you and Mr. Deckenbach discussed the comment in your deployment log about how you noted residual odor and where that comment came from during the stop.
A. Where did it come from?
Q. I guess my question -- I'm just trying to confirm that was a conversation you had --
A. Oh.
Q. -- with Mr. Deckenbach.
A. Yes.
Q. And I just want to double-check.
By putting "residual odor" in your deployment log, what tie is there to the conversation that you had with the Rawlins Police Department K-9 handler after the sniff?
A. Yeah. So from -- from him stating that he had previously stopped that vehicle one week earlier where his dog had alerted to the odor of narcotics and, when they searched that vehicle, a marijuana roach was -- was located.
Q. And you -- did you believe that that roach had left residue -- residential odor -- res- -- residual odor behind?
A. Yes.
Q. Okay. Finally, there was a conversation about Defense Exhibit G. This was a stop from November 8th, 2023, where you had the discussion with Mr. Deckenbach about the young man who was in the car, you brought him back to yours, and he had told

you that there was marijuana in the vehicle prior to you deploying Becky.

Does this sound familiar?

A. Yes.

Q. Okay. Now, ultimately, she gave her final indication on the seam of the door between the -- on the passenger side between the front and back; correct?

A. Yes. If it's . . . the white -- the white passenger car and --

Q. Would it be helpful if I just pulled up the video briefly?

A. Yes.

THE COURT: It would. It would help me.

BY MS. HAMMER:

Q. So I'm just going to play the sniff without audio. You don't need to aerate -- or narrate. Just let me know when we get to that final indication.

A. Okay.

Q. And we are starting Defense Exhibit G1 at 11:44.

(Excerpt of Defense Exhibit G1 played.)

A. And right there is her -- her focused stare.

BY MS. HAMMER:

Q. And that was approximately 12 minutes 5 seconds, 6 seconds?

A. Yes.

Q. Okay. And, ultimately, was that car searched?

A. Yes, it was.
Q. And what was located in the vehicle?
A. Marijuana.
Q. And do you recall where the marijuana was found in the vehicle?
A. On the rear passenger-side floorboard.
Q. Okay. And isn't it true that you -- after Becky hits on the vehicle -- you actually go back to your patrol car where he's sitting and you have a conversation with him?
A. Yes.
Q. And does that conversation happen before or after the search of the vehicle?
A. That was after.
Q. And do you remember asking him where the marijuana is -- is going to be or is -- was found?
A. Yes.
Q. And what did he tell you?
A. Right there where the dog hit.
Q. Finally -- I know I've said that before, but I think I mean it this time.

Discussing the stop from December 10th, 2023, that's the stop involving the male driver and the female passenger in the red vehicle that we saw. And I just want to confirm this because I -- I think this may have gotten muddled on cross.

When did the driver say that he had last used

marijuana?
A. On Thursday.
Q. And given that definitive statement, did you feel the need to really narrow that down further?
A. No.
Q. Okay. And remind us again what day of the week this -- that traffic stop happened.
A. That was on a Sunday.
Q. Within three days?
A. Yes.
Q. Okay. And, finally, I think we were talking about -- with Mr. -- or Mr. Deckenbach was talking to you about putting information into reports about -- based off of what other people have told you and kind of how that can follow someone, given that law enforcement can read other officers' reports.
A. Uh-huh.
Q. And it sounded like you didn't quite finish -- or have the opportunity to say what you wanted to say about that.
A. So I'm -- I believe he had mentioned that I had -- I had only received this information through law enforcement officers.

So . . . Mr. Ostertag mentioned Kendal Wall during that traffic stop. And, again, Kendal Wall is associated with -- with using narcotics, dealing narcotics. His own girlfriend is -- has been arrested for narcotics. She was on

the -- the -- the DCI traffic stop involving that yellow car.

MS. HAMMER: And, for the record, Your Honor, that's referring to Defense Exhibit U.

BY MS. HAMMER:

Q. The first deployment that you did with Becky, did that driver have a warrant?

A. Yes, he did.

Q. What was the warrant for?

A. Possession of a controlled substance, cocaine.

MS. HAMMER: May I just have one moment, Your Honor.

THE COURT: Yes.

MS. HAMMER: Thank you.

(Discussion held at counsel table.)

MS. HAMMER: No further questions. Thank you.

**EXAMINATION BY THE COURT**

Q. When you received Becky, about how old a dog was she?

A. So she is 10 now, so she was -- she was 9, just -- she had just turned 9.

Q. And she had been in service since about when?

A. So the previous handler had her for five years, so right around . . .

Q. 2018, somewhere in there?

A. Oh, gosh. So 20- -- yeah, 2018. And I -- I think -- I'm not for certain, but I think she might have been somewhere else. I could be wrong.

Q. And the dog -- and the drugs that you tested her on were?
A. Marijuana, methamphetamine, cocaine, heroin, and fentanyl.
Q. Tell me, when you're out on a job, available, do you ever, if you're looking for a particular drug, give her a -- a coffee filter with maybe some of that odor on it as you let her out of the car so that she knows what to look for?
A. On a regular traffic stop like when we're going around deploying her?
Q. Yeah.
A. No.
Q. Now, I see dogs that are -- search dogs, for example, they wave a dirty sock of --
A. Yeah.
Q. -- a person they're searching for or their underwear and --
A. Sure.
Q. -- send them out.
Do you do anything like that?
A. No.
Q. All right.
With regard to M1, what we just looked at, the license of the car appeared to be out of state. Do you recall that?
A. Which one was . . .
Q. M1 was the very -- the first -- the first search in --

A. The first traffic stop?
Q. Yeah.
A. Yes, sir.
I believe it was a Missouri-stated license plate.
Q. Do you know whether or not the car was a rental?
A. At that time, no, I did not. Especially with the -- the damage that was on the side, I didn't suspect that of being a rental car.
Q. All right. Anything else about that stop that was a concern?
A. So when . . . when the individual was placed under arrest -- so we did -- we did a -- a search incident to arrest of his person -- there was some paraphernalia located in his pockets.
Q. And I assume it was the officer who stopped him who checked his driver's license, his insurance, his status of the vehicle, his story, travel plans.
A. So for that individual I -- I ran his -- I ran his information.
He didn't have a driver's license, so I had him come back to my -- my patrol vehicle, and that's where he -- he provided that information for me.
And then when I entered in that information, that's when we had found out that -- that he had a warrant.
And then I performed the -- the search. Because he

was -- he was being placed under --
Q. Arrest?
A. -- under arrest by me.
Q. All right.
Now, I'm curious. Do you track successful deployments where Becky does not alert?
A. Yes.
Q. Can you tell me just roughly, of the deployments that you've been involved in, how many times has that occurred?
A. I don't -- I don't know -- so since -- since this -- since January 24th of -- of last year, there have been other -- other stops where we have deployed Becky.
I don't specifically know the numbers, but in -- in one particular instance when I ran her, she just checks and -- I deploy her, she searches that front end and went and searched the -- the sides and the rear end, and I called no alert.
And the -- the deputy that -- that had stopped -- stopped this person, he was pretty -- pretty adamant that -- that something was -- was going to be in this vehicle. So I essentially told him, "I don't know what to tell you; my dog didn't alert," something to that effect. And -- and that was that.
Q. Just out of my own curiosity and for no reason related to this case at all, do you ever conduct searches around

tractor-trailers?
A. We have in -- in training, but I haven't done that in -- in -- in -- in a live traffic stop.
I know we . . . we'd like to do more of those.
Q. Now, Becky's trained on all of these drugs and narcotics and marijuana. When Becky alerts or is deployed, do you really know what she is -- what substance -- she can't tell you?
A. I -- I can only figure that it's the five, one of the five. It could be a combination.
But there is no specific odor that -- that she would be able to -- to tell me that she's alerting to.
Q. And by that -- in this particular case you don't know what she alerted on? She alerted --
A. Correct.
Q. -- in your view.
A. Yes.
Q. Could be heroin? Could be fentanyl? Could be methamphetamine? Could be marijuana? Could be cocaine?
A. Yes, Your Honor.
Q. All right. My next question is -- and maybe you're not the right one to even ask this question.
Marijuana, cocaine, methamphetamine are drugs that are typically taken -- and I think certain forms of heroin -- are typically taken -- can be smoked, can be heated and the

fumes huffed, can be injected, and even could be shoved up the rectum.
A. Yes, sir.
Q. Now, when they are heated or burned or consumed in that way, is your dog capable of reacting to the odor?
A. Yes.
Q. You've been told that and trained that way?
A. Yes, sir.
Q. So if a person is a smoker of one of those drugs, Becky is capable of, nevertheless --
A. That's correct.
Q. -- detecting it?
She's 10 years old now.
A. Yes, she is.
Q. Looks to be pretty active.
A. She's -- she's still a hundred miles an hour.
Q. Do we have records on Becky going back to when she was acquired?
A. Yes, sir, I believe so.
Q. How has she done? Do you know?
A. I -- I don't believe she's ever been placed out of service. So I would say that she's been successful prior to -- to me being assigned to her.
Q. Her jumping didn't start with you, did it?
A. No, Your Honor.

Q. Do we know what her score is over a period of 10 years or 5 years or --

A. I can only assume that she's been successful.

Like I said, that -- I don't think -- think she's ever been removed from service because she has failed an assessment. From my understanding, she's -- she's passed and been successful in -- in all of her assessments.

Q. Throughout the period of her service, has she been periodically certified?

A. Yes.

Q. At least annually?

A. Annually, yes, sir.

THE COURT: Counsel, any questions? Follow up if you -- feel free to do it.

MR. DECKENBACH: I have just one brief one for clarification, Your Honor, but I don't know if the Government . . .

MS. HAMMER: Please go ahead.

MR. DECKENBACH: I just want to clarify.

**RECROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. Between -- up until the search and alert that you testified about regarding Mr. Ostertag, prior to that time, she had never been deployed without alerting? She's alerted every time up until that point; correct?

