IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE OSTERTAG,<br><br>Defendant. | DOCKET NO. 24-CR-00084-ABJ<br>VOLUME III<br><br>(Pages 554 through 680)<br><br>Cheyenne, Wyoming<br>Monday, February 10, 2025<br>1:32 p.m. |

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

**BEFORE THE HONORABLE ALAN B. JOHNSON**
**UNITED STATES DISTRICT JUDGE**

***MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC***
***Federal Official Court Reporter***
***2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001***
***307.433.2169 * MelanieSonntagCRR@gmail.com***

*Proceedings reported with realtime stenography;*
*transcript produced with computer-aided transcription.*

APPEARANCES:

For the Plaintiff:

PAIGE HAMMER
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
2120 Capitol Avenue, Fourth Floor
Cheyenne, WY 82001

CHRISTYNE M. MARTENS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
100 East B Street, Suite 2211
Casper, WY 82601

For the Defendant:

JORDAN DECKENBACH
FEDERAL PUBLIC DEFENDER'S OFFICE
DISTRICT OF WYOMING
104 South Wolcott Street, Suite 601
Casper, WY 82601

# I N D E X


**GOVERNMENT WITNESSES:**

| | PAGE |
|---|---|
| **CHAD BRACKEN** | |
| Direct Examination By Ms. Hammer | 558 |
| Cross-Examination by Mr. Deckenbach | 584 |
| **ROBERT HAVICE** | |
| Cross-Examination (Continued) by Mr. Deckenbach | 610 |
| Redirect Examination by Ms. Martens | 626 |
| Recross-Examination by Mr. Deckenbach | 631 |

**DEFENSE WITNESSES:**

| | PAGE |
|---|---|
| **CHRIS WALSH** | |
| Direct Examination by Mr. Deckenbach | 634 |
| Cross-Examination by Ms. Martens | 641 |
| Redirect Examination by Mr. Deckenbach | 644 |
| **LOANA DOMINGUEZ** | |
| Direct Examination by Mr. Deckenbach | 646 |
| Cross-Examination by Ms. Hammer | 675 |

## E X H I B I T S

| | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| GOVERNMENT'S EXHIBITS | | | |
| 12 | Body Camera Footage Clip | 575 | 575 |
| 13 | Body Camera Footage Clip | 560 | 561 |
| DEFENSE EXHIBITS | | | |
| A2 | Body Camera Footage Clip | 594 | -- |
| N | Dominguez Report | 649 | 649 |
| O | PDF of California POST Website | 660 | 661 |
| S | 2018 Post Rules | 636 | 637 |
| T1 | Photograph | 653 | 654 |
| T2 | Photograph | 654 | 654 |
| T3 | Photograph | 654 | 655 |
| T4 | Photograph | 655 | 655 |
| T5 | Photograph | 655 | 655 |
| T6 | Photograph | 655 | 655 |
| T7 | Photograph | 655 | 655 |
| T8 | Photograph | 655 | 655 |
| T9 | Photograph | 655 | 655 |
| T10 | Photograph | 655 | 655 |
| T11 | Photograph | 655 | 655 |
| T12 | Photograph | 655 | 655 |

(Proceedings commenced 1:32 p.m., February 10, 2025, within the presence of the defendant on bond.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

We are continuing this afternoon in the case of the United States against George Ostertag. This matter comes before the Court under a motion to suppress, under Criminal Docket 24-CR-00084.

The defendant is providing testimony at this point. Our last witness was Mr. Elias Acevedo, who testified about -- concerning his interaction with -- in this matter -- with Officer Martinez.

Is the Government ready to proceed?

MS. HAMMER: We are, Your Honor.

THE COURT: And is the defense?

MR. DECKENBACH: Yes, Your Honor, we are.

THE COURT: I would note that Paige Hammer is again appearing for the Government with Christyne Martens and that Mr. Ostertag is -- I'm sorry -- is present in court today with Jordan Deckenbach, his public defender.

Mr. Deckenbach, I think the ball is in your court.

MR. DECKENBACH: Thank you, Your Honor.

At this point we would request the Court permit us to turn it back to the Government. They broke in their witnesses to allow us to get a number of lay witnesses on the stand, and

so I believe they're ready to resume calling their witnesses at this time.

THE COURT: Are you?

MS. HAMMER: We are.

We would call Sergeant Chad Bracken.

(Witness sworn.)

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: My name is Chad Bracken. It's C-h-a-d. My last is B-r-a-c-k-e-n.

MS. HAMMER: Good afternoon.

THE WITNESS: Good afternoon.

**CHAD BRACKEN, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

**BY MS. HAMMER:**

Q. So, Sergeant Bracken, I'm going to ask you to be consciousness of the microphone. Sometimes when it's a little bit higher up, it can get a little scratchy, and I imagine our court reporter will let us know if you need to just move it around a little bit. All right?

A. Okay.

Q. Now, Sergeant Bracken, who do you work for?

A. I work for the Wyoming Highway Patrol.

Q. And what do you do for them?

A. I am a patrol sergeant in the Carbon County area.

Q. How long have you been with the highway patrol?
A. Approximately a little over five years.
Q. And do you have any law enforcement experience before the highway patrol?
A. Yes. Prior to that, I worked for the Rawlins Police Department, approximately five years, and, prior to that, I worked for the Department of Corrections out of Wyoming as a correctional corporal for approximately three years.
Q. And do you recall what year you started with the Rawlins Police Department?
A. Yes. 2014.
Q. And what about the highway patrol?
A. 2019.
Q. Okay. And did you -- did you attend an academy and are you POST certified in the state of Wyoming?
A. Yes, ma'am.
Q. Now, I want to take you back to the evening of January 24th, 2024. Did you conduct a traffic stop upon Mr. Ostertag?
A. I did.
Q. And for what reason?
A. For a turn signal violation.
Q. And what happened at the beginning of the traffic stop?
A. After observing the violation for no turn signal, I conducted a traffic stop at approximately I-80 business,

214 and Locust Street. I contacted Mr. George Ostertag, which I identified as the driver. And I advised him the reason for the stop, where he had indicated -- he made some gestures looking down at his blinker, maybe indicating that he realized he might not have used his blinker.

At that time I asked him for his driving documents and vehicle documents, and, during my interaction, he had to look up his insurance information. He was reluctant to tell me where he was coming from or where he was heading to on original contact when I contacted him during the traffic stop.

At that point, once I received his driving documents and his vehicle documents, prior to leaving the vehicle, because of the temperatures at that time of the evening or night, I advised him he could roll his window up, and I went back to my patrol vehicle, where I conducted warrants and driver's license checks on Mr. Ostertag.

Q. And were you wearing a body camera that night?

A. I was.

Q. So if we can pull up what is currently on the screen, which is marked as Government's Exhibit 13.

Do you recognize what's on the screen in front of you?

A. Yes.

Q. And what is it?

A. That is Mr. Ostertag in the driver's seat as a driver,

along with his vehicle. It appears that he's holding his cell phone. I'm assuming, just from this still shot here, it was when he was trying to provide me his vehicle insurance information.

Q. Let me ask you a better question. Do you recognize what this video is in general?

A. Yes. It is the traffic stop that I conducted on Mr. George Ostertag.

Q. And is this a video of your body cam from that evening?

A. Yes, it is.

Q. And is it a fair and accurate representation of your interactions with Mr. Ostertag during that traffic stop?

A. Yes, ma'am.

MS. HAMMER: Your Honor, I'd move to admit Government's Exhibit 13.

MR. DECKENBACH: No objection, Your Honor.

THE COURT: We'll receive it.

(Government's Exhibit 13 received into evidence.)

THE COURT: I would comment it's terribly blurry, difficult to independently even identify that there's a human figure in it.

BY MS. HAMMER:

Q. Now, I'm going to start it here at -- Exhibit 13 -- 3 minutes 12 seconds.

And, before I do that, just to confirm, the

information that you've previously -- at what point in the traffic stop is this?
A. This is upon requiring his driving documents, I believe original contact, when I contacted Mr. Ostertag.
Q. Okay. And playing at 3 minutes 12 seconds.
THE COURT: There. That's better.
(Excerpt of Government's Exhibit 13 played.)
MS. HAMMER: Do we have audio?
THE COURTROOM DEPUTY: We do.
MS. HAMMER: My audio is on. I just want to make sure the courtroom audio is, so I'll start playing again.
I stopped it at 3 minutes 14 seconds, and I'll begin playing there again.
(Excerpt of Government's Exhibit 13 played.)
BY MS. HAMMER:
Q. All right. Stopping Exhibit 13 at 3 minutes 30 seconds, what was that last thing that you told Mr. Ostertag before you started heading back to your patrol car?
A. That he was more than welcome to roll his window up.
Q. And do you recall whether or not he ever rolled his window up during the traffic stop?
A. He did not.
Q. Now, moving forward in this traffic stop, does -- is a K-9 deployed on the vehicle?
A. Yes.

Q. And, after her deployment, did you receive word about whether or not she had given her final indication on the vehicle?
A. Yes, by Trooper Martinez.
Q. And what did you do at that point?
A. At that point I exited my patrol vehicle and contacted Mr. Ostertag on his driver's side and advised him that the K-9 indicated a positive alert and to exit his vehicle, that a search would be being conducted of his vehicle.
Q. And what did you do with Mr. Ostertag?
A. At that point, once him exit my vehicle, I had him go up to the front of my patrol vehicle, where I searched his person.
Due to the clothing that he was wearing, I was concerned that maybe he may be armed, just because -- his motorcycle affiliation that he had during the time of the stop that he was wearing, as well as I placed him in investigative detention for officer safety in wrist restraints, and I began a search of his person for weapons.
Q. And what was Mr. Ostertag like during that pat-down search?
A. He was very argumentative, upset about the K-9 alerting to his vehicle. At that time, as well, Trooper Martinez had asked him why he was wearing gloves, because I was having issues, I believe, getting around his leather jacket and other

layer of clothing, getting restraints on him because he had gloves. He was sweating profusely. He admitted -- when Trooper Martinez asked why he had gloves on, he said he was cold.

Once we immediately pulled him out of the vehicle, you could see him sweating, beads of sweat on his forehead. For someone that was advising they were cold, it seemed like he was actually hot during this encounter, but his mood swings were very argumentative at the time during this point of the stop.

Q. Now, at some point after this pat-down search of Mr. Ostertag, did you search the vehicle, his vehicle?

A. Once we placed Mr. Ostertag in -- the prisoner -- in my patrol vehicle, we began a search of the vehicle.

Q. And which side of the vehicle did you search?

A. I searched the driver's side.

Q. And what did you find?

A. During the search I located -- tucked next to the center console and driver's side area where you would fasten your driver seat belt, I located a loaded 9-millimeter pistol that did not have a serial number on it. It appeared to be altered.

Q. Did you ask Mr. Ostertag any questions about that firearm?

A. I did. Mr. Ostertag, I believe, was complaining about his wrist restraints, so I went back and readjusted them. At that

point I read him his *Miranda* rights, where I asked him about the pistol that was in his vehicle, where he indicated that it wasn't his, that it was potentially somebody that borrowed his vehicle, which, in particular, he had mentioned Mr. Kendal Wall.
Q. And are you familiar with Kendal Wall?
A. Yes.
Q. How?
A. Through my prior experience with the Rawlins Police Department, interactions with other law enforcement agencies within Carbon County. He is a known drug user and an individual that has been caught and known to use -- or excuse me -- sell narcotics.
Q. After finding the firearm did you continue searching the driver's side of the vehicle?
A. Yes, I did.
Q. And why was that?
A. Kind of just to double-check to see if we could locate any other illegal items or substances inside the vehicle.
As well as to continue the search of the vehicle until it was completed.
Q. Now, do you recall, towards the end of this search, asking Trooper Martinez if he found anything else in the vehicle?
A. Yes, I did.
Q. And why did you ask him that?

A. Just because I did not search the passenger side, so I asked Trooper Martinez if he had observed anything illegal or any type of substances or anything else illegal in the vehicle, where he advised that he found marijuana shake on the passenger-side floorboard.
Q. And did you confirm his observation of the marijuana shake?
A. I did not.
Q. Why not?
A. Because I've worked with Trooper Martinez for quite a while. As well, he has more training and experience with me, especially when it comes to drug seizures and more drug cases. And I didn't need to question what he observed because he has well more training and experience than I do.
Q. As part of your preparation for court today, did you rewatch some or parts of your body cam footage from this stop with Mr. Ostertag?
A. Yes, I did.
Q. And did you see anything of note in your body camera footage that is relevant to today's hearing?
A. Yes, I did.
Q. What did you see?
A. After preparing for this preparation for the suppression hearing, I reviewed my body cam footage, where -- I don't remember exactly what point in the video, the time, but from

my training and experience, I observed what appeared to be marijuana shake on the driver's side of the vehicle.
Q. So back in Exhibit 13 at 26 minutes 39 seconds, I want to start playing this video. And when you see the marijuana shake, will you please tell me to stop.
A. Yes.
Q. Okay.
(Excerpt of Government's Exhibit 13 played.)
A. Right there. Stop.
BY MS. HAMMER:
Q. Now, the screen in front of you is a touch screen. And would you please circle what you see in the video that you say is marijuana shake, please.
A. Yes, ma'am.
Q. Now, why do you think that that is marijuana shake upon further review of your body cam?
A. After further review of my body cam -- I didn't notice it at the time during the stop -- but you can see the illumination from my flashlight cross as well as, while I'm searching the vehicle, my body cam is picking this up. I'm leaning down. I'm a shorter guy.
But, as you can see -- if you replay the video or play it even after this -- you can see the light green coloring of the substance. At this time of year there wouldn't be nothing that would be that bright green,

especially in Rawlins, Wyoming. It's not something that's on the floorboard where somebody would be putting their shoes or picking up any debris from the outdoors.

This is right next to the driver's seat where someone who was maybe rolling a marijuana cigarette or joint would swipe it off their lap or something in that manner, as well as the shape, where a blade of grass might be, you know, longer or more pointed or something like that. But during this time of year it wouldn't be that green.

But that particular shape, as well, looks -- from my training and experience, I believe -- to be a particle off a marijuana bud that an individual might drop if they're rolling a marijuana cigarette or using a marijuana grinder.

MS. HAMMER: And, for the record, Your Honor, the video is stopped at 26 minutes 46 seconds, and Sergeant Bracken has circled an item that is at -- if you look at this still -- at the top middle.

I don't know what further record if -- the Court wishes to make.

I know that -- I think the Court has the ability to print this, I believe.

THE COURTROOM DEPUTY: A screenshot?

MS. HAMMER: Screenshot it. And that may be something that I think we would ask to do just for the record.

And, Your Honor, if you wish, I'm happy to go back if

you would like to rewatch this section of the video again to see for yourself.

THE COURT: I'm looking at it.

MS. HAMMER: Okay.

THE COURTROOM DEPUTY: Do you want a screenshot?

MS. HAMMER: Yes, please.

THE COURTROOM DEPUTY: Give me just a moment because it will take a moment to load.

MS. HAMMER: Okay.

Tina, can we continue with questioning while you do that if I just leave it as is?

