IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| UNITED STATES OF AMERICA, | DOCKET NO. 24-CR-00084-ABJ<br>VOLUME IV |
| Plaintiff, | (Pages 681 through 909) |
| vs. | |
| GEORGE OSTERTAG, | Cheyenne, Wyoming<br>Tuesday, February 11, 2025 |
| Defendant. | 9:00 a.m. |

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

**BEFORE THE HONORABLE ALAN B. JOHNSON**
**UNITED STATES DISTRICT JUDGE**

***MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC***
***Federal Official Court Reporter***
***2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001***
***307.433.2169 * MelanieSonntagCRR@gmail.com***

*Proceedings reported with realtime stenography;*
*transcript produced with computer-aided transcription.*

APPEARANCES:

For the Plaintiff:

PAIGE HAMMER
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
2120 Capitol Avenue, Fourth Floor
Cheyenne, WY 82001

CHRISTYNE M. MARTENS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF WYOMING
100 East B Street, Suite 2211
Casper, WY 82601

For the Defendant:

JORDAN DECKENBACH
FEDERAL PUBLIC DEFENDER'S OFFICE
DISTRICT OF WYOMING
104 South Wolcott Street, Suite 601
Casper, WY 82601

# I N D E X


**GOVERNMENT WITNESSES:**

| | PAGE |
|---|---|
| **KENNETH FURTON** | |
| Direct Examination by Ms. Martens | 853 |
| Cross-Examination by Mr. Deckenbach | 877 |
| Redirect Examination by Ms. Martens | 889 |
| Recross-Examination by Mr. Deckenbach | 896 |
| Examination by the Court | 896 |
| Further Recross-Examination by Mr. Deckenbach | 902 |

**DEFENSE WITNESSES:**

| | PAGE |
|---|---|
| **COREY CRUZ** | |
| Direct Examination by Mr. Deckenbach | 685 |
| **MARY CABLK** | |
| Direct Examination by Mr. Deckenbach | 689 |
| Cross-Examination by Ms. Martens | 777 |
| Redirect Examination by Mr. Deckenbach | 831 |
| Examination by the Court | 842 |
| Recross-Examination by Ms. Martens | 847 |


# E X H I B I T S


| | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| GOVERNMENT'S EXHIBITS | | | |
| 14 | SWGDOG Response to Lit Study | 808 | 851 |
| 15 | Frontiers in Veterinary Science Article | 812 | 852 |
| 16 | Furton Curriculum Vitae | 853 | 854 |
| 17 | Cablk Curriculum Vitae | 778 | 779 |
| 18 | Technical Report | 815 | 816 |
| DEFENSE EXHIBITS | | | |
| A1 | Body Camera Footage Clip | 761 | -- |
| A3 | Body Camera Footage Clip | 761 | -- |
| K2 | Body Camera Footage Clip | 757 | -- |
| P | AAFS Guidelines | 697 | 698 |
| Q | Article, "Handler Beliefs Affect Scent Detection Outcomes" | 706 | 707 |
| R | Compilation of Video Clips | 736 | -- |
| V | Photograph of Snuff Container | 686 | 687 |

(Proceedings commenced 9:00 a.m., February 11, 2025, within the presence of the defendant on bond.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

Mr. Deckenbach, you may call your next witness.

MR. DECKENBACH: Thank you, Your Honor. At this time the defense recalls Mr. Corey Cruz to the stand via Zoom by agreement with the Government.

THE COURTROOM DEPUTY: We may need to contact IT.

MR. DECKENBACH: Do we reswear him in?

THE COURT REPORTER: Judge, do you want him sworn in?

THE COURTROOM DEPUTY: Do I swear him in?

THE COURT: Yes.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness sworn.)

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please state and spell your name for the record, sir.

THE WITNESS: Corey Cruz, C-o-r-e-y C-r-u-z.

MR. DECKENBACH: Good morning, Mr. Cruz.

You appear to be in your vehicle. Are you on your way to work?

THE WITNESS: I'm actually in the parking lot here at work.

MR. DECKENBACH: Okay. Well, we'll keep this brief

for your sake as well as everyone else's sake.

THE WITNESS: Okay.

**COREY CRUZ, DEFENSE WITNESS,**

**DIRECT EXAMINATION BY MR. DECKENBACH:**

Q. Yesterday we heard -- yesterday we heard testimony from Trooper Bracken about an observation he made in approximately September of 2023 of you near the Medicine Bow National Forest.

Do you recall an incident where you were in close contact with Trooper Bracken back in September of 2023?

A. Yes, I do.

Q. And can you explain what happened on that day?

A. Yes. It was -- we were actually archery hunting, me and my cousin. And we were up in -- by the forest edge in Medicine Bow National Forest and getting ready to do some elk hunting.

And, as I was driving into my hunting spot, I actually noticed Trooper Bracken's truck there because we kind of -- I know we -- we've -- he's my neighbor and we -- you know, I noticed his truck.

And we kind of hunt in the same area. It's a small area. So I did notice he was in there.

And we drove up to our spot, and we were going to get out. And I recall -- I didn't see, actually, Officer -- or Trooper Bracken -- there until after the incident.

But we were -- we had got out of my Toyota 4Runner, and I had -- before we were going to go in the trees, I had this -- it was like tobacco snuff, German tobacco snuff. It was in a little white -- I mean a little clear jar. And I poured some out on the hood of my 4Runner, and we -- it's your -- it's tobacco. You actually sniff it, you know. And I put some on the hood, and we sniffed it.

And then I happened to look in the bushes -- I heard some rustling in the bushes and looked over, and it happened to be Trooper Bracken and another fellow that I didn't know.

And then he started walking up to me, and then he -- once -- I believe once he noticed it was me -- I thought he was going to talk to me. And I believe once he noticed it was me, he turned around and walked back in the bushes.

Q. Okay. And I'm going to show you what's been previously marked Defense Exhibit V.

A. Okay.

Q. And, hopefully, this will pop up on your screen here, just . . . can you see an image on your phone?

A. Yes.

Q. Okay. And is that the tobacco product that you were sniffing?

A. Yep, that's it. Schneeberg Snuff. Yeah.

Q. Okay. And is it a white powder that is sniffed in tobacco form?

A. Yes. Yes, it is.
MR. DECKENBACH: Okay.
Your Honor, I'd move to enter Exhibit V into the record.
MS. HAMMER: No objection.
MR. DECKENBACH: We can take the exhibit down now.
THE COURT: Exhibit V is received.
(Defense Exhibit V received into evidence.)
BY MR. DECKENBACH:
Q. And, Mr. Cruz, has Trooper Bracken ever asked you about that incident directly?
A. Directly he never did, no. And I've had encounters with him several times afterwards, and it was never -- never mentioned.
Q. Did you learn that -- if Trooper Bracken reported that to anyone else?
A. Yes, I did. I -- I learned that he went and reported it to DFS, Department of Family Services.
Q. Okay. And has that become part of your DFS case, then?
A. Yes, it has.
Q. And was this about the time, then, you started to be encountered by law enforcement numerous times, as you testified to previously?
A. Yes, most definitely.
Q. And have you been encountered and stopped by law

enforcement since your testimony here before this Court two weeks ago?
A. Yes, I have.
MR. DECKENBACH: Your Honor --
BY MR. DECKENBACH:
Q. And, I guess -- in any of those circumstances did they find drugs in your vehicle?
A. No, sir.
MR. DECKENBACH: Your Honor, I have no further questions for this witness.
THE COURT: Thank you.
MS. HAMMER: We don't have any questions for this witness.
THE COURT: Thank you, Mr. Cruz. We'll let you get to work.
THE WITNESS: Yes, sir. Thank you.
MR. DECKENBACH: All right. Your Honor, at this time the defense would call Dr. Mary Cablk via Zoom.
MS. MARTENS: I'm just wondering. Are we going to see Mr. DeHerrera today or no?
MR. DECKENBACH: No.
MS. MARTENS: Okay.
MR. DECKENBACH: All right.
THE COURTROOM DEPUTY: Dr. Cablk, please raise your right hand to be sworn.

(Witness sworn.)

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Thank you.

MR. DECKENBACH: Good morning, Dr. Cablk.

THE WITNESS: Good morning. Can you hear me okay?

MR. DECKENBACH: I can. And I believe the Court can.

**MARY CABLK, DEFENSE WITNESS, DIRECT EXAMINATION**

**BY MR. DECKENBACH**:

Q. Would you state your name for the record.

A. Mary, M-a-r-y; Cablk, C-a-b, as in "boy," -l-k.

Q. And what is your current occupation?

A. I'm a retired research professor emeritus, and I am an adjunct professor in anthropology at the University of Tennessee-Knoxville, and I am a K-9 trainer and expert through my consulting business, Detection Science Solutions.

Q. And you -- can you describe briefly for the Court your subject matter of specialty?

A. The science of K-9 detection, training handlers, training K-9s, olfaction. It's . . . that generally encompasses it, but I could certainly go into more detail.

Q. Well, before we go into more detail, what academic degrees do you hold and from where and when were they obtained?

A. I have a bachelor's degree in biology from Virginia Tech, 1989. I have a master's degree. It's in environmental management from Duke University in 1991. And then I got my

PhD in 1997 from Oregon State University. And that degree is actually in -- in forestry, but I'm happy to say how that has anything to do with K-9s.

Q. Sure. Please do.

A. Well, the background in biology, I think that is a direct -- you can see how that might directly relate to K-9s and organismal biology and ethology, which is the study of behavior of animals.

And then my advanced degrees are actually focused on remote sensing. And olfaction is a form of remote sensing. Remote sensing is simply the gathering of information or data from something without coming into contact with it, and that's how K-9s work.

So I have a -- sort of a two-tier history -- professional history -- in remote sensing, which is optical remote sensing and olfaction, K-9 studies.

Q. And do you have any other additional specialized degrees or training in the area of K-9 detection?

A. Oh, gosh.

Well, I'm a Nevada POST K-9 evaluator. I sit on the Nevada POST K-9 standards committee. I am on the American Academy of Forensic Sciences consensus body for dogs and sensors and on several working groups looking at K-9 detection standards.

We're transitioning from the SWGDOG guidelines from

the late 20- -- 2000s, early --

(Technical interruption.)

A. (Continuing.) -- standards at a national level.

THE COURT REPORTER: Stop. Stop.

(Reporter seeks clarification.)

MR. DECKENBACH: Will you stop.

We just had a brief hiccup in the Zoom, so if you could start that over again right there. I apologize.

THE COURT REPORTER: About her working group.

MR. DECKENBACH: About your working group experience.

A. (Continuing.) With the American Academy of Forensic Sciences, I'm on the consensus body for dogs and sensors and on working groups for several of the K-9 disciplines.

We are revising and transferring, I suppose -- transforming -- the SWGDOG guidelines that were implemented in around 2010, generally, in that time frame, into a national standard.

BY MR. DECKENBACH:

Q. And, previous, do you -- do you personally have any experience in law enforcement or with K-9 handling?

A. I am an auxiliary deputy with several different sheriffs' offices in Nevada.

So I don't carry a gun, and I don't arrest people, but I do handle a K-9 in -- in that capacity for several sheriffs' offices here.

I respond directly to Reno Police Department with my own K-9. And I deploy my K-9 in California in that same capacity.

Q. And how long have you been providing that service as a reserve law enforcement officer?

A. I have to clarify because I'm not a reserve; I'm an auxiliary.

And I have been doing that for 25 years.

Q. And how many times in those 25 years have you deployed your -- with your K-9 in support of law enforcement?

A. Hundreds.

Q. Have you conducted any research in the area of K-9 detection?

A. Yes.

In my career as a research scientist, I have published the results of my K-9 studies in the leading journals. I have been sent around the world on behalf of my sponsors, such as the US Army and the military, to present the results of my research.

I am an active research scientist. I present the results of my research typically on an annual basis to the American Academy of Forensic Sciences.

And we are about to go into the annual meeting of the academy, which is the -- the society for forensic science disciplines, including K-9s. That will be coming up later

this month, and I have a number of presentations and a workshop involving my K-9 research.

Q. And has any of your research been peer-reviewed and published?

A. Yes.

Q. All right. And are you actively involved in teaching or training other dog handlers?

A. Yes.

Q. Okay. And in what capacity do you do that?

A. I train handlers in multiple capacities. With the advent of online learning, expedited by COVID, I have developed online training resources for K-9 handlers.

That is no substitute for hands-on with a dog and a handler, and so I have handlers that come to me under contract, and I work with them. And I do travel around the country and give hands-on training for handlers and their K-9s.

Q. And have you also worked as an expert in court in the -- on the topic of the science of K-9 detection?

A. Yes.

Q. Okay. And how often have you done that?

A. I usually end up testifying maybe once or twice a year.

I look at a lot of cases. Attorneys regularly send me videos and ask me to review them to see if there's an issue, particularly with the narcotics sniffs.

I don't take a whole lot of those, and so it usually comes out to be maybe one or two cases a year. Sometimes I'll go for a year or two and I don't end up testifying.

Q. Have you ever testified on behalf of the prosecution?

A. Yes.

Q. Do you also testify, like today, on behalf of the defense?

A. Yes.

Q. And have State Courts established you as an expert?

A. Yes.

Q. And have Federal Courts also found you to be an expert in the field of the science of K-9 detection, K-9 disciplines, and the training of K-9s?

A. Yes.

MR. DECKENBACH: Your Honor, I move to tender this -- Ms. -- Dr. Cablk as a qualified expert witness in the field of science -- science of K-9 detection, K-9 detection disciplines, training K-9s, and the handling of K-9s.

MS. MARTENS: Excuse me.

I think that the Court can certainly take her testimony for what it is. I think we'll have a disagreement about how far Dr. Cablk's expertise in this area goes, but she certainly has more knowledge than the average person.

THE COURT: She may testify in her area of expertise. And that is in the area of her sensing research and her training of K-9s.

BY MR. DECKENBACH:
Q. Dr. Cablk, as part of your work in this case, were you afforded an opportunity to review videos pertaining to K-9 Becky and Trooper Martinez with the Wyoming Highway Patrol?
A. Yes.
Q. Were you also able to review training logs regarding K-9 Becky and Trooper Martinez?
A. Yes.
Q. Were you also able to review deployment logs from between September 2023 and January 2024 for K-9 Becky and Trooper Martinez?
A. Yes.
Q. And were you also afforded an opportunity to discuss with me the contents of Trooper Martinez's testimony in this case with the aid of an unofficial transcript?
A. Yes.
Q. Were you also able to do the same regarding the testimony of a gentleman named Rob Havice?
A. Was that the transcript from yesterday?
Q. Yes. He -- two days of testimony from the president of IPCA.
A. From last week -- or -- I'm sorry. From previous testimony, yes.
Q. Okay. And were you also able to review the testimony with

me of the K-9 certifier in this case, a former lieutenant from the Wyoming Highway Patrol named Joshua Hardee?
A. Yes.
Q. And, finally, were you also able to review with me the testimony from a Wyoming Highway Patrol K-9 supervisor named Marc Russell?
A. Yes.
Q. Okay. Before we get into the details of this case, I want to circle back and ask you about national standards and guidelines.
Are you familiar with the organization that goes by the acronym SWGDOG?
A. Yes.
Q. And how are you familiar with this group?
A. SWGDOG has a -- had a large presence back in the late 2000s, when that entity was funded by several of what we call the three-letter Federal agencies; for example, the FBI, Homeland Security, TSA.
Those agencies put together a panel that was a combination of practitioners, K-9 handlers -- mostly law enforcement and some scientists -- to put together guidelines for all of the K-9 disciplines at the time.
I was not on the committee. I was not directly involved with that work. I was early to midcareer when those were being formed, but I am aware of them, yes.

Q. All right. And when was the last time SWGDOG published any type of national guidelines?
A. I -- it would have been around 2010. So it could be, you know, plus or minus.
Q. And are you familiar with an organization called the American Academy of Forensic Sciences?
A. Yes. I am a member of that academy.
Q. And has that academy done any work in regards to creating general guidelines for training, certification, and documentation of K-9 detection disciplines?
A. The academy's standards board, through their working groups, are actually revising those original SWGDOG guidelines into standards.
Q. Okay. And is the work of the American Academy of Forensic Sciences basing these standards off of the work of SWGDOG?
A. As a starting point, yes.
Q. Okay. And did the American Academy of Forensic Sciences publish any general guidelines in 2020?
A. Yes.
Q. Okay. I'm going to show you what's been marked Exhibit P.
Are you familiar with this document that I'm showing you the cover page for?
A. Yes.
Q. And is this a 21-page document that was issued by the American Academy of Forensic Sciences in regards to training,

certification, and documentation of K-9 detection disciplines?
A. That's what you're showing me, yes.
Q. And is that based on the guidelines and work of SWGDOG?
A. Originally, yes.
Q. Okay. And this is a 21-page document I'm showing you.
Have you previously reviewed this 21-page document and are familiar with its contents?
A. Yes.
Q. And do they accurately reflect the last published guidelines for -- for this discipline?
A. Well, this is for all detection disciplines. So I would qualify that by saying it's not for any one discipline; it would cover any detection discipline.
Q. All right. And that would include narcotics disciplines?
A. Yes.
MR. DECKENBACH: Your Honor, I move to enter Exhibit P into the record.
MS. MARTENS: No objection.
THE COURT: Exhibit P is received.
(Defense Exhibit P received into evidence.)
BY MR. DECKENBACH:
Q. When putting together these guidelines, who was consulted?
A. This 088 standard?
Q. Yes.
A. Well, the academy put together a working group, and

I don't know who the membership was for the committee for this particular standard. I know that it draws upon a number of different experts from a variety of backgrounds. And that's -- that's what I can tell you about that.

I -- I'd have to look up and see who the membership on that particular working group was.

Q. Okay. And I think you mentioned already -- or you clarified -- that this is a -- general guidelines for all K-9 detection disciplines.

What are the different types of K-9 detection disciplines?

A. Well, there's -- there's many. So narcotics, explosives, live human scent, articles, bedbugs, human remains, tracking/trailing, conservation, poaching. The list goes on and on.

Q. And is -- the science of how a dog responds to a trained odor across these disciplines, is it different?

A. Physiologically, no.

Q. And do detection K-9s search for trained odors in a similar manner regardless of what that trained odor is?

A. Yes.

Q. I'd like to move to page 5 of Exhibit P, which has some definitions.

And Definition 3.2 talks about K-9 handler error, "Any action or cue by the handler that causes the K-9 team to

perform incorrectly."

What are the types of K-9 handler errors that occur -- or that can occur -- when a handler is working with a K-9 detection dog?

A. Well, an example would be giving the dog a correction -- like a leash correction or a verbal correction -- at an inappropriate time.

Eliciting a response from a dog absent target odor. Overpresenting. Pushing a dog beyond its trained capabilities. Working it for too long a time. There's something called nose time. And, if you ask a dog to work longer than it is capable of doing, that's a mistake.

Q. Okay. I'd like to now then move to page 6 of Exhibit P.

We have here 3.7, at the top of the page, a definition for "cognitive bias." It says "A set of influences that may affect the reliability and validity of one's observations and conclusions."

Are you familiar with this definition?

A. Yes.

Q. And how does cognitive bias impact a -- how might cognitive bias generally impact the reliability and validity of a handler's observations?

A. Humans are -- humans cannot escape bias. It is part of who we are; it's part of how our brain weeds through and processes information. So this is a unique human construct.

And it can affect working with a K-9 in a few different ways. There is research to support this. And, when you think about it, it makes sense, as well.

So the research has looked at the effect of beliefs. And beliefs are -- can be equated to -- to a bias. So if you believe -- for example, in the case of narcotics, if you believe that there's drugs in a car and you get your dog out, your brain is going to be looking for information that supports your belief. That's how our brains work.

So one way that cognitive bias, through a specific form of that bias, confirmation bias, is that handlers get their dogs out of the car, they believe there's going to be drugs to be found -- or whatever their target is -- and their K-9s are not doing a trained final response but they're working a car or vehicle and the handler interprets the behavior of the dog incorrectly in the absence of a final response.

So that's one way that bias affects dog handling, where handlers are expecting to find something and they are looking for signals from their dog to tell them that the dog has odor.

One of the ways that we get around that, if you will, is you teach the dog to do a final response that is clear and persistent and is done by the dog only in the presence of target odor. That helps alleviate bias in the part of the

handler.

So we let the dog make the decision based on odor, give a clear, consistent, trained response that's repeatable and reliable, and it doesn't matter what the handler thinks.

Q. And you've used a term called a "trained final response." I'd ask that we move to page 7 of Exhibit P.

At the top of the page there it defines final response as "A behavior that a K-9 has been trained to exhibit in the presence of a target odor/scent source. This behavior may be either passive (sit, stare, down, point) or active (bite, bark, scratch) also known as a trained final response."

Is this consistent with your understanding of how -- or what a trained final response is?

A. Yes.

Q. I'd like to move on, then, to --

MR. DECKENBACH: We can take this exhibit down for now.

BY MR. DECKENBACH:

Q. In the guidelines that we just entered into evidence, it talks about initial training and states that a K-9 handler training shall be conducted by a competent trainer from an entity that utilizes a structured curriculum with specific training and learning objectives.

Why is utilizing a structured curriculum with specific training and learning objectives important?

A. You want to make sure that whatever it is that you're teaching the dog and the handler is thought through.

If you're going to be training a K-9, you want to have that planned out. You want to understand and demonstrate that understanding of how dogs are trained from start to finish using classical and operant conditioning. That's how dogs are trained.

Whoever is coming to you for that training, I would think they would want to take a look at your curriculum and understand what it is that they're getting into and be able to follow along with those lessons over the course of that training.

I think in our education system that's pretty standard practice. When you go to a college course, for example, one of the first things the instructor is going to provide you is a syllabus so that you know what to expect and what benchmarks you might want to be ready to meet along the way.

Q. Additionally, these guidelines call for initial training of a new handler and K-9 pair to include aspects on cognitive bias.

Do you believe it's important for new handlers to understand aspects of cognitive bias?

A. Yes, absolutely, for the reasons that I talked about with how bias can affect the outcome of a sniff, regardless of the

discipline, but certainly when we're talking about vehicle sniffs and getting probable cause to search. The dog is the sensor. The dog is the one making the determination. The dog is the one that's detecting the odor.

And the handler is there to maintain safety of the dog, make sure it doesn't run out into the street. The handler is there to ensure at times that the dog is able to get odor, depending on the conditions surrounding the vehicle or wherever they're searching. And -- and the dog is there to make that determination.

So if the handler is taught from the beginning how to correctly wield that sensor, that frees up the team to do their job correctly, letting the dog do its part of the equation, and the handler can do their part of the equation.

And that's consistent across all K-9 disciplines.

Q. And on the topic of -- I think you talked about how a handler's belief might affect their cognitive bias in regards to detection dogs.

Are you familiar with a study by Dr. Lisa Lit called "Handler Beliefs Affect Scent Detection Dog Outcomes"?

A. Yes.

Q. And can you summarize for the Court what that study found?

A. Dr. Lit asked a question, a very simple question, which was "How do beliefs affect the outcome of sniffs?" This was one of a three-part series of research that she conducted. So

it is a stand-alone research project, but there are other studies around it.

And I had nothing to do with this study, but I have talked with Dr. Lit since its publication about the research. She was testing a belief. She wasn't testing the dogs. So if you are going to test a belief, you have to instill that belief into the handler.

And the way that her research team did that was she told certified narcotics handlers that she was going to go and set narcotics training aids out in three different rooms, I think it was. And she told them that -- where there was a piece of red construction paper taped on the wall, she told them there was odor there.

So that's how that belief was instilled. The belief was there's target odor here where the red construction paper -- not cardboard -- construction paper was. And then the handlers went in, and they worked their dogs in the rooms.

And the results of the study were pretty surprising to her and, I think, a lot of the community. It seemed like the community was divided on if they thought this was surprising or not.

What the researchers found was that the handlers reported not only final responses at the cardboard but they reported final responses throughout the rooms. They false-alerted to windowsills, to pencils, to dog treats --

well, I can't say the dogs false-alerted. The handlers reported those alerts, but they are false alerts because there was no odor present.

And so the results of that study showed what can happen when handlers have a belief about what they can expect to find through the course of a sniff.

Q. Did this study identify an issue with trained dogs, or did this -- was the issue with something else?

A. This wasn't about the dogs because we don't actually know if the dogs went to final response or not. All we know is what the handlers reported.

So this study looked at the effect of beliefs on the handlers and their ability to be biased and affect the outcome of the sniff. So whether the dogs went to final response or the handlers just interpreted their dog's behavior we don't know because, ultimately, it's the handler making the call based on the dog.

Q. Okay. And I'd just briefly like to show you what's been previously marked Exhibit Q.

This is titled "Handler Beliefs Affect Scent Detection Outcomes." It's a 16-page document including an abstract.

Do you recognize this as the study you were just discussing?

A. Yes.

MR. DECKENBACH: Your Honor, I'd move to enter this in as Exhibit -- Defense Exhibit Q.

MS. MARTENS: No objection.

THE COURT: It is received.

(Defense Exhibit Q received into evidence.)

MR. DECKENBACH: And we can take the exhibit down, please.

BY MR. DECKENBACH:

Q. Going back to the national guidelines that we were discussing, the 088 standards, we see that they recommend that a K-9 shall be trained to perform a predetermined specific final response upon locating a trained odor or scent.

Well, why is it important that a K-9 -- detection K-9 -- be trained to perform a predetermined specific final response?

A. Number one, so that it is the K-9 making the decision regarding target odor. Right? So it's the K-9 that does the sniffing and makes that determination, is this target odor or not.

And the final response is the sole way that the dog communicates that it has located the highest concentration of odor and only target odor. It takes the burden off of the handler to try to interpret what the dog is telling them. That is the way that we free the handler up from bias.

And a properly trained dog will do that final

indication over and over and over again only for target odor.

Q. The guidelines also outline that, in regards to initial training, that the K-9 team's training shall be continued until the required level of operational proficiency is achieved and the K-9 team is certified.

We heard testimony from Trooper Martinez that he received an initial 80 hours of training with K-9 Becky prior to deploying her in the field.

In your opinion, is an 80-hour course a sufficient amount of time to conduct initial training with a new K-9-handler pair?

A. No. Typically K-9 schools are six weeks, on average. There's a lot to learn, especially for a first-time handler.

Q. Okay. And would certifying a K-9-handler pair seven or eight days into -- or seven days into that training, would that be an appropriate time to attempt to certify a new K-9-handler pair?

A. Are you asking if the handler shows up for a two-week K-9 school and, at the end of the first week, they certify? Is that appropriate? Is that what you're asking?

Q. Yes.

A. Absolutely not.

Q. And why not?

A. For a first-time handler to be paired with a K-9 who hasn't actually completed the training in the curriculum to be

able to adequately field a dog, that's -- that's not enough time.

Q. I'd like to then pivot to the IPCA certification standards -- or I'm sorry. Not the IPCA but the certification standards in these 088 guidelines that dictate a certifying official shall not routinely be involved in the day-to-day training of a K-9 team being evaluated.

Why would that be important?

A. Well, it's not a good practice for friends to certify friends, number one.

That's -- that's unfair to the evaluator, and it's unfair to the handler. Right? Because there's an inherent bias. So if you're teaching and training the dog, you want that dog to succeed. You can't help it; right? That -- that K-9 team is a product of you.

And so it's . . . having an independent evaluator test the dog takes the burden off of everybody involved that there could be a perception -- whether it's a perception or it's real -- of some favoritism or lessening of the standard.

