FILED

3:58 pm, 5/8/25

**Margaret Botkins
Clerk of Court**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

UNITED STATES OF AMERICA,

       Plaintiff,

VS.

GEORGE OSTERTAG,

       Defendant,

Case No.  2:24-CR-84-ABJ

---

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

---

THIS MATTER comes before the Court on Defendant George Ostertag's *Motion to Suppress Evidence* (ECF No. 52), filed November 4, 2024. The United States filed its *Response* (ECF No. 67) on January 10, 2025, and Defendant filed his *Reply* (ECF No. 85) on January 18, 2025. The parties presented evidence and argumentation before the Court on January 23, January 24, February 10, February 11, and February 24, 2025. *See* ECF No. 70; ECF No. 88; ECF No. 99. Now, having reviewed the parties' filings and the applicable law, having heard their evidence and argumentation, and being otherwise fully advised, the Court finds that Defendant's *Motion* shall be **DENIED**.

1

# BACKGROUND

## I.    Factual Background

On January 24, 2024, Wyoming Highway Patrol ("WHP") Sergeant Chad Bracken pulled over Defendant George Ostertag ("Defendant") while he was driving home from Country Pride, a restaurant in Rawlins, Wyoming, where he worked as a kitchen manager. ECF No. 52 at 2. While Sergeant Bracken ran checks on Mr. Ostertag's information, WHP Trooper Andres Martinez deployed his narcotics detection dog "K9 Becky" (or "Becky" herein) to perform a free-air sniff around Defendant's vehicle. *Id.* at 3. Video footage of the stop shows Becky approaching the car with Martinez, running back and forth along the passenger-side doors while moving her head, and then repeatedly jumping up onto and placing her front paws on the side of the rear passenger-side door. Def. Ex. 3 – Martinez Body Worn Camera at 1:25–1:49. Becky then stops jumping but continues sniffing at that part of the car while stationary, and Martinez gives her a ball before returning her to his vehicle. *Id.* at 1:45–2:10.

Following his deployment of Becky, Martinez reported to Bracken that Becky positively alerted to the smell of narcotics. *Id.* at 2:18. Bracken removed Defendant from his vehicle, and Martinez and Bracken began searching the car. ECF No. 52 at 3–4. During the search, Martinez' body camera footage shows the floorboards of the car to be covered with trash and miscellaneous items. Def. Ex. 3 at 9:44. About three minutes into the search, the officers located a Beretta 9mm pistol with an obliterated serial number between the driver's seat and the center console. ECF No. 67 at 2. After a further search

of the vehicle, Martinez also stated that he identified "shake," referring to marijuana residue, on the car's floorboards. Def. Ex. 3 at 20:55, 29:58–30:03.

Following the search, the officers provided *Miranda* warnings to Defendant before arresting him for possession of the pistol found in his car. ECF No. 67 at 2; ECF No. 52 at 4. Defendant was indicted on one count of possessing a firearm and ammunition as a felon under 18 U.S.C. § 922(g)(1) and one count of possessing a firearm with an obliterated serial number under 18 U.S.C. § 922(k). Defendant has now brought the instant *Motion* asserting that the pistol was found pursuant to an unconstitutional search and therefore must be suppressed. ECF No. 52 at 1.

## II.    Legal Background

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures is inadmissible at trial." *United States v. Clarkson*, 551 F.3d 1196, 1200 (10th Cir. 2009), quoting *United States v. Muldrow*, 19 F.3d 1332, 1335 (10th Cir. 1994) (quotations omitted).

Searches are typically reasonable when conducted pursuant to a warrant. *See United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021); *United States v. Dalton*, 918 F.3d 1117, 1127 (10th Cir. 2019). However, warrantless searches are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Neugin*, 958 F.3d 924, 930

(10th Cir. 2020) (citing *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003); *Katz v. United States*, 389 U.S. 347, 357 (1967)) (internal quotations omitted). While a defendant "bears the burden of proving whether and when the Fourth Amendment was implicated," "[t]he government then bears the burden of proving that its warrantless actions were justified [by an exception]." *Neugin*, 958 F.3d at 930. One such exception exists for searching automobiles "if there is probable cause to believe [the automobile] contains contraband." *See United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993) ("*Ludwig I*"). For these searches, probable cause may be supplied by a reliable drug dog's positive alert. *See Florida v. Harris*, 568 U.S. 237, 245–46 (2013); *United States v. Ludwig*, 641 F.3d 1243, 1250–51 (10th Cir. 2011) ("*Ludwig II*").

## ANALYSIS

As an individual's "privacy interest in [his] automobile is constitutionally protected," Officer Martinez' warrantless search in this case implicates the Fourth Amendment. *See Neugin*, 957 F.3d at 930 (citing *Romo v. Champion*, 46 F.3d 1013, 1017 (10th Cir. 1995); *California v. Carney*, 471 U.S. 386, 390 (1985)). The Government therefore bears the burden of proving that the search of Mr. Ostertag's vehicle was justified by a relevant exception. *See Chavez*, 985 F.3d at 1240. To meet this requirement, it asserts that the search was proper due to the positive alert by Becky, a reliable narcotics dog. ECF No. 67 at 2.

Defendant presents three main arguments to undermine the search. First, he contends that Becky never gave an "alert" sufficient to provide the police officers probable cause for the resulting search. Tr. at V-32. Next, he challenges Becky's

reliability and the trustworthiness of any "alert" given. ECF No. 57 at 16–29. Finally, he

contends that even if Becky gave a reliable alert, her sniff itself constituted a warrantless,

unreasonable search under the Fourth Amendment due to either her physical contact with

Defendant's vehicle or her capacity to detect noncontraband substances. *Id.* at 7–15.

None of these arguments succeed.

## I.    Becky gave a positive alert on Defendant's vehicle.

Narcotics dogs are trained to give a final "indication" when they detect the exact

location of contraband. *See* Tr. at I-102, 213. In Becky's case, that final indication

consists of a "focused stare," described by her trainer Marc Russell as a "sit" or "lay

[down]" with her nose "closest to the source of the odor." Tr. at I-102. Meanwhile,

Martinez testified that Becky may give her "focused stare" final indication while sitting,

standing, on her hind legs, or even jumping and moving around. Tr. at I-269, II-281.

Dogs also exhibit more general "alert behavior" upon detecting a target odor and

prior to giving their final indication. Multiple witnesses testified that such alert behavior

can be composed of "a head snap," "closed-mouth breathing," "bracketing" back and

forth to narrow down the source of an odor, and changes in posture or ear position,

among other behavioral changes. *See* Tr. at I-111–12, I-213, I-269, II-310–11, II-318, IV-

193. In addition to these actions, Martinez testified that Becky's jumping on vehicles may

be an alert behavior that means she has "detected [an] odor" and is "trying to get to it."

Tr. at I-269. However, Martinez further testified that such jumping is not *necessarily* alert

behavior, and that Becky may jump on cars when searching for odors simply because she

is "a short dog, so she's just trying to check up higher." Tr. at II-394–95.