A. So -- well, I mean, according to my deployment log, if that's what you're referring to, she -- where I -- I called the alert -- or a negative alert. And if -- if I wasn't -- if I was more trusting in myself, I would have called that -- that an alert.

Q. That's not what I'm asking about. We've kind of talked about that a lot.

The Judge asked you about how she's performed generally with you, has she ever been deployed and not alerted. And you said at least once that you can remember; is that right?

A. Yes.

Q. And that was after Mr. Ostertag -- Mr. Ostertag's incident? That was within the last calendar year?

A. Yes, that's correct.

Q. Okay. And how many deployments have there been in the last calendar year since Mr. Ostertag?

A. I didn't keep track of those.

Q. You were averaging about two a month between September and January. Would that be . . . maybe more than two. Probably three.

A. We can -- sure. We can say that.

Q. Well, it would be safe to scrap -- I mean, that's kind of a normal average? Is that safe?

A. Yes.

Q. Okay. So, over a year, about three deployments a month in this calendar year or --
A. There's -- there were months where I don't think she's gotten deployed. So I -- I can't give you an accurate number. I don't know.
Q. That's okay. I just wanted to say if it was one time out of all those where she was deployed and did not alert is what you are --
A. I can recall one. There may be another but I don't have numbers --
Q. Okay.
A. -- to verify, to give you an accurate number.
MR. DECKENBACH: Thank you.
I just wanted to clarify the timing. Thank you.

**FURTHER REDIRECT EXAMINATION**

**BY MS. HAMMER:**

Q. When you just told Mr. Deckenbach that you don't keep track of your deployments, is that you don't accurately remember or that you don't keep track at all?
A. Just that I won't recall them. That's . . . yeah, I -- they're -- they're documented. They're recorded. But I don't keep track of them in my memory.
Q. In your deployment log?
A. Yes.
Q. Okay. And then Judge Johnson asked you questions about

whether or not you would give your dog kind of a filter paper with a -- a drug before you deploy her and discussed, you know, an ability with human -- or human-tracking dogs who may be given an article of clothing --

A. Uh-huh.

Q. -- for someone.

Is there different training between a narcotic dog and a human-detection dog?

A. I would imagine so.

I . . . I haven't been around too much as far as tracking. I think once or twice, actually. And they -- they're different because -- yeah, they -- they do -- just like Judge Johnson said, they would normally present an article from this person and then have them -- put them on -- on the trail.

Q. And, hopefully, each time that dog is being deployed it's a different person, so they need to be introduced to those different scents each time?

A. Yes.

Q. Is it true that you don't come into stops with preconceived notions so you don't want to do anything that would maybe change that?

A. That's correct.

MS. HAMMER: Okay.

No further questions.

THE COURT: I wanted to follow up about that.

## EXAMINATION BY THE COURT

Q. In all of your trainings, though, you do present to the dog a situation where there is a blank --
A. Yes.
Q. -- where there is no substance.
A. Correct.
Q. And it's equally important in each of those trainings --
A. Yes.
Q. -- that they not alert?
A. Yes, that's -- that's correct.
Q. How does she do in those situations?
A. She -- she runs the -- the area very quickly. Shows no change of behavior, which is what we're looking for, and -- but she -- yeah, she doesn't have a change of behavior.

And we'll clear from that area from -- with -- with her not alerting.

THE COURT: All right.

Are we ready to let this witness -- he's endured a lot.

MS. HAMMER: I think he's ready to step off. Thank you, Your Honor.

THE COURT: Trooper Martinez, you're excused.

THE WITNESS: Thank you, Your Honor.

MS. MARTENS: Your Honor, may we have just a minute

to confer about logistics.

THE COURT: Yes.

(An off-the-record discussion was held among counsel.)

MR. DECKENBACH: Your Honor, we just discussed -- are you -- is it -- is the Court okay with us taking some defense witnesses now? Trooper Bracken is willing to come back as well as -- I think we have to finish with their certifying president.

So . . . we have some lay witnesses that have been here. We'd hope not to have to bring them back from Rock Springs and Sheridan.

So . . . if the Court would indulge us, defense is ready to call Richard Mendoza to the stand.

THE COURTROOM DEPUTY: Stop right there and please raise your right hand.

(Witness sworn.)

THE WITNESS: Yes, ma'am.

THE COURTROOM DEPUTY: Please take a seat.

Please state and spell your name for the record.

THE WITNESS: Richard Mendoza, R-i-c-h-a-r-d M-e-n-d-o-z-a.

THE COURT: Mr. Mendoza, I'm Judge Johnson.

THE WITNESS: Hi.

THE COURT: You're going to be questioned about a highway stop that occurred in your case --

THE WITNESS: Yes, Your Honor.

THE COURT: -- by highway patrol. And, if not by your attorney -- or not your attorney but by the defendant's attorney in this matter -- certainly by the Government attorneys, there may be questions touching upon your criminal history.

THE WITNESS: I understand.

THE COURT: So I want to tell you you may be asked questions regarding your use or possession of an illegal or controlled substance.

You have a constitutional right to refuse to answer any question if you reasonably believe a truthful answer to that question would tend to incriminate you.

Do you understand?

THE WITNESS: Yes, Your Honor.

THE COURT: I want to also mention that -- I don't know if you've been in touch with her or not -- the Court has arranged for a well-qualified attorney to be kind of on standby in case you had a question or didn't understand or felt you needed to talk to someone.

Her name is Joanne Zook-Sweeney. And I'll give you her phone number if you feel you need to contact her. I don't see her in the courtroom at the moment.

THE WITNESS: Okay. Thank you.

THE COURT: So don't hesitate if you have concerns.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may proceed.

MR. DECKENBACH: Thank you, Your Honor.

**RICHARD MENDOZA, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Mr. Mendoza, how old are you?

A. I'm 44 years old.

Q. And where do you live?

A. I live in Green River, Wyoming.

Q. And where did you grow up?

A. I grew up in Las Vegas, Nevada.

Q. And what do you do for your profession?

A. I am a concrete tradesman, concrete finisher.

Q. As you -- the Judge told you, we're here to ask you some questions about a traffic stop that occurred back in 2023.

In preparation for your testimony today, have you been able to review body cameras' footage from that stop?

A. Yes, sir.

Q. And before I ask you about the events of that day -- well, actually, I will start with events of that day.

What were you doing at the beginning of your day on December 5th of 2023?

A. I was waiting for a friend of mine to come out of court. I was at the Little America hotel here in Cheyenne, and my heater was messing up. I was attempting to fix the heater for

my passenger on the way home.
Q. And was your plan to leave Cheyenne that day?
A. Yes, sir.
Q. And what court was your friend testifying in?
A. I honestly don't know, sir.
I just dropped her off at the courthouse.
Q. And was it this courthouse?
A. Yes, sir.
Q. Okay. And what is your friend's name?
A. Seanna Kelly.
Q. Did you then eventually leave Cheyenne on December 5th with Seanna Kelly?
A. Yes, sir.
Q. And what did you leave in?
A. My vehicle.
Q. Okay. And what -- just describe your vehicle.
A. Oh, I'm sorry.
It's a 2003 Toyota Avalon, white.
Q. Okay. And did you come across law enforcement on your trip back home?
A. Yes, sir, I did.
Q. Can you tell me about the -- when that first occurred?
A. The . . . I actually got -- had two encounters with them.
The first one was in -- I want to say just outside of Laramie, just -- I guess west of Laramie on I-80. We got

stopped. I missed a posted speed limit sign. I still thought it was 80, but I got stopped for, I believe, 82 in a 75. I'm not positive about that.

But I got stopped initially; it was for speeding.

Q. And did you receive a speeding ticket from that officer?

A. No.

Q. All right. What happened towards the end of that first encounter?

A. Towards the end of the encounter, he -- he pulled me out of his vehicle. And I had some issues with -- with some of my paperwork because I was trying to fix the heater.

But, anyways, it ended up being he asked me if I could -- if he could search the vehicle. And initially I didn't have a problem with that.

So he asked my passenger, Seanna, to get out of the car, also, while he -- while he did that. And so she was in the back car -- of the car.

And we actually had an open bottle of vodka in the vehicle. So I told him about the bottle of vodka, and he found it and he dumped it out. And he asked if he could proceed with the -- with his search. And at that time I told him no.

Q. And what happened after you told him no? Were you free to go?

A. Yeah. It was surprisingly . . . you know, I was a little

surprised by how -- he said "Okay. Fine." I believe he gave me a -- a ticket for no proof of insurance and, I think, a couple of warnings.

I'm not positive on that, what exactly they were, but a couple -- couple citations. And, yeah, sent us on our way. It was surprisingly easy and simple.

Q. And did you -- did you continue on to Rock Springs from there -- or Green River -- from there?

A. Yes, sir. We just -- we were -- we were on a beeline home, so, yes, we headed straight home.

Q. And did you then come across law enforcement a second time on that journey?

A. Yes, sir.

Q. Okay. And where was that at?

A. Directly outside of Rawlins, this side of Rawlins.

Probably less than a mile away from the first exit coming into Rawlins westbound.

Q. And did the trooper who stopped you tell you what that stop was for?

A. He did. Well, initially, I . . . showed him my paperwork right away, then informed him that I had just been through this a couple hundred miles back and thought it would be an easy thing because everything was figured out, the paperwork. I got my citations. I had my warnings, whatnot.

And he asked me to step out of the car to verify that

same paperwork, just to discuss it with him, I guess. And so I got out of the -- my vehicle and got in the passenger side of his patrol car.

Q. Okay. And we've seen video of a dog deployment of that stop. I'm going to ask you -- as well as conversations you had with Trooper Martinez.

Do you recall those conversations that you had that day with Trooper Martinez?