THE COURTROOM DEPUTY: I'm sorry?

MS. HAMMER: May I continue with questioning if we leave this as is?

THE COURTROOM DEPUTY: You can.

MS. HAMMER: Okay.

BY MS. HAMMER:

Q. Now, what -- you mentioned a little bit earlier that you're a little bit shorter. And how did that affect whether or not you -- why you did not see this that night?

A. I don't know if my height had anything to do with it. But the -- the portion -- once I located the firearm in the vehicle, I was kind of affixiated [sic] on that because, as a law enforcement official, you -- when you find something like that item, you kind of get excited, per se, because it is a --

a good find.

But just -- I was more looking for -- searching in other areas and wasn't paying particular attention to that area until I reviewed the body cam and observed, after rewatching it, what I observed there that I explained.

Q. And, at this point when you're in the vehicle, are your eyes looking at the same place where the body camera is pointed?

A. No. My body camera is worn on my outer carrier vest, on the lower right side of my pectoral, so it wouldn't -- essentially -- wouldn't be seeing the same thing that I was -- I was looking at, like a --

Q. At least while you're leaning over?

A. Yes, that's correct.

Q. And you mentioned earlier you were discussing kind of Mr. Ostertag's behavior while you were doing the pat-down search.

Did you have any concerns about that behavior?

A. I did as well as Trooper Martinez. During the interaction I observed Mr. Ostertag go through several different mood swings to the point where, at the end, where he was being placed under arrest, he was pretty calm, cool, and collective, to at one point in the prisoner area he was almost to the point where he was falling asleep, still sweating profusely in the back of my prisoner area.

And clenching of his jaws, grinding of his teeth, all indication of -- as well as from my training and experience -- from drug use other than marijuana.

Q. So let's talk about your training and experience with drug use.

As part of your training to be a POST-certified police officer, did you go through the training to learn the standard field sobriety tests?

A. I did.

Q. And did you also at any point in your career go through the training for ARIDE?

A. Yes.

Q. And what is ARIDE?

A. Advanced Roadside Impairment Detection.

Q. And how does that relate to controlled substance use?

A. It's designed for investigation for individuals that are driving under the influence, particularly of controlled substances, not alcohol.

Q. And is methamphetamine one of the controlled substances you learn about?

A. Yes.

Q. Now, did you have a conversation with Mr. Ostertag about your concern related to his behavior and the potential connection with any controlled substance use?

A. Yes.

MS. HAMMER: So still in Exhibit 13, I'm going to start playing at 48 minutes 3 seconds.

(Excerpt of Government's Exhibit 13 played.)

MS. HAMMER: And stopped at 48 minutes 6 seconds and playing again.

(Excerpt of Government's Exhibit 13 played.)

MS. HAMMER: Do we have audio?

(Excerpt of Government's Exhibit 13 played.)

MS. HAMMER: So, playing again, 48 minutes 7 seconds.

(Excerpt of Government's Exhibit 13 played.)

MS. HAMMER: Ending at 48 minutes 36 seconds.

BY MS. HAMMER:

Q. In your report for this case you wrote, quote, "Mr. Ostertag is also a known drug user. I've had previous contacts with Mr. Ostertag during my employment with the Rawlins Police Department," end quote.

Can you describe the contact you had with Mr. Ostertag prior to the traffic stop as it relates to his drug use?

A. Yes. Prior to my employment with the Wyoming Highway Patrol, I was employed by the Rawlins Police Department. I responded to Mr. Ostertag's house -- I believe it's approximately on Seventh Street.

But just patrolling in the area as a City cop in Rawlins, I was very proactive, especially with getting drugs

off the community -- or the streets of the community we lived in. So just even being a smaller community, I can still tell what -- who individuals are, even though I'm not a City cop anymore.

The people that I've observed Mr. Ostertag with are known drug users, as well as the individual he mentioned that night, who has been caught selling narcotics as well as uses drugs and the individuals that he associates with, and even the individual that he -- during this stop that night, it was his girlfriend, I believe he said -- is a known drug user, as well, within the Rawlins area.

Q. Now, why did you include this information in your report?

A. I think it is imperative because, as well as Wyoming Department of Criminal Investigations, a DCI agent, along with officers within the Carbon County community advised to kind of be on the lookout for Mr. Ostertag. Agents with DCI advised that they had information from individuals they had contacted, informants in other interviews, that Mr. Ostertag was believed to be selling narcotics.

Q. How would this information be helpful to future investigations?

A. I'm sorry. Could you repeat that again?

Q. How would this information regarding your belief or your knowledge of Mr. Ostertag's drug usage be helpful to future law enforcement officers?

A. Just normal routine patrols and individuals leaving areas that are known to -- to sell or areas where individuals use narcotics within Rawlins, to document it, our encounter. So, that way, if they have further investigation with any type of drug use with Mr. Ostertag, it would be helpful for their case.
Q. So what happened to Mr. Ostertag's vehicle after he was arrested?
A. Once Mr. Ostertag was placed in custody, I didn't want to leave the burden of Mr. Ostertag -- he already had a lot going on, so I didn't want to have him have to pay for a tow bill if need be, so if we could allow somebody that he would -- could call or contact to get his vehicle, we allowed him to do that so, that way -- like I said, he had a lot going on, and I didn't want to have him to pay for a tow bill or not be able to have a vehicle once he was released from custody.
Q. And did someone come and pick up his vehicle that night from the side of the road?
A. Yes.
Q. Now, I want to go to a different traffic stop at this point. I want to talk about the traffic stop from December 10th, 2023, involving Kaitlyn White and Elias Acevedo.
Do you remember that traffic stop?
A. I do.

Q. And were you wearing a body camera that day?
A. I was.
Q. Now, up on the screen here, I have what's been marked as Government Exhibit 12.
MS. HAMMER: And I will scroll through, forward just a little bit, so that you can see it and ensure that this is the same body cam that I'm thinking about.
(Excerpt of Government's Exhibit 12 played.)
BY MS. HAMMER:
Q. So stopping it at 3 minutes 32 seconds, do you recognize this body cam footage?
A. Yes, I do.
Q. And is it from the traffic stop from December 10th, 2023, involving Kaitlyn White and Elias Acevedo?
A. Yes.
Q. Is it a fair and accurate representation of your interactions during that traffic stop?
A. It is.
MS. HAMMER: The Government would move to admit Exhibit 12.
MR. DECKENBACH: No objection, Your Honor.
THE COURT: Exhibit 12 is received.
(Government's Exhibit 12 received into evidence.)
BY MS. HAMMER:
Q. Now, at some point during that traffic stop, did you have

Mr. Acevedo sit in the front seat of your patrol car?
A. I did.
Q. And why was that?
A. Upon contact, when receiving the driving documents and vehicle information, I smelled what I thought was the odor of marijuana coming from inside the vehicle, specifically burnt marijuana.
And I wasn't a hundred percent sure at that time, so, at that point, I had Mr. -- I don't want to mispronounce his name -- Acevedo exit his vehicle to come sit back while I work on his warning for the traffic stop for the speed violation and to also see if I could smell odor of marijuana coming off of his person.
MS. HAMMER: All right. In Exhibit 12 at 5 minutes 24 seconds, we'll play this.
(Excerpt of Government's Exhibit 12 played.)
MS. HAMMER: Stopping at 6 minutes 45 seconds.
BY MS. HAMMER:
Q. Now, at this point, what happens in the traffic stop with you?
A. At -- while I'm contacting the driver or what happens after this?
Q. What happens -- do you search his car?
A. Yes, I do.
MS. HAMMER: Okay. Now I want to jump ahead to

7 minutes 47 seconds.

(Excerpt of Government's Exhibit 12 played.)

MS. HAMMER: Stopping at 8 minutes 55 seconds.

BY MS. HAMMER:

Q. Why did you have that conversation with Ms. White about her marijuana usage?

A. Because from the -- the slight odor that I caught originally that I thought I smelt marijuana, once I even smelled a hint of the marijuana as it -- you observed in the body cam footage, as well as asking her why there would be any reason that the K-9 would alert and to see if she smoked marijuana in the state of Colorado inside the vehicle where it is legal there. But indicating why there was a reason why the K-9 would alert to the vehicle.

Q. And, at this point, did you have Ms. White take a seat in Trooper Martinez's car?

A. Yes.

Q. And then, at this point, did you search the vehicle?

A. Yes. After she was placed in Trooper Martinez's vehicle, we conducted a search of the vehicle.

MS. HAMMER: Starting the video again at 12 minutes 47 seconds.

(Excerpt of Government's Exhibit 12 played.)

MS. HAMMER: Stopping at 13 minutes 34 seconds.

///

BY MS. HAMMER:
Q. Why are you having this conversation with Trooper Martinez?
A. During the search -- like I said, once we start searching the vehicle and get inside the vehicle, you can smell the heavy order of burnt marijuana coming from inside the vehicle.
Q. Now, are you aware that part of the argument by the defense in this case is that these conversations that you're having are just to bolster Trooper Martinez and Becky when she doesn't -- when she alerts on a vehicle but no drugs are actually seized?
MR. DECKENBACH: Your Honor, objection; argumentative.
THE COURT: Sustained.
BY MS. HAMMER:
Q. Do you narrate your body cam?
A. Depending on the circumstances. Generally, it's more -- when I'm by myself I might not as much but -- depending on the situation and the circumstances around it.
Q. And why would you sometimes narrate your body cam?
A. To help remember for a report or as well as to document because no matter -- during whatever case or incident might be, I might not remember to put everything in a report or this would also document the incident, as well.
Q. What was happening here this day? Was that narration or

was that conversation?
A. It was conversation.
Q. One of the conversations you had with Mr. Acevedo is about -- seems to be about residual odor of marijuana; is that fair to say?
A. Yes.
Q. What is your experience with residual odor of marijuana in your experience with searching vehicles?
A. As far as the distinct odors?
Q. Sure.
A. Just the -- the difference between burnt -- the odor of burnt marijuana where it has previously been smoked has more like a smoky smell compared to raw marijuana, which is very potent and a lot stronger and doesn't have the smoky smell to it.
Q. Are you -- in your experience have you experienced residual odor of marijuana in a vehicle?
A. Yes. In my experience I have, as well as individuals just out and about that have smoked weed. You know, I think even from life experiences, you've walked past somebody in Walmart where you can smell the odor of marijuana just on somebody because they've recently smoked, and it's on their clothing.
Q. Now, in your law enforcement experience, approximately how many cars have you searched where your basis for the search or the probable cause to search was a dog sniff?

A. It would be a rough estimate because I don't keep documentation of that because I'm not a K-9 handler, but I would imagine around a hundred if not more.

Q. And during the sniffs -- or during the searches where you're searching after a dog has indicated on the vehicle, have you found fentanyl during any of those searches?

A. I have.

Q. And, of the fentanyl you've found, was any of it legally possessed by the car occupants?

A. No. None of them had a prescribed prescription for fentanyl.

Q. Have you come across any fentanyl patches?

A. Patches? Fentanyl patches, I have not.

Q. What about fentanyl lollipops?

A. I have not.

Q. What kind of fentanyl have you seen?

A. Powder and pill form.

Q. The blue M30s?

A. Yeah.

Q. Okay. Now, within the same vein, have you found methamphetamine during any of these car searches based off of a dog sniff?

A. Yes, several.

Q. And of the methamphetamine you found, was any of it legally possessed, such as ADHD medication?

A. No. It was all illegal controlled substance methamphetamine.
Q. And during any of these car searches have you found hemp?
A. No. Not -- if we did find any type of hemp items, it was generally something else that was in the vehicle, illegal substance.
Q. Like what?
A. Like whether it be methamphetamine, marijuana, other illegal controlled substance that would even be sold over the counter or through a doctor prescription.
Q. I guess I want to be really clear about this. Have you found raw hemp, like the plant itself, in a car?
A. I have never found, in my law enforcement career, raw hemp.
Q. Okay. Now, having been a law enforcement officer in the Rawlins area, are you familiar with Corey Cruz?
A. I am.
Q. And how are you -- how do you know Corey Cruz?
A. Mr. Cruz is my neighbor -- he lives directly to the west of me -- as well as word of mouth through Carbon County law enforcement. I've backed officers up or tried to -- by being that he is my neighbor, there's kind of a conflict of interest so -- but I primarily know him just through word of mouth of cases through other law enforcement officials as well as being my neighbor.

Q. What do you personally know of his drug use?
A. Mr. Cruz and Ms. Keller, when they were living next door to me -- I know just through word of mouth -- their children were taken and re-placed, taken out of their home because of drug use, as well as, off dirty -- or excuse me -- off duty I observed Mr. Corey Cruz use illegal narcotics -- or what appeared to be, from my training and experience, illegal narcotics -- as well as the individuals that he has at his residence -- or used to have when he lived at the residence -- are -- as well as individuals I've dealt with when I was employed by the Rawlins Police Department -- that are known drug users.
Q. In fact, have you seen Corey Cruz actively using what you believed were controlled substances?
A. Yes, I have.
Q. And when was that?
A. During hunting season in September.
Q. Of which year?
A. It would have been 2023.
Q. Okay. And can you describe the context in which you saw that?
A. Yes. Out of the rare asides, I was actually out archery hunting with the deputy -- ex-deputy director of DCI as well as the ex-colonel of Wyoming Highway Patrol, Kebin Haller.
When we were in the -- near the Medicine Bow National

Forest, I observed a vehicle right -- a couple hours probably before night. We were sitting on a waterhole waiting for elk, and I observed Mr. Corey Cruz drive his 4Runner that is always parked in front of his residence come down the hill.

We were in camouflage, so at first I don't think they seen us, and they -- they stopped their vehicle, where I observed Mr. Corey Cruz, Hailey Keller, and Mr. Paul Cruz, who is also a known drug user in the Rawlins area, get out of the vehicle, where I see them retrieve a clear bag that appeared to be a white crystal substance, and they actually put lines on the hood or -- I observed them snorting the substance.

Q. And how close were you to them when this was going on?

A. It would approximately be 70 yards, but I also had a very good set of Maven binoculars, where I was using those to observe their behavior.

MS. HAMMER: May I have just a moment, Your Honor.

Thank you.

THE COURT: You may.

(Discussion held at counsel table.)

MS. HAMMER: I have no further questions for this witness. Thank you, Your Honor.

THE COURT: Thank you.

MR. DECKENBACH: Good afternoon.

THE WITNESS: Good afternoon, sir.

MR. DECKENBACH: May I, Your Honor.

THE COURT: You may proceed.

**CROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. I first want to talk to you about the stop on January 24th of 2024 with Mr. Ostertag.

At the beginning of your turn, I think you testified that you pulled him over for a signal turn -- or failure to signal a turn.

Is it true that you were watching Mr. Ostertag earlier that evening?

A. Yes. I was in the area and observed Mr. Ostertag drive over the bridge to a TA where he said he was employed.

Q. Okay. And this was, then, a little later in the evening that you saw him leave the TA; is that correct?

A. Yeah, approximately 20 minutes after I observed him arrive at the TA.

Q. And what's already been previously admitted into evidence is a copy of your dash cam video.

Did you have a chance to review that at all prior to your testimony?