And the reality is the work that these K-9 teams do is important and we really want the -- the best and the most capable teams out there on the street.

So if you can have someone who just walks in cold, who is not familiar with the team, and takes a look at what the standard is that they're testing the team to, goes out and

sets it up, and the dog flies through that certification without issue, that's what we want to put out there on the street working.

And we do not want there to be any conflict of interest or any reason to give the public or anyone else a reason to mistrust the process.

Q. In your professional opinion, would a trainer who is very involved with a K-9 for years be adequately removed from bias after four months of being away from that dog and then subsequently certifying that dog?

A. No.

Q. And would an evaluator who has strong opinions about a dog's great track record and strong drive be adequately removed from bias to give a fair-handed evaluation of a K-9?

A. Well, their bias is going to color their view.

So if you have worked with a dog for years and years and you think that dog is fabulous, your expectation going into that certification is going to be based on your beliefs about that dog. So you're going to be looking for things that are fabulous about that dog, rather than "Let's just see how this goes."

Q. I'd like to now show you page 7 of what's been previously admitted as Exhibit O. These are California POST standards in regards to the evaluator of a K-9.

MR. DECKENBACH: And it's page 7 at the bottom of the

actual PDF. I'm not sure what that translates to.

Go up one. There it is.

And if we could zoom in on the right-hand side of that page.

BY MR. DECKENBACH:

Q. As far as the K-9 team evaluation, Rule 3 of this exhibit states "In order to preserve the highest standards of professionalism and to avoid any perceived conflict of interest between the evaluator and K-9 team, the evaluator" -- 3.1 -- "should not have monetary interest in breeding/ selling/training of the dog being evaluated," and 3.2 says "should not be the handler of the dog being evaluated."

Under these -- first of all, would you agree with -- these standards are appropriate as established by the California POST?

A. Yes.

MR. DECKENBACH: Okay.

And we can take the exhibit down.

BY MR. DECKENBACH:

Q. We heard testimony that -- from Government witnesses -- that Mark Rispoli, who is a vendor that provides training to the Wyoming Highway Patrol, is also involved in the creation and implementation of the IPCA certification process.

In your opinion, is that an appropriate setup for the Wyoming Highway Patrol K-9 certification?

A. I'm sorry. Can you -- can you repeat that?
Q. Sure.
If -- I'll -- I'll make it simpler.
If Mark Rispoli is a vendor for the Wyoming Highway Patrol's training of their K-9s, is it appropriate for his organization to also be the certifying organization of those K-9s?
A. Well, certainly, under the California POST rules and the 088 standard, no, because a vendor has a vested interest -- a financial interest and a professional interest -- in the K-9 that they're then certifying. So that would go against standards.
Q. And are there dangers under these principles when someone who works closely with the K-9 vendor is the certifier, be it a business partner or friend?
A. What do you mean, "dangers"?
Q. Of undue influence or bias.
A. Yeah. I think that's -- that's the point. It's a -- we call it a conflict of interest. So that's what those statements refer to. It's -- it's not a best practice.
It is something that vendors do in this country. And it is something that many in the K-9 community and the industry are working to change because -- yeah. Of course. If you want to sell a dog -- and these dog teams, these dogs, they go for a lot of money. There's a lot of money exchanging

hands regarding this with the school and the cost of the dog and the training. Those -- those costs are very real, and it is not inexpensive.

And so that's a lot of pressure to put on someone to then have their K-9 -- you know, you spend 15-, $20,000 and then come out and the dog can't pass a test? That's -- that doesn't look good businesswise.

So I wouldn't cast shade on anyone, but I think you can see objectively, standing back, that that type of setup puts undue pressure on everyone involved.

Q. I'd like to also discuss with you the 088 guidelines recommendation that double-blind tests should be used during the certification process.

What is your understanding of why that is a recommendation?

A. In the 088 guideline it says at least one of the elements should be conducted to have a double-blind, and that is because it eliminates the possibility of any bias. So that standard does not say it should all be done double-blind. It says one of the elements should be.

Double-blind is what happens on real deployment. If -- if you're doing a traffic stop, you have -- actually, there could be someone who knows the answer, and that's the driver of the car or the passenger, whoever they are, but they are generally -- not always -- taken outside of the car.

They're also not trying to influence the outcome of the sniff so that the dog goes to final response.

So, really, when you show up with your K-9 to do a sniff somewhere and you do not know the answer, that is what is being simulated by the double-blind element in a certification or in a training.

Q. All right. We heard testimony regarding concerns about the double-blind method, specifically testimony from Mr. Havice, the president of IPCA, that double-blind tests could result in test takers cheating by looking in cabinets and closed hide locations to validate they have the right answer before writing it down.

In your opinion, is that a valid concern of the double-blind test?

A. If nobody is present, that is true. Handlers could cheat. I have heard it -- I have heard that as a concern and a criticism of double-blind. So if you have handlers that are going to seek to go against the rules -- because you're generally not supposed to open drawers and see if you're right -- I suppose that's a concern.

I don't know how often that necessarily occurs, but I have heard that, that they're worried about people cheating.

"Double-blind" doesn't mean nobody's there to be a proctor. It just means the person who -- a person who knows the solution and, more importantly, who can affect the outcome

of that sniff, they are not in position to affect the outcome of the sniff.

So double-blind can be accomplished in a number of different ways. And you can certainly put somebody in each of the rooms or have them look in the rooms or you can set up a video camera and review the video if you wanted to do that, to alleviate handlers looking.

Q. Another concern Mr. Havice testified to was that there was a safety concern, that K-9s might find and eat aids if an evaluator in the know of where the hides were present was not there to stop them.

In your opinion, is this a valid concern of the double-blind assessment?

A. No. There's -- there's a number of things that we can unpack to look at that.

Number one, many dogs are cross-trained, narcotics and patrol, the pointy-eared breeds. So not necessarily a dog like Becky that isn't trained to bite people but the Malinois and the shepherds, things like that.

If you had a dog that was trying to get into a drawer or a cabinet and an evaluator ran over to close the door or the drawer, there's probably a good likelihood they're going to get bit. So that's -- that's not going to happen. I don't know anybody who's going to run up on a dog and surprise them from behind or from the side and close -- close drawers and

doors. That's -- that's a safety hazard. So that doesn't hold water.

The other thing is, the handlers going into these tests, they know their dogs aren't supposed to open drawers and open cabinets. That's a rule.

And, since the narcotics are dangerous, we don't want the dogs interfacing with them. We don't want people interfacing with them. They are generally hidden out of sight.

And so if a handler sees a dog is trying to penetrate into a cabinet or a drawer, that's their responsibility; right? The handler is responsible for the safety of the K-9.

So I don't see that as a valid concern or a factor into double-blind. If your dog isn't supposed to get into stuff, don't let your dog get into stuff.

Q. One final concern Mr. Havice raised in his testimony just -- was the need for an evaluator to make an on-the-spot correction so the handler can learn and be retested if need be.

In your opinion, is this a valid reason to not implement double-blind assessments?

A. In certification that is -- that's a problem.

So what he's essentially said is dogs never fail. And the whole point of the certification test is to determine pass or fail. And, if you are using your evaluators to stop a

test because a dog is going to make a mistake so you can fix it, you're not actually testing the dog, and so that's a problem. Any test that does not allow teams to fail is not really a test.

Q. In regards to the IPCA's requirements, we heard testimonies that the handler is required to inform the evaluator of whether their K-9's alert is passive or aggressive.

Why would an evaluator need to know such information?

A. So they can -- well, a couple of reasons.

Number one is the evaluator can certainly provide feedback after the element is run or the test is run. And so to be able to say, "Yeah, your dog did a beautiful final response, it was obvious, it was apparent, great job," you know, they need to know what they're going to expect going into working with the team.

Keep in mind the evaluator is not supposed to know the dog or the handler, and so that's just information that they're given to prepare them for what they're about to see, ideally.

And we also don't want the handler to just guess. There certainly are ways you can set tests up where the solution to the test would be apparent based on the configuration of the setting, and so we don't want handlers to just run in and guess. We want it to be based on the dog. So

that would be a second reason.

Q. We heard testimony in this case from Trooper Martinez that K-9 Becky's trained indication is a sit and focused stare.

Is that a passive or active alert?

A. That is a passive alert.

MS. MARTENS: Your Honor, I believe this misstates the record.

THE COURT: I didn't hear you.

MS. MARTENS: I believe the question misstates the record.

MR. DECKENBACH: Your Honor, in the unofficial transcript, which I won't read into the record, it's stated twice by questioning of the Government, not even my questioning. So I would ask the Court would just rely on their recollection.

THE COURT: I heard "focused stare," as well.

MS. MARTENS: The misrepresentation is "sit and focused stare." It was "focused stare" only, I believe. And I've got the transcript so I can provide --

MR. DECKENBACH: All right. He was -- twice confirmed it was "sit and focused stare" during questioning by the Government.

Regardless, again, I just ask the Court rely on their own memory and the transcripts -- official -- when they come out.

THE COURT: Well, it wasn't consistent.

MR. DECKENBACH: I would agree with that, Your Honor.

THE COURT: They were perfectly willing to accept a focused stare, jumping, pause on the object, sitting.

MR. DECKENBACH: Well, I'll curtail this question to really get at the point, Your Honor.

THE COURT: That's all right. Ask your questions. We only have one chance to get this witness, and I want to --

MR. DECKENBACH: All right.

BY MR. DECKENBACH:

Q. Dr. Cablk, is a focused stare a passive or active alert?

A. Passive.

Q. And can you describe what a focused stare is?

A. A focused stare final response is when the dog stops all forward motion. The dog just literally freezes up.

If you've ever seen a hunting dog that's a pointer that is pointing at a bush or a shrub and literally locks up and does not move and is pointing at that shrub -- take away the -- the bent paw -- that is an example of a focused stare. It's often called a freeze, a freeze alert.

Oftentimes the dogs are going to be sitting, as well. It's actually a shaped behavior. And so that's why it's called a passive final response, because it is quiet and the dog stops moving.

With vehicles oftentimes the dog will do what we call

square off, meaning it faces the vehicle and just stops moving and literally stares there until the handler releases the dog.
Q. Can a focused stare occur while the dog is actively jumping and it -- jumping?
A. No.
Q. Can a --
A. That's just jumping.
Q. I'm sorry. Say that. I apologize.
A. That's just jumping.
Q. Can a focused stare occur while the dog is moving its head and looking in multiple directions?
A. No.
Q. Can a focused stare occur while the dog is actively pawing or scratching at an object?
A. No. That's an aggressive alert.
Q. And in regards to trained -- K-9s being trained to conduct their final alert, does a final alert only occur when they get to the source of odor?
A. The dogs are trained to go to final response at the highest concentration of odor. Sometimes the highest concentration is right there where your source is and sometimes it's not.
All we know is, when the dog goes to final response, that's the highest concentration of odor unless there's a problem with the training where the dog has been taught to go

to final response at a specific location regardless of where it gets odor. And that is something that can be trained.

Q. Is a dog capable of going to a final alert outside a vehicle when the source of the odor is inside the vehicle?

A. Well, they have to because the -- the drugs aren't generally taped to the outside of the car. And we don't want dogs interfacing with toxic substances anyway.

So dogs are telling you where the highest concentration of odor is coming out of whatever it is they're sniffing.

So dogs don't open --

(Technical interruption.)

A. (Continuing.) -- do sniffs for the --

THE COURT REPORTER: Excuse me.

(Reporter seeks clarification.)

BY MR. DECKENBACH:

Q. Hold on one second. We had a slight break in the Zoom there.

Can you restart that sentence over, please?

A. Dogs go to final response at the highest concentration, and they can do that outside of the packaging or the containment of the -- their target.

So dogs that do parcel sniffs are not opening up those parcels to put their nose on the target, just like they're not supposed to open drawers to put their nose on the

drugs in the drawers, whether it's in testing or training or they're searching a residence.

And in cars, because the drugs are not generally taped to the outside of the car, they're concealed inside of the car -- and that's the point of the dog. The dog is essentially saying, to anthropomorphize, "I smell narcotics odor and it's coming from the car, and most of it's coming from here."

Q. Thank you for that answer.

You've touched on this in regards to pawing, I think you said, would be an active alert.

Is -- jumping and scratching, would that be a passive or an active alert?

A. Those are aggressive behaviors.

Q. Okay. And are those aggressive behaviors con- -- what could explain such aggressive behaviors? I guess is the question.

A. Well, the dog's been trained to do that. The dog has been reinforced for doing whatever behaviors it does.

That's -- that's the part about training a dog. We're teaching the dog, number one, "Here's the thing that is of value that's going to earn you your reward." And that thing, in this instance, being the odor of narcotics.

So the dog is trained "This odor is important" and "By the way, when you get to this odor, I want you to perform

this very specific behavior."

Some dogs are what we call handsy. They -- they like to use their paws a lot. Not all dogs. You know, like . . . like people, dogs have different personalities and different temperaments.

And so if you're not careful with a dog that's very bouncy and likes to scratch and is superexcitable and wiggly -- if you're not careful in the training of the dog, you're going to reinforce behaviors that are not wanted, they're undesirable behaviors, scratching being one of them. Flinging itself at a car is another.

So you have to put thought into what you're reinforcing with these dogs because they only know what we teach them. The dogs don't train themselves.

Q. We heard testimony from Marc Russell, a supervisor at the Wyoming Highway Patrol, that pawing is an undesirable behavior demonstrating the dog's excitement.

Does excitement equal alert behavior?

A. No.

You can be excited about a lot of things. Dogs get excited because they're going to go for a walk. Dogs get excited because it's dinnertime. They get excited about a lot of things.

So they can certainly be excited to work. We -- we want that in a working dog. But excitement alone is not

indicative of anything, other than, "Yeah, I'm psyched to be here. What are we going to do?"

Q. And is there a way to distinguish between excited behavior versus actual alert behavior to the target odor?

A. Is there a way to distinguish between those two? Is that your question?

Q. Yes.

A. Alert behaviors are not specific to target odor.

And this is something that a lot of handlers will say, that "I can read my dog." And the reality is that the alert behaviors that handlers cite as being specific to target odor also occur for other things of interest to a dog.

For example, dog closed-mouth sniffing. That is the way that dogs actually perform the act of sniffing. They close their mouth so that they can funnel the air and the odor molecules into their nose.

So a dog that suddenly closed its mouth to sniff something -- could be a target odor, could be a ham sandwich, could be a tennis ball. Who knows?

But all dogs do that. They don't sniff through their ears. Some dogs don't sniff through their feet. So they're all going to do that, even a pet dog.

The . . . the change in their behavior in terms of -- a tail wag, for example, is often cited, whether it's a faster tail wag or, instead of going left and right, it does a

circle. Those are also alert behaviors, but they are not specific to just target odor. Dogs also do that for things that they're interested in, that they're excited about, and they'll do that for their toys, as well.

These are -- these are just a couple of examples, and this is why it is important and why most, if not -- I can't say "everybody" but -- most people put that final response on the dog, because that is the one way that a handler can know for sure, absent a problem in their training, that the dog is responding just to target odor and not something else that is of interest to it.

Some dogs, very friendly dogs, they like people. And so if you have people sitting in your car and that dog likes people, particularly the nonpointy-eared breeds, that dog's going to be excited. "Hey, there's someone in the car. Who are you? I want to meet you. This is so exciting. Hi, my name's, you know, Fido."

So those things that handlers then say, "Oh, that's alert behavior, I recognize that," that's -- that's the point of the Lisa Lit study, and that's the point of why we do everything in our power to eliminate or reduce the bias, so that the handler doesn't have to make a mistake or try to interpret the dog's behavior. Let the dog do the job.

And if excitement is a part of that because "There's a person in the car" or "I'm just excited to be out," it's --

it can be very difficult to tease those two things apart.
Q. So would you then agree with Marc Russell that allowing a dog to engage in excited pawing is not a desired result when you deploy a K-9?
A. Right. It's also destructive to the car.
Q. And who is responsible for identifying and correcting such behavior in a K-9?
A. The handler and its trainer.
Q. And in preparing for this case, did you have an opportunity to make yourself familiar with the IPCA's certification testing standards?
A. I looked --
(Technical interruption.)
A. (Continuing.) -- yes.
BY MR. DECKENBACH:
Q. And we just had a break. Can you repeat that?
A. I did look at that, yes.
Q. And we heard testimony that IPCA testing combines an odor and comprehensive assessment. Is that true?
A. That's what the standard says, yes.
Q. Okay. And does the IPCA's testing require the same number of elements as recommended by SWGDOG?
A. My memory of SWGDOG is they want three elements tested and the IPCA has two.
Q. And, in regards to the actual certification testing, we

heard testimony that it isn't randomized, the hide locations are not randomized.

Do you think, in your professional opinion, that location of hides during certification tests should be randomized?

A. My memory of the testimony was that the selection of the number of hides was not randomized.

So in the IPCA standard it says, I think, zero to two, and that should be randomized.

Humans are unable to randomize without the use of some type of tool, like a coin toss or a random number generator. And so what happens is -- because this is another form of bias -- and this is an actual thing -- where evaluators, regardless of their -- their best efforts -- they're not conscious of it -- they -- they are creatures of habit, and they also have patterns.

And that's why randomization is such an important aspect for certification, for assessments, so that we don't get into patterns. And what happens is evaluators will -- they will tend to pick the same number of hides or they set them in the same places. It's just human nature to do so.

I have done analyses of placements in vehicle lineups where it turns out you have a lineup of, say, five cars from left to right, 1 to 5, and 90 percent of the hides -- some very high number, between 80 and 90 percent -- of the hides in

those types of sets are put between -- it's usually in the middle or Car 2 to 3. And very rarely is anybody putting hides at the ends.

And, if you randomize that through drawing numbers out of a hat or a random number generator, you are going to get a distribution that is not predictable. And that is the point of randomization, is you do not want to have the handler be able to predict what the solution is. Evaluators that just make decisions without randomizing tend to be predictable over time.

Q. We also heard testimony from Mark Hardee that a K-9 -- if a K-9 and handler fail certification, they can set up to run the test again through IPCA.

Is that process problematic, in your opinion?

A. No, I wouldn't say so.

If you're going to fail the test, you need to go fix the problem and come back and retest. Right? We -- if there's a problem, you want to fix it.

If a handler were to actually fail a test and then they set it up again on the same day or the next day without fixing the problem, is it just luck that they passed? I -- I don't know. You'd have to determine what the training issue was and how long it's going to take to fix it.

Q. And then last question on certification: We heard testimony that the vendor, Mark Rispoli, was present during

the certification process.

Is that problematic?

A. Well, that certainly adds a layer of pressure, doesn't it?

Because he's the vendor, he has a lot invested in the dog and the team and the contracts that he's getting. And so, you know, it just provides an opportunity for there to be some additional unnecessary pressure to affect the outcome of the certification, you know, potentially.

Q. All right. And then I'd like to pivot to the guidelines on recordkeeping.

Do you agree with the 088 recommendation that K-9 teams shall perform regular documented maintenance training, periodic proficiency assessments, double-blind assessments, and follow other recommended local, State, and Federal guidelines?

A. Yes.

Q. And why is regularly documented training important?

A. I would break that down into the two aspects. The first part is why do we have to perform ongoing training and then why is it documented.

So the reason that handlers need to be doing ongoing training is that practice makes perfect. So you want to be able to ensure that the K-9 and handler are working well together as a team and the dog understands odor and you're maintaining that trained final response that's so very

important in the field.

Also, you want to be able to challenge the K-9 with situations and training scenarios that it may encounter in the field so that the K-9 and the handler are prepared for those.

Why do we document ongoing training? Because everything is part of an investigation where it concerns law enforcement. And the training records are where we determine the reliability of the K-9, where we're looking at blind and double-blind trainings. You can use some operational outcomes to factor in or just to talk about, I guess, for reliability of the team, but you need to know the solution to the set in training to be able to assess false alerts, misses in training.

And so we have a saying in the research community -- and I think a lot of other people say it, too -- "If it isn't written down, it didn't happen." And so documentation is important, just like writing an accurate report is important. That's just part and parcel to any investigation.

Q. And are you familiar with the 088 guidelines regarding what types of information should be captured in training records?

A. Yes.

Q. And were you also able to review Trooper Martinez's and K-9 Becky's training records from September 2023 until January 2024?

A. Yes.
Q. And did those records reflect the required -- or the information -- all the information required by the 088 guidelines?
A. No.
Q. And the absence of information in those records, what negative effect does that cause?
A. Well, it certainly hampers anyone's ability to look at the details of the training.
What they have in their -- their training logs are -- it's minimal information that doesn't meet the guideline. We don't know who else was at training. We don't know who was setting things up. We don't know what the weights of the training aids are. We don't know anything about challenges the dogs might have had or mistakes or handler error.
There's a lot of information that isn't there. It -- it's just a -- a numeric form.
Q. The other type of records that the guidelines address are deployment records.
Were you able to review the deployment records -- I believe you testified you have reviewed the deployment records for Trooper Martinez and K-9 Becky between September 2023 and January of 2024. Is that correct?
A. Yes.
Q. And was there anything that stood out to you in regards to

those deployment records?
A. Well, K-9 Becky alerts every --
(Technical interruption.)
A. (Continuing.) -- she is taken out of the car.
BY MR. DECKENBACH:
Q. Hold on one second. We had another hiccup. And I apologize, but we just want to make sure this record is perfectly transcribed.
Can you start that sentence again?
THE COURT REPORTER: Thank you.
A. With one exception K-9 Becky alerts every time she's taken out of the car. So she has a 94 percent alert rate.
The handler says every time she gets out of the car, according to the deployment records, she alerts, but they only find narcotics about 50 percent of the time. And that's a problem when you have a dog that alerts every time it's taken out of the car and you don't always find drugs.
So that -- that is a problem, and that's an affective bias.
BY MR. DECKENBACH:
Q. And can you highlight why that represents a problem?
A. Because, if you're just doing traffic stops, you're not part of interdiction, and you're just pulling people over for traffic violations and then develop reasonable suspicion to run your dog around the car, the likelihood that every citizen

out there is transporting narcotics or has narcotics in their car, that -- that doesn't seem reasonable, that everybody in the public is involved with drugs.

And that's what this dog is saying, that "I always have a drug odor. Every time I get out, there's always drug odor. Always, always. Every time." So that's a problem.

Q. And what does the term "indiscriminate rewarding" mean?

A. Indiscriminate rewarding is when a handler reinforces behavior of a K-9 absent knowledge of target odor being present.

Q. And how might that look in deploy- -- or how might that shape a K-9's alert rates?

A. If you reward a dog every time it gets out just for running up to a vehicle or jumping on a vehicle, you teach the dog "That's what I want you to do." So that's how K-9s learn what is expected of them, what is -- what the handler wants them to do, is you reinforce the behaviors you want to increase the likelihood of occurring.

So you -- the way that we reinforce that is -- for K-9 Becky, at least, she likes a tennis ball. And she likes to be told she's a good girl but mostly the tennis ball.

So when she runs up to a car and starts jumping on it and the handler tosses her the ball, she learns, "Oh, that's what I'm supposed to do."

Q. Is there a particular danger in indiscriminately rewarding

a dog when they are not performing their trained final response?

A. Well, you undermine the integrity of the dog's training.

So if the dog has a trained final response and the handler reinforces behavior before the dog goes to final response, you are literally telling the dog "Don't worry about that focused stare. Don't worry about the sit. You don't have to do that. All you have to do is jump or wiggle" -- or whatever it is that the dog is doing at the time.

Whatever you reward the dog for doing, that's what the dog will do more of in the future.

Q. Trooper Martinez testified that he would deploy K-9 Becky when he already knew drugs were present in the vehicle in order to increase her stats.

Does that information impact how one should understand K-9 Becky's supposed success rate reflected in the deployment logs?

A. Probably.

Q. And is -- is . . . do deploying -- would you recommend deploying your dog when you already have information supporting probable cause that drugs are in a vehicle?

A. If you are going to use that as a real-world training example to your dog, to present that to your dog, then you should expect the correct and complete behavior.

So if, for some reason, you know for sure there's

narcotics in a vehicle and you get your dog out, you want to use that as a training example, and you would expect the dog to complete the process of going to final response before you reinforce the dog. That would be the proper way to take advantage of that situation.

MR. DECKENBACH: Your Honor, I'm about to go over some video evidence with Dr. Cablk. I'm not sure if this would be a good time for a break.

THE COURT: Absolutely. Thank you.

We'll stand in recess for 15 minutes.

Have a recess, Doctor.

THE COURTROOM DEPUTY: All rise. Court will stand in recess for 15 minutes.

MR. DECKENBACH: Dr. Cablk, we'll be back in 15.

(A recess was taken from 10:23 a.m. to 10:45 a.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

Mr. Deckenbach, are you ready to proceed?

MR. DECKENBACH: I am. Thank you.

THE COURT: All right. Please do.

MR. DECKENBACH: Thank you, Your Honor.

BY MR. DECKENBACH:

Q. Dr. Cablk, you testified that you had an opportunity to review some videos in this case involving Trooper Martinez and K-9 Becky, and I'd like to review some of them with you.

Okay?

A. Yes.

Q. I have what has been previously admitted as Exhibit R, which is a compilation of videos that I'll have stopped and started, but I'll reference the actual exhibits and the time stamps from the original exhibits as we go through them here.

So one second while we pull it up on the screen, Dr. Cablk.

MR. DECKENBACH: This first video is going to be a clip from Exhibit M1, which occurred on September 27th of 2023, and will be played from that exhibit 22 minutes and 58 seconds to 24 seconds and 31 -- or 24 minutes and 31 seconds. This has previously been testified as Trooper Martinez's and K-9 Becky's first deployment after their certification.

(Excerpt of Defense Exhibit R played.)

BY MR. DECKENBACH:

Q. Okay. And, Dr. Cablk, in that video Trooper Bracken corrects Becky for jumping on the vehicle.

From your experience, why would a handler tell a dog not to jump on a vehicle?

A. It's an undesirable behavior.

Q. And what makes such a behavior undesirable?

A. Well, it's going to scratch the vehicle. You know, that's -- nobody wants to have to pay to repaint somebody's

vehicle.

And there's no reason for a dog to be scratching someone's vehicle. Handlers went away from aggressive alerts a long time ago to save time and money, and it is not necessary for a dog to do that to be effective.

Q. And you previously were able to review this body camera exhibit in its entirety; is that correct?

A. Yes.

Q. And we heard testimony that later in this body camera footage Trooper Martinez tells another officer that Becky gets excited when she sees an open window.

What does it mean for a dog to be excited by the visual -- a visual thing?

A. It just means that's something that they're excited about.

We could see in that video that she only jumps on the car on the side where the window is down. On the driver's side both of those windows are up, and she's not jumping up on the car on that driver's side. So there's something about the window that she wants to get in. There's nobody sitting in that car, but that could just be like, "Oh, yay."

And, if she's been reinforced to jump on cars at open windows, of course she's going to do it. That's what she's been taught to do.

Q. And Trooper Martinez testified that in the body camera he stated that the excitement for the jumping towards an open

window is based on a belief she will get paid.

How do you understand a dog's behavior is affected by the anticipation of getting paid?

A. They're going to do the behavior that gets them their reward.

Q. Would a dog's excited response to an open window be the same thing as alert behavior to the presence of narcotics odor?

A. Are you asking if jumping at an open window means there's drugs in the car?

Q. Is that consistent with alert behavior to at least the presence of drug odor?

A. If there were drug odor coming out of an open window and a dog had that odor, you would expect the dog to go to final response pretty quickly.