While early Tenth Circuit dog sniff cases assumed without deciding that probable cause may only arise upon a drug dog's trained final indication, more recent cases have held that alert behavior is by itself sufficient to warrant a search of a vehicle's interior. *See United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989) (assuming that a dog must have "keyed" on the exact location of the drugs to warrant a search); *United States v. Forbes*, 528 F.3d 1273, 1277 (10th Cir. 2008) ("a canine's alert to the presence of contraband during an exterior sniff of a vehicle gives rise to probable cause for agents to search that vehicle's interior"); *United States v. Parada*, 577 F.3d 1275, 1281–82 (2009) ("a dog's alert to the presence of contraband is sufficient to provide probable cause"). After watching video footage of the stop, credible witnesses for both parties offered opposite testimony as to whether Becky exhibited alert behavior demonstrating that she was "in odor." *See* Tr. at IV-80–82, V-12–15. However, multiple experts further testified that due to time spent with the dog and familiarity with its mannerisms, a dog's handler is the best judge of when their dog has alerted to drugs. *See* Tr. at IV-219, V-11–12. While it has not published binding precedent on the subject, the Tenth Circuit has consistently upheld district courts' reliance on dog handlers' determinations of whether their dog alerted. *See, e.g.*, *United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015); *Parada*, 577 P.3d at 1281; *Ludwig I*, 10 F.3d at 1528; *United States v. Gavilanas-Medrano*, 479 F. App'x 166, 171 (10th Cir. 2012). Given the unique familiarity that handlers have with their dogs as well as this consistent caselaw, this Court similarly relies on Martinez' ability to determine whether Becky alerted to Defendant's vehicle. *See United States v.*

*Goldberg*, 850 F. App'x 610, 613 (10th Cir. 2021) (holding that a district court is "entitled to credit [a] handler's testimony" as to their dog's alert behavior).

Still, the Court hesitates to make a dog handler the sole interpreter of their dog's potentially ambiguous behavior. As a sister district stated, Fourth Amendment protections "become[] meaningless if the dog's communication of its detection of drugs is so subjective that it is nothing more certain than a reflection of the handler's hunch that drugs must be there." *United States v. Jordan*, 455 F. Supp. 3d 1247, 1255 (D. Utah 2020). Regardless of how certain a handler may be in their ability to understand their dog, the true canine mind remains hidden. To narrow the range of possible miscommunications—especially when considering alert behavior short of a final trained indication—it is critical to be able to identify some action or signal from the dog that could not be attributed to *non-alert* behavior. *See United States v. Hernandez*, 847 F.3d 1257, 1268 (10th Cir. 2017) (noting that the Fourth Amendment requires at least "'some minimal level of objective justification' for making [a] stop") (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In other words, the Court must see some alert-specific behavior separate from that which might occur while merely exploring for possible odors, as well as from the simple actions of a dog being a dog. *See Jordan*, 455 F. Supp. 3d at 1257 (finding that a dog did not alert in part because the court, after reviewing footage of a dog's sniff, observed "no evidence that could be interpreted by an objective viewer as showing, let alone indicating, that [the dog] had detected the scent of narcotics in [the defendant's] vehicle").

Based on this consideration, the Court cannot accept Officer Martinez' assertion that Becky's jumping on the Defendant's car constituted alert behavior warranting a search. *See* Tr. at II-322. As described, Martinez' testimony indicated that Becky's jumping could be either alert behavior or basic exploratory behavior. Tr. at I-269, II-394–95. Without any other indicators, allowing Martinez to attribute to the presence of narcotics a potentially neutral act like jumping would severely erode constitutional protections, undermine the very purpose of well-trained drug dogs, and give dog handlers almost wholly unchecked authority in justifying warrantless searches.

Yet Becky's jumping was not the only purported alert behavior identified. Rather, Martinez' testimony highlighted alert-specific acts including a "head snap" and "bracketing" as well as Becky's trained final indication on Defendant's automobile, consisting of her sitting and exhibiting a focused stare towards Defendant's rear passenger-side window. *See* Tr. at II-322. The Court did not hear evidence that Becky has ever exhibited these other alert or indicator behaviors outside of a positive drug detection setting. Rather, Martinez testified that Becky has "never given a false alert in a training setting" and that she does not bracket back and forth, exhibit a focused stare, or otherwise alert when off the job, including when smelling human food. *See* Tr. at II-299–302. Based on her alert-specific behaviors, expert witness Rob Havice also concluded that Becky positively alerted to narcotics (though he characterized her final behavior as a "fringe alert" rather than a final indication due to her not being able to access the strongest source of the odor inside the car). Tr. at V-12–14. Finally, the Court upon its objective review of the footage similarly observed Becky's alert-specific behaviors near

8

the start of her sniff, as well as her focused stare at its conclusion. *Cf. Jordan*, 455 F. Supp. 3d at 1257 (finding that a dog did not alert where the court could not identify any objectively apparent alert-specific behavior). Even discounting Becky's jumping, these other behavioral indicators therefore constituted an "alert" sufficient to provide probable cause for the subsequent search.

## II.    Becky is sufficiently reliable for her alerts to create probable cause.

While the Tenth Circuit "has consistently held that probable cause can be based on alerts by trained dogs[,]" it "has further indicated the narcotics dog must be 'reliable' or 'trained' in order for an alert to support probable cause." *Clarkson*, 551 F.3d at 1203 (internal quotations omitted). A defendant may challenge a dog's reliability by showing, for instance: (i) that the dog was not certified by a "bona fide organization;" (ii) that the relevant certification process or training program was inadequate; (iii) that the dog or handler's performance in assessments was inadequate; (iv) that the dog's actual performance in the field is deficient; or (v) that circumstances surrounding the specific alert at issue "undermine the case for probable cause." *See Harris*, 568 U.S. at 246–47. However, the Supreme Court has made clear that "a finding of a drug-detection dog's reliability cannot depend on the [Government's] satisfaction of multiple, independent evidentiary requirements," as such an "inflexible checklist" would not be a proper way "to prove reliability, and thus establish probable cause." *Id*. at 245. The Supreme Court has further held that records of a dog's field performance "in most cases… have relatively limited import," as field data may both fail to capture a dog's false negatives and "markedly overstate a dog's real false positives." *Id*. at 245–46. Rather, "[t]he better

measure of a dog's reliability… comes away from the field, in controlled testing environments." *Id.*; *see also Ludwig II*, 641 F.3d at 1251 (stating that "courts typically reply on the dog's certification as proof of its reliability" rather than "mount[ing] a full-scale statistical inquiry into each dog's history"). This Court therefore takes a "totality-of-the-circumstances" approach to its inquiry into Becky's reliability but weighs her performance in training and certification settings more heavily than any field data. *Harris*, 568 U.S. at 245–46. Based on this approach, the Court concludes that the Government has shown Becky to be a sufficiently reliable dog.

### a. Becky was certified by a bona fide organization.

Defendant first contends that the International Police Canine Association ("IPCA") (formerly called the California Narcotic Canine Association ("CNCA")), the organization responsible for certifying Becky, is not a "bona fide" organization which can mark a dog as reliable by nature of its certification. ECF No. 52 at 18 – 19. Defendant's central arguments for this challenge are that IPCA is not recognized by California Peace Officer Standards and Training (POST) as a K9 certification organization and that it does not adhere to California POST's ethical guidance regarding conflicts of interest. Upon review, the Court finds neither argument persuasive.