A. If that's . . . yeah. The one with the -- with the K-9?

Q. Yeah.

A. Yeah, I think so.

Q. Okay. And did he -- he informed -- actually, his partner informed you that the dog had alerted; is that correct?

A. Yeah. I -- I was sitting in his patrol car when -- when -- I kind of seen it, too, but he said -- he said -- "That's a hit" is what he told me.

Q. And what did you think or how -- when you were informed that there had been a hit?

A. Can you repeat the question?

Q. What were you thinking when you were told this dog had alerted to your vehicle?

A. Kind of like "Of course, it did," you know, like -- I mean, I -- I don't know. I -- I just kind of figured we were getting stopped because of my denial on the last one, so I was . . . I was just going to -- I was just kind of --

I didn't have anything to worry about, so I was just like -- I feel like they were going to search the car no matter what I said or did so . . . I just -- I was okay with it, you know. I -- I wasn't surprised at all.

Q. All right. And was that lack of surprise because you believed the dog had found narcotics in your vehicle?

A. No. My lack -- my surprise was that -- I wasn't surprised in the fact that we had been stopped a little while later after denying a search originally.

And, you know, so the second time it wasn't long that we were stopped by the first patrol car that the K-9 unit came up. I mean, it was seconds from me getting into his patrol car that another one jumped out. I just wasn't surprised.

I just -- I felt like a -- you know, that the first -- they wanted to search me the first time, but maybe there was a K-9 too far away, so they were waiting for me in Rawlins. That's how I felt.

Q. Okay.

A. I mean --

Q. Now, you had a conversation about drug use with Trooper Martinez. Do you recall that?

A. I feel like the whole -- the whole thing was about narcotics in one form or another.

But yeah. I -- I -- I -- it depends on the question, sir, if I recall exactly that or not. I don't know.

Q. Do you -- in the video we watched earlier, he asked you if you were using, and you -- you denied that you were using narcotics.
Was that a truthful answer?
A. Yes, sir.
Q. And you told him that you had smoked weed a couple weeks ago.
Was that a truthful answer?
A. Yes, sir.
Q. Had you smoked weed in that motor vehicle?
A. No, sir.
Q. Had you smoked marijuana in the clothing that you were wearing that day?
A. No, sir.
Q. Had you smoked marijuana -- or are you someone who regularly washes your clothing that you wear?
A. Yes, sir. Absolutely.
Q. Okay. And when you said you were not a user of narcotics, you then later told, in the video we watched, that you had, you know, used, previously, narcotics.
A. Yeah. Previously in my life, correct.
Q. Okay.
A. Yes.
Q. And what narcotics had you used previously in your life?
A. I have used -- I've used weed; I've used meth; I've done

some coke, maybe a few pills over the course of my life.

Q. And when was the last time prior to this stop that you had used something other than marijuana?

A. Oh, it would have been . . . I got incarcerated in March of 2022, and it had been prior to that.

Q. And were you incarcerated for a drug-related offense?

A. I was.

THE COURT: Melanie, do you want to stop?

THE COURT REPORTER: I guess I do. Yes, please.

THE COURT: Okay. We'll stop. We have some transcript issue.

THE COURT REPORTER: We'll take a little recess.

THE COURT: Yeah. Everybody should feel free to stand, stretch, and relax, take a few deep breaths.

(A recess was taken from 3:36 p.m. to 3:39 p.m.)

MR. DECKENBACH: May I, Your Honor.

THE COURT: Yes.

MR. DECKENBACH: Okay.

BY MR. DECKENBACH:

Q. And so I think you were -- we had just started talking about you had a conviction in 2022. Is that what you'd said?

A. Yes, sir.

Q. And was that a drug conviction?

A. Yes, sir.

Q. What type of drug conviction was it?

A. It was a possession charge.
Q. A possession of what?
A. It was actually possession of nothing, but it was a -- a -- a dirty piece of glass that tested positive for meth.
Q. So a piece of paraphernalia with meth residue on it?
A. Yes, sir.
Q. And had you used that to smoke meth?
A. No, sir. Not that particular one that they found, no, sir.
Q. But had you been using meth prior to that conviction generally?
A. Yes, sir.
Q. Okay. And did you go -- serve time after that 2022 conviction?
A. Yes, sir -- well, I don't know when the conviction was. But I -- I ended up . . . in -- in -- in lieu of probation, I ended up doing time.
The conviction was probably in 2021, but I ended up serving out my remaining time in March of 2022.
Q. When were you released from custody?
A. December of 2022; December 21st of 2022.
Q. After you got out of jail on December 21st of 2022, did you resume using methamphetamine?
A. No, sir.
Q. And why is that?

A. I . . . many reasons. Mainly my family.

Having to tell your -- hearing your mom cry over the phone while you're in jail or something, it's -- it was impactful on me personally. Sorry about that.

So -- you know, just not putting my family through it and just being done with it overall. You know, I was in a low place and, you know, wasn't working, just kind of being a -- a creep.

So I was -- I was just done with the whole thing. Did a -- did an outpatient treatment while I was incarcerated, did a few things through the church. And I did, you know, just some things that ended up being -- working out to be positive for me.

And when I did get out, it was a -- I believe I could kind of -- a real rehabilitation, you know, my time in there.

Q. And between December of 2022 and this stop in December of 2023, did you ever smoke meth again?

A. No, sir.

Q. Okay. Did you drink still after you got out?

A. Yes, sir. I still drink.

Q. And do you occasionally -- or did you at that time, at least, occasionally use marijuana?

A. Occasionally, yes, sir.

Q. I want to talk about your vehicle that was stopped.

Where was your vehicle while you were locked up in

jail?
A. It was at an apartment complex of a friend in -- in Green River, Wyoming.
Q. Okay. And how long did it remain there?
A. It -- I got stopped at a Walmart. I want to say it was there for probably about a month before I got it -- before friends and family got it back to Green River.
So I'd say probably from maybe April or May of 2022 until -- I want to say October of 2023 is when I decided to plate it again, put some plates on it and start using it and stuff.
So over a year.
Q. And you told Trooper Bracken in the video we watched earlier about how, when your car was not in your possession during that time, people had broken into it.
Can you tell us a little bit about what that -- what happened?
A. Yeah. My stereo was -- was stolen. I had speakers in the trunk and they were stolen.
And -- I don't know. There was blankets and -- like -- like maybe somebody was kind of squatting in it here and there. I mean . . . I don't know for sure. I wasn't there but -- I mean, there was -- there was signs of it. It definitely got broken into.
There . . . my stereo was stolen. My -- my speakers

were stolen. And there was a . . . there was just some odd things in there when I finally got back to it and went through it. There was some blankets and there was some clothing and stuff like that in there.

Q. And we've watched some body camera where you told Trooper Martinez about maybe somebody who had broken into your car could have left a baggie.

Do you remember telling him that?

A. Yeah. I was just trying to really give him a rational explanation as to why his dog hit, because that -- that was really the only thing I could think of that was a possibility, was . . . was that.

Q. And starting on October 23rd until this stop on December 2023 -- so that couple-month window -- was that car being used by you then?

A. I'm sorry. Can you -- can you say that again?

Q. Yeah. In October of 2023 you told us you replated and reregistered the vehicle.

From that time until the stop a couple months later in December --

A. Uh-huh.

Q. -- were you the main person or the only one using that car?

A. Yes, sir.

Q. Was there anyone who was using narcotics driving that car?

A. No, sir.
Q. Was there anyone in that -- allowed to use narcotics in your car?
A. No, sir.
Q. You were with Seanna Kelly at the time -- at the time of this stop.
Had Seanna Kelly been using narcotics in that car?
A. No, sir.
Q. During -- how many days were you both in Cheyenne?
A. I want to -- I want to say -- she had court twice, so I want to say three days.
Q. Okay. And at any point during those three days did you witness Seanna Kelly using narcotics?
A. No, sir.
Q. Did you witness her smoking marijuana?
A. No, sir.
Q. So is there any rational explanation for why there might be a residue odor of narcotics in your vehicle on December 5th of 2023?
A. No, sir.
MR. DECKENBACH: I have no further questions, Your Honor.
MS. MARTENS: Good afternoon, Mr. Mendoza.
THE WITNESS: Good afternoon.
MS. MARTENS: How are you today?

THE WITNESS: I'm good. How are you?

MS. MARTENS: I'm good.

My name is Christyne Martens. I'm an Assistant United States Attorney. That means I'm the lawyer for the Government. I have just a couple small clarification questions for you.

**CROSS-EXAMINATION**

**BY MS. MARTENS**:

Q. I think you told Mr. Deckenbach that you plated your vehicle in October of 2023. Did I hear that right?

A. You did. I could be mistaken by that time frame but yes.

Q. Thereabouts, give a little bit -- give or take a little bit?

A. Uh-huh.

Q. And is it -- was it true that, once you plated it, you didn't borrow that car to anyone?

A. No, ma'am.

Q. Okay. And then my other question for you is Mr. Deckenbach asked you if you talked to Trooper Bracken at this traffic stop.

Do you know the names of the two troopers at the traffic stop?

A. I remember Officer Martinez is the one with the dog. I do not recall the other trooper's name.

Q. So if I told you that the other trooper was actually

Trooper Howell, would you have any reason to dispute that?
A. No.
MS. MARTENS: Okay.
I have no further questions, Your Honor.
THE COURT: May this witness be excused?
MR. DECKENBACH: Unless you have questions, Your Honor. I have no further questions.
THE WITNESS: Thank you, Your Honor.
THE COURT: Drive safe.
(Discussion held at counsel table.)
MR. DECKENBACH: Your Honor, at this time the defense would call Seanna Kelly to the stand.
(Witness sworn.)
THE WITNESS: Yes, I do.
THE COURTROOM DEPUTY: Please take a seat.
Please state and spell your name for the record.
THE WITNESS: Seanna Kelly, S-e-a-n-n-a K-e-l-l-y.
THE COURT: Ms. Kelly, I'm Judge Johnson.
THE WITNESS: Hi.
THE COURT: I'm one of the Judges. Hi.
You are -- you've been subpoenaed to appear in this criminal proceedings, and the questions that are going to be directed to you are going to be -- going to involve the traffic stop that occurred near Rawlins, Wyoming --
THE WITNESS: Okay.