A. Yes.

Q. And tell me if you disagree, but would it be fair to say that in that video you are accelerating off of I-80 as Mr. Ostertag crosses the bridge across the freeway?

A. I'm sorry. Could you ask that again one more time? I guess just to help me understand.
Q. Yeah.
So when -- you first see Mr. Ostertag leaving the TA as you're exiting the freeway; is that right?
A. I'm not exiting. Prior to the stop of Mr. Ostertag, I was actually parked on the shoulder on the 214 eastbound off-ramp.
Q. Okay. And so you accelerate to catch up with Mr. Ostertag from your parking place?
A. Yes.
Q. And this is prior to him committing a turn signal violation?
A. Yes.
Q. Okay. And why were you so interested in catching up to Mr. Ostertag at that point?
A. To see if I could observe a -- a violation for probable cause just because -- with the information that I had from the Department of Criminal Investigations that Mr. Ostertag was involved in criminal activity, specifically the sale of narcotics.
Q. Okay. And so that is why Trooper Martinez was prepared to support you during this stop if you were able to observe a traffic -- or violation; is that correct?
A. Yeah. It was a pretextual stop, sir.
Q. Okay. And I want to ask you a little bit about that,

then.

Your . . . you testified that a DCI agent had a conversation with you about Mr. Ostertag; is that right?

A. That is correct.

Q. How -- what was the time frame in which that conversation happened? About when?

A. You know, I would -- I don't -- can't give you exact time. Probably at least six months prior.

Q. Okay. And what is the name of the agent who had that conversation with you?

A. It is Agent Darren Willis. He's a task force officer with the Department of Criminal Investigations.

Q. And where did that conversation occur?

A. I can't recall. It's just not uncommon for law enforcement officials in Carbon County to door up and talk about individuals or bring up occurring events and subjects that are involved in criminal activity in the Carbon County community.

Q. And so that -- and that agent's name was Darren Wilson; is that right?

A. Willis.

Q. Oh, Willis?

A. Yes.

Q. Thank you.

And who else was present for that conversation with

Agent Willis?
A. It was just me and Agent Willis.
Q. And do you remember what the basis of Agent Willis' -- where he got that information from?
MS. HAMMER: Your Honor, I'm going to object at this point to relevance for the purpose of this hearing.
THE COURT: Sustained.
BY MR. DECKENBACH:
Q. Do you remember having a conversation with Ms. Hammer about you reporting that Mr. Ostertag, as you wrote in the report in this case, is known to associate with drug users?
A. Yes, I do.
Q. And do you remember telling her that you couldn't remember who told you that information?
A. I guess -- you're -- I'm sorry. Could you repeat?
Q. Do you remember telling Ms. Hammer you don't remember where you learned this information?
A. Of how I know he associates with drug users?
Q. Yes.
A. I don't recall. Just from my experience with the Carbon County community as well as the individuals that I've observed Mr. Ostertag with as my -- as my years of service within the Rawlins community.
Q. Okay. I -- all right. And so you . . . we'll move on from that.

Your testimony today is you remember who told you that? Is that -- I guess that's what I'm getting at. Fair? Anyone else tell you that in law enforcement?
A. Besides Agent Willis?
Q. Yes.
A. Yeah, other individuals within the Carbon County Sheriff's Department as well as Rawlins PD. They've had enough contacts with either Mr. Ostertag or the individuals he associated with.
Q. Okay. Well, let's go back to the stop, then.
You tell us it's a pretextual stop. Prior -- during your initial conversation with Mr. Ostertag -- you reviewed your body camera -- I'm sorry -- of that -- that encounter today; is that correct? With Ms. Hammer.
A. That is correct.
Q. And in that body camera when you approach, Mr. Ostertag is wearing a pair of leather gloves; is that correct?
A. I can't recall if they were leather or not, but he was wearing some gloves, sir.
Q. Yeah. And during your interaction he actually removes one of those gloves in order to fetch out his license for you; is that correct?
A. That is correct.
Q. And had you ever had any personal encounters with Mr. Ostertag prior to this evening?

A. Yes. One in particular, yes.
Q. Okay. And how long ago was that?
A. I can't recall. It was during my employment with the Rawlins Police Department.
Q. Okay. And in your report you noted that he was wearing a motorcycle jacket; is that correct?
A. That is correct.
Q. And, in fact, that he was wearing patches on that jacket that made you concerned; correct?
A. Yes.
Q. But you -- you have no personal knowledge of where he received those patches; is that fair to say?
A. Where he received them from?
Q. Yes.
A. That's fair to say.
Q. He could have bought them on the internet as far as you know?
A. From my experience as well as being involved with -- at the DOC as far as a -- a gang investigator, an individual would only wear those type of patches if they want to represent something, like the 1 percent diamond as -- is a representation of the 1 percent of nonlaw-abiding individuals that belong to a motorcycle club.
Q. There was a patch you referenced in your report called the Diamond King -- or Demon King. I'm sorry.

Do you have any personal knowledge in your training and experience of what motorcycle gang, if any, that is?
A. No, just the patch that is associated as being a Hells Angels support club.
Q. And -- but, again, you had no personal knowledge of whether or not Mr. Ostertag was a member of those -- that organization?
A. That is correct.
Q. In your report you also noted that you didn't believe Mr. Ostertag was coming from work. Is that something that . . . is it true, though, he did tell you -- and I think you've already testified that night he explained to you that he worked at the TA.
A. The night of the stop, yes, he explained that he worked at the TA.
Q. And, in fact, he helped work in the kitchen as well as in the restaurant generally?
A. That is correct, sir.
Q. And in your report you wrote that he was engaged in deception when he told you he worked at TA. Is that your opinion today?
A. That is not my opinion for today. Or that he -- that he is -- I'm sorry. Could you repeat?
Q. Sure.
You wrote in your report that he was engaged in

deception when he told you he was working at the TA. Is that still your opinion today?
A. The time of the stop, he had -- he said he had just left work, which 20 minutes prior I'd seen him travel to work. So that -- during the time of the stop, that was where I -- the deception came from, because he said he was just leaving work when I contacted him, which, in fact, 20 minutes prior I had seen him travel back to the TA.
Q. Okay. And during your pat-down -- you testified you committed -- did a pat-down search prior to placing him in your squad; is that correct?
A. Yes.
Q. And part of your search included retrieving items inside his pockets; is that correct?
A. Yes.
Q. And we saw the video of your search where you found a gun.
Is it true that at no time during this search did you ever state that you saw marijuana? Is that correct?
A. During the -- in my report?
Q. Yes.
A. In my report at the time. I didn't observe the marijuana until preparation for this suppression hearing, sir.
Q. And you didn't observe that marijuana in your video until you understood that was a contested issue in this case; is that right?

A. Yes. That is one of the reasons. And then after reviewing it for -- for the case in general.
Q. During your search of Mr. Ostertag's vehicle, you -- at no time do you state that you smell marijuana?
A. Yeah, that's correct.
Q. And you didn't find anything during your search that would be consistent with marijuana paraphernalia?
A. That is correct.
Q. And it's now at this hearing that you have seen some piece of article -- item on the floorboard that you're believing today is marijuana shake; is that right?
A. Not on the floorboard. But after reviewing my video and how green the substance is -- the video that we watched earlier didn't really show. If you continue to play it, you can see how brightly green it is, and it appears to be marijuana.
Q. And you would acknowledge that there are multiple lights in this video, to include your flashlight?
A. Yeah. Mine and Trooper Martinez's light, I believe, is the only thing that was illuminating the inside of the vehicle at the time.
Q. And that different items look different depending on how the light is shining on it; is that correct?
A. That's correct.
Q. And now I want to touch briefly -- after you found the

gun, you talked to Mr. Ostertag, and he mentioned an individual named Kendal Wall; is that correct?
A. That is correct, sir.
Q. And he told you that Mr. Wall had recently used the vehicle; is that correct?
A. Yeah. He had stated he was probably the last one that borrowed his vehicle.
Q. And you are aware of who Mr. Kendal Wall is -- or was?
A. Yes, sir. Yeah.
Q. You were aware that Mr. Kendal Wall actually had recently been in jail at the time of this stop?
A. During the stop I'd mentioned I'd heard just through word of mouth that he was in rehab, but I know that he had been incarcerated, as well, to -- but, the last I heard, he was in rehab, I believe.
Q. All right. And specifically at that rehab residential treatment in Sheridan, Wyoming?
A. That is correct, sir.
Q. And based on that, you did not find Mr. Ostertag's claim that Kendal Wall was using his vehicle to be very credible; is that fair to say?
A. Just his admission saying that he had -- Mr. Wall had borrowed his vehicle.
Q. All right.
And so after you -- is it only after the -- the fact

that you found the firearm -- that's the first time you asked Trooper Martinez if he sees anything else; is that right?
A. Yes.
Q. And as he's digging through loose change in the console, you asked him if there is any residue in there?
Do you remember doing that?
A. I'd have to watch the video --
Q. Okay.
A. -- to refresh.
MR. DECKENBACH: If we could show Exhibit A2.
BY MR. DECKENBACH:
Q. This is a previously admitted defense video that is exactly the same as the -- Exhibit 13, which is your body camera so --
A. Okay.
Q. And we are going to start at 24:40 and play it until 25:15.
(Excerpt of Defense Exhibit A2 played.)
BY MR. DECKENBACH:
Q. All right. Does that refresh your memory about your conversation with Trooper Martinez?
A. It does, sir.
Q. And Trooper Martinez suggests that there's shake in there?
A. He was -- when I asked him about that or when he had made the admission, I think he was referring to that "You're asking

me about was the shake on the floorboard?"
Q. And you respond when he says that "There is"? Do you remember saying that?
A. Yeah, after watching the video.
Q. Okay. And your -- in saying that, you're just kind of affirming his observation; is that right?
A. No. It's more of a -- asking if -- if that's what he's seeing.
Q. Okay. And then -- and, at that point, you don't ask Trooper Martinez to specifically point out the marijuana shake?
A. No, I don't.
Q. Okay. And nor do you make any effort to collect marijuana shake; is that correct?
A. That is correct.
Q. And, once you're back in your vehicle, you again ask Trooper Martinez to tell you where the shake was specifically at?
A. That is correct.
Q. And, in fact, it's you that suggests to him that it was possibly down on the passenger floorboards? That was your suggestion?
A. I suggested?
Q. Yes.
A. I was just confirming with that's where he -- he had

observed the shake in case I needed to call the county attorney or any other options, to confirm with what he saw.
Q. Yeah. And, after you suggested he saw it on the passenger floorboards, he agreed with that; is that correct?
A. I didn't suggest. I was just advising what he observed.
Q. Okay. You were advising him what he had observed?
A. Or confirming what he observed.
Q. And I want to touch briefly, then, also on your conversation with Mr. Ostertag.
You mentioned that he has -- that you perceived mood swings; is that correct?
A. That is correct.
Q. And, again, those mood swings or conversations are captured on your body camera, as far as you're concerned?
A. Yes, sir.
Q. Okay. And you testified that you were trained to complete roadside intoxication evaluations?
A. Yes, sir.
Q. And that's part of your job, is keeping our roads safe from drunk or intoxicated drivers?
A. That's -- that's correct.
Q. And to include from drivers under the influence of narcotics?
A. That is correct.
Q. But on this evening at no time did you run any of those

tests with Mr. Ostertag; is that correct?
A. That is correct.
Q. And you did spend time talking with the local DA about potential charges you could bring against Mr. Ostertag after discovering the firearm; correct?
A. That is correct.
Q. And at no time during that conversation do you suggest you could book him for driving under the influence?
A. I don't recall.
Q. And then you have testified here that Mr. Ostertag was profusely sweating; is that correct?
A. That is correct.
Q. And he even talked -- you talked to him about the fact that he was sweating; correct?
A. Yes. I was concerned that -- I didn't want to see him go into any type of medical emergency.
Q. And he shared with you that he was wearing multiple layers of leather, which made him hot; correct?
A. That's what he stated, yes.
Q. And he had also earlier told you that he had been coming from work in a kitchen; correct?
A. He said he was just leaving work, and he did advise that one of his duties at the TA travel stop was that he was a cook.
Q. I then want to pivot to the second stop that we saw video

from, and that was on December 10th. And, actually, let's put a pin in that for one second.

I noticed in that video we talked about lights that were on that night. Your squad car's lights were on behind Mr. Ostertag; correct?

A. Yes. My rear emergency lights, yes, sir.

Q. And your -- Trooper Martinez also had emergency lights that were on during this search; correct?

A. Yeah. I'm not sure if he had his front lights, but his rear I'm assuming probably were on.

Q. And the front lights can have blue and red lights flashing off intermittently; correct?

A. They can if activated.

Q. And that would be an additional source of light in these videos; correct?

A. Potentially.

Q. Okay. Thank you.

Let's pivot back real quick, then, to December 10th.

You -- a part of your job is to do drug interdiction stops on I-80; is that correct?

A. Yes.

Q. And that, again, is when you would stop someone for speeding or a traffic infraction and have a K-9 partner ready to be deployed during the traffic stop?

A. Not all the time. It's a lot -- most of the time it's

not a K-9 ready to be deployed. It's just through travel plans inconsistent, travel plans as well as body behavior, things in plain view.

But not all the times. It's just a matter of once you come in contact and you determine that someone is taking part in criminal activity that you have reasonable suspicion to believe.

Q. And when looking to do drug interdictions, sometimes you target out-of-state license plates? Is that fair to say?

A. No. I mean, it -- the majority of the individuals we come across, because we are on Interstate 80, are out of state because it is a -- a corridor, a travel corridor. But not particularly with -- do we target out-of-state vehicles.

Q. Okay. Well, on December 10th you pulled over that vehicle for speeding; is that correct?

A. Yes, sir.

Q. And Trooper Martinez was immediately on the scene; is that correct?

A. That is correct.

Q. And that wasn't based on you seeing something independent and calling him over? Is that fair to say?

A. Yeah. We were working together and doored up in the median when I observed the vehicle that you're referring to, the speeding violation.