Continued just jumping, jumping, jumping, jumping, that's just excitement, and that's what the dog's been reinforced to do.

So when we break that down, a dog that is motivated to get its reinforcer, meaning the toy or the praise -- but, in this instance, mostly the toy -- when that dog wants that toy and it understands very clearly the way to get the toy is to do that final response, the focused stare, pretty much as soon as they get odor they're going to lock up because they want to get that paycheck.

So persistent jumping behavior or continue to work around a vehicle is not indicative of target odor.

In fact, dogs that are highly motivated for their toy will get more and more animated when they are not in target odor because they are trying really hard. That's sort of a layman's way of putting it.

And there is the possibility that a handler can misinterpret those trying-hard behaviors to be alert behavior, particularly a new handler that's only been in school for two weeks and suddenly is put on the street with a dog that he doesn't really know.

Q. When, in the body camera, Trooper Martinez reports to dispatch that there was no alert, would that be an accurate observation based on your viewing of this video?

A. Yes.

Q. And Trooper Martinez, in the body camera, identified the jumping behavior towards the open window as a habit needing to be broken.

What would be a proper method for breaking a dog of a bad habit?

A. Well, you would address that in training and make it very clear to the dog that that behavior is undesirable.

And there are a variety of tools that you can use, pieces of equipment that you can use, but, ultimately, you need to be consistent and very clear, as a handler or trainer,

about what your expectation is and what behaviors the dog will do to earn her -- her reward.

This behavior of her jumping, if it is -- if I remember correctly, I think she's 10 years old at this time, so this would be a dog that has been allowed to do that behavior for probably years. And that's going to be very difficult to break, but it can be done.

Q. Is there a risk of a K-9 handler killing a dog's drive when attempting to break it of bad habits?

A. I don't know that you can actually kill drive. Drive is innate. It is something that the dog brings to the table. It's their -- it's their motivation. It's something selected for.

So can you destroy drive? I don't know that that is true. You can certainly use really harsh tools to teach a dog that a target odor is not desirable. I don't see that happening. This dog does not wear an electronic collar. I don't see her wearing any collar. And it looks like she's worked on a harness.

So when you have a dog that is superenthusiastic and is motivated for the work, telling a dog, "Hey, don't do that," that's not going to kill drive.

And, you know, some of the other testimony that I heard -- one of the other witnesses said, you know, "This is a dog that is a working machine. This is a dog that would

jump off a cliff if she had odor." She has been painted as a highly motivated dog.

So the likelihood that she is going to be deterred from wanting to do her job seems very low to me.

Q. Is there a distinction between a K-9's drive and a K-9's excitement levels or arousal?

A. Yes.

So drive is what motivates a dog, and dogs have different types of drives.

Some dogs are driven to play or to retrieve, like retriever breeds. We have drives that relate to hunting behavior. We have what we call prey drive, which is the desire to kill another creature. So those are all examples of drive.

Arousal levels have to do with the emotional state of the dog. We're calling it excitement here, but it's really arousal level. And those two things are not predictive, necessarily, of one another.

So you can have a high-drive dog that is pretty laid-back, is a mellow dog, if you will, in sort of layman's terms, that has a low level of arousal, and they can still be very, very effective.

Dogs that get too excited, that have very high arousal levels that go higher than their drive, they're not workable. They're not good dogs because they just -- they get

way too excited and they cannot focus on the task at hand.

So just because you have a dog that's superexcited to go to work, that doesn't mean that's a high-drive dog. You can have a dog that is superexcited but it could care less about retrieving a ball or eating a snack.

So those two things have to be parsed out when we're talking about what's going on with a specific dog.

Q. Do arousal levels vary depending on the type of breed of detection dog?

A. In general. But, certainly, you have to look at each dog independently.

So generally -- for example, I've got some sport dog handlers that have Rhodesian ridgebacks right now. And these are not high-arousal dogs. They're pretty laid-back. But they really like their treats. So they have a high-drive, low-arousal level. They're not really bothered by a whole lot.

In general, the spaniel breeds, the pointing breeds, they're -- yeah, they have a pretty high arousal. They're -- they're excited but they're not all over the top. So you really have to look at the individual dog.

When we talk about arousal, as well, that's something that can be patterned through reinforcement.

So, in Becky's example, she might naturally be a happy, excited, wiggly dog. And, if you encourage that

behavior, you can enhance it and have it persist.
Q. And you talked about spaniels being pointer dogs. Do a spaniel's inclination to arousal or excitement interfere with its ability to be still and point?
A. No. No, not at all.
It should be the opposite, actually. When they get target odor and they have that high concentration and they've made their determination based on their sense of smell, they should lock up. And that is why the spaniels and the pointers -- they're chosen for this work specifically for that ability.
Q. And would -- a spaniel that is excitedly jumping or scratching, would that be consistent with its alert indication or alert behavior?
A. No. That's -- that could be attributed to a number of factors. So that could just be, again, the dog's been reinforced. The dog's been taught like, "Hey, you should do this behavior. I like it. I'm going to pay you for it."
It could be that she's just excited and that's just her way. It could be -- it is possible that she's jumping up because she wants to sample the air coming out of the window, but it's not necessary.
And, again, if that dog jumps up and she's like, "Oh, odor's coming out of the window," that's when the dog should go to that final response. There's no need to continue to

jump and jump and jump and jump and jump.

Q. As we have mentioned before, Trooper Martinez testified that he didn't want to break her of her drive.

In your opinion, is a handler who's unwilling to break a dog of a bad habit qualified to continue working with that detection K-9?

A. Well, I think they clearly need some continuing education and maybe a little bit better understanding of classical and operant conditioning, the importance of timing, clarity, and expectation. That's what I would see. I think there's a deficit in understanding.

And if we're talking about a two-week handler school -- that's a great example -- they probably didn't get to that. There's a lot that you need to learn about handling dogs and understanding them and reinforcing them how odor works, all of those aspects. That is why handler school is usually around six weeks.

Q. We also heard testimony from Trooper Martinez that he subsequently identified this body camera footage to be of -- of an alert.

Do you see any alert behavior in this video?

A. No.

I see a dog that's trying really hard. I see a dog that clearly is excited about the open window and continues to sniff around the car.

If she had made a determination that there was odor coming out of the window, assuming this dog is properly trained, I would expect the dog to go to final response right then, right there, because she wants that paycheck.

That's not what we see. We see a dog that continues to work around the car and head clockwise up the driver's side. And she doesn't fling herself. She's just hunting. She's -- she's just working the car.

And then when her handler says "All right; let's go," she comes off the car without issue.

Q. I'm going to now show you, again, a -- just a shorter portion of Exhibit M1 and -- starting at 23 minutes and 10 seconds, and we'll play it until 23 minutes and 38 seconds.

And I'd ask you to observe this portion of video and see if you can identify any moment in which K-9 Becky engages in a focused stare.

(Excerpt of Defense Exhibit R played.)

BY MR. DECKENBACH:

Q. Did you observe K-9 Becky engage in a focused stare during this segment of the video?

A. No.

Q. And I believe Trooper Martinez stated that the focused stare occurred at 23 minutes and 32 seconds in that exhibit.

Do focused stares -- can a focused stare occur while the dog is actively jumping on a vehicle?

A. No. A focused stare is a passive final response where the dog stops moving and literally freezes and stares at whatever its -- whatever the thing is. That is a focused stare.
Q. Can a focused stare occur when a dog's head is moving around constantly?
A. No. They're supposed to freeze movement. They're just standing there locked up, pointing at the thing of interest.
Q. Does a focused stare normally require the pause function on a video player in order to capture the split second when the dog is performing that trained indication?
A. Absolutely not. The other part of a focused stare -- or with any final response, regardless of whether it's a sit or a down or a bark -- is the dog is supposed to hold that until the handler releases it. And that's something that is really important with the proper training of a focused stare. And it is a shaped behavior. So you're reinforcing that quiet, focused stare until the handler releases the dog.
So the idea that a dog can, in less than a second, perform a focused stare, that's incorrect.
Q. And in your years of experience, have you ever heard anyone in the industry or other handlers claim that a focused stare could occur while a dog is actively in motion?
A. I haven't heard that and I haven't seen it, and I actually don't know anyone who would agree with that.
Q. Okay. I'd like to return back to Exhibit R.

MR. DECKENBACH: And if we could advance the video about 20 seconds.

BY MR. DECKENBACH:

Q. We're going to see here in a second -- I'll read it into the record --

MR. DECKENBACH: If you could just press play.

BY MR. DECKENBACH:

Q. We're seeing the tail end of the body cam -- or the dash cam of the last deployment, but I'm going to draw your attention to the second clip that's about to play.

(Excerpt of Defense Exhibit R played.)

MR. DECKENBACH: And, for the record, Exhibit M2 is playing right now of the first deployment.

BY MR. DECKENBACH:

Q. And I guess I'll ask, as this plays, do you see Becky doing any focused stares?

In that one.

A. No.

Q. And in Exhibit R at 2 minutes and 41 seconds, does Becky's jumping on the trunk there indicate any type of alert behavior?

A. That looks like a dog that's working a car.

MR. DECKENBACH: Okay.

And if we can continue playing.

(Excerpt of Defense Exhibit R played.)

MR. DECKENBACH: And if we could pause again at 2:49 or 2:50.

BY MR. DECKENBACH:

Q. We just saw Becky kind of walk back and forth alongside the driver's side of the car.

Is -- walking back and forth or bracketing, as some have testified to it, is that alert behavior?

A. I did not see her bracketing, so I would not call that bracketing behavior. That's just a dog working a car.

Q. So if a -- if a dog changes direction and doubles back on a portion of a car, is that -- does that always mean it's bracketing, or can it be something else?

A. It does not always mean it's bracketing.

MR. DECKENBACH: Okay.

If we could continue the video.

(Excerpt of Defense Exhibit R played.)

BY MR. DECKENBACH:

Q. We're now going to see a portion of video from Exhibit E, 2:39 to 3:26, which is the second deployment of K-9 Becky on September 27th of 2023.

(Excerpt of Defense Exhibit R played.)

MR. DECKENBACH: Okay. We'll pause there for a second.

BY MR. DECKENBACH:

Q. What did you observe in that deployment?

A. There wasn't a lot of the dog to see in that deployment so the -- it's a little hard. I -- I could see Becky come in and out of view of the video, but -- but she wasn't really focused on -- on that -- that SUV.

And then her handler says, you know, "She's afraid of the dogs." So it doesn't seem like that was an effective sniff.

Q. When a K-9 handler deploys a dog and there is an unsuccessful or ineffective free air sniff, in your professional opinion, should that be reflected in the K-9's deployment logs?

A. If the K-9 was deployed, you'd want to record that.

Q. And even if it's an unsuccessful deployment, why would you want to record that?

A. Because the K-9 was deployed and you want to capture that.

Q. We heard testimony that the dog was proofed with dog -- with distractors, to include other dogs, during a certification.

What would keep that proofing from being effective in the field?

A. Well, you want to really recreate the scenario that you're trying to assess.

So if you just have a dog -- even a familiar dog or an unfamiliar dog -- that's just kind of in the area, that's just standing there, and consider that a demonstration that

you have a -- that your K-9 will work past another dog, you know, then that's one very specific situation.

And that is not the same situation as what we had in -- in the video that we saw where -- where I could hear dogs barking. I don't know where they were. I couldn't see them. But you could certainly hear two different dogs, at least, maybe more, but I heard two different vocalizations from other canines in the area.

And so if -- so that's enough, clearly, to disrupt Becky's concentration and her focus. Her handler said she was afraid. And so that would be something that you'd want to work on in training.

Or, you know, there is another alternative because the handler had an opportunity to ask the -- the woman -- assuming the woman was the owner -- she asked him at the start of the clip "Do you want me to put my dogs up?" and he said no.

So he could have -- seeing his dog's response, he could have gone back and, I suppose, asked her, "Hey, do you mind putting your dogs up?" And then he could have redeployed her.

Q. Does -- how does comparing -- how does this compare with distractor proofing with other items, such as food?

Is distractor proofing with food always effective in the field?

A. No, not always. Handlers will use less -- what we call a lesser-value food. Like if you put dry kibble out, that might be really interesting and desirable to some dogs, but other dogs, who aren't quite so food motivated, they -- they might not care about that. But, if you take steak or tri-tip, that's a much higher-value food reward, food item, and that could be the difference.

So if you're taking something that is relatively unpalatable and putting that out to see how a dog responds to it and then expecting that that will cover the full spectrum of food distractors in the field, you're really doing a disservice to maintaining your dog's training and understanding what their limitations are.

Q. And we saw in the training records that this dog had been proofed on fire hoses, tape, wood, painted metal.

Are these the type of distractors you would normally proof a dog on?

A. No. I'm not sure why a dog would confuse painted metal with its target odor.

Fire hoses, it is a possibility if your dog -- dog's reward is a fire hose toy. I don't know that that was something that Becky ever played with. They do make tug toys out of fire hoses. And so that's one thing that I could see as a possibility.

But the others, especially the painted metal, that

doesn't make sense. I'm not sure what that relationship would be.

Q. I would like to then draw our -- your attention back to Exhibit R.

This is going to be a short clip from Exhibit U1 from the third deployment on her first day in the field with Trooper Martinez, from 4:14 to 5:33.

And we'll start the video now.

(Excerpt of Defense Exhibit R played.)

BY MR. DECKENBACH:

Q. We'll pause it there.

Now, Dr. Cablk, we again see Becky jumping at the window and, again, she's corrected.

Did you see any alert behavior from Becky when she was jumping on the vehicle?

A. No.

Q. And did you see K-9 Becky engage in a focused stare at the trunk?

A. At the trunk she does slow down. She's got her paws still on the vehicle. But you have to take into account the fact that her handler has leaned over her at that point, and that is a -- that is a signal to her that her reward is coming.

So you can see elements of the prior training of the dog in that, but it is elicited by the behavior of her handler. It's not elicited by the dog.

Q. And how would a handler leaning towards or over their dog trigger a slowing down in their behavior?
A. Because they -- dogs read humans extremely well. They have evolved to read our body language. And they pick up on subtle clues or cues in our behaviors that we are unaware that we are doing. And the research has demonstrated this over and over again.
So subtle shifts in weight of the person, of the handler, leaning forward, all of those things the dogs come to associate with "reward is coming." And so, as soon as the handler reaches in his pocket to get its toy, that dog is aware of that, and she knows what she's supposed to do because she knows what is going to happen. And what is going to happen is "I'm going to get my ball."
Q. And Trooper Martinez testified about this stop that there was information from other law enforcement agencies that there may be drugs in the vehicle.
How might that impact a handler's cognitive bias regarding whether their dog is to be -- found to be alerting or not alerting?
A. It has a direct impact on that. That's the way the human brain works. We look for things to reinforce our beliefs.
So if you believe there's drugs in the car, you are going to see -- see things, whether they're real or not. You're going to interpret things to support your -- your

belief system, your bias.
Q. I'd now like to return back to Exhibit R where we left off.
And this is Exhibit B1. We'll play a clip from 9:40 to 11:45 of that exhibit. This is a stop that occurred in Rawlins on October 9th of 2023.
(Excerpt of Defense Exhibit R played.)
BY MR. DECKENBACH:
Q. In that video what did you observe, Dr. Cablk?
A. Well, she was jumping at the car again. And when the handler leaned over with the ball, she settled down.
The way that you -- so that's an artifact of training the focused stare. The way that you reinforce the focused stare is wherever the dog is settled and when they're locked up and looking, you walk up to the dog and you drop the ball, as we see in these videos. So the handler steps over top of the dog and he drops the ball right in her face. And that is how the dogs come to understand that "When my handler walks up to me, reward is coming."
And so I -- I see very similar behavior.
Q. Prior to Trooper Martinez leaning -- or towards -- moving towards the dog, did you see the dog engaging in a focused stare at any time?
A. No.
Q. Okay. And did you observe any changing in breathing that

could be objectively determined to be alert behavior?

A. I saw a dog working the truck. So she's sniffing while she's running the side of that truck.

Q. And is the -- the immediate reward in this circumstance problematic?

A. Well, it's an indiscriminate reward.

Q. And can -- and what is the problem with an indiscriminate reward in these circumstances?

A. Well, she may be right; she may not be right. What are you reinforcing?

So as soon as the -- when a handler gives a signal to a dog that reward is coming, that is what reinforces that behavior. So the -- paying her while she's jumping on the vehicle, that's problematic. When she is jumping on the vehicle and he walks up to her, she understands "Reward is coming."

So that is similar to saying "Yes" or what we call a terminal marker, meaning you are saying "That's what I want you to do," and it buys the handler time to give them a reward. So that's what's happening here.

Q. Does -- do some law enforcement agencies or dog handlers wait to reward their dog until after the presence of narcotics is confirmed?

A. Yes.

Q. Okay. And what -- how do they do that?

A. Sometimes what they do is they'll search the vehicle and then they find the narcotics, and they close the vehicle up. And they get the dog again, and the dog comes out and does its final response again, and they reinforce the dog at that time.

So they know for sure what's in the vehicle and where it was, and they have that expectation that the dog will do the final response, typically, again, because oftentimes they do it the first time out. And so they use that as a training opportunity.

Q. I'll then direct your attention, again, to another stop on -- in Exhibit R.

This is Exhibit F, which is the first stop on November 8th of 2023 involving the deployment of K-9 Becky. We're going to watch a short clip from Exhibit F from a time stamp 1:52 to 2:48.

(Excerpt of Defense Exhibit R played.)

BY MR. DECKENBACH:

Q. And, Dr. Cablk, in that video is that consistent with the other videos we've been observing today?

A. He doesn't allow her to jump for quite the length of time, but she jumps in the same spot. And the rear window is down, and there's a person in the car. So she's jumping and he leans over and gives her a pet and tells her "Good -- good dog."

So what he's reinforced there is scratching at

vehicles and jumping. That's what she was just taught there.
Q. And is any of that -- any of that behavior consistent with alerting to the presence of a narcotics odor?
A. Not necessarily. Could just be jumping because she's been taught it, "Go ahead and jump. That will get you paid." We can't say that -- that is the problem. That's what we're looking at here.
If she was jumping up and then dropping down into a focused stare, we'd be having a very different conversation. And I do not see that with this dog.
Q. And then you were provided a copy of a video, in some form or another, of all traffic deployments in that window from September 2023 until January 24th of 2024; is that correct?
A. Yes, I believe so.
Q. And were those videos that you observed con- -- in any of those videos did you observe K-9 Becky to go into a focused stare without any interference from Trooper Martinez?
A. No. And, in fact, one of the videos included a sniff that would have demonstrated that she was actually trained to do that. And -- and that didn't happen.
Q. Well, I would want to draw your attention to a video from January 14th. It's Exhibit K2. And just one second. We're going to start it at 1:35.
We heard testimony from Trooper Bracken yesterday that he was involved on this date in a test to see if

K-9 Becky would alert to a presence of THC in a wax candle.

So if you can just hold on one second, we'll play portions of that.

We're starting at 1:35.

(Excerpt of Defense Exhibit K2 played.)

BY MR. DECKENBACH:

Q. Here, we see -- what appears to be occurring in this video, Dr. Cablk?

A. They have an item of interest, and they want to run the dog on it to see if the dog responds to narcotics odor.

Q. Okay. And --

A. So they've -- I'm sorry.

Q. Go ahead.

A. Well, this isn't set up in a way to actually conduct that type of assessment correctly. Because the handler is involved in the setup, number one. And, if you're going to run a dog on a line of parcels, you have somebody set it up so that the handler doesn't know the answer. Right? That's -- that's part of the assessment.

Number two, the dog needs to have equality in terms of the contents of the boxes. And it doesn't mean it has to be the exact same thing, but there do need to be other things under the boxes. Because, otherwise, the dog is just telling you, "Hey, there's something underneath here. This is the one box that is different."

I don't know that Becky was trained to do this type of a lineup. It is not part of our certification, and I didn't see that they had set it up in training. The handler only went to handler school for two weeks, and he said "I've never done this before," so that might explain why this wasn't set up correctly, because it was outside of their level of training.

So what we have is three boxes that the handler put out and one of which has something underneath it. If you were to do this properly, the handler would have exited the room, and then the helper, the other officer, he would have gotten other items to put underneath it. So maybe they're in an office building. Maybe somebody else had a -- an actual candle. Maybe he would have put a sandwich. Maybe he would have put the handler's gloves. You know, I don't know.

But it is not a valid assessment for the handler to set out three boxes and only one of them have the article of interest. That's not how we do that.

Q. I'll now advance the Exhibit K2 to the 4-minute mark, and we'll play it to about 4:28.

(Excerpt of Defense Exhibit K2 played.)

BY MR. DECKENBACH:

Q. Now, Dr. Cablk, in that deployment there, what did you observe?

A. That would have been the best opportunity to demonstrate

that Becky, in fact, had a focused stare final response, and she clearly does not.

And the reason I say that is, you know, those boxes are on the floor. So there's no need to jump. There's nobody sitting in a car. There's no vehicle involved.

And boxes -- those types of boxes are -- it's not uncommon to use something similar to that when you're shaping that behavior. So this should have been an exercise that she had a very clear understanding of what she was supposed to do, and that is she gets to the box and, assuming there's odor there -- we're making that assumption -- I mean, maybe that actually didn't have THC in it and that's why she was just digging, because it was the box that was different.

But what we would expect to see is her to go up to that box and just lock onto the box and sit there quietly. And, instead, what we see is she is acting like a bulldozer and digging at the box. And she lifts the box up, and her handler has to step in. And he actually reinforces that bad behavior, which is the digging and trying to tip over the box.

So that would have been a great example, very straightforward, assuming that's target odor, for her to run over to that box and sit quietly and just literally freeze and look at the box. And we didn't see anything remotely resembling that.

Q. Thank you.

I'll now want to, finally, get to the video at issue in this case. We'll pull up Exhibit R, and I will identify what exhibit this is a clip of.

We're going to see a clip from the deployment in this case that happened on January 24th of 2024. This is a clip from Exhibit A1 that will be played from 1:10 to 1:15.

(Excerpt of Defense Exhibit R played.)

MR. DECKENBACH: We're now going to play a second clip of this deployment, which is from Exhibit A3, a dash camera, and this will be from the 5:39 minute mark to the 6:05 minute mark in Exhibit A3.

(Excerpt of Defense Exhibit R played.)

BY MR. DECKENBACH:

Q. Now, Dr. Cablk, did you have the opportunity to review the entire video, both of the dash and of Trooper Martinez's body camera, for this deployment?

A. I did.

Q. Okay. And what did you observe about the conditions on this evening during this traffic stop?

A. It seems to be typical of their types of operational deployments. You know, it's -- it's cold. It's nighttime. But it's not like there's a hurricane bearing down. We're not on the side of a cliff. There aren't any unusual circumstances. So this would be typical of their deployment types.

Q. And what on this specific deployment, if anything, did you observe about K-9 Becky's behavior?
A. It looks like all the others where she's animated, she's excited, she's jumping up at the window. The passenger window is down, and she jumps there because that's her -- that's -- that's what she does.
And then, very quickly, while she's jumping, her handler reaches into his pocket. And, as soon as he takes a step forward and leans over top of her, she settles and he pays her.
Q. And is anything in her behavior -- I think you've described it as flinging herself at the vehicle.
Is anything in that behavior indicative of her being in the presence of narcotics odor?
A. With this dog she's been reinforced to do that behavior. So we -- you cannot attribute target odor to her jumping and scratching at vehicles.
Q. And we heard testimony that the change in breathing in this case -- or Trooper Martinez observed a change in breathing that he understood to be an alert.
What does a K-9's breathing through her nose signify when she's conducting the free air sniff?
A. That she's sampling the air.
So changes in breathing alone, to the extent that a human can hear, you cannot attribute that to anything other

than the K-9's changed their breathing pattern. Whether it is because they are sampling something delicious in a car or a person or anything else, all you can say is that "My dog is sniffing." And that's what these dogs are supposed to be doing. They're -- excuse me -- they are supposed to be sniffing.

And, interestingly, there is some brand-new research that just came out where they actually measured, in a laboratory environment, the sniff rates of K-9s that are detector dogs. And there is a range of variability for K-9 sniffing in the presence of their specific target odor. So you cannot say that a dog that is smelling narcotics sniffs at this rate specifically and that means for sure it's narcotics because that's not true.

Q. And so would a dog smelling something interesting, like fried chicken, make the same type of breathing noises through their -- through their nose?

A. Possibly.

Q. And in this video did you see any type of bracketing that indicated K-9 Becky was in the presence of narcotics odor?

A. No. I just saw her flinging herself at the car like she always does, and then the handler paid her.

Q. Did you see any K-9 head snaps? Did Becky snap her head in a way that could possibly mean she was in the presence of narcotics?

A. I did not.
Q. Is there any research to support an assertion that a set -- any set of -- or combination of unique behaviors are tied specifically to a target odor?
A. There is no research on that.
Q. Is there any evidence to support such a claim?
A. Handlers believe that they can read their dogs to be exhibiting target-specific odor. But they haven't set it up correctly in training, and they have never actually demonstrated that to be true.

So when handlers talk about, "Well, we -- you know, I proof, I put tennis balls out, I put food out," they know the answer. They know where those things are. They set themselves up so that they can correct the dog for -- should the dog respond inappropriately, like go to final response or spend too much time investigating toys or food or whatever it is they put out. So they know the solution to that, and that is not the way that you assess whether you can correctly interpret your K-9's behavior on target odor.

So if the only option is your dog is responding to target odor and that's it, like during a training or the certification that they do -- there's no distractors placed out in that -- it is, I think, normal that a handler would say, "Oh, well, I see -- I see my dog is sniffing, so the only thing that my dog could possibly be sniffing is target odor;

that must be what it looks like," but they haven't actually done what they need to do to determine if they can read the difference.

And the little bit of research that's out there on, in general, a human's ability to interpret K-9 behavior is, yeah, actually people are not that good at it and some people cannot do it.

Q. And does cognitive bias play a role in the handler's inability to make a distinction like that?

A. Yes. That is the problem with the -- with the bias and specifically the -- the confirmation bias part of cognitive bias, which is we look for evidence that supports our suppositions. And so the brain literally weeds out things that do not match, that do not support what we believe, and it looks for things that do. And that is where the misinterpretation comes in.

So just because you see a dog sniffing doesn't mean that that means that dog has target odor. Dogs sniff a lot of things.

Q. Can tail-wagging be a sign -- or is tail-wagging unique to a dog being in narcotics odor?

A. No.

Q. Is scratching unique to a dog being in narcotics odor?

A. No. Generally, scratching is discouraged. We don't want that.

Q. Okay. And then, finally, is jumping unique to a dog being in narcotics odor?
A. No.
Q. And why -- what would let the handler know the dog is, in fact, in narcotics odor? What kind of response?
A. The only thing that is for certain indicative of target odor is that trained final response. And that is why so much time and effort is put into training a final response and maintaining it.
Q. And is there a reason that you could explain, through your expertise, why a handler could go from understanding a behavior to be a bad habit to understanding it to be an alert behavior?
A. No.
Q. And is it possible for a K-9 to become trained to focus on certain parts of a vehicle even in the absence of narcotics odor?
A. Absolutely.
Q. And how would this occur?
A. The timing of your reinforcement.
So, in this case, we're talking about a dog that's trained to jump. And so she has been reinforced repeatedly that "When I jump, I get paid."
Similarly, in training, if you had a dog that was focusing on a door seam, for example -- I see that. Dogs are

trained that door seams are where they are supposed to go to final response. So they're reinforced for putting their nose on door seams, even though the odor is coming out of the window above. That is one of the ways you can see if there are some positional training or fixations on the part of the dog that's been reinforced.