As a primary matter, neither Defendant nor any caselaw apparent to the Court defines what a "bona fide" organization is in this context, and it is possible that Defendant attaches greater significance to that term than is warranted. *See generally Harris*, 568 U.S. at 246–47. Regardless, IPCA's bona fides do not turn on "certification" by California POST. California POST is a state-affiliated organization which establishes

guidelines and offers courses for California drug dog certifiers. *See* ECF No. 52 at 21.
Importantly, California POST certifies officials rather than organizations, meaning that
any argument as to IPCA's illegitimacy due to a lack of California POST organizational
certification or recognition is necessarily invalid. *See* ECF No. 52 at 18; Tr. at I-80.
Moreover, despite IPCA being a California-based organization, it is not clear to the Court
why IPCA officials certifying Wyoming drug dogs would need to be credentialed through
California POST for their organization to be considered "bona fide." Finally, while IPCA
president Rob Havice admitted that IPCA certifying officials are not required to attend
California POST certifying evaluator courses, he testified that IPCA's own internal
evaluator trainings were superior to those of California POST. Tr. at I-80–81. Havice
further stated that California POST does "recognize" organizations, and that IPCA has
been so recognized. *Id.*

Apart from its general lack of California POST-certified instructors, Defendant
also contends that IPCA should not be considered a bona fide organization due to
purported conflicts of interest related to its founder, Mark Rispoli. ECF No. 52 at 18 – 19.
In addition to his history with IPCA, Rispoli is also the primary trainer for Makor K-9,
the company that bred, trained, and sold Becky. *Id.* However, California POST's ethical
standards state that certifiers "should not have a monetary interest in
breeding/selling/training the dog being evaluated." *Id.* at 19. Defendant asserts that
Rispoli had exactly such an interest when Becky was certified due to his dual roles, and
that IPCA's certification of Becky therefore lacks legitimacy. *Id.*

The Court is again unconvinced by Defendant's argument. First, if California
POST standards are not binding on IPCA, ethical concerns based on those standards
would be equally inapplicable. More importantly, however, Rispoli's dual roles did not
create an impermissible conflict of interest even as contemplated by California POST.
While the Court heard testimony that Rispoli sold and helped train Makor dogs being
used by WHP, the Court heard no evidence that he actually certified either Becky herself
or any other dogs in which he had a financial interest. Tr. at I-69–71, I-99, I-211.
Furthermore, though he was sometimes present at certifications for Makor dogs, the
Court heard that he would "typically… stay out of the way." Tr. at I-211. Havice also
testified that IPCA itself follows the SGWDOG guidelines requiring that certifiers
"should not routinely be involved in the day-to-day training" or "have a monetary interest
in the dog." Tr. at III-71. The Court heard no evidence that Rispoli ever violated those
standards, meaning it cannot conclude he ever had a genuine conflict of interest.

Finally, IPCA appears to generally be a bona fide organization. The Court heard
testimony from multiple witnesses that IPCA's standards are based on the Scientific
Working Group on Dog and Orthogonal Detector Guidelines (SWGDOG), which
provides national standards for drug dog training and certification programs. Tr. at I-27–
28; IV-121–22, IV-153–54. Further testimony indicated that IPCA's programs are in fact
more stringent than those of SWGDOG with regards to certification components like the
required accuracy rate in odor detection tests during training, and that IPCA is a "leader
in the country" regarding its own science-based standards. Tr. at I-52, IV-180–81. Based
on these standards, IPCA's own organizational reputation, and Defendant's failure to

highlight material conflicts of interest, the Court sees no reason to doubt IPCA's bona fides as a certifying organization with regards to Becky.

**b. IPCA's certification process and Makor K-9's training programs are adequate.**

Defendant's principal criticism as to IPCA's certification process is its exclusive use of single-blind testing. ECF No. 52 at 22–23. Drug dog certification tests typically require a dog to identify a certain number of hidden objects or sources of odor in a controlled test environment. *See* Tr. at I-34. "Single-blind" testing refers to assessments wherein the evaluator, but not the dog handler, knows the location of the objects or sources at the outset of the test. *Id*. Meanwhile, "double-blind" testing refers to tests wherein a third party hides the objects or sources and neither the handler nor the evaluator knows their location. Tr. at IV-32. The American Standards Board (ASB) (associated with the American Academy of Forensic Sciences), which is currently developing new drug dog standards, recommends that at least one odor source in a certification test be double-blind. Tr. at IV-176–79, IV-86. However, IPCA uses only single-blind testing for its certification assessments—a decision which Defendant contends renders its certification process inadequate due to the potential for the certifier to affect the test outcome by "cuing" the dog. Tr. at I-34–35, IV-31–32; ECF No. 52 at 23.

The Court does not find that double-blind testing is essential for an adequate certification process. The Court heard testimony explaining possible concerns with double-blind testing, including that it removes the ability for an assessor to immediately

13

end a test when a dog is struggling to find aids and that it reduces protections ensuring

that a dog does not consume an aid. Tr. at I-38–41. While Defendant's expert witness

rebutted these criticisms, the Court need not rule on their validity. *See* Tr. at IV-31–34.

At present, the ASB guidance on double-blind testing has not been adopted as a binding

national standard and remains merely a recommendation. Tr. at IV-178–79. The decision

not to follow optional guidance cannot defeat the legitimacy of IPCA's certification

process.

Defendant also asserts that IPCA "fails to require their certifiers attend

certification training or keep current with local or national certification standards or

practices" and "has no formalized training program of [its] own, and instead selects

certifiers based on their on-going business dealings with individuals and organizations

[it] sells dogs to." ECF No. 2 at 23. However, the Court heard testimony that IPCA is a

"leader in incorporating science into [its] standards and ongoing training," as well as that

IPCA updates its standards regularly based on other national standards and scientific

knowledge. Tr. at I-59–66. The Court further heard that IPCA requires its certifiers to

have a "minimum of five years' training detection dogs and… two years in the narcotics

field" prior to their hiring, that they must undergo a background check and administer a

mock certification test before becoming fully-fledged certifiers, and that they must

complete ongoing trainings based on updated science and standards during their tenure

with the organization. Tr. at I-44–47, IV-181. Based on this testimony, the Court finds no

deficiencies with IPCA's processes sufficient to import any indicia of unreliability to

Becky and her alerts.

14

Finally, Defendant contends that Makor K-9 and the Wyoming Highway Patrol do not adequately train their dogs. Specifically, Defendant asserts that Rispoli (as the owner of Makor K-9) "has no formal training program he utilizes with the dogs he trains and sells" and "has no written or recorded standards, methods or techniques for training dogs." ECF No. 52 at 23. Defendant also states that the WHP training program is inadequate due to its lack of any "identifiable training methodologies or techniques" and its total reliance on dog handlers to perform ongoing training. *Id.* at 24.

The Court heard testimony that prior to delivery to WHP, Makor K-9 imprints odor recognition on its dogs for the appropriate target odors, as well as trains them on basic commands and their final indication behavior. Tr. at I-99–100. Makor also helps train the dogs in conjunction with WHP after their delivery to prepare them for certification. Tr. at I-134. New WHP handler-dog teams must complete an initial 80-hour training course prior to certification as well as a minimum of 16 hours of continued monthly training after certification. Tr. at I-106, I-205. Other post-certification training includes annual weeklong coordinated group sessions for all handler-dog teams during which teams practice detection of different targets in different settings, annual "in-service" trainings in coordination with outside vendors who evaluate the dogs and work with individual teams to improve on their specific areas of need, and coordinated trainings with other state agencies within the Statewide Narcotics Interdiction Force ("SNIF"). Tr. at I-106–11; I-115–16. Finally, WHP requires handlers to complete monthly training records, conducts annual in-house certifications, and performs other

regular assessments six months following certifications using double-blind testing. Tr. at I-116–22, II-302–03.

The Court is aware that these training practices may not comport with all industry best practices. For instance, Defendant's expert witness testified that drug dog schools are typically six weeks on average and that the 80-hour course required for WHP teams is too short for a first-time handler. Tr. at IV-205. The Court also heard repeated testimony that Makor K-9 does not use a structured or written syllabus to organize its training, while Defendant's expert witness testified that a structured syllabus is generally important in any training program or educational setting, including drug dog training. Tr. at I-203, II-368, IV-21. However, the Court has received no evidence as to any concrete requirements or industry standards for dog training, nor has it heard that any other programs or vendors actually produce written curriculums. Based on this lack of evidence, as well as given WHP's substantial processes for continuous training and monitoring post-certification, the Court concludes that WHP and Makor's training and certification programs are sufficient for the purposes of this inquiry.