THE COURT: -- in October of 2023.

You may be asked questions regarding your use or possession of an illegal controlled substance.

You have a constitutional right to refuse to answer any question if you reasonably believe a truthful answer to that question would tend to incriminate you.

Do you understand that right?

THE WITNESS: Yes, I do.

THE COURT: Now, I'm fairly confident there will be some questions directed about whether you were using at that time and -- or have a drug history.

If you have a question or are concerned or feel that you need some legal advice, I've made arrangements for Joanne Zook-Sweeney, who's an attorney here in Cheyenne, who's kind of on standby at her office. And, if you need that telephone number, we can arrange for you to talk to her.

THE WITNESS: Okay.

THE COURT: Is that agreeable?

THE WITNESS: Yep.

THE COURT: All right.

Counsel.

MR. DECKENBACH: Thank you, Your Honor.

Good afternoon, Ms. Kelly.

THE WITNESS: Hello.

///

**SEANNA KELLY, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Ms. Kelly, how old are you?
A. 44.
Q. All right. And where do you currently live?
A. Sheridan, Wyoming.
Q. And what, if anything, has been your profession or job?
A. Right now I'm a seafood clerk at Albertsons.
Q. Okay. And, Ms. Kelly, we're -- I'm going to ask you some questions about a December 5th, 2023, traffic stop.
Have you had the opportunity to review some body camera from that stop?
A. Yes, I have.
Q. And do you remember the details of that day?
A. Yes, I do.
Q. Where were you on the morning of December 5th?
A. On the morning of December 5th, I was in Cheyenne. And then we traveled -- we were traveling towards Green River, where I live.
Q. Perfect.
And what had brought you to Cheyenne?
A. I had to testify in a civil case in this same courthouse.
Q. In this very courthouse?
A. Yes.
Q. Okay. And was that in the civil case of Megan Anderson

versus Love's Stops and Country Stores?
A. Yes, it was.
MR. DECKENBACH: And, Your Honor, I'd just ask you to -- if the Court would be willing to take judicial notice of the Civil Docket 22-CV-119-KHR, Document 113. It's a minute order from a trial held that lists Ms. Seanna Kelly as a witness that day.
Or I could offer it as an exhibit.
THE COURT: I'm willing to take judicial notice unless there's any objection.
MS. HAMMER: No objection.
BY MR. DECKENBACH:
Q. And how long had you been in Cheyenne for that trial?
A. From Sunday to Thursday, I believe.
Q. Okay. And where were you staying while you were in Cheyenne?
A. At Little -- the Little America.
Q. And who was with you on this trip?
A. My friend Richard Mendoza.
Q. Okay. And who is Richard Mendoza to you?
A. He is a very close family friend.
Q. And how did you get to Cheyenne with Richard?
A. He drove us in his car.
Q. And after -- where did you stay while you were in Cheyenne?

A. Little America.
Q. Okay. During your time in Cheyenne, had you been using any marijuana?
A. No.
Q. Were you using any narcotics?
A. No.
Q. Did you at any point see Richard using any marijuana?
A. No.
Q. Did you smell what might be marijuana?
A. No.
Q. Did you -- have you previously had -- at any point in your life -- an issue with drugs?
A. Yes.
Q. Okay. And what type of drugs have you used previously?
A. Meth and alcohol.
Q. Okay. And back in 2022 did you get into an alcohol-related incident?
A. Yes, I did.
Q. Did that result in a criminal conviction?
A. Yes.
Q. What was the charge?
A. I had a DUI and reckless endangerment.
Q. And did you serve time on that?
A. Yes, I did six months.
Q. Okay. What county was that in?

A. Sweetwater.
Q. Okay. And when -- at what -- approximately when did you get out of that six-month sentence, out of custody?
A. I got out October 13th of 2022.
Q. Okay. And did you resume using methamphetamine at that point?
A. Yes.
Q. Okay. And how long did you continue to use methamphetamine?
A. Until I went into treatment on January 23rd of 2023.
Q. Okay. And what were the circumstances that brought you to treatment at that time?
A. When I got out of jail, I still had six months' probation, and I violated my probation.
Q. And did you do that through continued use of methamphetamine?
A. Yes.
Q. At the time that you were continuing to use methamphetamine, were you living with anyone?
A. Yes. I was living with my husband and my -- a friend of mine.
Q. And where had you met your friend?
A. I met her in jail.
Q. Was she also using methamphetamine?
A. Yes, she was.

Q. Did you ultimately assist that person in getting methamphetamine?
A. Yes, I did.
Q. And what did you later learn about who -- that -- that methamphetamine that you helped that person get?
A. That she had worn a wire on me and my husband twice.
We -- I wasn't arrested for it right away. She wore it on November 4th of 2022 -- or 20- . . . she wore it in November, and I got arrested for it after I got out of treatment in July.
Q. Okay. So just so the time frame's clear, you went into treatment on January of 2023?
A. Yes.
Q. And, at that point, it was because you were continuing to test --
A. Yes.
Q. -- positive for meth?
A. Yes.
Q. And you didn't realize there was a pending criminal case against you?
A. Exactly.
Q. And then you left treatment in July of 2023?
A. Yes.
Q. Were you subsequently charged with the conduct that had happened the year prior?

A. Yes.
Q. Okay. And did you choose to plead guilty for the wired sale -- the sales that were caught on wire to your roommate?
A. I did. I took a plea bargain.
Q. Okay. And were you facing potential incarceration --
A. Yes.
Q. -- because of that plea deal?
A. I was facing four to six years in prison.
Q. And when was your sentencing for that case?
A. It was November 13th.
Q. Okay. And did you believe you were going to prison at that time?
A. Yes. My attorney had told me that I was going to have to take the prison sentence.
Q. Okay. And so on your way to court on that sentencing date, what did you do?
A. He informed me that the prosecution -- we had good news, the prosecutor was willing to give me probation instead of prison time, and that I had to check in to probation the next day.
Q. And, prior to going to receive that good news, what -- had you used any substances?
A. Yes, I had.
Q. What did you use?
A. I had used methamphetamine and alcohol.

Q. And that was on November 13th?
A. Yes.
Q. Why did you use methamphetamine prior to going to court?
A. I thought I was going to prison so . . . you know, it didn't matter to me.
Q. After you learned you received a probationary sentence, did you continue to use methamphetamine in November 2023?
A. Okay. So I -- I did continue to use. I had two dirty UAs for methamphetamine and alcohol.
And then I was waiting on a bed date to go into treatment.
Q. Okay. And do you remember when -- the second time you used in November of 2023?
A. Well, I know my first violation was the day I checked in to probation, which was November 14th. That was my first violation. And then a week later was my second violation.
Q. When was?
A. It was a week later.
Q. Okay. After that second violation, did you stop using at that point?
A. Yes, I did.
Q. Okay. And the probation office was working with you to get into inpatient treatment?
A. Yes, they were.
Q. Now, had you -- when you used methamphetamine in November,

had you used it in Richard's car?
A. No.
Q. Had you used it around Richard?
A. Not at all, no.
Q. Were you, when you went to Cheyenne, wearing clothing that you had smoked methamphetamine in?
A. No.
Q. Are you someone who routinely does laundry?
A. Yes.
Q. Okay. Did you bring any paraphernalia with you for methamphetamine use --
A. No.
Q. -- when you went to Cheyenne?
A. No.
Q. Were you using at all when you were in Cheyenne?
A. Not at all.
Q. Was there anything in your car that would have been exposed to methamphetamine use?
A. No.
Q. Anything that you brought on the trip?
A. No.
Q. After . . . so then, on the day that you are leaving Cheyenne after your testimony, what's the first time you came into contact with law enforcement?
A. The day that I was leaving?

Q. Yeah. When you left court on December 5th --
A. Okay.
Q. -- to head back to Green River.
A. So we had gotten pulled over somewhere between Laramie and Rawlins, I believe.
Q. Okay. And tell me what happened when you got pulled over that first time.
A. So the trooper pulled us over. Richard couldn't find his insurance card or his registration, so the officer put Richard in his car while he was checking out the information.

And then the officer had asked to search the car, I guess, so the officer came and asked me to get out of the car because he was going to search.

And so I got in the police car with Richard. And I told Richard that was stupid, "You don't have to let him search."

And Richard said "It doesn't matter. There's nothing in there."

And I said "It doesn't matter? You have rights."

So Richard told him about the bottle of alcohol that I had in there. And the cop poured it out and then let us go.
Q. Now, the bottle of alcohol, that was yours; is that correct?
A. Yes, it was.
Q. Now, was that a violation of your probation to have

alcohol?

A. Yes, it was.

Q. Why were you willing to consume alcohol but not methamphetamine while on probation?

A. Because it got out of my system sooner.

Q. And you were then on your way to -- back to Rock Springs. Did you get stopped again?

A. Yes, we did, in Rawlins.

Q. Okay. And what happened on that second stop?

A. The police officer asked Richard to get out of the car and put him in his car and left me in Richard's car.

And then, the next thing I knew, another officer pulled up with the dog and ran the dog around the car with me still in it. The dog jumped up on the driver's side. And the officer said that that was a hit so they were going to search the car.

They put me in the back seat of the officer's car with Richard, and they searched the car.

Q. And were you nervous at -- during that search that they might find some evidence of narcotics?

A. No, I wasn't nervous at all because I knew there was nothing in there.

Q. And while riding in that car, had you observed any odor of narcotics?

A. Not at all, no.

Q. Did you -- did you observe Richard to be under the influence of narcotics?
A. Not at all.
Q. And, since Richard got out of jail in 2023, had you ever witnessed him use hard drugs?
A. No.
Q. Did you eventually get into treatment?
A. Yes.
Q. How's that going?
A. It's going really great. I've been -- I've been clean and sober for over a year now.
Q. And what program did you go through?
A. I went through TC.