Q. Okay. And, by the time he deploys his K-9, you are

already sitting in your squad car with the driver; is that correct?
A. Yes, sir.
Q. And Trooper Martinez then indicates that his dog has alerted to you while you're sitting in the car with the -- with the driver; is that right?
A. He advises over the radio, and I heard it over the radio that it was a positive alert.
Q. All right. And once you heard that on the radio, your training or at least your -- you're trained to do -- to try to get an admission from the driver about why there -- a narcotics dog would alert to his vehicle; is that right?
A. Not from my training but I like to know for my records, reports, or why the dog would alert because, living so close to states where marijuana is recreational or medical, we see it quite often where we see marijuana. So I like to ask them why the vehicle -- the dog would alert to the vehicle.
Q. And so you began questioning him, then -- this driver specifically in that video -- about his marijuana use for those reasons you just stated?
A. Not just those reasons. There's also the reason that I thought I -- originally, when I stopped the vehicle -- could have smelt the odor of marijuana, but I wasn't a hundred percent sure at the time, as well as when I brought him back to the patrol vehicle I could smell the odor, a hint of what

appeared to be, from my training and experience, marijuana on his person.
Q. Okay. And your training -- what does your training in regards to learning to identify the smell of marijuana involve?
A. Training is in the Wyoming Law Enforcement Academy or DCI agents bring in substances for us to observe and smell as well as personal experience. I mean, a lot of people in today's day and age knows what marijuana smells like. So from my personal experience as well as training and experience as a law enforcement officer.
Q. Okay. And it's after Trooper Martinez radioed that there was an alert that -- that's the first time you suggest the smell of marijuana might be on the driver's clothing; is that correct?
A. I can't recall. You'd have to play the video, but I thought I had advised the driver that maybe I could smell some weed on him prior to the alert.
Q. You also -- we saw a portion of the video where you step out of the vehicle and talk to Trooper Martinez. And you told him in that video that was played for you that you did not smell it in the car; is that correct?
A. Yeah. Upon contact at first, I wasn't a hundred percent sure if I could smell it or not. And then, after bringing the driver back as well as confirming -- another step with the dog

is at that point. We didn't actually a hundred percent until we got inside the vehicle, where I smelled the odor of marijuana.
Q. Okay. And so it was with K-9 Becky's alert that you felt more confident in regards to what you were smelling?
A. Yeah, for the -- for the search.
Q. Okay. And during your search you focused on a vape pen in the body camera as well as vape cartridges. Fair to say that at first you believed those to be marijuana products?
A. Yeah. Once we entered the vehicle, we could smell the marijuana, so immediately we saw the vape cartridges. But, after smelling them, I couldn't smell anything that appeared to be marijuana inside them.
Q. And, in fact, there was packaging in the vehicle for legal tobacco vape products; correct?
A. I can't recall but that could be correct.
Q. Okay. And, again, this might be captured on your body camera?
A. Yes, sir.
Q. Okay. And in the video you called yourself "Misdemeanor Bracken." Can you explain why?
A. Yeah. After reviewing my video -- working I-80, it does get overwhelming with the misdemeanor cases because Wyoming Highway Patrol requires a lot of paperwork. And it's a lot of work just for a misdemeanor. As a law enforcement officer,

it's no different; a big drug bust, especially a felony amount, is something to be proud of, to take drug smugglers and criminals off the street.

But, in that quote that you're referring to, it's just me kind of making a joke because I get tired of getting misdemeanor drug cases because that's a lot of work for the little amount of substance.

Q. Okay. And during this search you -- you moved to the back of the vehicle to search the contents of the truck; is that -- trunk -- is that correct? Or the hatchback?

A. That is correct.

Q. But you do not complete a full search of that area; is that correct?

A. That is correct.

Q. And -- because, at that point, you tell Trooper Martinez you're not too worried about what might be in the vehicle?

A. Yeah. From my training and experience with individuals, especially when they're coming from a state -- in Utah where they're allowed to use marijuana there as well as Colorado, it's uncommon on I-80 for somebody to bring a large amount of felony -- I'm not saying it can't happen, but a lot of times it's misdemeanor.

So, from my training and experience, you locate a lot of misdemeanor marijuana, especially from individuals from the state that they were living in -- where it's illegal here --

to the state of Wyoming.

So there's nothing that drew my attention as far as -- concerning as far as like a felony amount, so we completed the search and that was it.

Q. Okay. And then on January 14th -- I guess I'll go back to that.

At that point you weren't sure if there was a felony amount of marijuana in the car or not because you didn't fully search the vehicle? Is that fair to say?

A. To -- everything to eyes' view. I mean, there's -- I don't think I searched through every little item towards the end or I -- I can't recall what all items were in the trunk. But once I decided that there was probably no other substance in the vehicle, I stopped the search.

Q. All right. And then there's one other incident I want to touch on briefly with you.

On January 14th of -- of 2024, about nine days prior to stopping Mr. Ostertag, do you recall being involved in a stop where a jar of wax was discovered in a black backpack?

A. That's correct, sir.

Q. And this discovery was, again, predicated on a reported alert by K-9 Becky?

A. Yes.

Q. Okay. And it wasn't clear what this jar of wax was, and so it was brought back to the station; is that correct?

A. That is correct.
Q. And you were present with Trooper Martinez in setting up a test of sorts to see if it was, in fact, positive for THC; is that right?
A. Yeah, after -- and as well as his admission of receiving the substance from a marijuana dispensary in the state of Oregon.
Q. And so the -- you were present when the three boxes were set on the ground?
A. Yes, sir.
Q. And you set that up with Trooper Martinez?
A. I can't recall if I set it up. But I remember being present when it was -- when it took place, yes.
Q. And you left your body camera on for that?
A. I can't recall or not if I had, sir.
Q. Okay.
And then, finally, I just want to ask you some questions about Corey -- well, I guess two more topics. One is with -- regarding Mr. Cruz, Corey Cruz.
And you talked about your hunting trip. What year was that hunting trip?
A. I want to say it was in the fall of 2023, so September. I like to archery hunt. It was during archery season.
Q. And who were the individuals on that trip with you?
A. During the trip at that time where I observed them was

Ex-Colonel Kebin Haller as well as the deputy director -- he was the ex-deputy director of the Department of Criminal Investigations, as well.
Q. For DCI?
A. Yes, sir.
Q. All right.
And what -- it was archery season. So do you know about the month that was?
A. Yeah. Generally, archery season in Carbon County -- specifically the area we were hunting -- is in September.
Q. Okay. And at this time did you report -- write a report about your observations?
A. No. But I did call a Rawlins police K-9 sergeant, Sergeant Craig, and advised him what I observed, that there's a good chance that Mr. Cruz would be heading back towards Rawlins and that he had controlled substances on his person or inside his vehicle.
Q. And was a traffic stop effectuated based on your report?
A. For Mr. Cruz?
Q. Uh-huh.
A. There was never a report done. It was more of an off-duty tip, "Hey, this is what I observed," but there was never a report done, and there was not a traffic stop performed that night.
Q. And so you never had an opportunity to seize the contents

of the bag that you saw from some distance away; is that correct?
A. No. I was off duty on vacation, sir.
Q. Okay. And you do have the authority to arrest people when you're off duty and see them committing a crime; is that fair to say?
A. No, that's not fair to say.
Q. You don't have a -- the authority to make arrests off duty?
A. If it's life-threatening or property damage, a felony of property damage, exigent circumstances. But, no, I don't have the authority just to arrest somebody because I observed a violation of law off duty.
Q. And in regards to -- was that the only time that you saw what you thought was them -- Mr. Cruz specifically -- using illegal substances?
A. Yes.
Q. Okay. And in regards to the DFS case, you don't have any personal knowledge of whether they -- children were removed for alcohol use versus narcotics use?
A. No. Just through word of mouth and, also, Mr. Hailey's behavior -- Ms. Hailey's behavior -- what I observed as her neighbor is, from my training and experience, somebody to be under the influence. Unfortunately, like I said, it's kind of a conflict of interest. I don't like to involve myself too

much because they live right next door to me, because of retaliation, and I'd like to keep that professionalness -- or professional relationship, you know, because he is my neighbor.

Q. Okay. And, finally, I just want to talk to you about your past experiences that Ms. Hammer was asking you about.

There are times that you've been in the field where a K-9 is deployed and a search follows. I think you said -- how many times in your career?

A. I can't recall but I said approximately probably around a hundred throughout my whole career.

Q. And sometimes nothing is discovered after searches are conducted based on a K-9 alert; fair to say?

A. Sometimes that may occur.

Q. And in those instances you can't tell what the K-9 might have been alerting to? You can't always be certain what odor the dog alerted to?

A. No.

Q. Okay. And you can't tell maybe if it was a hemp product in the car? You're not sure what products are even made out of hemp in the car; is that fair to say?

A. It's -- I'm not a K-9 handler, so I don't have that type of training as far as the dog -- how that works as far as their alerts and what they're -- you know, I generally know what substances they are trained on, but I don't know as far

as the -- as the hemp goes for the most part.

Q. And -- I guess probably in the same vein, you're not trained on what prescribed medications might have methamphetamine or fentanyl in them? Is that fair to say?

A. I am aware of what -- certain medications might contain some of the same substances, methamphetamine. But as far as the actual substance and what it's made of, I -- you know, I . . .

MR. DECKENBACH: All right.

I have no further questions, Your Honor.

MS. HAMMER: We have no further questions, Your Honor. Thank you.

THE COURT: Mr. Bracken, you may step down.

Do you wish this officer to be released to his employment?

MS. HAMMER: Yes, please, Your Honor. Thank you.

THE COURT: You are released, sir.

MS. MARTENS: I think at this time, if Mr. Havice is in the Zoom waiting room, we can go right into -- I think Mr. Deckenbach was crossing him or -- I don't know if this is also perhaps a good time for a break.

THE COURT: Good time for a break. We'll stand in recess for 15 minutes.

THE COURTROOM DEPUTY: All rise.

(A recess was taken from 2:43 p.m. to 3:01 p.m.)

THE COURTROOM DEPUTY: All rise. Court is now in session.

THE COURT: Please be seated.

I'm not seeing Mr. Havice on my -- my screen at this point.

Good afternoon, Mr. Havice. This is Judge Johnson speaking.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: I want to remind you that you are still subject to the oath that you took when you came in last week.

THE WITNESS: Thank you, sir. I understand.

THE COURT: Actually, two weeks ago.

Mr. Deckenbach, you may continue.

MR. DECKENBACH: All right.

Good afternoon, Mr. Havice.

THE WITNESS: Good afternoon, sir.

**ROBERT HAVICE, GOVERNMENT'S WITNESS,**

**CROSS-EXAMINATION (Continued) BY MR. DECKENBACH:**

Q. I just want to briefly run through your understanding and see if you're -- you might agree with certain requirements in regards to training from your experience and your expertise. Okay?

A. Okay.

Q. Would you agree that a K-9 handler training program should be conducted using a structured curriculum? Do you think

that's a -- that's a -- something that should be required of K-9 detection training?

A. We don't -- we don't get involved in agencies, in how they run their different programs. We leave that up to individual agencies because they have different ideas on how they want to run them.

So, as an organization, we don't -- we don't get involved in that.

Q. As a vendor yourself, would you believe a structured curriculum should be required for anyone offering such types of training to agencies?

A. I guess I would ask what your opinion or definition would be of "a structured program," sir.

Q. Specific training and learning objections -- objectives -- outlined for the law enforcement agency.

A. I could speak to my business, and what I do is we have certain goals, and that's to get the dog to be able to get to a level where they can pass minimum standards where that they -- we know that the dog knows the odor that the agency wants it trained to detect, that the dog can go out and hunt independently to find that odor, and that the handler can recognize when that dog gives a -- is in odor and can give a final response and that the dog can search an area where there are no aids placed and will not give a final response.

So those are my basic objectives when I go into a

class. Each person that I train comes in with varying levels of experience. Sometimes they've handled two or three dogs, so it's going to be different on how I handle the class than someone that is brand-new and never handled a dog before.

Q. Thank you for that answer.

Would you agree that the training should also include focusing on -- on the environmental conditions and how they might impact a dog's ability to detect odor?

A. Yeah. Those are all basic parts of -- like when I'm talking about when you're handling a dog -- that you're -- you're going to cover with your student.

Q. And would you agree that the training should also cover how to reward a dog?

A. Well, again, that's pretty subjective. People have different views on how the dog should be rewarded and what you're even going to reward it with.

Q. And is there a consensus, at least, that you should only reward correct responses from your K-9?

A. Well, they have a -- there are people in the scientific world that will talk about paying your dog for hunt, so there are things in the industry where, after they get done hunting, if there's no finds, then they will do a reward.

And a reward comes in varying fashions. It doesn't mean you're going to give them a toy. Praising a dog and rubbing their head and telling them they're a good dog is a

form of praise, as well.
Q. Would you at least agree that rewarding a dog for incorrect responses is not something you want to train your handlers to do?
A. Giving them -- rewarding the dog for a -- like, say, a false positive, like where there is no odor present?
Q. Yes.
A. That is not something I would recommend. That's one of the reasons we have stayed away from the double-blind, is because that could happen quite often.
Q. Okay. And then do you -- is it your position and belief that education for K-9 handlers training should include training on cognitive bias?
A. And define your -- what you mean of -- by "cognitive bias" so that we're on the same page.
Q. Would you -- would you -- have you heard or would you understand cognitive bias to mean a set of influences that may affect the reliability and validity of one's observations and conclusions?
A. Yeah, that's -- that's kind of a broad definition. But more specifically?
Q. Do you involve any type of training when you're a vendor regarding cognitive bias in handlers?
A. Well, like I said, it can be dependent upon the training that you're providing for the person and their -- their

experience and what you're seeing in their dog.

As far as -- if you're getting to if I have a laid-out, structured curriculum, that is not something I do.

Q. Okay. And I think you've already testified just now that the training also should include a predetermined specific final response in regards to locating a trained odor. Is that correct?

A. Yeah. And it could be just about anything, as long as the handler understands what that is to recognize it.

Q. And it should be something that's identifiable and clear to an objective observer; is that correct?

A. Well, to the handler. It's -- the key is that the handler understands and can recognize it. The alert is -- is of stages. And the final response is the end. The dog goes through a series of behavior changes when it gets into odor, and you'll see those changes in the dog before it gives a final response.

Q. And so one level -- or one type of alert behavior could be an -- an increased level of excitement; is that correct?

A. It -- you would have to -- it wouldn't be just the increased level of excitement. I would be looking for other things that led up prior to that.

Q. And that's because dogs' alerting behavior can -- it's kind of a dog-by-dog experience; is that right?

A. It's not just that. It can be environment-by-environment.

Say if -- say if you taught a dog to sit for their reward and they're -- on the interior of a car. They may be working and not be able to sit or they may think they're sitting. Their -- their behind may be up against the back of the seat, and to them it feels like they are sitting, but, in fact, they're still standing.

So I'm going to look at the things that led up to that, prior to that, the behavior changes, the way they go to closed-mouth breathing and start using their olfactory system and bracketing, things like that, to go along with it.

Q. Okay. But, ultimately, a final indication, that is something that an objective observer could identify; is that fair to say?

A. Well, like I said, it would depend upon the observer and their experience and -- and them knowing the dog or what its final response may be. Not just an average person off the street, like when we give demos, is going to be able to observe a final response in -- in most dogs.

Q. So a sit might not always look like a sit, I think, is your testimony.

A. It can vary, yes, because the dog thinks it's sitting because it feels pressure up against its backside because it's in a confined area. But, yet, it's not; it's still standing.

Q. Okay. And a focused stare and sit, that -- would that be something some -- an objective observer would be able to see?

A. Again, it depends on the circumstances.

A dog is trained to go to source. We train them to get as close as they can. And, if they can't, it isn't always going to be just a straight, focused stare. Say if it's in an elevated location, high in a corner. Even a dog that sits generally, they will just sit there and bound at it because they're trying to get closer to it.

Q. Okay. And so sometimes I guess your testimony is, based on the environment and conditions, trained final indication is not always going to manifest.