Q. I'd like to briefly show you part of Exhibit R at 10:33. This is a -- going to be a clip of a stop that occurred on December 3rd.

Just one moment.

(Excerpt of Defense Exhibit R played.)

BY MR. DECKENBACH:

Q. Dr. Cablk, in that video did you see -- observe K-9 Becky to be jumping again?

A. She did do some jumping.

Q. Did you also observe her to be sniffing along what appeared to be some type of scratch on the side of the vehicle?

A. I did. And I found that very curious.

Q. And what was curious about that portion of the video?

A. This -- that is an all-white vehicle. There isn't -- at least in the frame where the dog is, there's -- there's not anything to break up the different parts of that vehicle colorwise except for those horizontal scratches that run along lengthwise on the vehicle, sort of parallel to the ground.

And those are -- they're just scratches. Right? So we can't see through them that I can tell from the video. It doesn't appear that those go all the way through the door and present an open space for the air inside the vehicle to exchange outside. So it appears to be superficial.

And I saw Becky do what we call detailing. So she sees those, and she runs her nose along them and -- as if she's sniffing them, but that is not a place that would be productive for odor. Right? The open window is the place that would be productive for -- for odor to come out.

And, yet, she fixates on those horizontal scratches and puts her nose on them, and that is where her handler throws the ball and reinforces, which is a way -- it's just another example of the poor timing and bringing into question what exactly is this dog being rewarded for on these vehicle sniffs.

Q. Throughout your review of all the videos, did you observe Trooper Martinez to be indiscriminately rewarding K-9 Becky?

A. Yes.

Q. And did any of his rewarding appear tied to her final trained response?

A. No.

Q. Did K-9 Becky's -- or did Trooper Martinez's rewarding appear tied to any specific alert behavior?

A. Well, if you consider jumping and scratching alert

behavior, that's what's being reinforced.

Q. And do you consider jumping and scratching to be alert behavior?

A. No.

Q. And would you agree with Marc Russell's determination that it's a bad habit that she needs to be broken of?

A. Absolutely.

Q. And what impact is there when a K-9 is rewarded for a myriad of behaviors during a deployment?

A. It undermines the integrity of their training. It teaches the dog that -- that final response isn't necessary. It teaches the dog what is necessary. And whatever you're reinforcing is what continues to happen with increasing frequency and predictability in the future.

Q. And what happens when a handler does not insist on their K-9 performing a final response?

A. They stop doing it.

Q. And does that appear to be what's occurring here in the videos you've observed?

A. Yes.

Q. And does it appear, in your professional opinion, that Trooper Martinez is misrepresenting K-9 Becky's -- or misunderstanding K-9 Becky's behavior?

A. I believe he is misunderstanding and misinterpreting his -- his dog's behavior.

Q. And, in considering the records and videos you've reviewed of K-9 Becky's deployments with Trooper Martinez in that time frame of September 2023 and January 24th of 2024, do you have an opinion about whether K-9 Becky was reliably alerting to Mr. Ostertag's vehicle on January 24th of 2024?
A. I don't believe she was.
Q. And what is that opinion based on?
A. Reviewing all of the videos and the training records, deployment records, and listening to the testimony.
Q. And you have been previously retained by my office, specifically me, on K-9-related cases; is that correct?
A. Yes.
Q. And in any of those cases have you ever advised me that you've observed what appeared to be a legitimate alert?
A. Yes.
Q. Is that often what you advise me?
A. Up until now, yes.
Q. Okay. And I want to touch briefly on the topic that was brought up by the Government's witnesses of residual odor.
We've heard testimony that Trooper Martinez believed there to be residual odor in the vehicles when no narcotics were found.
Can you explain to the Court how residual odor works?
A. Residual odor are the odor molecules that persist or linger in the absence of the original target. So as long

as -- in this case, narcotics. As long as the original source of narcotics, the narcotics itself, are present, the odor is coming off of those narcotics. It's continuing to produce odor.

And once you take away the narcotics, there will be those molecules that linger in the absence. But how long they linger and under what conditions is completely unknown territory, completely unknown. We do not have research on that.

The way that we talk about residual odor in terms of giving a -- an example that humans can relate to would be, for example, you step into an elevator and the elevator is empty, and you clear -- you can smell somebody had cologne on. But you have no idea how long ago they were in the elevator. You have no idea when they put that cologne on. All you know is that, "Hey, I smell cologne" and that's it.

So you get out of the elevator and do whatever you're going to do, and then you come back, and you don't smell that cologne anymore.

And at -- how long that odor persisted in the elevator when you were away from it, you know, who knows? It depends on -- what kind of cologne was it? How much did the person put on? How long ago had they left the elevator?

We don't know any of that. All we know is that when we stepped into the elevator, boy, it sure smelled like

cologne.

And when it comes to narcotics, there's no research on that. I have heard so many different opinions from people about how long it persists, but the reality is nobody can say anything about that with any degree of certainty.

Q. And Trooper Martinez testified that on that October 9th stop he reported the presence of used narcotics odor but he could not smell it himself.

In your experience, why would handlers be convinced there must be residual odor when no drugs are found?

A. If they blindly believe their dog.

Q. We did hear testimony from Trooper Martinez that K-9 Becky is a hundred percent correct all the time.

In your experience, is that a plausible claim?

A. Absolutely not.

Q. And we also heard testimony that K-9 Becky performs well in controlled training environments.

How could it be possible that K-9 Becky passes her training in controlled environments but is not being deployed reliably by Trooper Martinez?

A. Well, in training, they're using their kits, and they're using the same narcotics training aids over and over and over again.

And dogs should be proficient and fluent with their own training aids because they know those better than anything

else. Right? They've . . . research -- very recent research, again, has come out that showed just interfacing with -- interfacing a dog with a specific target once is enough for them to remember it, that specific one, and then become proficient with it very quickly.

So, of course, the dog should look really good in training, in its familiar environment with its familiar training aids. You would expect that. That's kind of a gimme.

The challenge is getting that dog on what we call variants, which are different training aids or real drugs that we expect them to find in the field, so that the dogs do what we call generalize and say, "Oh, yeah, this smells a lot like the thing that I normally train on, enough so that I think I'm going to tell you about it," when, in training, we expect the dogs on their own hides to look really good.

And that's why it's important for handlers to train with other people and train on different aids and go to different places. And they're supposed to be doing their best to recreate operational requirements when they're in the phase of wanting to do maintenance training and challenge the dog with new experiences.

Q. We also heard testimony that Trooper Martinez was able -- is able to get Becky to perform her final indication through kind of prolonged presentation drills or delayed presentation

drills.

Why, in your opinion, isn't that replicated in the field in the videos you observed?

A. I don't know why. I don't know why he is -- I can't answer that question. I don't know what his thought process is on that.

Q. We also heard testimony that K-9 Becky passes her certifications without issue. How is it possible that K-9 Becky can pass these certification tests easily but fails to be deployed reliably in the field?

A. Well, she's -- she's certified on familiar training aids, so that makes it easy for the dog.

Q. Does the amount of -- I think we heard testimony that 20 grams of the target narcotic is used during her certification.

Does that impact a dog's performance in a controlled environment?

A. Absolutely.

The difference between 20 grams of a narcotic and what -- what we talked about with residual is substantial. I talked about how residual is just the molecules that remain once you take that target away. But when you -- so the difference between a few molecules existing and 20 grams of a substance, that's a big difference. And so it should be straightforward for a dog to detect 20 grams of narcotics,

especially its own training aids. So that -- that's what you expect.

And narcotics dogs are supposed to produce narcotics. The goal of a narcotics dog is not to tell you "There used to be drugs in the car." The goal of a narcotics dog is "There's drugs in the car right now."

And so that's why they put those lower limits, those minimum amounts, in certification testing.

Q. In consideration of all of the evidence you've told us you've looked at, do you believe K-9 Becky alerted in a way that provided Trooper Martinez probable cause to search Mr. Ostertag's vehicle on January 24th?

A. No.

MR. DECKENBACH: Your Honor, I have no further questions for this witness.

MS. MARTENS: Since it's noon on the dot, should we perhaps reconvene after lunch?

THE COURT: I think that would be a good idea. This witness has been on examination for quite a while.

Doctor, we'll have you back in an hour and 15 minutes.

THE WITNESS: Thank you, Your Honor.

THE COURT: We'll stand in recess.

(A recess was taken from 12:00 p.m. to 1:14 p.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

THE COURTROOM DEPUTY: We've lost -- we don't have your witness, either.

MS. MARTENS: Oh, she's not?

(An off-the-record discussion was held between the courtroom deputy and the Court.)

MS. MARTENS: And I apparently got booted off the internet, and I'm now booted from Zoom, so I can't share anything with the witness. But -- I do have paper copies of most of the things that I had intended to share, so I'll keep trying to get the computer to cooperate, but I don't think that should -- at least on my side, I don't think that that's going to cause a huge problem, at least not right now.

MR. DECKENBACH: But you don't see her in the room?

THE COURTROOM DEPUTY: She's not in.

(An off-the-record discussion was held.)

THE COURT: Good afternoon.

THE WITNESS: (Indicating.)

THE COURT: Ms. Martens will conduct cross-examination.

MS. MARTENS: Thank you, Judge.

Good afternoon, Dr. Cablk. How are you?

THE WITNESS: Good afternoon.

MS. MARTENS: Are you well?

THE WITNESS: Yes. Thank you.

MS. MARTENS: Glad to hear it.
All right.

CROSS-EXAMINATION

BY MS. MARTENS:

Q. So we haven't spoken before court. That's correct?
A. No.
Q. All right. I was experiencing a little bit of technical difficulties making this all go, so I'm going to be clicking a couple of things while we sort of start our conversation to try and get myself back up and running as I had hoped to prior to starting court here. I was all tested and ready and then it didn't work.
So I do just want to go back over with you some of your education and experience. If I can get admitted to the Zoom hearing, I do have a document that I'll show you, and I have it in paper if we don't want to do Zoom just yet.
THE COURTROOM DEPUTY: Okay. I don't know that -- are you going to present or --
MS. MARTENS: Yeah. Can you see me in the Zoom hearing?
THE WITNESS: Are you talking to me?
MS. MARTENS: I'm sorry. I'm talking with the clerk. She's running all of the technical stuff here to make it work.
THE COURTROOM DEPUTY: Okay.
MS. MARTENS: So she's admitting me to the Zoom

hearing so that I can share a document with you since you're appearing by Zoom.

That appears to be working, I think.

BY MS. MARTENS:

Q. What I would like to do is show you a document that I have marked as Government's Exhibit No. 17.

And I think I need to share. There we go.

Are you seeing a copy of your CV?

A. It looks like it.

Q. All right. Do you see that blue file stamp across the top?

A. Yes.

Q. I'll represent to you that that case number is from United States versus Thin Elk, which was a --

A. Okay.

Q. -- Federal case in South Dakota. Do you recall that case?

A. Yes.

Q. All right.

This document is 15 pages. I'm just going to scroll through it so you get a chance to look at it. Down to the bottom.

Does that appear to be at least then, in December of '23, what was a current copy of your CV?

A. Yes.

MS. MARTENS: All right. So, at this point, I'd like

to move for admission of Government's 17.

MR. DECKENBACH: No objection, Your Honor.

THE COURT: Received.

(Government's Exhibit 17 received into evidence.)

BY MS. MARTENS:

Q. All right. So I realize that this copy of your CV is from the end of 2023, so there's probably a little bit that we need to update the Court on.

So, in the last couple of years, are there things that you would have added to this document?

A. Probably.

Q. What are they?

A. My affiliation with the University of Tennessee.

Q. Anything else?

A. I would have to call up my current CV and take a look. So, you know, off the top of my head -- I mean, I'm continuing to train handlers, and I have that affiliation with Tennessee and the National Institute of Justice-funded research program, things like that.

Q. Yeah. And you've got some upcoming presentations we already talked about. I think on February 17th you'll be presenting or doing a workshop called "Can Human Remains Detection K-9s Teams Detect Residual Odor? Results of Odor Recognition Tests and Chemical Analysis."

A. Correct.

Q. So when I went through your CV -- and correct me if you've published anything additional in the last two years -- I see a bunch of publications and presentations.

So starting from the top, though, we see that you have a bachelor's in biology, a master's in environmental management and resource ecology, and a PhD in forestry.

Right?

A. As I described, yes.

Q. Yes. And then, you know -- so you're a professor emeritus at this point; is that right?

A. At Desert Research Institute at the University of Tennessee, Knoxville, I am an adjunct professor.

Q. So in academia would you agree that it's important to publish or present in your area of expertise?

A. Yes.

Q. Are you familiar with the expression "publish or perish"?

A. Yes.

Q. I thought so. And it seems like you've done that quite a bit.

A. Okay.

Q. I mean, your CV's 15 pages long.

A. I have. Yes, I have published.

Q. So, as we go through those publications, I see a lot of issues related to human remains-detection dogs.

A. That's correct.

Q. And a good deal of publication on wildlife detection, specifically desert tortoises.
A. That's correct.
Q. And I think that you are presently a dog handler yourself.
A. Yes.
Q. Of human remains-detection dogs?
A. Yes.
Q. And am I right that you are on your fourth human remains-detection dog?
A. Yes.
Q. What organization certifies your dogs?
A. Over the years it has been several different organizations. At present I am certified to the State of California's specialized HRD, which has adopted the AS -- the NIST ASB 076 first edition draft.
Q. Is that the only place you currently certify your dogs?
A. For HRD, yes.
Q. Do you have dogs certified in any other area?
A. Water.
Q. Water?
A. Yes.
Q. What's that?
A. Drowning victims or evidence of people -- they don't necessarily drown; they are dumped in the water. So it's submerged victims under water.

Q. So is that also a human remains subspecialty?
A. No. It's its own certification.
Q. Okay. So it could be human remains or other objects submerged in water?
A. No. It's -- it's a stand-alone certification.
So it's not like an add-on that you would just tack on. It requires its own unique training and testing, and that is a completely different standard. But the people are dead. It's the same target. It's the context.
Q. Okay. All right. That -- I guess that was maybe where we were missing each other. So I was wondering what the target is.
So I think the target is still human remains; it's just with the water element.
A. Right. Sort of like the difference between an avalanche dog that is snow context specific and a regular area dog that finds missing people.
Q. So have you ever published in the area specific to certification standards for narcotics dogs?
A. No.
Q. Or training protocols specific to narcotics dogs?
A. No.
Q. Have you ever published any papers specific to narcotics dogs?
A. Nope.

Q. Presented specific to narcotics dogs at a sort of peer, scientific, say, committee or organization like the American Academy of Forensic Sciences?

A. Not solely on narcotics. But when I speak about detection dogs, I talk about a wide range of disciplines, and narcotics is one of them. Land mine detection is another. Wildlife conservation is another. Finding live people is another.

So in that context, yes, I talk about narcotics dogs but not specifically "Here's a talk about just narcotics dogs."

Q. And does that go with the discussion you had earlier with Mr. Deckenbach about a lot of the -- the olfaction, the physiology of detection is the same?

A. Correct.

Q. But training can be different, though; right?

A. Well, the targets are different.

Q. So you've never been a certified narcotics dog handler?

A. That's correct.

Q. And you have never trained a narcotics dog team from selection of the dog through certification?

A. That's true. Just in various aspects of their training.

Q. So like in other, more generalized workshops that might apply to multiple disciplines?

A. Sure. Or I have narcotics K-9 handlers come through my training, and they'll participate with their dogs. Oftentimes

they're looking for information to solve a problem.

And so, yeah, it's not like I have no experience with narcotics dogs. I'm not a narcotics K-9 handler myself, but -- but I do have experience working with them.

Q. But in workshops where it would be just as appropriate to work with a human remains-detection dog or an explosives dog?

A. No. I have narcotics teams that come through just as a group of narcotics handlers.

Q. But would that curriculum be specific to -- the curriculum you developed -- be specific only to issues faced by narcotics dogs handlers?

A. What would be an example of an issue that was specific only to narcotics dogs? I'm not sure I'm understanding.

Q. Well, and I think that this is something else I want to talk to you about anyway, is . . . the sorts of scenarios that are presented in each discipline may be different from each other in terms of operations? Isn't that fair?

A. Well, if you're talking about vehicles, no, because HRD dogs do a lot of vehicle sniffs. Explosives dogs do vehicle sniffs. And contraband dogs, like the wildlife poaching dogs, they do vehicle sniffs. So I would not agree with that.

Q. So is it your testimony that there's no difference, then, between the way that you might present a real-world scenario to any of these disciplines?

A. I'm saying that -- are there specific contexts that relate

to the narcotics dogs that don't apply anywhere else to any of these other disciplines? No, that's not true.

Q. Okay. And along with not being a narcotics dog handler -- you already talked about not being a sworn peace officer, but you're an auxiliary deputy; is that right?

A. That's right, yes.

Q. Are those volunteer or paid positions?

A. They're volunteer positions.

Q. And is that mostly search and rescue based?

A. Search, rescue, and recovery, yes. I -- I am not a peace officer. I do not portray myself as that. I am very clear.

Q. Have you ever deployed your dog during something like an active roadside stop?

A. Like a -- a traffic stop like they do with narcotics where they're trying to get probable cause to a car?

Q. Yes.

A. We do vehicle sniffs on -- where vehicles are left on the side of the road, but they're not part of traffic stops where we're trying to get probable cause in the exact same manner.

So I do vehicle sniffs frequently but not because I'm driving around in a police car and I'm a sworn peace officer, no.

Q. Yeah. So it would no longer be an active stop by the time you are coming to -- on scene?

A. Typically right.

Q. So in preparation for your testimony today, did you interview anyone from the International Police Canine Association?
A. No.
Q. So you haven't talked to anybody about how it is that they set their standards for certifications?
A. Well, they have the document that is supposed to be the written standard for that, and that's what I reviewed.
Q. No outside information about California Narcotics Canine Association, CNCA, or IPCA, the International Police Canine Association?
A. I -- I didn't go and look into anything other than what was provided to me.
Q. So you have no idea how it is that they're organized?
A. Well, I know it's a nonprofit organization. I actually belong to it.
Q. Currently?
A. I'm a member of the -- yeah.
Q. Have you ever attended a training?
A. Not yet. That's something that I'm hoping to do.
Q. When did you renew your membership?
A. Well, I'm sure I have in the past year.
Unless -- unless they have dropped me and I'm not aware of it. Then that is entirely possible. But I do pay my dues, and so I am a member.

Q. Were you aware that the organization expects you to be a sworn peace officer to be a member?
A. They do allow for nonsworn individuals to participate. And, since I am -- I do have an affiliation, an official affiliation with sheriffs' offices, that qualifies me.
Q. So have you ever -- you haven't attended any trainings?
A. No.
Q. Ever been invited to speak?
A. That's something that I'm hoping for.
Q. But it hasn't happened yet?
A. Correct.
Q. Ever, as a dog handler, gone through one of their certifications?
A. No. I'm -- they don't certify in my disciplines.
Q. So then why be a member?
A. I am interested in their conference. They do bring in academics and some of my peers, and so I'm interested in that. I also live very close to the state of California, so I am interested in promoting best practices and being up-to-date on who's doing what. I think that's important.
Q. So you're aware that they're a nonprofit. But do you know, say, how their board functions?
A. No.
Q. How they handle conflicts of interest, for example?
A. No. I'm not a board member. I -- I am just a member of

this organization. I pay my dues, just like anybody can be a member of any of the other national organizations.
Q. Okay. So same for highway patrol. Have you ever interviewed anyone regarding how highway patrol conducts its K-9 program?
A. No.
Q. Observed or participated in K-9 training conducted by Wyoming Highway Patrol?
A. No.
Q. Observed or participated in any of their internal assessments that they have -- that Wyoming Highway Patrol conducts?
A. No. I don't know that that's allowed.
Organizations and agencies often don't open those up, so I don't know that that's even an opportunity I'd be afforded.
Q. Have you ever talked to Trooper Martinez?
A. No.
Q. Ever personally observed K-9 Becky beyond the videos for court?
A. No.
Q. So you talked some with Mr. Deckenbach about some standards, and we talked about SWGDOG, and we talked about NSIT -- or NIST. Yeah.
A. Right, NIST.

Q. That's the National Institute of Science and Technology; right?
A. I think it's the National Institute for Standards and Technology.
Q. Thank you.
So I want to talk a little bit about those organizations. So would you agree that the standards put out by SWGDOG are best practices?
A. SWGDOG did not put out standards. SWGDOG put out guidelines.
Q. And would you consider those guidelines best practices?
A. At the time that was their intention, yes.
Q. Yeah. And you talked about how NIST is updating those guidelines. And so would you call those the best practices available in the field as they're being published?
A. Yes.
Q. So in an area where no new NSIT [sic] guidelines have been published, would SWGDOG still be the best available practice?
A. Yes.
Q. And can you clarify for me again -- I think you said something about the consensus body.
Can you explain exactly how it is that the National Institute of Science and -- Standards and Technology -- I think you corrected me -- and the standards boards are organized?

A. Yes, to the best of my ability to explain this because I think it is a little confusing.

So NIST has taken on the role that SWGDOG once had. And they are going to be the publisher of the standards. To do that, they put together what is called the Organization of Scientific Area -- Areas of -- something. And I apologize I cannot remember the acronym. But it is O-S-A-C, OSAC. So NIST has this OSAC, and they are responsible for all of the standards.

The way to accomplish writing those standards, though, is to go to the American Academy of Forensic Sciences, because K-9s are a forensic science discipline, and the academy has what they call their standards board, the ASB.

And the Academy Standards Board has working groups, so this is this whole tiered approach, if you will, the Federal entity that will be publishing the standards, because they are standards at a Federal level, and then you drill down through all of the forensic science disciplines to the -- to the OSAC, to the dogs and sensors subcommittee. They have a consensus body, and that is a group of individuals who receive the standards from all of the working groups, and the consensus body votes to approve or not approve the standards that are then published through the NIST OSAC.

I'm not sure if that clarifies. There's a lot of acronyms, and it is a -- sort of a hierarchy.

Q. So would you have any reason to be aware of who serves on the OSAC dogs and sensors subcommittee?
A. At the OSAC level Paola Tiedemann, I believe; Ken Furton, maybe Suzy Perry. I have not looked at that list. I'm not a part of the NIST OSAC. I am a part of the academy's consensus body and working groups.
Q. So you don't know the complete membership list of the -- of the OSAC subcommittee?
A. I haven't memorized it. So I -- I would have to look it up because I don't involve myself with the day-to-day. I don't participate in those meetings. I'm down in the trenches building the standards.
Q. And on the committee that you're on, Dr. Ken Furton is also on that committee?
A. On a few of them, yes.
Q. And you wouldn't have any reason to dispute that Mark Ripsoli [sic] is part of the OSAC dogs and sensors subcommittee?
A. I'd have to look it up. He may be. I don't know.
MS. MARTENS: So, I'd like, then, to turn to those standards themselves, so if I could share my screen with the witness again.
BY MS. MARTENS:
Q. You talked with Mr. Deckenbach a little bit on direct about conflicts of interest, and I'd like to show you what's

marked as Government Exhibit No. 2.

Does that look familiar to you at all?

A. Yes.

Q. And do you know what that document is?

A. The -- that's the SWGDOG -- what's called SC2, and that is the general guidelines. So that would be the equivalent back in the day of what is the 088 -- the current 088 standard at the -- for NIST, for the NIST OSAC.

Did I get that backwards? Can you show me the top page again, please?

Q. Sure.

A. This is the general guideline? Yes, correct.

Q. Yeah. And so when we go down into the SWGDOG standard, I'm going to go to 3.2.3.

A. In the guideline. It's a guideline.

Q. Yeah. I'm sorry. I keep calling it a standard. The guideline.

So this here . . . no, that's not what I wanted. Sorry. This is something else I wanted to talk to you about.

So on direct with Mr. Deckenbach you talked about what's required for certification. And, since we're looking at it, let's talk about that anyway.

You expressed some uncertainty about what was required. Does this refresh you?

THE COURT: In what manner?

A. No -- oh, for the -- I'm sorry.

BY MS. MARTENS:

Q. So IPCA's certification requirements -- on direct you expressed some uncertainty whether there were two or three elements that were required for SWGDOG versus what was required for IPCA.

So now, looking at the SWGDOG certification standard in Government's Exhibit 2, does that change your opinion or help you come to a better one?

A. I think I was thinking about the SC8, which is the SWGDOG narcotics. I am not sure if it's from SWGDOG or if it's from the 088, but I -- I thought it was -- perhaps it's from SC8, which is the narcotics.

And somewhere I thought I recalled reading that you're supposed to have three elements and not two. So it might not be in this one, which is a general one, but there is a SWGDOG guideline specifically for narcotics.

Q. So if the test- -- I told you that the testimony about IPC -- IPCA's certification standard was based on this standard from SWGDOG, that the certification shall be comprised of a comprehensive assessment together with either an odor recognition assessment or a double-blind, does that affect your opinion?

A. No.

Q. And I understood your opinion to be that the IPC -- IPCA

standard was not actually consistent with SWGDOG.
A. If -- we're not looking at the same section that I was thinking about, and I'm not sure that we're looking at the same SWGDOG guideline.

So there -- this is a general overarching for any detection team. This could apply to anything. It could apply to wildlife. It's just general. Could apply to narcotics.

But there is an SC8, SC No. 8, which is a narcotics-specific SWGDOG guideline. And so that's more appropriate to be modeling because that actually was published before the general guidelines, if I'm not mistaken.

And so that's what I would think would be referenced --
Q. So --
A. -- and that might be where I'm thinking of.
Q. So I guess I'll confine my question to the general guideline we're looking at.

Does that comply -- does the IPCA standard comply with the general guideline?
A. Well, we'd have to go down to where they talk about the number of elements.

So you'd need -- that's not the section -- that does not talk about the number of elements. That talks about what -- what the composition of certification is.

So they're looking for an odor recognition test and

a . . . a comprehensive with odor recognition or double-blind. And, of course, the IPCA doesn't deal with double-blind, but this is different from the part that I'm talking about, which is how many elements.

Q. Oh. So you mean something different, I think, about elements.

A. Correct.

Q. What do you mean by "elements"?

A. If you go up, it talks about -- and it might not be in here because, again, this is not narcotics specific. Oops -- stop right there.

So . . . umm -- let me look at this. Maybe this is the section -- I think we're not looking at the same document that I was referring to.

Q. So I'll tell you that the defense supplied to me in discovery the full SWGDOG guidelines, which I think is this document or very close to it, the -- this is 155 pages with this cover letter showing Dr. Furton as sort of like a lead author.

So when we go through this document, that's where I think we get into the subspecialties.

A. Appendix of -- yeah, Appendix 11, which is probably SC8.

Q. I think I can maybe -- yes, I can.

A. Right.

Q. And that's awfully small so let me zoom in on it.

A. Thank you. Better.
Q. So this would have been the standard you were talking about when you were talking with Mr. Deckenbach earlier?
A. I -- I think so. There are three that we've talked about. It could be the 088.
But if we scroll down to certification on this one, let's see -- okay. So 2.1.3, "Test should be designed to resemble normal operational searches, vehicles, buildings, parcels," level -- level -- luggage, et cetera. Okay.
And then we scroll down some more . . . no less than 5 grams. Oh, here we go, 2.1.6. That's what I was talking about.
So under the SC No. 8, which is specific to narcotics, Section 2.1.6, it says "The test shall include scenarios resembling searches within the normal operational environment and include at least three different searches (see categories below) designed to evaluate the K-9's ability to recognize odor," et cetera.
And below that it lists "parcels, baggage, person/crowd search, building/room search, motor vehicles or open area." And in the IPCA it's only vehicles and interiors.
So that's what I was talking about.
Q. So when we're talking about IPCA, they've gone with the general standard rather than the narcotics substandard?
A. I would call it a narcotics standard.