### c. Becky's training and certification with Martinez was adequate.

In addition to criticizing IPCA, WHP, and Makor K-9's training and certification programs, Defendant also attacks Becky's individual training and certification with Trooper Martinez, her handler. Specifically, Defendant asserts that Martinez and Becky's certification as a team after just the first week of their 80-hour training program was premature, as one week of training is insufficient to train a new handler and dog team.

16

ECF No. 52 at 25; Tr. at IV-26. Defendant also contends that Becky's own IPCA certification was tainted by her certifier's conflict of interest. ECF No. 52 at 24–25.

Defendant raises legitimate concerns regarding Martinez' lack of experience and short pre-certification training period with Becky. While the Court did not hear sufficient evidence to conclude that WHP's 80-hour training was necessarily too short to adequately train a handler-dog team, Martinez and Becky's certification after just the first week of the 80-hour course appears premature based on the testimony presented. *See* Tr. at II-381–82; IV-26. To be sure, an abbreviated pre-certification training period might be sufficient for an already experienced dog handler. But here, Martinez' prior experience with detection dogs was limited to general exposure through his training officer during his prior job at the Rawlins Police Department, as well as his assistance setting up trainings for both that officer and during his early years at WHP. Tr. at I-255–56. Neither of those experiences was substantive enough to compensate for a potentially rushed certification in what may already have been a briefer-than-usual training course.

Defendant also contends that Lt. Josh Hardee, a former WHP officer who later certified Becky for IPCA, was conflicted due to his "vested interest in K-9 Becky's continuing success." ECF No. 52 at 25. The Court heard testimony that Hardee was "very involved" with Becky for about five years while working at WHP, although he was not part of her day-to-day training. Tr. at I-188, I-206. Moreover, Defendant's expert witness testified as to her opinion that Hardee's involvement with Becky while working at WHP meant that he could not have been "adequately removed from bias" when certifying her just four months after his retirement. Tr. at IV-27. The Court finds this testimony

credible; regardless of his efforts to remain neutral, Hardee's prior experience with Becky likely could have impacted his evaluation. Critically, however, Hardee's certification of Becky was not barred by any ethical standards that Defendant has presented in this case. California POST requires that evaluators "not have a monetary interest in breeding/selling/training" and "not be the handler of the dog being evaluated," while IPCA and SWGDOG require that certifiers not have a monetary interest in the dog or be routinely involved in its day-to-day training. ECF No. 52 at 19; Tr. at III-71. As Hardee was neither Becky's handler nor involved in her day-to-day training, and as he had no apparent monetary interest in her at the time of his certification, he had no impermissible conflict according to the industry standards apparent to the Court and his prior involvement with Becky does not taint her certification.

Becky's certification itself, as well as her performance in post-certification training and assessments, strongly supports her reliability. As stated, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Harris*, 568 U.S. at 246–47. Moreover, the best measure of a dog's reliability "comes away from the field, in controlled testing environments." *Id*. Finally, "even in the absence of formal certification," a dog's alert may be found trustworthy "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id*.

Here, Becky has an apparently exemplary detection record in controlled assessments, including in her first certification examination with Martinez and

18

throughout subsequent trainings and tests. Becky passed her first official certification

assessment with Martinez in September 2023 after searching four rooms and three

vehicles, meaning she correctly detected all finds with no false positives. Tr. at I-52; I-

272. She passed her annual re-certification test in 2024 with the same results and

performed similarly well during other internal assessments. Tr. at I-302–03. According to

Martinez, Becky has never given a false alert in a training setting, nor has she ever failed

any assessment. Tr. at I-302, II-462. This performance in controlled settings strongly

indicates that Becky's alert is trustworthy and outweighs any concerns the Court might

have about Martinez and Becky's possibly premature certification. *See Harris*, 568 U.S.

at 247.

### d. Becky's field performance is not deficient.

Defendant also asserts that Becky is unreliable due to her purported record of

giving false positives when deployed in the field. Becky's deployment record with

Martinez shows that she has alerted nearly every time she has been deployed, but that

narcotics were only found after eight of her thirteen alerts. ECF No. 52 at 26; Tr. at II-

480–81. Defendant seeks to characterize three of the alerts that did not yield contraband

as false positives through testimony from the drivers and passengers in each of the three

cars sniffed.

As a primary matter, this Court is generally unconvinced by Defendant's

invocation of Becky's field data. The Supreme Court recognizes that a dog's correct alert

may not yield drugs simply because the dog "detected substances that were too well

hidden or present in quantities too small for the officer to locate[,]" or because it "smelled

the residual odor of drugs previously in the vehicle or on the driver's person." *Harris*, 568

U.S. at 245–46. Field data may therefore "markedly overstate a dog's real false

positives," and the Court has accordingly held that such records "have relatively limited

import." *Id.* The same holds true here.

Defendant's attempt to retroactively cast Becky's fruitless alerts as false positives

is similarly unavailing. Based on the testimony given, it is indeed possible that some of

those alerts were false positives or that Martinez misidentified Becky's non-alert

behavior. However, it is equally possible that Becky alerted to some trace amount of odor

of which the vehicular occupants were unaware—or, indeed, that there were narcotics

present in those vehicles which the searches did not reveal. Those individual incidents are

not the subject of this trial, and the Court will not draw conclusions as to each of them

based on the limited testimony and evidence presented. Nor should it. The very reason

courts rely on dogs' certifications and records in controlled environments is to avoid

"mount[ing] a full-scale statistical inquisition into each dog's history." *Ludwig II*, 641

F.3d at 1251. The Court refrains from conducting such an inquiry here.

Finally, even if all *five* of Becky's alerts that did not produce drugs were false

positives or misidentified, her field record still would not mean that the alert in question

was unreliable. Responding to a similar argument in another case, the Tenth Circuit

stated that "a 58% chance of finding a seizable quantity of drugs" based on a dog's

historical performance would be enough to find probable cause from that dog's alert

(though it "hesitate[d] to get into the business of affixing figures on probable cause"). *Id.*

at 1252. Here, eight of Becky's thirteen alerts with Martinez resulted in narcotics being

found. Even if only those eight alerts were correctly given and identified, Becky would still have an accuracy rate of 61.5%, surpassing the 58% rate that the Tenth Circuit has found adequate. As such, Becky's field record cannot undermine the Government's case for probable cause in this instance.

> **e. The circumstances surrounding the alert at issue do not render it untrustworthy.**

Finally, Defendant contends that Martinez' actions and reporting regarding Becky's alert render the alert untrustworthy enough to defeat probable cause. Defendant specifically highlights an allegedly critical inconsistency: during Martinez' search of Defendant's car, Martinez stated that he observed "marijuana shake" on the car floorboards, presumably to explain Becky's detection of a target odor. ECF No. 52 at 28; Tr. at II-326. However, in his subsequent deployment log, Martinez merely stated that "no drugs [were] found" but that Defendant was "known to be associated with illegal narcotics." Tr. at II-347. Defendant claims that this inconsistency "makes [Martinez'] reporting untrustworthy" and is "further circumstantial evidence that Becky's supposed alert was untrustworthy." ECF No. 52 at 29.