And then I went straight from the TC in Rock Springs to the Sheridan VOA sober living home, which is where I'm at now.

MR. DECKENBACH: And I think that's all the questions I have for you. Thank you, Ms. Kelly.

THE WITNESS: Thank you.

(Discussion held at the podium.)

MS. MARTENS: May I, Your Honor.

THE COURT: Ms. Martens.

MS. MARTENS: Good afternoon.

THE WITNESS: Good afternoon.

MS. MARTENS: My name is Christyne Martens. I'm an

Assistant United States Attorney. That means I'm the attorney for the Government. I have just a couple of follow-up questions for you.

**CROSS-EXAMINATION**

**BY MS. MARTENS**:

Q. The items that you -- I guess let me back up.
When you used, did you use in your home?
A. Yes.
Q. And when you packed for that trip to Cheyenne where Mr. Mendoza drove you, did you use luggage and other tote bags that you stored in your home?
A. Yes.
Q. Did you wash those items before you packed your otherwise clean laundry into them?
A. Yes.
Q. So you -- you-- you hosed out your hard-sided luggage?
A. Oh, no, I did not.
Q. Did you wash the totes themselves before you packed things into them?
A. I wash those all the time, yes.
Q. You wash the totes --
A. Yes.
Q. -- but not the hard-sided luggage?
A. Yes.
MS. MARTENS: Okay.

No further questions, Your Honor.

THE COURT: When you're using -- I don't want to create an -- certainly, there are so many things that can create a craving.

How was your use? Was it smoking? Injections?

THE WITNESS: Smoking.

THE COURT: All right.

Thank you.

THE WITNESS: Uh-huh.

THE COURT: Do you wish --

MR. DECKENBACH: I have no further questions for this witness, Your Honor.

THE COURT: May this witness be excused?

MR. DECKENBACH: Yes.

THE COURT: Ms. Kelly, you are excused.

THE WITNESS: Thank you.

MR. DECKENBACH: Your Honor, at this time the defense would like to call Corey Cruz to the stand.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness sworn.)

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Please be seated.

Please state and spell your name for the record.

THE WITNESS: Corey Cruz, C-o-r-e-y C-r-u-z.

THE COURT: Mr. Cruz, I'm Judge Johnson.

THE WITNESS: Nice to meet you.

THE COURT: Glad to meet you.

You're here in a -- a criminal matter involving a -- a search that occurred in or near Rawlins, Wyoming.

The questions that are going to be directed at you will touch on an incident that occurred with you near Rawlins involving some of the same officers and the dog search that went around your vehicle or a vehicle that you were operating.

THE WITNESS: Okay.

THE COURT: Questions that may be asked of you will touch upon your criminal history and experience, if any, with controlled substances --

THE WITNESS: Okay.

THE COURT: -- including marijuana, so you may be asked questions regarding your use or possession of illegal controlled substances.

I want to remind you that you have a constitutional right to refuse to answer any questions if you reasonably believe that a truthful answer to that question would tend to incriminate you.

Do you understand that right?

THE WITNESS: Yes, I do.

THE COURT: Now, we've made arrangements for -- if you have questions or are concerned at any point during the proceedings -- for a local attorney who is experienced in

these proceedings, Joanne Zook-Sweeney. I have her telephone number. You can interrupt the proceedings and -- if you need -- feel you need legal advice.

THE WITNESS: Okay. Thank you.

THE COURT: You're welcome.

MR. DECKENBACH: Good afternoon.

THE WITNESS: Good afternoon. How's it going?

MR. DECKENBACH: It's going well.

**COREY CRUZ, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. How old are you, Mr. Cruz?
A. 37.
Q. And where do you live?
A. Rawlins, Wyoming.
Q. And what is your occupation?
A. Heavy equipment operator.
Q. And where do you work at?
A. For High Desert Renovations.
Q. Okay. And we're here, as you know, to talk about a traffic stop that occurred on October 9th of 2023.

Do you remember that event?
A. Yes, I do.
Q. And were -- prior to this hearing, have you had an opportunity to review video from that incident?
A. Yes, I have.

Q. Okay. Now, on the night of October 9th of 2023, were you in a vehicle?
A. Yes.
Q. Whose vehicle was that?
A. My vehicle.
Q. And how long have you owned that vehicle?
A. I'd say close to five -- five years.
Q. And who, if anyone, was riding with you that night in that vehicle?
A. Hailey Keller, which is my significant other, and Carlos DeHerrera.
Q. And who is Carlos to you?
A. He is a friend of mine.
Q. And how long have you been friends with Carlos?
A. Oh, I'd say close to 10 years.
Q. And how long have you been in a relationship with Hailey?
A. For 12 years.
Q. Okay. Now, on the evening of October 9th, were you stopped by law enforcement?
A. Yes.
Q. And can you explain to the Court the circumstances in which you understand that to have occurred?
A. Yes, I can.
I was giving Hailey's friend a ride home that evening, and we had dropped her off. And we were headed back

home to our house, and there was a police officer -- we were at the stoplight, and I noticed a K-9 unit across at the other stoplight.

And prior to dropping Hailey's friend off, she had told me that I had a taillight out. So I was going past -- when the light turned green, I went past the K-9 unit. And I sped up a little bit to make it to my house because I knew that -- I figured he was going to pull me over for the taillight, and I didn't have my insurance on me at the time, which was at my residence. So I kind of sped up to get to my residence.

And I knew the proof of insurance was there on the table, so I wanted to at least get to my house before he pulled me over, and that way I could explain to him that my insurance was in the house in case they needed to show me proof -- or I needed to show them proof.

Q. And this was in the town of Rawlins?

A. Yes.

Q. Is Rawlins a pretty small town?

A. Yes, it is.

Q. And were you familiar with the officer and the K-9 unit that you observed?

A. Yes, I was.

Q. And do you have a history with that officer?

A. Yes.

Q. What was going on with this officer around that time?
A. I felt like that officer was harassing me quite a bit.
And he had pulled me over the week before and had did a search on my vehicle and had run his dog on my vehicle. He said that his dog had hit on my vehicle and that they were going to search my vehicle.
And he searched my vehicle. And he thoroughly searched it and came back with a -- what appeared to be a rolled up cigarette that had been smoked down. And he said that it was possibly marijuana.
So they went to -- he continued to search my vehicle and came back, and he said that he wasn't going to write me a ticket because there wasn't enough of the cigarette left to test. So he -- they didn't write me a ticket and let me go that day.
Q. Now, is it a possibility that marijuana would be found in your truck?
A. No.
Q. Are you a user of marijuana?
A. No, I'm not.
Q. Have you ever tried marijuana?
A. When I was in high school -- probably a freshman in high school -- I did.
Q. And have you ever seen anyone else smoke marijuana in your truck?

A. No, I haven't.
Q. Does your girlfriend, Hailey, smoke marijuana?
A. No.
Q. Does Carlos smoke marijuana?
A. No.
Q. And do you know -- have any reason to believe any other narcotic has been used in your car?
A. No.
Q. Do you use other narcotics?
A. No, sir.
Q. Do you know Hailey to use other narcotics?
A. No.
Q. And what about Carlos?
A. No.
Q. And what about Hailey's friend that you gave a ride home to prior to the stop on October 9th?
A. No.
Q. Now, had you had any other run-ins with this Rawlins police officer?
A. There had been a couple times like -- that I had -- he had pulled me over.
I believe it was the sheriffs that had pulled me over, and he had showed up on the scene. And the -- the sheriffs had pulled me over in front of my home, and he got out and was asking the sheriffs why they would pull me over

right there, blocking traffic the wrong way. I remember that.

But other than that, no.

Q. And do you live close to anyone that you know to be in law enforcement?

A. Yeah.

I actually live -- Chad Bracken -- he's a highway patrolman -- he lives just across from where I live.

Q. And have you had any interactions with him?

A. No, I haven't.

Q. So when -- the night of October 9th, you are put into handcuffs?

A. Yes.

Q. Okay. And was your car searched again on that evening?

A. I believe so, yes.

Q. Okay. And what did you think when the -- you were informed that -- or when you saw your car being searched again?

A. I just thought it was a little bit ridiculous of them to be searching my vehicle like that. I don't remember them asking consent or anything like that, so I thought it -- I was just being harassed.

Q. And do you have any convictions for any previous drug use?

A. No.

Q. Was the last -- do you have a conviction from 2003 for possessing a small amount of a controlled substance?

A. From 2003?
Q. Yeah.
A. No. Not that I recall, no.
Q. Okay. Your testimony is you haven't used marijuana since you were in high school?
A. Correct.
Q. And that you've never used -- or you haven't used any other narcotics -- or have you used narcotics since high school?
A. No.
Q. Okay. And do you drink?
A. Once in a while I -- I will. I'll have a beer or something after work but that's about it.
Q. And do you smoke cigarettes?
A. Yes.
Q. Okay. And what type of cigarettes do you smoke?
A. They are Marlboro Black Reds.
Q. And do you ever -- and in cleaning your car -- looking in your truck, I guess -- do you find cigarettes on the floorboards?
A. Yes, I have.
Q. And how does that occur?
A. You know, sometimes I'll be working on my vehicle or coming home from work, and I'll have a cigarette pack in my pocket. And I'll go to pull one out, one will be broke or

something inside the pack, and I'll pull it out and maybe set it on the middle console, forget about it, and it will end up on the floor or something.
Q. Okay. Is there any reason marijuana would ever be found on your floors instead of a cigarette?
A. No.
Q. And do you borrow your car to people who use narcotics?
A. No.
Q. Do you borrow your car -- or lend your car, excuse me -- to people who smoke marijuana?
A. No.
Q. Is there any way that you could possibly explain why there might be an odor of narcotics in your truck?
A. No.
MR. DECKENBACH: I have no further questions, Your Honor.
THE COURT: What kind of car is it?
THE WITNESS: It's a 2006 Toyota Tundra.
THE COURT: Ms. Hammer.
MS. HAMMER: Good afternoon.
THE WITNESS: Good afternoon.
MS. HAMMER: My name is Paige Hammer. I'm an Assistant United States Attorney, so that just means I'm an attorney for the Government.
///

**CROSS-EXAMINATION**

**BY MS. HAMMER:**

Q. Earlier you discussed that you have a history with a K-9 officer, and I just want to be clear which K-9 officer that is.