A. It can't -- it can vary. It's -- it's just going to depend upon the situation and the search conditions. So that there is no hard, steadfast "It's going to be a hundred percent this every time."

Q. Okay. And of these topics that we're reviewing and that you go through and you offer training to law enforcement agencies, would you agree that failure to master these areas can lead to K-9 handler error?

A. Well, the thing about being a K-9 handler -- I did it for 25 years, and I don't know if I would ever say that I mastered it. That is your goal. But it's something you're always working on.

There's so many variables out there that are included in all the different search conditions, like we just discussed.

Q. All right. And so as -- perhaps in your experience -- at times are corrective action plans required in order to improve a K-9 handler or their dog's performance?

A. Sure.

If you're -- if you're doing -- if I'm doing training for a group of dogs and I'm seeing where a -- a K-9 team is struggling in a certain area, then there will be remedial training. You'll give suggestions to them to try to work whatever issues they may have. And sometimes those arise in people with 15 years of dog handling.

Q. Have you, in your experience, ever come across a perfect handler?

A. Absolutely not.

Q. Have you ever come across a perfect K-9?

A. Absolutely not.

Q. And then I just want to briefly talk to you about assessments.

I think you -- is it your belief that handlers and K-9s should continue to go -- be assessed on an ongoing basis?

A. Being assessed by who? Themselves or . . . coworkers? Or who are you talking about, sir?

Q. I guess any of those. And maybe you --

A. Well, generally, you have a training group and -- of varying levels. And my experience with my agency and what I tell agencies is there -- it's generally in law

enforcement -- your sergeant is your next level. And that they are involved with -- with that.

The problem being is the thing of -- in my experiences -- they usually don't have any K-9 experience. It's very rare where you have a supervisor that's a former handler. So the learning curve is extremely steep, and they usually promote or move to another area before they gather a lot of training.

So it's usually based off of going to conferences where -- they have working dog conferences and things like that.

Q. Okay. And so how ongoing assessments are executed, that's on each individual law enforcement agency?

A. It is. It's based on their training program, how they have it set up, and -- and -- and how they're going to continue that education.

And, again, it's also, in these days, based on funding.

Q. Okay. And I believe you were maybe asked -- I think -- I'm sorry; it's been two weeks here -- double-blind testing and why or if it should be used.

Do you understand that the -- the goal of double-blind testing is to avoid handlers accidentally cuing their dog? Do you understand -- is that your understanding of one reason for double-blind testing?

A. I understand that's one of the ideas behind it.
Q. Also, the goal of a double-blind test would be to keep the assessor from accidentally cuing a dog from looking at a certain place or how they're reacting to the dog's activity; correct?
A. Correct.
Q. And would you agree that cuing can occur subconsciously by a handler?
A. If -- it's hard for a handler to cue a dog if they don't know where the aid is at. And when they go into a double-blind test, they do not know where the aid is at.
Q. And if it's a test that they, themselves, have set up or are familiar with, would that then become more of a possibility since they would know where the finds are?
A. It would also depend on how they're working their dog, on lead, off lead. There are some other factors.
Q. And those factors exist because dogs, depending on where a handler is positioned, are very perceptive to human behavior; is that correct?
A. They can be. It's a generalization because, of course, every dog is different.
Q. Would it be fair to say that dogs are particularly familiar with their handlers as opposed to other people?
A. They are familiar with them because they're with them all the time.

My experience is, generally, they're -- you know, we're selecting hunting breeds with very high hunt drive, and they work very independently.

And they get out and they -- they -- they're just out hunting. They don't spend a lot of time looking back or paying attention to their handler, usually, until they -- they are at source. And then they'll pay more attention to them because they want to be rewarded.

Q. Okay. And I think you talked about your practice was staying behind your K-9. Is that correct?

A. I try to stay as far back as possible. When I'm doing a room, I'm going to come in the room and look for hazards -- because that's the only thing I'm really worried about with my dog, to make sure there's no open drugs that the dog could get into or any sharps or -- any hazards for the dog.

And then I'll come in and just cut the dog loose, offline, and let it hunt. And I just stand back at the door in the corner. That's how -- that's how I handle.

Q. And that helps -- and that way you're avoiding any possibility of inadvertently cuing the dog; is that right?

A. That could be one of the reasons. The other thing is it gives me better observation skills on the dog. When you're standing back, it's easier to watch the dog, read the dog, and just watch it work.

Q. And as far as how you're -- you work with the dog in that

manner, that -- that's not a principle or a requirement enshrined in your certification procedures; correct?

A. No, it's not. Everyone is allowed to -- to -- to search or hunt -- however you want to put it -- on their own, whatever -- whatever their style is. They can do it on a 6-foot lead; they can do it off lead; they can do it on a long line. It doesn't matter.

It's going to depend upon where you're searching. Obviously, if you're searching outside along a roadway or close to traffic, they're not going to be allowed offline.

Q. Okay. And another thing I want to touch on, in your direct testimony I believe you were talking with Ms. Martens about avoiding frustrating a dog.

Do you recall testifying about the ways you might frustrate a dog?

A. I don't remember what we were discussing when -- when we were discussing that.

Q. Specifically the need to know -- a dog needs to know they are getting the answer right -- and this is in regards to rewarding.

A dog needs to know they're getting the answer right so they can be immediately -- they should be immediately rewarded? Is that your testimony?

A. I do recall we were talking about double-blinds.

Q. Uh-huh. Yes.

A. Yes. Yes.
Q. And it's true you wouldn't want the handler to be rewarding the dog, though, when they are getting it wrong?
A. That's correct. You're reinforcing a bad behavior.
Q. And so double-blinds would only be effective if there was a way for the dog to be immediately rewarded or not rewarded based on the correct answer?
A. Well, not everybody rewards every time. They do variable-ratio rewards.
So a dog -- it depends on the dog team. A dog doesn't get a reward with every find, with every team. So if you have five finds, they -- they may only get rewarded once or twice or they may get rewarded all five. It's going to depend upon the dog team.
Q. And so there's no uniform way in which rewarding is employed as far as your certification standards are required? They don't require --
A. No, the --
Q. -- a certain rewarding method?
A. No. They -- they have to be audible to tell us that there was an alert and that they are -- that they are calling that alert verbally. And then they are given a -- a yes or a no. Okay?
Then it's their choice if they want to reward the dog. If it's a no, then the test is over because it's a

hundred percent test. If they are wrong.

But then you're not reinforcing that with a reward to reinforce. Then they can be -- it's easier to remediate that with the dog handler and to give them further training.

Q. And what steps does a handler have to take to assure they are not rewarding an incorrect behavior when employed in the field?

A. It goes to their training. They're going to be able to know -- they should -- as you work your dog longer, you become better at reading your dog. It takes a little time. It isn't something you just pick up after your basic class.

It's . . . you're going to get better reading your dog, like I say, with your experience.

Q. And so . . . in the field -- I guess I -- I'll ask the question again.

What -- what -- how would one handler assure they are not incorrectly rewarding a dog in the field?

A. Until they get to that point, most times -- there's a lot of agencies, they don't give rewards in the field if they don't -- if -- on live searches. That's up to the agency. But there are a lot of agencies that -- they don't reward their -- their dogs for finds in the field.

Q. Is it possible to enshrine bad habits in a dog by rewarding it indiscriminately?

A. In -- you mean just giving it rewards for just anything?

Q. Yes. If you reward a dog every deployment, could you be potentially enshrining bad habits in that dog?
A. Well, there are varying feelings on that, and people are going to have a lot of different feelings on if they will or if they will not. There's some folks out there that think that, if you do it every time, you know, the -- the dog gets its toy and you play with it and it wears it down. It makes it more tired because you're playing with it. So they -- you know, "good dog" and they move on; they go to the next -- next find.
If what you're saying is could you -- if -- if there's no odor there for the dog and you give it its reward? Is that what you're talking about, Counselor?
Q. Yes. Would that potentially enshrine bad habits in the dog?
A. It could.
Q. And then I just want to talk briefly about certification.
Would you agree with a standard that requires at least one certification or point -- component being a double-blind assessment?
I think I know your answer to that but --
A. Well, we have -- we have discussed it on the board, and it was a general consensus that we do not want to employ double-blinds for the reasons I've already explained.
Q. Okay. Thank you.

And then this final . . . one of the final topics here is from your training and experience as a vendor.

Training records. Do you believe the training records should always be maintained by supervisors? Or . . .

A. We don't get involved with that, how they deal with their training records. We let the agency come up with their own systems on how they do that. We just don't give guidance on that. We don't come in and micromanage agencies. That's not what our mission is.

Q. Fair enough.

And then, finally, in preparation for your testimony on this case over the last two weeks, did you review any videos of this K-9 and its handler's deployments?

A. I have.

Q. Okay. And did you deploy -- did you review their deployment records?

A. I did not.

Q. Did you review any of the officers' training records?

A. I have not seen those.

Q. Okay. And can you speak to -- with -- to the depth of training the specific handler, Trooper Martinez, received from Mr. Rispoli? Were you present for that?

A. I was not, sir.

MR. DECKENBACH: Okay. I have no further questions for this witness, Your Honor.

MS. MARTENS: Good afternoon, Mr. Havice. How are you today?

THE WITNESS: Good afternoon. Well. Thank you.

**REDIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. All right. So I'd like to ask you a few questions to follow up on what you discussed with Mr. Deckenbach, and I'm going to pick up pretty much right where we left off.

You said that a lot of agencies don't reward dogs in the field. Is that an area of disagreement among K-9 handlers and trainers?

A. It's -- it's a -- something that's discussed. Everyone has their own feelings on that.

It's not just -- it -- they do that in training, too. It isn't just in deployments. So you will see them do it in training, as well.

Q. But, at any rate, there's different ways to get it done?

A. Correct. Absolutely.

Q. And multiple ways are accepted?

A. It is.

Q. So two weeks ago you spoke with Mr. Deckenbach a little bit about the initial dog that you purchased through Mr. Ripsoli [sic], your training by Mary Ann Sampson, and it sounds like everybody knows everybody. Is that sort of a common thing?

A. In the -- in the K-9 world it is.

It's -- it's a pretty small group, relatively small group, and some we know better than others. But you -- you -- after a while you -- you get to know a lot of folks and most of them in the industry.

Q. Would you consider the K-9 handlers perhaps a subspecialty of law enforcement?

A. It is.

Q. And then do -- do -- those professional relationships, knowing each other through your work, even working with each other occasionally, do you -- or does IPCA feel like those sorts of professional relationships create conflicts of interest?

A. Conflicts of interest for --

Q. For certification.

A. -- like training?

Oh, for certification, no.

Q. Why not?

A. Just because we go off the SWGDOG guidelines, which, you know, states that they should not routinely be involved in the day-to-day training.

Q. Or have a monetary interest in the dog?

A. Correct.

Q. There was some discussion of the standards. Again, this would be calling back to two weeks ago, and Government's

Exhibit 2 was the version of the SWGDOG standards that I believe the IPCA was using. Is that correct?
A. That is correct.
Q. Are those standards revised?
A. The -- the -- our standards with IPCA?
Q. The SWGDOG standards.
A. They have been but not revised since the ones we're working off of.
Q. Right. So I guess what I'm driving at is, are you aware of whether there's more than one version of the SWGDOG standards?
A. There are.
Q. And the version that the IPCA is using is either the -- is it the most recent version?
A. It is the most recent version.
Q. Okay. Mr. Deckenbach asked you about legal marijuana in Oregon, and I want to ask you a little bit about your practical experience as a K-9 handler.
So, just to be clear, when you were talking about legal marijuana in Oregon is not PC for a traffic stop, you're not a lawyer?
Sir?
A. Correct. Correct.
Q. Never been a prosecutor?
A. No.

Q. So your answers are based on your practical experience, then?
A. Correct.
Q. What is that experience?
A. I've got just almost 32 years in law enforcement and 25 years as a K-9 handler. 2 years of that was a -- as a -- working as a patrol dog handler, finds persons and property, and then the other 23 years was working as a -- a narcotics-detection dog handler.
Q. And in that experience and especially since the legalization of marijuana, what have you seen in terms of your jurisdiction and prosecution on marijuana?
A. It -- the prosecution on marijuana is generally pretty much nonexistent in the state of Oregon on the -- especially on the State side. And very little to none on the Federal side that I'm aware of.
Q. So is it fair to say that there's just no interest in prosecution of marijuana, then, in your jurisdiction?
A. With the deputy district attorneys there's none. On the Federal side there is very little. It's generally large-scale import/export.
Q. And then, also, as a practical matter, with your experience as a dog handler, have you ever had a dog alert to a car and found legal hemp?
A. I have not.

Q. What about legal fentanyl?
A. No.
Q. What about some sort of legal methamphetamine derivative?
A. Like -- are you talking about like a pharma level, like amphetamine?
Q. Yeah. So I think -- and maybe you know more than me. But I think that there are certain mental health medications that maybe contain amphetamine derivatives.
A. Oh, no, I've never had an alert to that.
Q. A couple of weeks ago Mr. Deckenbach talked to you some about written curriculum, and I think he was sort of touching on that again today.
Do you know of any K-9 vendor that actually produces a written curriculum for their dog training program as in for the dog initially before they supply it?
A. I -- I'm not familiar if they do. I . . . not the ones that I work with or -- or are around. I don't know of anyone that's doing that.
Q. And then in the industry are you familiar with any sort of written curriculum that would pick up at the point where the dog is given to the handler, so for the dog-handler pair team?
A. Again, not that -- not that I'm aware of. There could be vendors out there that do but one -- I'm not aware of any.
Q. Is -- is it your experience, then, that the industry is just training to the test?

A. For the most part, yes. That's -- and everything else is pretty much left up to the agency on where they go with their program from there.

MS. MARTENS: May I have just a moment, Your Honor.

THE COURT: You may.

(Discussion held at counsel table.)

MS. MARTENS: I don't have any additional questions, Your Honor.

THE COURT: Thank you.

MR. DECKENBACH: Just two brief questions, Your Honor.

THE COURT: Proceed.

**RECROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. Mr. Havice, I just want to ask you about something Ms. Martens touched on.

With your K-9s do you teach them to decipher between the smell or the odor of legal fentanyl and illicit fentanyl?

A. When you're talking about pharma grade -- when you're talking legal fentanyl, you're talking about patches?

Q. That's an example, yeah, medications.

A. Okay. We do not expose them to prescription grade. The training that we'd received was that -- like say in -- in the patches, for instance, which has fentanyl in it. The amount that's in it is so minuscule that they told us to -- and the

way that it's sealed -- that your dog would never alert to it.

Again, handling those patches, the patches themselves are transdermally absorbed with the drug, so there's a lot of issues with safety there.

Q. And same thing with hemp. Is any of their -- is there any training for the dog to decipher between a legal amount of THC in a hemp product versus an illicit amount of THC?

A. No, sir, there is no training that I've done as far as hemp, which is a very low amount of THC, as you're aware, as opposed to -- because a lot of the stuff we were running into that were being sold as hemp or portrayed as hemp were not, indeed, hemp. It had higher levels, which made it marijuana.