Q. Okay. Subspecialty standard?
A. It's -- this is a standard. This is the standard for narcotics. The -- well, current -- let me correct myself.
It's the guideline. This is specific to narcotics. And, if you are looking at a general guideline, that would be -- yeah, we'll -- we'll go with this because my specific discipline is not represented in any of the other guidelines. But we do have a guideline specific for narcotics, and that is this one.
Q. Are you aware of whether it's only narcotics dogs that are certified by IPCA?
A. I thought I heard testimony that they do explosives, as well, and there is also an explosives guideline in SWGDOG's.
Q. But, at any rate, as an organization, they have chosen to go with the general guideline rather than specific guidelines for each subspecialty?
A. If that is their decision, it seems peculiar to me why you would not go with a narcotics-specifics guideline for your narcotics dogs. I don't know why they would do that, and that would be their decision, and I'm not involved in those decisions.
Q. You talked with Mr. Deckenbach about the California POST standards, and I think you agreed with him that those were appropriate. Is that right?
A. He asked about the conflict-of-interest statements, and

I read those and I said they made sense.
Q. All right. So if we go to the California POST standards -- and I think that was Defense Exhibit O -- that was . . . it's really small so I'm struggling a little.
Yep, that's the page I want. Sorry; I went past the first time.
So we have these minimum qualifications and specifically Section 3.
So California POST, according to Section 3.1, agrees -- or sets forth that the certifier or evaluator of the K-9 team should not have a monetary interest in breeding/ selling/training of the dog evaluated and should not be the handler of the dog.
And I think that was the part that you agreed was appropriate.
A. Yes.
Q. That standard -- and I -- can you agree with me that that standard says nothing about agency affiliation?
A. That's correct.
Q. And then if we go back to our SWGDOG standard, that standard here in 3.1.2 in Government's Exhibit No. 2 says that the certifying official shall not be routinely involved in the day-to-day training of the K-9 team being evaluated.
And can you agree with me that that's appropriate?
A. Yes.

Q. And can you agree with me that that says nothing about the agency affiliation of the evaluator?
A. Yes.
Q. You opined that you thought that four months of separation by Mr. Josh Hardee from the Wyoming Highway Patrol was not a sufficient amount of time to be removed for a conflict of interest to go away.
Now, in reaching that opinion, did you have contextual information about his role in the Wyoming Highway Patrol before he left?
A. If I remember correctly -- first of all, I didn't say it was related to eliminating a conflict of interest.
I think the question that was posed to me was about -- he had worked with this dog for years and years, he had a lot of experience with this dog, and he thought -- I'm so sorry -- he thought highly of this dog. Would he somehow be able to set aside his own experience, years and years and years, high opinion of the dog -- could he set that aside after just four months? I don't think so.
Q. So if he hadn't been involved in the day-to-day work with this dog for longer than four months, might that change things?
A. I'm sorry. I'm not sure I understand your question.
Are you asking -- I'm not -- I don't understand what you're asking. I'm sorry.

Q. All right. So I'll represent to you that the testimony is that Josh Hardee certified K-9 Becky approximately four months after he retired.
A. Okay.
Q. And that, in the lead-up to his retirement, he was no longer involved with the day-to-day activities of K-9 Becky. That would add more time to that window. And I'd have to go back through the transcript to tell you how much more time.
But would more time affect your opinion?
A. I don't think so, given the -- how effusive the testimony of all of the K-9 officers were about this dog. They had a very strong opinion and used some very strong words about -- about this dog and how highly they thought of her.
So I just don't see that all of a sudden they can be like, "Oh, actually, I forgot all about Becky and I don't remember how great she was." I think that's a problem. I -- I don't think that you could suddenly forget that.
Q. Mr. Deckenbach also asked you about whether vendors can have a vested interest in the dog and the certification, and I think that you said that that would not be appropriate.
And my understanding of the way that Mr. Deckenbach put that to you was calling IPCA Ripsoli's organization. Do you have any knowledge about Mr. Mark Ripsoli's involvement in the International Police Canine Association?
A. I thought he founded the organization.

Q. Do you understand the structure of the organization?
A. Well, it's -- it's a nonprofit so it would have a board of directors. And it probably has some committees or subcommittees. I am not involved in the day-to-day workings of the IPCA, so I'm really not qualified to talk about how they conduct their business.
Q. We've been talking a lot about these guidelines. And I think you agreed with me earlier that they're best practices.
Now, does failure to adopt a best practice necessarily invalidate results?
A. I don't know why you wouldn't adopt a best practice. And the reason that the SWGDOG -- or --
THE COURT REPORTER: I'm sorry.
(Reporter seeks clarification.)
MS. MARTENS: The Zoom cut out. We're going to have to back up a little bit.
THE WITNESS: Okay. I'm not sure where it cut out.
A. (Continuing.) But what I can say is I don't know why you wouldn't want to adopt best practices. They're put there for a reason. Law enforcement has a very important role and function. The public's trust in law enforcement needs to be maintained and continue to be earned. And so doing things in the best manner possible seems like a good way to conduct business.

So while there is no charge anywhere that I'm aware of that anybody in any discipline or any field has to adopt best practices, it seems like it would behoove law enforcement to do everything in their power to try to achieve those.

And keep in mind those guidelines that were put in place by SWGDOG were put in place because there was so much variability and a complete lack of quality control not only in the K-9 community but -- definitely in the K-9 community but also across all the forensic science disciplines.

So SWGDOG was put into place to try to get a handle on the Wild West that used to be the K-9 community and give agencies and organizations what is ultimately a very simple, basic template to be able to come into compliance so that they could produce a better product and so that they could be more defensible in court.

BY MS. MARTENS:

Q. So --

A. So I guess, to answer your question, if that's not something that law enforcement should be achieving, then I think maybe we have a problem.

Q. So best practices to strive for. But, if we fall short of best practices, does that necessarily equate to unreliable results?

A. It doesn't equate to unreliable results. The SWGDOG guideline is about as basic as you can get. Truly.

Q. You talked about you think a six-week training school should be required for drug dog handlers.
A. I did not say that.
Q. Well, then correct me about what your testimony was.
A. My testimony was that typically handlers go through a six-week K-9 school, plus or minus. That is typical.
Q. What schools are you familiar with that provide a six-week training?
A. Oh, of course, right now that you asked me, the name of the -- names of the vendors don't come to mind.
But that is very typical, and that's why it's so expensive. There is a lot -- when you look at curriculum from, certainly, some of the bigger vendors -- and many of them do actually offer curriculum -- there is a lot -- especially for a first-time handler who's interfacing with a new dog, there is a lot for them to learn. And it is not something that can be just taught in two weeks.
Q. So, just to be clear, you're not a K-9 detection dog vendor?
A. Correct.
Q. Do you do any selection of -- of dogs and initial imprinting training with dogs?
A. Yes.
Q. And do you supply dogs as a vendor, then, or are those --
A. No.

Q. -- the search and rescue dogs that you use yourself?
A. Oh, it's a whole breadth. No, I -- I test litters for people. I have a whole breadth of experience with a variety of disciplines in not just the professional community and the volunteer community but the support community. So, yes, I do all of that.
I do not sell dogs. I'm not a vendor. But I do know -- because I am involved in the community, I do understand a range of what occurs out there in the law enforcement community, and it is not uncommon for handlers to go to a six-week training school.
Q. At these six-week schools -- are you familiar with the setup or the curriculum of these six-week schools?
A. Somewhat. I don't have them memorized, but I have seen enough of them over the years to get a handle on the types of things that are taught, and it -- it ranges from "Here's a dog, here's the front end of a dog, here's how you brush a dog," the veterinary needs of dogs, the care and kenneling, and we have guidelines for all of these things, as well, because they are important. That's why they're in the SWGDOG guidelines and will go into the NIST standards.
How do you hold the leash? How to read dog behavior. What's a trained final response? Courtroom testimony. The environmental effects on odor.
All of those things go into a structured curriculum,

and it takes time for handlers not only to take that information in but to apply it because, especially for a first-time handler, they need to learn how to deal with a living creature that is their tool of the trade.
Q. Would a K-9 handler school, in your opinion, be well served to adapt to the skill level of the dog and the handler?
A. Well, first-time handlers come in, generally, without any skill. They're starting at ground zero because -- that's what makes them a first-time handler.
Q. What about prior experience around detection dogs, even if they're not a handler?
A. That's not the same thing as handling a dog. So, no, you don't get to skip the first four weeks of class because you've hung around dogs.
I mean, many handlers, I would assume they've owned dogs. Maybe not. I know a lot of people have hunting dogs, and that does not excuse you from formal training.
Q. What is your . . . so then it -- so then is it your testimony that on-the-job practical training is not a substitute for formal classroom training?
A. When you are paired with a new dog, the expectation is that you are going to go through K-9 school and get that formal training.
Q. So my question was, is it your testimony that on-the-job training cannot be a substitute for the classroom training?

A. Not for a first-time handler, no.
Q. So you talked about the Lit study with Mr. Deckenbach on direct examination, and I believe that was Defense Exhibit Q. You talked about the results of that study.
And, if I understood your testimony correctly, that was an evaluation of the dogs -- or rather, not the dogs but the handlers. And, essentially, showing that handlers could get their dogs to false-alert.
A. No, not exactly, because we don't know what the dogs did in the rooms. What -- the study was an assessment of the effect of belief on the outcome of sniffs.
Q. Thank you.
So can you agree with me that, when relying on academic literature, that it's important to stay current with regard to that literature?
A. Yes.
Q. Especially if you're going to testify about it in court?
A. Yes.
Q. And the Lit study was published all the way back in 2011; isn't that right?
A. Correct.
Q. So are you aware that SWGDOG criticized the Lit study?
A. Yeah. I'm happy to talk about that.
Q. Let's talk about that. Let me show you . . .
THE COURT: You looked at me. Were you thinking

about a break at that point? Was I sensitive to you?

MS. MARTENS: I just -- I heard something up at the bench, so I wasn't sure if you were trying to get my attention, Judge.

THE COURT: Well, let me turn to the court reporter, who's so important.

Is it time for a break?

THE COURT REPORTER: (Indicating.)

THE COURT: She's good to go.

MS. MARTENS: She's good to go.

THE COURT: We're talking about the Lit study at this point.

MS. MARTENS: Yes, Your Honor, the Lit study, which was, I believe, Defense Exhibit Q and, I think, also filed attached to the original motion.

So I'm going to share my screen. And I guess -- I think I have been failing to seek admission of the handful of things that we've been talking about.

So did we -- let me confirm. Did we actually admit Dr. Cablk's CV?

MR. DECKENBACH: Your version, yes. Oh, no, we didn't.

MS. HAMMER: Yes, we did.

MR. DECKENBACH: Yes. I said no objection.

MS. MARTENS: Okay. And then we talked about things

that were in evidence, and then we had the full version of the SWGDOG standards, which may not have been actually marked and admitted.

MR. DECKENBACH: It has not been.

MS. MARTENS: Do you intend to admit them, Mr. Deckenbach?

MR. DECKENBACH: I don't intend to admit it, but I don't object to you admitting it right now.

MS. MARTENS: I'm happy to leave it out if you're not going to put it in.

Unless the Court wants it. Okay.

But I have marked the SWGDOG response to the Lit study as Government's Exhibit 14, and I would like to admit that. Do you have any objection?

MR. DECKENBACH: I have no objection, would ask for a courtesy copy at the conclusion of today.

Okay. Thank you.

BY MS. MARTENS:

Q. So let's talk about that. Are you familiar with the criticism of the Lit study by SWGDOG?

A. I have not looked at this in a very long time. I did read it at the time that it came out, and I actually called Ken Furton about it at the time it came out.

Q. So I'll tell you that in this document SWGDOG goes so far as to say, quote, "There are a number of characteristics of

the study presented that limit or invalidate the conclusions" of the study and "cannot be extended to working detector dog teams."

So did you talk with Ken Furton about that?

A. When this letter came out -- and understand that this is -- this is just a letter. It's -- it's kind of a rant. It is -- it's just their opinion. It's like if this group got together and put out a blog.

It was originally titled "Rebuttal to the Lisa Lit Study," something about -- there was the word "rebuttal," and that's why I called Dr. Furton, who is my colleague.

And I called him and he answered, and I said "I don't understand why this is a rebuttal. Did -- was -- is there something out there that points to SWGDOG? Is there something that was directed at the committee? I don't understand what -- what is this a rebuttal to?"

Because, typically, you would say something targeted to a group or an entity -- right? It's targeted at someone or some group. And then you have a chance to rebut that.

And he said, "No, it's not a rebuttal." And then we hung up the phone, and the title of that document changed within an hour.

And so the way that it works in science -- because this is not a scientific study. This isn't a paper that he or this group put out. This is -- this is just their opinion.

This is what they had to say.

But in the scientific community, we have a very formal process for disagreement and arguing. And if a research paper is published and someone doesn't agree with the results or they don't like it or they want to challenge it, there is a formal process for doing so.

And the process is this: You put together your arguments and you say -- maybe it's whatever is written in this letter -- and you submit that to the editor of the journal. This is all very transparent, and, more importantly, it has to have merit.

And the editor of the journal will receive that letter to the editor, that commentary or challenge to the peer-reviewed publication -- and let's remember that that Lisa Lit study went through a very rigorous peer-review process.

So the editor receives that and decides, first of all, does that have merit. Is there a valid argument or is this somebody just saying "I don't like it"? Because in the scientific world we do not entertain challenges to scientifically rigorous papers that are just based on how you feel about something or it makes you mad. There has to be legitimacy to the challenge.

For example, "The sample size didn't include this" or "I don't think you should have used a least squares regression analysis; I think she should have used a discriminant function

analysis," very technical aspects there.

So if this was submitted to the journal, it never went past the "Does it have merit?" stage.

I have asked Dr. Lit afterwards did she ever receive anything through the journal and she said no. So I don't know that it was ever sent to the journal, or, if it was, it certainly didn't pass muster because the way that it works when you challenge the validity of a scientific study is, if it passes that first gateway that it has actual merit, then it is provided to the author and the author has a chance to respond. And all of those responses are subsequently published so that the whole rest of the world can take a look and decide "Do we think there's a problem with this study or not?"

But this document, this letter that the SWGDOG committee wrote, did not go through peer review. It's their opinion and it is -- it has no bearing on the validity of that peer-reviewed study because this was not.

Q. So is it fair to say that you don't believe any criticism is valid unless it's subject to peer review?

A. That is not at all what I said. What I said was, if you are going to challenge the validity of a peer-reviewed paper, you're welcome to your opinion. Everybody has them.

But, if you are going to say that there is a problem with a research study or the interpretation of results were

incorrect or anything in the scientific realm -- which is what we're talking about -- we have a process for that. And that process is designed for transparency and for legitimacy.

So, short of that -- the SWGDOG committee, they wrote this; they put it out there. That's all fine and good, but that doesn't mean that they're right.

Q. Are you aware of other peer-reviewed research reaching different results and challenging the Lit study?

A. Like what?

Q. I'll go to what I've marked as Government Exhibit No. 15.

This is an article from Frontiers in Veterinary Science. And I don't know if you're familiar with this article or not.

A. I am.

MS. MARTENS: Well, I'd like to seek it be admitted at this time, then.

MR. DECKENBACH: I guess I would want to know more about it, but I won't object at this point.

If I could also get a courtesy copy.

MS. HAMMER: I will.

BY MS. MARTENS:

Q. So, Doctor, you're familiar with this particular study. And I understand this study -- and I'm not a scientist -- to reach a very different conclusion from the Lit study.

But why don't you explain it.

A. Well, I can read the objective right here in the abstract, which is not the same as the Lisa Lit study. So the Lisa Lit study aimed to assess the effect of handler belief, and, as I read from the abstract, it says "The aim of this study was to evaluate if knowing the number of hides placed influenced detection dog performance in an applied search environment," and those two things are not the same.

Q. Why not?

A. Because there's nothing about belief here. This is about, "Hey, the number of hides placed, does that influence detection dog performance?"

The Lisa Lit study looked at the effect of belief on the outcome of the sniff, and this study says they wanted to know if the number of hides affects dog performance.

Q. What about the sentence where it says "handler knowledge or the lack thereof" influence on dog behavior? Isn't that getting toward the same thing?

A. I'll have to find that in here so I can read it. Where . . . if you could highlight it.

Q. Let's see.

A. So this is -- the complete sentence says, "However, many detection teams operate under unknown conditions, and it remains unclear how handler knowledge or lack thereof of odor presence or absence influences the dog's behavior."

So that is the opposite side of the coin. So, no,

these are not the same.
Q. And reading it together with the next sentence, "The aim of this study was to evaluate if knowing the number of hides placed influenced detection dog performance in an applied search environment."
A. Right. That's not the same. We're talking about the dog here; we're not talking about the effect of belief.
They did not instill belief in these handlers. They were not testing belief. These are not the same study. They did not use the same methods.
So, no, these are not the same.
Q. So if this study goes on to criticize the methods of the Lit study, that would just be irrelevant information in this paper?
A. I can't say that it's relevant or irrelevant.
Q. Let's talk some about alert behaviors.
You testified on -- oh, it's defense exhibit. That's why I'm not seeing it.
There we go. This is my copy of what I think was marked Defense Exhibit P.
So you talked with Mr. Deckenbach about these general guidelines and the meaning of the final response and those sorts of things being appropriate, a bunch of terminology.
Do you recall that testimony?
A. Is this the 088 standard?

Q. I believe it is but let's scroll to the top to make sure we're talking about the same thing.
A. Okay.
Q. And then I think it was also your testimony that you are a member of the subcommittee for ASB -- I might be -- consensus -- I -- I think I'm confusing consensus body and subcommittee so please correct me.
But I think you said you were some sort of affiliate working member with ASB. Is that correct?
A. Yes. I'm on the consensus body for dogs and sensors.
Q. Thank you.
Are you familiar, in addition to this standard, with the terms and definitions as published by ASB?
A. I think that's the 025, if I remember correctly.
Q. So I will show you what I have marked as Government Exhibit No. 18.
Is that the standard to -- or the -- yeah. So this would be a standard; right?
A. Well, this is a technical report --
Q. Okay.
A. -- which is yet another category.
Q. Fair enough.
But, at any rate, the terms and definitions that are relevant when we're understanding Defense Exhibit P?
A. Yes. I say that a little hesitantly because this

Technical Report 025 was published in 2017, and that was prior to the 2020-088, which is the general detection dog standard.

And in the Detection Dog Standard 088 there are additional terms and definitions. And they may not match up completely, and that is just a function of the giant task of maintaining all of these technical reports and all of the specific standards.

Subsequent to 2017 and 2020, as the working groups became more organized, what we are doing now is standardizing using some boilerplate language in certain aspects across all of the K-9 disciplines and the 025 informally within the consensus body and the working groups -- we are well aware that it needs to be updated.

So although this is a published technical report, I would not say that this represents the -- what is currently being used or necessarily agreed upon because it is about to be revised.

MS. MARTENS: So I'd like to ask that Government's Exhibit No. 18 be received.

MR. DECKENBACH: No objection.

THE COURT: With the comments that have been provided, it is received.

(Government's Exhibit 18 received into evidence.)

BY MS. MARTENS:

Q. So when we're looking at . . . I've got too many things

open. There we go.

When we go back to that 088 standard, Defense Exhibit P, if a term is not defined in this standard, would we refer to the terms and definitions document to find it?

A. That would be the first place to look. There is also a lexicon on the website, a link to a lexicon, and that draws from the original SWGDOG terms and definitions as well as the 025.

Q. And I understood your testimony to be that alert behaviors short of the trained final indication are really useless. Is that a fair summary?

A. Not at all.

Q. Okay. Why not?

A. Alert behaviors are real. They occur. But they are not specific to target odor.

So I did not say that they are useless. They are real. But they are not specific to target odor. Alert behaviors like a dog closing its mouth so that it can do closed-mouth sniffing, yeah, that's a real thing. Dogs do that. That's how they sniff. They sniff through their nose, and they're funneling the air through their nose.

But does that alone -- does that mean, because a dog is sniffing, "Oh, there must be narcotics there"? No.

Q. So is it then correct to say that, in terms of a dog locating its target odor, alert behaviors are not helpful was

your prior testimony?
A. That is not my prior testimony, either. Alert behaviors exist. I gave examples of them. They are not indicative of target odor specifically. That's why we train a final response.
So you can see a dog close its mouth because it's sniffing, because it's working. Right? That's the dog's job. "So if I need to sniff this thing, I'm going to sniff it, and I've got to close my mouth so that I can get the air through my nose and I can sniff it."
And maybe the dog smells a hamburger and it checks it out for a little bit and then it walks off. And that's -- that's one way we know like, "Okay; that wasn't it. It was interesting to the dog but that wasn't it."
If it is something that has target odor, has narcotics in it, the dog is still going to close its mouth because that's how dogs sniff, and then it's going to make that determination, "Oh, actually, that's my thing; here, let me throw a sit, and that is my way to communicate so that there is no ambiguity that I have target odor."
Q. So is it -- that sit, that final trained indication, is it your testimony that's the only thing a handler should be focusing on?
A. That is the way that a handler can determine, without question, what the dog is responding to.

Q. So is it your testimony there is no other way?
A. Well, they can just guess. Sure. They could guess, 50/50, yes or no. That would be another way that a handler could make that determination.
Q. So bringing it full --
A. But it is --
Q. So bringing it full circle, is it your testimony, then, that anything other than the final trained indication is a guess?
A. Yes.
Q. Okay. So when we go to Government's Exhibit No. 18 and we look at 3.16, the terms and definitions accepted by the American Standards Board, they define an alert as "A characteristic change in the ongoing behavior in response to a trained odor or scent, as interpreted by the K-9 handler. The components of the alert may include the change in behavior, interest, and final response or indication."
So in terms of terminology in recognizing the value of the alert, do you disagree with the standards board?
A. I do. And I have talked with them about that. We have this discussion over the years frequently. And the reality is there is no science to support this.
Q. All right. You talked about proofing a dog off food, and you offered that K-9 handlers are often going to use low-value food items.

Do you recall that testimony?
A. Yes.
Q. Does it affect your opinion if they offer things like hamburgers or beef jerky?
A. I'm not sure I understand.
Q. So in terms of adequacy for proofing off of food, I think your critique was that handlers don't usually do it well enough because they're offering low-value items. Is that a fair understanding of your testimony?
A. Right. Yes. So I'll agree to that.
Q. So if a handler is offering an item like beef jerky or a hamburger, is that better?
A. It is better. It's not a complete picture.
There was a second part to my testimony, which was "and they need to not know that those high-value distractors are present so that they can actually look and see the reaction and the response of the dog without interfering."
Q. So if we, say, take a dog to a place like I think Murdoch's -- I don't know if you have Murdoch's where you're at.
A. No. I don't know what that is.
Q. Farm and ranch store, dog food, chicks, human food items, often fresh popcorn, people all over the place.
That kind of uncontrolled environment -- to work on proofing them off of distractors, would that be a good

environment to proof a dog?
A. Well, it would certainly present a -- a -- an environment with a lot of distractions. But are they serving filet mignon? Is that laying around? I mean, you know, that's -- that's a high-value type of thing that very few dogs can resist. So popcorn -- you know, I don't know if that's high value to a dog. Dog treats? Yeah, that's -- you know, for some dogs.
It also depends on the food motivation of the dog. I mean, believe it or not, I -- I know some people that just -- they're not interested in sweets. I don't understand that. But if you were to put a chocolate cake in front of them, they would have no interest in it.
Q. And I think I understood your prior testimony to be that Becky alerts -- or, rather, jumps or scratches at the sides of vehicles -- because she's been poorly trained and rewarded just simply at open windows and car doors. Is that fair?
A. Well, she's been reinforced for doing those behaviors, and her handler also essentially said that.
Q. Can you agree with me that, as a general matter, we would expect a well-trained detection dog to attempt to find the highest concentration of odor?
A. Yes.
Q. And so we might expect a well-trained detection dog to jump up to do that?

A. Not as much as we see with this dog.
Q. But in general?
A. But once they locate -- once they locate that high concentration, they're supposed to go to final response.
Q. So we might expect a well-trained detection dog to jump up?
A. I'm not going to agree to that because I have seen some really great detection dogs that don't jump.
Q. So you wouldn't expect a well-trained detection dog to jump toward an open vehicle window?
A. They might but I see a lot of them that don't. Many handlers, in my experience -- and I have not seen all handlers, so let's just be clear, but I do look at a lot of vehicle sniffs, a lot. And I don't see a lot of dogs jumping because it is not an acceptable practice in general. It's destructive. And in some states, like Idaho, it's actually not allowed that the dog come in contact with the car at all.
So if you're asking me is it necessary that a dog fling itself at a car to be good, the answer is no.
Q. Okay. Do you recall testifying in the United States versus Thin Elk in the District -- excuse me -- the Central District of South Dakota on December 28th, 2023?
A. I do remember that case.
Q. I'm going to show you a transcript from that hearing.
MS. MARTENS: Oh, no. Did I get booted? No,

I didn't. For a second I thought I got booted from the Zoom.
BY MS. MARTENS:
Q. All right. Are you seeing the transcript?
A. Yes.
Q. I'm going to talk -- and you said you remember testifying in this case?
A. I do remember. This was a case where the dog came out for, I think, maybe three seconds. The handler took the dog out, did a circle by a car, and then put the dog back up and said, "Oh, yeah, good to go."
Q. All right. I've taken us to page 30 of that prior transcript.

And you were, under oath, testifying for the defense in that case; right?
A. Yes.
Q. So if you'll read along with me . . . let's see. The question was: "And did you have the opportunity to actually review the entire video?"

Answer: "I reviewed" -- wait. Let me zoom in so I can read it better.

"I did review the entire video.

"Did you make an observation about the passenger-side window?

"Both windows are down.

"Okay. And did you -- were you able to determine, at

least based on your review of the videos, which direction the wind would have been traveling?

"It appears it's traveling from the passenger side to the driver's side.

"And the canine sniff is done on the driver's side or the passenger side?"

You answer: "The driver's side."

Question: "So if the wind is coming from the passenger side over to that side and both windows are open, what would you expect to see from the canine that's detecting odor?"

Answer: "I would expect to see the canine respond to odor on the down -- downwind side. That's how it works. And the bulk of the odor would be coming out the window. It's not going to be coming out the seam of the door.

"So would you expect the canine" . . . I want to make sure I -- oops.

"So would you expect the canine to actually be tracking that odor through the window?

"Yes."

Question: "Would you expect to see the canine jump up towards the window?

"Yes.

"Did you see that in this case?

"No."

Did I read that correctly?

A. Yes.

Q. So in that case you criticized the dog for not jumping at the open window?

A. In this case the K-9 never even got close to the car. This was literally -- I can't remember if it was a 3- or 4-second sniff. That was it. And the handler took the dog out of the car, walked to the car, spun the dog in a circle, and, when the dog was coming out of that spin and facing the car, that was it. It was a 3-second deployment of the dog.

And so that is a very different set of circumstances than what we're talking about here. It is correct -- I am correct and I'll stand by it -- the way odor works is it moves with the wind.