First, Defendant's allegations of "baseless and shifting" reporting on Martinez' behalf are easily countered. *See* ECF No. 52 at 28. Martinez testified that he only records finding a "seizable amounts" of drugs in his deployment log, and that as he does not collect marijuana shake due to its negligible quantity, his decision not to record the purported shake was consistent with that practice. Tr. at II-347–48. The United States also introduced Martinez' separate incident report from the search, which states that

"[t]here appeared to be marijuana residue on the front passenger floorboard." Tr. at II-334–36. Between this explanation and the incident report's consistency, the Court identifies none of the "baseless and shifting" reporting that Defendant alleges.

More importantly, whether Martinez actually located "shake" during his search is largely immaterial. Any shake identified was found during the search subsequent to Becky's alert. It is wholly possible that Martinez misidentified some other debris as "shake" during that search, but there is no requirement that an officer locate the very substance that *caused* the alert. Rather, the Supreme Court explicitly recognizes that such a failure has no bearing on the adequacy of the dog's alert itself. *Harris*, 568 U.S. at 245–46.

Still, two possibilities remain which could prove that the particular alert here was unreliable: first, that Martinez misidentified non-alert behavior as alert behavior; and second, that Martinez somehow cued Becky (consciously or not) to alert. *See id.* at 247 (stating that an officer's cuing of a dog to alert would undermine a case for probable cause). The Court finds evidence of neither.

First, the Court recognizes that an officer may misidentify non-alert behavior as alert behavior. Defendant presented credible expert testimony as to a study (the "Lit study") which found that a dog handler's belief as to the presence of narcotics could impact that handler's identification of their dog's alert. Tr. at IV-22–24. Applied to this specific situation, Martinez' belief as to the presence of drugs in Defendant's car due to his understanding that Defendant was "associated with illegal narcotics" could therefore have biased him, consciously or not, to misidentify Becky's non-alert behavior as an

alert. However, the Court need not consider this possibility due to its earlier finding that Becky unambiguously alerted to Defendant's vehicle. *See supra* Part I.

Next (and relatedly), the Court heard credible expert testimony that a dog handler's cognitive bias might cause them to cue their dog to alert even when the dog does not detect any target odors. Tr. at IV-202–03. If identified, such cuing would undermine any subsequent alert's reliability and the resulting case for probable cause. *See Harris*, 568 U.S. at 247. Defendant's expert testified that on reviewing footage of Becky's sniff, she noted Becky "slowing down" upon Martinez leaning over her, and only then giving her final "focused stare." Tr. at IV-72. According to that testimony, Martinez' leaning was a subtle cue which told Becky that she would soon be rewarded, and that this action—not any actual detection of odor—may have been what elicited Becky's final indication. *Id.* However, the United States presented a competing expert who testified that *his* review of the footage revealed no cuing whatsoever, that Becky is a "very independent" and "experienced dog," and that Becky displayed alert behavior indicating that she detected a target odor. Tr. at V-6–7, V-12–15.

Both parties' experts are credible, and the Court's own limited capacity to identify subtle cuing (especially with less-than-perfect video footage) makes judging what actually occurred challenging. But this specific inquiry, too, is unnecessary. Even if the Court were to give more credence to Defendant's expert regarding the cause of Becky's final indication, Martinez would have had probable cause to search Defendant's vehicle based on Becky's previous alert behaviors signaling that she detected a target odor (e.g. bracketing, head snap). Due to this separate source of probable cause, and without

stronger evidence of malpractice by Martinez, the Court identifies no circumstances which render this particular alert untrustworthy.

### III.    Becky's sniff does not otherwise invalidate the subsequent search.

Defendant finally contends that the evidence found in his vehicle must be excluded because Becky's sniff itself was an unreasonable warrantless "search" under the Fourth Amendment. The Supreme Court has created two alternative tests to determine when such a search occurs: the common-law trespassory test described in *Jones* and the reasonable expectation of privacy test established in *Katz*. *See United States v. Jones*, 565 U.S. 400, 404–05 (2012); *Katz*, 389 U.S. at 347. Defendant asserts separate theories for why Becky's sniff was a search under each of the two tests. First, he contends that Becky's contact with the outside of Defendant's vehicle constituted a physical occupation of private property for the purpose of obtaining information, meeting *Jones*' definition of a trespassory search. *See Jones*, 565 U.S. at 404–05. Second, he posits that as Becky's sniffs are capable of detecting non-contraband materials like legal hemp, they violate *Katz*' "reasonable expectation of privacy"-based protections. *See Katz*, 38 U.S. at 351. While the Court is more persuaded by the first argument than the second, neither is sufficient to hold that the post-sniff search must be ruled unconstitutional and the resulting evidence suppressed.

### a.    Becky's contact with the exterior of the car does not defeat the officers' subsequent search.

Under *Jones*, the Government conducts a "search" within the meaning of the Fourth Amendment when it "physically occupie[s] property for the purpose of obtaining

information." *Jones*, 565 U.S at 404–05. Based on this rule, Defendant asserts that the officers conducted an impermissible warrantless search when Becky (a) jumped up on the side of Defendant's car during her sniff and (b) allegedly crossed the plane of the car's open window with her nose. ECF No. 52 at 6–7. To analyze Defendant's assertion, the Court breaks the *Jones* definition of a "search" into its components and considers three questions: first, whether Defendant's vehicle was protected property; second, whether Becky physically trespassed on it; and third, whether that physical occupation was "for the purpose of obtaining information." *Id.* The Court also considers whether Becky's jumping may be excepted as "instinctual" behavior under *Stone* and *Vasquez*. *See Stone*, 866 F.2d at 364; *United States v. Vasquez*, 555 F.3d 923, 930 (10th Cir. 2009). The Court holds that while all three conditions were met and Becky's behavior was not instinctual, her pre-trespassory alert behavior regardless gave probable cause to search Defendant's car.

### i. Defendant's vehicle was protected property.

As a primary matter, no party disputes that Defendant's vehicle was protected under the Fourth Amendment. *Jones*, from which the Court draws the definition of a trespassory search used herein, considered the Government's "occupation" of the outside of a defendant's car by placing a GPS tracker on its undercarriage without a warrant. 565 U.S. at 404–05. The *Jones* Court stated that it was "beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment." *Id.* at 404. The same holds true for Defendant's car here.

### ii. Becky physically trespassed on the outside of Defendant's car.

Defendant asserts that Becky physically "occupied" or trespassed on Defendant's car by (1) jumping on its doors and (2) crossing the plane of an open window with her nose. As a factual matter, this Court has seen no evidence of the latter purported trespass. Video footage of the stop showed Becky jumping towards an open window but did not show her nose crossing the window's plane into the car. The Court also heard witness testimony that her nose was at its closest "two to three inches" from the open window and that, due to Becky's short stature and the window's height, she likely would have been physically unable to place her snout past the window's plane. Tr. at II-319–21. The Court therefore concludes that Becky never entered the car itself with any part of her body and considers the trespassory argument only as it relates to Becky's jumping on the outside of the vehicle.

The Supreme Court's bulwarks against trespass are ancient and sturdy. The *Jones* Court applied centuries-old English common law to the modern problem of GPS trackers on cars, reminding the parties that:

> "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all."

*Jones*, 565 U.S. at 405 (quoting *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (C.P. 1765)). Based on that principle, the Court held that the undercarriage of the defendant's vehicle was a protected "effect" under the Fourth Amendment onto which the Government impermissibly trespassed by physically attaching a tracker. *Id.* at 406. The Court has also held that Fourth Amendment protections may be violated as easily by a

narcotics dog's presence as any other form of intrusion. *See Florida v. Jardines*, 569 U.S. 1, 9 (2013). As such, this Court concludes that physical contact with the exterior of a car by an information-gathering device should be consistently treated as a trespass even when that device has four legs and a tail. *See Jones*, 565 U.S. at 404–06.