Is that Trooper Martinez with the highway patrol or Officer Greninger with the Rawlins Police Department?

A. I believe it was Officer Greninger.

Q. With the City police department?

A. Yes.

Q. Okay. And earlier you testified about not using any substances -- marijuana or any controlled substances -- since high school?

A. Correct.

Q. I believe you said it was just marijuana.

A. I never used -- well, marijuana in high school, yeah.

Q. Okay. And you testified earlier that Hailey Keller is your significant other?

A. Yes.

Q. Do you two have any children?

A. Yes.

Q. Do you currently have custody of those children?

A. Actually, they are in DFS custody right now.

Q. Is that due to substance use in the home?

A. No.

Q. No?
A. No.
Q. Are you required to take UAs as part of that?
A. Correct, yes.
Q. And are you passing your UAs?
A. I have been, yes.

MS. HAMMER: Okay. No further questions.

MR. DECKENBACH: I just want to clarify.

**REDIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Does the DFS placement have anything to do with Hailey using narcotics?
A. No. Not that I know of, no.

My son got out of -- escaped out a window, and the -- I believe it was some lady that was working for the railroad found him in the alleyway and turned him in to the police.

And she was frantically looking for our son at the time when he was missing, and they said that she was -- looked like she was on narcotics.

And they never did a UA that day or anything on her, so they just took her, state -- or took our kids -- stating that she looked like she was on narcotics.
Q. To your knowledge, has she ever tested positive for narcotics?

A. Not that I know of, no.
Q. And have you ever seen her use narcotics when you've been together?
A. No.
MR. DECKENBACH: No further questions.
THE COURT: Mr. Cruz.
THE WITNESS: Yes, sir.
THE COURT: Any objection to him being excused?
MS. HAMMER: No.
THE COURT: There being no objection, you are excused.
THE WITNESS: Thank you.
THE COURT: Be safe.
MR. DECKENBACH: Your Honor, at this time the defense would call Hailey Keller to the stand.
THE COURTROOM DEPUTY: Please raise your right hand.
(Witness sworn.)
THE WITNESS: Yes, I do.
THE COURTROOM DEPUTY: Please take a seat.
THE WITNESS: Okay.
THE COURTROOM DEPUTY: Please state and spell your name for the record.
THE WITNESS: Hailey Keller, H-a-i-l-e-y K-e-l-l-e-r.
THE COURT: Ms. Keller, I'm Judge Johnson.
THE WITNESS: Hello.

THE COURT: This proceedings involves a vehicle search --

THE WITNESS: Uh-huh.

THE COURT: -- and criminal proceedings that have followed from that search.

You're a witness to that by virtue of having had a previous search with the same dog --

THE WITNESS: Yes, sir.

THE COURT: -- in a vehicle that you were riding in.

The questions that may be directed to you may touch upon criminal matters --

THE WITNESS: Okay.

THE COURT: -- or concerns that have been in your life and may touch upon your use or possession of illegal or controlled substances, narcotics.

THE WITNESS: Uh-huh.

THE COURT: You have a constitutional right to refuse to answer any questions if you reasonably believe a truthful answer to that question would tend to incriminate you.

Do you understand that you have that right?

THE WITNESS: Yes, Your Honor.

THE COURT: I want to tell you that, because of the possibility there may be a question that would raise some sort of issue like that, a lawyer here in Cheyenne, Joanne Zook-Sweeney, has been arranged on standby to be available.

So, if you feel that you need to talk to a lawyer, interrupt me, and I can give you her phone number and arrange for you to make a call to her and -- and discuss the issue. Okay?

THE WITNESS: Okay. Yes, Your Honor.

THE COURT: Good.

Please proceed, Mr. Deckenbach.

MR. DECKENBACH: Thank you.

**HAILEY KELLER, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Ms. Keller, how old are you?
A. I am 30 years old.
Q. And where do you live?
A. I live in Rawlins, Wyoming.
Q. And what, if any, job do you have?
A. Right now I have a shoveling job for Rawlins Glass.
Q. All right.
A. Seasonal.
Q. Well, as the Judge informed you and as you know, you're here to discuss a traffic stop on October 9th, 2023.

Do you recall that evening?
A. Yes, I do.

I do remember that we were going -- we had went to drop off a friend of mine, Tura Wenger.

And we had, I believe, about -- I want to say it was

probably about a block and a half from the place that we used to live. The policeman had turned on his lights and pulled us over, saying that Corey was evading.

And I know that his concern was the insurance on the vehicle, that it was in the house. And I told him not to worry, that we had insurance on the vehicle. And so he wanted to get there. So we did get there.

And then the police proceeded to pull us out of the vehicles, and they put us all three in separate vehicles. And they asked if there was any illegal substances in the vehicle, and we told them no because there was not. And I just remember telling them that the only concern was the insurance on the vehicle.

And other than that, I do believe that they let -- they had let me go.

And that's -- as far as I know, that's what I remember.

Q. And did Corey or Mr. Cruz get that truck back to the residence prior to stopping?

A. Yes, he did.

Q. All right. And did Corey go to jail that night for eluding?

A. Yes, I do believe so.

Q. Now, how long have you known Corey Cruz?

A. 12 years.

Q. Okay. And did you know -- was there another gentleman in the car?
A. Yes, there was.
Q. And who was that?
A. Carlos DeHerrera.
Q. And how do you know Carlos?
A. I don't necessarily know him. I think I just know him of being acquaintances from Corey.
Q. And I think you said that prior to being stopped you had just dropped off your friend Tara. Is that correct?
A. Tura, yes.
Q. Tura? How long have you known Tura?
A. Probably since I was 17 years old.
Q. Okay. And on that evening did you witness Corey's truck get searched?
A. I do believe that they had already had me in a State trooper vehicle.
Q. Okay. In the years that you've known Corey, has he been known to abuse methamphetamine?
A. No.
Q. Fentanyl?
A. No.
Q. Heroin?
A. No.
Q. Cocaine?

A. No.
Q. What about marijuana?
A. No.
Q. Have you used any of those drugs in -- in the years that you've known Corey?
A. No.
Q. When was the last time you used marijuana?
A. Probably when I was probably 18 years old.
Q. And would that have been around 2010?
A. Yes.
Q. Okay. And did you receive a misdemeanor conviction for that?
A. Yes, I did.
Q. And did you stop, then, using marijuana after that?
A. Yes.
Q. Do you drink?
A. I used to in the past.
Q. Have you stopped recently?
A. Yes, I have.
Q. Okay. On the date of this stop, had -- were you still consuming alcohol from time to time?
A. Probably, yes.
Q. Smoke cigarettes?
A. Yeah, back then I did.
Q. And what about Tura Wegner?

A. She smoked and drank, but I think that's about it.
Q. Did she smoke marijuana in Corey's truck?
A. No, she did not.
Q. Did she smoke marijuana around you?
A. No, she did not.
Q. Do you know her to be a user of marijuana?
A. No, I do not.
Q. Any of those other harder drugs that I mentioned --
A. No.
Q. -- does Tura use those?
A. No.
Q. And what about Carlos? Have you ever witnessed him smoke marijuana?
A. No, I have not.
Q. Have you ever witnessed him use hard drugs?
A. No, I have not.
Q. And have you ever witnessed anyone using any type of hard drug in Corey's truck?
A. No, I have not.
Q. Have you witnessed anyone smoking marijuana in Corey's truck?
A. No, I have not.
Q. Have you ever observed a rem- -- lingering smell in Corey's truck of marijuana?
A. No, I have not.

Q. A lingering smell of any other type of narcotic?
A. Nope.
Q. Can you think of any reason why there might be a smell or odor of narcotics in Corey's truck?
A. I cannot.
Q. Now, you mentioned you quit drinking recently.
Does that have to do with an open CPS case or DFS case?
A. Yeah. I did -- I did attend CWCC, and I did complete that program.
Q. And was that -- what was that program being geared towards?
A. The drinking liquor.
Q. Okay. And was part of the reason you lost custody of your children temporarily due to your alcohol problem?
A. Yes.
Q. And do you have to take UAs in order to show the department that you are remaining sober?
A. Yes, I do.
Q. And is Corey also taking UAs to prove he is also staying sober?
A. Yes.
Q. Has he quit drinking with you?
A. Yes, he has.
Q. And this is all in preparation of getting your kids back?

A. Okay.
Q. Well -- is it? I guess.
A. Yes, it is.
MR. DECKENBACH: Okay.
I have no further questions, Your Honor.
MS. HAMMER: We don't have any questions for this witness, Your Honor.
THE COURT: Okay. May this witness be excused?
MS. HAMMER: Yes, sir.
THE COURT: You are excused.
THE WITNESS: Okay. Thank you.
MR. DECKENBACH: Thank you.
THE WITNESS: Thank you.
MR. DECKENBACH: Your Honor, the next witness that I'm going to call is here on a writ, so I think I need to coordinate something with the marshals perhaps.
I didn't think I was going to move this quickly. The pace has changed. But he is in the building.
MS. MARTENS: I'm sure the marshals would love it if we can get him done today so they don't have to transport him.
MR. DECKENBACH: I think Carbon County would also appreciate that.
(A recess was taken from 4:30 p.m. to 4:42 p.m.)
MR. DECKENBACH: Your Honor, at this time I would like to call Kaitlyn White, who's appearing by Zoom. And

I believe she is located in California.