Q. Okay. And the testing thresholds, what -- how many grams of the narcotic are used when testing a dog to be certified?

A. For IPCA it's a minimum of 20 grams.

Q. Okay. And that's a significant more -- or a -- a larger amount of weight than a small residual amount that might be in pharmaceutical medications?

A. Well, you can't quantify odor for a dog. It's like if you have a kilo of cocaine that comes across the border and you put a dog on it, you can't say there's a kilo of odor coming off of it. It could only be a residual amount because of the way it's packaged and they seal it so well.

So I can't -- I can't really tell you. I can't quantify odor, so I can't tell you how much odor is coming off

of -- of anything.

Q. So a dog might be able to pick up residual -- small amounts of odor from a sealed product? Is that what you're telling us?

A. They can. And it's going to depend upon the dog and its training and the size aids that they train with.

And for that reason -- and I do a lot of smaller amounts of training aids with -- with very small amounts of odor on them.

MR. DECKENBACH: Okay. Thank you.

THE WITNESS: Yes, sir.

MS. MARTENS: No further questions, Your Honor.

THE COURT: Mr. Havice, thank you. We'll let you go.

THE WITNESS: Thank you, Your Honor. All right, sir. Have a great day.

THE COURT: Thank you.

MS. MARTENS: At this point that's the conclusion of the Government's witnesses.

THE COURT: Very well.

MR. DECKENBACH: I'll consult my next witness quickly, Your Honor.

(Discussion held at counsel table.)

MR. DECKENBACH: Your Honor, at this time the defense would like to call Mr. Christopher Walsh, who is in the waiting room.

THE COURT: Very well.

Mr. Walsh, would you raise your right hand and be sworn. Thank you.

(Witness sworn.)

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record, please.

THE WITNESS: My name is Chris Walsh.

MR. DECKENBACH: May I, Your Honor.

THE COURT: Proceed.

MR. DECKENBACH: Good afternoon, Mr. Walsh. This is Jordan Deckenbach. I'm the defense attorney who's asked you to appear here today.

**CHRIS WALSH, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH**:

Q. Mr. Walsh, can you tell the Court what your current occupation is?

A. I'm currently retired and that's a recent event. I retired on January 3rd as the executive director of the Peace Officer Standards and Training Commission.

Q. And, prior to your retirement, how long did you work in law enforcement?

A. Since September of 1990 so almost 35 years.

Q. And what law enforcement agencies did you work with during that long career?

A. Starting in 1990 I worked with the Casper -- I started with the Casper Police Department, and I served there until my retirement in 2014, and I retired as the chief of the Casper Police Department at that time.

From there I went to what's called the Wyoming Gaming Commission now, was the Pari-Mutuel Commission at that time, then I was appointed to my position at POST.

Q. And tell us, how did you come to be appointed at POST?

A. I'm sorry. Could you repeat that, please?

Q. How did you come to be appointed at the Wyoming POST?

A. There had been a vacancy posted that I had -- I had seen listed and put in an application. I went through an interview process with the POST commission and then a background check with DCI and was ultimately selected.

Q. And what is the purpose of the Wyoming POST?

A. There's a couple facets to it.

It -- first of all, it's to ensure that anybody that comes into law enforcement -- it -- actually, POST has responsibility over multiple areas. So law enforcement, correctional officers, detention officers, coroners, and dispatchers.

So it -- the first thing we do when we get an application is make sure that they're being hired according to State statute, and then, later on, throughout their career, we ensure that they meet certain milestones, ongoing training

requirements, and meet time-of-service requirements in order to advance through the -- our certification steps.

And then the other aspect would be misconduct allegations or investigations across the state.

Q. Okay. And has the Wyoming POST promulgated rules that are published?

A. Yes, they are, and they're published on the website for POST.

Q. All right.

MR. DECKENBACH: And if I may, I'd like to show the witness what's been previously marked, Exhibit S.

(Discussion held at counsel table.)

MR. DECKENBACH: These don't display on the . . .

THE COURTROOM DEPUTY: You have to share through the Zoom.

MR. DECKENBACH: Oh, through the Zoom. I see.

THE COURTROOM DEPUTY: We can do it here so . . .

MR. DECKENBACH: Okay. And I'm not sure . . .

BY MR. DECKENBACH:

Q. Mr. Walsh, can you see a PDF that's been pulled up? Not yet?

A. There's no one projected on my screen. I can see a screen behind you, sir. That's a little bit difficult for me to make out the words on it.

Q. I'll ask you a question, then.

Is 2018 the last time that POST rules were promulgated?
A. Yes, they were.
Q. Okay. And is that about a 51-page document with different chapters and sections?
A. Yes, it is.
Q. Okay. And are there -- is there specifically a chapter, Chapter 10, on the minimum standards for schools and training programs?
A. That's correct.
Q. Is there also a Chapter 11 that specifically deals with minimum standards for instructors of such courses?
A. Yes, there is.
Q. Okay.

MR. DECKENBACH: I'm not sure if the Government's going to object, but I would move to enter Exhibit S, which is those 2018 POST rules.

MS. MARTENS: I have no objection.

THE COURT: It is received.

(Defense Exhibit S received into evidence.)

MR. DECKENBACH: Thank you.

And then -- I can just verbally go through this with him. If I can have the Zoom put back up on the screen, that would be great.

///

BY MR. DECKENBACH:

Q. And so looking at Chapter 10, Mr. Walsh, why is there standards for -- minimum standards for schools and training programs in the state of Wyoming?

A. And if it will help you out at all, I have these pulled up on my computer, as well. So you -- you're welcome to reference this section and that kind of thing, and I can see those.

But the -- the -- the rules for initial certification of schools and for mandatory courses would be for uniform -- for uniform training for the officers. So mandatory schools is going to be referencing more of a -- of a basic training program and the facilities they have. And then a commission-mandated basic training program, of course, is the -- is the same type.

The differentiation would be -- so basic training has to -- everybody has to go through basic training within the first year of their certification as far as a peace officer goes.

As far as -- mandated job training programs would be the training requirements based on the certification level. And then, within that group of training hours that has to be accomplished, there's certain specifics particularly to a peace officer called "perishable skills." Those include things like emergency driving, first aid, use of force, crisis

intervention techniques. It's typically skills that one would expect an officer to be able to call on immediately, just through recall, without having a reference book to go through.

So that's the -- kind of the differentiation we're talking about there.

Q. Okay. And then in Chapter 10, Section 4, it talks about accreditation for in-service training programs. What type of programs does that address?

A. That is an extremely wide range of training, so that would include the ongoing trainings that officers go through that their agencies would select for them. And then provide that to POST to ensure that they maintain their certification.

So to . . . I guess, to make it easiest, we'll go to the professional level of a peace officer. Every two years they have to have 40 hours of ongoing training, and 10 of that has to be perishable skills.

So I addressed perishable skills briefly. So you've got 30 hours of general police training. That would be that in-service training, and that could be anything from departmental policies to report writing, anything that would pertain to the officer doing their job.

Q. And as a part of Section 4's requirement, it states "Accreditation requests for training shall include an outline of the course, which includes content of the course and a breakdown of hours of instructions for the course."

Why is that required?
A. That's so that we know that, when we're handing out credit, that we are providing credit for an actual training course, not . . . to make sure that the name of the course and that the description of what the course provides actually has an outline and that it's being taught according to that. And then, of course, you'd referenced earlier Chapter 11 that was being trained by instructors that are qualified to do so.
Q. Okay. And I -- and I'd like to briefly touch on Chapter 11, then.
Why do you have minimal -- minimum standards for instructors?
A. Primarily so that -- we try and ensure that the training that the officer's credited for through their POST record is put on by people that have a background in it and know what they're talking about and are skilled in that area.
Q. Okay. And how would one apply to become certified by Wyoming POST as an instructor?
A. Well, there's multiple ways to do it.
The most common way would be an individual that works for an agency that would be an expert in a certain area of police work. They would submit, you know, a CV or a résumé spelling out their background and their training abilities, their specialty schools they would demonstrate that they'd been to a -- an instructor-level course in that particular

area, and then, within at least two years of that initial application, they would provide proof that they'd gone to an instructor development-type course.

Q. Okay.

MR. DECKENBACH: Okay. Mr. Walsh, thank you very much. I have no further questions for you.

THE COURT: Mr. Walsh, the next person who will be speaking to you is Christyne Martens, who is an Assistant United States Attorney.

MS. MARTENS: Good afternoon, Mr. Walsh. How are you?

THE WITNESS: Good afternoon. I'm doing well. Thank you.

MS. MARTENS: Good. And, just to be clear, I think we actually had a phone call before today's hearing.

THE WITNESS: Yes, we did.

MS. MARTENS: All right.

**CROSS-EXAMINATION**

**BY MS. MARTENS:**

Q. So I just wanted to ask a couple of follow-on questions.

So when it comes to designing the courses themselves or ensuring the content, is that something that POST does, or does POST work with other sources for that?

A. POST does not design the course conduct -- or -- or the course content. Those are designed by either an agency or an

instructor or collectively through an agency set of instructors or through a third-party vendor that provides training for police training.

Q. Does the Wyoming POST have any standards specific to police K-9s of any form?

A. No, ma'am, they do not.

Q. Now, you talked with Mr. Deckenbach about there's a 40-hour minimum, I think it was, for officers every year.

A. In that professional peace officer standard, yes.

Q. Now, is that a minimum or a . . . I guess -- well, I'll try and not make -- ask you a compound question. My brain and my mouth are not going at the same speed.

So is that 40 hours a minimum?

A. Yes, it is. It's minimum.

Q. Does a peace officer get much of anything for exceeding the minimum?

A. No, not as far as the State requirements on certification go.

Q. Maybe just the extra courses reflected on their transcript?

A. That's all it would be. So they -- they can access a POST transcript. If they want to apply all training that they've received, it's all in one location. But what we focus on is those minimum training hours in order to maintain the certifications.

Q. So if an officer does training above and beyond that 40-hour minimum, is there any requirement for them to report it to POST?

A. No, there is not.

Q. And does reporting to POST affect anything about the quality or content of training?

A. I would say that much of it does not. I -- I don't know what it all is.

Q. Yeah. And maybe -- your face said maybe that was a bad question so . . . I guess my question is -- is -- say an officer has met their 40 hours, they take another class, and they decide not to apply for credit.

Does that give you any reason to doubt the quality of that class that they took?

A. No, ma'am, it doesn't. In fact, I -- to give you an example, oftentimes we'll have officers from different -- different states apply for and get certified here in the state of Wyoming. It's not uncommon for a lot of states to only record through their state POST those required trainings, and then I'll get a secondary transcript from the agency that will have much more additional training. And then we'll accept all of those that -- for reciprocity.

Q. Does the same go for instructors?

So if an instructor is giving a course and they don't decide to apply to be an instructor recognized by POST, does

that have anything to do with the quality of their instruction?
A. That one's difficult to say.
But we -- if we're taking reciprocity, for example, we'll accept that training. And then the agency will bear the responsibility of proving that the individual was capable of putting on a class.
Q. And so, unless somebody actually applies, you wouldn't be able to say anything about the quality of training that they were provided?
A. No, I would not.
MS. MARTENS: Okay.
That's all I have, Your Honor.
THE COURT: Thank you.
MR. DECKENBACH: Just one question, Your Honor, on redirect.
THE COURT: You may follow up.

**REDIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Mr. Walsh, just on the reciprocity -- reciprocity -- thank you. Sorry. My brain's not working well this afternoon, either.
That's -- that training that would come in and receive credit is training that's been already recorded by that law enforcement's POST office in the other jurisdiction;

correct?
A. No, sir, not always. Some . . . a lot of jurisdictions in different states will only record those -- those required trainings that each state has in order to maintain certification. So we'll also receive a training transcript -- I'm sorry -- from the agency itself. So we can receive two separate documents outlining training.
Q. Okay. And whether that -- that training is certified by a separate state's POST is not always the case? Is that what you're saying?
A. Correct. The other states haven't logged it into their training record, but the agency has documented it as agency-approved training.
Q. Okay. And in regards to being able to verify a training or trainer is qualified and the training is adequate, you're only able to make that assessment when they apply for credit to your organization -- or your former organization -- correct?
A. That's correct, sir.
MR. DECKENBACH: No further questions, Your Honor.
MS. MARTENS: I have no follow-up, Your Honor. Thank you.
THE COURT: Mr. Walsh, thank you for appearing this afternoon.
THE WITNESS: Thank you, Your Honor.

MR. DECKENBACH: May I have one more moment to see if someone else is available on Zoom here.

(Discussion held at counsel table.)

MR. DECKENBACH: Your Honor, at this time we'll go with an in-person witness, and I would call Loana Dominguez to the stand.

(Witness sworn.)

THE WITNESS: I do.

THE COURT: Please be seated.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Sure. My first name is Loana, L-o-a-n-a -- sorry. Is it really loud?

How about now?

My last name is Dominguez, D-o-m-i-n-g-u-e-z.

THE COURT: Proceed.

**LOANA DOMINGUEZ, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Ms. Dominguez, what is your current occupation?

A. I'm an investigator.

Q. Who are you an investigator for?

A. The Federal Public Defender here in Wyoming.

Q. And how long have you been a -- an investigator for the Federal Public Defender's office?

A. Here in Wyoming about 7 1/2 years and, before that, in

San Francisco for about 2 years.
Q. And did you work as an investigator prior to your time in the San Francisco Federal Defender office?
A. Yes. I worked as an investigator at the Habeas Corpus Resource Center, which is a postconviction death penalty agency in California.
Q. And in your time as an investigator, have you gained experience in interviewing individuals?
A. Yes.
Q. And do you have experience in writing reports?
A. Yes, I do.
Q. I -- as part of your investigation into this case, did you speak with anyone from Mr. Ostertag's previous workplace?
A. Yes, I did.
Q. And who did you speak with?
A. I spoke to a woman named Ashley Moses.
Q. All right. And who is Miss Moses?
A. She was an employee at the TA there in Rawlins, Wyoming.
Q. All right. And did you learn anything from Miss Moses regarding this case?
A. Yes.
Q. What did you learn?
A. She said that Mr. Ostertag had come by the TA the evening that he was pulled over by Trooper Bracken.
Q. And did she explain the circumstances in which he came to

the TA that evening?
A. Yes, she did.
Q. Can you please describe what she told you to the Court?
A. So she had an employee that was working the kitchen there. And I guess he was trying to leave early or shut down the kitchen early. So she called George Ostertag to come down and try to get the employee to work.
Q. And did she indicate whether that was -- she was successful in that attempt to get that to work?
A. Yes.
Q. And what did she describe as happening?
A. She said Mr. Ostertag came down there and he specifically ordered chicken fingers so that the employee would turn the fryer back on there at the TA.
Q. And was she able to identify the time frame in which this occurred? In regards to -- in relation to Mr. -- the night Mr. Ostertag was arrested.
A. Yes. She said she knew that it was the evening that he had been arrested.
Q. Okay. And that was on January 24th of 2024?
A. Correct.
Q. Okay. And did you write a report regarding this conversation with Ms. Moses?
A. Yes, I did.
MR. DECKENBACH: I'll show the Court what's

Exhibit N.