And so I would have expected to see that dog respond to odor coming out the window. That's what I was talking about, not -- you know, this was a very different set of circumstances.

Q. So then I'll take you to page 27 of the very same transcript -- or I'll ask you this question first: Would you agree with me that the time duration of a sniff is not determinative?

A. I'm not sure I understand what you mean by "not determinative."

Q. Well, would you agree with me that there's a whole range

of sniffs? They can be long; they can be short?
A. Yes.
Q. And that a dog that moves pretty quickly has usually picked up on odor right away?
A. No, not necessarily. You can just have a fast-moving dog and there's no narcotics in the car and they're just moving quickly.
Q. All right. So let's go, then, to page 27 of the Thin Elk transcript.
(Discussion held at counsel table.)
BY MS. MARTENS:
Q. All right. So the -- I'll -- read along with me and please confirm that I've read this correctly.
So the question posed to you was: "So, in your experience with canine handling, what do you expect to see in a canine sniff?"
And your answer was: "I've seen a whole range of canine sniffs. So much of it depends on the scene setting, the training of the dog, the handler, and all that. I have seen sniffs that are short. Typically when you have a very short canine sniff, the dog has odor from the moment it gets out of the patrol vehicle. Typically, with a really short canine sniff, the dog is dragging the handler to the car because it already has odor. That's not what we see here.
"With very short sniffs, they'll drag their handler

to the car, exhibit a change of behavior that's very obvious. And they will slam or sit. If they have a focus stare, they'll hold that focus stare. And it happens very quickly."

Did I read that correctly?

A. Yes. Absolutely.

And that -- when you have -- a dog that gets odor will do that. And the most important part here -- there's -- actually, there's a mis- -- it's not exactly translated correctly if you go up.

Just -- just so I can see the bottom of that page. It says "and they will slam or sit."

It should say "they will slam a sit," meaning they will do exactly what I have testified to today, which is you expect, when the dog gets that odor, gets the highest concentration, and they do their trained final response.

And it is not that they're jumping, jumping, jumping, jumping. It's that, "Oh, my gosh, it's coming from the vehicle; I cannot wait to get paid; here's my final response."

Q. So would you agree with me, though, that a well-trained detection dog would, in fact -- we would expect them to jump toward an open window in an attempt to get to the highest concentration of odor?

A. They could.

Q. And that they would do that --

A. And they should do their -- I'm so sorry.

And then they do their trained final response. There's got to be the part two there. That's -- that's how you know it's not just jumping for the sake of jumping or jumping because they've been taught that they're supposed to do that.

It's . . . go to the highest concentration of odor and then do, in this case, a focused stare.

Q. And we're --

A. And, as I testified before -- as I testified before, they're supposed to hold that focused stare or that sit until they're released by the handler.

Q. And would we expect that dog to do everything in its power to try and get to the source of that odor and to investigate further?

A. With vehicles? The dogs know that they're not going to be able to put their nose on the narcotics.

And context is important and that's something that we need to make sure we're all clear on today. This idea that the dogs are only going to do their final response if they can put their nose on the drugs is -- that is not correct.

And, if that is true, then the dogs are useless in the field because, unless the drugs are taped to the outside of the car -- which, remember, is dangerous -- they cannot put their nose on those narcotics.

And we heard -- I didn't hear it -- I read about the

testimony --

Q. So I'm going to stop you there.

A. Okay.

Q. So will you agree with me that you expect a properly trained dog to do everything within its power to stick to that odor and investigate further?

A. I think what you're talking about is my prior testimony where handlers are pulling their -- trying to get their dogs off the car. So in the Rederick case -- I see that you have that up here -- and in many cases where the dogs are not doing their trained final response, the handlers are just reading the behavior and they walk away from the car and the dogs go willingly.

That's where I am consistent -- and this is true -- that a properly trained dog wants to get paid and they are going to do everything in their power to stay with that odor.

So when a handler is like, "Come on, let's go back to the truck," the dogs are like "No, actually -- but what about this? What about this car? Come on, come on, let's go back here."

So that's my testimony about dogs do everything in their power to communicate to their handlers.

Q. So you would expect a well-trained detection dog to do everything in its power to go to the source of the odor; is that right?

A. To communicate to the handler that the odor is -- that they've located the highest concentration, that is my testimony.
Q. They're going to attempt to go to the highest concentration of the odor?
A. They are going to go to the highest concentration of odor, they should give their trained final response, and they are going to do everything in their power to communicate that to their handler.
Q. And, in the process of doing that, will you agree with me that we may see a well-trained detection dog jump toward an open window?
A. That is in the range of possibilities, yes.
MS. MARTENS: Fair enough.
May I have just a moment, Your Honor.
THE COURT: Yes.
(Discussion held at counsel table.)
MS. MARTENS: Those are all the questions I have for this witness at this time.
THE COURTROOM DEPUTY: Are you admitting your transcript -- your transcript are you admitting?
MS. MARTENS: I don't intend to admit the transcripts.
I think, if I unplug, I'm going to get booted from the Zoom, so I'll just leave my computer here if it's not in

your way, Mr. Deckenbach.

MR. DECKENBACH: Sure.

MS. MARTENS: Okay.

THE COURT: Mr. Deckenbach.

MR. DECKENBACH: Hello again, Dr. Cablk.

THE WITNESS: Hello.

**REDIRECT EXAMINATION**

**BY MR. DECKENBACH:**

Q. Do detection dogs looking for human remains have a trained final indication?

A. Yes.

Q. And is it similar to or the same as -- process in training that final indication -- that is used in training narcotics dogs, to give their trained final indication to the separate odor of narcotics?

A. Yes.

Q. And, in fact, is -- training dogs to respond to odor -- be it a decaying body, narcotics, game -- is it the same science and process for training those dogs how to respond to that odor?

A. Yes.

Q. Is there any distinction in the science or the process for how that's achieved?

A. Other than the -- the targets themselves, no. Dogs are taught through classical and operant conditioning.

Q. And I wanted to ask you about your understanding of CNCA or what we now know to be called the IPCA.

At the time that that you joined, were you aware of who Mark Rispoli is or was?

A. I don't know that I . . . I don't know much about Mark Rispoli. I've -- I've had one encounter with him. And so I -- I really don't know much to say about that.

And I haven't been a member for very long.

Q. All right. And did you have any personal knowledge regarding his activity or work as a vendor for -- offering training?

A. I had heard of Makor K-9, but I don't think I knew it was Mark Rispoli's business or -- you know, I -- I -- I can't say with certainty that I put those pieces together.

Q. And the Government asked you about whether you have done any consulting with the Wyoming Highway Patrol.

Would an organization like that benefit from bringing outside experts in to evaluate their program?

A. I would think they would.

Q. Is there a risk in only relying on vendors and associates of your vendors to review and approve your internal program?

A. Well, it certainly doesn't -- it doesn't open you up to new ideas or advancements or getting a -- an experienced -- so let's be clear, you know.

You don't want to bring in someone that doesn't know

anything about dogs to come and look at your program or your dogs, but it certainly doesn't hurt to have, on occasion, others come in and take a look and perhaps offer some guidance or insight into how you might be able to do things a little differently or a little more efficiently. You know, it does not hurt to have an outside set of eyes come in and give you an assessment.

Q. And as far as your involvement in the academic community, do you have any knowledge of Mr. Rispoli being involved in scientific studies himself?

A. I'm not aware of that.

Q. The Government introduced their Exhibit 14, which was the SWGDOG response letter to Lisa Lit's study. On that exhibit we see a number of subcommittee chairs with email addresses.

I don't -- I'm not plugged in, so I'll just read. Some are DHS.gov. Are you familiar with Department of Homeland Security?

A. I -- I -- yes. I know it exists. I don't work for them, so I can't speak to their ins and outs.

Q. We also see FBI.gov in one email handle. Is -- are you familiar with the FBI?

A. Yes.

Q. Okay. And are there many law enforcement agencies that are involved with the SWGDOG working group?

A. They -- they were, yes, at the time.

Q. Okay. And were -- we also see Mark Rispoli himself is listed here with an AOL email as a subcommittee chair.

Is it -- at that time was it common for vendors who sold training to be involved in the SWGDOG program?

A. The SWGDOG committee drew upon a whole range of -- a whole range of backgrounds of people.

To put that into context, I thought I heard or read testimony that it was a bunch of scientists, and that's not true, and I think your pointing out those other agencies is -- is important.

At the time it was a -- a completely unregulated industry, and the reason -- one of the reasons why it was -- the SWGDOG committee was put into place was to develop guidelines, best practices, to try to get a handle on -- on all of this variability and give agencies a road map for how they could be more consistent and up-to-date.

It was never intended to be the be-all, end-all. SWGDOG was known to be put into place for a finite amount of time because it was funded at -- you know, there was money involved to be able to bring all these people together and pay for their travel. It was a first step towards bringing everybody -- tightening up the industry, so to say.

And you cannot go from a completely unregulated "We do it the way we do it, don't care how you do it, this works for us" mentality to a very strict, tight series of shall

statements. That's not going to work.

And so it is a guideline, not a standard, because it was a first step. And, now, here we are, a long time later, over a decade later, moving in the direction of actual standards.

And the SWGDOG guidelines were not thrown away. They're the -- the baseline, the starting point, for the actual standards now. The new standards are much more rigorous, but, even in our current committee and consensus body discussions, we still understand that these are works in progress and it takes time to wrangle all of the handlers and their agencies and groups and organizations to try to bring everybody into better compliance so that there is a consistent set of practices and you get consistency no matter where you are in the United States.

Q. And was there a reason for law enforcement members and vendors selling training to resist or be upset with Dr. Lit's study?

A. Part of the reason that the vendors and law enforcement were with SWGDOG's -- I guess I never really got around to that part of it -- is to get their buy-in. They're not going to take a bunch of rules and regulations and shall statements and should this and "you need to do that" if they're not involved in forming that. That's what consensus -- that is the importance of consensus.

So -- I'm sorry. Can you ask the question again? Because I think I started to answer it and I got off track.

Q. Was there a reason for them to resist Dr. Lit's study?

A. Well, when that study came out, I was not a part of it. I didn't know Lisa Lit, and I started to hear a little bit of the hullabaloo. And a very prominent retired law enforcement K-9 handler at the time -- his name was Terry Fleck; he's deceased now -- I know that he was -- I learned later that he was pretty good friends with Mark Rispoli.

And Terry Fleck was livid over this study because he was afraid. He was afraid that the Lisa Lit study would undermine all of the narcotics K-9 teams in the country. And Terry Fleck's modus operandus -- I knew him personally because he was a neighbor -- he was -- his style was just to -- "The sky is falling." And he could whip up a froth in the K-9 community like nobody's business. And so that's what he did.

He called me up because he assumed that I had something to do with the study. This is what he told me, you know -- well, I'm a female researcher so I must know Dr. Lit -- this was -- Terry Fleck told me this -- so he assumed I had something to do with it.

And I told him "I don't even know her. I have no idea. I don't know what's going on. Why are you so upset about this?"

And he was afraid that it was going to undermine all of the narcotics dogs in the country and they would be deemed unreliable.

And that's not true and it hasn't happened. What the Lisa Lit study did was demonstrate, "Hey, we can do better." That's all it was. She just asked a question, "Is there something to this?"

And so as -- I was listening to this hubbub going around in the community, and I've got Terry Fleck literally yelling at me on the phone, and I talked to Ken Furton about "Why is this a rebuttal? Why is everybody losing their minds over this study?"

And a lot of the handlers actually were not upset. They -- a large proportion of the handlers I talked with said, "Yeah, no duh. We know that's a thing, and that's why we need to train at least blind, so that we can try to mitigate the effects of bias. We know this exists."

So why the SWGDOG committee was so upset? Well, now, in hindsight, maybe some of it was ties to Terry Fleck. It's certainly fear-based, and it has not played out in the way that they predicted it would be.

Q. I also want to ask you a quick question -- I'm not sure which exhibit -- it was the 25 tech . . . well, that technical -- the --

A. The 025 technical report?

Q. Thank you.

-- which has been entered into evidence, and I think that we'll just --

MS. HAMMER: Exhibit 18.

MR. DECKENBACH: Exhibit 18, Government's?

BY MR. DECKENBACH:

Q. And they talked to you about the definition of "alert" in that document, and it says the components of the alert may include change of behavior, interest, and final response or indication.

And is it your testimony that all three of those should be present or, at the very least, a final response?

A. The definition of "alert," "final response," and "indication" is problematic and it is circular and we have talked about that.

And so alert behavior can include a final response, but it does not have to, according to that definition.

And that definition, I believe, is taken directly from the original SWGDOG guideline and whatever their -- I don't know what SC number it is for terms and definitions.

But keep in mind, at the time when that definition was formed in the original SWGDOG, they were just trying to wrap their arms around all of what was going on across the United States in the K-9 community and make it palatable and digestible by most if not everybody out there.

And the terminology even today varies depending on where you are geographically. And so it is no wonder that that is a confusing and circular set of terminology, because it was not consistent and it is still confusing to this day.

Q. And I want to ask you, then, also -- they asked -- Ms. Martens asked you about proofing on beef jerky and burgers.

Would proofing on those items proof a dog on all other food items?

A. Not necessarily.

Q. Could a dog respond differently to fried food than it might to beef jerky?

A. It could. It could. Just like -- believe it or not, I know people that aren't interested in sweets but most people -- many people are. So what works for one dog and is of interest to one dog isn't necessarily of interest to another.

And I will say, you know, it would be really hard to try everything that's out there. Like you could see "How does my dog respond to zebras or giraffes or cats or ferrets." But that doesn't mean that there isn't going to be that one thing out there that you didn't know about that maybe your dog is going to be superinterested in.

It depends on the dog, and it depends on what the value of whatever it is they encounter happens to be.

Q. And the change of behavior, can that be -- can that be caused by an odor of interest that is not target odor?
A. Yes.
Q. Would a dog -- a well-trained dog, at least -- do a final response to an odor that's not a trained odor?
A. They should not. That's -- that's why we spend so much time and money and talk about it in -- across the board. If it was irrelevant, if these trained final responses that are only done in the presence of target odor -- if they were -- truly were irrelevant and meaningless, then we wouldn't spend so much time teaching dogs. We wouldn't talk about it. It wouldn't be part of the conversation.

And it continues to be part of the conversation decade after decade.
Q. And I want to just turn briefly to the testimony that Ms. Martens brought up with you that you've provided in other cases.

Does a dog jumping to try to get a better smell of odor out of a window indicate that that odor must be of narcotics?
A. No.
Q. And why would a dog want to get a smell of just general odor coming out of a vehicle?
A. Why would a dog sniff the air that's coming out of a vehicle? Well, because dogs are very contextual, and so they

understand "When I'm faced with a vehicle, that's the thing I'm going to sniff. When I'm faced with a vehicle, I'm supposed to be checking this vehicle for target odor."

And when a window is rolled down, especially if there's a temperature gradient -- you know, the inside of a car in the wintertime is generally going -- it's not going to be 17 degrees inside the car when it's 17 degrees outside the car. Generally, you'll have the heat on.

And so that temperature differential is going to affect the movement of air from inside the car and outside the car. And so the dog understands "This is where the air is coming from, I know the drugs are not taped to the outside of the car, so it must be coming from the inside of the car if it is there, and I need to sample that air."

And we see that across the board in all disciplines. When you have a dog that's out doing an open-air sniff or -- or a search out in a field and there's not a lot of air movement and the wind comes up, the dogs stick their heads up and they sample the wind because olfaction is a very important part of a dog's way around the world, and they understand that the air currents is what brings them odors of interest.

Q. And could a dog be trained not to scratch wildly at a vehicle and still get the benefit of searching the odor coming out of a window?

A. Absolutely.

Q. And that is -- again, whose responsibility is it to train a dog to do it without scratching wildly?
A. The handler and the trainer.
MR. DECKENBACH: I have no further questions, Your Honor.

**EXAMINATION BY THE COURT**:

Q. We've been told here that the only worthwhile dogs are European breeds for this kind of work.
Can you tell me why you think that's true? Or is it true?
A. I don't agree. No, I don't agree with that.
I do know that vendors go to Europe to -- to purchase dogs, and I do have friends and peers that have worked for vendors over the years, and they tell a little bit of a different story.
There's also a supply and demand issue in the United States where, if you are working for a very large agency -- for example, a Federal agency -- and you need to buy a hundred dogs at a time, that can be hard to come by, particularly if you're looking at specific breeds that only have a single purpose.
And so there is also a perception that the Europeans are breeding dogs with a stricter requirement, and I'm not sure that's entirely true. It may be in certain parts. But keep in mind that, in Europe, those breeders, they're --

they're not going to sell their best dogs. They want to keep them in country, and they want to keep them for their own breeding purposes, as well.

And so some of my peers and colleagues who have worked for vendors have talked about we're actually not getting the best dogs because the vendors over in Europe don't want to give up the highest quality product and ship it to the United States.

Now, I can't say that's universally true, but I have heard that repeatedly from multiple individuals involved in the industry, and there is also a -- a supply and demand issue that we have in the United States.

Q. It sounds to me, listening to this entire discussion, that this is a very complex area that involves not only science but politics and economics driving owners and trainers and those who certify as well as the tendency of law enforcement to fall into itself unless there's an easy electronic gadget or piece of equipment they can obtain -- and, of course, a dog is such a piece of law enforcement, having served on what we knew in the day as LEAA, which sought to obtain radios and the latest night vision goggles and so forth.

Are you familiar with military training for dogs?

A. A little bit.

Q. Any idea of what the length of a handler's training in tech school might be?

A. I do know that, when a military working dog handler first goes to Lackland for their training, they're actually not even given a dog. They're given an ammo box on a leash, and they have to drag that ammo box around before they ever put hands on a dog so that they are learning just -- there's learning involved before you even get the dog, to be aware of the dog, to think about the fact that you have this living creature and you can't forget about it.

So it is not a two-week program where they're paired with a dog and, in two weeks, off they go on deployment. It is a lengthy process. I could not tell you the time, but I know that there is at least one week -- ten days, two weeks -- where they're dragging something other than a K-9 around on a leash before they even get the dog.

Q. I've observed that school in the past.

You've mentioned that the matter of training and the various -- the techniques to achieve it has been largely -- you mentioned the Wild, Wild West. Do you think that Wild, Wild West still lives? I'm asking you a political question now.

A. I think that in some parts of the country for sure. In the United States it is still a relatively unregulated community, meaning there is no oversight, no unified oversight committee or board or entity or agency that has -- that everybody is accountable to.

And so handlers will say, for example, there's a million ways to train a dog, and that's not actually true. There are a million different devices and gadgets and -- and tactics that you can use to work with every individual dog because they're motivated slightly differently, like people are. And not all dogs love balls on a rope. Some dogs like to tug and some dogs don't care about toys; they like food.

But, at the same time, we are still using classical and operant conditioning to reinforce the behaviors that we want. The rest of it, yeah, people have their own ideas; people are hanging out shingles left and right; they are selling their particular gadget.

We have a lot of research and development going into mimics and things that we can use so that people don't have to cart drugs around or explosives or human remains that would substitute for the real thing. It is a moving target in many respects.

And so I -- the Wild West, certainly before SWGDOG's, yeah, absolutely. And now it's maybe reined in a little bit, but we still have a ways to go.

Q. Thank you.

Were you aware, when you took on this task for Mr. Deckenbach, that the traffic stop in this matter was motivated because law enforcement recognized the defendant as a possible -- or as a suspect in drug dealing in the

community?

A. When he originally contacted me, I went through my standardized process, and I just want to look at the videos and the police reports.

So I do not remember what was in the police reports, but the very first thing I do without any input or information is I just want to look at the stop and see what I see in terms of the behavior of the dog and the handler. And I am listening -- that's why I look at the whole video; I want to hear the conversations.

And so, ultimately, with any of the cases that I end up looking at or -- or accepting, that information will come to me. And, at the time, I can't remember if I knew it was -- it was part of a bigger picture or if it was just a traffic stop.

THE COURT: All right.

Before I let you go, any thoughts that you -- anything that I asked that raised any questions that you want to follow up on?

MR. DECKENBACH: No, not from the defense, Your Honor.

MS. MARTENS: I did have one possible follow-up question on something Mr. Deckenbach asked, but I don't know if the Court would entertain me.

THE COURT: Oh, absolutely. We only have one chance.

MS. MARTENS: Thank you, Judge.

**RECROSS-EXAMINATION**

**BY MS. MARTENS:**

Q. You talked with Mr. Deckenbach about training a dog not to jump and scratch. Can you agree with me that a dog trying to go through a window would likely scratch?

A. It depends on the dog. Some dogs can jump through windows and clear the -- the whole vehicle and they just go right through the window.

Q. You've seen the videos with Becky. She's -- she's small.

Do you think she's capable of getting through a window without scratching at the side of a car?

A. You know, I guess it's possible. She could get a running jump -- like she could get back and run -- if she wanted to just jump in a vehicle -- and we're not talking about a jacked-up pickup truck -- you know, I suppose it's possible she could get a running start and just fly through the window.

Q. And you'll agree with me that a well-trained detection dog, as part of pursuing that odor in an open window, may try to get through it?

A. It depends on your jurisdiction and if that's allowed or not. So in parts of the country where if the dog breaks the plane -- those dogs are trained, yeah, you do not break entry, you do not break the plane, and that's a training issue. It's a hundred percent training issue. And in those parts of the

country and in Idaho I think I mentioned --

Q. That's not what I asked you, Dr. Chab -- Cablk. Excuse me. I'm trying to keep it short.

So I'll represent to you that in the Tenth Circuit, so long as they're not trained to go into the vehicle, it's not off limits. So the rules of the jurisdiction are not really for discussion.

A. Okay.

Q. But can you agree with me that a well-trained detection dog trying to go to source may try to go through an open window on a car?

A. Unless they're trained not to, they could.

MS. MARTENS: Okay.

THE COURT: If they're on a leash, that makes it a little tough for them, doesn't it?

THE WITNESS: Yeah. The leash is -- that's a tool that you can use to keep a dog from jumping.

MS. MARTENS: I have no further questions, Your Honor. Thank you.

MR. DECKENBACH: Judge, would you take judicial notice from a military officer that it's an 18-week dog handler course in the United States Army?

THE COURT: I thought it probably was.

Doctor, I don't know that we've ever pronounced your name correctly.

THE WITNESS: Oh, I -- everybody came really close -- it is Cablk -- so I appreciate that.

THE COURT: Spelled C-a-b-i-l?

THE WITNESS: C-a-b-l-k and the k is silent.

THE COURT: Oh, it's Bilk.

THE WITNESS: Yeah -- Cablk. I've heard it Cabl-k. It's like "cable TV." The k is silent.

THE COURT: All right.

THE LAW CLERK: Judge, I do have one question if I can ask. I don't know if I should just speak up.

THE COURT: Just tell it to me and I'll ask it.

THE LAW CLERK: The question is -- and I --

THE COURT REPORTER: Use your microphone, please, Jared.

THE LAW CLERK: The question is -- I think earlier on in the testimony it was a discussion that, you know, there is the trained final indication that we've been working off of as the focused stare but that there are other -- like dogs might be trained with other like active or aggressive final indicators.

And my question was just like, from looking at the videos that we've seen, could Becky have been possibly exhibiting any of those other final indicator behaviors?

THE WITNESS: Aggressive alerts, called a scratch alert or a dig alert, that's -- that has generally been phased

out. That used to be the case in the '80s, for example, and maybe even into the '90s. It's -- and the rationale behind it is really old-school.

And they phased it out because it's expensive. When a dog is scratching the crap out of a car, you have to pay to fix the paint job. And, interestingly, bomb dog handlers came around and said, "Hey, we cannot train dogs to aggress on bombs. That's really dangerous. So we're going to teach something very quiet, like a sit or a down." Focused stare has come into fashion relatively recently.

And so could it be that, you know, Becky's jumping and scratching at the window because she's been reinforced for that? Absolutely. That's my point. If you're going to teach a dog to do a focused stare and you stop expecting that and you decide to let the dog just do any behavior, flinging itself at a car and jumping up and scratching -- and that's what you pay the dog for -- that is what the dog learns is expected of it.

But the problem in this particular case with all of that is it was not done in a training context where it is known for sure that there's drugs present. So instead of teaching the dog in training "It's okay if you, you know, scratch instead of sit or stare because there's odor here," the context is very different, which is "Hey, get out of the car and just scratch at the car; that's okay with me; keep

doing that." That's the problem.

THE LAW CLERK: Thank you.

THE COURT: Did that raise anything that you need to ask?

MS. MARTENS: (Indicating.)

THE COURT: Dr. Cablk, thank you.

THE WITNESS: Am I released?

THE COURT: You are released.

THE WITNESS: Okay. Thank you.

MR. DECKENBACH: Your Honor, with that, the defense has no further witnesses.

THE COURT: All right. Let's take 15 minutes.

(A recess was taken from 3:21 p.m. to 3:41 p.m.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Thank you. Please be seated.

Exhibit 14 is the swig -- SWGDOG objection letter and study. I can't recall if it was offered into evidence or -- or not.

MS. MARTENS: My recollection, Your Honor, was that 14 was offered and there was no objection.

MR. DECKENBACH: That's correct, Your Honor. Sorry. No objection.

THE COURT: Very well. It will be received.

(Government's Exhibit 14 received into evidence.)

THE COURT: Any other offer that's been made that was

not accepted?

MS. MARTENS: Yes, Your Honor. I think the same was the case for Exhibit 15.

MR. DECKENBACH: And there was no objection, Your Honor.

THE COURT: Very well. Exhibit 15 will be received.

(Government's Exhibit 15 received into evidence.)

THE COURT: Thank you.

MS. MARTENS: At this time, Your Honor, the Government is prepared to offer rebuttal expert testimony through Dr. Kenneth Furton in light of the testimony of Dr. Cablk, and, also, we have on standby for a few points Mr. Rob Havice, who would then testify as an expert dog handler, narcotics dog handler.

So if, at this point, I may proceed with Dr. Furton.

THE COURT: Very well. Thank you.

MS. MARTENS: Thank you, Judge.

Would you please state and spell your name for the record.

THE COURT REPORTER: Wait.

THE WITNESS: Yes. My name is Dr. Kenneth Furton, K-e-n-n-e-t-h F-u-r-t-o-n.

THE COURTROOM DEPUTY: Thank you, Dr. Furton. Will you please raise your right hand to be sworn in.

(Witness sworn.)

THE WITNESS: I do.

THE COURTROOM DEPUTY: Thank you.

**KENNETH FURTON, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. Dr. Furton, would you please introduce yourself to the Court.

A. Yes. I am a distinguished university professor of chemistry and biochemistry here at Florida International University. I'm also the executive director of the Global Forensic and Justice Center here as well as the director for the Center for Advanced Research in Forensic Science.

I'm a professor emeritus and the chief scientific officer here at FIU.

Q. And I'm going to show you a document which I have previously marked as -- well, I don't have the exhibit number on the copy I opened; that's not good -- Government's 16.

There we go. So I'm sharing my screen with you.

Do you see that document?

A. Yes.

Q. Do you recognize that document?

A. Yes. That's my curriculum vitae.

Q. And did you prepare that document?

A. Yes, I did.

MS. MARTENS: At this time, Your Honor, I would ask that Exhibit No. 16 be received.

MR. DECKENBACH: No objection, Your Honor.

THE COURT: It is received.

(Government's Exhibit 16 received into evidence.)