Some courts have identified a sort of *de minimis* contact exception for drug dogs during sniffs, finding that momentary brushes against a car or brief jumps that left no damage did not rise to the level of a trespass. For instance, in *United States v. Anderson*, K9 Bane "raised up once or twice without touching the car, and then momentarily touched his paws on the driver's door as he raised up again." 658 F. Supp. 3d 1000, 1007 (D. Kan. 2023), *reconsideration denied*, No. 22-10006-01-JWB, 2023 WL 3092583 (D. Kan. Apr. 26, 2023). Similarly in *United States v. Acuna*, K9 Rosko "at times brush[ed] against" the exterior of a car while conducting his sniff, then raised up and made a "momentary light touch" against the car before abruptly sitting down and alerting. No. 21-10035-01,02-JWB, 2022 WL 3081419, at *2, *6 (D. Kan. Aug. 3, 2022). The court in both cases found that such momentary, inconsequential touches did not clearly violate any "dignitary interest" in possession of a car on a public street and therefore did not rise to the level of a trespass. *Anderson*, 658 F. Supp. 3d at 1014; *Acuna*, 2022 WL 3081419, at *6.

Other courts have held more egregious contact between dogs and cars to constitute impermissible trespasses. For instance, the Idaho Supreme Court in *State v. Dorff* considered K9 Nero's contact with the defendant's vehicle when Nero "plant[ed] his front paws to stand up on the door and window as he sniffed the vehicle's upper seams."

171 Idaho 818, 821, *cert. denied*, 144 S. Ct. 249 (2023). The court held that Nero's

contact amounted to a common-law trespass as "intermeddling," which it defined as:

> the difference between a dog's tail that brushes against the bumper of your
> vehicle as it walks by—and a dog who, without privilege or consent,
> approaches your vehicle to jump *on* its roof, sit *on* its hood, stand *on* its
> window or door—or enter *into* your vehicle."

*Id*. at 827. The court further stated that if a dog "jumps on or into your vehicle, without

privilege or consent, no one (including common-sense) could doubt your right to protest

and exclaim: … 'Hey! Get your dog off my car!'" *Id*. at 828. Similarly, the court in

*United States v. Corbett* found that K9 Kali committed a trespass when she "placed two

paws on the open windowsill of the rear passenger-side window," as such an act was "at

least as intrusive" as physical contacts by police officers which other circuits have held to

be impermissible trespasses. 718 F. Supp. 3d 537, 561 (S.D.W. Va. 2024) (citing *United

States v. Richmond*, 915 F.3d 352, 357-59 (5th Cir. 2019) (finding that an officer's

tapping of a car tire to see if there was more than just air inside was a trespass under the

Fourth Amendment); *Taylor v. City of Saginaw*, 922 F.3d 328, 332–33 (6th Cir. 2019)

(finding the same from an officer's chalking of a car tire)).

While this Court agrees that not all inconsequential touches of a car reach the level

of a trespass, Becky's jumping on and scratching of Defendant's door is within the

category of impermissible contact as defined by *Dorff* and *Corbett* rather than that of *de

minimis* brushing as in *Anderson* and *Acuna*. Video footage shows Becky repeatedly

scrabbling against the passenger-side door of Defendant's car with her paws, and

testimony indicated that she likely left "claw mark" scratches on that door as a result. Tr.

at II-318, III-96. This level of contact is beyond a "momentary light touch" and is much closer to what other courts have conclusively determined constitutes a trespass.

Finally, holding Becky's jumping here to be an impermissible trespass by law enforcement is consistent with the Supreme Court's license-based approach to that inquiry in *Jardines*, which considered a drug dog's sniff on the curtilage of a private residence. 569 U.S. at 6–8. The *Jardines* Court found that a police officer's "implicit license" to approach a home is the same as any other visitor and "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8. A law enforcement officer may likewise approach the front door of a home "in hopes of speaking to its occupants," but may *not* enter the curtilage with a dog to conduct a sniff. *Id.* ("An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker"). Similarly, members of the public certainly have the right to move around the exterior of a vehicle, as well as likely have an implicit license to touch it in non-harmful ways—for instance, by knocking on a window to get a driver's attention or by briefly brushing against a door while walking between vehicles in a crowded parking lot. But none would assert that a member of the public has such a license to climb onto another's car and, in doing so, scratch or otherwise damage it. *See Dorff*, 171 Idaho at 827. Applying that restriction and the *Jardines* Court's logic to Becky's jumping

against and scratching Defendant's vehicle, this Court is left with no other conclusion

than that she committed a trespass.[1]

### iii. Becky's trespass was for the purpose of gathering information.

The final *Jones* component requires that a trespass be "for the purpose of

obtaining information" to be considered a Fourth Amendment search. *Jones*, 565 U.S. at

404. This inquiry is further justified by the *Jardines* Court's license-based approach, as

"[t]he scope of a license—express or implied—is limited not only to a particular area but

also to a specific purpose." *Jardines*, 569 U.S. at 9.

Here, Becky's contact with Defendant's car was both for the purpose of obtaining

information and resulted in information being obtained. The Court heard testimony from

Becky's handler that she sometimes jumps on cars because she is "a short dog, so she's

just trying to check up higher." Tr. at II-394–95. A jump to perform exploratory sniffs

while searching for odors as Martinez described would certainly be "for the purpose of

obtaining information," with that information being the presence or absence of a target

odor. *See Jones*, 565 U.S. at 404. The Court also heard testimony that Becky may jump

when she has already "detected [an] odor" and is "trying to get to it." Tr. at I-269. This

sort of jumping would likewise be "for the purpose of obtaining information," with the

relevant information being the location of the odor's source. Furthermore, Becky

---

[1] This application of *Jardines* does not call *Caballes* and its progeny into doubt, as the Tenth Circuit has warned against. *See United States v. Seybels*, 526 F. App'x 857, 859 n.1 (10th Cir. 2013). Unlike that of a home, the curtilage of a vehicle remains within the scope of the implicit public license to navigate about for whatever reason necessary, including with a trained narcotics dog. Nowhere did *Caballes* hold that the scope of a well-trained drug dog's sniff may also include its jumping against and scratching the side of the target vehicle. *See generally Caballes*, 543 U.S. 405.

apparently *did* obtain information from her jumps. While she demonstrated alert behavior prior to jumping, she did not give any sort of final indication until after her contact with the car. Tr. at II-322, V-12–14. From this sequence of events, the Court can conclude that Becky's jumps allowed her to establish the presence of a target odor at a relatively specific location, meaning that she indeed gleaned information from her trespass.

That Becky's trespass was for the purpose of obtaining information also distinguishes it from other cases where courts held that contact with a vehicle's exterior was not a warrantless Fourth Amendment search. For instance, the *Acuna* court determined that K9 Rosko's brief touching of a car was not a search in part because it was "implausible that the dog's touching of the vehicle materially aided the dog in any way in detecting the odor." *Acuna*, 2022 WL 3081419, at *7. The court in *United States v. Green* came to the same conclusion regarding K9 Luka's incidental touch because it was "implausible that exterior surface contact materially aided the dog in detecting the odor." No. 23-10108-JWB, 2024 WL 2260901, at *4 (D. Kan. May 16, 2024).[2] Finally, the court in *United States v. Hughes* similarly found that a police officer's inadvertent leaning against a car was not a trespass-based search under *Jones* because, while it was a physical intrusion, it was "unintentional" and "with no purpose at all, let alone for the purpose of obtaining information." No. 22-20043-01-DDC, 2023 WL 3338790, at *3 (D. Kan. May 10, 2023). Unlike in those cases, it is highly likely that Becky's contact with

---

[2] The Court also notes that *Acuna* and *Green* turn on an apparent misapplication of *Jones*, which requires inquiry into the *purpose* rather the *result* of the trespassory contact. *See Jones*, 565 U.S. at 404. Regardless of whether the dogs in those cases were "materially aided" by their contact with the vehicles, that contact would be an unconstitutional search if it was for the purpose of obtaining information about the presence or location of target odors.

the exterior of Defendant's car was both for the purpose of and materially aided in her detection of odors. Tr. at I-170 (testifying that "Becky is … a cute, little tiny thing" and jumps "in an exploratory way… to see if there's any odor up high"), I-264 (testifying that Becky jumps because "she's a short dog" and wants "to catch that high odor").