THE COURT: Ms. White, my name is Alan Johnson. I'm a Judge in the Federal Court here in Cheyenne, Wyoming.

Are you able to hear?

THE WITNESS: Yes. Can you hear me?

THE COURT: Yes, I hear you perfectly. And I see you, as well.

THE WITNESS: Okay.

THE COURT: I wanted to speak to you briefly before we proceed. I think maybe you are familiar with this.

This proceedings does involve a search that took place here, near Rawlins, Wyoming, and you also were involved in a similar search situation located near Rawlins.

The questions that are going to be posed to you by attorneys both for the Government and for the defendant in this case, Mr. Ostertag, may touch upon the use of illegal controlled substances.

I want to tell you you have a constitutional right to refuse to answer any question if you reasonably believe a truthful answer to that question would tend to incriminate you.

Do you understand that right?

THE WITNESS: Yes.

THE COURT: Now, arrangements were made for you to speak to an attorney if you wished, and that attorney is a

lady by the name of Joanne Zook-Sweeney, a very capable attorney.

And if at any time you feel that you need to speak to her, you may interrupt me, and I'll give you her telephone number and you can talk to her.

THE WITNESS: Thank you.

THE COURT: Is that agreeable?

THE WITNESS: Yes.

THE COURT: The next voice you're going to hear in this matter will be the clerk of -- the deputy clerk of court. Her name is Becky Harris, and she'll be administering the oath to you in this matter.

Ms. Harris.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness sworn.)

THE WITNESS: I -- I do.

THE COURTROOM DEPUTY: Please state your name and spell it for the record.

THE WITNESS: Kaitlyn White, K-a-i-t-l-y-n W-h-i-t-e.

THE COURT: Next, you'll be hearing from Mr. Jordan Deckenbach, who's the defense counsel in this case.

Mr. Deckenbach, please proceed.

MR. DECKENBACH: Okay.

Good afternoon, Ms. White.

THE WITNESS: Hi.

**KAITLYN WHITE, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Ms. White, how old are you?
A. I am 29.
Q. And where are you currently residing?
A. In Los Angeles, in California.
Q. And is that where you currently are Zooming us from?
A. Yes.
Q. And what is your current profession?
A. I am a scientific affairs manager. I do research with clinical trials.
Q. And back in 2023, where were you living during that time?
A. Colorado Springs.
Q. Okay. And at that time who were you living with?
A. Elias Acevedo.
Q. And who is he to you?
A. He is, as of recently, my fiancé.
Q. Congratulations.
A. Yeah.
Q. Was he also your romantic partner back in 2023?
A. Yes.
Q. Okay. And I'm going to ask you now about December 10th of 2023.

Do you remember a traffic stop that occurred in Wyoming?

A. Yes. I don't know the date but yes.
Q. And have you only been stopped once in the state of Wyoming during -- for a traffic stop?
A. Yeah. As far as I'm aware.
Q. Okay. And where were you coming from on the day you were stopped in Wyoming?
A. We were coming from Salt Lake City in Utah.
Q. And what had brought you to Salt Lake?
A. Elias had a rap battle. He has been into rap for most of his life, and so we went out there for him to perform and to see his father.
Q. Okay. And where did you stay when you were in Utah?
A. I believe we stayed with his dad. It was long enough ago and we had gone out there enough times that I'm not certain. We may have stayed in a motel, but I think that time was with his father.
Q. And when staying with his father, was there any type of marijuana use going on in his father's home?
A. No.
Q. And what was the venue that the rap concert was held at?
A. I -- I believe this one was in -- I'm not sure exactly what it was but like an art gallery. It was an all-ages venue. Yeah, I think it was an art gallery.
Q. And was there any active marijuana use that you noticed in that art galley?

A. No, not that I noticed.
Q. And over that weekend had you been using marijuana?
A. No.
Q. Okay. Prior to -- when had you guys left on your trip to Utah?
A. I don't honestly remember. I have heard -- in discussing it in recent days, my partner mentioned that it was a Thursday or a Friday that we left.
But -- actually, I think it would have . . . no, I'm not sure. Either Thursday or Friday.
Q. Okay. And when you were living in Colorado Springs, would you recreationally use marijuana at times?
A. Yes.
Q. Okay. And would you do that in your -- the privacy of your own home?
A. Not even in -- well, in -- yes, in a private location but not inside of my home.
Q. Okay. Would it be -- not to pry too much but -- in your garage or something?
A. On a balcony.
Q. On a balcony? Okay.
And so the items inside your house were not exposed to marijuana smoke when you would tend to recreationally use marijuana; is that fair to say?
A. Yeah.

Q. Okay. And the car you were driving that day, do you remember what kind of car it was? Or you were riding in. I'm sorry.
A. Yes. It is a red Toyota Elantra.
Q. Okay. And who does that car belong to?
A. Sorry. I misspoke.
It's a Hyundai Elantra.
Q. Okay. Who owns that car?
A. I currently own it. At the time my parents owned it.
Q. And what type of license plates were on that car?
A. Texas.
Q. And is that where your parents reside?
A. Yes.
Q. Okay. Now, how long had you been using their car?
A. They gave it to me as a graduation gift when I graduated from my . . . undergrad, I believe. So I think that would have been 2018, I think.
Q. All right. And from 2018 until this stop in December of 2023, had you ever used marijuana in that vehicle?
A. No, not that I am -- can recall.
Q. Okay. Would it be something that you would do? Or --
A. No. No.
Q. Why not?
A. Well, for one, I . . . just wouldn't have smoked in my car because I wouldn't do that and drive.

But, also, my parents owned the car. And I am -- would respect that that -- they would not be okay with that.

I also would drive the car to Texas frequently and so would -- wouldn't risk that.

I mean -- a number of reasons. It just wouldn't have been something I would do. Yeah.

Q. And would you let your partner ever smoke in the vehicle, a marijuana --

A. No. No, I would not allow that if I knew that was happening.

Q. And would you smoke tobacco in that car in any form?

A. Vape, yes -- well, yeah. There would have been times that I'd owned the car where I'd actually smoked tobacco in the car.

But then frequently at the time, also, vaping nicotine.

Q. And on the day that you were coming back from Utah and were stopped, were you or Eli smoking a nicotine vape?

A. Yes. Yes.

Q. And what flavor was that -- if any -- was that nicotine vape?

A. Probably menthol. I -- it was either menthol or tobacco flavored but likely menthol because the only instance where it was tobacco flavored is if menthol was not a possibility. So that was very rare.

Q. And your parents, did they have less of an issue with tobacco than they would have marijuana?
A. Yeah. Yeah. Certainly would have less of an issue.
Q. Okay. Now, there was a lot of items that we saw in a video that we watched earlier.
Can you explain what these items were that were kind of in your car and in the hatchback area?
A. I didn't see the video so I . . .
Q. Okay. Do you recall if there were a lot of items in your vehicle?
A. Yes. Yes. My car was -- was filthy, is the best way to put it. It was full of junk that had -- I had like put in my car in between moves to different apartments and had never fully taken it out.
So there was a lot of clothing and boxes and trash. There was a lot of stuff in the car.
Q. And do you routinely do laundry after you've worn clothing?
A. Yes.
Q. Okay. And the other nonclothing items in the vehicle, were these types of items that you might bring up to your porch when you were smoking marijuana at your apartment?
A. No, I don't think so.
Q. And when you were told by -- we saw a video where a trooper told you that your car smelled like marijuana.

How did you react to that in your mind?
A. Just surprised. Yeah. Didn't know why that would be.
Q. When you returned to your vehicle after he let you guys go, did you smell marijuana?
A. No, not that I remember.
Q. And would there be any reason why your car would smell like marijuana?
A. No, not that I know of.
Q. And do you use marijuana frequently -- at least at that time did you use it so frequently that you might not be able to appreciate the smell -- what the marijuana smells like?
A. No, I don't think so.
Q. Did anything in that car, to include Eli, smell like marijuana on the day you were stopped by the Utah Highway -- or the Wyoming Highway Patrol?
A. Not that I'm aware of.
MR. DECKENBACH: I have no further questions.
THE COURT: The next voices you'll be hearing may be a Government attorney.
MS. HAMMER: We have no questions for this witness. Thank you.
THE COURT: No questions.
And I have no questions.
Is Elias there with you?
THE WITNESS: He is. I can go get him.

MR. DECKENBACH: Can she hear me? I think she's probably just getting Elias right now.

THE WITNESS: I can hear you. I'm just letting him . . .

MR. DECKENBACH: Okay. Switch.

MR. ACEVEDO: Hello.

THE COURT: Hello. Would you please raise your right hand and be sworn.

(Witness sworn.)

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: My name is Elias Acevedo. That is E-l-i-a-s A-c-e-v-e-d-o.

THE COURT: Mr. Acevedo, I am Judge Johnson. I'm the Presiding Judge in this proceedings. I wanted to talk to you briefly before we proceed.

As you know, this issue in this matter involves you being stopped -- or the vehicle you were riding in -- being stopped near Rawlins, Wyoming, and that will be a matter we'll be discussing now. However, I anticipate that some of the questions regarding -- will regard your use or possession of an illegal controlled substance, including marijuana.

I want to advise you that you have a constitutional right to refuse to answer any question if you reasonably

believe a truthful answer to that question would tend to incriminate you.

Do you understand that you have that right?

THE WITNESS: I do.

THE COURT: Now, I want to tell you that, in advance of this hearing, arrangements were made for any witness who would be testifying about this incident or incidents like yours to be able to have contact with a local attorney who has been on standby throughout the proceedings, although she's not in the courtroom at this moment but at her office.

Her name is Joanne Zook-Sweeney. And, if any of the questions raise an issue in your mind, I have her telephone number and would be happy to provide it to you so that you could talk to her before we go further.

Is that agreeable with you?

THE WITNESS: Yes, it is, Your Honor.

THE COURT: Thank you.