BY MR. DECKENBACH:

Q. Is this the report that you authored just capturing what she had observed that evening?

A. That is it.

MR. DECKENBACH: Your Honor, I'd move to admit Exhibit N.

MS. HAMMER: No objection.

THE COURT: It is received.

(Defense Exhibit N received into evidence.)

MR. DECKENBACH: Okay.

BY MR. DECKENBACH:

Q. As part of your -- we can take that down now.

As part . . . as part of this case, did you have an opportunity to inspect Mr. Ostertag's vehicle?

A. Yes, I did.

Q. Okay. And when did that occur?

A. August 2nd, 2024.

Q. And where did you find Mr. Ostertag's vehicle on that date?

A. In Rawlins, Wyoming.

Q. In what condition did you find the interior of the vehicle?

A. It was pretty dirty.

Q. And what types of items did you find in that vehicle?

A. Like old candy wrappers, empty soda bottles, empty water bottles, clothing, trash. Just, you know, a lot of . . . stuff.
Q. And was there any indication that the vehicle had been cleaned recently?
A. No.
Q. What indications -- what indicated to you that the vehicle had not been cleaned?
A. Well, there was a lot of trash that hadn't been cleaned but, also, some older documents that kind of indicated they had been there for a while.
Q. What type of documents?
A. Like we found a Walmart receipt from 2019, a double-ARP envelope from 2022, a Circuit Court document there in Carbon County from 2023, like end of 2023. So documents that had been there for a while.
Q. Okay. And did you find any type of food items that indicated they had been there for a while?
A. Yes. I found some old Taco Bell.
Q. Okay. What indicated to you that this Taco Bell item -- what was it, a wrapper or what was --
A. Yeah, there was -- it was, you know, what they wrapped their food in.
Q. What indicated to you that that had been there for a while?

A. There were dead maggots on it.
Q. Okay. And, in your experience, are you familiar with marijuana?
A. Yes.
Q. And are you familiar with marijuana shake?
A. Yes.
Q. Were you looking for marijuana shake on -- when inspecting the floorboards of Mr. Ostertag's vehicle?
A. I was.
Q. And did you see anything that appeared to be dried-out, old marijuana shake?
A. No.
Q. What did you observe in the floorboards?
A. Gravel, dirt, pine needles, twigs, you know, outside yard stuff, that -- that sort of thing.
Q. And we saw -- during the break were you able to look at a still from the body camera of Trooper Bracken which he says he identified marijuana shake in?
A. I wasn't able to look at a still. I mean, I saw it up here when we pulled it up on the computer here for Trooper Bracken, but I didn't look further and inspect that.
Q. Was the size of what he identified in there consistent with the size of other dirt and items seen on the floorboards of Mr. Ostertag's car upon your inspection?
A. Yes.

Q. And did you take some pictures -- oh, I -- actually, before we get into that, did you also look at the exterior of Mr. Ostertag's vehicle?
A. I did.
Q. Okay. And, prior to doing so, did you have an opportunity to view video of the K-9 deployment on January 24th of 2024?
A. Yes.
Q. And in that video were you able to observe an area on which K-9 Becky was jumping on the passenger-side door?
A. Yes.
Q. Did you inspect the passenger-side door of Mr. Ostertag's vehicle?
A. Yes.
Q. And in that same area did you observe anything?
A. Yes.
Q. What did you observe?
A. What could be claw marks from an animal or dog.
Q. All right. And what --
A. Scratches.
Q. Were these scratches in the paint?
A. Yes.
Q. How would you describe them?
A. They were pretty surface level. You know, vertical lines that were somewhat apart from one another.
Q. All right. And did you take pictures of -- of this area

of the vehicle?
A. Yes.
Q. Did you also take pictures of the interior of the vehicle?
A. Yes.
MR. DECKENBACH: At this time I would like to pull up Exhibit -- what's been previously marked as Exhibit T1.
BY MR. DECKENBACH:
Q. Do you recognize this picture?
A. Yes.
Q. And what is this a picture of?
A. It's a picture of the passenger door on Mr. Ostertag's red Pontiac.
Q. Okay. And what are those . . . where on this picture, if anywhere, do you identify light scratches?
A. I can circle this; correct?
Q. If you would circle them.
A. Yeah.
Q. Okay. And are -- were you able -- did these scratches appear different in person? Or does this accurately kind of reflect --
A. This is more or less what the scratches appeared to look like. I would say it was pretty sunny that day so . . . you know, the glare coming off the camera maybe doesn't illuminate them as well as my -- with some different lighting. But this is pretty accurate.

MR. DECKENBACH: I move to enter Exhibit T1 into the record.

MS. HAMMER: No objection.

BY MR. DECKENBACH:

Q. And then I will --

THE COURT: T1 is received.

(Defense Exhibit T1 received into evidence.)

MR. DECKENBACH: Thank you, Your Honor.

I'd move to Exhibit T2. I don't know if there's a way to make that circle disappear. Maybe it's appropriate.

BY MR. DECKENBACH:

Q. And is this another picture of the door?

A. Yes.

MR. DECKENBACH: I'd move to enter Exhibit T2.

MS. HAMMER: No objection.

THE COURT: It's received.

(Defense Exhibit T2 received into evidence.)

MR. DECKENBACH: Let's move to what's been previously marked T3.

BY MR. DECKENBACH:

Q. And is this -- what is this a picture of?

A. It's a picture of the door.

Q. Okay. And, again, are there light scratches kind of starting at the top and moving down to the bottom of the door?

A. Yes.

MR. DECKENBACH: I'd move to enter Exhibit T3.

MS. HAMMER: No objection.

THE COURT: Received.

(Defense Exhibit T3 received into evidence.)

MR. DECKENBACH: And maybe I could just preemptively move to enter Exhibits T4 through T12. I believe the Government's seen them already.

MS. HAMMER: We've seen them. No objection.

THE COURT: Okay. T4 through T12 are received.

(Defense Exhibits T4 through T12 received into evidence.)

BY MR. DECKENBACH:

Q. Okay. So let's go down to T4, please. What is this a picture of?

A. Yes, sir. This is the passenger's floorboard in that vehicle.

Q. Okay. All right.

And is this some of the trash that you previously described?

A. Yes.

MR. DECKENBACH: And if we could zoom in to some of the debris at the bottom of the page, towards -- or the . . . okay.

And if we could zoom in just a little more to the debris.

///

BY MR. DECKENBACH:
Q. Okay. Is this -- at the bottom of this zoom-in, what do you see in this picture?
A. Empty water bottles, a pop bottle, Gatorade bottle, Reese's Peanut Butter Cup package that's empty, just trash.
Q. And did you look closely at the gravel and dirt that appears towards the bottom of the picture?
A. Yes.
Q. Did you remove this trash at any point to look closely at all the floorboards?
A. Yes.
Q. And did it all consistently look like the dirt and debris that we see in this picture currently?
A. Yes.
Q. And, again, did any of that look like marijuana shake?
A. No.
Q. And we'll go to the next picture.
And did you see anything that appeared to be residue on any of the items in this picture, to include the center console?
A. No.
Q. Did you see any marijuana shake in the center console?
A. No.
Q. All right.
MR. DECKENBACH: Go to T6.

BY MR. DECKENBACH:
Q. What is this a picture of?
A. This is the back seat, taken from the passenger side.
Q. And did you again search the -- underneath this trash to look at the floorboards?
A. Yes.
Q. And did you observe there to be anything remotely appearing to be marijuana shake?
A. No.
MR. DECKENBACH: Go to T7.
BY MR. DECKENBACH:
Q. And this is the passenger -- or what is this?
A. It's the driver's floor area.
Q. Okay. And looking through this area, did you see anything that appeared to be marijuana shake?
A. No.
MR. DECKENBACH: If we go down to T8.
BY MR. DECKENBACH:
Q. And then, again, what is this?
A. This is the back driver's side seat.
Q. And did you search the floor areas for anything that resembled marijuana shake?
A. Yes.
Q. And did you find anything that resembled marijuana shake?
A. No, I did not.

Q. Okay.

MR. DECKENBACH: If we could go to 9.

BY MR. DECKENBACH:

Q. What is this a picture of?

A. This is a double-ARP envelope.

Q. Where did you find this?

A. In the vehicle.

Q. And what year did it appear to be from?

A. 2022.

MR. DECKENBACH: And if we go to the next picture.

BY MR. DECKENBACH:

Q. What is this a picture of?

A. This is an old Walmart receipt. Excuse me.

MR. DECKENBACH: And if we could zoom in.

BY MR. DECKENBACH:

Q. Next to the -- right above the QR code, what date do you see on that receipt?

A. July 30th of 2019.

Q. Okay. And was this found in the vehicle?

A. Yes.

Q. On the floor?

A. Yes.

Q. Okay.

MR. DECKENBACH: And if we go to the -- the T11.

///

BY MR. DECKENBACH:
Q. And this is the same receipt, just zoomed in?
A. Yeah.
MR. DECKENBACH: And then if we go to T12.
BY MR. DECKENBACH:
Q. And what is this?
A. This is a -- so the Circuit Court of the Second Judicial District issued this to Mr. Ostertag. I think it's just an advice that tells him his wages was garnished -- were garnished. Excuse me.
Q. Okay. And what is the due date of this notice to him? Or -- I'm sorry -- the date.
A. Well, the date is --
Q. I'm sorry. The date.
A. -- December 5th, 2023.
Q. And is that just a little -- six weeks prior to the stop in this case?
A. Right.
Q. And was this found on the floor of his vehicle?
A. Yes.
Q. Okay. Thank you.
MR. DECKENBACH: We can take the exhibits down now.
BY MR. DECKENBACH:
Q. You just heard from Mr. Walsh. Had you talked to Mr. Walsh prior -- as part of your investigation?

A. I did.
Q. Did you also speak with anyone associated with the California POST?
A. I did.
Q. And what was that individual's name?
A. Bruce Praet.
Q. And who is Bruce Praet?
A. He is a lawyer, and he has consulted pretty extensively with California POST about their narcotic-detection K-9 standards.
Q. Okay. And was he able to direct you to the current California POST standards in regards to K-9 certification?
A. Yes. It's a manual that's publicly available online.
Q. Okay. And did he point you to that online manual?
A. Yes.
Q. Was he also able to confirm that that manual was the current guidance from the California POST?
A. At the time I spoke to him, it was.

MR. DECKENBACH: I'd ask that we pull up what's been previously marked Exhibit O.

BY MR. DECKENBACH:
Q. Is this the PDF that Mr. Praet directed you to that's on the publicly facing California POST website?
A. Correct.
Q. And were you --

MR. DECKENBACH: At this time I would move to admit Exhibit O into the record.

MS. HAMMER: We would object, Your Honor.

Ms. Dominguez has not actively worked with this document, is not part of its creation, and I don't know that she would be the proper foundational witness for it even in a motions hearing.

MR. DECKENBACH: Your Honor, I . . . they can argue to the weight that it should be given, but she testified that she was directed by someone from the California POST to pull this off their public-facing website where it's still hung today. So I don't believe the Government's . . . accusing Ms. Dominguez of fabricating this document.

THE COURT: I don't think it's Ms. Dominguez at all. I don't know who Mr. Krep is.

I'm going to overrule the objection and allow it in. I don't know what California's issue is.

(Defense Exhibit O received into evidence.)

BY MR. DECKENBACH:

Q. And, Ms. Dominguez, we'll just quickly go to -- according to this document and Mr. Praet, who helps prom- -- you testified helps promulgate these rules --

MS. HAMMER: Your Honor, at this point -- I apologize for objecting before the full question is out.

But this is, I guess, our exact concern, is that

Mr. Praet isn't here to testify, and Ms. Dominguez is testifying about what he has told her about this document. And so if we want to get into what Mr. Praet said, then he should be present as a witness.

MR. DECKENBACH: Your Honor, hearsay's allowed at these hearings. They have a written summation of what Mr. Praet has said.

I'm not asking her to speak as an expert to any of these issues, just he said "Look at this page for required courses attended, look at this page regarding like avoiding conflicts of interest."

I'm not going to have Ms. Dominguez speak to how those rules came to be established or why they are what they are, just where they were pointed to in this document by Mr. Praet.

THE COURT: I think the document says what it says.

MS. HAMMER: Fair enough, Your Honor.

THE COURT: Sustained.

MR. DECKENBACH: Okay.

All right, Ms. Dominguez.

And we can take this exhibit down, then.

BY MR. DECKENBACH:

Q. Did you make a records request from California POST in regards to Mark Rispoli?

A. Yes, I did.

Q. And did those records reflect that Mr. Rispoli had taken an evaluator's course through the California POST?
A. They did not.
Q. All right.
And then I want to talk about generally -- in this investigation did you speak to witnesses who had previously talked to Makor K-9 -- or had involvement with Mr. -- Makor K-9 or Mr. Rispoli?
A. I'm sorry. Can you rephrase that question?
Q. Yes.
As part of your background investigation, have you spoken to any witnesses who have professionally worked with Makor K-9 and specifically Mark Rispoli?
A. I have.
Q. And were one of those conversations with a man named Matt Moonin?
A. It was.
MS. HAMMER: Your Honor, at this point I would object to the -- continuing this line of questioning for the same reason, that Ms. Dominguez will be testifying about what other people have said, we don't have the option to be able to cross-examine those people to get more information about what they may be saying.
Ultimately, we've allowed the testimony regarding the TA employee because what she had to say we don't have any

cross-examination on, but, in terms of Mr. Moonin or anyone else that Ms. Dominguez has talked to as part of this investigation, her testifying about what they've said does not give us the opportunity to cross-examine those people. We can only cross-examine Ms. Dominguez about what she learned from them.

And, ultimately, if Mr. Deckenbach wanted to have those people come in and testify, then he should have had them come in and not be testifying through Ms. Dominguez.

MR. DECKENBACH: Your Honor, the Government does not have a constitutional right to confrontation of these witnesses. They've had summations of these witnesses' statements for a very long time. They maybe have talked to these individuals. I don't know. I would think they would. We provided their phone numbers.

And, again, they've elicited testimony at a suppression hearing from law enforcement agents about what people are saying in the community about Mr. Ostertag or about Mr. Cruz. It's all -- hearsay's allowed at these hearings. You give it the weight that you give it, Your Honor.

And these witnesses are former law enforcement officers who were happy to speak to us about their Makor K-9 encounters and their opinions but were not willing to testify, as former law enforcement officers, on behalf of the defense, regardless of the merits of our case.

And so they had the opportunity to speak with these individuals, to call them themselves if they wanted to. Again, they know exactly what the heart of this testimony is going to be. It's not expansive.

It helps the Court also inform why we're challenging what we are and how we got to be where we are in regards to the testimony that's already been elicited in this case.

MS. HAMMER: The relevance . . .

(Discussion held at counsel table.)

MS. HAMMER: The relevance here is attacking the certification, not necessarily the underlying training. And the fact that people may have negative feelings about Makor K-9 and the dogs that they train really isn't relevant to this Court's determination of whether or not the dog in practice or in training with this handler are reliable and credible.