BY MS. MARTENS:

Q. So your CV outlines your experience. How many peer-reviewed publications have you authored or participated in?

A. Yes. So I published 324 peer-reviewed publications, 2 books, 32 patents. I've given presentations at conferences 714 times. And about 74 of my publications are directly related to odor detection, specifically around the volatile organic compounds that K-9s detect.

Q. How is your work focused in or specific to K-9s?

A. So since 1994 -- so about 31 years ago I started doing work on trying to understand -- I'm an analytical chemist by training, so I did my PhD in analytical chemistry and a postdoc in actually nuclear chemistry, and I wanted to work on developing sensors.

So we're using K-9s as a model, and so we've been studying the reliability of K-9s and trying to understand how they detect trace amounts of drugs and explosives and other forensic specimens. And we actually developed this -- one of the first scientific -- scientifically validated independent certification programs back in 1998 where we've evaluated over 2,000 K-9 teams.

Q. Since 1998 how -- have you remained working with K-9s and

K-9 teams?
A. Yeah. So I was always very interested in trying to improve the performance of K-9 teams through developing of national standards.
And so we -- I was the inaugural chair of the Scientific Working Group on Dogs and Orthogonal Detector Guidelines, the SWGDOG. That started in 2004. I remained chair of that group until 2013, when it -- that group transitioned to what's called the Organization of Scientific Area Committees or OSAC, which is managed by the National Institute of Standards and Technology or NIST, and I was the inaugural chair of that group beginning in 2014.
And then I'm still a member, but then I -- when the -- a new group was formed by the American Academy of Forensic Sciences called the dogs and sensors consensus body of the American Standards Board in 2016, I was the inaugural chair of that group, and I currently serve on the executive committee as the secretary of that group.
Q. And along with serving in these committees and organizations, do you teach and train in the area of -- I'll just call it -- K-9s or detector K-9s?
A. Yeah. So I teach some formal coursework, so I do crime scene -- I teach crime scene investigation and actual courtroom testimony, admissibility of scientific evidence in court.

And that includes the -- the use of K-9s for locating crime scenes, locating items at crime scenes, and -- and comparing K-9s to our instrumental methods that we have available to us.

Q. Do you teach or have you teached [sic] with the California Narcotics Canine Association?

A. I -- yes. So I actually -- the first time I spoke I was invited to give a talk at the -- what was then called the -- the CNCA, and they would invite scientific speakers on the latest research.

So I'd been doing K-9 work for about three years, and I discussed the drugs on money, the fact that most money in circulation has trace amounts of drugs on it, and what the odor of cocaine is and how that affects the -- the K-9s.

So I've been -- I believe since 1997 -- like 28 years ago was the first time I spoke at CNCA. And I've -- I've been invited back almost every year, including this past year. Now they've renamed themselves the International Police Canine Association because they're -- they go beyond just narcotics.

Q. Are you involved with CNCA or IPCA in any other capacity?

A. Just mainly -- I give two 2-hour scientific talks at the conference, and then I usually interact with the, you know, members, the IPCA members, and utilize some of what I learned there in terms of what are some of the challenges they're having to develop new scientific studies. And then I come

back and present the results of our studies.
Q. Do you -- have you interacted with them over things like the SWGDOG standards?
A. Yes. Yes. In fact, when we created the initial SWGDOG, I believe it was at a CNCA meeting where we had sort of our first organizational discussion. That included members of the CNCA, including Mark Rispoli; as well as members of the FBI, which was Rex Stockham; as well as Homeland Security, Dave Kontny, were sort of the key -- some of the key players in developing the initial Scientific Working Group.
Q. And has Mr. Ripsoli stayed involved with continued Scientific Working Group activities?
A. Yes. So he -- he was actively involved throughout the SWGDOG process, and he's currently part of the -- the group that's developing the standards for narcotics-detection K-9s for the American Standards Board.
Q. The American Standards Board or the OSAC subcommittee? I'm not -- I'm confused on which is which.
A. Yeah. I believe it's on the -- on the -- the ASB, the American Standards Board, which is the American Academy of Forensic Sciences. The ASB is the one that actually finally creates the standards following ANSI guidelines. And then they get put on the Federal registry through OSAC.
So it's kind of confusing. There's two parallel groups, OSAC and ASB, and they work together. But ASB creates

the standards, and OSAC sort of disseminates it through the Federal registry.
Q. Have you testified before?
A. Yes, I have.
Q. Approximately how many times?
A. I've been involved in about 90 different cases. I've testified, I believe, approximately 25 times for the prosecution and about 11 times for the defense, so 36 times total.
MS. MARTENS: Well, at this time, Your Honor, I would offer Mr. -- or Dr. Furton as an expert in the area of detection dogs.
MR. DECKENBACH: Sounds like he's an expert in the chemistry of how detection dogs smell, no other area.
THE COURT: Doesn't raise dogs, as far as I know.
MS. MARTENS: Nope. I don't think --
BY MS. MARTENS:
Q. And just to be clear, Dr. Furton, you don't raise dogs and do the hands-on training yourself with the dogs?
A. No, I don't do the hands-on, but I do do the evaluation of the K-9s and -- as part of the certifications, working with other organizations and -- and the Global Forensic Justice Center that I'm the director of. We also certify K-9s so . . .
THE COURT: You personally certify -- are a

certifier?

THE WITNESS: Yes.

THE COURT: Very well. I assume you set -- you were involved in setting the standards for those organizations for certification.

THE WITNESS: Yes. Correct.

THE COURT: Do you call them standards or guidelines?

THE WITNESS: So we -- for SWGDOG we called them guidelines, which were best practices. But under the -- the ASB, we now call them standards, American national standards.

THE COURT: And have they been published -- I mean, at this point -- fully adopted and -- would you say they are the expected -- expected practice we would assume that you and all those persons who are certifiers would require?

THE WITNESS: Yes. So they -- they're still volunteer standards. So, you know, maybe in the future, maybe with the Federal registry, there may be requirements that people follow them, but we've been working with most of the certifying organizations to adopt the standards.

So, for example, with -- for narcotics detection, the SWGDOG standard is -- or SWGDOG guideline -- is still the one that's -- the only one that's approved. And then the ASB standard that we're working on is still in the process. It takes up to two years to go through, you know, public comment and adjudicating all comments that come in from the community.

And within the guidelines or the standards there is different things like shoulds and shalls. And the shalls are things that you must do, and the shoulds are things that would be recommended best practices.

So those are the kind of things that we -- at our regular meetings we kind of discuss in terms of providing some flexibility but ultimately moving the profession into greater consistency.

THE COURT: Are you involved in the sale of dogs?

THE WITNESS: No.

THE COURT: And do you have any financial arrangement with anybody who is involved in the sale of dogs?

THE WITNESS: No, I don't.

THE COURT: He can testify about his experience as -- his expert experience based upon his service on various boards and as a leader in the field of -- of certification of narcotics dogs and other dogs that use their -- their olfactory senses to detect substances and odors, particular odors, as well as the biochemistry of that process.

MS. MARTENS: Thank you, Judge.

BY MS. MARTENS:

Q. So in your setting of these standards or working with the organizations that are adopting them, why do you think that that's important? You said something about standardization. But standards in general, do they bring reliability into the

field?

A. Yes. So, interestingly enough, within -- there are 22 different groups within forensic science that there are standards being developed. And, until relatively recently, there -- there really weren't national standards.

So -- so dogs and sensors is the group that -- that I am, you know, a leader in, but there are other groups, including like crime scene investigation and chemical analysis of drugs and so forth.

And within forensic science most areas are still -- it's a voluntary . . . it -- you know, in terms of whether you get certified or whether you follow the standards, it is voluntary. But within all 22 areas of forensic science we are moving more and more into having common standards across the United States.

So like when I got involved with the California Narcotic Canine Association, I would say they're the leader in the country in terms of having a statewide standard, and they actually serve beyond California to neighboring states.

In the state of Florida we don't have any such organizations, so that's -- that's why we set up our own certification program working with like the Florida Highway Patrol and local law enforcement, because we didn't have an equivalent organization in Florida.

Q. Now that CNCA is IPCA, do they remain a leader?

A. Yes. So they -- when I first went there, they were really focused on narcotics, and then they included explosives-detection K-9s and then patrol dogs.

And now they even look at -- do certification of things like mass storage devices, electronic detection, and that's why they broadened the name. They're not just focused on drugs and explosives but just calling themselves International Police Canine Association.

And the -- at the -- at the meetings there's typically a -- there's a law enforcement section, so most of the people there, other than people like myself who are speakers, are from the law enforcement community.

And then they may have other sections, which would be for nonlaw enforcement, you know, which would be, you know, like sport work where people do like nose work and things like that.

Q. And are they a leader in incorporating science into their standards and ongoing training?

A. Yes. Yeah. And that's why I go back every year, because I like to see what they're doing in terms of the -- implementing standards, including things like -- for example, they were one of the first groups that uses -- used -- does certification of dogs for fentanyl detection.

And we -- and we worked -- we've worked on developing training aids, training materials that can help benefit the

training of the K-9s in different areas, you know, starting with -- with cocaine was -- the first area that I did related to cocaine and currency, figuring out what the odor was and, you know, measuring how long the odor remained, that kind of thing.

Q. And I think it's helpful. But what was the basic results of your work on cocaine and currency?

A. Yeah.

So what we found was that the -- the dogs don't actually alert to cocaine. They alert to a breakdown product, a chemical that's typically created when you have residual solvents with the cocaine. And you get something called -- methyl benzoate is the -- is the odor.

And what we find -- on circulated currency you find tiny amounts of cocaine, on the order of millionths of a gram total and billionths of a gram on the surface. The methyl benzoate actually dissipates.

So if you store drugs -- like store cocaine with money, the odor will get on the money, and that residual order will only stay there for a period of time. Once the money goes through counting machines and is handled, the odor dissipates.

So we found that when we put methyl benzoate, say, on circulated currency, within a couple of hours the odor will dissipate below the level where dogs will alert. But if you

seal it in a container, it can -- depending on how well you seal it, it could last for days or weeks or even months, depending how it's contained.

Q. Have you studied how odor works with other controlled substances?

A. Yes. Yes. So we've looked at different kinds of materials, how does odor go onto different materials and how long it -- you know -- it remains on those surfaces under controlled conditions in the laboratory.

Q. And so the . . . based on those studies, what can you tell us about residual odor?

A. Yes. A residual odor is odor that is present either by direct contact, let's say, with nar- -- if it's narcotic residual odor, it could be direct contact with the narcotics substance that gets removed or it could be stored near -- let's say the -- the -- let's say narcotics are in a bag and that bag's put into a -- a vehicle. The odor will get onto -- absorb to materials. It doesn't absorb very well on things like stainless steel or glass, but it -- but on porous materials it will absorb in.

And so for a period of time there will be detectable amounts of that odor, and dogs will be able to detect that odor even though the -- the parent material has been removed.

Q. And it works kind of like you explained with cocaine? So based on whether it's sealed up or things like temperature,

humidity also affect it?
A. Correct.
Q. I want to ask you whether you're familiar with the study by Lisa Lit published in 2011.
A. Yes, I am.
Q. Can you -- can you tell us what you think about that study?
A. Yeah. I think that study was highly flawed.
So it came out in 2011, and the -- we discussed it at one of our SWGDOG meetings, and the entire 55 members of SWGDOG expressed significant concerns over it because of the -- there were, I would say, at least 10 major flaws in the design of the study, including the fact that the dogs, you know, weren't evaluated in advance on whether they were reliable or not. There was no documentation of how proficient the dogs were before they did the test. They had dogs that were trained for drugs and explosives, which are not -- that's not allowed. That's not -- not only is it, you know, not best practice, it's not -- it's -- the standard is you should not train on both.
They -- there was no mention about the certification being annual, which is a requirement. The -- they never swept the area ahead of time. They brought drugs and explosives into the church and then removed them, but they never tested the room to see if it was free of drugs or explosives.

They never asked whether the handlers were either sequestered or told not to speak to each other, which is a common challenge in any kind of a test, is to make sure people aren't talking to each other and saying, "Hey, there's odor here or there" because that can -- that can influence them.

And -- and, in the end, there were no additional odors put there. They just put red construction paper up and said "When you see the red construction paper, there are up to three target scents where that paper is."

And it's really a very extreme scenario, where you're introducing bias to the point that some of the handlers actually called more than the maximum number of targets. It seemed like the -- you know, wherever these dogs came from, they were basically alerting to everything. There was one that there were 12 -- actually, there were 12 different runs where they found -- they said that they alerted more times than they actually -- was the maximum that they were told.

So we wrote a -- a commentary, which is the -- what -- I believe one of the exhibits -- which was signed off on by all 55 members of the Scientific Working Group on Dogs and Orthogonal Detection Guidelines, and we pointed out some of these points and I think a couple additional areas.

And the recommendation was that the study really needed to be repeated, accounting for these flaws, and then you need to publish the results.

And there have been -- I don't think Lit -- Lit published any additional studies since then but others have. There was a 2020 article that looked at, you know, whether single-blind and double-blind influenced the reliability of the dogs. And so I don't think that that original study from 2011 was ever -- other -- ever repeated.

But, really, there were some -- so many experimental errors associated with how it was set up you can't really draw any meaningful conclusion from that -- from that paper. And that's just not -- not just my opinion. That was the opinion of a hundred percent of the SWGDOG members.

Q. So you mentioned additional peer-reviewed studies that came later. Are there things that we can learn from those in terms of the way that dogs work and their reliability?

A. Yes.

So the -- one of the articles that came out in 2020 was interesting because they looked at single-blind and double-blind. And the SWGDOG guidelines -- I mean -- the ASB guidelines, we recommend at least one component that's double-blind. It's -- it's not a shall but it's a -- it's a should. Because scientists like to do double-blind. That means everyone in the room, including the evaluator -- nobody knows where the hide is.

But in the study that was published in 2020, they found that there was no difference between single-blind and

double-blind in terms of the dogs' ability to locate correctly, so they didn't have larger numbers of false positives.

Because you would think, if it's single-blind, then the evaluator, if they know where it's at, they may stand close to where the hide is or they may be looking in a certain area, and they may influence the handler to maybe not necessarily cue the dog but sometimes, when the handler gets nervous and keeps going back to a certain location, you can in- -- inadvertently cue the dog or cause a problem, and that usually results in more false positives.

Q. And, just to be clear, is the title of the study you're talking about "Effect of Handler Knowledge of the Detection Task on Canine Search Behavior and Performance"?

A. Yes, that's the article.

MS. MARTENS: And that's, for the record, Government's Exhibit 15.

BY MS. MARTENS:

Q. In advance of court, as long as we're talking about research papers, the defense filed an article -- the gist of the title is implications for juror decision-making on dogs -- and that was published in 2019.

Have you had a chance to read that paper?

A. Yes, I have.

Q. And what does that paper stand for?

A. It -- it wasn't totally clear to me. I know Itiel Dror published that with Lisa Lit, and it seemed to indicate it was really a survey paper that said that, I believe, jurors may tend to give greater weight to K-9 evidence, depending on whether it's a guilty or a not guilty verdict.

But it didn't really talk about reliability of K-9s. It was more about perception of -- of individuals on the reliability of K-9s.

Q. I want to talk to you some about your experiences at -- as a certifying official.

Do you routinely review training documents and deployment logs in that capacity?

A. Yes. So as part of a -- to get recertified or initially certified, they must maintain training records demonstrating that they're working at least 16 hours a month with certain kinds of conditions, and then they -- and then they have to complete the certification at least every 365 days or 366 days if it's a leap -- leap year. They have to repeat the certification.

Q. In preparation for court today, have you reviewed training and deployment logs?

A. Yes, I have.

Q. So specifically that would be Government's Exhibit 4, training logs from September 2023 to January 2023 and -- excuse me, January 2024 -- and Government's Exhibit 8,

deployment logs, September 2023 to January 2024.

Are those the documents you're talking about?

A. Yes.

Q. With your involvement on the standards-setting bodies, were you involved in the updated 2020 guidelines?

A. Yes.

Q. So having been involved in that process and based on your experience, what is your overall impression of these training and deployment logs?

A. I would say, overall, they are the kind of documents that I would say are very complete in terms of, you know, covering the major components. There are always -- as a -- as a scientist, you know, there's always room for improvement in terms of adding additional details into it, but the key things you look for are how many hours per month, and the records show like a minimum of 16 and up to 24 hours per month that meets the -- the standard.

And then you look for -- that the -- that there were a variety of drugs, and there were four different drugs that were utilized. You look for a variety of amounts, and there were four different amounts. You look for different concealment, and there were five different kinds of concealment. And then you also look for locations. So there were six different locations, including interior and exterior, vehicles, open areas, building, parcel, blanks.

So those are the main things you want to look for to see that the -- the dog being maintained is being reinforced with different amounts of -- of -- different drugs, different amounts of drugs, different locations of the drugs.

The -- the -- the thing that's not detailed in there are some of the very -- you know, specifics such as whether it was rainy or whether it was, you know, sunny or some, you know, specifics relative to the environmental conditions.

But that doesn't really concern me that much because that's -- that's really more -- would be if a dog never trains in a -- it's -- always trains in a dry condition and then they do searches in a wet condition, is that going to cause a problem in terms of the search.

So I would like to see that, but that's -- again, you don't -- you're not required to come -- include every single area like that. But I would like -- would have liked to see that just as a -- for completeness.

Q. On the scale of records kept by K-9 handlers, do you have any sense of how these compare?

A. I would say this is one of the -- the better records I've seen. I've -- it's pretty rare to see that -- you know, four or up to six different drugs, amounts, concealment, and locations. That's pretty comprehensive.

And then in the deployment, you mentioned the -- it also shows that the K-9 Becky with K-9 Handler Martinez had

alerts to marijuana and methamphetamine under search conditions. And, of course, that's -- those are completely blinded searches. And not only do they alert but then drugs were recovered, which shows under operational settings they're finding what they were trained to alert to.

Q. But are operational settings really the measure of reliability?

A. No. You can't use them for reliability. Even in certification you have to be very careful that you don't have any kind of contamination of the area, so you typically will run a previously certified dog in the area to make sure there's -- there's no residual odor anywhere where a dog can alert.

But in an operational setting you could have residual odor where drugs had been placed and removed and the dog will still alert or the dog may alert and it's concealed in such a way that you just can't get to it. It could be, you know, actually sealed into a component of the car that -- that you physically cannot remove. And that's -- actually, within our terms and definitions, we -- we talk about that, is that -- that a dog -- you know, an unconfirmed operational outcome does not mean that the dog is incorrect. It just means you couldn't confirm it because you couldn't get to the item.

It's very common, for example, with human remains-detector dogs because you could have a body in a

vehicle, take the body out. The residual odor will remain there, but you may not have DNA or any testable material to confirm that there was a deceased person in the vehicle.

Q. You mentioned the standards and the alert. In terms of the standards groups that you have worked with, can you tell us a little bit about what those groups think in terms of alert behavior versus the trained final indication?

A. Yeah. I would -- it's interesting. I would say that the term "alert" -- we've got hundreds of terms that we've defined as part of the national standard. It goes back to -- the first edition was in 2017. We're actually going back and reviewing it now because every five years we update the standards.

But the definition of an alert -- which, again, is the national standard -- is a characteristic change in ongoing behavior in response to a trained odor or scent, as interpreted by the K-9 handler.

And then those components -- actually, there's three components. It's the change of behavior that's recognized by the handler. There's interest, and typically the dog will move towards the highest concentration that they can get to. And then you may get a final response or -- or an indication if the dog gets to the -- to that highest concentration.

But in many cases it may not be available to the dog, so you could be -- the dog could walk into a room, show a

change of behavior as recognized by the handler, try to move towards the highest concentration, but the drugs may be in the ceiling and so there's no way for the dog to actually reach the source, and so they may not give their final response.

And that final response is typically -- it could be a sit or a stare or a down or a point, or it could be a bark, a bite, a scratch, a jump. So there's -- there -- there are any number of ways that the dog can give their final response, but that's not a requirement for an alert. That's -- that's the requirement in order to pinpoint the location if it's -- if it's available.

You know, same thing like a vehicle. If -- if the dog shows a response outside the vehicle, they may not be able to get right to the source unless you open the vehicle, and then the dog can get maybe to where a drug is concealed within the vehicle.

MS. MARTENS: May I have just a moment, Your Honor.

(Discussion held at counsel table.)

BY MS. MARTENS:

Q. So I do have one other area to chat with you about.

When we talked before court, you mentioned that you're doing some studying in the area of hemp versus marijuana and detection dogs. Can you tell us some about that and where further research is needed, just kind of where the field is at on that.

A. Yeah. So we . . . had just recently completed a study that we're in the process of publishing. We presented it at different meetings, the American Academy of Forensic Science and other meetings. But it's not peer-reviewed yet.

And what we found was that when dogs are -- are trained and certified to alert to marijuana, they may alert -- they don't alert to hemp products. But hemp buds -- some hemp buds smell very close to marijuana. And so we found that, in some cases, dogs will show an interest or -- or alert to hemp buds so that we recommend that they be put out as distractors. And -- but dogs can be proofed off of hemp, and they will still alert to marijuana.

So it's really -- they call them distractors, so you want to put as many distractors out as possible to minimize the dog alerting to something that's -- that's not a controlled substance.

Q. So what exactly is a hemp bud?

A. It's basically the -- the -- when the -- the buds of the plant that -- when they're produced -- so if you look at growing marijuana or growing hemp, they look very, very similar. They smell similar to me. I mean, they basically smell exactly the same to me, but the dogs are able to differentiate between them.

The reason we -- I mentioned that is we did a whole variety of different hemp products like you might buy at a --

like a -- you know, a -- a hemp -- I don't know what you -- like a distributor or something.

And -- and I believe they're used for -- maybe for making, you know, teas or -- I'm not exactly sure what they're used for, but it's really just the bud of a plant.

Q. And is that the strongest source of odor from a hemp plant, is the bud itself?

A. It does -- I believe so. We haven't really done detailed studies of the leaf versus the bud to see how much odor's given off, but that's -- those are the ones that are most similar in the -- in the -- for example, in the laboratory, we can't differentiate the two.

We do a method called gas chromatography mass spectrometry, and they look identical in terms of their volatile organic compounds, but dogs can still differentiate them.

Q. And in -- in this study did you look at how many dogs would alert to hemp before being proofed off of it?

A. Yeah. We didn't do a very -- a large number.

So some of the dogs did not alert, but maybe -- maybe half of them or a little less than half would alert to hemp if they weren't proofed off of it.

So if you didn't put it out as a distractor and do what -- it's called extinction training, so you -- this happens even with -- with K-9s, if they happen to start

alerting to something that's not a controlled substance, then you put those distractors out, and you basically don't reward the dog, and then they'll learn, "Okay; I'm not going to get my toy or my treat or my play if I alert to that, that item."

Q. But, at any rate, those dogs that did alert, it was the bud itself, rather than hemp products?

A. Correct. Yeah.

MS. MARTENS: I think that's all I had for this witness, Your Honor. Thank you.

THE COURT: Yeah. Usually, they test the buds on hemp and the buds are what contain the small amount of the THC.

THE WITNESS: Okay. Right.

MR. DECKENBACH: May I, Your Honor.

THE COURT: Mr. Deckenbach, you may cross-examine.

MR. DECKENBACH: Thank you.

Good afternoon, Doctor.

THE WITNESS: Good afternoon.

**CROSS-EXAMINATION**

**BY MR. DECKENBACH**:

Q. You, yourself, are not a K-9 handler; is that correct?

A. That's correct.

Q. And you, yourself, do not train K-9 detection dogs?

A. That's correct.

Q. And I think you already established your work focuses on

the chemistry of how or what a dog is smelling.
A. I -- I do both the chemistry as well as evaluating the performance of certified K-9s in the field.
Q. And I do want to ask you about your experience as a certifier.
Did you take any courses to become a certifier?
A. No. I've been to dozens of K-9 conferences, and I'm very familiar with -- with the literature and helped develop the national standards over the last 20 years and then worked -- when we are going out and doing, evaluating the teams, we're following those -- those standards that I helped develop.
Q. And when you are certifying a K-9, do you require a K-9 handler to inform you, prior to the test, of their K-9's trained indication?
A. No.
Q. Okay. And is that information unimportant to you when you're evaluating or certifying a K-9?
A. Correct. Because the handler is the one that calls the alert.
I made a mistake early on where I would, in a certification or in the research -- because what we did with the certified teams is when we do research, and we'll put out different materials -- like I say, hemp versus marijuana -- with teams that we know are reliable.
And I would try to interpret -- or I -- or observe

and determine whether the dog alerted or not. And the reason the national standard is that it's -- the alert is the trained behavior interpreted by the handler is that, in some cases, I thought that the dog was showing an interest or possibly had alerted and the handler will say, "No; he was just frustrated." And other times I didn't see the alert because it wasn't -- it was more subtle, but the handler would call the alert.

And so that is the national standard, is the handler is the one that calls the alert, just like in -- in a -- like you say, I'm mainly a chemist. And in my laboratory I'll look at my gas chromatograph mass spectrometer, and I'm the one who will finally call whether it's cocaine or not. It's -- it's my interpretation of -- of the work. I don't rely on the machine telling me.

Q. Okay. And, just to clarify, you are a certifier for the IPCA; is that correct? Is that the organization you certify -- or the name under which you certify?

A. No. No. We have -- our Global Forensic and Justice Center has our own certification program that we work with, assisting mainly people in the -- in the state of Florida and some people outside.

And so we actually work and have master trainers that we work with to do certification, and in many cases we'll actually go out and do it ourselves and do the certifications.

Q. Have you ever been invited to come and certify K-9s at the Wyoming Highway Patrol?
A. No, I haven't.
Q. And in regards to the standards for certifiers, do you agree that it's not appropriate to have someone who was involved in the day-to-day training or handling of the K-9 to be the certifying official for that K-9?
A. Yes.
Q. And would it be appropriate for someone who has a business interest in a K-9 to certify that K-9?
A. I mean, it would depend on what -- the person -- the national standard is that you should not be involved in the day-to-day maintenance training of the dog and then be the person certifying the K-9. I don't believe there's any national standard related to if you actually sold the dog to a particular agency.
Q. Do you see any problem with that just personally? Any potential conflict of interest if you are both selling the dog and having -- certifying that dog at the same time?
A. I -- I think it would be better to have whoever -- the person signing the certifications, you know, not to be in -- the vendor or the -- the trainer in the day-to-day operations.
Q. There's value in inviting an uninterested third party in to do an independent certification? Would you agree with that?

A. Yes.
Q. I want to briefly touch on your cocaine currency study.
I think you testified that the chemical compound or -- I'm sorry; I'm not a scientist, so I will use the wrong words; you can correct me -- doesn't linger if it's not contained in some type of sealed compartment.
Is that -- I butchered it. You can correct me.
Is that correct? Or even close?
A. Yeah. So, really, it's a combination of things. So the methyl benzoate lets in currency -- when you have single bills that are out in circulation, the odor dissipates quickly, but, if you have stacked bills, it will slow down the -- the dissipation.
And if you put it in a -- like, say, you put it in a wallet or you put it in a box, that will slow it down even further.
So the -- how long the residual odor remains depends on the environmental conditions.
Q. And in this study the residual odor from those compounds on the loose bills didn't last more than 48 hours; is that correct?
A. That's correct.
Q. I also want to talk to you about Dr. Lit's study that you testified about. You outlined for the Government kind of a litany of issues.