### iv.  Becky's jump is not excepted as "instinctual behavior."

In addition to the Supreme Court's definition of an impermissible, warrantless Fourth Amendment search under *Jones* and *Jardines*, the Court must further consider the Tenth Circuit's separate exception under which trespasses by drug dogs do not invalidate those dogs' sniffs. *See Vasquez*, 555 F.3d 923, 930 (10th Cir. 2009); *Stone*, 866 F.2d at 364. While the dogs in both of those cases jumped *into* cars they were sniffing, the Tenth Circuit determined that an alert after such a trespass remained valid so long as "(1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog." *Vasquez*, 555 F.3d at 930; *see also Stone*, 866 F.2d at 364. This exception seems to be an area of leniency through which the Tenth Circuit recognizes that even highly trained professional narcotics dogs are still, fundamentally, dogs. They may follow their noses above all else, and they may jump into an open car for reasons unknown to their handlers—or simply because they enjoy car rides.

The latter *Vasquez* factor is not relevant in this case due to the Court's prior determination that Becky did not actually enter any part of the car. *See Vasquez*, 555 F.3d at 930; *supra* Part III(a)(ii). Nor does Becky's jumping fall under the excepted category of "instinctual rather than orchestrated" behavior. Repeated testimony shows that Becky

is notorious for placing her paws on vehicles to get a better vantage point for her sniffs. Tr. at I-170, I-263–64, II-281–82. Furthermore, while Martinez testified that Becky was not trained to jump on cars, he also testified that he chooses not to pull her *off* of cars when she jumps for fear of discouraging her "hunt drive." Tr. at II-282–83. Instead, he testified that he tries to "reward [Becky] sooner rather than later" when she jumps and scratches at cars so as to avoid prolonging any such contact. *Id.* However, the Court also heard credible expert testimony that such a system causes a dog to associate their reward with their behavior prior to being rewarded: in this case, jumping on a car. Tr. at IV-51–52. Becky's jumping may have at some point been instinctual behavior, but years of rewarding and reinforcement have likely converted it into trained behavior. By jumping on Defendant's car, Becky was not simply following her nose or exhibiting instinctual dog behavior. Rather, she was acting exactly how her handler both expected her and— intentionally or not—trained her to do.

### v. Becky's pre-trespassory alert gave probable cause to search Defendant's vehicle.

Despite this lengthy foray into Becky's constitutional violations, the officers' search of Defendant's car remains valid. As the Court has already explained, Tenth Circuit caselaw solidly holds that alert behavior rather than just a dog's trained final indication suffices to warrant a search of a vehicle's interior. *See Forbes*, 528 F.3d at 1277 ("a canine's alert to the presence of contraband during an exterior sniff of a vehicle gives rise to probable cause for agents to search that vehicle's interior"); *Parada*, 577 F.3d at 1281–82 ("a dog's alert to the presence of contraband is sufficient to provide

probable cause"); *Moore*, 795 F.3d at 1232 ("We have held that an alert, or a change in a dog's behavior in reaction to the odor of drugs, is sufficient to establish probable cause to search a vehicle, and that a final indication is not necessary"); *Goldberg*, 850 F.App'x. at 613. And as also explained previously, Becky's bracketing and head-snap constituted alert behavior which was expressed before any trespassory contact with the car began. *See supra* Part I. As such, Becky positively alerted prior to committing a trespass and gave the officers independent probable cause to conduct their subsequent search of Defendant's vehicle. This conclusion is consistent with Tenth Circuit and sister district cases considering near-identical facts such as *Moore*, in which the court held that while K9 Jester did not give a final trained indication until he jumped into the window of the defendant's car, his proper alert with "a really good change of behavior" and a head-snap prior to that trespass created immediate probable cause. *Moore*, 795 F.3d at 1231–32; *see also Green*, 2024 WL 2260901, at *4 (similarly finding that K9 Luka's alert behavior prior to leaping into a car window established probable cause to search).

> **b. Becky's capacity to detect identical non-contraband odors does not defeat her positive alert.**

In *Katz*, the Supreme Court held that what a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected" under the Fourth Amendment. 389 U.S. at 351. While drug dog sniffs are performed for the very purpose of *exposing* materials that a person seeks to preserve as private, they are generally permitted under the Fourth Amendment because "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only

reveals the possession of contraband 'compromises no legitimate privacy interest.'"
*Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (quoting *United States v. Jacobsen*, 466
U.S. 109, 123 (1984)). The constitutionality of drug dog sniffs therefore turns on the
dogs' training to detect only illegitimate contraband, while other methods of detection
which reveal both lawful and unlawful activity may be Fourth Amendment searches that
are impermissible without a warrant. *See Kyllo v. United States*, 533 U.S. 27 (2001)
(holding that use of a thermal imaging device to detect heat from marijuana grow lights
within a house was a warrantless search under the Fourth Amendment due in part to its
ability to additionally detect lawful activity).

In 2018, Congress amended the federal Controlled Substances Act to legalize
hemp, a plant in the same family as illegal marijuana but which has a negligible amount
of psychoactive THC. 21 U.S.C. § 802(16)(B)(I); 7 U.S.C. § 1639o(1). As both are types
of cannabis, hemp and marijuana smell identical. Defendant contends that because the
odors are indistinguishable, a trained drug dog may alert to and therefore expose a
person's possession of lawful hemp, compromising that person's legitimate privacy
interest and violating their constitutional protections. ECF No. 52 at 13–15. This is a
relatively novel argument, and thus far the Seventh Circuit has been the only circuit court
to address it in some capacity. *See United States v. Plancarte*, 105 F.4th 996 (7th Cir.
2024). That court rejected the argument; this Court holds the same.

First, the Supreme Court's Fourth Amendment jurisprudence turns on the basic
expectation of privacy which society considers to be reasonable. *Caballes*, 542 U.S. at
408–09; *Jacobsen*, 466 U.S. at 122; *United States v. Place*, 462 U.S. 696, 703, 706

(1983). Indeed, reasonableness is the very "touchstone of the Fourth Amendment," and is

"measured in objective terms by examining the totality of the circumstances." *Ohio v.*

*Robinette*, 519 U.S. 33, 39 (1996). *Place* involved the Supreme Court's first inquiry into

whether a drug dog's sniff was reasonable, holding that it was because a sniff:

> does not require opening the luggage. It does not expose noncontraband
> items that otherwise would remain hidden from public view, as does, for
> example, an officer's rummaging through the contents of the luggage. Thus,
> the manner in which information is obtained through this investigative
> technique is much less intrusive than a typical search. Moreover, the sniff
> discloses only the presence or absence of narcotics, a contraband item.
> Thus, despite the fact that the sniff tells the authorities something about the
> contents of the luggage, the information obtained is limited.

*Place*, 462 U.S. at 707.