Well, I'm going to turn the questioning over to the defense attorney, Mr. Deckenbach, who will be questioning you now.

MR. DECKENBACH: Good afternoon, Mr. Acevedo.

THE WITNESS: Good afternoon.

**ELIAS ACEVEDO, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH**:

Q. How old are you?

A. I am 35.
Q. And do you currently reside in Los Angeles?
A. Yes, sir, I do.
Q. And what is your occupation there?
A. I am a PhD student at UCLA.
Q. And what are you studying?
A. I'm studying psychology.
Q. As you're aware, you're here to testify about a traffic stop that happened on December 10th of 2023 in the state of Wyoming.
Do you recall that day?
A. Yes, sir, I do.
Q. And have you had an opportunity to review some of the materials -- mostly body camera footage -- from that day?
A. I have.
Q. Okay. Where were you coming from on that day and where were you headed?
A. I was coming from Salt Lake City, Utah, and I was headed to Colorado Springs, Colorado.
Q. All right. And how long had you been in Utah?
A. Two days, just the weekend.
Q. And we heard you were there for a rap battle. Is that correct?
A. That is correct.
Q. And you are a performer?

A. Yes. I was performing at an event.
Q. And did you smoke marijuana at that event?
A. I did not.
Q. Did you witness anyone else smoking marijuana at that event?
A. I did not.
Q. And where were you staying?
A. We stayed at my dad's house.
Q. Okay. And was anyone using marijuana at your dad's house?
A. No.
Q. Did you witness -- well, I guess -- who was in the car with you?
A. Kaitlyn, my partner.
Q. And did you witness Kaitlyn use marijuana that weekend?
A. I did not.
Q. Now, we watched video where a trooper from the Wyoming Highway Patrol asked you to explain why his dog may have alerted on your vehicle.
Do you recall that?
A. Yes, I do.
Q. And what did you think when you heard a dog had alerted to your vehicle? What went through your mind?
A. I -- I -- I was confused. I . . . wasn't sure if -- if maybe it had -- yeah, I -- I honestly just was -- was confused.

Q. Had you intentionally not brought marijuana on your trip?
A. Yes.
Q. And --
A. Yeah, we had -- go ahead.
Q. I was going to say "Why?"
A. Well, traveling in -- traveling to Utah, we were worried about having any marijuana on us in Utah. We didn't want to get in trouble.
Q. Okay. And do you recreationally -- or at least at that time had you been someone who had recreationally used marijuana when in the state of Colorado?
A. Yes.
Q. Okay. And would you use that at home?
A. Yes.
Q. And where in your home would you consume that marijuana?
A. In -- in our apartment. In our living room.
Q. Would you ever use it on the balcony?
A. Yes.
Q. Okay. Would -- did you have items in that vehicle that you routinely smoked marijuana around?
A. I'm sorry. Can you repeat the question?
Q. Well, let me back up here.

When was the last time prior to that stop that you recalled using marijuana?
A. I -- I'm honestly not sure. It would have been several

days.
Q. Okay. And had -- are you someone who washes their clothing?
A. Yes. I mean -- generally. I . . . sometimes I -- sometimes I can wear the same -- the same clothes a few times in a row, depending on what it is, like jeans.
Q. Did you wear the same clothes a few days in a row while you were at the rap battle?
A. I don't think so but I can't -- I mean, I can't be sure.
Q. Okay. Did you smoke any type of tobacco in that vehicle on your trip back from Utah?
A. I had a -- a vape pen that had nicotine in it but not a tobacco product like a -- like actual tobacco.
Q. Okay. And when you were told the dog alerted, did anyone tell you that they also smelled marijuana in your vehicle?
A. You mean -- are you referring to the officer there?
Q. Yes.
A. Yes, I think so.
Q. When you got back into the car, did you then smell marijuana yourself?
A. No.
Q. Are you someone who uses marijuana so heavily that you might not be able to appreciate the smell of marijuana on a different environment?
A. I doubt it.

Q. And have you ever been known to smoke marijuana in that motor vehicle?
A. No. No. That was something that was very important to Kaitlyn. It was -- it's her car -- or it's her -- it's registered in her parents' name. And, yeah, she's very particular about not smoking in the vehicle.
Q. All right. And you abide by her wishes?
A. Yes.
Q. Okay. And did you smell any marijuana on your clothing after you were informed by the troopers that there was an odor of marijuana?
A. No, I was not.
Q. Do you have any reasonable explanation why troopers would be claiming to smell the presence of marijuana in your motor vehicle that day?
A. I'm sorry. Can you repeat the question?
Q. Sure.
Do you have any way to explain, from what -- your experience, at least -- why the trooper might have claimed to smell marijuana in your vehicle that day?
A. I do not.
One -- one thought that had crossed my mind was that maybe animal smells can sometimes smell like weed, such as skunks or cat pee.
We do have a cat, and she does pee on things

occasionally. So -- I mean, this is a pretty unlikely explanation and event, it seems to me, but it's -- it's one that -- it's about the only thing I could find a way to make sense of it.

Q. And, at the end of the day, there was no odor of marijuana on that roadside in that vehicle, was there?

A. No.

MR. DECKENBACH: All right.

I have no further questions, Your Honor.

THE COURT: You will be hearing perhaps from a Government attorney, who will introduce herself to you.

MS. MARTENS: Thank you, Judge.

My name is Christyne Martens. I'm an Assistant United States Attorney. As the Judge said, that means I'm a Government attorney. I have just a couple of follow-up questions for you.

**CROSS-EXAMINATION**

**BY MS. MARTENS**:

Q. Mr. Deckenbach talked to you about the smell of marijuana in the car.

Do you recall sitting in the front seat of a patrol vehicle?

A. Yes, I do.

Q. Do you remember that trooper talking to you about smelling marijuana on you?

A. No, not -- not specifically.
I remember him talking about smelling marijuana. I wasn't -- I don't remember if he said it was on me or if it was in the car.
Q. Fair enough.
You mentioned that you smoke in -- used to smoke in the living room of your apartment and that sometimes you rewear clothes.
Do you remember what you were wearing that day?
A. Yes, I do.
Q. What were you wearing that day?
A. I was wearing a black sweater, a -- a beanie, a Carhartt hat, and jeans.
Q. You mentioned that you might rewear items like jeans.
What about a hat?
A. Yeah.
Q. Are you certain that everything that got into that vehicle would have been washed from the time -- I guess -- never mind. You already answered that question.
But my other -- my other question for you is -- there's luggage and a whole bunch of stuff in that car. Do you remember kind of what the contents of that car were?
A. Yes. I mean, I can't say specifically, but it -- it -- there's a bunch of junk in the -- in the back seat.
But, yes, I do remember generally.

Q. Did you have a -- a piece of luggage or tote bags that belonged to you or your fiancée?
A. Yes. I had a backpack that I brought with me.
Q. Would you have washed the backpack itself between taking it out of your apartment and packing your things in it to go to Salt Lake City?
A. No.

MS. MARTENS: Okay.

Those are all the questions I have, Your Honor.

THE COURT: All right.

My only question to you, Mr. Acevedo -- or Acevedo, I'm sorry -- and for Kaitlyn is, how are you all doing out there in Los Angeles?

THE WITNESS: We're doing -- doing well. We -- we enjoy it out here.

The -- there was the event of the fires, which was a little stressful. But, otherwise, we're -- we're doing great.

THE COURT: Well, we've been thinking about everybody in Los Angeles and -- and the devastation of those fires. I've never seen anything like it or imagined I ever would see it. And, of course, it must be like a war zone out there in spots like Altadena and -- and Malibu.

THE WITNESS: Yeah. Yeah, it's -- it's -- it's been devastating for those areas.

THE COURT: Very well.

With no further questions, we can excuse you and -- and we'll release you from any requirement that you appear in this matter.

THE WITNESS: Thank you, Your Honor.

THE COURT: Very well.

MS. WHITE: Thank you.

THE COURT: I never expected to be speaking to a rapper.

MR. DECKENBACH: Is this a breaking point, or did you want to keep going, Judge? It's 5:10.

THE COURT: It's -- it is. Surprisingly, it's 10 after 5:00. I think it is a good breaking point for the weekend.

And I still don't have a date, but I'm kind of relying upon you, Ms. Hammer, to keep me apprised. I haven't seen anything from Joe Bustos.

MS. HAMMER: He did file motions. Unfortunately, they were filed in the magistrate case and not the CR case. I believe Ms. Harris and Ms. Williamson are aware and are negotiating that situation.

I believe we're trying to set a hearing to address those motions, but one of those motions was a motion to continue trial.

THE COURT: Okay. Well, thank you.

Everyone have a good weekend in any event.

And -- and for you, Christyne, safe travels and . . . it's just a perfect time to go down to that part of the world and -- and take a relaxing breather on a beautiful beach.

MS. MARTENS: I have been looking forward to it very much.

Unfortunately, we already had to reschedule once that -- we had an unanticipated medical issue. It's sort of been wild to get it pulled off. But I'm going so . . .

THE COURT: Well, enjoy.

MS. MARTENS: Thank you.

MR. DECKENBACH: Your Honor, would you order the marshals to release Mr. DeHerrera from his writ? And we will file for a new writ once we have established a new date.

I don't know if the food's better at Carbon County, but I imagine he wants to get back there.

THE COURT: Yes. I'd be happy to do that. And we'll take care of it.

MR. DECKENBACH: Thank you, Your Honor.

THE COURT: Thank you.

I think I'll come and clean up later. We'll stand in recess.

(Proceedings adjourned at 5:12 p.m., January 24, 2025.)

C E R T I F I C A T E

I, MELANIE HUMPHREY-SONNTAG, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, do hereby certify that I reported by realtime stenography the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 7th day of February, 2025.

/s/ Melanie Humphrey-Sonntag

MELANIE HUMPHREY-SONNTAG
RDR, CRR, CRC
Federal Official Court Reporter