And the fact that other people have disagreements with Makor K-9 are not really relevant to what we're here to do today -- or I guess over the past three days.

THE COURT: I'll sustain the objection.

MR. DECKENBACH: And so just -- Your Honor, what is the scope of your sustaining that in regards to what she can testify to?

THE COURT: It's pure hearsay when she's -- she is offering the sworn truth of the testimony that she had

obtained from others and is denying any opportunity for any cross-examination of those witnesses.

MR. DECKENBACH: All right. Well, Your Honor, again, I'd just -- can I make a proffer that won't go to your determination, then?

THE COURT: Surely.

MR. DECKENBACH: Your Honor, again, we wouldn't testify to the truth of those -- these witnesses because only they would have to do that under sworn testimony.

Of course, the Government could have called them here as witnesses to impeach Ms. Dominguez's statements. But, again, Mr. Moonin, for the record -- for the purpose of the record, as a proffer of what he would -- she would have testified to his statements with him, that he was aware that Makor K-9 was -- had a scheme in which they would certify their dogs through CNCA and that the people that were certifying these dogs were the same people who worked with the vendor and there was a conflict of interest that resulted in dogs being deployed in Nevada through inadvertent or direct -- or -- or purposeful cuing, resulted in many unconstitutional searches.

She would also have been testifying to what Bob Eden told us, who is a vendor out of Canada, who does international trainings and that he worked with Mr. Rispoli at these events, hired him as a trainer but eventually had to stop working with

Mr. Rispoli because he was unethical and that he was also engaging in a certification process where he would bring people known to him to certify the dogs that he was selling as a vendor.

Finally, she would also -- was going to speak regarding her investigation and conversations with Dr. Lisa Lit. Dr. Lisa Lit was the author of that study that you referenced already that was submitted to the Court regarding the double-blind testing where handlers were told, "Hey, there's going to be a find there" and the dog alerted there, no narcotics was used.

Dr. Lit told Ms. Dominguez that she was actually interested at one time in being a witness at this case as an expert but was ultimately intimidated due to the fact that CNCA has identified her at their conferences on a blacklist of people who should not be dealt with, and, in fact, Mark Rispoli tried to intimidate her after her study came out. And so that she ultimately was averse to coming here because she didn't want to bring up that old history.

And then, finally, I guess we can -- well, I don't know if you're going to object to our -- her conversations with Mr. Rispoli himself in regards to the subpoena of this Court, so I don't --

THE COURT: Go ahead. Make your offer of proof.

MS. MARTENS: May I suggest for your offer of proof

that you just submit memos.

MR. DECKENBACH: I can also submit the memorandums, but I don't know if you want them -- how those should go into the record.

I guess the only other witness would be the conversation she had with Green River Captain Halter, who -- he told us about how they previously worked with Mark Rispoli; however, he didn't give them written materials, and so they finally moved off to a vendor who would provide them actual curriculum that they could refer back to.

And then, finally, her conversation with Mark Rispoli -- which, again, I don't know if they're objecting to. But he just confirmed, after he was served a subpoena, that there was no written materials to be turned over, that he didn't utilize a syllabus or written materials outside of what IPCA has, that three-page document already in evidence.

And so I don't know if that last piece I might be able to inquire about just regarding the subpoena service and what he told her, that there was nothing responsive to it.

MS. HAMMER: That last part is fine. Everything else we would object to.

MR. DECKENBACH: So, Your Honor, I do have some written summations that I can submit to the Court, maybe separate, that are just as a -- the offer of proof. And I don't know how the Court would propose I submit those to the

Court.

MS. MARTENS: If I may, Your Honor.

I would submit that we could just take those written memos, and I trust the Court to take them and exclude them from its decision-making. But that, I think, makes a good record of what Ms. Dominguez may have testified to if the Court had allowed it.

And then, in terms of just sort of fleshing out the record as to the nature of our objection, part of our concern is Mr. Deckenbach suggested that some of those memos reflect that folks were willing to say things but weren't willing to testify to those things. So that certainly raised a reliability question in terms of the Government, which was part of why we would object with that -- those hearsay concerns.

And then some digging on some of these folks -- for example, Mr. Moonin was part of a lawsuit against Mr. Ripsoli, but he ultimately dismissed his claims against Mr. Ripsoli, and the only thing that ever came out of that litigation was actually a free-speech claim against his department. So he dismissed all of the Makor K-9 defendants out of that lawsuit without ever having any kind of finding of any kind of wrongdoing.

So we think that it absolutely would have been essential for the statements to be subject to cross-

examination to deal with their reliability.

MR. DECKENBACH: And, Your Honor, just in regards to any hesitance to testify by any of these witnesses, it wasn't because they were afraid of being subject to cross-examination. They routinely said they're all former law enforcement and they don't cross the line by testifying for the defense.

That's why this whole dog issue is hard to litigate, because there's like the thin blue line that people don't cross in regards to really getting at the root of what is a bona fide certification group and what isn't. And our hands are tied, but we've done our due diligence to dig and talk to these folks, and the Government has the power to subpoena them here and impeach Ms. Dominguez if she's improperly reflecting their comments.

With that said, though, you have ruled, Your Honor, so I'll -- should I hand these to the clerk, these documents?

THE COURT: Yes. We'll put those in a nice manila envelope, and we'll seal that envelope and make it part of the record.

I would say at this -- you know, this whole area is kind of the heart of the defense allegations concerning Rispoli's dogs and their training. You have to remember this dog . . . was in service for -- at the time this occurred -- since 2018. So a lengthy period of -- of service and reliance

upon the work that this dog was performing.

And it had 16 hours of training each month plus, under Wyoming standards, certification that went -- was ongoing. This looks back to the time that the original training occurred with a different law enforcement officer, although Martinez did go through the 40-hour training program that was offered by Makor.

I'm not hearing that there's any request or effort made to subpoena these people in or obtain their presence here in Wyoming. Presumably, they would be available to respond to a subpoena. And perhaps, as former law enforcement officers, wouldn't be willing to lie in open court or at least give statements that would be subject to being impeached if you decided not to attempt to secure their presence here, regardless of their protestations, based upon their representations that they would change their testimony or change their statements from what your investigator was told.

But that's the reason we're in court. We sit there and we try to figure out the wheat from the chaff and undoubtedly are lied to frequently. But it's the only way to put people under oath and get to the bottom of their testimony and their -- make the difficult credibility determinations.

It seems to me to be doubly difficult to -- if this case goes on to trial, which it very well may -- to, again, be attempting to offer the investigator's hard work, again, into

evidence before a jury. I don't think you would do that.

And perhaps Ms. Hammer would have responded to you had you asked for her assistance.

MR. DECKENBACH: I certainly wouldn't have elicited hearsay at a jury trial, Your Honor, but I know the rules are much more relaxed here -- or should be.

THE COURT: I think it's straining -- it's straining it to the breaking point.

MR. DECKENBACH: With that, Your Honor, may I resume my direct examination of Ms. Dominguez.

THE COURT: Please. Would you.

MR. DECKENBACH: Okay.

BY MR. DECKENBACH:

Q. Ms. Dominguez, did you have an opportunity to serve -- or speak with Mr. Rispoli after he was served with subpoenas in this case?

A. Yes, I did.

Q. In regards to documents maintained by Makor K-9 in regards to their training, did he -- what did he tell you?

A. He said they don't produce documents, they don't create documents in their training of narcotic-detection K-9s.

Q. Did he state whether -- did he say whether they had a syllabus or an outline available?

A. He said they did not.

Q. Did he tell you whether or not they had a manual?

A. He said they did not.
Q. And then, in regards to certification and IPCA, formerly CNCA, were there any documents that they had outlining their certification requirements outside of the three-page document currently in evidence in this case?
A. There were none beyond that document.
Q. Okay. And then we've heard testimony in this case regarding a -- an individual named Mel English. Were you able to investigate Mr. English?
A. Yes.
Q. And does he have any publicly available websites that you were able to find?
A. He does.
Q. And did he, on that website, advertise -- on that website was it advertised that he had any affiliation with Makor K-9?
A. Well, to be clear, the website is for Battle Born K9, which is run by Mel English. And, yes, there was indication that he had sold -- well, he posted that he had sold his training system to Makor K-9.
Q. And did he identify himself as a trainer for Makor K-9?
A. Yes.
Q. Okay. And on the CNCA or IPCA website, is he an identified certifier?
A. He is.
Q. And who was -- as part of your investigation, did you

receive a certification record for K-9 Becky and her previous handler just prior to Trooper Martinez taking custody of her?
A. Yes.
Q. And who was the last person to certify K-9 Becky --
A. Mel English.
Q. -- and her previous handler?
A. Mel English. Sorry.
MR. DECKENBACH: All right. I have no further questions, Your Honor.
(Discussion held at counsel table.)
MR. DECKENBACH: Actually -- can I ask one more thing I forgot?
Your Honor, I think the Government might entertain me asking one more topic I briefly forgot about.
THE COURT: Proceed.
BY MR. DECKENBACH:
Q. We heard record -- or we heard about testimony from Trooper Martinez regarding a Carlos DeHerrera, who's yet to testify in this case.
A. Correct.
Q. Did you find any -- did you find any records that indicated he had tested positive for marijuana anytime after the stop on October of 2023?
A. I did not.
Q. Okay. And did -- we heard testimony from Trooper Martinez

that a green tongue observed in a report about Mr. DeHerrera was -- was what he understood to be indicative of use of marijuana.

In your -- were you able to investigate or research that issue?

A. I found an article about a green -- the green tongue claim that law enforcement had been making.

Q. Okay. And what did that -- what was the gist of that article?

A. The gist was that there's no scientific studies that support that a green tongue is indicative of marijuana use.

MR. DECKENBACH: Okay. Thank you.

No further questions.

MS. HAMMER: Good afternoon.

THE WITNESS: Hi. Good afternoon.

**CROSS-EXAMINATION**

**BY MS. HAMMER:**

Q. So I want to talk -- I just have a couple questions. We'll be brief.

A. Okay.

Q. I want to talk with you about, first, the photos that you took, the exhibits starting with the letter T.

A. Okay.

Q. And so I'll be up front with you. Mine are not labeled the same, but I did take notes. Please correct me if

I misidentify any, and I imagine Mr. Deckenbach will, too.

So up here on the screen we have what I believe was marked and admitted as Defense Exhibit T4.

Okay. And you had stated that this -- these were the -- this photo was taken back in August of 2024 and this is the passenger -- front passenger --

A. Yes.

Q. -- of Mr. Ostertag's vehicle.

A. Correct.

Q. Okay. And then have you had an opportunity to ever review Exhibit . . . for the Government it's Exhibit 5, and it is Trooper Martinez's body cam footage from the day of Mr. Ostertag's stop.

A. Yes.

Q. Okay. Now, I want to put these side by side real quick if I may.

A. Okay.

Q. Now, just for the record, would you agree with me that what is currently shown on Exhibit 5, which is at 21 minutes 59 seconds, and what is shown in Defense Exhibit T4 is roughly the same angle of the front passenger area of Mr. Ostertag's vehicle?

A. Yes.

Q. Okay. Now, it's a little dark, and, certainly, if -- we can play it back and forth in the hopes that a little

flashlight light hits it.

But, based off of what we see here in Government's Exhibit 5, are we able to see any of the same detritus that you took a photo of in Defense Exhibit T4?

A. No.

Q. And would you agree with me that it's completely different detritus?

A. Yes.

Q. Okay. And I'll get rid of these.

THE COURT: I can't see it -- I can't identify anything in . . .

MS. HAMMER: All right. It's -- if I may, Your Honor, I'll just pull that back up.

THE COURT: Yeah. You may have to guide me through it as to what we're seeing. I can't compare them.

Oh. Now I'm seeing better.

MS. HAMMER: Thank you, Your Honor.

So, for the record, we're at Exhibit 5, 22 minutes and 3 seconds.

THE COURT: I can see . . . can you pull up Government's Exhibit 5, expand it to look more at the floorboard?

MS. HAMMER: I can try, Your Honor. I don't know exactly how to do that within this program, but this is about as close as I can get without --

THE COURT: Yeah. I think you've done all you can. Thank you.

MS. HAMMER: Thank you.

BY MS. HAMMER:

Q. And then, Ms. Dominguez, I believe Defense Exhibits T1, T2, and T3 were the scratches found on the vehicle.

A. Okay.

Q. Is that correct?

A. I can't tell you the exact exhibit numbers but . . . if those are your notes, I would say that's probably accurate.

Q. Okay. And you were not present when those scratches were made on the vehicle?

A. No.

MS. HAMMER: May I have just one moment, Your Honor.

THE COURT: Yes.

(Discussion held at counsel table.)

BY MS. HAMMER:

Q. You had indicated that, as part of your investigation, you had received records relating to K-9 Becky prior to Trooper Martinez taking over as her handler.

A. Some records, yep.

Q. And I think you indicated that one of them was the certification previous to 2023.

A. Correct. I think it was the 2023 certification.

Q. But it was the certification prior to Josh Hardee

certifying her?
A. It was -- Trooper Petr- -- Petruso was the previous handler. It was the certification when he took Becky to the certification --
Q. Okay.
A. -- yeah.
Q. And you believe it may have been 2023 when it happened?
A. I haven't looked at it recently, but I think it was 2023, yeah.
Q. Okay. And are you aware that Mel English left Makor K-9 in June 2022?
A. I am not.
MS. HAMMER: Okay. I don't think I have any further questions, Your Honor. Thank you.
MR. DECKENBACH: One second, Your Honor.
Actually, no further questions, Your Honor. Thank you.
THE COURT: You may step down.
THE WITNESS: Thanks, Your Honor.
MR. DECKENBACH: Your Honor, if I -- just -- may I ask about our next witness.
(Discussion held at counsel table.)
MR. DECKENBACH: Your Honor, our next witness is Mr. Carlos DeHerrera.
He's -- he was the one that was writ here. They

missed us by a couple hours and took him to Scotts Bluff instead. He was released back to Carbon County. The Government's been kind enough to agree to let him appear by Zoom.

We're working with a deputy over there. And so if we could take maybe a five-minute break to see if it's possible -- if not, I know they will have him ready at 9:00 a.m. tomorrow so -- I don't know if the Court would just prefer to have him at 9:00 a.m. tomorrow or if we should see if we can get him moved down the hall to the computer.

THE COURT: No. We've reserved time and -- so tomorrow at 9:00 would be fine.

MR. DECKENBACH: That would be great, Your Honor.

And then, with that, Your Honor, the only other witness who I think we'll call is our expert, who we are also anticipating -- she was only available tomorrow, which we already knew that.

So I think we're done for the day if the Court is ready.

THE COURT: Perfect. Thank you.

We'll stand in recess.

(Proceedings adjourned at 4:40 p.m., February 10, 2025.)

# C E R T I F I C A T E

I, MELANIE HUMPHREY-SONNTAG, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, do hereby certify that I reported by realtime stenography the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 19th day of February, 2025.

/s/ Melanie Humphrey-Sonntag

MELANIE HUMPHREY-SONNTAG
RDR, CRR, CRC
Federal Official Court Reporter