Did you -- when you published that letter objecting to the study, had you conducted any internal studies or controlled measures of your own to -- to test the -- their methods?
A. No. We -- we -- I've never replicated her study.
Q. Okay. And did you submit your concerns and issues with the publisher of that article?
A. No. We did it as a commentary from the whole group versus submitting -- it would be like a letter to the editor, figuring, you know, having 55 people on the letter to the editor was not necessary. We did it as a -- as a commentary.
Q. Okay. And you mentioned one of your issues was that she injected -- or the study injected bias into the handlers. Was that accurately -- was that one of your concerns?
A. Well, it's the extreme nature of it. Because the -- they put red cardboard up and said "This is where your dog needs to alert and there are up to three targets at those locations."
And -- and it turns out there were -- you know, they -- they didn't have -- at those red cardboard they didn't put a training aid out. I mean, they brought in drugs and explosives and removed them, so there's no telling whether there were odors present or not. But that's -- that's not a type of a scenario that you would ever see in an operational setting, so there's no way to extrapolate that kind of a test.
Not to mention that we have no idea whether those

dogs could actually find drugs or explosives with any reliability. It wasn't clear where they came from. They clearly were not following national standards because some were dual trained in -- in -- like I say, there was no baseline done to see if they were just unreliable dogs and the handler influenced them because they knew they were supposed to alert at those red cardboard placards.

Q. Do you, in your experience, understand cognitive bias to be an issue that needs to be considered when training handlers?

A. Of course, yeah. Handlers can cue their dogs, and you'd want to minimize cuing dogs. That's why you'd want to do single-blind or, ideally, double-blind.

But dogs who are cued will not pass certifications, in my opinion. I'm sure, those dogs that were part of the Lit study, they would all fail certification.

Q. Except for that one handler pair that went through the study without alerting once? They might have been adequately trained and certified, in your opinion?

A. That -- yeah. That might have been.

Q. And so you talked about cognitive bias maybe resulting in cuing. Can cuing be unintentional when a -- a handler believes there is drugs present where there are not?

A. Yes. And, in fact, in the -- in the 2020 study what they found was when you -- when the handlers were told of the

outcome in terms of -- not where the location is but they were -- they were supposed to find drugs, then they spent a longer amount of time searching than they would if -- if they weren't told that.

But in that study the dogs actually did not false-alert because of that. But typically what can happen is, if a handler is spending a lot of time or going back to one location -- let's say in the Lisa Lit study. If the dog kept going -- handler kept going back two or three times, eventually the dog's going to get like "Okay; I get it" and alert, and that would be a false alert caused by the handler essentially cuing the dog, either -- probably unintentionally, although you could -- you know, could -- could be intentionally, too. I don't know what . . . you know -- I don't know the exact conditions of who the handlers were or what their experience was.

Q. Okay. And in regards to your testimony on the training logs, was it your testimony that these logs were missing information that would be -- that would be -- should be included or shall be included according to the Standards 088?

A. If I can look at the 088 standard.

Q. And maybe I could pull it up on the screen. Would that make it easier for you?

Or I could direct you to page 13, and we could pull it up on the screen at the same time. This is Exhibit P.

MR. DECKENBACH: And zoom in just slightly.

And I think it's page 13, actually. I apologize.

Thank you.

A. Yeah. I see it, yeah.

MR. DECKENBACH: I -- and I -- internal to the document page 13 so -- apologies. Okay.

BY MR. DECKENBACH:

Q. And I think you mentioned that these records were lacking environmental conditions of the training being conducted. Correct?

A. Right. And some of the things like the -- what was the set time, the --

Q. Would it be lacking --

A. -- the size of the search area were lacking, yeah.

Q. Also, the names of individuals conducting or assisting with the training? They're not consistently reflected, are they?

A. That's true. That's correct.

Q. Nor the time of the training? That's not reflected in these records?

A. I believe . . . that's correct. The time's not there on the -- on the deployment but not on the training logs.

Q. All right. As well as there's no training design indicated regarding single-blind or double-blind; is that correct?

A. Correct.
Q. And, according to 9.7, these are the types of information that shall be included; is that right?
A. Yes.
Q. And I'll just guide you down -- let's talk a little bit about the deployment records under 9.8.
This is another section that talks about what shall be documented, kind of sets a floor; is that fair to say?
A. Yeah. I don't know that I would call it a floor, but the -- it's what's recommended that are included in the -- in the deployment logs.
Q. Okay. And it talks about -- again -- about including environmental conditions at the deployment? And those are missing, aren't they?
A. Yes.
Q. It also talks about information regarding any final response. And we don't see that in these records, either, do we?
A. I don't see it.
Q. And you would anticipate, a dog being deployed in the field, there would be some information about a final response; correct?
A. Yeah. I see the -- yeah. It will indicate an alert but not whether it's a . . . a final response or not.
Q. And you would also anticipate that the dog handler would

put in all his deployments in -- in these records even if it was an unsuccessful deployment? Would that be best practices?

Dr. Furton, did you hear my question?

A. Yeah. I don't know that we have that as a standard or not but -- yeah, I would say that would be a -- normally -- a best practice is to -- every time you're deployed -- is to document it, even if there's no alerts.

Q. And even if a distractor caused the deployment to be ended prematurely? Would that be worth reporting for potential fixing and correcting that issue in the future?

A. Yes, that -- that would be useful.

Q. And then I want to ask you about just your testimony regarding alerts and -- alerts behavior. And it -- do you have specific training or have you conducted any studies in differentiating between arousal or excitement by odors generally versus arousal or excitement due to the presence of a target odor?

Have you studied that issue or . . . conducted any peer-review studies on it?

A. I'm not sure I understand the question, if you'd repeat the question.

Q. Do you personally -- through your experience can you observe a K-9 and tell the difference between a dog being aroused by odor generally versus a dog being aroused by the presence of a target odor?

A. No. I know there are -- there are peer-reviewed papers related to that that I've read, but I haven't done that myself.
Q. Okay. And if a trained -- if a K-9 trainer who has familiarity with a -- a specific dog were to tell you a behavior is a bad habit versus an alert behavior, would you have any expertise or reason to disagree with that K-9 trainer?
A. I would have to know what they're saying is a bad habit because I'm -- I'm very familiar with bad habits of K-9s, both from the literature as well as, you know, observation and certification and research.
Q. If -- and I'll give you a more specific example.
If a K-9 trainer said a dog has developed a habit of identifying open windows with getting paid and, therefore, will jump at them and he identifies that as a bad habit, would you have any reason to disagree with that K-9 trainer?
A. Yeah, I think I would. I mean, if a -- if a dog only alerts at open windows, then they would alert to every vehicle that they encounter, so I -- I think that's speculation on behalf of the trainer.
Q. And in your hypothetical would that be problematic if a dog, in fact, did that, alerted at every vehicle?
A. Yeah. That dog wouldn't pass the certification, so you would -- you would find that out pretty quickly.

Q. Okay. And finally --

MR. DECKENBACH: Actually, I have no further questions. Thank you very much.

**REDIRECT EXAMINATION**

**BY MS. MARTENS:**

Q. Dr. Furton, you keep going back to whether or not a dog would pass certification. Is certification the measure of reliability?

A. Yes, it is.

Q. Why?

A. Because that's the only way that you can actually measure the reliability of a K-9 team.

So the national standard is that dogs must find at least 90 percent of the target material -- so it would be like 9 out of 10, say, drug hides -- and have no more than 10 percent false positives. If they're less than 9 targets, then they have to find a hundred percent of the targets.

Q. And are you familiar with whether or not IPCA requires more than that?

A. Yes. They . . . since they don't have 10 targets, they require a hundred percent; the dog must find every target.

Q. When we get above a 90 percent success rate, are we talking something in the neighborhood of proof to a scientific certainty?

A. Yes.

So instrumental method -- so I do sensors and GC mass spec and so forth. The reason we chose 90 percent is that's similar to what you would find with instrumental methods, you know, even if you're doing detection technologies like PCR and so forth or -- typically, you know, 90 or -- or above is considered the gold standard.

Q. And then in terms of reviewing training and deployment logs, with certification being the measure of reliability, how important are training and deployment logs?

A. The training and deployment logs are important to review before the certification so that, with the deployment records, it's indicating that the dogs are being productive. But you don't know what the reliability is, but at least you know that they, in, essentially, a double-blind setting where the dog and the handler have no idea whether there's drugs in a vehicle, let's say, and the dog alerts and they do find drugs in the vehicle, that means they can actually work not only in a -- in a controlled setting like training but, also, in -- in a deployment. But you can't really measure -- there's no way to measure reliability.

The training logs are designed to show that they're getting regular, up-to-date training, and the most important thing is the 16 hours. And then making sure that all the different drugs that you want the dog to alert to in the certification are being reinforced in the training and that

there are different amounts of those drugs and that they're hidden in different locations and that they're, you know, hidden at different elevations and buried and things of that nature.

Those are the most important items to demonstrate the training of the -- of the team, is getting that 16 hours per month because, less than that, typically what will happen is you may -- the dog may have challenge reaching a 90 percent or higher in their certification.

Q. And thinking specifically about those deployment logs, Mr. Deckenbach talked to you a little bit about an unsuccessful deployment. And I'll tell you what we have been talking about in court as an unsuccessful deployment, and that's been a deployment where it wasn't actually completed. The dog did not get a full opportunity to sniff all the way around the vehicle, never gave any behavior that the alert -- or alert behavior that was called by the handler or a final indication, and the search was stopped prematurely.

Leaving an event like that off of a deployment log, does that cause you any particular concern about a dog's reliability?

A. No. I would -- and under that circumstance I would say that deployment was never completed. So the deployment record would be was the entire vehicle searched or was the entire room searched or . . . and then what was the outcome. But if

the dog was stopped before being able to complete their search, then I wouldn't call that a -- a full deployment.
Q. And that doesn't cause you any worries for reliability on -- in your review of records if something like that's left off?
A. No. Only -- I mean, only if there was a reason that the deployment was stopped. Like if it was stopped by the handler for some reason because they . . . maybe thought that the dog wasn't performing properly or something, and then maybe they would document that.
Q. I'll tell you that, the instance we're talking about, there were a couple of large dogs, I think, tied up and barking that you can hear on the body cam, and the handler testified that he stopped the deployment because he felt his dog was distracted and scared of these large dogs and just not working.
A. Yeah. I would -- I mean, that doesn't -- I wouldn't have concern over that.
Q. Going back to Government's Exhibit No. 4, that was the . . . training logs. I'm going to share those with you. And you talked a little bit with Mr. Deckenbach about those.
In terms of documentation for single- versus double-blind, I wanted to draw your attention to the column here that says "Blanks."
And I don't know if it's -- if you have a paper copy

in front of you, that's a little easier. Here.
A. Yes.
Q. "Blind Hides." And I think there's another one that says "Blanks."
A. Uh-huh.
Q. What would -- just reviewing the records, are you able to, without more information, draw much for conclusions for exactly what that means?
A. Yeah. That also indicates something that I would look for in terms of a . . . maintenance training being done correctly, is that you would want to have blank areas. So, in that case, the -- the dog is searching and there's -- there is no odor there.
So you don't want to always have a target odor present, so that's why you include blanks.
Q. And then "Blind" -- I recognize that doesn't say single versus double, but that record, I think, is still trying to get at the idea. Is that fair, do you think?
A. I believe so.
Q. So the highway patrol could probably improve its form by differentiating between single and double, but it is on there?
A. Yes. Yeah. And they -- and they could improve by including like the environmental conditions and so forth.
But that -- these are voluntary standards. It's not required that all that information is in there. And, in the

end, it's to minimize the chance that they won't pass their certification. So that's why I don't really have concern not knowing all the details of the searches.

I would have concerns and I would state that if -- if there weren't a variety of drugs used, different amounts, different locations, concealed different ways. Those are the most important things because that's what's going to happen in a -- in a certification.

And most training and most certifications are done under fairly similar conditions so -- but, as scientists, we like -- we'd like to collect as much information as possible.

Q. And when Mr. Deckenbach asked you about cognitive bias, you started talking about cuing.

Why is that?

A. Because, you know, if you -- if you believe that there is a correct outcome, then you may influence the K-9. So, like I say, you may spend a longer period of time searching an area than you normally would in your regular training.

If -- like, for example, if you're told it's over in that filing cabinet and then it -- what will happen is the K-9 may pick up on that and then could -- could give you a false alert.

Q. And --

A. And, again, if you're -- if there is the -- if that's occurring, it -- it comes out in the certifications.

And, you know, I failed many teams during certification because there -- they aren't able -- they have too many false positives. And then you find out, well, in their training they're -- maybe they're not doing any blinding at all. You know, the handler knows where the drugs are all the time. And then, when we go on certification and it's a blinded situation, then the dog can't perform.

Q. And is cuing -- is it fair to say that cuing is the -- one of the ways at least or probably the most relevant way that cognitive bias surfaces in this area?

A. Yes. I'd say that's accurate.

Q. So do you think it's also, then, fair to say that, if a training program is addressing cuing, it's addressing cognitive bias? Or a form of it?

A. Yeah. You're trying to minimize it. You know, there's always influences. And, like I said, it -- there's 22 different areas of forensic science, and all areas have the same challenges. If you're evaluating fingerprint evidence or you're evaluating drugs or you're handling a -- a K-9, that's always a problem -- it's always a challenge that you need to be aware of.

MS. MARTENS: Your Honor, if I'll have just a moment, I think I'm done.

(Discussion held at counsel table.)

MS. MARTENS: I have no further questions for this

witness.

MR. DECKENBACH: Just two, Your Honor.

**RECROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. Dr. Furton, do you agree with the SWGDOG Report 139 that states "Training records do not necessarily reflect the reliability of a team"?

A. Yes.

Q. And did you also publish an article with another -- I'm guessing a Dr. Heller -- called "Advances in the Reliability Location of Forensic Specimens Through Research and Consensus" in 2005?

A. Yes.

Q. And do you stand by the assertions in that study?

A. In which -- which assertions are you referring to?

Q. Specifically the quote that says "Excessive emphasis is often placed on how detector dogs have been trained rather than how the dog-handler teams perform."

A. Yes, 100 percent.

MR. DECKENBACH: All right. No further questions.

**EXAMINATION BY THE COURT:**

Q. I view these things as an independent figure that reacts to evidence that's brought to the courtroom. Fortunately, now police officers wear body cams, which are sometimes turned on and are sometimes reliable and show something if -- if the

officer chooses to let me see it.

I've had a number of these cases involving dogs, and, prior to the time that K-9s were typically around, highway interdictions were -- were occurring here largely on the skill of officers in terms of their ability to react with the traveling and motoring public, and most of those people were as good as a dog in manipulating the situation in a way that would allow them to detect the presence of narcotics or controlled substances in the vehicle.

I worry about the transparency of the process here because, in the past, the US Attorney -- probably because they're ignorant about it and -- as I am; we're learning more about it in this proceedings -- never asks "How was the dog trained to respond to odor?" Never discussed. And always usually the situation a dog is deployed -- which we don't see or only see portions of . . . of it, know nothing about what a handler does or should do, and there's a voice, presumably from the handler, that said "Alert."

And the person is arrested, the driver's arrested, and a search ensues, and they either find drugs or they don't find -- and usually do find. In this case they did not find. They found something else that the dog was not trained to smell, alongside a package of fried chicken, freshly fried chicken.

Do you think it's important in these proceedings that

the Judge be informed about the trained response of the dog and that some effort be made by law enforcement to demonstrate that with their camera as they walk around and walk -- and are observing the dog? Wouldn't that be helpful to the Court?

Or should we not even have a dog at all and just have handlers walk around the car and say the dog alerted?

A. No, I -- I believe it would be useful to know from the handler what is the -- what is the . . . the behavior that they recognize as an alert.

And the reason that the national standard talks about focusing on certification is that, during certification, the handler has to call an alert or not an alert because the dog may have a stare alert. So sometimes dogs are trained just to stop and stare, or they may -- I mean, if they're -- if they're like a bark alert or something like that, it would be very -- it's very obvious to see.

But oftentimes, when they can't get to the source, they may increase their breathing. So the studies show that their breathing rate more than doubles, and their energy level sometimes can go up by a -- a factor of four.

And so when they get into a trained odor and that -- that's different than, say, you know -- it would be the odor of, say, cocaine versus the odor of fried chicken -- they -- there are published papers saying the dogs do change their sniff rate.

But that -- but it would be important, I think, for you, as the Judge, and for the Court to know "Okay. What -- what is the trained behavior?" And -- and for the handler to say "Why did you call it an alert?" Right? And, if it's not immediately available on the body cam, then, you know, why is that the case?

But I've been involved, like I say, for over 20 years in -- and I initially tried to -- I tried to call the alert but -- just by observing, and I've had other people do it, as well, you know, observing and trying to interpret the dogs' behavior. And, invariably, the -- the K-9 handler, since they're with that dog all the time, they have a -- a -- they're more accurate in terms of determining whether the dog alerted or didn't alert.

You know, like I say, there's cases where it looked like the dog alerted but the dog was just frustrated. And the handler says, "No, when he gets frustrated he does that, but that wasn't, you know, his trained response."

Q. Would -- would you expect the trained response to be there or, in your experience, is usually no trained response or maybe even bad behavior is considered the trained response and is rewarded?

A. In my experience -- and I've seen this in certifications as well as -- I've been involved in other cases. When -- when you're dealing with, say, an open window with an odor coming

out of a vehicle, it's common for the -- the dog to show a -- a change of behavior that would be called as an alert but not give their final response because they can't get to the source.

In Florida what we do is the -- when the dog shows that initial change of behavior and the handler -- the officer says it's a -- an alert, they then open the vehicle and put the dog in and try to get a final response on the location. So I'm not sure what they do in Wyoming.

But with an open window it's very difficult to get a trained final response in my experience. Like I say, some -- in our certification scenarios we do that. We place drugs in a vehicle, the window's open, and the -- the dog may -- may not give a -- you know -- a trained response because the -- the strongest odor's inside the vehicle, not, you know, in the -- in the -- if it's a small dog and they're trying to get up maybe to a high window, it makes -- makes it challenging.

That's why you don't have to give the trained final response for it to be an alert.

Q. So in your experience -- I guess your opinion would be, then, the least important thing is the final response.

A. I wouldn't say it's the -- I -- the least important thing. But it -- it's -- it's one component of an alert, of the -- sort of the three components of the -- you know, the dog gets in odor, usually he starts sniffing harder; they may change

their behavior. Ideally, you would like to get them into a situation where they could get to the source of the odor. But it may be if it's, say, in a room and the height is very high or up in the ceiling, you may not be able to get a final response from the dog.

And so they're -- you -- it -- but the final response is helpful to pinpoint the location. Right? So if -- if a dog alerts to a vehicle and can't pinpoint where the odor is, you know, you -- you wouldn't want to like tear apart the entire vehicle. You'd want to try to find the source of the odor if -- if the drug's still there, is it hidden in -- you know, is it in the glove compartment? Or maybe it's in the wheel well or inside of a tire.

So the final response is important, but it's -- I don't think it's required in order to -- to show that the dog has alerted to the material. And that's where the handler -- I think questioning the handler is the most important in terms of how do they -- in their -- in certification and out in the field and as part of their maintenance training, what do they look for for them to call that alert.

Q. Here, no drugs were seized. The officer speculated or claimed that he saw, in a filthy car -- might have seen shake on the floorboard.

A. Yeah. I mean, small amounts --

Q. How does that line up with your studies concerning cocaine and --

A. Yeah -- the dogs are very sensitive. So, you know, small amounts of shake could produce enough odor for the dog to alert. And we -- and they can -- you know, it can be a challenge like with -- sometimes dogs will alert to a vehicle and then the owner will say, "Well, I just recently was smoking a joint" or something, and so the odor may be in the vehicle.

They may not have, you know, a large quantity, but -- but that is one of the challenges -- the challenges with a dog, is they -- they can't tell you the exact quantities. It could be a small amount of odor.

THE COURT: Thank you, Dr. Furton. You -- I appreciate the work you've done in this area.

THE WITNESS: Thank you, Your Honor.

THE COURT: Any of my questions raise --

MR. DECKENBACH: Just one, Your Honor.

**FURTHER RECROSS-EXAMINATION**

**BY MR. DECKENBACH:**

Q. Dr. Furton, if there is a large source of odor, let's say a fresh steak off the grill, could that mask a much smaller odor that might be present in a certain location?

Let's think about your cocaine study. If there's just a residual amount of cocaine and a fresh steak sat on the

table near that dollar bill, could that -- could -- is it possible that could mask the smell of the residual or of cocaine?

A. That has not been my experience, but that's where the training -- training records can be important -- right? -- to see whether there are distractors put out, what kind of distractors are put out. Typically you would put out, you know -- you know -- hamburgers or things that dogs will -- that will have a strong odor and make sure that the dog's not going to be distracted by -- by those items.

So it's -- it's possible that the dog's not trained to avoid distractors. Right? So it hasn't -- but it has not been my experience that you can mask the odor of a controlled substance with a -- with, say, a non- -- a strong-smelling noncontrolled substance. People have tried all kinds of things.

And even with -- with cocaine, you know, a small amount of cocaine odor, they will still alert even if there are -- are strong food smells. But, again, that would be, really, more for the handler to explain with their dog. Do they put distractors out? Right? So the . . . if there's -- have they experienced fried chicken, you know, in -- in training?

Because it's -- those are the kind of things you don't normally put in -- you can but it's not required to

put in as part of your certification so . . .

MR. DECKENBACH: Thank you.

THE WITNESS: Okay.

MS. MARTENS: We have no follow-up, Your Honor.

THE COURT: Thank you, Dr. Furton. We'll excuse you at this point.

THE WITNESS: All right. Thank you, Your Honor.

MS. MARTENS: So we had prepared to call Rob Havice as an expert narcotics K-9 handler but it is 5:15.

So I am looking for a little guidance from the Court on how we'd like to proceed at this point because I think it will come as no surprise to the Court that Mr. Havice will disagree with Dr. Cablk's assessment of some of the videos, but that's the intention of his testimony.

THE COURT: Well, if you feel it's necessary to present him . . . I can certainly accommodate that tomorrow if that's convenient. Probably not very convenient but . . . what do we have first thing tomorrow morning?

THE COURTROOM DEPUTY: We have tomorrow afternoon, but you have a hearing -- a sentencing hearing in the morning. And we have tomorrow afternoon at 1:30.

MS. MARTENS: Ms. Hammer has court tomorrow in Casper, I think, at 1:15.

THE COURTROOM DEPUTY: And then you also have Thursday, the 13th, or Friday, the 14th, at 9:00.

MR. DECKENBACH: I, unfortunately, as of tomorrow evening will be out of the state for the remainder of the week.

MS. MARTENS: I'm willing to work late if anybody else is.

MR. DECKENBACH: I do not object to -- but that -- to that proposition.

MS. MARTENS: But I think our court reporter is probably the most important person in the room.

THE COURT: Well, I'm glad that you brought that up. It's nice to hear an attorney recognize that.

What about early tomorrow morning?

MS. MARTENS: I could do that. I could just stay. I'm going to have to rewear a suit but --

MS. HAMMER: I think that's fine. My concern, when I was thinking of my travel plans up to Casper, is it's supposed to snow overnight and depending on the road conditions and needing to leave a little bit earlier to be able to safely get to Casper on time for 1:15.

So depending on what goals are going to be accomplished tomorrow in terms of both presentation of evidence and whether or not we are going to be making final arguments tomorrow, that . . . that dictates for me when I'm -- whether I'm going to be able to get out of here on time to get up to Casper.

It -- it isn't a necessarily complicated sentencing, but there are some matters that I think are best presented by me as the attorney of record and the most prepared for that for -- for Judge Skavdahl.

THE COURT: Well, I certainly don't want to cause problems there.

If you want to -- the parties would want to enter a stipulation and say he would disagree with what she said, I'm sure that counsel here would agree that would be fine.

MR. DECKENBACH: Can I consult with them briefly, Your Honor?

THE COURT: Or . . . or we can come back at a later time.

(Discussion held at counsel table.)

MS. MARTENS: We're giggling because the Government -- you know, we could proffer, but then, you know, Mr. Deckenbach says he would like to proffer that the witness would melt under his withering cross so . . .

THE COURT: That's the usual problem.

MS. MARTENS: Exactly. So I don't know that we can reach a meaningful stipulation, unfortunately.

THE COURT: Well, you tried.

MR. DECKENBACH: We understand that Mr. Havice would disagree and say that this was just fine and aboveboard, I have no doubt.

THE COURT: Well, if you want to recess the proceedings and look for a time when you can start up again, that's fine.

MS. MARTENS: Thank you, Your Honor. We certainly appreciate your indulgence.

THE COURT: Is there something you could give me that might help us to be refreshed and in a better position to give you -- before 30 days expire after this case is turned over to us -- a decision?

MS. MARTENS: As far as materials go, our office --

THE COURT: I'd note that Mel -- Melanie has been -- I have the first two volumes at this point, and she'll probably very shortly have the remainder.

MS. MARTENS: As far as transcripts go, our office is not in the position to pay the fee for anything but a 30-day transcript on additional transcripts. And that's an awful long delay.

MR. DECKENBACH: Your Honor, if our office bought the seven-day, I don't know if -- then is the clerk able to give them the 30-day rate? Since they had to do the seven-day for --

THE COURT: We'll see -- we'll have access to it before that, won't we, Melanie? Probably.

Actually, the person that's helping her is my former court reporter, Julie Thomas, who's doing this remotely.

MR. DECKENBACH: Your Honor, I know when we initially set off on this adventure we thought -- we thought that oral argument might be best, and I don't know at this point, with the transcripts, you'd prefer something written or how you would like us to submit this to you.

THE COURT: I don't -- I don't mind -- written would probably be a good idea but -- in terms of the record.

MR. DECKENBACH: At this point, Your Honor, I think I agree since it's a kind of voluminous record we're dealing with here.

MS. MARTENS: So I -- is that then -- are we in agreement that we can wait for 30-day transcripts to do written closings?

MR. DECKENBACH: That I'd leave to the Court.

THE COURT: Well, I think you'd -- Mr. Ostertag and you would like to get this thing rolling. But if you want to do it on a seven-day basis, I'm sure that Melanie would be happy to accommodate.

MR. DECKENBACH: And I'll just confirm that, if I order 7-day transcripts, then the Government might be able to order them for themselves at a 30-day rate. Or is that . . . I don't know why I'm negotiating on the record.

The defense will pay the full seven-day.

THE COURT: She doesn't do this for her health.

MS. MARTENS: Clearly not, nor would we expect her

to. She's put up with us. Good grief; she needs extra pay.

THE COURT: Well, you need to confer with your higher-ups and decide what you need to do. And if it's oral argument, we'll live with that. And I might give you an oral opinion even.

MR. DECKENBACH: Shall we stick behind and schedule this with your clerk, Your Honor?

THE COURT: Why don't you do it through Sarah --

MR. DECKENBACH: Okay.

THE COURT: -- rather than burden Tina with it.

MR. DECKENBACH: Will do.

THE COURTROOM DEPUTY: All rise.

THE COURT: Can we stand in recess?

THE COURTROOM DEPUTY: Court will stand at recess subject to call.

(Proceedings adjourned at 5:24 p.m., February 11, 2025.)

C E R T I F I C A T E

I, MELANIE HUMPHREY-SONNTAG, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, do hereby certify that I reported by realtime stenography the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 19th day of February, 2025.

/s/ Melanie Humphrey-Sonntag

MELANIE HUMPHREY-SONNTAG
RDR, CRR, CRC
Federal Official Court Reporter