To be sure, Defendant's argument merits serious consideration. Even the best-

trained dog might alert to legal hemp and elicit an officer's search, which in turn would

expose noncontraband items. But the vast majority of the rationale underpinning *Place*

and *Caballes* is still applicable. The sniff remains "much less intrusive than a typical

search" and the information revealed to authorities remains "highly limited." *See id*. In

fact, the sniff itself reveals *no* private information, merely telling an officer that one of

many possible target odors is present. As such, even a dog sniff that might result in a

subsequent search revealing legal hemp rather than contraband marijuana is generally

reasonable.

This Court also adopts the reasoning presented in *Plancarte*. As the Seventh

Circuit discussed in that case, *Kyllo*'s principal concern was clearly in protecting the

sanctity of the home. *See Plancarte*, 105 F.4th at 1000; *Kyllo*, 533 U.S. at 31. However,

the Supreme Court has repeatedly held that "[o]ne has a lesser expectation of privacy in a motor vehicle" versus a home. *United States v. Knotts*, 460 U.S. 276, 281 (1983); *see also New York v. Class*, 475 U.S. 106, 112–13 (1986). *Kyllo*'s finding that thermal imaging of a home was an unconstitutional search because "[i]n the home…, *all* details are intimate details, because the entire area is held safe from prying eyes" is thus inapplicable to the instant context. *Kyllo*, 533 U.S. at 37.

   *Plancarte* further rejected a similar argument to Defendant's because "[c]ourts have long acknowledged and tolerated the imperfection of drug detection dogs." 105 F.4th at 1001. This statement is critical to understanding why a dog's inability to distinguish the odor of legal hemp does not defeat their sniff's constitutionality under *Caballes*. Indeed, the Tenth Circuit accepts a 42% chance (at least) that a search pursuant to a dog's positive alert will reveal *only* non-contraband material. *See Ludwig II*, 641 F.3d at 1251. Such apparently erroneous alerts may frequently occur because the dog detected a quantity of narcotics under a seizable amount, or because it smelled the residual odor of drugs previously in a vehicle or on a driver or passenger's person. *See Harris*, 568 U.S. at 245–46. But a dog's inability to differentiate a residual odor from a seizable quantity of drugs remains acceptable. *See id.* at 246 n.2 ("[a] detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone").

   If a dog's occasional tendency to alert even when no drugs are found is permitted, so too must its occasional tendency to alert on the indistinguishable odor of a legal substance be allowed. This is because there is zero substantive difference between the

information revealed from a dog's alerting to residual odors versus legal hemp, or even to seizable quantities of narcotics. In all instances, the handler learns only that the dog has detected *some* target odor, but not what substance that odor is from or what quantity of the substance is present. Nor can a positive alert by itself reveal the presence of a legal substance subject to privacy protections; a dog cannot sniff at a car door, turn to its handler, and bark, "hemp!" Rather, it is the subsequent search that reveals information. And no matter if the alert was on a residual odor or on legal hemp, that search will reveal *only non-contraband*—but the sniff will stand as valid.

Again, this outcome is permitted because courts recognize that dogs are imperfect. Their sniffs remain acceptable because so long as they are well-trained, they "*generally* [do] not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409 (emphasis added); *but see id.* at 411 (Souter, J., dissenting) (describing dog sniff jurisprudence as resting on a theory of "[t]he infallible dog," "a creature of legal fiction"). Some risk of error, whether due to the residual scent of narcotics no longer present or a legal but indistinguishable substance, will always exist. So long as the sniff remains targeted primarily at contraband and "generally likely[] to reveal only the presence of contraband," that risk does not convert the sniff to a search. *See Caballes*, 543 U.S. at 409.

In *Dow Chemical Co. v. United States*, the Supreme Court held that the U.S. Environmental Protection Agency's aerial photography over a private chemical plant was not a warrantless Fourth Amendment search. 476 U.S. 227 (1986). The Court found that just as naked-eye aerial observation of private property does not constitute such a search,

neither does aerial photography which "undoubtedly... give[s] more information than naked-eye views," but "remain[s] limited to an outline of [a] facility's buildings and equipment." *Id*. at 238. Rather, "[t]he mere fact that human vision is enhanced somewhat... does not give rise to constitutional problems." *Id*. On the other hand, use of "[a]n electronic device to penetrate walls or windows so as to hear and record confidential discussions of chemical formulae or other trade secrets would raise very different and far more serious questions." *Id*. at 239.

While Defendant seeks to place dog sniffs capable of detecting non-contraband materials in the same category as the thermal imaging in *Kyllo*, they are much closer to the aerial photography in *Dow Chemical*. Both odor emanating from a car and a view of buildings from above are sensory details noticeable by any person in the right public location; as such, there is no "subjective expectation of privacy that society considers reasonable" surrounding either. *See Kyllo*, 533 U.S. at 33. Similarly, a dog's sniff and aerial photography each amplify basic human senses while providing no new information (and in the case of the sniff, even less information) as to the activities or materials within.

Based on these considerations, the Court holds that the introduction of indistinguishable legal odors like hemp does not defeat the Supreme Court's reasoning in *Caballes* as to why a sniff is not a search. Even if hemp is occasionally present, narcotics dogs will still generally detect and alert to contraband that lacks Fourth Amendment privacy protections. Of course, should the frequency of private vehicles carrying legal hemp dramatically rise, there may be a statistical argument that a dog's (or police officer's) detection of cannabis odor no longer means that "under the totality of the

circumstances, there is a fair probability" that a car exuding that odor contains contraband and therefore no longer confers probable cause for a search. *See United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) (internal quotations and emphasis omitted). But even in such a world, the sniff itself would remain a minimally invasive tool for sensing odors emanating into the public sphere, as well as a detection method which provides even fewer details than a person would obtain had they smelled the odor themself. For these reasons, the Court finds that despite its potential to detect legal hemp, a dog sniff is not an unreasonable search under the Fourth Amendment.

## CONCLUSION

The Court finally notes that the handlers and trainers of narcotics detection dogs occupy a position of immense public trust. Courts frequently credit handlers' opinions as to possibly subjective alert behaviors, and they focus inquiries into a dog's reliability on their performance in environments often controlled by people with an interest in that dog's reputation and success. There are essential reasons for these approaches. As the people who spend a disproportionate amount of time with their dogs, handlers are by far the best interpreters of their four-legged partners' idiosyncrasies and particular ways of working. Moreover, the infinite number of possible confounding variables in the field, combined with the high possibility that an officer's search fails to (or cannot) locate the source of a dog's correct alert to narcotics, means that controlled environments are the *only* spaces where a dog's reliability can be accurately tested. But regardless of the reasons for their authority, this Court reminds those who work alongside canine

colleagues to exercise caution and responsibility. Constitutional protections hang in the balance.

Despite the foregoing's lengthy exploration of a complex subject matter, the outcome of the instant issue is relatively simple: Defendant's *Motion* shall be denied. Becky demonstrated alert behavior on Defendant's car. She is a sufficiently reliable dog for her alerts to create probable cause, as demonstrated by her certification from a bona fide organization, completion of an adequate training process, excellent results in controlled testing environments, and field alerts which are at least as accurate as the Tenth Circuit's identified standard. Moreover, while her jumping on and scratching the outside of Defendant's vehicle should be characterized as an unconstitutional trespassory search, her pre-jumping alert behavior regardless provided probable cause for the officers' subsequent search. Finally, the mere fact that the odor of legal hemp is indistinguishable from that of illegal marijuana does not mean that a sniff by a detection dog trained to that odor violates the Constitution.

**THEREFORE, IT IS HEREBY ORDERED** that Defendant's *Motion to Suppress Evidence* (ECF No. 52) is **DENIED**.

Dated this _8th_ day of May, 2025.

Alan B. Johnson
United States District Judge